GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
WILLIAM M. NOALL, ESQ.
Nevada Bar No. 3549
E-mail: wnoall@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
Proposed Attorneys for Las Vegas Monorail Company

E-Filed 1/13/10

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

In re:

LAS VEGAS MONORAIL COMPANY,

Debtor.

Case No.: 10-10464-LBR
Chapter 11

Date:  N/A
Time:  N/A

### OMNIBUS DECLARATION OF CURTIS L. MYLES, III
### IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

I, Curtis L. Myles, III, hereby declare as follows:

1.    I am over the age of 18 and am mentally competent.  I have personal knowledge of the facts in this matter and if called upon to testify, could and would do so.  I make this declaration initially in support of the Debtor's *Emergency Application for Order Permitting Debtor to Honor Prepetition Ticket Purchases and Refunds* (the "Tickets Motion"), *Emergency Motion For Order (I) Authorizing The Debtor To Pay Wages, Salaries, Benefits, Reimbursable Business Expenses, And Other Employee Obligations, And (II) Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations* (the "Wage Motion"), *Emergency Motion Pursuant To 11 U.S.C. §§105(a) And 366 For An Order Determining That Adequate Assurance Has Been Provided To Utility Companies* (the "Utilities Motion") and the *Emergency Application for Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts* (the "Cash Management Application," and together with the Tickets Motion, the Utilities Motion, and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

the Wage Motion, the "First Day Motions") filed by the Debtor, Las Vegas Monorail Company, a Nevada non-profit corporation ("Debtor" or "LVMC") in the above-captioned case (the "Chapter 11 Case").[1]

1.    I am the President and Chief Executive Officer of LVMC, and have served in that capacity since July 18, 2005. Prior to joining LVMC, I served as Deputy General Manager of the Regional Transportation Commission of Southern Nevada from May 2002 to July 2005; Assistant Director of Aviation for McCarran International Airport from June 1995 to May 2002; Operations Manager and Management Analyst for McCarran International Airport from July 1991 to June 1995; and Sales Manager for Northwest Transport Services from 1986 to 1991. I hold both a Bachelor of Science and Masters degree in Economics (Finance). In my capacity as LVMC's President and Chief Executive Officer, I am familiar with and oversee LVMC's daily business, operational, and financial affairs. In addition, I am responsible for implementing policies of and actions taken by the board of directors (the "Board") of the Debtor.

2.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of LVMC's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of LVMC's management and LVMC's various business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

3.    This Declaration is filed on the same date (the "Petition Date") that the Debtor has filed a voluntary petition for relief under Chapter 11, Title 11 of the U.S. Code (the "Bankruptcy Code"). The Debtor will file its various First Day Motions (as defined herein) to allow it to operate effectively in this Chapter 11 Case. The relief sought in the First Day Motions is critical to LVMC's business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that the Debtor is provided the opportunity to reorganize successfully. The Debtor is requesting that the Court notice and hear the First Day Motions as soon as possible and grant the immediate relief as requested in each of the remaining First Day

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant First Day Motions which are being filed contemporaneously herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

2

Motions.

4.     This Declaration provides the Court with background information regarding the Debtor as well as the context for the initial relief sought by the Debtor.   Accordingly, the Declaration is organized into two parts: (a) an overview of LVMC, its business, its organizational structure, its debt structure, and the reasons for and events leadings up to the Chapter 11 Case; and (b) an explanation of the relief sought in the First Day Motions, which immediate relief which I believe, in my business judgment, is critical to LVMC's reorganization.

5.     Since the inception of operations, LVMC's cash flow from operations, while sufficient to meet operational costs. has been insufficient to service its existing debt obligations Since the initial commencement of operations on July 14, 2004, proceeds from the initial financing and LVMC's debt service reserves have been used to bridge the gap between its cash flow from operations and debt service obligations.   These reserves have now been depleted and the surety bond which was posted as part of the LVMC's initial financing will be depleted no later than July 2010.    While limited additional revenue enhancement and cost savings opportunities may exist, the incremental benefits from such initiatives will not generate sufficient cash flow to meet the LVMC's existing debt service obligations and its significant capital expenditure ("CAPEX") requirements commencing in 2019.

# I.
# BACKGROUND

### A.     LVMC's Business

#### 1.     Corporate Background and Structure

6.     The Las Vegas Monorail System, a public improvement (the "Monorail"), was first conceived as a joint venture between MGM Grand and Bally's Hotel, which in 1993 first created a one-mile transportation system linking the two hotels.   In 1997, the state of Nevada passed legislation which authorized a private company to own, operate, and charge fares as a public Monorail system.   On December 2, 1998, as authorized by the statute, Clark County granted a franchise (the "Franchise") to MGM Grand-Bally's Monorail LLC ("MGM-Bally's LLC") to construct, operate, and maintain the Monorail through December 2, 2048 (the "Clark County

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

3

1  Monorail Franchise Agreement") pursuant to Chapter 5.04 of the Clark County Code.

2      7.      On October 20, 1999, the Clark County Monorail Franchise Agreement was amended

3  (the "First Amendment") to, among other things, authorize transfer of the Franchise to a special

4  purpose Nevada corporation formed for the sole purpose of developing, acquiring, constructing,

5  operating and improving the Monorail. The Las Vegas Monorail Company was incorporated in

6  May 2000 as a Nevada not-for-profit corporation organized for the purposes set forth in the First

7  Amendment. LVMC was established to finance, acquire, develop, construct, operate, and

8  maintain the Monorail. In September 2000, upon the formation of LVMC, LVMC acquired the

9  original Monorail system from MGM Grand-Bally's Monorail LLC and commenced extension

10  of the system to its current state of seven stations.

11      8.      The Debtor is a Section 501(c)(4) organization under federal tax law and has been

12  granted sales/use tax exempt status as a charitable or non-profit organization pursuant to Nevada

13  Revised Statutes (NRS) 372.3261. As a nonprofit entity, no part of LVMC's net earnings may

14  inure to the benefit of anyone other than the Governor of the State of Nevada on behalf of the

15  State or a designated agency of the State upon dissolution, liquidation, or winding up. LVMC

16  thus has no capital stock or equity holders. True and correct copies of the Debtor's

17  organizational documents are attached hereto as **Exhibits** "1" (the Articles of Incorporation) and

18  "2" (the Amended and Restated Bylaws).

19      9.      LVMC operates pursuant to the Clark County Monorail Franchise Agreement issued

20  pursuant to Chapter 5.04 of the Clark County Code, as amended by the First Amendment, the

21  Second Amendment to Franchise Agreement dated October 7, 2003 (the "Second Amendment"),

22  the Third Amendment to Franchise Agreement dated November 1, 2005 (the "Third

23  Amendment"), the Fourth Amendment to Franchise Agreement dated December 6, 2006 (the

24  "Fourth Amendment"), and the Extension to Fourth Amendment to Franchise Agreement dated

25  December 3, 2008 (the "Extension," and together with the Clark County Monorail Franchise

26  Agreement, the First Amendment, Second Amendment, Third Amendment, and Fourth

27  Amendment, the "Franchise Agreement"). True and correct copies of the Clark County Monorail

28  Franchise Agreement, along with all amendments and extensions thereto, are attached hereto as

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

4

1   **Exhibits** "3", "4", "5", "6" "7," and "8".

2   10.    Upon LVMC's acquisition of the Monorail from MGM Grand-Bally's Monorail

3   LLC, the Franchise Agreement was assigned to LVMC pursuant to the Monorail Franchise

4   Agreement Findings Resolution No. 8-8-00-1 approved by the Clark County Board of

5   Commissioners on August 8, 2000.   Pursuant to the Extension, the term of the Franchise

6   Agreement extends through December 31, 2107.  The Franchise Agreement grants to the Debtor

7   as the franchisee a franchise to construct and operate the Monorail, including the exclusive right

8   to extend the Monorail to McCarran International Airport.

9        **2.    Operations**

10   11.    The Monorail is a state-of-the-art, fully-automated, driverless rail system that runs

11   above the streets along the east-side of Las Vegas Boulevard (a/k/a the "Las Vegas Strip").  It is

12   the first driverless public monorail system in the world.[2]   The existing operations provide

13   convenient and cost-effective transportation between its seven stations.   LVMC's business

14   focuses on making the Monorail an easy and convenient connection to the Las Vegas Strip and

15   the Las Vegas Convention Center.

16   12.    Though LVMC benefits from its tax-exempt status due to being a nonprofit entity, it

17   is the first privately-owned public transportation system in the nation to be funded solely by fares

18   and advertising.  No other U.S. public transit system finances its operations solely through fare

19   and advertising revenues.  LVMC receives no governmental financial support or subsidies.

20   13.    The Monorail currently has seven stations along a 3.9-mile route: MGM Grand,

21   Bally's/Paris Las Vegas;  Flamingo/Caesars Palace;  Harrah's/Imperial Palace;  Las Vegas

22   Convention Center; Las Vegas Hilton; and the Sahara.  It travels the 3.9-mile route in 15 minutes

23   or less, and reaches speeds of up to 50 miles per hour.  It is capable of moving 3,200 passengers

24   per hour in each direction.  The Monorail operates 365 days per year, 19 hours per day during the

25   week and 20 hours each day Friday through Sunday.

26   14.    The Monorail is an integral factor in relieving congestion in the Strip Corridor and is

27

28   [2] The Monorail is an "automated guideway," defined by the Federal Transit Administration as an electric railway of guided transit vehicles operating without vehicle operators or other crew onboard the vehicles.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

5

one of the most "green" public transportation systems in the United States. The Monorail's trains emit zero emissions. In 2008, the Monorail aided in the annual removal of an estimated 3.4 million vehicle miles from the major roadways of Southern Nevada and reduced emissions by more than 61 tons of carbon monoxide (CO), volatile organic compounds (VOC) and nitrogen oxides ($NO_x$). In addition to the environmental benefits of utilizing the Monorail instead of roadway travel, increased utilization of the system generates additional capacity on the existing transportation infrastructure. Reduced vehicle usage decreases traffic and improves travel conditions and congestion in the entire Strip Corridor area, especially along the Las Vegas Strip. Ultimately, reduced congestion improves the overall visitor experience by reducing travel times, extending the timing required for infrastructure improvements (such as the widening or addition of major thoroughfares), mitigating safety concerns related to congestion, and providing a better commute for resident travelers. The enhanced travel experience within the Strip area increases business in the entire Strip Corridor, to the benefit of the entire community.

