LEWIS AND ROCA LLP
LAWYERS

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Facsimile (702) 949-8321
Telephone (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429
Facsimile (602) 734-3824
Telephone (602) 262-5756

Susan M. Freeman (AZ State Bar No. 004199)
Email: sfreeman@lrlaw.com *(pro hac vice application pending)*
Rob Charles (NV State Bar No. 006593)
Email: rcharles@lrlaw.com
Stefan M. Palys (NV State Bar No. 011434)
Email: spalys@lrlaw.com

*Attorneys for Indenture Trustee Wells Fargo Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re

LAS VEGAS MONORAIL COMPANY, a Nevada non-profit corporation,

Debtor.

CASE NO. 10-10464-BAM

CHAPTER 11

**INDENTURE TRUSTEE'S OBJECTION TO USE OF CASH COLLATERAL AND MOTION FOR ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363(c)(2) AND 363(e)**

All of the Debtor's money, wherever held, is the cash collateral of Wells Fargo Bank, N.A. as Trustee under a Senior Indenture dated September 1, 2000 ("Trustee"). The Trustee objects to the Debtor's use of cash collateral without first providing adequate protection as set forth in this motion. The Trustee's motion is made without prejudice to its joinder in a motion to dismiss this case, and in recognition of its entitlement to adequate protection for as long as this case may last.

. . .

. . .



## SUMMARY

The Debtor, Las Vegas Monorail Company ("LVMC") financed its acquisition and operation of the monorail through industrial development bonds in the amount of approximately $650 million issued by the Director of the Nevada Department of Business and Industry (the "Director"). In exchange for the loan of the bond proceeds, the Director took a security interest in all of LVMC's contracts and revenues, among other things. That UCC security interest supplemented the Director's statutory lien on all of LVMC's revenues. The Director assigned its statutory lien and security interest to the Trustee on the bonds issued to finance LVMC.

LVMC defaulted on its bond indebtedness three years ago, triggering an obligation both under the bond documents and Article 9 of Nevada's Commercial Code to immediately turn over all of its money upon receipt to the Trustee, for deposit in a trust account held at Wells Fargo Bank. The point of this arrangement was to set up a lock box account, ensuring that the Trustee has control of the funds, and so could exercise authority to ensure the funds are only being spent for a proper purpose: reasonable and necessary operation and maintenance expenses for the monorail. <u>LVMC complied with this arrangement for two years and eight months</u>.

That was until September, 2009, when LVMC started to hide its cash in another bank in an effort to (1) defeat the Trustee's security interest, and (2) avoid the Trustee's oversight and right to withhold payment on expenses that were not reasonable and necessary. In other words, the Debtor converted the Trustee's collateral.

Legal arguments aside, LVMC reneged on its promises to the Director. That should be concerning to this Court because based on LVMC's promises, the Director gave the bonds the imprimatur of the State of Nevada. In reliance on those promises, the



Director raised $650 million from private investors; the bondholders. The Trustee represents the interests of the bondholders here.

LVMC has proven it cannot be trusted with the Trustee's collateral, and that significant steps must be taken before the Trustee's interests can be "adequately protected."

Assuming this bankruptcy case is not dismissed at the outset,[1] the Trustee, by this motion, gives notice of its non-consent to the use of its collateral. Accordingly, LVMC can only use cash if it can adequately protect the Trustee's interests. That is difficult given that every dollar spent is a dollar of the Trustee's collateral lost. The Trustee submits that to adequately protect its interest, LVMC must: (1) maintain all funds (including all DIP accounts) in the Revenue Fund at Wells Fargo Bank pursuant to the lock-box arrangement detailed in the parties' Financing Agreement dated September 1, 2000 (the "Financing Agreement"), with all revenues deposited into the Trustee's Revenue Fund, and with the Trustee advancing money back to LVMC for authorized expenditures under the requisition approval procedure the parties agreed to and used for years prepetition (until LVMC's diversion and conversion of funds); (2) agree upon and comply with a budget, including amounts to fund and replenish an account for Trustee's administrative expenses; (3) grant the Trustee a post-petition replacement lien in all of the Collateral; (4) grant the Trustee a first-priority lien on all of LVMC's unencumbered real and personal property; (5) require that LVMC provide full and complete financial reports and projections to the Trustee and Ambac Assurance Corporation ("Ambac") on a weekly basis, and provide the Trustee and Ambac with notices and Collateral inspection rights as set forth in Financing Agreement §

[1] The Trustee has joined in Ambac Assurance Corporation's motion to dismiss on the grounds that this Court does not have proper jurisdiction over LVMC pursuant to 28 U.S.C. §1334(b) and section 109(d) of the Bankruptcy Code because LVMC is ineligible to be a chapter 11 Debtor, as it is a municipality.




11.01; and (6) allow a Section 507(b) superpriority administrative expense claims in favor of the Trustee, to the fullest extent necessary to protect the Trustee from any diminution in the value of its collateral, to the extent this adequate protection proves inadequate.

This motion is made pursuant to 11 U.S.C. §§ 361 and 363, and is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, subject to this Court's determination as to whether LVMC is eligible to be a chapter 11 Debtor. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

#### A. LVMC Obtains the Rights to Run the Monorail and Enters Into Subcontracts To Operate It

Clark County, Nevada, granted a franchise to operate the monorail pursuant to the Clark County Monorail Franchise Agreement dated as of December 2, 1998, as amended (the "Franchise Agreement"). The rights under the Franchise Agreement are now held by LVMC, which authorizes LVMC to charge and collect fares from passengers, display advertising, establish concessions, and lease space on the monorail.[2]

LVMC has entered into a contract called the Operation & Maintenance Agreement (the "O&M Agreement") with Bombardier Transit Corporation through which Bombardier operates the monorail for LVMC.[3] LVMC's rights in the O&M Agreement were assigned to the Trustee as collateral for LVMC's payment obligations to the Trustee.[4]

---

[2] Declaration of Gavin Wilkinson, attached as **Exhibit A** hereto, ¶ 3.

