LEWIS
AND
ROCA
——LLP——
L A W Y E R S

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Facsimile (702) 949-8321
Telephone (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, Arizona  85004-4429
Facsimile (602) 734-3824
Telephone (602) 262-5756

Susan M. Freeman (AZ State Bar No. 004199)
Email: sfreeman@lrlaw.com *(pro hac vice application pending)*
Rob Charles (NV State Bar No. 006593)
Email: rcharles@lrlaw.com
Stefan M. Palys (NV State Bar No. 011434)
Email: spalys@lrlaw.com

*Attorneys for Indenture Trustee Wells Fargo Bank, N.A.*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re | CASE NO.  10-10464-BAM |
| | CHAPTER 11 |
| LAS VEGAS MONORAIL COMPANY, a Nevada non-profit corporation, | |
| | **INDENTURE TRUSTEE'S OBJECTION TO DEBTOR'S EMERGENCY APPLICATIONS TO: (1) MAINTAIN PREPTITION CASH MANAGEMENT SYSTEM AND (2) PAY BUSINESS EXPENSES, and RESPONSE TO DEBTOR'S CASH COLLATERAL MOTION** |
| Debtor. | |
| | **Hearing Date: January 19, 2010 Hearing Time: 4:00 p.m.** |

Wells Fargo Bank, N.A. as Trustee under a Senior Indenture dated September 1,

2000 ("Trustee") responds to the Debtor Las Vegas Monorail Company ("LVMC")

Emergency Motion Determining and Authorizing Use of Cash Collateral [DE 49], and its

Emergency Application for Order Authorizing Maintenance of Prepetition Cash

Management System [DE 30], and the other motions that ask the Court to permit LVMC

2141296.4



to use the Trustee's cash.[1]  LVMC errs in its overly-narrow concept of the Trustee's cash collateral and its claimed entitlement to benefit by its own wrongdoing, and accordingly offers too little to adequately protect the Trustee's interests.  The Trustee strongly objects to LVMC's proposal to continue use of bank accounts at Bank of America, and thus objects to LVMC's cash management system motion to the extent it seeks authority to continue use of accounts outside of Wells Fargo Bank.  The Trustee has no problem with payment of wages and other legitimate reasonable and necessary operating and maintenance expenses — upon LVMC's compliance with the parties' contractual lock-box procedures.

### Summary of the Trustee's Position

LVMC was funded with the proceeds of statutorily-authorized, government-issued tax exempt bonds.  The bonds were to be paid from Monorail revenues, not the general fisc, and the Director of the Nevada Department of Business and Industry and LVMC committed to bond purchasers that those revenues would be available to repay the bonds after using what was reasonable and necessary to keep the revenue stream coming through operating and maintenance costs.  LVMC was entitled to control its expenditures as long as it paid the bonds.  But upon a default, the Trustee for the bondholders was authorized to take a more active role.  The Court should not reward LVMC's deliberate undermining of Trustee control over expenditures and efforts to sabotage the Trustee's security interest in

---

[1] Those are: *Emergency Motion Pursuant to 11 U.S.C. Sections 105(a) and 366 For an Order Determining That Adequate Assurance Has Been Provided to Utility Companies with Proposed Order* [DE 31]; *Emergency Application for Order Permitting Debtor to Honor Prepetition Ticket Purchases and Refunds with Proposed Order* [DE 32]; *Emergency Motion for Order (i) Authorizing the Debtor to Pay Wages, Salaries, Benefits, Reimburseable Business Expenses and Other Employee Obligations, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* [DE 41].

2141296.4



revenues by violating its contractual duty to deposit all funds promptly upon receipt in the Trustee's account, as requested by LVMC in these motions.

LVMC's actions do not defeat the Trustee's cash collateral interests in project revenues for two legal reasons, wholly apart from its misconduct. LVMC omits these legal reasons entirely from the arguments in its cash collateral motion. First, N.R.S. § 349.620 imposes a lien on all revenues generated by monorail operations. The Director assigned the lien to the Trustee. Second, the Financing Agreement creates a security interest in all of LVMC's money as proceeds of its Franchise Agreement and/or Operating and Maintenance Agreement. LVMC argues that operating business income is never "proceeds," but its cases concern a superseded U.C.C. definition of proceeds or say the income is not proceeds of equipment and inventory used in the business. LVMC ignores the *Value-Added* case that explains how such income is, in a case like ours, proceeds of a contract. *In re Value-Added Communications, Inc.*, 139 F.3d 543, 546 (5th Cir. 1998). A Ninth Circuit case is in accord. *In re Turley*, 172 F.3d 671, 675 (9th Cir. 1999) (earnings from actions authorized by franchise agreement are franchise agreement proceeds).

