# EXHIBIT 1



Bryant D. Barber
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004-4429

Direct Dial: (602) 262-5375
Direct Fax: (602) 734-3818
BBarber@LRLaw.com
Admitted in: Arizona

Our File Number: 26426-00065

November 23, 2009

**VIA ELECTRONIC MAIL
& OVERNIGHT MAIL**

Gerald M. Gordon, Esq.
Gordon Silver
3960 Howard Hughes Parkway, Ninth Floor
Las Vegas, Nevada 89169-5978

Kris T. Ballard, Esq.
Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89169-0949

      Re:    Director of the State of Nevada Department of Business and Industry
               Las Vegas Monorail Project Revenue Bonds, 1st Tier and 2nd Tier Series 2000

Gentlemen:

     We serve as counsel to Wells Fargo Bank, N.A. ("Wells Fargo"), the trustee under that certain Senior Indenture, dated as of September 1, 2000 (the "Senior Indenture"), by and between the Director of the State of Nevada Department of Business and Industry (the "Director") and Wells Fargo. For purposes of this letter, capitalized terms used and not defined herein shall have the meaning ascribed to them in the Senior Indenture.

**Certain Rights of Wells Fargo**

     Wells Fargo accepted the administration of the trusts under the Senior Indenture, and agreed to exercise and perform the powers and duties under the Senior Indenture and that certain Financing Agreement, dated as of September 1, 2000 (the "Agreement") by and between the Director and Las Vegas Monorail Company (the "Borrower"), subject to certain rights, immunities and privileges being afforded to Wells Fargo (collectively, certain "Reimbursement and Indemnification Rights"), including, among other things:

     1.    Wells Fargo is entitled to compensation and reimbursement as set forth in Section 8.06 of the Senior Indenture.

     2.    Wells Fargo is not required to expend or risk its own funds or otherwise incur individual financial liability in the performance of its duties or in the exercise of any of its rights or powers other than to notify the Director or the Bondholders that Wells Fargo will not take a particular action after an Event of Default, as set forth in Sections 8.01(A) of the Senior Indenture.



3. In the event the Borrower defaults under any of the provisions of the Agreement and Wells Fargo employs attorneys or incurs other expenses (including expert witness fees and expenses) for the collection of the payments due under the Agreement or the enforcement of performance or observation of any obligation or agreement on the part of the Borrower contained in the Agreement, the Borrower agreed to pay to Wells Fargo the reasonable fees of such attorneys and such other reasonable expenses so incurred by Wells Fargo, all as set forth in Section 7.3 of the Agreement.

4. The Borrower covenanted and agreed to pay and indemnify Wells Fargo against all costs and charges, including reasonable fees and disbursements of attorneys, accountants, consultants and other experts, incurred in good faith in connection with the Agreement, the Bonds, the Senior Indenture or the Subordinate Indenture, including but not limited to any judicial or administrative proceeding or investigation or audit, as set forth in Section 9.2 of the Agreement.

5. The Borrower released Wells Fargo from, and covenanted and agreed that Wells Fargo shall not be liable for, and covenanted and agreed to hold harmless Wells Fargo, its members, officers, employees and agents, from and against, any and all losses, claims, damages, liabilities or expenses, of every conceivable kind, character and nature whatsoever arising out of, resulting from or in any way connected with, among other things: (i) the Project, (ii) the issuance of any Bonds or any certifications or representations made in connection therewith, (iii) the carrying out of any of the transactions contemplated by the Senior Bonds or the Subordinate Bonds and the Agreement, or (iv) Wells Fargo's acceptance or administration of the trusts under the Senior Indenture, or the exercise or performance of any of its powers or duties under the Indenture or the Agreement, as set forth in Section 9.3 of the Agreement.

6. Wells Fargo is not under any obligation to exercise any of the rights or powers vested in it by the Senior Indenture at the request, order or direction of the Bondholders, unless Wells Fargo has been provided security or indemnity acceptable to Wells Fargo against any costs, expenses or liability which may be incurred in such exercise, as set forth in Sections 8.03(B) and 7.05 of the Senior Indenture.