15.    The Monorail consistently runs at more than 99 percent operational efficiency. During the past 4.5 years of full operations, the Monorail has carried more than 40,000,000 riders ("ridership") with a goal of further improving mobility in what is nationally recognized as one of the most congested corridors in the United States, the Strip Corridor. The Monorail carried 6,005,024 riders in 2009; 7,602,599 riders in 2008; 7,917,613 riders in 2007; and 7,015,109 in 2006. During large conventions such as the Consumer Electronics Show, the Monorail carries more than 70,000 people into and out of the Las Vegas Convention Center over the course of a four-day event. This is the equivalent of over 23,000 three-passenger taxi trips or over 1,200 55-passenger bus trips.

16.    Since commencement of its operations, total economic output sourced to the Monorail has reached $142,000,000, resulting in nearly $38,000,000 in wage and salary payments to area workers and employment of 763 "person-years" (the equivalent of one-year of employment for a full time employee). In 2008 alone, economic output sourced to the Monorail

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

6

1  was $36,000,000, and the Monorail was responsible for 230 jobs in southern Nevada.[3]

2  17.    Salary costs for LVMC have decreased each of the last three years.  The salaries and

3  related costs have dropped annually since 2006.  Between 2007 and 2008 the LVMC reduced

4  security costs by more than $500,000 annually by hiring security personnel directly instead of

5  contracting security services to a third party.  As a further cost containment measure, there were

6  positions that were budgeted but not filled during the year and several positions were eliminated.

7  Salary costs in 2008 were almost $675,000 less than the budgeted amount.  Cost containment

8  measures continued through 2009.

9  18.    The Monorail is also one of the safest modes of transportation available.  Cameras on

10  each train record activity on the trains during all hours of operation, and closed-circuit TV

11  cameras throughout the stations constantly record and monitor the ticket vending machines

12  ("TVMs"), platforms, and escalators.  The security feeds are constantly monitored by Central

13  Control.  The stations are staffed with armed and unarmed security officers charged with

14  maintaining the security of the system and assisting passengers.  All stations and trains are

15  equipped with emergency Push-To-Talk intercom telephones ("E-Tels") that provide a direct

16  connection to Central Control.  The Monorail further employs explosive detection canine

17  officers.  Comprehensive maintenance checks are performed daily.  The Monorail meets or

18  exceeds every applicable mass transit code and safety standard.

19  19.    As stated earlier, the Monorail is the only system in its peer group that receives no

20  assistance from the federal, state, or local government.[4]  The Monorail ranks as one of the

21  highest in terms of fare revenues per passenger trip among automated guideways and light rail

22  systems, and first when compared to other automated guideways only.  Specifically, the

23  Monorail generates more revenue per mile of system than any other automated guideway or light

24  rail system, and is only second in total annual revenue generation to Boston's MBTA system.[5]

25

26  [3] Applied Analysis report, "Las Vegas Monorail Company:  A Review and Analysis" dated on or around August 14, 2009, attached hereto as Exhibit "9"

27  [4] Excluding incidental benefits resulting from LVMC's tax-exempt status.

28  [5] National Transit Database 2007 Statistics, available at www.ntdprogram.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

7

20.    Though LVMC employs approximately 40 employees, including security personnel, most of the physical operations of the Monorail are conducted by Bombardier Transportation, Inc. ("Bombardier"), with whom LVMC contracted to operate and maintain the trains, automatic train controls, and other control subsystems pursuant to the Monorail Operations and Maintenance Agreement dated September 1, 2000 (the "Bombardier Agreement"), attached hereto as **Exhibit** "14."

21.    LVMC has consistently generated operational profits; however, as explained more fully below, these operational profits have not been sufficient to service its debt and provide for its future CAPEX needs.  LVMC generates revenue from two primary sources.  The largest component of LVMC's revenues is derived from ticket purchases (the "Fare Revenues").  Approximately 263,350 tickets are sold at the 42 TVMs each month, at which customers generally may pay in cash or coins (the "TVM Cash Receipts"), or with a debit or credit card (the "TVM Credit Receipts").  Customers may also purchase tickets online (the "Web Receipts"), while Las Vegas residents can purchase a daily maximum of two local $1 one-way tickets at customer service booths located at the Sahara and MGM Grand stations (the "CSA Booth Receipts").  The mechanisms by which LVMC collects Fare Revenues are more particularly described below in my discussion of facts supporting the Debtor's Cash Management Application.

22.    The Monorail offers four basic fare options.  Customers may purchase a one-way fare for $5 at a TVM or online; an all-day pass for $14 at a TVM or $13 online; or a 3-day pass for $30 at a TVM or $28 online.  As stated previously, residents may purchase a one-way local fare for $1.  Tickets for local residents are typically purchased by Clark County residents employed by businesses along the Las Vegas Strip, who ride the Monorail to facilitate travel to and from their places of employment and to access the many Strip destinations and events.  Further, for promotion of the Monorail, the Monorail occasionally offers free tickets and advertising opportunities in connection with certain events in exchange for advertising of the Monorail to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

potential customers.[6]

23.    The average monthly sales from operations are approximately $2.3 million.  The Debtor estimates that its total Fare Revenues for 2009 were $26,986,487.  Total Fare Revenues were $29.7 million for 2008 and $30.3 million for 2007.

24.    The other major component of LVMC's revenue is derived from the sale of advertising space on the Monorail (the "Ad Revenues").  The Debtor estimates that its total Ad Revenues for 2009 were $353,830.    Total Ad Revenues were $1,377,991 for 2008 and $2,273,954 for 2007.

25.    LVMC generated approximately $27,409,717 in Program Revenues for 2009, which consist of Fare Revenues and Ad Revenues along with miscellaneous revenues for vending and concessions.  LVMC generated $31,097,597 in Program Revenues in 2008,[7] and $31,750,582 in Program Revenues in 2007.[8]

26.    In accordance with its organizational documents, each year the Board adopts a budget (the "Budget") which is submitted to the Governor for approval.  True and correct copies of the approved Budgets for calendar years 2008, 2009 and 2010 are attached hereto as **Exhibits** "10", "11", and "12".[9]  In addition, in accordance with organizational documents, LVMC is required to have audited financial reports prepared.  A true and correct copy of the Audited Financial Report for calendar years 2008 and 2007 prepared by Kafoury, Armstrong & Co., publicly available at http://www.lvmonorail.com/corporate/, is attached hereto as **Exhibit** "13".

**3.    The Debtor's Prepetition Management Structure**

27.    As a nonprofit company, no person or entity holds an equity interest in the Debtor. The Board is appointed by the Governor of the State of Nevada and is comprised of five

---

[6] The total cost of providing a small number of free tickets to LVMC is less than $50,000 per year, which is insignificant in comparison to the Debtor's average monthly sales from operations.  Further, the cost of providing the free tickets is far exceeded by the advertising opportunities it provides to the Monorail.

[7] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008; Las Vegas Monorail Company Financial Statements for the Years Ended December 31, 2008 and 2007 and Independent Auditor's Report ("Auditor's Report"), available at http://www.lvmonorail.com/corporate/.

[8] Auditor's Report.

[9] If the Governor does not disapprove a proposed budget submitted by the Board, it is approved as a matter of law.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

9

members.  The current members of the Board are Donald L. "Pat" Shalmy, Chairman of the Board, Bruce L. Woodbury, Marcus "Mike" Sloan, Anthony Santo, and Robert Beers.  Mr. Shalmy was first appointed to the Board on January 1, 2000.  During his career he has served as a senior vice president and president of Nevada Power Company, director of government and community relations for Kummer, Kaempfer, Bonner and Renshaw, and president of the Las Vegas Chamber of Commerce, the third largest chamber in the United States.  Mr. Shalmy dedicated over three decades of work to the public sector, culminating as Clark County manager.

28.     Mr. Woodbury was appointed to the Board on February 1, 2009.  He dedicated nearly 28 years to public service as the representative for Clark County Commission District A.  Mr. Woodbury served as Chairman of the Regional Transportation Commission Board of Commissioners for more than 16 years, as well as Chairman of the Board of County Commissioners, Big Bend Water District Board of Trustees, and the Clark County Air Quality Management Board.  He was a member on the Las Vegas Valley Water District Board of Directors, University Medical Center Board of Trustees, Henderson Chamber of Commerce Board of Directors, and the Las Vegas Springs Preserve.  He is a partner with the law firm of Jolley, Urga, Wirth, Woodbury & Standish.

29.     Mr. Sloan was appointed to the Board on April 1, 2009. Until his retirement following the acquisition of Mandalay Resort Group by MGM Mirage in 2005, Mike H. Sloan was a senior corporate executive with that company (formerly Circus Circus Enterprises – a New York Stock Exchange company) for 20 years.  He joined Mandalay Resort Group in 1985 as Vice President, General Counsel and Secretary, having primary responsibilities for directing the company's legal department as well as labor and government relations.  In addition, Mr. Sloan was actively engaged in the planning, development and construction of the company's numerous new projects, including the Excalibur Hotel and Casino, Luxor Hotel and Casino and the Mandalay Bay Resort. Beginning in 1997, Mr. Sloan gave up day-to-day supervision of the legal department in order to concentrate on the planning and development of the company's premiere property, Mandalay Bay, focusing on the development and location of new entertainment and restaurant venues for the project.  He secured agreements for the company with Four Seasons

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

1 Hotel, House of Blues and Rum Jungle night club as well as restaurants Aureole, Red Square,

2 Wolfgang Puck's Lupo, China Grill and later famed chef Alain Ducasse's Mix Restaurant and

3 Lounge. Mr. Sloan has been chairman and served on the board of Nevada Resort Association for

4 over 20 years. Prior to his career as gaming executive, Mr. Sloan was elected Las Vegas City

5 Attorney and later served as a state senator. He also worked as the press secretary for United

6 States Senator Alan Bible (D-NV), and as a deputy attorney general for the Nevada Gaming

7 Division, providing legal advice for the Nevada Gaming Commission and Nevada Gaming

8 Control Board. He is a founding trustee and past president for the National Association for

9 Gaming Lawyers and past chairman of the Gaming Law Committee of the American Bar

10 Association.

11      30.     Anthony Santo was appointed to the Board on April 1, 2009. He is a 28-year veteran

12 in the gaming industry and is currently consulting in the gaming and hospitality businesses for

13 operational reviews and potential acquisitions. Mr. Santo served in various senior management

14 roles with Caesars Entertainment, and upon their acquisition, Harrah's Entertainment, Inc.