[3] Wilkinson Dec. at ¶ 4.

[4] *Id.*



### B. Monorail Financing

LVMC financed its acquisition of the monorail with a series of three tax-exempt bonds issued by the Director: (1) the $451,448,217.30 original principal amount 1st Tier Bonds (the "1st Tier Bonds"); (2) the $149,200,000 original principal amount 2nd Tier Series 2000 (the "2nd Tier Bonds;" the 1st Tier Bonds and 2nd Tier Bonds are collectively the "Senior Bonds"); and (3) the $48,500,000 original principal amount 3rd Tier Series 2000 (the "Subordinated Bonds").[5] The Director entered into the Senior Indenture dated September 1, 2000 (the "Senior Indenture") pursuant to which the Senior Bonds were issued in accordance with N.R.S. §§ 349.400 to 349.670.[6] The Director then loaned the proceeds of the Senior Bonds to LVMC pursuant to a Financing Agreement.[7]

Among the bond financing documents, LVMC executed the Financing Agreement with the Director and a Senior Promissory Note (the "Senior Note").[8] Pursuant to the terms of the Financing Agreement, the Director agreed to issue bonds in the total amount of $649,148,217.30 and to loan the funds raised by the issuance of the bonds to LVMC. Under the Financing Agreement and Senior Note, which incorporate the Senior Indenture, LVMC promised to repay the bond indebtedness.[9] The Financing Agreement, the Senior Indenture, the Senior Note, and all other documents related to the September 1, 2000 bond transaction are hereafter collectively referred to as the "Financing Documents." The State of Nevada authorized and approved the bond transaction based on the carefully constructed terms and conditions in the Financing Documents.

---

[5] Wilkinson Declaration at ¶¶ 5-6.

[6] Wilkinson Declaration at ¶ 7 (the Senior Indenture is attached as Exhibit 1 to Mr. Wilkinson's Declaration).

[7] Wilkinson Declaration at ¶ 7.

[8] Wilkinson Declaration at ¶ 8 (copies of the Financing Agreement and Senior Note are attached to the Wilkinson Declaration as Exhibits 2 and 3).

[9] Wilkinson Declaration at ¶ 10 (a copy of the Senior Indenture is attached thereto as Exhibit 4).



The Trustee is currently serving as the indenture trustee on the 1st Tier Bonds issued by the Director pursuant to the terms of the Senior Indenture and indenture trustee on the 3rd Tier Bonds issued pursuant to the terms of a Subordinate Indenture dated September 1, 2000 (the "Subordinate Indenture"); and is serving as the co-trustee on the 2nd Tier Bonds issued pursuant to Senior Indenture.[10]

**C. The Trustee's Rights Under the Senior Indenture**

The Senior Indenture granted certain rights to the Trustee so that it could administer the Funds and protect the Bondholders. Among those rights:

- The Trustee is entitled to compensation and reimbursement of expenses, including attorneys' fees and costs, all of which are indemnified by LVMC.[11] That indemnification obligation continues postpetition, and is an administrative expense obligation of LVMC.
- The Trustee is not required to expend or risk its own funds or otherwise incur individual financial liability in the performance of its duties or in the exercise of any of its rights or powers other than to notify the Director or the Bondholders that the Trustee will not take a particular action after an Event of Default.[12]
- Upon and during an Event of Default, the Trustee is entitled to use all Revenues and any other funds then held or thereafter received by the Trustee under any of the provisions of the Senior Indenture (subject to rebate and other tax requirements) to pay the Trustee's expenses and any expenses

[10] Wilkinson Declaration at ¶ 11.

[11] Senior Indenture § 8.06 (Wilkinson Dec. Ex. 1); Financing Agreement §§ 7.3, 9.2, 9.3 (Wilkinson Dec. Ex. 2).

[12] Senior Indenture §§ 8.01(A), 8.03(E) (Wilkinson Dec. Ex. 1).




necessary in the opinion of the Trustee to protect the interests of the Bondholders.[13]

**D. The Trustee's Perfected Security Interests**

Under the Senior Note and under the Financing Agreement, both of which incorporate the Senior Indenture, LVMC agreed to pay the Director and granted the Director a security interest in the following ("Collateral"):

> As security for the payment of any and all amounts due hereunder, the Borrower [LVMC] hereby grants, assigns and pledges to the Director [now, the Trustee] a security interest in all of the Borrower's right, title and interest in, to and under the following (hereafter, the "Collateral"): (i) <u>contract rights of the Borrower under the</u> Purchase Agreement, the Design-Build Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the <u>Franchise Agreement</u> and any amendment or successor agreement thereto, (ii) the <u>Net Project Revenues</u>, and (iii) <u>all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or this Agreement</u> . . . whether now owned by [LVMC] or hereinafter acquired and <u>whether now existing or hereinafter coming into existence</u> and <u>all money, deposits, funds and balances</u> . . . and all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and <u>all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing</u>, including <u>all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing</u>.[14] (emphasis added)

The Director assigned all of its rights to the Trustee.[15] The Trustee holds perfected security interests based on the Director's filings and the Trustee's status as an assignee,

[13] Senior Indenture § 7.03 (Wilkinson Dec. Ex. 1).