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    The Trustee Has a Security Interest In of All of LVMC's Cash**

**A. The Trustee's Statutory Lien**

Industrial development bonds issued by the Director are secured by a lien on all money generated by the project the bonds funded:

> 1.  The principal of, the interest on and any prior redemption premiums due in connection with the bonds issued pursuant to NRS 349.400 to 349.670, inclusive, **are payable from, secured by a pledge of, and constitute a lien on the revenues out of which the bonds have been made payable**. In addition, they may, in the discretion of the Director, be secured by:
> …

3

2141296.4

LEWIS
AND
ROCA
LLP
L A W Y E R S

(c) The proceeds of the bonds and income from investment of the proceeds and of revenues.

N.R.S. § 349.620(1) (emphasis added).  As the underlined portion above shows, the Trustee's U.C.C. security interest is provided "in addition to" this statutory lien.  Both the statutory lien and security interest are independently sufficient to grant the Trustee an interest in all of LVMC's money.

The Financing Agreement states on its face that the Director was issuing the bonds "pursuant to Sections 349.400 to 349.670" as is required for the statutory lien to apply. *See* Financing Agreement at Recital 1.  The Trustee now holds the lien that § 349.620 creates in favor of the Director by virtue of the Director's assignment of its rights.  *See* Financing Agreement § 4.4, and the Senior Promissory Note and Assignment thereto; Senior Indenture § 5.01.

As explained in more detail in the Trustee's Objection to Use of Cash Collateral [DE 13 at pp. 13-15], the liens provided by N.R.S. § 349.620 constitute "statutory liens" under Section 101(53) of the Bankruptcy Code, which are unaffected by Code Section 552(a) and continue to attach to all of LVMC's post-petition Revenues, Funds and the proceeds thereof.

As LVMC did not respond to this point, the Trustee will not belabor it here, other than to note that based solely on this statutory lien all of LVMC's cash is the Trustee's collateral, including after-acquired cash despite Section 552.  The Court need not even consider the Trustee's security interests to find that LVMC must comply with the Bankruptcy Code requirements for use of cash collateral.

**B.  The Trustee's Security Interests**

**1.  LVMC is Focused on the Wrong Collateral**

The problem with LVMC's arguments about the Trustee's security interests is that it focuses on the wrong collateral.  LVMC *mentions* the Trustee's security interest in the

4

2141296.4

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

Franchise Agreement and the Operation and Maintenance Agreement (the "O&M Agreement"), but then LVMC only discusses the Trustee's interests in the Net Project Revenues.[2]  *See* LVMC Cash Collateral Mot. at 20-21.  All of LVMC's cash is the Trustee's collateral by virtue of its security interests in the Franchise Agreement and the O&M Agreement and proceeds thereof.

Pursuant to the expanded definition of proceeds in Revised Article 9, "proceeds" include "rights arising out of collateral," and "whatever is collected on, or distributed on account of, collateral."  N.R.S. § 104.9102(1)(kkk)(3); *see also* U.C.C. § 9-102 cmt. 13a ("The revised definition of 'proceeds' expands the definition beyond that contained in former Section 9-306 and resolves ambiguities in the former section.").[3]  Here, the Trustee has a security interest in LVMC's Franchise Agreement, which LVMC does not dispute.  Ownership of the Franchise Agreement gives LVMC the rights "to charge and collect fares from passengers," "to display advertising and establish concessions," and "to lease space on the [m]onorail to vendors, merchants, advertisers, public utilities or cable companies . . . ."  Franchise Agreement § 2.1 [DE 7-4, p. 6 of 32]  There would be no Las Vegas Monorail and no Project Revenues but for the Franchise Agreement.

Money generated from the exercise of Franchise Agreement rights constitutes proceeds of the Franchise Agreement. The Ninth Circuit recognized this in *Turley*, a dispute over interpleaded funds between two secured creditors of a driver in "Indy Car" auto racing events who was eligible to participate only because he was a Championship Auto Racing Teams ("CART") franchise member. 172 F.3d at 672.  The court ruled in

---

[2] LVMC concedes that the Trustee has a security interest in these contracts.  The Trustee properly perfected its interest in the contracts by filing appropriate financing statements with the Nevada Secretary of State.

[3] Here, the generation of money from the Franchise Agreement would also satisfy N.R.S. § 104.9102(1)(kkk)(B) because LVMC collects money on the Franchise Agreement both through the O&M Agreement and from Fare Revenues and Ad Revenues.

2141296.4



favor of the creditor holding "a perfected security interest in the debtor's general intangibles [arguing] that it has priority to the interpleaded funds because they represent proceeds from a general intangible - a franchise agreement between the debtor and CART." *Id*. at 672, 675. The money at issue consisted of a payment to redeem the driver's CART franchise membership and a payment "based on his participation in CART-sanctioned races…." *Id.* at 673. The losing creditor argued that "the proceeds stem not from a franchise agreement, but from the redemption of the debtor's CART share certificate, which the debtor pledged to the bank." *Id.* at 672. The Ninth Circuit held that the funds "were proceeds attributable to [the driver's] interest in CART. That interest is a general intangible," and the creditor with a security interest in the franchise agreement and its proceeds accordingly prevailed. *Id.* at 675. The same principle applies to money attributable to LVMC's right to generate revenues from operations pursuant to the Franchise Agreement.