7. No provision of the Senior Indenture requires Wells Fargo to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under the Senior Indenture, or in the exercise of its rights or powers, if Wells Fargo has reasonable grounds for believing that payment for such funds or adequate indemnity against such risk or liability is not reasonably assured to Wells Fargo, as set forth in Section 8.03(E) of the Senior Indenture.

8. Wells Fargo has a lien on all funds prior to and superior to the lien of the Bondholders for its compensation, all reasonable expenses, charges, legal and consulting fees and other disbursements, including those of its attorneys, agents and employees, as set forth in Section 8.06 of the Senior Indenture.

9. If an Event of Default occurs and is continuing, all Revenues and any other funds then held or thereafter received by Wells Fargo under any of the provisions of the Senior Indenture (subject to rebate and other tax requirements) shall be applied by Wells Fargo first to the payment of any expenses necessary in the opinion of Wells Fargo to protect the interests of the Bondholders and payment of reasonable charges and expenses of Wells Fargo (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under the Senior Indenture as set forth in Section 7.03 of the Senior Indenture.



LEWIS AND ROCA LLP LAWYERS

Gerald M. Gordon, Esq.
Kris T. Ballard, Esq.
November 23, 2009
Page 3

**Borrower Events of Default**

<u>Borrower To Pay Debt Service Monthly</u>. The Agreement requires the Borrower to, among other things, pay to Wells Fargo, on or before the Last Business Day of each month, sums sufficient to fund debt service on the Bonds and replenish the Debt Service Reserve shortfalls (over twelve months). Specifically, Section 4.2(a)(i) of the Agreement requires the Borrower to make monthly payments sufficient to pay: (1) Into the 1st Tier Debt Service Fund, one-sixth of the interest and one-twelfth of the principal next coming due on the 1st Tier Bonds; (2) Into the 1st Tier Debt Service Reserve Fund; one-twelfth of the total amount necessary to restore the 1st Tier Debt Service Reserve Fund to the Debt Service Reserve Requirement for the 1st Tier Bonds; (3) Into the 2nd Tier Debt Service Fund, one-sixth of the interest and one-twelfth of the principal next coming due on the 2nd Tier Bonds; and (4) Into the 2nd Tier Debt Service Reserve Fund, one-twelfth of the total amount necessary to restore the 2nd Tier Debt Service Reserve Fund to the Debt Service Reserve Requirement for the 2nd Tier Bonds.

<u>Borrower Failed to Make Monthly Payments</u>. The Borrower has caused certain Events of Default to occur under the Agreement and Senior Indenture, including the following Events of Default:

1. The Borrower failed to make sufficient payments in December 2007 to satisfy the requirements of Section 4.2(a)(i) and consequently, on January 2, 2008, there were insufficient amounts available in the 1st Tier Debt Service Fund and the 2nd Tier Debt Service Fund to pay all amounts of principal and interest coming due on that day. Therefore, and as provided in Sections 5.04(d) and 5.04(e) of the Senior Indenture, on January 2, 2008, Wells Fargo withdrew from the 1st Tier Debt Service Reserve Fund and the 2nd Tier Debt Service Reserve Fund amounts sufficient to make up the deficiency in the respective Debt Service Funds.

2. The Borrower also failed to make sufficient payments for the first six months of 2008 to satisfy the requirements of Section 4.2(a)(i). In every month from January 2008 through June 2008, the amount of Revenues available to be applied to debt service was less than that required under Section 5.03(a) of the Senior Indenture to fully fund Debt Service on the 1st Tier Bonds. The entire balance of the available moneys on deposit in the Revenue Fund was transferred each month to the 1st Tier Debt Service Fund, and as a result, there were no Revenues available to replenish the 1st Tier Debt Service Reserve Fund, to fund the 2nd Tier Debt Service Fund or to replenish the 2nd Tier Debt Service Reserve Fund. There were insufficient revenues available in the 1st Tier Debt Service Fund to make the July 1, 2008 debt service payment and the Trustee made a withdrawal on the 1st Tier Debt Service Reserve Fund to cover the shortfall. The entire amount of the 2nd Tier payment of interest was funded from the 2nd Tier Debt Service Reserve Fund for the July 1, 2008 debt service payment due on the 2nd Tier Bonds.