15 Throughout his career, he managed multiple hotel/casino properties. Mr. Santo was appointed to

16 Senior Vice President of Western and Mid-South Regions for Caesars Entertainment; as

17 President of Paris Las Vegas, Bally's Las Vegas, Flamingo Las Vegas, Las Vegas Hilton, Reno

18 Hilton, and Flamingo Reno. He served as Senior Vice President of Operations, Products and

19 Services for Harrah's Entertainment, Inc. where he managed the company's domestic and

20 international operations. Mr. Santo previously served on the boards of Las Vegas Events, the

21 Culinary Training Academy of Las Vegas, UNLV's Harrah Hotel College Alumni Association,

22 the Las Vegas Convention and Visitors Authority, and the Reno-Sparks Convention and Visitors

23 Authority.

24      31.     Mr. Beers was appointed to the Board on April 1, 2009. He is the managing partner

25 for Seale and Beers, CPAs, a PCAOB-registered auditing firm. He is also the chief financial

26 officer for a start-up tequila importer. Prior to Seale and Beers, he owned and operated Wilson,

27 Beers and Alu, a computer systems company, from 1989 to 2002, when he sold the company to a

28 large regional accounting firm. In 2004, Mr. Beers was elected to a four-year term in the Nevada

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

11

1    Senate. Prior to his senate election, Beers served six years as a Nevada assemblyman.

2        32.    In late September, 2008, the Board reduced its monthly fee from $5,000 to $2,500 per

3    month. The then-Board held bi-monthly meetings and rarely needed to participate in additional

4    meetings or conferences. Commencing in the summer of 2009, the Board began to spend

5    substantial additional time meeting and conferencing regarding the restructuring. In addition to

6    monthly regular board meetings, in consultation with its restructuring advisors and counsel, it

7    began to meet on a weekly basis with even more frequent conferences and correspondence

8    during the week. As such, the Board's involvement has increased significantly, and in light of

9    this, and after receiving input from its restructuring advisors regarding additional compensation

10    in similar circumstances, it has temporarily increased its monthly Board fee by $2,500 for the

11    period of the restructuring of LVMC. The members of the Board are now compensated on an

12    interim basis at their prior rate of compensation.

13        33.    As the President and Chief Executive Officer of the Debtor and pursuant to my

14    Employment Agreement dated August 20, 2008, I receive annual compensation of $346,200,

15    along with employment benefits available to other LVMC employees. The Employment

16    Agreement commenced August 21, 2008 and the initial term will end August 20, 2011. After

17    the initial term of employment ending August 20, 2011, my continued employment is at the will

18    of the Board and may terminate at any time thereafter by written notice, unless otherwise agreed

19    to by the parties.

20        34.    On or about April 24, 2008, in connection with the potential restructuring of the

21    Debtor and in consideration for a forbearance, Ambac Assurance Corporation ("Ambac")

22    demanded that the Board retain Conway, Del Genio, Gries & Co., LLC ("CDG") as restructuring

23    advisor.[10] Upon its retention, CDG appointed Michael Monaco ("Monaco") as LVMC's Chief

24    Restructuring Officer ("CRO"). Pursuant to the terms of its engagement, CDG received a

25    monthly fee of $150,000 plus expenses. Commencing December 6, 2008, the scope of services

26    provided by CDG was reduced to a monitoring role, and the monthly fee payable to CDG by

27

28    _____
      [10] As more fully explained below, Ambac is the insurer of the 1st Tier Bonds (as defined below).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc                                                    12

LVMC was reduced to $25,000, plus expenses. From the time of its retention through the end of 2008, CDG received compensation (including reimbursement of its expenses) of approximately $1,159,196 for services rendered. During the monitoring period commencing on December 6, 2008 and ending in or about September 2009, CDG received an additional $257,812, for a total compensation to CDG of $1,417,007. In his capacity as restructuring officer, Monaco was responsible for considering, evaluating and negotiating restructuring proposals and any aspect thereof with respect to the Debtor, making recommendations to the Board regarding the restructuring, and approving any changes to LVMC's CAPEX budget. In the course of its engagement, CDG prepared revenue and expense projections as well as projections regarding the future CAPEX needs of the Monorail.

35.     The Board ultimately determined that its engagement of CDG and Monaco was not achieving the desired objectives, and the relationship was terminated on or about September 29, 2009. Commencing on or about November 15, 2009, Ambac retained CDG as an advisor to Ambac.[11]

**4.     The Debtor's Relationship With Bombardier And CAPEX Requirements**

36.     Though LVMC employs approximately 40 employees, including security personnel, most of the physical operations of the Monorail are conducted by Bombardier Transportation, Inc. ("Bombardier"), with whom the Debtor contracted to operate and maintain the Monorail trains, automatic train controls, and other control subsystems pursuant to the Monorail Operations and Maintenance Agreement dated July 14, 2004 (the "Bombardier Agreement"). A copy of the Bombardier Agreement is attached hereto as Exhibit 14. Bombardier has more than 35 years of operations and maintenance experience, providing a range of operation and maintenance services for fully automated systems in cities around the world, including New York, Miami, San Francisco, Kuala Lumpur, Beijing, and London.

37.     The initial term of the Bombardier Agreement was for 5 years with two (2) 5-year options. In January 2009, Bombardier was awarded the first 5-year option to continue to operate

---

[11] The full extent and range of services being provided to Ambac are unknown to Declarant.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

13

the system.  There remains one additional 5-year option, which if exercised, will allow LVMC to continue the Bombardier Agreement until 2019 when a new operation and maintenance agreement will need to be negotiated.  The costs of a new contract are unknown, but it is not expected to be less than the cost of the existing Bombardier Agreement.

38.    During the year 2008, in accordance with the Bombardier Agreement, LVMC paid $16,675,678 to Bombardier for operation and maintenance of the Monorail.[12]  LVMC paid approximately $17,027,307 to Bombardier for operation and maintenance of the Monorail in 2009.

39.    While the scope of the Bombardier Agreement includes normal maintenance and repair, along with some replacement costs which costs are paid pursuant to the Capital Asset Replacement Program ("CARP"), it does not include CAPEX expenditures.  Both LVMC (with the assistance of A&M) and CDG (prior to its termination) have prepared projections of revenue and expenses for 2010 through 2040.  A summary of the results of LVMC's projections (the "Base Case") and the CDG projections ("CDG Projections," and together with the Base Case, the "Projections") are attached hereto as **Schedule** "1".

40.    The Projections prepared by both CDG and LVMC contain analyses of the Debtor's CAPEX requirements for 2012 through 2040.  CAPEX refers to the expenditures for replacement and repair of capital assets.  In the case of LVMC, these assets are train control systems, Monorail escalators, workshop equipment, communication systems, traction power systems/PDS, platform doors, guideway elements, Monorail elevators, fare collection equipment, the maintenance recovery vehicle, and the Monorail trains themselves.

41.    CDG's CAPEX analysis determined that the Monorail will require $362,865,726 in 2009 Dollars (without regard to inflation) for CAPEX from 2012 through 2040 (the "CDG CAPEX Projection").  A summary of the CDG CAPEX Projection is attached hereto as **Schedule** "2".  LVMC requested that Bombardier also analyze CAPEX requirements from 2012 through 2040.  The Base Case encompasses the analysis of Bombardier, which determined that

---

[12] Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

the Monorail will require $261,010,819 in 2009 Dollars (without regard to inflation) for CAPEX from 2012 through 2040 (the "Bombardier CAPEX Projection," and together with the CDG CAPEX Projection, the "CAPEX Projection").   A summary of the Bombardier CAPEX Projection is attached hereto as **Schedule** "3".   Comparisons of the CAPEX Projections are shown on **Schedule** "4," attached hereto.

42.     Both the CDG CAPEX Projection and the Bombardier CAPEX Projection assume that the Debtor's significant capital assets have the following "lifespans" or replacement periods:

| CAPEX Category | Bombardier (in years) | CDG (in years) |
|---|---|---|
| Traction Power Systems/PDS | 30 | 30 |
| Guideway Elements | 30 | 30 |
| Monorail Elevators | 30 | 30 |
| Monorail Trains | 30 | 25 |
| Monorail Escalators | 17 | 17 |
| Train Control Systems | 15 | 15 |
| Communication Systems | 15 | 15 |
| Platform Doors | 15 | 15 |
| Fare Collection Equipment | 15 | 15 |
| Workshop Equipment | 7 | 7 |
| Maintenance Recovery Vehicle | 25 | N/A |

43.     Both CAPEX Projections show that the first significant CAPEX will occur in 2019, fifteen (15) years following the commencement of the Monorail's operations. The CDG CAPEX Projection determined that an initial CAPEX investment of $77,459,732 will be required in 2019 alone, for full replacement of the Debtor's train control systems, communications equipment, fare collection equipment, and platform doors.

44.     The Bombardier CAPEX Projection determined than an initial CAPEX expenditure of $23,060,266 will be required in 2019 for full replacement of the Debtor's fare collection equipment and platform doors.   Under the Bombardier CAPEX Projection, the next significant CAPEX requirement would occur in 2024, when the train control system and communication system would be fully replaced at a cost of $52,647,684.

45.     The CDG CAPEX Projection determined that the remaining bulk of the CAPEX requirements would occur between 2029 and 2034, when the Monorail trains would have to be

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

15

replaced, along with significant other expenditures in 2034 for replacement of the traction power systems/PDS, train control systems, communication systems, guideway elements, fare collection equipment, platform doors, and platform doors, for a total cost during the period of 2029-2034 of $245,047,396.