[14] Financing Agreement § 3.01(b) (Wilkinson Dec. Ex. 2).

[15] Wilkinson Declaration at ¶ 12.



based on the Trustee's own UCC-1 filings, and pursuant to its control of certain LVMC deposit accounts.[16]

**E. Monorail Operations**

LVMC generates revenue primarily from the sale of tickets to riders ("Fare Revenues").[17] Fare Revenues are received through the sale of tickets on the internet, and through cash and credit card purchases at the Monorail's stations.[18] Brinks Currency Services ("Brinks") periodically picks up cash from the ticket vending machines at the various Monorail stations and deposits the money into bank accounts specified by LVMC.[19]

Following Fare Revenues, the largest component of the Monorail's revenues derives from sale of advertising (the "Advertising Revenues" and collectively with the Fare Revenues, the "Project Revenues" as more particularly defined below).[20] Advertising purchases are usually made to the Monorail by check, which is deposited into the "Collection Fund."[21] The Collection Fund is an account at Wells Fargo Bank established pursuant to the terms of the Financing Agreement. Post-default, Collections Fund money is swept daily into the Revenue Fund, which is held by the Trustee at Wells Fargo Bank in trust for the benefit of the bondholders.[22] As noted, LVMC followed this practice for two years and eight months after defaulting on the bonds.

---

[16] Wilkinson Declaration at ¶ 13 (copies of the relevant UCC filings are attached as Exhibit 5 to Mr. Wilkinson's Declaration).

[17] Wilkinson Declaration at ¶ 15.

[18] Wilkinson Declaration at ¶ 16.

[19] Wilkinson Declaration at ¶ 17.

[20] Wilkinson Declaration at ¶ 18.

[21] Wilkinson Declaration at ¶ 19.

[22] Wilkinson Declaration at ¶ 20 (and Ex. 2, Financing Agreement § 4.1(b)(vi)).



**F. LVMC's Pre-Petition Defaults**

The Financing Agreement requires LVMC to make monthly payments to the Trustee in an amount sufficient to fund debt service on the bonds and to replenish shortfalls in the debt service reserve accounts for the bonds.[23] LVMC failed to make monthly payments of Net Project Revenues in amounts sufficient to pay its operating and maintenance expenses and debt service obligations starting in June, 2006 and continuing ever since.[24] This was an Event of Default under the terms of the Financing Agreement.[25] LVMC admitted this default by sending a notice to the Trustee (as required by the Financing Agreement § 4.1(d)) on January 5, 2007, LVMC stating that December, 2006 was the sixth month in which LVMC would be unable to meet its financial obligations under the Financing Documents and therefore it would transfer its funds to the Trustee.[26]

Without sufficient net revenues, LVMC defaulted on its bond payment obligations, and the Trustee withdrew moneys from certain reserve funds to make each of the next five scheduled semi-annual debt service payments (in January and July of 2008 and 2009, and January, 2010).[27]

**G. LVMC's Post-Default Obligation to Deposit Funds With the Trustee; and The Trustee's Compliance With its Obligations**

Following LVMC's failure to make required payments on the bonds, LVMC was required to "**promptly upon receipt, transfer all Project Revenues to the Trustee for deposit in the Revenue Fund**, and thereafter all payments permitted or required to be

[23] Wilkinson Declaration at ¶ 21.

[24] Wilkinson Declaration at ¶ 22.

[25] *Id.*

[26] Wilkinson Declaration at ¶ 23 (a copy of the notice is attached as Exhibit 6 to Mr. Wilkinson's Declaration).

[27] Wilkinson Declaration at ¶ 24.



paid from the Collection Fund for Operation and Maintenance shall be paid by the Trustee from the Revenue Fund upon written direction of [LVMC]."[28] LVMC was required to remit all of its money to the Trustee for deposit in the Revenue Fund held at Wells Fargo Bank, to ensure that the Trustee would have control over the Project Revenues. Money in the Revenue Fund is part of the Trustee's trust estate, in which LVMC does not hold an ownership interest. This creates a "lock-box" arrangement where all borrower money goes to the secured creditor, and the secured creditor re-advances funds necessary to meet the borrower's operating and maintenance expenses.

The Financing Documents define "Operation & Maintenance Costs" that can be paid with Project Revenues by incorporating a threshold requirement that they be "reasonable and necessary."[29] After a default by LVMC, the Trustee is authorized to make the determination of whether operation and maintenance expenses are reasonable and necessary.[30] The Trustee acknowledged its duty under the Financing Documents to advance funds to pay LVMC's reasonable and necessary operating and maintenance expenses, and had done so for the past three years.[31]

Historically, the Trustee approved virtually all requisitions submitted by LVMC.[32] In fact, in the last six months the Trustee approved 96.76% of all of LVMC's requisitions.[33] The Trustee has only disapproved of expenses that had not been justified

[28] Wilkinson Declaration at ¶ 26 (and Ex. 1, Financing Agreement § 4.1(b)(vi) (emphasis added)).

[29] Wilkinson Declaration at Ex. 1, Financing Agreement § 4.1(b)(vi) (requiring LVMC to apply for payment of operating and maintenance expenses); Senior Indenture § 1.01 (defining operating and maintenance expenses as only those which are reasonable and necessary)).

[30] Wilkinson Declaration at ¶¶ 27-29.