*Value-Added* drives this point home, both because it involved a business that was run pursuant to contractual authorization and because the court found all money was proceeds of a governmental franchise contract like the LVMC Franchise Agreement under the more-restrictive definition of proceeds in former Article 9. 139 F.3d 543 (5th Cir. 1998). The State of Minnesota gave the debtor the right to operate a pay phone business in Minnesota's prisons through a contract, the Site Lease. *Id.* at 544. After the debtor declared bankruptcy, the issue arose whether coins generated through the use of the payphones were proceeds of the pay phone equipment and thus subject to the secured party's interest, or whether the money was proceeds of the Site Lease. *Id.* at 544-45. The court held that use of a phone was not something that would generate proceeds of the phone itself (under Old Article 9 language requiring disposition of collateral to generate proceeds). *Id.* at 546. Instead, the court held that the money was proceeds of the Site

2141296.4



Lease that let the debtor operate the prison-phone business in the first place. *Id.* Here, just like the *Value-Added* debtor, the monorail operates its business pursuant to contractual authorization to do so in the Franchise Agreement, and all money generated by the business is therefore proceeds of that underlying right.

*Value-Added* is not the only authority that recognizes that payments received based on rights one holds are proceeds. *See, e.g., Johnson v. Cottonport Bank*, 259 B.R. 125, 129-30 (W.D. La. 2000) (tribe member's future stream of payments held to be proceeds of member's per capita rights to share of gambling revenues, and security interest would continue in stream post-petition); *In re SJR Enters., Inc.*, 150 B.R. 933, 941 (Bankr. N.D. Ill. 1993) (payment to franchisee to induce franchisee to exercise right to terminate franchise constituted proceeds of the franchise agreement); *In re Keneco Fin. Group, Inc.*, 131 B.R. 90, 95, 16 U.C.C. Rep. Serv. 2d 219, (Bankr. N.D. Ill. 1991) (when security interest is granted in lease, rent generated by lease constitutes proceeds); G. Ray Warner, *The Anti-Bankruptcy Act: Revised Article 9 and Bankruptcy*, 9 Am. Bankr. Inst. L. Rev. 3, 54 (2001) (noting expanded definition of "proceeds" in Revised Article 9 "adds to the class of proceeds future property that is generated by or related to the original collateral."); U.C.C. § 9-102(a)(64) cmt. 13a (noting revision to "proceeds" was meant to reject cases finding that payments on stock were not proceeds); *cf. In re Magnacom Wireless, LLC*, 503 F.3d 984, 994 (9th Cir. 2007) (noting result in *SJR Enters.*, and approving of bankruptcy court's reasoning in *SJR* that money received from the exercise of a valuable right constitutes proceeds of the right).

The legal principle that money generated by LVMC's exercise of its Franchise Agreement rights is analogous to a patent-owner's exercise of the rights provided by virtue of owning a patent. Ownership of the patent gives the owner the right to use the patent, which the owner might exercise through a license of that right. License payments are

2141296.4



proceeds of the patent, just like payments obtained by LVMC's exercise of its Franchise Agreement rights are. *See, e.g., In re Barbara K. Enters.*, 2008 WL 2439649, 12 (Bankr. S.D.N.Y. 2008) (royalties received post-petition were proceeds belonging to a secured party having an interest in her intellectual property); *Orton v. Virtual Fonlink, Inc.*, 2004 WL 2618354, 3 (Cal. App. 2004) ("the patent is plainly the proceeds of the patent applications given as collateral."); Robert P. Simons, *Back to Earth from Cyberspace: Dealing with Business Failure of Internet Companies*, 8 Nev. Lawyer 12, 13-14 (June 2000) (noting under Revised Article 9 that a security interest in copyrighted software would now "clearly" include licensing fees and royalties of the software as proceeds); *see also Karle v. Visser*, 118 P.3d 136, 139-40 (Idaho 2005) (analyzing proceeds as "rights arising out of collateral" and finding that secured creditor having an interest in the debtor's promissory note had a valid security interest in a judgment obtained by the debtor for breach of the note because the right to collect money the note was a right "arising out of the collateral" making the money recovered proceeds and *citing inter alia Effective Communs. W., Inc. v. BOCES*, 446 N.Y.S.2d 684 (1981) for the proposition that "a security agreement which describes collateral as all contract rights owned or hereinafter owned attached to a judgment on a contract claim as proceeds of the secured party's interest in all present and future contract rights").[4]

### 2. LVMC's Authorities Are Distinguishable

The monorail presents a somewhat unique circumstance where a business is being run pursuant to a contractual grant of authority to conduct the business. That, and the expanded scope of "proceeds" in Revised Article 9 distinguishes all of LVMC's cases.