3. As of October 30, 2008, the Borrower had failed to make Revenues available to replenish the 1st Tier Debt Service Reserve Fund, to fund the 2nd Tier Debt Service Fund, or to replenish the 2nd Tier Debt Service Reserve Fund.

4. The Borrower continued its failure to make sufficient payments to satisfy the requirements of Section 4.2(a)(i) and consequently, on January 2, 2009, Wells Fargo withdrew from the 1st Tier Debt Service Reserve Fund and the 2nd Tier Debt Service Reserve Fund amounts sufficient to make up the deficiency in the respective Debt Service Funds.


**LEWIS AND ROCA**
—LLP—
LAWYERS

Gerald M. Gordon, Esq.
Kris T. Ballard, Esq.
November 23, 2009
Page 4

5.   As of March 10, 2009, the Borrower continued its failure to deposit sufficient revenues from operations to pay debt service on the Senior Bonds as they became due.

6.   As of July 1, 2009, the Borrower failed to deposit sufficient funds in the 1st Tier Debt Service Fund to make the July 1, 2009 debt service payment. Wells Fargo therefore drew on the 1st Tier Debt Service Reserve Fund and the Surety Bond issued by Ambac Assurance Corporation (the "Bond Insurer") which makes up part of the 1st Tier Debt Service Reserve Fund to cover the shortfall and pay debt service due. There were insufficient funds available in the 2nd Tier Debt Service Fund and 2nd Tier Debt Service Reserve Fund to pay in full the July 1 interest payment on the 2nd Tier Bonds, and thus Wells Fargo made only a partial payment of interest to holders of the 2nd Tier Bonds on July 1, 2009 as directed by the requisite number of holders of the Senior Bonds. Such direction required Wells Fargo to withhold $1,500,000 in the 2nd Tier Debt Service Reserve Fund from the July 1, 2009 payment of interest on the 2nd Tier Bonds.

**Concern Regarding Claim Payment Ability of Bond Insurer**

Ambac Management's Warnings. According to the Management's Discussion and Analysis of financial Condition and Results of Operation contained in the November 9, 2009 Form 10Q filing with the SEC (the "10Q") submitted by Ambac Financial Group, Inc., parent to the Bond Insurer ("AFG"), among events, risks, uncertainties or factors that could cause its actual financial results to differ materially from what was reported in the 10Q are: (1) AFG's available liquidity is currently insufficient to fund its needs beyond the near term and it could run out of liquidity; (2) as a result of the Bond Insurer's deteriorating financial condition, regulators could commence delinquency proceedings; (3) changes in AFG's and/or the Bond Insurer's credit or financial strength ratings.

AFG Liquidity Concerns. As a holding company, AFG is largely dependent on dividends from the Bond Insurer to pay dividends on its common stock, to pay principal and interest on its indebtedness and to pay its operating expenses. The Bond Insurer is unable to pay dividends to AFG in 2009 without the consent of the Office of the Commissioner of Insurance of the State of Wisconsin ("OCI"), and is unlikely to be able to pay dividends in 2010 without the prior consent of OCI. See Part I, Item 2 "Management's Discussion and Analysis—Liquidity and Capital Resources" of the 10Q for further information.

According to its 10Q, AFG's available liquidity is currently insufficient to fund its needs beyond the near term and its failure to successfully execute on its current strategies could result in it running out of liquidity in the second quarter of 2011, or potentially sooner. AFG has stated that it is developing strategies to address its liquidity needs, which may include a negotiated restructuring of its debt through a prepackaged bankruptcy proceeding. If AFG is unsuccessful in executing its strategies, it has stated that it may need to consider seeking bankruptcy protection without agreement from major creditor groups concerning a plan of reorganization.