46.    By contrast, the Bombardier CAPEX Projection determined that the remaining bulk of the CAPEX requirements would occur between 2034 and 2037, when the Monorail trains would have to be replaced, along with significant other expenditures during 2034-2036 for replacement of the traction power systems, guideway elements, fare collection equipment, and platform doors, for a total cost during the period of 2034-2037 of $177,802,869.

47.    Though the Bombardier CAPEX Projection and the CDG CAPEX Projection differ substantially with respect to the cost of replacement of the train control systems, Monorail escalators, and workshop equipment, as shown on **Schedule** "5," the CAPEX requirements occur in large increments approximately every ten (10) years under both CAPEX Projections, necessitating the accumulation of cash reserves for CAPEX and leaving little available for debt service. The alternative to accumulating these cash reserves will be equipment obsolescence and failure resulting in the premature cessation of operations as early as 2019 based upon which CAPEX Projection is considered.

**B.    The Debtor's Prepetition Debt Structure**

48.    In September 2000, the Director of the State of Nevada Department of Business and Industry, as the Issuer (the "Director" or Issuer"), issued tax-exempt bonds (collectively, the "Bonds") for construction and operation of the Monorail as follows:[13]

(a)    Pursuant to a Senior Indenture with Wells Fargo Bank, N.A. as Trustee (the "Trustee") dated September 1, 2000 (the "Senior Indenture"), the Issuer issued $352,705,000 in 1st tier current interest bonds and $98,743,217.30 in 1st tier capital appreciation bonds (collectively, the "1st Tier Bonds") to the Trustee on behalf of the beneficiaries under the Senior Indenture (the "1st Tier Bondholders"). A true and correct

---

[13] However, as more fully explained in paragraph 37 below, the Bonds are non-recourse to the State of Nevada.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

16

copy of the Senior Indenture is attached hereto as **Exhibit** "15";

(b)    Pursuant to the Senior Indenture, the Issuer also issued $149,200,000 in 2nd tier current interest bonds (the "2nd Tier Bonds," and collectively with the 1st Tier Bonds, the "Senior Bonds");[14] and

(c)    Pursuant to a Subordinate Indenture also dated September 1, 2000 (the "Subordinate Indenture" and collectively with the Senior Indenture, the "Indentures"), the Issuer issued $48,500,000 in subordinate capital appreciation bonds (the "Subordinate Bonds" and collectively with the Senior Bonds, the "Bonds") in favor of Wells Fargo Bank, N.A. as the Trustee (the "Subordinate Indenture Trustee") in favor of the beneficiaries thereunder (the "2nd Tier Bondholders" and together with the 1st Tier Bondholders, the "Senior Bondholders").    A true and correct copy of the Subordinate Indenture is attached hereto as **Exhibit** "16".

49.    The Bond proceeds were used for partial financing of the acquisition, construction, improvement and equipping of the Monorail as well as for principal and interest payment reserves and a separate reserve in favor of Clark County for the removal of the improvements in the public right-of-way, which reserve account (the "Removal Fund Account") is in the name of and under the sole control of Clark County.    As of November 30, 2009, there was $7,900,374 in the Removal Fund Account.

50.    The 1st Tier Bonds are special, limited obligations of the Issuer, and the principal, premium, if any, accreted value and interest on, the 1st Tier Bonds are payable (except to the extent payable from Bond proceeds) solely from and are secured by a pledge of the Senior Loan Repayments to be made under the Financing Agreement after payment of operation and maintenance costs of the Monorail (defined in the Financing Agreement as "Operation and Maintenance Costs") and prior to the payment of debt service with respect to the 2nd Tier Bonds.

51.    Payment of principal and interest on the 1st Tier Bonds is insured by Ambac.    To the

---

[14] On or about December 20, 2009, the District Court of Hennepin County, Minnesota appointed U.S. Bank, National Association as the Co-Trustee of the 2nd Tier Bonds pursuant to the request of the Trustee in its *Verified Petition for the Appointment of a Co-Trustee and for Instruction in the Administration of a Trust Pursuant to Minn. Stat. § 501B.16.* The Trustee has represented that it is also seeking a co-trustee of the Subordinate Bonds.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

17

extent any 1st Tier Bond payments are not made when due, the Insurer will pay such amount upon notice pursuant to an insurance policy (the "Insurance Policy"). Additionally, a 1st Tier Surety Reserve Bond (the "Surety Bond") of $20,991,807.50 was issued by the Insurer to be available for payments on the Senior Bonds to the extent that LVMC was unable to meet debt service on the Senior Bonds. LVMC was unable to meet the full debt service obligations due on July 1, 2009, and $3,767,799.27 was drawn on the Surety Bond on July 1, 2009. On January 1, 2010, principal and interest on the 1st Tier Bonds came due in the amount of $16,764,971.88. LVMC was unable to satisfy the debt service, and on or about January 1, 2010, the entire amount of $16,764,971.88 due to the 1st Tier Bondholders was drawn against the Surety Bond.[15] The remaining balance on the Surety Bond is $416,305.52.[16]

52.    The Issuer is obligated to reimburse any funds drawn from Surety Bond coverage pursuant to a Guaranty Agreement (the "Guaranty"), under which the Issuer granted to Ambac a security interest securing payment of all amounts due under the Guaranty, "[t]o the extent, but only to the extent, that the Indenture pledges to the [1st Tier Bondholders] or any Trustee therefore, or grants a security interest or lien in or on any collateral property, revenue or other payments in order to secure the [1st Tier Bonds]." A true and correct copy of the Guaranty is attached hereto as **Exhibit** "17".

53.    Once the Surety Bond is drawn in full, there will be no further reimbursements of funds to Ambac by the Issuer on account of the Guaranty. Both § 3.9 of the Financing Agreement (as defined below) and § 7.01 of the Senior Indenture (as defined below) explicitly limit the liability of the Director and the State. Specifically, § 3.9 of the Financing Agreement provides that "Anything in this Agreement to the contrary notwithstanding, any obligation the Director may incur in connection with the undertaking of the Project for the payment of money

---

[15] On or about November 16, 2009, the Trustee without notice to Debtor withdrew approximately $2.6 million from the Debtor's accounts at Wells Fargo, including $1,898,328 from the 1st Tier Debt Service Fund, to insure payments and indemnifications provided to the Trustee under the Indentures. The 1st Tier Debt Service Fund was designated for the payment of the 1st Tier debt service obligations due January 1, 2010. Though the Trustee subsequently returned some of the funds, it retained the deposits designated for payment of the 1st Tier Debt Service Fund.

[16] The 2nd Tier Bonds are not insured. LVMC was unable to pay any of the interest in the amount of $3,689,360.07 which came due on the 2nd Tier Bonds on July 1, 2009, and was unable to pay any of the interest in the amount of $5,493,875 which came due on the 2nd Tier Bonds on January 1, 2010. The Subordinate Bonds are also uninsured.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc                                    18

shall not be deemed to constitute a debt or general obligation of the Director, the State, or any political subdivision thereof, but shall be payable solely from the revenues and receipts received by it under this Agreement..." Section 7.01 of the Senior Indenture provides, in part, that "THE BONDHOLDERS SHALL HAVE NO RECOURSE AGAINST THE DIRECTOR OR ANY PROPERTY NOW OR HEREAFTER OWNED BY THE STATE OF NEVADA IN THE EVENT THAT SUCH REVENUES AND FUNDS ARE INSUFFICIENT TO MAKE SUCH PAYMENTS..." (emphasis in original).

54.    The Debtor is not a party to the Senior Indenture or the Subordinate Indenture, the Guaranty, or the Insurance Policy, but is obligated under the Financing Agreement, dated September 1, 2000 (the "Financing Agreement" or the "Agreement"), between the Debtor and the Issuer, which was concurrently assigned to the Trustee as security for payment under the Indentures. A true and correct copy of the Financing Agreement is attached hereto as **Exhibit** "18". Under the Financing Agreement, the security interest granted to the Issuer is limited to the following:

(i)    Contract rights of the Debtor under the Purchase Agreement, the Design-Build Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the Franchise Agreement, each as defined in the Franchise Agreement (the "Project Agreements");

(ii)    Any "Net Project Revenues," defined in the Senior Indenture as "Project Revenues" minus "Operation and Maintenance Costs"[17]; and

(iii)    All amounts held in any funds or accounts created under the Senior or Subordinate Indentures, all money and funds earned or accrued on any deposit of Net Project Revenues, and related collateral serving as proceeds of the foregoing.

---

[17] Project Revenues are in turn defined in the Senior Indenture as:

all gross income and revenue received or receivable by [Debtor] from the ownership, operation or use of the Project, including all fees and charges received by [Debtor] for the use of the Project, including but not limited to farebox revenues, business interruption insurance, advertising revenues, licensing fees, rent, sponsorship income, other contractual revenues, interest earnings on funds held hereunder or by [Debtor] (excluding the Construction Fund, Contingency Fund, and Rebate Fund) liquidated damages, payments under performance or completion bonds or under the Project Agreements, and all other income and revenue howsoever derived by [Debtor] from the ownership, operation or use of the Project or dedicated by [Debtor] or any other person to support the Project, and such other revenues as may be designated by [Debtor] in the Agreement, but excluding in all cases any refundable deposits made to establish credit and advances or contributions in aid of construction received during such Fiscal Year.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

19

102200-001/781381_8.doc

See Financing Agreement § 3.1(b). The Issuer has assigned substantially all of its rights under the Financing Agreement to the Trustee and Subordinated Indenture Trustee, as security for payment under the Indentures. See Financing Agreement §§ 2.1(c).