[31] Wilkinson Declaration at ¶¶ 30-32 (and Chart attached thereto as Ex. 7, reflecting Trustee's actions on disbursement requests over the last six months).

[32] Wilkinson Declaration at ¶ 32.

[33] *Id.*




*i.e.*, were not "reasonable and necessary."[34] For example, the Trustee withheld some, but not all, professional expenses when the basis for such requisitions was unclear, or when the professional wanted a retainer despite its invoices having been paid when submitted.[35]

Notably, by requiring that Project Revenues be deposited at Wells Fargo and transferred into the Revenue Fund, LVMC agreed that the Trustee would have control over disbursements for reasonable operating and maintenance costs, "control" of the account and an attendant first-priority security interest pursuant to Article 9 of Nevada's Commercial Code, and ownership of the money pending authorized disbursements.[36] The Financing Documents do not provide LVMC with the latitude to have any other deposit relationship with respect to the Project Revenues, since all Project Revenues must be deposited with the Trustee.[37]

**H. LVMC's Improper Diversion of Funds**

After LVMC complied with the lock box arrangement for nearly three years, the Trustee recently found out that LVMC had been diverting funds to an account at Bank of America (the "BA Account"), in an apparent effort to avoid the Trustee's security interest and ownership interest, as explained in more detail below, and contrary to LVMC's obligations under the Financing Documents.[38]

The Trustee heard of LVMC's improper diversions, and on January 7, 2010, received written confirmation when it obtained Brinks records showing that Brinks was picking up fare money from LVMC stations and depositing the money in the BA

---

[34] Wilkinson Declaration at ¶ 33.

[35] *Id.*

[36] Wilkinson Declaration at ¶ 29.

[37] Wilkinson Declaration at Ex. 2, Financing Agreement § 4.1(b)(vi).

[38] Wilkinson Affidavit at ¶¶ 35-37 and ¶¶ 44-45, and Bank of America, Brinks, and LVMC documents attached thereto as Exhibits 8-13 thereto.




Account.[39] The Trustee also obtained Bank of America account records from LVMC, showing that nearly $1 million had been diverted into the BA Account in violation of the terms of the Financing Agreement.[40] Lastly, the Trustee obtained documents showing that LVMC was quickly churning through the money in the BA Account, and records showing it planned to build the amounts in the BA Account up to approximately $1.6 million over the coming months by taking money meant to be held in the Revenue Fund at Wells Fargo Bank.[41]

## Argument

### I. The Trustee Does Not Consent to the Debtor's Use of Cash Collateral Without Adequate Protection

#### A. All LVMC Cash Is The Trustee's Cash Collateral

As the factual background shows, *all* of LVMC's cash is the Trustee's collateral. This is so for four reasons.

##### 1. Original Collateral

First, all cash in any Fund is the Trustee's original collateral pursuant to LVMC's grant of a consensual security interest. Pursuant to the Financing Documents, the Trustee has a security interest in "(ii) the Net Project Revenues, and (iii) all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or [the Financing] Agreement (except the Rebate Fund and the Indemnification Account of the Contingency Fund), whether now owned by the Borrower or hereinafter acquired and whether now existing or hereinafter coming into existence and all money, deposits, funds and balances . . ." as well as any proceeds from the collateral described. *See* Financing Agreement § 3.1(b) (emphasis added).

---

[39] Wilkinson Declaration at ¶¶ 36-39 and Ex. 8 thereto.

[40] Wilkisnon Declaration at ¶¶ 39-40, 42.

[41] Wilkinson Declaration at ¶¶ 41-43. and Exs. 11-13 thereto.



LVMC's money is from fares and advertising. By tracing through the definitions section in the Senior Indenture, one can see that all of that money from fares is the Trustee's collateral. The Trustee has a security interest in Net Project Revenues. The definition of that term is in Senior Indenture § 1.01, and it is defined as Project Revenues less Operation and Maintenance Expenses (which include bond payments). Project Revenues, in turn, includes: "**all gross income and revenue received or receivable by [LVMC]** . . . including, but not limited to farebox revenues . . . advertising revenues . . . and all other income and revenue howsoever derived by [LVMC] . . . ." Senior Indenture § 1.01. Post-default, all Project Revenues are required to be deposited into Wells Fargo Bank accounts and become part of one of the Funds in which the Trustee holds a security interest or an ownership in trust interest.

### 2. Statutory Lien

Second, all LVMC cash is the Trustee's collateral by virtue of a lien created by Nevada statutes applicable to municipal bond financing. Pursuant to N.R.S. § 349.620(1), a lien is automatically imposed on all cash and proceeds derived from LVMC's operations: "The principal of, the interest on and any prior redemption premiums due in connection with the bonds issued pursuant to NRS 349.400 to 349.670, inclusive, are payable from, secured by a pledge of, and constitute a lien on the revenues out of which the bonds have been made payable." Here, among other assets the Director pledged, were "all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or this Agreement (except the Rebate Fund and the Indemnification Account of the Contingency Fund) . . . ." *See* Senior Indenture § 5.01(A) and Financing Agreement § 4.4.[42]

The liens provided by N.R.S. § 349.620 constitute "statutory liens" under Section

[42] Exs. 1 and 2 to the Wilkinson Declaration.




101(53) of the Bankruptcy Code, which are unaffected by Code Section 552(a) and continue to attach to all of LVMC's post-petition Revenues, Funds and the proceeds thereof.