---

[4] LVMC chooses to exercise its Franchise Agreement rights through the O&M Agreement, pursuant to which Bombardier actually operates the monorail. LVMC remains the responsible party on the Franchise Agreement. [DE 7-4, p. 9 of 32]. The O&M Agreement and its proceeds are also the Trustee's collateral in any event.

8

2141296.4



1   LVMC contends that the Fare Revenues and Ad Revenues are not proceeds because they

2   are not received from the "sale of the collateral, but rather, through the use of it." [DE 49

3   at p. 26 ln. 15]. This argument is a throw-back to pre-2001 Article 9's definition of

4   "proceeds," which required a disposition of collateral. *See, e.g.,* U.C.C. § 9-102(a)(64)

5   cmt. 13a (rejecting cases that require a disposition of collateral for there to be proceeds).

6   Now the concept of a disposition is just one of five ways in which an item might be

7   proceeds. *Compare* N.R.S. § 104.9102(1)(kkk)(1) (requiring a disposition) *with*

8   104.9102(1)(kkk)(2)-(5) (not requiring a disposition).

9         LVMC's arguments about proceeds suffer from a general failure to focus on the

10  collateral involved in the case it cites. The Trustee does not quibble with the general rule

11  that to have proceeds, the secured party must have an interest in the original collateral.

12  *McDonald v. Star Bank, N.A.*, 261 F.3d 478, 482 n.2 (6th Cir. 2001) (noting that, under

13  Revised 9, one way for an item to be proceeds is if it originates from the collateral). In *In*

14  *re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Tex. 2003), for example, the

15  court did not rule that restaurant income can never be proceeds, as LVMC contends. [DE

16  49 at 26:13-15]. Rather, it held that a portion of the money generated by restaurant

17  operations was attributable to food; the restaurant's inventory in which a security interest

18  had been taken, and part was generated by services that did not collateralize the debt. 299

19  B.R. at 409. The same point applies to cases addressing what portion of money generated

20  by a business constitutes "rents" as used in a deed of trust versus what portion is related to

21  a service. [DE 49 at 26] (citing "assignment of rents" cases including *In re Zeeway Corp.*,

22  71 B.R. 210 (9th Cir. B.A.P. 1987); *In re Gen. Assoc. Inv. Ltd. P'Ship*, 150 B.R. 756

23  (Bankr. D. Ariz. 1993); *Everett Home Town Ltd. P'Ship*, 146 B.R. 453, 455 (Bankr. D.

24  Ariz. 1992); *In re Corner Pockets of the Sw., Inc.*, 85 B.R. 559, 562 (Bankr. D. Mont.

25  1988)). Proceeds do not have to be generated from tangible collateral, as demonstrated by

26

9



another case LVMC cites, *In re Barbara K. Enterprises*, *supra* (noting that security interest in pre-petition intellectual property licenses would extend to royalties received post-petition).

Given that the Trustee holds a security interest in LVMC's Franchise Agreement, from which LVMC derives all of its authority to run the monorail, there is no need to apportion the proceeds of monorail operations — they all stem from the exercise of the contractual rights granted by the Franchise Agreement.

### 3.  A Bank at Which A Debtor's Funds are Held Has a Security Interest in those Funds

LVMC cobbles together an argument that would require this Court to find that Wells Fargo does not have a security interest in LVMC funds held at Wells Fargo Bank. Not so.  As Wells Fargo is both the secured party and the bank at which the accounts are held, it has a perfected security interest in the money in Wells Fargo accounts.  N.R.S. §§ 104.9104(1)(a) (a secured party has control of a deposit account if it is the bank at which the account is maintained); 104.9312 (secured party perfects an interest in a deposit account through control).  This debate is largely academic since the Trustee also has a right to setoff the accounts at its bank.  N.R.S. §§ 104.9327 and 104.9340; 11 U.S.C. § 553.  LVMC's claim that the Trustee cannot have a security interest in bank accounts because its interest is derivative of that of the Director, who does not control the accounts, is nonsense because the Director's security interest was assigned to the Trustee in the same document creating the Director's interest, with LVMC's consent. [DE 49 at 21]; *See* Financing Agreement § 4.4 (headed "Assignment of Director's Rights"); *see also* Financing Agreement § 7.2 (granting the Trustee rights on default).