Bond Insurer's Deteriorating Financial Condition. According to the 10Q, as a result of the Bond Insurer's financial condition, regulators could commence delinquency proceedings with respect to AFG. Due to the deterioration of the Bond Insurer's financial condition, the OCI has increased its oversight of the Bond Insurer and is evaluating the Bond Insurer's ability to pay all claims in its insured portfolio. While no proceeding is currently pending, following such evaluation and depending on the result of such review, OCI could decide to initiate delinquency proceedings with respect to the Bond Insurer to protect the interests of policyholders. A number of adverse consequences could result from the initiation of



Gerald M. Gordon, Esq.
Kris T. Ballard, Esq.
November 23, 2009
Page 5

delinquency proceedings, thus compromising the Bond Insurer's ability to mitigate loss in its insured portfolio.

The Bond Insurer is subject to the insurance laws and regulations of each jurisdiction in which it is licensed. Failure to comply with applicable insurance laws and regulations (including, without limitation, minimum surplus requirements, aggregate risk limits and single risk limits) could expose the Bond Insurer to fines, the loss of insurance licenses in certain jurisdictions, the imposition of orders by regulators with respect to the conduct of business by the Bond Insurer. Any of the foregoing items could prompt the initiation of delinquency proceedings with respect to the Bond Insurer. Even if delinquency proceedings were not commenced, the OCI could impose additional limitations on the Bond Insurer's operations and business, which could limit the ability of the Bond Insurer to pay claims under financial guarantee insurance policies.

Continued Downgrades in Rating of Bond Insurer. The financial strength of the Bond Insurer is rated by Moody's Investors Service ("Moody's), Standard & Poor's ("S&P") and Fitch Ratings ("Fitch"). On January 29, 2008, Moody's issued a Rating Update for the Borrower, indicating a downgrade of the underlying rating on the 1st Tier Bonds to "Caa2" from "B3." The Bonds were still (as of the date of the Rating Update on January 29, 2008) rated Aaa based on bond insurance provided by the Bond Insurer, although Moody's noted that the Bond Insurer's Aaa rating remained on review for possible downgrade.

On June 4, 2008, Moody's announced that it had placed the "Aa3" insurance financial strength rating of the Bond Insurer on review for possible downgrade. On June 5, 2008, S&P lowered its financial strength rating on the Bond Insurer to "AA" from "AAA" and placed the rating on CreditWatch with negative implications. On June 26, 2008, Fitch, at the request of the Bond Insurer, withdrew its rating of the Bond Insurer.

On April 13, 2009, Moody's downgraded the Bond Insurer to "Ba3" from "Baa1." On June 24, 2009, S&P lowered its counterparty credit, financial strength and financial enhancement ratings on the Bond Insurer to "BBB" from "A." On July 28, 2009, S&P lowered its counterparty credit, financial strength and financial enhancement ratings on the Bond Insurer to "CC" from "BBB." On July 29, 2009, Reuters reported that Moody's downgraded Ambac to "Caa2"; outlook is developing.

According to the 10Q, the Bond Insurer has a "CC" financial strength rating with a developing outlook by S&P, and a "Caa2" financial strength rating with a developing outlook from Moody's. According to the 10Q, these ratings reflect multiple downgrades in the Bond Insurer's financial strength ratings from June 2008 through August 2009.

On Wednesday, November 18, 2009, S&P lowered the counterparty and financial enhancement ratings on the Bond Insurer to "SD" (selective default).