55. Under the Senior Indenture, the Director pledged to the Trustee all Revenues and other amounts held under any accounts created pursuant to the Senior Indenture to secure the payment of principal and interest on the Senior Bonds.[18] Revenues are defined in the Senior Indenture as

> all moneys received by the Director or the Trustee for the account of the Director pursuant or with respect to the Agreement for the benefit of the Senior Bonds, including, without limiting the generality of the foregoing, Senior Loan Repayments (including both timely and delinquent payments, any late charges, and paid from whatever source), prepayments, and all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to this Senior Indenture, but not including any Administrative Fees and Expenses or any moneys paid for deposit into the Rebate Fund. Revenues do not include Project Revenues deposited with the Trustee pursuant to the last paragraph of Section 4.1(b) of the Financing Agreement until such moneys are used to make a Senior Loan Repayment.

Senior Indenture, p.21.

56. As such, the 1st Tier Bonds are secured by a pledge of and a first lien on Revenues. See Senior Indenture § 5.01(A), (D). The 2nd Tier Bonds have a junior and subordinate pledge and lien. See Subordinate Indenture, § 5.01(B). The Subordinate Indenture contains a similar pledge, setting forth a subordinate lien on revenues held specifically for the benefit of the Subordinate Bonds. See Subordinate Indenture § 5.01(A), (C).

57. Pursuant to § 7.01 of each of the Indentures, under no circumstance is the Issuer obligated to pay principal or interest due on the Senior Bonds or any other related costs upon acceleration, redemption, or otherwise, except from Revenues and funds pledged under the Senior Indenture. Bondholders have no recourse against the Director or property owned by the state of Nevada. See Senior Indenture § 7.01; see also Financing Agreement, § 3.09. Thus, while the Issuer has an absolute and unconditional obligation to pay principal and interest due on

---

[18] Excepting the Indemnification Account and the Rebate Fund (as defined in the Senior Indenture).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

20

1    the Senior Bonds, such obligation extends only to payment out of Revenues and other pledged

2    assets. See Senior Indenture §§ 7.07; 12.01.

3        58.    The Debtor has not pledged as security to the Issuer, the Trustee, Ambac or any other

4    party the equipment or other hard assets of the Monorail, including the stations and tracks.

5    Further, Debtor has never granted a security interest in accounts receivable or in contract rights

6    other than those specifically described in the Financing Agreement.

7        59.    I am informed and believe that the enterprise value of LVMC's business will not

8    diminish subject to the Monorail continuing to operate in the ordinary course and the expenditure

9    of capital expenditures as set forth in the Cash Collateral Motion and the exhibits thereto, with

10   the Franchise Agreement and all management remaining in place.    Based upon LVMC's

11   projections, which were prepared under my supervision and control and reviewed by Alvarez &

12   Marsal ("A&M"), the financial advisors to the Debtor, revenues will be sufficient to meet

13   ordinary course expenditures as well as maintenance requirements for the expected duration of

14   this Chapter 11 Case.

15   **C.    Events Leading To This Chapter 11 Case**

16       **1.    Financial Performance.**

17       60.    The three individual drivers of revenue of the Monorail are Las Vegas visitor volume,

18   the Monorail's market share of visitors (the percentage of visitors who use the Monorail) and

19   fare yield (revenue per individual passenger).    The revenue drivers with the greatest impact on

20   incremental cash flow are visitor volume and market share, both of which are generally out of

21   the control of the Monorail.    The revenue driver most controllable by the Monorail is fare yield,

22   which has the least impact on cash flow.

23       61.    LVMC achieved operational profits in 2006 and has remained profitable at an

24   operational level since that time.    The Program Revenues are sufficient to satisfy all costs of

25   operation and maintenance of the Monorail.    Debtor's recent operational performance has been

26   as follows:

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

21

|  | Year Ended 12-31-07[19] | Year Ended 12-31-08[20] | Year Ended 12-31-2009[21] |
|---|---|---|---|
| Program Revenues | $31,750,582 | $31,097,597 | $27,409,717 |
| Fare Revenues | $29,446,783 | $29,678,753 | $26,986,487 |
| Ad Revenues | $2,304,799 | $1,418,844 | $353,830 |
| Investment Income | $4,203,774 | $2,208,294 | $0 |
| Miscellaneous Income | $630,333 | $75,775 | $69,400 |
| Total Revenues | $36,584,689 | $33,381,666 | $25,780,511 |
|  |  |  |  |
| Wages, Compensation, Salary, and Employment Benefits | $2,304,542 | $3,063,621 | $2,479,492 |
| Bombardier Transportation, Inc. | $15,322,237 | $16,675,678 | $17,027,307 |
| Other Operational Expenses | $6,655,406 | $5,422,131 | $6,526,599 |
| Total Operational Costs and Expenses | $24,282,185 | $25,161,430 | $23,553,906 |
| Net Income From Operations[22] | $12,302,504 | $8,220,236 | $3,853,427 |

62.    Under the economic circumstances prevailing at the time of the formation of LVMC and the incurrence of the debt obligations described above, forecasts indicated that the Debtor would be able to generate an operating profit (net cash flow) sufficient to operate the Monorail and service the Bonds.  However, these projections proved wrong and ridership and resulting revenues as well as advertising revenues never reached projected levels.  While the Monorail generates net positive cash flow, it has been insufficient and are projected to remain insufficient to meet its existing debt service requirements as well as CAPEX reserves necessary to fund CAPEX needs beginning in 2019.

63.    Beginning in 2008, the economy in the United States began to sharply decline, not only in the hotel and gaming industry, but throughout virtually every business sector.  As we

---

[19] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2007; Auditor's Report.

[20] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008; Auditor's Report.

[21] These figures are estimated.  LVMC has not yet obtained audited financial statements for 2009.

[22] Net of depreciation.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

22

know, this severe world-wide recession had a much more dramatic impact on the Las Vegas economy given its reliance on the hotel, gaming and convention business. LVMC was sharply impacted by the downturn and contraction in southern Nevada's core tourism industry. Through the first six months of 2009, ridership was down 24.9% compared to the same period of 2008. Though the Monorail carried 7,602,599 riders in 2008, it carried only approximately 6,005,000 riders during 2009, substantially less than preceding years and substantially less than projected, which generated approximately $27,409,717 in revenues, resulting in less than $5,000,000 net cash flow (or operating profit, excluding depreciation expense). Ignoring reserves for CAPEX, approximately $34,000,000 is required to maintain debt service each year, far exceeding the operating profits.

64.    Data reported by the Las Vegas Convention and Visitor's Authority ("LVCVA") confirms that the cyclical pattern of visitor volume marked a considerable decline in late 2008 and 2009.[23] See Year-To-Date Executive Summaries for 2005, 2006, 2007, 2008, and 2009, available at http://www.lvcva.com/press/statistics-facts/index.jsp.

65.    Compounding the effects of low visitor volume on ridership is the deteriorating level of convention attendance. See Year-To-Date Executive Summaries for 2005, 2006, 2007, 2008, and 2009, available at http://www.lvcva.com/press/statistics-facts/index.jsp. To cut costs, firms have downsized, relocated, or cancelled conventions. As a result, 2009 experienced significantly less convention attendance, cutting away a key demographic of the Monorail's customers.

66.    The decline in the Monorail's operations is tied directly to the decrease in gaming revenues in Nevada, and particularly along the Las Vegas Strip. According to the Abbreviated Revenue Release from the State of Nevada, Gaming Control Board, Tax and License Division (the "Revenue Release") for January 2009, which contains the most current figures available, Nevada gaming win has dropped precipitously for the current fiscal year to date, with statewide win decreasing 14.05%, and Clark County decreasing 14.80%.

67.    In sum, while the Monorail's financial problems existed from the beginning of its

---

[23] The Las Vegas Monorail Ridership Study concluded that 97% of the Monorail's riders are visitors. Las Vegas Monorail Ridership Study, GLS Research, March 2006.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

23

operations given the significantly lower than projected ridership and farebox and advertising revenues, the problems were exacerbated due to declining tourism and the consequent decrease in hotel and Convention Center bookings, and the number of riders on the Monorail has not met projections formed prior to the economic collapse.

### 2.    Economic Pressures and Requirements.

68.    As discussed above, both LVMC (with the assistance of A&M during the last several months) and CDG (prior to its termination) have prepared projections of revenue and expenses for 2010 through 2040 summaries of which are attached hereto as Schedule 1.  The Base Case relies on the Bombardier CAPEX Projection, attached hereto as Schedule 3, and the CDG Projections rely on the CDG CAPEX Projection, attached hereto as Schedule 2.  The CDG CAPEX Projection determined that the Monorail will require $362,865,726 in 2009 Dollars (without adjustment for inflation) for CAPEX from 2012 through 2040, whereas the Base Case encompasses the Bombardier CAPEX Projection, which determined that the Monorail will require $261,010,819 in 2009 Dollars (again, without adjustment for inflation) for CAPEX from 2012 through 2040.

69.    Though the Bombardier CAPEX Projection and the CDG CAPEX Projection differ substantially with respect to the cost of replacement of the train control systems, Monorail escalators, and workshop equipment, as shown on **Schedule** "5," the CAPEX requirements occur in large increments approximately every ten (10) years under both CAPEX Projections, necessitating the accumulation of cash reserves for CAPEX and leaving little available for debt service.  Because the largest CAPEX needs are estimated to occur between 2029 and 2034 under the CDG CAPEX Projection, or 2034 to 2037 under the Bombardier CAPEX Projection (in both cases primarily due to the need to replace the trains), there is limited cash available to service debt until at least 2035 or 2038.

70.    Even without considering LVMC's CAPEX requirements, increases in individual drivers of revenue necessary to generate sufficient cash to meet the existing debt service obligations is likely unattainable.  Under the Debtor's Base Case analysis, in order to satisfy these debt obligations in 2010, the Debtor would require an increase of 120% in visitor volume,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

24

118% in market share, and 118% in fare yield. <u>See</u> Schedule 1. In 2010 alone, the total debt service obligation is $37,387,694, of which $26,399,944 is for service on the 1st Tier Bonds. <u>See</u> Annual Debt Service Requirements, attached hereto as **Schedule** "6." By contrast, the Debtor is projected to have net operating revenue of only $6,003,400 under the Base Case, and only $14,107,485 in net operating revenue under the CDG Projections. <u>See</u> Schedule 1. Under both scenarios, these revenue shortfalls are projected to continue until at least the early 2030s, after significant CAPEX investments are required to have been made.