The term "statutory lien" is defined, in part, by Section 101(53) of the Bankruptcy Code, as a lien arising solely by force of statute on specified circumstances or conditions.[43] *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 314 (1977) ("[a] statutory interest is only one that arises automatically, and is not based on an agreement to give a lien or on judicial action."). Thus, a statutory lien arises automatically by operation of law. *See Barstow v. IRS*, 272 B.R. 710, 713 n.2 (D. Alaska 2001) (A statutory lien arises strictly by operation of law without either the consent of the debtor or the involvement of a court in its creation); *See also* 2 King, Lawrence P., et al, *Collier on Bankruptcy,* ¶101.53 (15th ed. Rev. 2009) ("If the lien arises by force of statute, without any prior consent between the parties or judicial action, it will be deemed a statutory lien"). A statutory lien is not undermined or displaced by a consensual lien. *See In re County of Orange*, 189 B.R. at 504 ("Whether a separate security agreement [exists] or not, the documentation between the parties does not displace the statutory lien…a creditor can possess "simultaneous separate liens" that are both statutory and non-statutory").

The Trustee's liens arose automatically pursuant to N.R.S. § 349.620(1). Once bonds were issued pursuant to N.R.S. §§ 349.400 through 349.670, those statutes automatically provided for a lien on revenues derived from such bonds. Nevada statutory law further provides in section 349.620(1) that the Director has discretion to extend such statutory lien to other collateral including the proceeds of such bonds and revenues without the need for further action or agreement on behalf of the parties, discretion that



2123044.3



was exercised by the Director here.[44] Accordingly, the money from which the Senior Bonds are made payable, including all money in Funds and all proceeds thereof, are encompassed by the Trustee's statutory lien.

Because the Trustee's liens are statutory liens, section 552(a) of the Bankruptcy Code, which severs pre-petition liens in certain circumstances, is not applicable.[45] Section 552(a) only applies to consensual liens arising from negotiated agreements and does not extend to statutory liens. *In re County of Orange*, 189 B.R. at 502; *see also* 5 King, Lawrence P., et al, *Collier on Bankruptcy,* ¶552.01[02] (15th ed. Rev. 2009). Thus, the statutory liens held by the Trustee attach to all pre- and post-petition cash. To the extent that LVMC seeks to use, or receives, postpetition Collateral subject to the Nevada statutory liens, the Trustee's interests in such Collateral must be adequately protected by the various measures requested herein.

**3. Proceeds**

Third, all LVMC cash consists of proceeds of the Trustee's collateral. 11 U.S.C. § 363(a) (defining "cash collateral" as including proceeds). Proceeds are broadly defined as including: "(1) whatever is acquired upon the . . . lease, license . . . or other disposition of

[44] *See* Wilkinson Declaration Exhibit 1, Senior Indenture § 5.01(A) (granting an interest in "all of the Revenues and any other amounts (including proceeds of the sale of Bonds) held in any fund or account . . . "). The fact that the Director has some discretion with respect to certain of the assets it chose to pledge to the Trustee does not affect the characterization of the Nevada Liens as "statutory liens" pursuant to section 101(53) of the Bankruptcy Code. *See Alliance Capital Management L.P. v. County of Orange (In re County of Orange)*, 189 B.R. 499, 503 (C.D. Cal. 1995) ("the plain language of the statute creates a statutory lien. [The statute] permits the County to decide *whether* to pledge, and *what* to pledge. But the statute itself imposes the pledge, without further action by the County").

[45] Section 552(a) of the Bankruptcy Code provides that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the Debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the Debtor before the commencement of the case." 11 U.S.C. § 552(a).




collateral; (2) whatever is collected on, or distributed on account of, collateral; [or] (3) rights arising out of collateral . . . ." N.R.S. §104.9102(1)(kkk).

No one can operate the monorail without receiving permission from Clark County under the Franchise Agreement. In other words, but for its rights under the Franchise Agreement, LVMC could not operate the monorail. As a result, *all* of LVMC's revenue only comes into being as a result of the permission granted to LVMC to run the monorail, and as a result of the collateral assignment of rights under the Franchise Agreement, the Trustee has a security interest in all money collected on account of or by virtue of rights arising out of the Franchise Agreement as the proceeds thereof.

This is not the first time a Court has examined the nature of money generated by an contractual permit to conduct a particular business. The case of *In re Value-Added Communications, Inc.* demonstrates that where a party conducts a business pursuant to a contractual grant of the right to do so, all of the money generated is proceeds of that contractual right (even under the more restrictive definition of "proceeds" under pre-2001 Article 9). 139 F.3d 543 (5th Cir. 1998). In that case, the secured party entered into a financing lease with the debtor through which the debtor financed the purchase of pay telephones. The debtor then entered into a contract with the state of Minnesota (the "Site Leases") that granted the debtor the right to put the pay phones in state prisons. To secure the "lease" payments, the secured party and the debtor executed a security agreement giving the secured party a security interest in the pay phones themselves, and the Site Leases, and the proceeds of both. The secured party filed a financing statement that mentioned its interest in the debtor's "equipment" but left out mention of the Site Leases. The debtor subsequently filed for bankruptcy and the bankruptcy trustee moved to avoid the secured party's lien on the cash generated by the pay phones on the basis that the secured party's interest in the cash was not perfected.



The secured party argued that the cash was proceeds of its security interest in the equipment. The court held that the secured party's interest was avoidable. The problem was that the secured party only perfected its interest in "equipment" in its financing statement. The court reasoned that the money deposited in the phones were not proceeds of "equipment" because the money was generated from the use of the equipment, which wasn't in the definition of proceeds in the pre-2001 version of 9-306. Instead, the court said, the money was actually the proceeds of the Site Leases between Minnesota and the debtor, which the financing statement failed to include.