2141296.4



### C.  LVMC Cannot Defeat a Security Interest By Its Own Misappropriation of Funds

Amazingly, LVMC announces to this Court that it has cleverly defeated the Trustee's security interests by diverting and converting the $1 million in the Bank of America accounts in violation of the parties' contract and Nevada law.  This argument is wrong as a legal matter because it ignores that a secured party has an automatically perfected security interest in cash proceeds wherever located.  N.R.S. §§ 104.9315(1) (automatic perfection in proceeds) and (4)(b) (providing that security interest in cash proceeds remains continuously perfected).  As explained, all money here is cash proceeds of the Franchise Agreement, and the O&M Agreement.  So the Court does not even need to reach this argument.  But assuming *arguando* that LVMC was right, the Court should not let LVMC profit from its wrongdoing.

After a default, a secured party has an immediate right to possess its collateral.  N.R.S. §§ 104.9607 and 104.9609; *see, e.g., Case Corp. v. Gehrke*, 208 Ariz. 140, 143, ¶ 11, 91 P.3d 362, 365, 55 U.C.C. Rep. Serv. 2d 1, 4 (App. 2004).  Contrary to LVMC's contentions, the Trustee's security interest here attaches to all cash by virtue of the post-default pledge of all money contained in Section 4.1(b)(vi) of the Financing Agreement, as well as the grant of a security interest in proceeds and the Trustee's statutory lien.[5]  For two years and eight months after LVMC's defaults, LVMC accorded the Trustee the benefit of that right by delivering the collateral to Wells Fargo Bank, thus providing for protection of the Trustee's interest in accordance with LVMC's contractual and Article 9 obligations to do so.  Then LVMC began hiding the money at Bank of America —

---

[5] Note that no particular words have to be used to give rise to a security interest.  Any agreement that creates or provides for one will work.  N.R.S. § 104.9203(2)(c) (describing various ways a party can meet the evidentiary requirement of a security agreement); N.R.S. § 104.9102(1)(ttt) ("'Security agreement' means an agreement that creates or provides for a security interest.").

2141296.4



outright conversion of the Trustee's cash collateral and right to include the money in the trust estate.[6]  *Case Corp. v. Gehrke*, 208 Ariz. at 143, ¶ 11, 91 P.3d at 365, 55 U.C.C. Rep. Serv. 2d at 4; *Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1104-05 (S.D. Fla. 2000).

A debtor cannot defeat a security interest by converting the property.  *See In re Howard's Applicance Corp.*, 874 F.2d 88, 95 (2d Cir. 1989) (imposing constructive trust to enforce secured party's interests in inventory where debtor relocated the inventory to another state, which had the effect of avoiding the secured party's interest, and the secured party did not have sufficient information about the concealed move in time to take action before the debtor filed its bankruptcy petition).  Where the debtor converts collateral, courts can impose a constructive trust or equitable lien on the collateral, making it subject to the secured parties' interest.[7]  *Burlesci v. Petersen*, 64 Cal. App. 4th 1062, 1069 (1998) (noting constructive trust is an appropriate remedy for conversion); *In re Triple A Coal Co.*, 55 B.R. 806, 813-14 (Bankr. S.D. Ohio 1985) (imposing constructive trust on funds that debtor wrongfully removed from account jointly controlled by it and the secured party); *In re Storage Tech. Corp.*, 55 B.R. 479, (Bankr. D. Colo. 1985) (finding secured party stated claim for constructive trust where debtor intentionally allowed financing statement covering debtor-controlled funding corporation to lapse in violation of the

---

[6] To the extent LVMC appears to argue that it could put money wherever it wanted to because the Trustee's interest was not yet perfected, this would be wrong.  The security interest is enforceable by the Trustee as soon as it attaches, which it did when LVMC executed the Financing Agreement and the Director gave value.  *See, e.g.,* U.C.C. § 9-203 cmt. 2 (noting a security interest is enforceable between the secured party and the debtor upon attachment of the security interest).

[7] The Trustee is not asking the Court to make a determination under Bankruptcy Code Section 541 that the money in the Bank of America Account is *not* property of the estate. The Trustee is merely asking the Court to recognize its security interest in that money, and require that all money be moved back to Wells Fargo Bank from Bank of America.



1  debtor's contractual obligations to the funding corporation's lenders, leaving secured

2  party's interests unperfected) .