Gerald M. Gordon, Esq.
Kris T. Ballard, Esq.
November 23, 2009
Page 6

**Demand for Security**

Wells Fargo is deeply and justifiably concerned about the ability of the parties to the transaction to make timely payment or provision for payment of the costs of Wells Fargo's Reimbursement and Indemnification Rights for the following reasons:

1.  As detailed above under the caption "Borrower Events of Default", the Borrower is reasonably expected to continue to be unable to make payments required under the Senior Indenture and the Agreement in light of the existence and continuation of Events of Default.

2.  The Borrower is a nonprofit public benefits corporation, has no stockholders equity, is highly leveraged and is dependent on Project Revenues generated through the operation of the Monorail. The consequences of the Borrower's leverage include that the Borrower has limited ability to obtain additional debt financing in the future for working capital, the Borrower cannot obtain financing from equity investors, and the Borrower may be vulnerable, and may have difficulty responding, to adverse changes in the economy.

3.  As detailed above under the caption "Concern Regarding Claim Payment Ability of Bond Insurer", the Bond Insurer's parent company has expressed concerns about the Bond Insurer's ability to continue making payments against the Bond Insurer's Municipal Bond Insurance Policy.

4.  The remedies available to Wells Fargo and the Bondholders upon an Event of Default under the Senior Indenture and Agreement are dependent upon regulatory and judicial actions which are often subject to discretion and delay, may not be available or may be limited. The availability of any of the remedies provided by the Senior Indenture and the Agreement in the event of bankruptcy (or any other insolvency proceeding) of the Borrower or the Bond Insurer cannot be predicted.

On the basis of the foregoing, Wells Fargo is demanding security for the Reimbursement and Indemnification Rights and is asserting its rights under Section 7.03(1) of the Senior Indenture, which provides, in relevant part, as follows:

> SECTION 7.03 <u>Application of Revenues and Other Funds After Default</u>. If an Event of Default shall occur and be continuing, <u>all Revenues and any other funds then held</u> or thereafter received by the Trustee <u>under any of the provisions</u> of this Senior Indenture (subject to Sections 5.06 and 6.06) shall be applied by the Trustee as follows and in the following order:
>
> (1) To the payment of any expenses necessary in the opinion of the Trustee to protect the interests of the Bondholders and payment of reasonable charges and expenses (including those previously outstanding) of the Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under this Senior indenture, [emphasis added]...



Gerald M. Gordon, Esq.
Kris T. Ballard, Esq.
November 23, 2009
Page 7

**Notice of Withdrawal**

Wells Fargo is hereby advising you that the following amounts have been withdrawn from the Senior Indenture to be held by Wells Fargo as security and to be applied against payment for the costs of Wells Fargo's Reimbursement and Indemnification Rights:

1. Withdrawal of $600,000.00 from the Revenue Fund[1];
2. Withdrawal of $1,898,328.07 from the 1st Tier Debt Service Fund; and
3. Withdrawal of $601,672.00 from the Indemnification Account.

The amounts withdrawn will be applied, as necessary, against the fair value of the costs incurred by Wells Fargo in the performance of any of its duties, or in the exercise of its rights or powers, under the Senior Indenture and the Agreement to protect the interests of the Bondholders. Any balance of these moneys after the above referenced risks have been resolved, in the discretion of the Trustee, will be transferred, on a pro rata basis, back to the fund or account of the Senior Indenture from which they were withdrawn. This withdrawal is to secure Wells Fargo's Reimbursement and Indemnification Rights and is not made in connection with any antecedent debt owed to Wells Fargo. Wells Fargo reserves the right to make future transfers as necessary to protect and secure its Reimbursement and Indemnification Rights.

It is important that parties move forward in a manner that properly allocates risks among and between the appropriate financing participants. I trust you can appreciate Wells Fargo's position on these issues.

Very truly yours,

Bryant D. Barber

cc: Gavin Wilkinson
    Susan Freeman, Esq.
    William Smith, Esq.
    Robert E. McPeak, Esq.

---

[1] This withdraw will be adjusted from $600,000 to $110,000, pursuant to discussions between Messrs. Gavin and Myles during our meeting on Friday, November 20, 2009.