71.    As a result of its own analysis, the CDG Projections and CDG CAPEX Projection, and the Bombardier CAPEX Projection, LVMC has come to the following conclusions:

(a)    Net cash flow from the existing Monorail will never be sufficient to service the present debt service on the Bonds;

(b)    Using all available net cash flow for 2010 through 2019 to make partial payments on the Bonds will result in LVMC having no moneys available to meet its CAPEX needs beginning in 2019, whether utilizing the CDG CAPEX Projection or the Bombardier CAPEX Projection;

(c)    Restructuring the debt service on the Bonds is necessary to allow LVMC to meet its CAPEX needs and allow it to obtain other revenue sources and expand the present Monorail system (including to McCarran International Airport).

**3.    <u>Default.</u>**

72.    Pursuant to the Financing Agreement, LVMC is obligated to make certain Senior Loan Repayments, as defined therein, sufficient to fund debt service on the Bonds and replenish the Debt Service Reserve Fund. Specifically, the Debtor is required to transfer sums before the last business day of each month to the 1st Tier Debt Service Fund and the 2nd Tier Debt Service Fund in an amount sufficient to satisfy the then-due principal and interest on the 1st Tier Bonds and the 2nd Tier Bonds, respectively, in compliance with Section 4.2(a)(i) of the Financing Agreement.

73.    LVMC was unable to transfer sufficient sums to satisfy the Senior Loan Repayments in December 2007, and consequently, on January 2, 2008, there were insufficient amounts

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc                                                                    25

available in the 1st Tier Debt Service Fund and the 2nd Tier Debt Service Fund to pay all amounts of principal and interest then due. LVMC was also unable to make sufficient payments to satisfy the requirements of Section 4.2(a)(i) of the Financing Agreement to fund debt service reserves and replenish the Debt Service Reserve Funds.

74. On February 11, 2008, the Trustee sent a Notice of Events of Default to LVMC. Also on February 11, 2008, the Trustee sent its Notice of Events of Default to Holders of Director of the State of Nevada Department of Business and Industry Las Vegas Monorail Project Revenue Bonds 1st Tier Series 2000 and 2nd Tier Series 2000, notifying the Bondholders of the default. LVMC has not cured the above-described default, and from December 2007 to the present, has not raised sufficient revenues to comply with Section 4.2(a)(i) of the Financing Agreement.

75. On or about July 17, 2008, LVMC entered into a forbearance agreement with the Trustee and the Insurer (the "Forbearance Agreement"), pursuant to which the Insurer and the Trustee agreed to forbear until October 31, 2008 the exercise of any of their rights and remedies as set forth in the Financing Agreement, Indenture, Guaranty, or other agreements. In exchange therefore, LVMC agreed to the continued retention of CDG with Monaco as CRO.

76. On or about October 31, 2008, LVMC entered into the Amended and Restated Forbearance Agreement with the Trustee and the Insurer pursuant to which the Insurer and the Trustee agreed to continue the forbearance of the exercise of their rights and remedies until January 31, 2009. The Amended and Restated Forbearance Agreement was subsequently extended to May 31, 2009, and then again to June 30, 2009. The Amended and Restated Forbearance Agreement expired on June 30, 2009, and no other forbearance agreement was executed.

77. In October of 2009, LVMC retained the services of A&M as financial advisors to assist in evaluating financial and strategic alternatives, including preparation of analyses of the Debtor's alternatives with respect to debt restructuring, debt refinancing, divestitures, or reorganization, the Debtor's debt service capacity and long-term financing needs, and the Debtor's business plan, operating and capital expenditures budgets, loan agreements and bond indentures, and multi-year financial projections under various operating scenarios.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

**4.    Financial Condition as of the Petition Date**.

78.    Under Paragraph 4.1(f) of the Financing Agreement, LVMC is authorized to open and retain bank accounts with any bank having a combined capital and surplus of at least $100,000,000.    However, as a result of the inability of LVMC to satisfy its debt service obligations, LVMC was required to transfer all of its Project Revenues to the Trustee for deposit in the Revenue Fund maintained at the Trustee bank (the "Revenue Fund") pursuant to Paragraph 4.1(b) of the Financing Agreement.    Also pursuant to Paragraph 4.1(b) of the Financing Agreement, the Trustee is required to pay from the Revenue Fund all payments permitted or required to be paid from the Collection Fund for O&M Costs upon written direction of LVMC. Until recently, all of the Debtor's revenues were deposited into the WFB Collection Fund.

79.    However, because of the wrongful refusal of WFB to honor disbursement directions by LVMC for O&M Costs commencing in October 2009, LVMC established the BofA Account. From time to time, LVMC has directed the deposit of revenues from operation of the Monorail into the BofA Account to pay these wrongfully dishonored payment requests.    On or about November 16, 2009, the Trustee without notice to Debtor withdrew approximately $2.6 million from the Debtor's accounts at Wells Fargo, consisting of $601,672 from the Indemnification Fund, $110,000 from the Revenue Fund, and $1,898,328 from the 1st Tier Debt Service Fund, to insure payments and indemnifications provided to the Trustee under the Indentures.    This diversion of funds included approximately $600,000 which LVMC had deposited into the WFB Collection Fund as a reserve for 2010 liability insurance premiums, which are critical to the continued operation of the Monorail.    The Trustee subsequently returned to the Revenue Fund $490,000 of the insurance reserve, with the remaining $110,000 replaced from Net Operating Revenues at the end of November.    The Trustee then notified LVMC that it reserves the right to withdraw further sums from the Revenue Fund without prior notice to LVMC.

80.    Most importantly, on or about December 22, 2009, Ambac issued a written instruction to the Trustee that the Trustee was to withhold funding for certain O&M Costs requested by LVMC for its restructuring professionals totaling $254,451.81, and that to the extent LVMC deposited revenues in the BofA Account for the payment of these or any other

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

27

expenses to which Ambac objected, "...Ambac will direct Wells Fargo to hold a like amount from the next requisition until the amounts taken prior to deposit into the Collection Account have been recovered." LVMC immediately sought clarification from the Trustee as to whether it intended to honor payment directives for O&M Costs upon the instruction of Ambac, which would jeopardize payment of such O&M Costs as wages, utilities, and payment to Bombardier under the Bombardier Agreement for operation of the Monorail. The Trustee would not respond.

81.    As a result of these actions of Ambac and the Trustee, LVMC began depositing all of its revenues into the BofA Account on December 27, 2009 to ensure its ability to meet its operational obligations pending assurances that revenues deposited into the WFB Collection Fund would not be diverted from payment of O&M Costs. To date, the Trustee has not been willing to provide any such assurance.

82.    On January 12, 2010, the Trustee issued a demand to Debtor to deposit all moneys in the BofA Account in the WFB Collection Account and provided a deadline of noon of January 13, 2010, to comply. A true and correct copy of the letter is attached as **Exhibit** "20" hereto. In response, the Debtor delivered a letter just prior to noon on January 13, 2010, a true and correct copy of the responsive letter is attached as **Exhibit** "21" hereto.

83.    As of the Petition Date, LVMC had approximately $226,346.06 in the WFB Accounts. As of the Petition Date, LVMC had a balance in the BofA Account of approximately $971,041.52, an estimated $64,594 in coin inventory on hand with Brinks, and approximately $162,209.95 in undeposited TVM Cash Receipts (part of which must remain in the TVMs to make change) and $650 in CSA Booth Receipts, and an estimated $30,000 in TVM Credit Receipts in process at the Merchant Bank. The BofA Account is not subject to any depository control agreement.

## II.
## RESTRUCTURING GOALS

84.    The Debtor believes that the Monorail plays a vital role in meeting the transportation needs of Clark County, Nevada and specifically the Resort Corridor. As previously discussed, the Monorail is an integral factor in relieving congestion in the Strip Corridor while at the same

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

28

1   time it is one of the most "green" public transportation systems in the United States.

2       85.    While the initial projections and expectations for the Monorail were flawed, that does

3   not mean that the Monorail cannot be restructured so that it can meet its CAPEX needs, find

4   additional sources of revenue and funding, and expand its system, while providing some level of

5   predetermined and performance-based cash flow to the Bondholders.

6       86.    LVMC is currently in the planning stages of a proposed expansion to McCarran

7   International Airport, which would help deliver Las Vegas visitors to their business and vacation

8   destinations along the Las Vegas Strip. The proposed expansion is expected to dramatically

9   increase ridership and revenues, and further serve the Debtor's goal of reducing congestion along

10  the Las Vegas Strip. This phase of expansion planning includes seeking environmental

11  approval(s), securing appropriate entitlement rights through the Clark County Monorail

12  Franchise and finalizing a ridership forecast for the expansion.

13      87.    However, none of this is possible unless immediate action is taken to restructure the

14  LVMC's debt service requirements and provide reserves for its CAPEX needs. The alternative

15  is the Monorail literally ceasing service sometime in 2019 or 2020.

### III.
### FIRST DAY MOTIONS

**A.**    **GENERALLY**

18      88.    LVMC has commenced this Chapter 11 Case in response to its debt obligations,

19  future capital expenditure requirements and the aforementioned market challenges. The Debtor's

20  transition into Chapter 11 proceedings must be comprehensively and effectively organized to

21  ensure that it will be able to operate smoothly in bankruptcy and be afforded the opportunity to

22  successfully emerge from this Chapter 11 Case. Accordingly, it is critical that LVMC maintain

23  strong relationships with its customers, employees, partners, vendors, creditors, Clark County

24  officials and other governmental entities, and such other parties that enable LVMC to conduct its

25  business. To maintain and foster these relationships, it is important to minimize the distractions

26  to the Debtor's business operations that could result from LVMC's petitioning for Chapter 11

27  relief.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

29

89.     I have reviewed and am generally familiar with the contents of each of the First Day Motions. Based on that familiarity and information supplied to me by other members of LVMC's management and LVMC's various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in this Chapter 11 Case with minimal disruption or loss of productivity or value. I also believe that the First Day Motions are vital to LVMC's successful reorganization and are in the best interests of the Debtor and its creditors.