*Value-Added* is on all fours with the present case. The Site Leases from *Value-Added* are directly analogous to the Franchise Agreement: both granted the debtor the right to conduct a business. And in both cases, all money generated by the contractual right to run the business is therefore proceeds of that underlying right. Here, the Franchise Agreement is the authorization that permits the LVMC to run the Monorail. Accordingly, all cash that LVMC generates from operating the Monorail (including fares) constitutes proceeds of the Franchise Agreement, and the Trustee has a security interest in that contract. LVMC also pledged its interests in other agreements, and all of its current assets are proceeds of those agreements as well. *See* Financing Agreement § 3.1(b).

LVMC may argue that its cash cannot be "proceeds" because it is not attained from the "disposition" of any collateral. Some courts found that to be determinative under the pre-2001 version of Article 9, although as *Value Added* demonstrates contracts could still generate proceeds without being "disposed of." *See, e.g., FDIC v. Hastie*, 2 F.3d 1042 (10th Cir. 1993) (stock dividends not proceeds of stock that was secured parties' collateral). However, the drafters of Revised Article 9 (the version now in effect) greatly expanded the definition of "proceeds" to broaden the scope of the term "proceeds." The drafters of the U.C.C. believed the courts construing old Article 9's definition of proceeds




got it wrong, and amended the definition specifically to reject those holdings. *See* U.C.C. § 9-102(a)(64) and cmt. 13(a) ("This section rejects the holding of *FDIC v. Hastie* . . . .").

The current, expanded definition of proceeds makes it even more clear that all LVMC money is collateral. In fact, the expanded definition of proceeds contemplates as much. P.E.B. Study Group Report at p. 111 (December 1, 1992) (noting expanded definition of proceeds "include[s] as proceeds those things that are . . . associated with an interest in the original collateral" and "embrace[s] all forms of distributions on account of securities, partnership interests, and other intangibles . . . and other payments that do not involve an 'exchange.'").

As it has an interest in all of LVMC's cash collateral as "proceeds," the Trustee's interests in LVMC's cash cannot be extinguished by Section 552. Various courts have held that post-petition proceeds of pre-petition contract rights are encompassed by the "proceeds exception" established by section 552(b)(1) of the Bankruptcy Code. *See, e.g., In re Wabash Valley Power Ass'n*, 114 B.R. 613, 617-18 (S.D. Ind. 1989) (mortgage provisions create a security interest in the debtor's contract rights and the proceeds of such contracts pursuant to section 552(b) of the Bankruptcy Code); *United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1191 (4th Cir. 1986) (cash proceeds generated under a pre-petition contract for the supply of coal but received by the debtor after the bankruptcy filing were subject to the creditor's security interest in the contract and its proceeds); *Everett Home Town Ltd. Partnership*, 146 B.R. 453, 458 (Bankr. D. Ariz. 1992) (membership fees paid post-petition were deemed proceeds of pre-petition membership agreements); *United States v. Jones (In re Jones)*, 181 B.R. 538, 541 (D. Kan. 1995) ("If, however, the payments… are deemed proceeds of a contract right which existed and became property of the estate on the filing date, the liens of the [creditor] would attach").



**4. Setoff Rights**

Fourth, the Trustee has a right of offset in all funds that it holds. 11 U.S.C. § 553. The Trustee has claims against LVMC for the Trustee's costs and expenses of addressing LVMC"s defaults, as well as for the amounts necessary to cure the defaults and comply with LVMC's debt servicing obligations. To the extent LVMC has left some of its cash in Wells Fargo bank accounts, as required by the bond financing documents, that cash is subject to the Trustee's offset rights.

**B. The Trustee's Adequate Protection Rights Should be Informed by Congressional Policy in Chapter 9**

LVMC is a government-created and controlled non-profit corporation, created to finance and operate a public project, using government-issued industrial development bonds authorized by statute. LVMC certified and admitted in writing, when seeking State approval of the bond transaction as tax-exempt, that it "is an instrumentality of the State of Nevada, [and] is controlled by the Governor of the State of Nevada…"[46] The Governor of Nevada controls LVMC, including by controlling its management and its budget, and the financing for LMVC came from government-issued industrial development bonds.

This case should have been filed under Chapter 9, and the Trustee has joined in Ambac's motion to dismiss the case for that reason. *See* 11 U.S.C. §§ 101(40) and 109(c) (a municipality may only be a Chapter 9 debtor; a municipality includes any instrumentality of the state); *see, e.g., In re County of Orange*, 183 B.R. 594, 602 (Bankr. C.D. Cal. 1995) (citing revenue bond financing vehicles as examples of municipalities); *see also In re Ellicott School Bldg. Auth.*, 150 B.R. 261, 264 (Bankr. D. Colo. 1992) ("the standard for determining whether an authority or agency is private or public is whether the

---

[46] Section 1.8 of the Tax Certificate and Agreement, dated September 20, 2000 (the "**Tax Agreement**"), between LVMC and the Director of the State of Nevada Department of Business and Industry (the "**Director**"), as issuer of the tax-exempt Bonds



agency or authority is subject to control by state or municipal authority."). Since LVMC is an "instrumentality" of the state, it is not eligible to be a Chapter 11 debtor.[47]

The Trustee believes that LVMC did not file this case under Chapter 9 based upon its construction of 11 U.S.C. § 109(c)(2) which conditions Chapter 9 eligibility on the entity being "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter . . . ." There is no such express Nevada statute, although LVMC's Articles of Incorporation do refer to bankruptcy authorization.[48]

In Chapter 9, Congress expressly recognized rights of holders of government-issued bonds such as the Trustee's beneficiaries, and set forth protections for such bondholders. LVMC should not be allowed to circumvent such rights and protections by filing its case under Chapter 11. Pending a ruling on the motion to dismiss due to LVMC's ineligibility to be a Chapter 11 debtor, the protections Congress intended for municipal bondholders can and should be taken into account in determining what is required to adequately protect the Trustee's interests.