3          The Court can also exercise its equitable powers to provide the Trustee with the lien

4  rights that LVMC (and the Director) represented, promised and intended to provide to the

5  Trustee, and that Nevada law recognizes as a statutory lien. For example, in *In re Air*

6  *Florida System, Inc.*, 49 B.R. 321, 325 (Bankr. S.D. Fla. 1985), the debtor argued that a

7  lender did not have a security interest in airline ticket sale proceeds because it did not

8  possess the proceeds.  The court noted that "airline financings would stop dead in their

9  tracks" if the debtor's technical argument succeeded after it had represented and intended

10 that the creditor would have a security interest in such revenues, and based on this, the

11 court found that the debtor "should be estopped from making a claim that is inconsistent

12 with its actions previously." *Id*. at 325, 326.  Similarly, the Court can and should take into

13 account federal policy that holders of municipal bonds with security interests in special

14 revenues are to remain effective post-petition notwithstanding 11 U.S.C. § 552(a), subject

15 to necessary operating expenses.  11 U.S.C. § 928(a)

16         Given the Trustee's consensual security interest in all Project Revenues as proceeds

17 of the Franchise Agreement and its statutory lien, the Court need not reach the issue of a

18 constructive trust or other remedy, but as a court of equity, this Court should not reward

19 LVMC's wrongful conduct.

20 **II.    LVMC Cannot Justify Its Diversion of Funds By Blaming the Trustee**

21      **A. The Financing Agreement Does Not Put the Cookie Monster**
22          **In Charge of the Cookies Post-Default**

23         LVMC complains that the Trustee did not rubber stamp every disbursement request

24 submitted by LVMC, and uses that as a basis for its claim that it should be able to keep

25 diverting the Trustee's cash collateral to Bank of America in violation of the Financing

26

2141296.4



1   Agreement.  [DE 49 at 10]  LVMC apparently would like to believe that the Financing

2   Agreement gives LVMC the right to decide how to handle the Trustee's cash collateral

3   after a default.  Not so.

4         After LVMC's default, Financing Agreement § 4.1(b)(vi) mandated that "**promptly**

5   **upon receipt, [LVMC must] transfer all Project Revenues to the Trustee for deposit**

6   **in the Revenue Fund**, and thereafter all payments permitted or required to be paid from

7   the Collection Fund for Operation and Maintenance shall be paid by the Trustee from the

8   Revenue Fund upon written direction of [LVMC]."  "Operation & Maintenance Costs" are

9   defined as only those that are "reasonable and necessary" for the operation and

10  maintenance of the monorail.  *See* Senior Indenture § 1.01.  In short, after LVMC's

11  default, all Project Revenues are deposited into the Trustee's trust account, and it is *the*

12  *Trustee* that is authorized to make the determination of whether operation and maintenance

13  expenses are reasonable and necessary — a normal secured creditor lock-box arrangement.

14               **1.  LVMC's Red Herrings: Its "Justifications" for the Diversions**

15        LVMC attempts to point to conduct by the Trustee that it believes would justify its

16  own breach.  Its attempts are unavailing because, in fact, the Trustee has scrupulously

17  honored its responsibilities.

18               **2.  LVMC Wants Its Trips to China — But Is Only Entitled to**
                     **"Reasonable and Necessary" Operating and Maintenance Expenses**
19
20        Allowing LVMC to divert money when it disagrees with the Trustee's decisions would

21  essentially grant it a veto over the Trustee's determination as to what costs are reasonable and

22  necessary and truly operating and maintenance costs, which does not exist in the Financing

23  Agreement.  The Trustee is not obliged to  rubber-stamp every single request that LVMC

24  submits.  Those that are supported by documentation showing costs to be reasonable and

25  necessary are approved; indeed, the Trustee approved 96.76% of all of LVMC's

26

                                              14



requisitions in the last six months.[8]  The Trustee has only disapproved of expenses that LVMC failed to justify as "reasonable and necessary."[9]  Thus, the Trustee declined to reimburse LVMC president Curtis Myles' approximately $7,000 for his trip to China as LVMC did not explain to the Trustee how the trip was reasonable and necessary, or even for operation and maintenance of the monorail. The Trustee also declined to pay retainers for professionals whose bills it was already promptly paying, and did not pay LVMC's increased meeting stipends.  Lastly, the Trustee did not pay a December 28, 2009, requisition request in full because it was out of money — *due to LVMC's diversion of funds*.[10]  Contrary to the representations by LVMC and Mr. Myles, the Trustee promptly responded to all inquiries by LVMC about funding of requisitions until one just before the New Year's weekend when LVMC's request was moot due to lack of money.[11] The Trustee had been funding all approved LVMC requests, draining the Trustee's Reserve Account, without being informed that LVMC had decided to stop replenishing the Reserve Account and instead to divert all money into its new Bank of America account.[12]

LVMC's concern that the Trustee was following directives from Ambac Assurance Corporation ("Ambac") is misguided, as the Trustee has made independent determinations as authorized by the Financing Agreement.[13]  Further, the Trustee has always covered all expenditures necessary to actually operate the monorail safely and efficiently, and

---

[8] Declaration of Gavin Wilkinson in Support of Trustee's Objection to Use of Cash Collateral [DE 13-1] at ¶ 32 and Ex. A-7 to Mr. Wilkinson's Declaration (chart showing payment history and reasons for denials).

[9] Wilkinson Declaration at ¶ 33.

[10] Ex. A-7 to Wilkinson Declaration, DE 13-1; Supplemental Wilkinson Declaration, filed with this brief, ¶¶ 8-12.