**B.      DEBTOR'S EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 366 FOR AN ORDER DETERMINING THAT ADEQUATE ASSURANCE HAS BEEN PROVIDED TO UTILITY COMPANIES**

90.     Subsequent to the Petition, the Debtor is filing an emergency motion pursuant to §§ 105(a) and 366 for a determination that adequate assurance has been provided to the Debtor's utility providers (the "Utilities Motion"). In the ordinary course of its business, the Debtor incurs utility expenses for electricity, gas, telephone service, and internet service. These utility services are provided by approximately seven (7) utilities (as such term is used in Section 366 of the Bankruptcy Code, collectively, the "Utility Providers"),[24] identified on **Exhibit** "19" hereto (the "Utility Service List").[25] On average, the Debtor collectively spends approximately $75,500 each month on utility costs. As of the Petition Date, I am informed and believe the Debtor is substantially current on its utility payments to each of the Utility Providers identified in the Utilities Service List.

91.     Of the average monthly expenditure of $75,500 for utility costs, approximately $70,000 per month is paid to NV Energy for the electricity required to power the Monorail.

92.     Preserving utility services on an uninterrupted basis is essential to the Debtor's

---

[24] All capitalized terms not defined herein shall be defined as set forth in the respective motions.

[25] Although the Debtor believes that the Utility Service List includes all of its Utility Providers, the Debtor reserves the right, without the need for further order of the Court, to supplement the Utility Service List if any Utility Provider has been omitted. Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of Section 366 of the Bankruptcy Code, and the Debtor reserves the right to contest any such characterization in the future. To the extent any of the Utility Providers identified on the Utility Service List provide services to a non-debtor entity, the Debtor does not anticipate that the procedures set forth in this Motion would be applicable.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

30

ongoing operations and, therefore, to the success of its reorganization.  Any interruption of utility services, particularly electricity service to the Monorail, even for a brief period of time, would disrupt the Debtor's ability to continue servicing its customers, thereby negatively impacting customer relationships, revenues and profits.  Such a result could jeopardize the Debtor's reorganization efforts and, ultimately, value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

93.    The Debtor intends to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtor expects that it will have ample liquidity, based upon cash on hand and cash flow from operations, to pay its postpetition obligations to its Utility Providers.  Specifically, the Debtor's operations are currently cash flow positive, prior to debt service, and the Debtor presently has in excess of $1 million either in cash or in its unencumbered bank account as of the Petition Date.

94.    Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtor will deposit $37,750 (a sum equal to approximately 50% of the Debtor's estimated costs of its monthly utility consumption) into a separate, interest-bearing account (the "Utility Deposit Account").  The Utility Deposit Account, together with the Debtor's ability to pay for future utility services in the ordinary course of business based upon its existing cash on hand and cash flow from operations (collectively the "Proposed Adequate Assurance") should provide protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

**C.    DEBTOR'S EMERGENCY MOTION FOR ORDER (I) AUTHORIZING THE DEBTOR TO PAY WAGES, SALARIES, BENEFITS, REIMBURSABLE BUSINESS EXPENSES AND OTHER EMPLOYEE OBLIGATIONS, AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

95.    Subsequent to the Petition, the Debtor is filing a motion seeking authorization to pay its employees in the ordinary course of its business their ordinary compensation, including allowing PTO accruals and paying reimbursable business expenses, to continue deducting taxes and garnishments from its employees' paychecks pursuant to applicable nonbankruptcy law, and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

31

1    to continue making contributions to its employee benefit plans and to continue remitting taxes

2    and garnishments pursuant to applicable nonbankruptcy law (the "Wage Motion").

3        96.    As of the Petition Date, the Debtor employed approximately 40 full and part-time

4    employees (the "Employees") in the ordinary course of its business.  Of these 40 employees,

5    three are officers or executives - Curtis L. Myles, III, President and Chief Executive Officer,

6    Ingrid Reisman, Vice President of Corporate Communications, and Mary Petersen, Treasurer and

7    Controller.  Kris Ballard, of Jones Vargas, is the Debtor's Secretary, but is not a paid employee

8    of LVMC.

9        97.    As of the Petition Date, the Employees were *not* owed sums from the Debtor for

10   wages and salaries which are incurred in the ordinary course of the Debtor's business ("Wage

11   Obligations"), other than those amounts accruing on the Petition Date itself.  Debtor pays its

12   Employees on variable two-week pay cycles, and the preceding two-week pay cycle ended

13   immediately prior to the Petition Date.  Prior to the filing of the Petition, the Debtor transferred

14   from its BofA Account to its payroll processor all amounts due to its Employees for the

15   preceding pay cycle, including $98,663.09 for wage and salary obligations, and $2,670.41 was

16   for benefits contributions, to be discussed below.

17       98.    Of the total Wage Obligations paid immediately prior to the filing of the Petition, I

18   received $27,736.46.  Of this, $12,736.46 was paid for Wage Obligations, and $15,000 was paid

19   to me as an annual retirement account contribution pursuant to my Employment Agreement,

20   which accrues on January 1 of each year, and is paid during the first payroll cycle of each year in

21   the ordinary course of business.

22       99.    Despite contrary and inaccurate media reports, employee salaries at LVMC have not

23   increased.  In fact, salary costs decreased in 2008 and 2009, and in 2009 were more than

24   $600,000 less than in 2008.  Further, as a cost containment measure, there were positions that

25   were budgeted but not filled during 2009 and several positions were eliminated.  Continued

26   service by each of the Employees is thus vital to the Debtor's ongoing operations and

27   reorganization.  Continued service by each of the Employees is thus vital to the Debtor's ongoing

28   operations and reorganization.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

100. The Debtor is required by law to withhold from its Employees' wages certain amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes, and to remit the same to the appropriate taxing authorities (the "Tax Obligations"). In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance. For the immediately-preceding payroll period, the Debtor's Tax Obligations are approximately $9,643.42.

101. In the ordinary course of processing payroll checks for its Employees, the Debtor also withholds certain amounts for various garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) (collectively, the "Garnishments"), which amounts have not yet been forwarded to the respective law firms and government agencies who are tasked with collecting the funds.

102. In the ordinary course of its business, the Debtor accrues amounts for contributions to 401(k) retirement plans, and various health and welfare benefit programs for their Employees prior to the Petition Date (collectively, the "Employee Benefit Plans"). These benefits include health plans (i.e., medical, dental, vision, and life insurance), flexible spending accounts for healthcare and dependent care, various benefits plans (i.e., life insurance, disability insurance, accidental death and dismemberment insurance, long-term care and critical illness insurance), and other employee assistance programs. A small number of employees are entitled to vehicle allowances, which total no more than $625 per payroll cycle. The contributions made by the Debtor to these Employee Benefit Plans (the "Employee Benefit Contributions") are an integral part of the compensation to which the Debtor's Employees are entitled. The total amount of Employee Benefit Contributions that will have accrued but will remain unpaid as of the Petition Date is estimated to be approximately $14,000. As indicated above, $2,670.41 in 401K contributions were made immediately preceding the filing of the Petition along with the Wage Obligations.

103. The Debtor also permits Employees to accrue various paid time off, pursuant to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

33

which Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation and/or personal days, among other matters (the "PTO Accruals"). Employees may carry forward up to 40 hours of accrued PTO each year, but Employees are not entitled to receive payment for unused PTO Accruals upon leaving the Debtor's employment. Any PTO accrued in excess of 40 hours per year is forfeited. The Debtor seeks authorization to continue to allow employees to utilize their PTO Accruals in the ordinary course of its business.

104.    In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of the Debtor (the "Reimbursable Business Expenses"). As of the Petition Date, Employees may not have been reimbursed by the Debtor for these Reimbursable Business Expenses. I cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, would estimate that that amount does not exceed $1,500.

105.    By statute, LVMC must maintain a workers' compensation policy. The Debtor seeks authorization to pay any premiums which may have accrued but which have not been paid and to continue to pay its premiums in the ordinary course of business.

106.    The Debtor's Chapter 11 case was filed during the Debtor's normal payroll periods for hourly and salaried Employees. Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations are unpaid and unreimbursed

107.    If the Debtor is unable to take the necessary steps to ensure that wages and related obligations are paid for the pay period commencing immediately prior to the Petition Date and concluding postpetition, there is a significant risk that its essential Employees will resign and that those Employees who remain will be discontented and demoralized, which will place the Debtor's reorganization effort at substantial risk.

108.    The Debtor has sufficient cash on hand to honor all of the foregoing employee-related obligations as set forth herein and in the Motion. The Debtor's operations are generating a positive cash flow, prior to debt service, and the Debtor presently has in excess of $1 million

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc                                            34

1    either in cash or in its unencumbered bank account as of the Petition Date.

2        109.    The aggregate of Wage Obligations, Employee Benefit Contributions, and PTO

3    Accrual to be paid to or for the benefit of each of the Employees pursuant to this Motion will not

4    exceed $10,950 per Employee per the cap in Section 507(a)(4) of the Bankruptcy Code.

5        110.    Continued payment of Wage Obligations, Employee Benefit Contributions, and

6    Reimbursable Business Expenses, as well as honoring PTO Accruals, are essential to preserve

7    the morale and to maintain positive relations between the Debtor and its Employees, as well as

8    allow the Debtor to continue operating.  If the relief requested herein is not granted, the success

9    of the Debtor's reorganization will be placed in substantial jeopardy.  Thus, it is my business

10    judgment that the relief requested in the Wage Motion is in the best interests of the Estate, the

11    Debtor's creditors, and other parties in interest.

12    **D.    EMERGENCY APPLICATION FOR ORDER AUTHORIZING MAINTENANCE**
**OF PREPETITION CASH MANAGEMENT SYSTEM AND MAINTENANCE OF**
13    **PREPETITION BANK ACCOUNTS**

14        111.    Subsequent to the Petition, the Debtor will file a motion seeking authorization to

15    maintain its current Cash Management System and to maintain all of its existing bank accounts

16    post-petition, including the BofA Account, the WFB Collection Fund, the Revenue Fund, and a

17    number of inactive accounts held at Wells Fargo Bank (the "Dormant Accounts," and together

18    with the WFB Collection Fund, the Revenue Fund, and the BofA Account, the "Bank

19    Accounts"), along with its various merchant accounts held for the purpose of processing credit

20    transactions.