Among the key rights and protections afforded to bondholders under Chapter 9 are the following:

- The automatic stay does not apply to application of pledged special revenues. 11 U.S.C. § 922(d).

---

[47] Only a "person" may be a Chapter 11 debtor. 11 U.S.C. § 109(d). The definition of "person" in 11 U.S.C. § 101(41) excludes a "governmental unit." The definition of governmental unit includes "municipalities. 11 U.S.C. § 101(27). Municipalities, in turn, means any "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101(40). Courts have viewed an "instrumentality" as "all manner of public improvement districts, school districts and revenue-producing bodies that provide services that are paid for by users rather than by general taxes . . . ." 2 King, Lawrence P., et al, *Collier on Bankruptcy,* ¶109.04[3][a][ii] (15th ed. Rev. 2009).

[48] "All actions by the corporation involving the (i) filing, (ii) consent to a petition for relief, or (iii) the conversion of an involuntary filing into a voluntary filing under the U.S. Bankruptcy Code, as amended, shall not be effective without the unanimous prior written approval of the directors of the corporation." Article V, attached as Exhibit B to DE9.

LEWIS AND ROCA LLP LAWYERS

- Payments to or for the benefit of bondholders may not be avoided. 11 U.S.C. § 926(b).
- Security interests in special revenues acquired by the Debtor postpetition remain effective notwithstanding 11 U.S.C. § 552(a), subject to necessary operating expenses. 11 U.S.C. § 928(a).

Accordingly, at least pending a ruling on dismissal, the Trustee's security interest should be held to extend to LVMC's postpetition cash and other assets, or it should in be granted a postpetition lien notwithstanding Section 552(a), and the Trustee should continue to hold all LVMC cash in Wells Fargo accounts and to apply such money in accordance with Trustee expense reimbursement and other Senior Indenture and Financing Agreement obligations.

**C. The Debtor Cannot Use the Trustee's Collateral Absent Consent or a Court Order Providing for Adequate Protection**

A secured creditor is entitled to adequate protection as a matter of right, not merely as a matter of discretion, when a debtor proposes to use property in which such creditor has an interest. 11 U.S.C. §§ 361, 363; *Metromedia Fiber Network Servs v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) (section 363(e) of the Bankruptcy Code "is not permissive or discretionary – it states that the court 'shall' grant the relief specified, at any time, on request of the secured entity"). Unless a debtor obtains the consent of a secured creditor to use cash collateral, it must provide such creditor adequate protection. 11 U.S.C. § 363(c)(2); *Metro. Life Ins. Co. v. Sunnymead Shopping Ctr. Co. (In re Sunnymead Shopping Ctr. Co.)*, 178 B.R. 809, 814 (9th Cir. B.A.P. 1995) ("A court's authorization for use of cash collateral must adequately protect the creditor's interest in that collateral"); *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("the right of a secured creditor to the value of its collateral is a property



right protected by the Fifth Amendment," as evidenced by the requirements of section 361 of the Bankruptcy Code).

The burden is on LVMC to prove that it is providing adequate protection of the Trustee's interests. 11 U.S.C. § 363(p)(1); *In re Center Wholesale, Inc.*, 788 F.2d 541, 544 (9th Cir. 1986); *In re Wilson*, 378 B.R. 862, 888-889 (Bankr. D. Mont. 2007); *In re Ernst Home Ctr., Inc.*, 209 B.R. 955, 965 (Bankr. W.D. Wa. 1997) (the burden of proof is by preponderance of evidence).

**II. Adequate Protection of The Trustee's Interests.**

Under Section 361 of the Bankruptcy Code, the Trustee is entitled to protection from the depreciation, deterioration or diminution in the value of its collateral during the bankruptcy case. When a secured creditor is threatened with a decline in the value of its interest, the estate must make up for the decline in value either through cash payments, liens on other property or other methods that provide the indubitable equivalent of the creditor's interest. *See U.S. Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365 (1988) (secured creditor would be entitled to periodic payments or additional collateral to provide adequate protection if property is depreciating); *Travelers Life Ins. & Annuity Co. v. Ritz-Carlton of D.C., Inc. (In re Ritz-Carlton of D.C., Inc.)*, 98 B.R. 170, 173 (S.D.N.Y. 1989).

Adequate protection maintains the status quo between the petition date and the date a plan is confirmed or the underlying claim is otherwise satisfied. *See In re 354 East 66th Street Realty Corp.*, 177 B.R. 776, 781 (Bankr. E.D.N.Y. 1995). By preserving the status quo, adequate protection ensures that the secured creditor's rights and interests are not being prejudiced during the pendency of the bankruptcy case. *In re Pac. Lifestyle Homes, Inc.*, 2009 WL 688908, at 8 (adequate protection "insures that the secured creditor receives the value for which he bargained").