[11] Supplemental Wilkinson Decl, ¶¶ 12, 14.

[12] *Id.*

[13] Wilkinson Declaration [DE 13-1] at ¶¶ 49(c)-50.

2141296.4



personally committed to LVMC that it would continue to do so.[14]  In any event, concerns about payment directives by Ambac or overly-strict decisions by the Trustee are moot in light of the current bankruptcy case and LVMC's ready access to this Court in the event of disputes.

### 3.  3. The Trustee's Use of Money to Pay Bond Obligations

LVMC next complains that the Trustee "without notice to Debtor withdrew approximately $1.5 million from the Debtor's accounts at Wells Fargo." [DE 49 at p 6, fn 4].  LVMC is wrong in representing that money was taken "from the Debtor's accounts," as all money was taken from accounts constituting part of the trust estate for bondholders. As set forth in the two Wilkinson Declarations, the withdrawals affected Ambac, not LVMC, except for the $600,000 withdrawn from the Revenue Account that reduced the money available to advance back to LVMC for operating and maintenance costs.  The Trustee returned $490,000 of that within 24 hours of being informed by LVMC that it planned to use that amount some six months hence to pay an insurance premium.[15]  The Trustee's actions were consistent with the Financing Documents, which provide that the Trustee is not required to expend or risk its own funds, or otherwise incur financial liability in the performance of its duties.  *See, e.g.,* Senior Indenture § 8.01(A).[16]

The fact is that LVMC's diversions cannot be justified, and should not be countenanced or allowed to continue.

. . .

---

[14] Supplemental Wilkinson Declaration at ¶¶ 7, 22.

[15] Wilkinson Decl. [DE 13 Ex. A ¶ 49; Wilkinson Supp. Decl. ¶ 15(c) (filed with this Response).

[16] Although LVMC is not a party to the Senior Indenture (see LVMC Motion at 5), the terms of the Senior Indenture bind LVMC through incorporation into the Senior Note and the Financing Agreement.

2141296.4



**B.  Maintenance of the BA Account Is a Breach of Contract**

LVMC contends that it can have the Bank of America account and not be in violation of the Financing Agreement because Section 4.1(f) allows it to keep accounts at other banks meeting certain requirements.  So long as absolutely no money is in the Bank of America account, LVMC is correct.

That is because another part of the Financing Agreement, Section 4.1(b)(vi), requires LVMC to turn over all money to the Trustee after a default, as here, which LVMC acknowledges immediately after stating that it can open other accounts. [DE 30 at 9 ll: 14-22]  Thus, having the Bank of America account with even one cent in it *is* a violation of the Financing Agreement.  The Court should not grant LVMC permission to continue breaching the Financing Agreement.

**III.  Relief Sought by the Trustee**

The Trustee asks this Court to hold that its security interest extends to LVMC's postpetition cash revenue and to the funds currently held by LVMC in its Bank of America accounts. LVMC should not be allowed to continue using its Bank of America accounts, as LVMC requests in its Bank Account motion [DE 30].  The Trustee does not object to funding the payment of wages, benefits, reimbursable business expenses, utilities, prepetition ticket purchases and refunds, or other reasonable and necessary operating and maintenance costs [DE 32, 41].  It has never objected to such expenditures, and always funded them. However, those should be funded from advances by the Trustee from the Revenue Fund after money at Bank of America is transferred to Wells Fargo Bank.

The Trustee additionally requests that the Court order LVMC to provide adequate protection for the Trustee's interests, as set forth in the Trustee's cash collateral motion [DE 13] through the following:

(1) All LVMC money (including all DIP accounts) should be maintained in accounts at Wells Fargo Bank, which should continue to sweep all Project Revenues daily

2141296.4



into the Revenue Fund at that bank accordance with LVMC's Financing Agreement, to be re-advanced under the contractual requisition procedure for approved expenses.

(2) LVMC should be required to consult with the Trustee and Ambac and strive to reach agreement upon a budget for operating and maintenance and bankruptcy administrative expenses, including the funding and replenishment of an account for Trustee's administrative expenses, and thereafter fully comply in good faith with that budget, so that all parties will have clear guidelines on the types of requisitions that will be approved. The Trustee provided LVMC prepetition with proposed budget and requisition terms acceptable to the Trustee, to which LVMC has not yet responded.

(3) The Trustee should be granted a post-petition replacement lien in all of the Collateral.

(4) The Trustee should further be granted a first-priority lien in all of LVMC's unencumbered real and personal property, to the extent necessary to protect against the diminution in value of the Trustee's Collateral.  Since most if not all of the post-petition Project Revenues will be consumed by payment of operating and maintenance and Chapter 11 costs, it is likely that a mere post-petition replacement lien will not in fact provide meaningful adequate protection.  The bond proceeds have been used to acquire and maintain the Monorail structure and rail cars, and the Trustee's Collateral will continue to be used for such maintenance.  A lien on the structure and rail cars is logical and equitable for that reason, as well as being the only realistic way to provide the Trustee with adequate protection for diminished Collateral value.