21        112.    The 42 TVMs are serviced periodically by Brinks, whose employees collect the cash

22    and restock the TVMs with change, which is collected from a Wells Fargo vault in Los Angeles.

23    Each week, LVMC employees direct Brinks to specific machines that need servicing, which

24    number depends upon the usage of the machines.[26]  Brinks is responsible for counting the TVM

25    Cash Receipts and depositing them into the Debtor's account.  Until recently, all TVM Cash

26    Receipts were deposited into the WFB Collection Fund.  However, as a result of the Trustee's

27    ───────────────────
[26] To protect the safety of Brinks' employees, the frequency of the service and the mechanism by which LVMC
28    selects the TVMs to be serviced will not be described herein or in the Cash Management Motion.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

35

wrongful refusal to honor disbursement directions beginning in October 2009 and its diversion of LVMC's operating funds from the Revenue Fund in December 2009, as discussed above, LVMC issued instructions to Brinks to begin depositing all TVM Cash Receipts into the BofA Account. On or about December 27, 2009, all TVM Cash Receipts have been deposited into the BofA Account. As of the Petition Date, there was approximately $971,041.52 on deposit in the BofA Account and LVMC estimates that it has an additional $64,594 in coin inventory on hand with Brinks, approximately $162,209.95 in undeposited TVM Cash Receipts (part of which must remain in the TVMs to make change), and $650 in CSA Booth Receipts in TVM Cash Receipts are in the possession of Brinks which have not been deposited in the BofA Account or the WFB Collection Fund.

113.    At the end of each day, the TVM Credit Receipts are submitted to a merchant processor (the "Merchant Bank"), who forwards the TVM Credit Receipts to the various credit issuers. The various credit issuers subsequently submit payment to the Merchant Bank. Thus, the Debtor also has merchant accounts with various credit card companies, which process the TVM Credit Receipts (the "Merchant Accounts"). Until recently, the Merchant Bank would thereafter deposit the funds from the Merchant Accounts into the WFB Collection Fund. Deposits by the Merchant Bank are made every one to three days. Pursuant to LVMC's instructions, as with Brinks, the Merchant Bank has begun depositing all TVM Credit Receipts into the BofA Account. TVM Credit Receipts generate approximately $40,000 in Fare Revenues per month. As of the Petition Date there were approximately $30,000 in TVM Credit Receipts in process with the Merchant Bank or in the Merchant Accounts.

114.    CSA Booth Receipts are managed and controlled by LVMC and until recently, were deposited into LVMC's WFB Collection Fund approximately three times per week. On January 4, 2010, LVMC began depositing the CSA Booth Receipts into the BofA Account. CSA Booth Receipts generate less than 1% of all Fare Revenues. There were $650 of CSA Booth Receipts on hand with LVMC as of the Petition Date.

115.    Web Receipts are processed through PayPal and Wells Fargo Bank, N.A. Deposits are automatically directed by LVMC to the WFB Collection Fund within one to three days of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc    36

purchase.  Due to the nature of the mechanisms in place for collection of Web Receipts, no provisions were made prior the Petition Date for deposit of the Web Receipts into the BofA Account.

116.    Advertising purchases are usually made to LVMC by check, which until recently, were deposited into the WFB Collection Fund.  Occasionally purchases are paid by wire transfer, in which case wire instructions were submitted by LVMC to the purchaser for the WFB Collection Fund.  On January 4, 2010, LVMC began depositing all Ad Revenues into the BofA Account, and issuing wire instructions for the BofA Account.  As of the Petition Date, LVMC has no outstanding receivables for advertising.

117.    As of the Petition Date, LVMC had approximately $226,346.06 in the WFB Accounts.  As of the Petition Date, LVMC had a balance in the BofA Account of approximately $971,041.52, an estimated $226,803.95 in undeposited TVM Cash Receipts and CSA Booth Receipts consisting of $64,594 in coin inventory, $162,209.95 in undeposited TVM Cash Receipts (some of which must remain in the TVMs to make change), and $650 in CSA Booth Receipts, and an estimated $30,000 in TVM Credit Receipts in process at the Merchant Bank.

118.    I believe the Bank Accounts, and in particular the BofA Account, are essential for the Debtor's continued management of its available funds and its postpetition revenues.  As described above, maintenance of the BofA Account is necessary to insure the continued operation of the Monorail.  Further, the Debtor's cash processor, Brinks, is under instruction to deposit TVM Cash Receipts, which are the Debtor's largest source of revenue, into the BofA Account.  I believe that to require Brinks to deposit the Debtor's receipts into another account is likely to significantly disrupt the Debtor's cash flow during the early stages of this Chapter 11 Case.

119.    Each of the other Bank Accounts maintained at Wells Fargo, including the Collection Fund, the Revenue Fund, and the Dormant Accounts, while not necessary to the Debtor's day-to-day operation of its business at this time, are required to be maintained pursuant to the Senior Indenture.  I am advised and believe that to require the Debtor to close all of these accounts and open new accounts would require a significant expenditure of time and resources.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

37

120.    The Debtor further seeks authorization to continue the use of its Merchant Accounts to process TVM Credit Receipts and any other credit card receivables.  I have been advised and believe that it would take a substantial amount of time to obtain new Merchant Accounts from the credit card companies.  Thus, if the Debtor is not permitted to continue to use the Merchant Accounts as a debtor-in-possession, it could not offer its customers the service of allowing them to pay for Monorail tickets with credit cards for whatever period of time it would take for the Debtor to obtain new Merchant Accounts.  The absence of credit card services would materially and adversely affect the Debtor's business.

121.    Further, as of the Petition Date, I am informed and believe that TVM Credit Receipts that were deposited in the Merchant Accounts were in various stages of processing.  To prevent the disruption that might otherwise occur with such processing, I believe it is in the best interest of the Debtor's estate to be authorized to continue to use the Merchant Accounts rather than to close these accounts and then open new accounts.

122.    Establishing a new Cash Management System could entail significant delay and cost.  At a minimum, disruptions to the Debtor's business could occur by, among other things, delaying the payments to employees, utilities, and Bombardier.  This would in turn harm trade creditors, visitor confidence, and employee loyalty, and would hinder the Debtor's chances to successfully reorganize.

123.    The Debtor will maintain strict records with respect to all transfers of cash so that it is able to readily account for all transactions.  The Debtor will also advise the Banks not to honor checks issued prior to the commencement of this Chapter 11 Case, except as authorized by this Court.

124.    Because the Debtor processes large amounts of cash on a daily basis to facilitate the unique needs of the Monorail enterprise, I believe that any disruption to the Cash Management System or Bank Accounts would seriously harm the Debtor and its estate.  If the Cash Management System or Bank Accounts are disrupted, I believe it is unlikely that the Debtor will be able to escape the immediate and irreparable harm that will follow from the disruption in cash flow.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

38

**E.     EMERGENCY APPLICATION FOR ORDER PERMITTING DEBTOR TO HONOR PREPETITION TICKET PURCHASES AND REFUNDS**

125.    Subsequent to the Petition, the Debtor will file an application seeking authorization to honor purchases of tickets by customers prior to the petition date (the "Prepetition Fares"), and refund requests made within the ordinary course of business, within the Debtor's discretion (the "Tickets Motion").

126.    The Debtor authorizes approximately $1,000 to $1,500 in refunds per month pursuant to its stated policies and procedures (the "Refunds"). The Debtor authorizes Refunds to customers in limited circumstances, including rare occasions when the Monorail fails to meet the Debtor's operational efficiency standards, when a TVM malfunctions, or when a customer inadvertently purchases the wrong product.

127.    Maintaining the satisfaction and goodwill of the community and the riders of the Monorail, including both residents of the community and prospective guests, is imperative to the success of any reorganization by the Debtor. Failure to honor the Prepetition Fares would have a substantial chilling effect on the willingness of repeat and potential customers to purchase tickets, and maintaining the satisfaction and confidence of both the community and prospective guests is imperative to the Debtor's on-going business operations and consequently, the success of any reorganization by the Debtor. Should the Debtor fail to honor Prepetition Fares immediately upon the filing of the Petition, I believe that the loss of confidence occasioned by the failure and the resulting detrimental impact on the Debtor's reorganization effort would be immediate.

128.    As of the Petition Date, Debtor estimates that it has sold 1,500 Prepetition Fares, for which customers have paid $30,000.

129.    The Debtor pays approximately $1,000 to $1,500 per month in Refunds. The relief requested by the Tickets Motion will not alter the Debtor's policies or procedures regarding Refunds.

130.    The effect of failing to honor Refunds within its standard policy guidelines would negatively impact the Debtor's operations in the same manner as failing to honor Prepetition

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc

1    Fares.  Failure by the Debtor to honor its policy with respect to Refunds would have a substantial

2    chilling effect on the willingness of repeat and potential customers to purchase tickets, and

3    maintaining the satisfaction and confidence of both the community and prospective guests is

4    imperative to the Debtor's on-going business operations and thus the success of the Debtor's

5    reorganization effort.

6        131.    The Debtor has sufficient cash on hand to honor all of the foregoing obligations.  The

7    Debtor's operations are currently generating a positive cash flow, prior to debt service, and the

8    Debtor presently has in excess of $1 million either in cash or in its unencumbered bank

9    account(s) as of the Petition Date.

10       132.    It is my business judgment that the relief requested herein is in the best interests

11   of the Estate and the Debtor's creditors, as it will have little, if any, economic impact on the

12   Debtor's creditors, while preserving invaluable customer goodwill and confidence.  Should

13   Prepetition Fares and Refunds not be honored, customers will not continue to purchase tickets,

14   thus causing a decrease in ridership and ultimately revenue.  The importance of the Debtor's

15   customer loyalty, and the need to encourage customers to continue riding the Monorail is

16   critical.

17       I declare under penalty of perjury of the laws of the United States that these facts are true

18   to the best of my knowledge and belief.

19       DATED 13th day of January, 2010.

20

21                                             Curtis L. Myles, III

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-001/781381_8.doc