Approximating the maintenance of the Trustee's status quo requires LVMC to comply as fully as possible with the Senior Indenture and Financing Agreement requirements. Congress intended as much in granting holders of government bonds with special Chapter 9 protections. Accordingly, the Trustee requests adequate protection through the following means:

(1) LVMC should be required to maintain of all of its money (including all DIP accounts) in accounts at Wells Fargo Bank, which should continue to sweep all revenues daily into the Revenue Fund at that bank accordance with LVMC's Financing Agreement, to be re-advanced under the contractual requisition procedure for approved expenses.

(2) LVMC should be required to consult with the Trustee and Ambac and strive to reach agreement upon a budget for operating and bankruptcy administrative expenses, including the funding and replenishment of an account for Trustee's administrative expenses, and thereafter fully comply in good faith with that budget, so that all parties will have clear guidelines on the types of requisitions that will be approved. The Trustee provided LVMC prepetition with proposed budget and requisition terms acceptable to the Trustee, to which LVMC has not yet responded.

(3) The Trustee should be granted a post-petition replacement lien in all of the Collateral.

(4) The Trustee should further be granted a first-priority lien in all of LVMC's unencumbered real and personal property, to the extent necessary to protect against the diminution in value of the Trustee's Collateral. Since most if not all of the post-petition Project Revenues will be consumed by payment of operating and maintenance and Chapter 11 costs, it is likely that a mere post-petition replacement lien will not in fact provide meaningful adequate protection. The bond proceeds have been used to acquire and maintain the Monorail structure and rail cars, and the Trustee's Collateral will continue to



be used for such maintenance. A lien on the structure and rail cars is logical and equitable for that reason, as well as being the only realistic way to provide the Trustee with adequate protection for diminished Collateral value.

(5) LVMC should be required to provide full and complete financial reports and projections to the Trustee and Ambac on a weekly basis, and provide the Trustee and Ambac with notices and Collateral inspection rights as set forth in Financing Agreement § 11.01; and

(6) The Trustee should be allowed a Section 507(b) superpriority administrative expense claim, to the fullest extent necessary to protect the Trustee from any diminution in the value of its collateral, to the extent this adequate protection proves inadequate.

## Conclusion

For the foregoing reasons, the Trustee respectfully requests that the Court enter an order conditioning LVMC's use of the Trustee's cash collateral upon the foregoing means of adequate protections to the Trustee, and full compliance with such requirements.

Dated: January 14, 2010.

**LEWIS AND ROCA LLP**

By /s/ Stefan Palys (#11343)
Susan M. Freeman
Rob Charles
Stefan Palys
*Attorneys for Indenture Trustee*
*Wells Fargo Bank, N.A.*

LEWIS AND ROCA LLP LAWYERS

PROOF OF SERVICE

COPY of the aforementioned sent via e-mail or U.S. First Class Mail on January 14, 2010 to:

Gerald M. Gordon
Gordon and Silver
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, NV 89109
Attorneys for Debtor
E-mail bankruptcynotices@gordonsilver.com

Laurel E. Davis
Fennemore Craig, P.C.
300 S. Fourth Street, # 1400
Las Vegas, NV 89101
Attorneys for Ambac Assurance Corporation
E-mail: ldavis@fclaw.com

U.S. Trustee
300 S. Las Vegas Boulevard S.
Suite 4300
Las Vegas, V 89101

Richard F. Holley
400 S. Fourth Street, 3rd Floor
Las Vegas, NV 89101
E-mail: tholley@nevadafirm.com
Attorneys for Bombardier Transportation Holdings USA, Inc.

Bombardier Transit Corp.
Attn: Managing Member
1501 Lebanon Church Rd.
Pittsburgh, PA 15236-1491

NV Energy
Attn: Managing Member
P.O. Box 30086
Reno, NV 89520-3086

Allegiance Direct Bank
Attn: Managing Member
P.O. Box 1750
Cedar City, UT 84721

LEWIS AND ROCA LLP LAWYERS

Promethean Partners, LC
Attn: Managing Member
10816 Iris Canyon Land
Las Vegas, NV 89135

Team Grapx, Inc.
Attn: Managing Member
33562 blue Lantern #1
Dana Point, CA 92629

Anthem Blue Cross Blue Shield
Attn: Managing Member
P.O. Box 541013
Los Angeles, CA 90054-1013

Brink's U.S.
Attn: Managing Member
3200 E. Charleston Blvd.
Las Vegas, NV 89104

Nevada Department of Taxation
Bankruptcy Section
555 E. Washington Avenue, Suite 1300
Las Vegas, NV 89101

Jumbo Transportation, Inc.
Attn: Managing Member
1201 Corbin St.
Elizabeth, NJ 07201

Oto Labs, LLC
Attn: Managing Member
10315 Professional Circle
Suite 100
Reno, NV 89521

Wells Fargo Business Card
Attn: Managing Member
P.O. Box 348750
Sacramento, CA 95834

Ikon Financial Services
Attn: Managing Member
P.O. Box 650073
Dallas, TX 75265-0073

Czarnowski Display Services, Inc.
Attn: Managing Member
6067 Eagle Way
Chicago, IL 60678-1060

LEWIS AND ROCA LLP LAWYERS

Bearcom
Attn: Managing Member
P.O. Box 200600
Dallas, TX 75320-0600

Quartermaster, Inc.
Attn: Managing Member
17600 Fabrica Way
Cerritos, CA 90703

Intercall
Attn: Managing Member
P.O. Box 403749
Atlanta, GA 30384-3749

/s/ MARIE H. MANCINO
Marie H. Mancino
Lewis and Roca LLP