(5) LVMC should be required to provide full and complete financial reports and projections to the Trustee and Ambac on a weekly basis, and provide the Trustee and Ambac with notices and Collateral inspection rights as set forth in Financing Agreement § 11.01; and

2141296.4



(6) The Trustee should be allowed a Section 507(b) superpriority administrative expense claim, to the fullest extent necessary to protect the Trustee from any diminution in the value of its collateral, to the extent this adequate protection proves inadequate.

### Conclusion

For the foregoing reasons, the Trustee requests that the Court find that all LVMC cash is the Trustee's collateral, order LVMC to comply with the Financing Documents by returning all funds to accounts at Wells Fargo Bank, and order that LVMC is prohibited from using the Trustee's collateral absent provision of adequate protection or the Trustee's consent. The cash collateral order and the bank account order submitted by LVMC should not be entered, even on an interim basis. The Trustee will gladly submit an order in compliance with the Court's ruling, after such ruling is made on the record, in accordance with LR 9021(a).

Dated: January 18, 2010.

**LEWIS AND ROCA LLP**


By /s/ Stefan Palys (#11343)
      Susan M. Freeman
      Rob Charles
      Stefan Palys
      *Attorneys for Indenture Trustee*
      *Wells Fargo Bank, N.A.*

2141296.4

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1    PROOF OF SERVICE

2    COPY of the aforementioned sent via e-
     mail or U.S. First Class Mail on January
3    18, 2010 to:

4

5    Gerald M. Gordon
     William Noall
6    Gordon and Silver
     3960 Howard Hughes Parkway, 9th Floor
     Las Vegas, NV 89109
7    Attorneys for Debtor
     E-mail  bankruptcynotices@gordonsilver.com
8

9    Laurel E. Davis
     Fennemore Craig, P.C.
     300 S. Fourth Street, # 1400
10   Las Vegas, NV 89101
     Attorneys for Ambac Assurance Corporation
11   E-mail:  ldavis@fclaw.com

12   U.S. Trustee
     300 S. Las Vegas Boulevard S.
13   Suite 4300
     Las Vegas, V 89101
14

15   Richard F. Holley
     400 S. Fourth Street, 3rd Floor
     Las Vegas, NV 89101
16   E-mail:  tholley@nevadafirm.com
     Attorneys for Bombardier Transportation Holdings USA, Inc.
17

18   Bombardier Transit Corp.
     Attn:  Managing Member
     1501 Lebanon Church Rd.
19   Pittsburgh, PA   15236-1491

20   NV Energy
     Attn:  Managing Member
21   P.O. Box 30086
     Reno, NV   89520-3086
22

23   Allegiance Direct Bank
     Attn:  Managing Member
     P.O. Box 1750
24   Cedar City, UT  84721

25

26

2141296.4

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

Promethean Partners, LC
Attn:  Managing Member
10816 Iris Canyon Land
Las Vegas, NV   89135

Team Grapx, Inc.
Attn:  Managing Member
33562 blue Lantern #1
Dana Point, CA   92629

Anthem Blue Cross Blue Shield
Attn:  Managing Member
P.O. Box 541013
Los Angeles, CA   90054-1013

Brink's U.S.
Attn:  Managing Member
3200 E. Charleston Blvd.
Las Vegas, NV   89104

Nevada Department of Taxation
Bankruptcy Section
555 E. Washington Avenue, Suite 1300
Las Vegas, NV   89101

Jumbo Transportation, Inc.
Attn:  Managing Member
1201 Corbin St.
Elizabeth, NJ   07201

Oto Labs, LLC
Attn:  Managing Member
10315 Professional Circle
Suite 100
Reno, NV   89521

Wells Fargo Business Card
Attn:  Managing Member
P.O. Box 348750
Sacramento, CA   95834

Ikon Financial Services
Attn:  Managing Member
P.O. Box 650073
Dallas, TX   75265-0073

Czarnowski Display Services, Inc.
Attn:  Managing Member
6067 Eagle Way
Chicago, IL   60678-1060

2141296.4

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1

Bearcom
Attn:  Managing Member
P.O. Box 200600
Dallas, TX   75320-0600

2

3

Quartermaster, Inc.
Attn:  Managing Member
17600 Fabrica Way
Cerritos, CA   90703

4

5

6

Intercall
Attn:  Managing Member
P.O. Box 403749
Atlanta, GA   30384-3749

7

8

9

10

11

 /s/ MARIE H. MANCINO
Marie H. Mancino
Lewis and Roca LLP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

2141296.4