1   GORDON SILVER                          E-Filed On _February 3, 2010_
    GERALD M. GORDON, ESQ.
2   Nevada Bar No. 229
    E-mail: ggordon@gordonsilver.com
3   WILLIAM M. NOALL, ESQ.
    Nevada Bar No. 3549
4   E-mail: wnoall@gordonsilver.com
    GABRIELLE A. HAMM, ESQ.
5   Nevada Bar No. 11588
    E-mail: ghamm@gordonsilver.com
6   3960 Howard Hughes Pkwy., 9th Floor
    Las Vegas, Nevada 89169
7   Telephone (702) 796-5555
    Facsimile (702) 369-2666
8   Proposed Attorneys for Debtor

9                   **UNITED STATES BANKRUPTCY COURT**

10                     **FOR THE DISTRICT OF NEVADA**

11  In re:                                  Case No.: 10-10464-BAM
                                            Chapter 11
12  LAS VEGAS MONORAIL COMPANY,

13          Debtor.                         **DEBTOR'S BRIEF IN SUPPORT OF
                                            ENTRY OF FINAL ORDER**
14                                          **DETERMINING EXTENT OF CASH
                                            COLLATERAL AND AUTHORIZING**
15                                          **USE OF CASH COLLATERAL
                                            PURSUANT TO 11 U.S.C. 363(A)**

16
                                            Date:   February 17, 2010
17                                          Time:   1:30 p.m.

18          Las Vegas Monorail Company, a Nevada non-profit corporation ("Debtor" or "LVMC"),

19  debtor and debtor-in-possession, by and through its proposed counsel, the law firm of Gordon

20  Silver, hereby submits this brief in support of entry of a final order determining the extent of

21  cash collateral and authorizing the use of cash collateral throughout this Chapter 11 case as

22  initially set forth in the *Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy*

23  *Rule 4001(B) and LR 4001(b): (1) Initially Determining Extent of Cash Collateral and*

24  *Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to*

25  *Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtor* (the

26  "Motion"), and in opposition to the *Indenture Trustee's Objection to Use of Cash Collateral and*

27  *Motion for Adequate Protection Pursuant to 11 U.S.C. 361, 363(c)(2) and 363(e).*

28  ...

    102200-001/838469_2.doc                      i

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. JURISDICTION AND VENUE ............................................................................ 2

III. BACKGROUND .................................................................................................. 2

    A.    The Bank of America Account ................................................................... 2

    B.    Debtor's Source of Revenues and Cash Management ................................ 4

    C.    The Security Agreements and Issuance of the Bonds ................................ 7

    D.    The Financing Agreement – Security Granted to the Director by LVMC ...................... 10

    E.    The Senior Indenture – Security Granted to the Trustee by the Director ......................... 12

    F.    Ambac's Security – Subordinated Security Interest ................................. 13

IV. LEGAL ARGUMENT ......................................................................................... 14

    A.    The Security Interest of the Trustee is Limited to Net Project Revenues ........................ 14

        1.    The terms of the Financing Documents ....................................... 14

        2.    The question of "proceeds" ........................................................ 16

        3.    The Trustee's security interest should be cut-off as of the Petition Date under Section 552(a) in the interest of the equities of the case ..................................... 22

    B.    Postpetition Revenues Are Not Subject to a Statutory Lien ............................. 23

    C.    The Trustee lacked a perfected security interest in the Postpetition Project Revenues on the Petition Date ................................................. 28

        1.    Only perfected security interests are within the scope of Section 363(a) .................... 28

        2.    Perfection requires possession (money) or control (deposit accounts) ....................... 29

        3.    The Debtor's deposits into the BofA Account raise no constructive trust, estoppel, or other equitable issues ............................................. 30

    D.    The Trustee is Not Entitled to Adequate Protection ............................. 34

        1.    As an undersecured creditor, the Trustee is entitled only to adequate protection for any diminution in value ............................. 35

        2.    The validity, priority, and extent of the Trustee's security interest is disputed ........... 36

    E.    The Trustee is Not Entitled to Recovery of Postpetition Interest or His Fees .................. 37

V. CONCLUSION ..................................................................................................... 39

...

ii

1

## TABLE OF AUTHORITIES

2

**Cases**

3

641 Ave. of Americas Ltd. Partnership v. 641 Associates, Ltd.,
4    189 B.R. 583 (S.D.N.Y. 1995)........................................................................ 29

5

Alliance Capital Mgmt L.P. v. County of Orange (In re County of Orange),
     189 B.R. 499 (C.D. Cal. 1995) .................................................................... 26
6

American President Lines, Ltd. v. Lykes Bros. S.S. Co. (In re Lykes Bros. S.S. Co.),
7    216 B.R. 856 (Bankr. M.D. Fla. 1996) ................................................... 19, 22

8

Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pacific Corp.),
9    316 B.R. 330 (B.A.P. 9th Cir. 2004)...................................................... 17, 19

10

Baybank-Middlesex v. Ralar Distributions, Inc., 63 F.3d 1200 (1st Cir. 1995)........................... 39

11

Brandt v. Fleet Capital Corp. (In re TMCI Elec.), 279 B.R. 552 (Bankr. N.D. Cal. 2000).......... 19

12

Chequer, Inc. v. Painters and Decorators Joint Comm., Inc., 655 P.2d 996 (Nev. 1982) ............ 31

13

Everett Home Town Ltd. P'ship, 146 B.R. 453 (Bankr. D. Ariz. 1992)........................................ 19

14

Executive Mgmt. v. Ticor Title Ins. Co., 114 Nev. 823, 963 P.2d 465 (1998) ............................ 30

15

In re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649
16    (Bankr. S.D.N.Y. June 16, 2008).............................................................. 18, 23

17

In re Beker Indus. Corp., 58 B.R. 735 (Bankr. N.D.N.Y. 1986) ................................................ 35

18

In re Cafeteria Operators, L.P., 299 B.R. 400 (Bankr. N.D. Tex. 2003) .............. 17, 18, 19, 21, 23

19

In re Corner Pockets of the Southwest, Inc., 85 B.R. 559 (Bankr. D. Mont. 1988) ............... 20, 28

20

In re Corpus Christi Hotel Partners, Ltd., 133 B.R. 850 (Bankr. S.D. Tex. 1991)....................... 22

21

In re Fairview-Takoma Ltd. P'ship, 206 B.R. 792 (Bankr. D. Md. 1997) ................................... 28

22

In re General Associated Investors L.P., 150 B.R. 756 (Bankr. D. Ariz. 1993).......................... 19

23

In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017 (11th Cir. 1984)...................... 35

24

In re Integrated Health Services, Inc., 260 B.R. 71 (Bankr. D. Del. 2001) ................................. 36

25

In re Johnson, 62 B.R. 24 (B.A.P. 9th Cir. 1986)...................................................................... 28

26

In re Kord Enterprises II, 139 F.3d 684 (9th Cir. 1998) .............................................................. 37

27

In re Ledis, 259 B.R. 472 (Bankr. D. Mass. 2001) .................................................................... 21

28

iii

In re Loewen Group Int'l, Inc., 274 B.R. 427 (Bankr. D. Del. 2002) .......................................... 37

In re Mosello, 195 B.R. 277 (Bankr. S.D.N.Y. 1996) ........................................................ 35

In re Northport Marina Assocs., 136 B.R. 911 (Bankr. E.D.N.Y. 1992) ...................................... 29

In re O.P.M. Leasing Services, Inc., 23 B.R. 104 (Bankr. S.D.N.Y. 1982) ................................ 31

In re O'Connor, 808 F.2d 1393 (10th Cir. 1987) ............................................................ 23

In re Patio & Porch Sys., Inc., 194 B.R. 569 (Bankr. D. Md. 1996) ........................................ 23

In re Pine Lake Vill. Apartment Co., 19 B.R. 819 (Bankr. S.D.N.Y. 1982) ............................... 35

In re Rancourt, 123 B.R. 143 (Bankr. D.N.H. 1991) ........................................................ 29

In re S & J Holding Corp., 42 B.R. 249 (Bankr. S.D. Fla. 1984) .......................................... 19

In re Scottsdale Medical Pavilion, 159 B.R. 295 (B.A.P. 9th Cir. 1993),
    aff'd 52 F.3d 244 (9th Cir. 1995) .................................................................... 28

In re Vienna Park Properties, 976 F.2d 106, 111 (2d Cir. 1992) .......................................... 29

In re Wabash Valley Power Ass'n, Inc., 72 F.3d 1305 (7th Cir. 1995) ..................................... 19

In re Welzel, 275 F.3d 1308 (11th Cir. 2001) .............................................................. 37

In re WorldCom, Inc., 304 B.R. 611 (Bankr. S.D.N.Y. 2004) ................................................ 35

Indian Motorcycle Assocs. III L.P. v. Massachusetts Housing Fin. Agency,
    66 F.3d 1246 (1st Cir. 1995) ........................................................................ 28

Kukuk v. Martin, 331 Ill. 602, 163 N.E. 391 ............................................................. 32

Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ............................... 18

Locken v. Locken, 650 P.2d 803 (1982) .................................................................... 30

Long v. Towne, 98 Nev. 11, 639 P.2d 528 (1982) .......................................................... 30

Matter of Continental Airlines, Inc., 134 B.R. 536 (Bankr. D. Del. 1991) ............................... 36

Matter of May, 169 B.R. 462 (Bankr. S.D. Ga. 1994) ...................................................... 29

Nelson v. Nelson Neal Lumber Co., 171 Wash. 55, 17 P.2d 626 (1932) ..................................... 32

Nevada State Bank v. Jamison Partnership, 801 P.2d 1377 (Nev. 1990) .................................... 31

NGA #2 LLC v. Rains, 946 P.2d 163 (Nev. 1997) ........................................................... 31

NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) ................................................... 18, 22

iv

*Perry v. Jordan*, 111 Nev. 943, 947, 900 P.2d 335 (1995) ............................................................ 30

*Peters v. WFS Financial, Inc. (In re Glandon)*, 338 B.R. 103 (Bankr. D. Colo. 2006) ................ 31

*Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*,
    944 F.2d 500 (9th Cir. 1991) ....................................................................................................... 17

*Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.)*, 339 B.R. 730
    (B.A.P. 9th Cir. 2006) .................................................................................................................. 29

*Rushton v. Dean Evans Chrysler-Plymouth (In re Solar Energy Sales and Services)*,
    4 B.R. 364 (Bankr. D. Utah 1980) ............................................................................................... 31

*Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*,
    874 F.2d 88 (2d Cir. 1989) ........................................................................................................... 31

*Smoker v. Hill & Assoc., Inc.*, 204 B.R. 966 (N.D. Ind. 1997) .................................................... 18

*T-H New Orleans Ltd. Pship v. Financial Secrity Assurance, Inc.*
    *(In re T-H New Orleans Ltd. Pship.)*, 10 F.3d 1099 (5th Cir. 1993),
    *cert. denied*, 511 U.S. 1083, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994) .................................... 21

*The Business Bank v. White (In re Timothy Dean Restaurant & Bar)*,
    342 B.R. 1 (Bankr. D. D.C. 2006) ................................................................................................ 21

*Thomas C. Thompson Sports, Inc. v. Farmers & Merchants Bank of Long Beach*
    *(In re Turley)*, 172 F.3d 671 (9th Cir. 1999).............................................................................. 16

*Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988)..................................................... 38

*United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.)*,
    No. 02-B-48191, 2004 WL 3080341 (Bankr. N.D. Ill. Sept. 20, 2004) .................................... 29

*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983) ................................................. 22

*Waldman v. Maini*, 195 P.3d 850 (Nev. 2008) ............................................................................. 30

*Waldron v. Northwest Acceptance Corp. (In re Johnson)*, 62 B.R. 24
    (B.A.P. 9th Cir. 1986)................................................................................................................... 28

*Wells Fargo Bank, N.A. v. Courson (In re Courson)*, 409 B.R. 516
    (Bankr. E.D. Wash. 2009).............................................................................................................. 32

*Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*, 359 F.Supp.2d 1075
    (D. Nev. 2004) ....................................................................................................................... 30, 31

*Zeeway Corp. v. Rio Salado Bank (In re Zeeway Corp.)*, 71 B.R. 210
    (B.A.P. 9th Cir. 1987).................................................................................................................... 19

…

v

**Statutes**

11 U.S.C. § 101(53) ............................................................................. 26

11 U.S.C. § 361 .................................................................................... 35

11 U.S.C. § 503(b) ............................................................................... 38

11 U.S.C. § 506(b) ............................................................................... 37

11 U.S.C. § 552(a) ............................................................................... 17

11 U.S.C. § 552(b)(1) .......................................................................... 17

11 U.S.C. § 902(2) ............................................................................... 27

11 U.S.C. § 363(p)(2) ........................................................................... 21

11 U.S.C. § 928(a) ............................................................................... 27

11 U.S.C. § 902(2) ............................................................................... 27

NRS 104.9102(1)(kkk) ......................................................................... 18

NRS 104.9104(1) .................................................................................. 30

NRS 104.9312(2)(a) ............................................................................. 29

NRS 104.9312(2)(c) ............................................................................. 29

NRS 104.9312(4)(b). ........................................................................... 33

NRS 104.9332(b). ................................................................................ 33

NRS 108.221 through 108.896, inclusive ............................................ 26

NRS 349.470 ........................................................................................ 10

NRS 349.520 ............................................................................. 15, 26, 27

NRS 349.570 ................................................................................... 25, 26

NRS 349.600 .......................................................................................... 9

NRS 349.620 ........................................................................................ 25

NRS 349.620(1) .................................................................................... 27

NRS 349.620(1)(a) ............................................................................... 25

# I.
## INTRODUCTION

1.     On January 13, 2010 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing its bankruptcy case (the "Chapter 11 Case").

2.     Debtor continues operating its business and managing its property as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.     The basis for the relief sought herein is Sections 361 and 363 of the Bankruptcy Code, Bankruptcy Rule 4001(b), and LR 4001(b).

4.     The Indenture Trustee's Objection to Use of Cash Collateral and Motion for Adequate Protection Pursuant to 11 U.S.C.  361, 363(c)(2) and 363(e) was filed on January 14, 2010 [Docket No. 13].

5.     The Debtor filed its *Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(B) and LR 4001(b):  (1) Initially Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtor* on January 15, 2010 [Docket No. 49].

6.     The *Indenture Trustee's Objection to Debtor's Emergency Applications to:  (1) Maintain Prepetition Cash Management System and (2) Pay Business Expenses, and Response to Debtor's Cash Collateral Motion* was filed on January 18, 2010 [Docket No. 58].

7.     After a hearing held on January 19, 2010, this Court entered the *Interim Order Re Emergency Motion For Entry Of An Interim Order Pursuant To Bankruptcy Rule 4001(B) And LR 4001(b):  (1) Initially Determining Extent Of Cash Collateral And Authorizing Interim Use Of Cash Collateral By Debtor; And (2) Scheduling A Final Hearing To Determine Extent Of Cash Collateral And Authorizing Use Of Cash Collateral By Debtor* on January 22, 2010 [Docket No. 89] (the "Interim Order").  The Interim Order authorized the Debtor to use its funds on deposit with Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to an agreed budget.  The Interim Order provided that the all rights and remedies respecting, and objections, positions, and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

1    arguments concerning the Debtor's use of cash collateral under 11 U.S.C. §363 of the

2    Bankruptcy Code, including the extent, validity and priority of liens were fully reserved.1

3                                                    **II.**
                                   **JURISDICTION AND VENUE**

4

5         8.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(1)(A)

     and (M) and 1334.

6

7         9.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8         10.    Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9                                                   **III.**
                                        **BACKGROUND**

10   **A.**     **The Bank of America Account**

11        11.    Under Paragraph 4.1(f) of the Financing Agreement, the Debtor is authorized to

12   open and retain bank accounts, including the Collection Fund, with any bank having a combined

13   capital and surplus of at least $100,000,000.  However, as a result of the inability of LVMC to

14   satisfy its debt service obligations, it was required to transfer all of its Project Revenues to the

15   Trustee for deposit in the Revenue Fund maintained at Wells Fargo (the "Revenue Fund")

16   pursuant to Paragraph 4.1(b) of the Financing Agreement.  Also pursuant to Paragraph 4.1(b) of

17   the Financing Agreement, the Trustee is required to pay from the Revenue Fund all payments

18   permitted or required to be paid from the Collection Fund for Operation and Maintenance Costs

19   ("O&M Costs") upon written direction of the Debtor.   Until recently, all of the Debtor's

20   revenues were deposited into the Collection Fund maintained at Wells Fargo (the "Collection

21   Fund").  *Omnibus Declaration of Curtis L. Myles, III in Support of Debtor's First Day Motions*

22   (hereinafter, the "Omnibus Declaration") [Docket No. 7], ¶ 78.

23        12.    However, the Debtor established the Bank of America deposit account (the "BofA

24   Account") in October, 2009 due to the Trustee's refusal to disburse Project Revenues to the

25   Debtor for payment of O&M Costs.  From time to time, the Debtor has directed the deposit of

26   revenues from operation of the Monorail into the BofA Account to pay these wrongfully

27   ─────────────────────
     [1] Unless otherwise indicated, all capitalized terms herein shall have the meaning set forth in the Omnibus
28   Declaration of Curtis L. Myles, III in Support of the Debtor's First Day Motions [Docket No. 7].

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                        2

1   dishonored payment directives. On or about November 16, 2009, the Trustee, without notice to

2   the Debtor, withdrew approximately $2.6 million from the Debtor's accounts at Wells Fargo,

3   consisting of $601,672 from the Indemnification Fund, $110,000 from the Revenue Fund, and

4   $1,898,328 from the 1st Tier Debt Service Fund (the account for payment of principal and

5   interest due to the 1st Tier Bonds), to insure payments and indemnifications provided to the

6   Trustee under the Indentures. This diversion of funds included approximately $600,000 which

7   LVMC had deposited into the Collection Fund as a reserve for 2010 liability insurance

8   premiums, which was critical to the continued operation of the Monorail. Following demand by

9   the Debtor, the Trustee returned to the Revenue Fund $490,000 of the insurance reserve, with the

10  remaining $110,000 replaced from Net Project Revenues. However, the Trustee then notified

11  the Debtor that it reserves the right to withdraw further sums from the Revenue Fund without

12  prior notice to the Debtor. Omnibus Declaration, ¶ 79.

13          13.    Most importantly, on or about December 22, 2009, Ambac issued a written

14  instruction to the Trustee that the Trustee was to withhold funding for certain O&M Costs

15  requested by LVMC for its restructuring professionals totaling $254,451.81, and that to the

16  extent LVMC deposited revenues in the BofA Account for the payment of these or any other

17  expenses to which Ambac objected, "...Ambac will direct Wells Fargo to hold a like amount

18  from the next requisition until the amounts taken prior to deposit into the Collection Account

19  have been recovered." LVMC immediately sought clarification from the Trustee as to whether it

20  intended to refuse to honor payment directives for O&M Costs upon the instruction of Ambac,

21  which would jeopardize payment of such O&M Costs as wages, utilities, and payment to

22  Bombardier under the Bombardier Agreement for operation of the Monorail. The Trustee would

23  not respond. Omnibus Declaration, ¶ 80.

24          14.    In light of the actions of the Trustee and Ambac, it was clear to the Debtor that

25  failure to preserve some of its Project Revenues for payment of critical O&M Costs might

26  impair continued operation of the Monorail. The Debtor therefore began depositing all of its

27  revenues into the BofA Account on December 27, 2009 to ensure its continued ability to meet its

28  operational obligations pending assurances that revenues deposited into the Wells Fargo

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                3

Collection Fund would not be diverted from payment of O&M Costs. Omnibus Declaration, ¶ 80.

15.     On January 12, 2010, the Trustee issued a demand to Debtor to deposit all moneys in the BofA Account in the Collection Fund and provided a deadline of noon of January 13, 2010, to comply. A true and correct copy of the letter is attached to the Omnibus Declaration as Exhibit "20." In response, the Debtor delivered a responsive letter just prior to noon on January 13, 2010, attached to the Omnibus Declaration as Exhibit "21," setting forth its positions on the payment of O&M Costs, the use of cash collateral during its anticipated Chapter 11 case, and again offering to transfer the moneys in the BofA Account to the Trustee upon confirmation by the Trustee that he would not divert funds from payment of O&M Costs. See Omnibus Declaration, ¶ 82.

16.     As of the Petition Date, LVMC had approximately $226,346.06 in the WFB Accounts. As of the Petition Date, LVMC had a balance in the BofA Account of approximately $971,041.52. Following the Petition Date, approximately $400,000 was deposited into the BofA Account by Brinks and the Merchant Bank because directions by the Debtor to deposit such funds in the Collection Fund at Wells Fargo pursuant to the Interim Order had not yet been implemented. The Debtor transferred these postpetition deposits to Wells Fargo on January 26, 2010.

**B.     Debtor's Source of Revenues and Cash Management**

17.     Fare Revenues. LVMC generates revenue primarily from the sale of tickets to riders (the "Fare Revenues"). For 2009, average daily Fare Revenues were approximately $73,903. *Declaration Of Curtis L. Myles, III In Support Of Emergency Motion For Entry Of An Interim Order Pursuant To Bankruptcy Rule 4001(B) And LR 4001(B): (1) Initially Determining Extent Of Cash Collateral And Authorizing Interim Use Of Cash Collateral By Debtor; And (2) Scheduling A Final Hearing To Determine Extent Of Cash Collateral And Authorizing Use Of Cash Collateral By Debtor* (hereinafter the "Myles Cash Collateral Declaration"), ¶ 4. Approximately 263,350 tickets are sold at LVMC's 42 Ticket Vending Machines ("TVMs") each month, at which customers may pay in cash or coins (the "TVM Cash Receipts"), or with a debit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

4

or credit card (the "TVM Credit Receipts"). Customers may also purchase tickets online (the "Web Receipts"), while Las Vegas residents can purchase a daily maximum of two local $1 one-way tickets at customer service booths located at the Sahara and MGM Grand stations (the "CSA Booth Receipts"). Omnibus Declaration, ¶ 21.

18. The 42 TVMs are serviced periodically by Brink's, an armored cash transportation and currency processing service, whose employees collect the cash and restock the TVMs with change. Each week, LVMC employees direct Brink's to specific machines that need servicing, which number depends upon the usage of the machines.[2] Omnibus Declaration, ¶ 112. Brink's is responsible for counting the TVM Cash Receipts and depositing them into the Collection Fund at Wells Fargo. Financing Agreement, § 4.1(b).[3] Brink's acts solely at the direction of LVMC. Myles Cash Collateral Declaration, ¶ 5.

19. Pursuant to the Debtor's instructions, on or about December 27, 2009, Brink's began collecting and depositing TVM Cash Receipts into the BofA Account, as described above.[4] As of the Petition Date, there was approximately $971,041.52 on deposit in the BofA Account. As of the Petition Date, the Debtor estimated that it had approximately $64,594 in coin inventory and approximately $162,209.95 in TVM Cash Receipts in the possession of Brink's (part of which must remain in the TVMs to make change) which had not been deposited in the BofA Account or the Collection Fund on the Petition Date. Omnibus Declaration, ¶ 112.

20. At the end of each day, the TVM Credit Receipts are submitted to a merchant processor (the "Merchant Bank"), who forwards the TVM Credit Receipts to the various credit issuers. The various credit issuers subsequently submit payment to the Merchant Bank. The Merchant Bank then deposits the funds into the Debtor's Collection Fund at Wells Fargo. Deposits by the Merchant Bank are made every one to three days. Omnibus Declaration, ¶ 113. The Merchant Bank acts solely at the direction of LVMC. Myles Cash Collateral Declaration, ¶

---

[2] To protect the safety of Brink's employees, the frequency of the service will not be described in this Brief.

[3] Though the Debtor created the Collection Fund at Wells Fargo Bank, nothing in the Financing Agreement requires that the Collection Fund be created at the Trustee bank.

[4] The BofA Account is not the subject of any depository control agreements with the Trustee and is not under the control and direction of the Trustee. Omnibus Declaration, ¶ 83.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

5

5.  Pursuant to the Debtor's instructions, the Merchant Bank began depositing all TVM Credit Receipts into the BofA Account on or about January 4, 2010.  TVM Credit Receipts generate approximately $40,000 in Fare Revenues per *day*.[5]  As of the Petition Date, there were approximately $30,000 in TVM Credit Receipts in process with the Merchant Bank.  Omnibus Declaration, ¶ 113.

21.  CSA Booth Receipts are managed and controlled by the Debtor and deposited into the Debtor's Collection Fund at Wells Fargo approximately three times per week.  On January 4, 2010, the Debtor began depositing the CSA Booth Receipts into the BofA Account.  CSA Booth Receipts generate less than 1% of all Fare Revenues.  There were approximately $650 of CSA Booth Receipts on hand with the Debtor as of the Petition Date.  Omnibus Declaration, ¶ 114.

22.  Customers may purchase tickets through the Monorail website.  Receipts from online purchases (the "Web Receipts") are processed through PayPal and Wells Fargo.  Deposits are automatically directed by Debtor to the Collection Fund within one to three days of the purchase.  Due to the nature of the mechanisms in place for collection of Web Receipts, no provisions were made prior the Petition Date for deposit of the Web Receipts into the BofA Account. Omnibus Declaration, ¶ 115.

23.  In addition to the Collection Fund maintained at Wells Fargo, the Revenue Fund and a number of inactive accounts are held at Wells Fargo Bank (collectively, the "Wells Fargo Accounts," and together with the BofA Account, "Deposit Accounts").  On the Petition Date, LVMC had approximately $226,346.06 in the Wells Fargo Accounts.  Omnibus Declaration, ¶ 111, 117.

24.  Ad Revenues.  Following Fare Revenues, the largest component of Debtor's revenues derives from sale of advertising (the "Ad Revenues," and together with the Fare Revenues and miscellaneous revenues for vending and concessions, the "Project Revenues").  Advertising purchases are usually made to LVMC by check, which until recently, were deposited into the Collection Fund.  Occasionally purchases are paid by wire transfer, in which

---

[5] In the Omnibus Declaration and the Cash Collateral Motion, the Debtor mistakenly stated that the TVM Credit Receipts generate approximately $40,000 in Fare Revenues per month instead of per *day*.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

6

case wire instructions were submitted by LVMC to the purchaser for the Collection Fund. On January 4, 2010, LVMC began depositing all Ad Revenues into the BofA Account, and issuing wire instructions for the BofA Account. As of the Petition Date, LVMC has no outstanding receivables for advertising. Omnibus Declaration, ¶ 116.

25.    In summary, on the Petition Date, LVMC had approximately $226,346.06 in the Wells Fargo Accounts; approximately $971,041.52 in the BofA Account; an estimated $226,803.95 in undeposited TVM Cash Receipts and CSA Booth Receipts consisting of $64,594 in coin inventory, $162,209.95 in undeposited TVM Cash Receipts (some of which must remain in the TVMs to make change); approximately $650 in CSA Booth Receipts; and an estimated $30,000 in TVM Credit Receipts in process at the Merchant Bank. Omnibus Declaration, ¶ 83, 117.

26.    The Debtor's revenue sources comprise three (3) types of collateral under NRS 104.9101, et seq., Nevada's enactment of Article 9 of the Uniform Commercial Code ("Article 9"). First, the TVM Cash Receipts as of the Petition Date, constitute "money" pursuant to which a security interest generally may only be perfected by possession. Second, the TVM Credit Receipts that have not been deposited by Brinks and the Merchant Bank into either the Collection Fund or the BofA Account, are "accounts receivable" under Article 9 (together, the "Receivables"). Finally, the BofA Account, the Collection Fund, and the other Wells Fargo Accounts constitute "deposit accounts" under Article 9 (together, the "Deposit Accounts").

27.    At issue before the Court is whether certain prepetition Project Revenues (the "Prepetition Revenues") consisting of TVM Cash Receipts, the Receivables, and the BofA Account, are subject to the security interest of the Trustee, and whether postpetition Project Revenues (the "Postpetition Revenues") from all sources are subject to the Trustee's security interest despite Section 552(a), and if so, to what extent.

C.    **The Security Agreements and Issuance of the Bonds**

28.    In order to finance the acquisition, construction, improvement and equipping of the Las Vegas Monorail (the "Monorail"), the Debtor entered into a financing agreement with Director of the Nevada Department of Business and Industry (the "Director" or "Issuer"). In

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

7

September 2000, in connection with the Financing Agreement, the Director issued tax-exempt bonds for the Debtor's construction and operation of the Monorail, which are more fully described below. The proceeds of the bonds (the "Bond Proceeds") were used for partial financing of the acquisition, construction, improvement and equipping of the Monorail as well as for principal and interest payment reserves.[6] Omnibus Declaration, ¶ 49.

29.    The Director assigned the Financing Agreement to Wells Fargo Bank, N.A. (the "Trustee") and simultaneously executed the Senior Indenture dated September 1, 2000 (the "Senior Indenture") and the Subordinate Indenture dated September 1, 2000 (the "Subordinate Indenture" and, together with the Senior Indenture, the "Indentures"). Exhibits 15 and 16 to the Omnibus Declaration.

30.    Pursuant to the Senior Indenture, the Director issued $352,705,000 in 1st tier current interest bonds and $98,743,217.30 in 1st tier capital appreciation bonds (collectively, the "1st Tier Bonds"). Pursuant to the Senior Indenture, the Director also issued $149,200,000 in 2nd tier current interest bonds (the "2nd Tier Bonds," and collectively with the 1st Tier Bonds, the "Senior Bonds"). Omnibus Declaration, ¶ 48.

31.    Pursuant to the Subordinate Indenture, the Director issued $48,500,000 in subordinate capital appreciation bonds (the "Subordinate Bonds" and collectively with the Senior Bonds, the "Bonds"). Omnibus Declaration, ¶ 48.

32.    Wells Fargo Bank, N.A. acts as the Trustee for the holders of the 1st Tier Bonds (the "1st Tier Bondholders"), the holders of 2nd Tier Bonds (the "2nd Tier Bondholders," and together with the 1st Tier Bondholders, the "Senior Bondholders"), and the holders of the Subordinate Bonds (the "Subordinate Bondholders," and together with the Senior Bondholders, the "Bondholders" ). On or about December 20, 2009, U.S. Bank N.A. was appointed as the Co-Trustee of the 2nd Tier Bondholders pursuant to the request of the Trustee (the "2nd Tier Co-Trustee"). The Trustee has represented that it continues to seek a co-trustee for the Subordinate

---

[6] A separate reserve in favor of Clark County for the removal of the improvements in the public right-of-way was also funded. This reserve account (the "Removal Fund Account") is in the name of and under the sole control of Clark County. As of November 30, 2009, there was $7,900,374 in the Removal Fund Account

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

8

1    Bondholders.  Omnibus Declaration, ¶ 48.

2        33.    The Bonds are special, limited obligations of the Issuer, and all of the obligations

3    thereunder are payable solely from and are secured by a pledge of the Senior Loan Repayments

4    to be made under the Financing Agreement after payment of operation and maintenance costs of

5    the Monorail ("O&M Costs").[7]  Nevada Revised Statutes (hereinafter "NRS"), § 349.600.[8]

6        34.    Payment of principal and interest on the 1st Tier Bonds is insured by Ambac

7    Assurance Corporation ("Ambac" or "Insurer").  To the extent any 1st Tier Bond payments are

8    not made when due, the Insurer is obligated such amount upon notice pursuant to an issued

9    insurance policy (the "Insurance Policy").  Additionally, Ambac issued the 1st Tier Surety

10   Reserve Bond in the amount of $20,991,807.50 (the "Surety Bond") to be available for payments

11   on the Senior Bonds to the extent that LVMC was unable to meet debt service on the Senior

12   Bonds.  The remaining balance on the Surety Bond is $416,305.52.[9]  Omnibus Declaration, ¶ 51.

13       35.    The Director is obligated to reimburse any funds drawn from Surety Bond

14   coverage under a Guaranty Agreement (the "Guaranty," and together with the Financing

15   Agreement, the Senior Indenture, the Subordinate Indenture, and the Insurance Policy, the

16   "Financing Documents"), pursuant to which the Director granted to Ambac a limited security

17   interest.  The Guaranty is attached as Exhibit 17 to the Omnibus Declaration.  The Director's

18   obligation is non-recourse to the State of Nevada, and is limited to and payable solely from the

19   revenues and receipts received by the Director under the Financing Agreement.  Once the Surety

20   Bond is drawn in full, the Director has no further obligation to reimburse funds to Ambac on

21   account of the Guaranty.  Section 3.9 of the Financing Agreement specifically limits the State's

22   liability, providing that "Anything in this Agreement to the contrary notwithstanding, any

23   _____

[7] Except to the extent payable from Bond proceeds, which have been fully consumed.

24
[8] NRS 349.600 provides that "All bonds issued by the Director pursuant to NRS 349.400 to 349.670, inclusive, are
25   special, limited obligations of the State. The principal of and interest on such bonds are payable, subject to the
     security provisions of NRS 349.400 to 349.670, inclusive, solely out of the revenues derived from the financing,
26   leasing or sale of the project or projects to be financed by the bonds." NRS 349.600.

[9] The 2nd Tier Bonds are not insured.  LVMC was unable to pay any of the interest in the amount of $3,689,360.07
27   which came due on the 2nd Tier Bonds on July 1, 2009, and was unable to pay any of the interest in the amount of
     $5,493,875 which came due on the 2nd Tier Bonds on January 1, 2010.  The Subordinate Bonds are also uninsured.
28   See Omnibus Declaration, ¶ 51.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                    9

obligation the Director may incur in connection with the undertaking of the Project for the payment of money shall not be deemed to constitute a debt or general obligation of the Director, the State, or any political subdivision thereof, but shall be payable solely from the revenues and receipts received by it under this Agreement..."[10] Omnibus Declaration, ¶ 52-53.

36.     The Debtor has never granted a security interest or lien to any party in the equipment or other hard assets of the Monorail, including the stations and track.  Further, the Debtor has never granted a security interest in accounts receivable, or in contract rights other than those specifically described in the Financing Agreement, which include the Purchase Agreement, the Design-Build Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the Franchise Agreement, each as defined in the Franchise Agreement.  See Omnibus Declaration, ¶ 58.

**D.     The Financing Agreement – Security Granted to the Director by LVMC**

37.     The Debtor is not an obligor under the Indentures, the Guaranty, or the Insurance Policy.  The Debtor is obligated on the debt through the Financing Agreement[11] between the Debtor and the Director.  Under the Financing Agreement, the Debtor granted the Director a security interest in the following:

> ...(i) contract rights of the [Debtor] under the Purchase Agreement, the Design-Build Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the Franchise Agreement, and any amendment or successor agreement thereto; (ii) the Net Project Revenues; (iii) all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or this

---

[10] Section 7.01 of the Senior Indenture provides, in part, that "THE BONDHOLDERS SHALL HAVE NO RECOURSE AGAINST THE DIRECTOR OR ANY PROPERTY NOW OR HEREAFTER OWNED BY THE STATE OF NEVADA IN THE EVENT THAT SUCH REVENUES AND FUNDS ARE INSUFFICIENT TO MAKE SUCH PAYMENTS..." (emphasis in original).  Senior Indenture, § 7.01.

[11] "Financing Agreement" is defined in NRS 349.470 as "an agreement by which the Director agrees to issue bonds pursuant to NRS 349.400 to 349.670, inclusive, to finance one or more projects and the obligor agrees to:

1. Make payments (directly or through notes, debentures, bonds or other secured or unsecured debt obligations of the obligor executed and delivered by the obligor to the Director or his designee or assignee, including a trustee, pursuant to the financing agreement) sufficient to pay the principal of, premium if any, and interest on the bonds;

2. Pay other amounts required by NRS 349.400 to 349.670, inclusive; or

3. Comply with all other applicable provisions of NRS 349.400 to 349.670, inclusive."

NRS 349.470.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

1
2
3
4
5
6
7
8

> Agreement…whether now owned by the Borrower or hereinafter acquired and whether now existing or hereinafter coming into existing and all money, deposits, funds and balances, whether or not evidenced by an certificates of deposit, passbooks or other documents and all revenues, income, dividends, issues and profits added to, earned or accrued on any deposit of the Net Project Revenues; and all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, rights to payment of any and every kind  and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

9  Financing Agreement § 3.1(b).

10      38.     "Net Project Revenues" are defined in the Senior Indenture as "Project Revenues"

11  less "Operation and Maintenance Costs."  <u>See</u> Senior Indenture, p. 17.  "Project Revenues" are in

12  turn defined in the Senior Indenture as:

13
14
15
16
17
18
19
20
21

> [A]ll gross income and revenue received or receivable by [Debtor] from the ownership, operation or use of the Project, including all fees and charges received by [Debtor] for the use of the Project, including but not limited to farebox revenues, business interruption insurance, advertising revenues, licensing fees, rent, sponsorship income, other contractual revenues, interest earnings on funds held hereunder or by [Debtor] (excluding the Construction Fund, Contingency Fund, and Rebate Fund) liquidated damages, payments under performance or completion bonds or under the Project Agreements, and all other income and revenue howsoever derived by [Debtor] from the ownership, operation or use of the Project or dedicated by [Debtor] or any other person to support the Project, and such other revenues as may be designated by [Debtor] in the Agreement, but excluding in all cases any refundable deposits made to establish credit and advances or contributions in aid of construction received during such Fiscal Year.

Senior Indenture, p. 19.

22
23      39.     O&M Costs are broadly defined in the Senior Indenture as:

24
25
26
27
28

> [A]ny and all amounts due under the Operation and Maintenance Agreement and the Management Agreement and any reasonable and necessary costs paid or incurred by the Borrower for maintaining and operating the Project, including all reasonable expenses of management and repair and other expenses necessary to maintain and preserve the Project in good repair and working order, and the annual costs of any permits or licenses, property taxes, including franchise fees, all administrative costs of the Borrower that are charged directly or apportioned to the operation of the Project, such as salaries and wages of employees, legal

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

11

1
2
3
4
5
6
7

and accounting fees, insurance, overhead, taxes (if any), fees and indemnification or other payments to the Director or the Trustee relating to any Senior Bonds and the Subordinate Bonds, Administrative Fees and Expenses and amounts described in Section 4.2(b)-(d) of the Agreement, and including all other reasonable and necessary costs of the Borrower or charges required to be paid by them to comply with the terms hereof or of such Senior Bonds or Subordinate Bonds, but excluding in all cases depreciation, replacement and obsolescence charges or reserves therefor, including deposits into or expenditures from the Capital Replacement Fund, amortization of intangibles, 1st Tier Debt Service, 2nd Tier Debt Service or Subordinate Debt Service and payments on any capital leases.

8
9

Senior Indenture, p. 17.  Net Project Revenues thus are defined as the business revenues less O&M Costs.

10

**E.      The Senior Indenture – Security Granted to the Trustee by the Director**

11
12
13
14

40.     Under the Senior Indenture, the Director (i) assigned its rights under the Financing Agreement to the Trustee, and (ii) pledged to the Trustee all Revenues and other amounts held under any accounts created under the Senior Indenture[12] as security for the payment of principal and interest on the Senior Bonds.[13]  See Senior Indenture, § 5.01.

15

41.     The term "revenues" is defined in the Senior Indenture as:

16
17
18
19
20
21
22

[A]ll moneys received by the Director or the Trustee for the account of the Director pursuant or with respect to the Agreement *for the benefit of the Senior Bonds*, including, without limiting the generality of the foregoing, *Senior Loan Repayments* (including both timely and delinquent payments, any late charges, and paid from whatever source), prepayments, and all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to this Senior Indenture, but not including any Administrative Fees and Expenses or any moneys paid for deposit into the Rebate Fund. *Revenues do not include Project Revenues deposited with the Trustee pursuant to the last paragraph of Section 4.1(b) of the Financing Agreement until such moneys are used to make a Senior Loan Repayment.*

23

Senior Indenture, p. 21 (emphasis added).

24
25
26

42.     Under the definition provided in the Senior Indenture, the grant of a security interest in "revenues" by the Director to the Trustee is no different than the grant of a security interest in Net Project Revenues to the Director by LVMC in the Financing Agreement, because

27

[12] The Collection Fund was created pursuant to the Financing Agreement, not the Senior Indenture.

28

[13] Excepting the Indemnification Account and the Rebate Fund (as defined in the Senior Indenture).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

1    moneys are received by the Director (or the Trustee for the account of the Director) for the

2    benefit of the Senior Bonds under the Financing Agreement only after O&M Costs are satisfied

3    and such funds become Net Project Revenues.

4         43.    The 1st Tier Bonds are secured by a pledge of and a first lien on the Revenues as

5    defined above, and the 2nd Tier Bonds have a junior and subordinate pledge and lien.  <u>See</u>

6    Senior Indenture § 5.01(A), (D).  The Subordinate Indenture contains a similar pledge, setting

7    forth a subordinate lien on a certain subset of Revenues held specifically for the benefit of the

8    Subordinate Bonds.  <u>See</u> Subordinate Indenture § 5.01(A), (C).

9    **F.**    <u>**Ambac's Security – Subordinated Security Interest**</u>

10        44.    The Insurance Policy requires that Ambac pay the 1st Tier Bond payments if the

11   Debtor defaults and reserves held by the Trustee are insufficient to satisfy the payments.  In

12   conjunction with the issuance of the Insurance Policy, the Director executed the Guaranty in

13   favor of the Insurer, under which the Insurer claims a junior and subordinated security interest as

14   follows:

15          To the extent, *but only to the extent*, that the Indenture pledges to the
     [Bondholders] or any Trustee therefor, or grants a security interest or lien in or
16   on any collateral property, revenue or other payments ("Collateral and
     Revenues") in order to secure the Obligations or provide a source of payment for
17   the Obligations, the Obligor hereby grants to Ambac a security interest in or lien
     on, as the case may be, and pledges to Ambac all such Collateral and Revenues
18   as security for payment of all amounts due hereunder, which security interest,
     lien and/or pledge created or granted under this Section 2.03 shall be subordinate
19   only to the interests of the [Bondholders] and any Trustee therefor in such
     Collateral and Revenues.
20

21   Guaranty, § 2.03 (emphasis added).  Thus, the Guaranty makes clear that Ambac's security

22   interest in the Project Revenues extends only so far as the Trustee's security interest and is

23   subordinated to the rights of the Trustee.

24   …

25   …

26   …

27   …

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

# IV.
# LEGAL ARGUMENT

**A.    The Security Interest of the Trustee is Limited to Net Project Revenues**

The Financing Agreement and Senior Indenture make clear that the Trustee does not hold a security interest in Project Revenues that are necessary for Debtor's O&M Costs, but has an interest solely in Net Project Revenues, as described above. The Financing Agreement sets forth three specific types of collateral pledged to the Director, one of which is Net Project Revenues. Financing Agreement § 3.1(b). The Director's security, along with "Revenues," were then assigned to the Trustee, but the definition of the "Revenues" pledged to the Trustee is no broader than the Net Project Revenues pledged to the Director.

The Trustee argues that its security interest is not so limited, but that it has a security interest in the entire universe of operating revenues created by the operation of the Monorail because all operating revenues of the Monorail are "proceeds" of the Franchise Agreement. The Trustee's argument makes the grant of security interests in the Financing Agreement and the Senior Indenture pointless and nonsensical. Simply put, if the parties had intended that the Trustee have a security interest in all of the operating revenues of the Monorail, the Financing Documents could have provided for a security interest in all of the operating revenues of the Monorail instead of describing in detail the "Net Project Revenues" granted as security to the Director and the "Revenues" granted as security to the Trustee.

### 1.    The terms of the Financing Documents

The intent to limit the security of the Trustee to the Net Project Revenues is evidenced by the definition of "Revenues" in the Senior Indenture as [A]ll moneys *received* by the Director or the Trustee for the account of the Director pursuant or with respect to the Agreement *for the benefit of the Senior Bonds…*" Senior Indenture, p. 21 (emphasis added). No payments are received for the benefit of the Senior Bonds until O&M Costs are paid.

The intent is additionally evidenced by the last sentence of the definition of Revenues in the Senior Indenture, which specifically excludes from the definition of "revenues" the "Project Revenues deposited with the Trustee pursuant to the last paragraph of Section 4.1(b) of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

1  Financing Agreement until such moneys are used to make a Senior Loan Repayment." Section

2  4.1(b) of the Financing Agreement provides that Project Revenues shall be disbursed first to pay

3  O&M Costs, after which Net Project Revenues shall be paid to 1st Tier Loan Repayments.

4  Therefore, only Net Project Revenues are used to make a Senior Loan Repayment and only Net

5  Project Revenues are "Revenues" under the Senior Indenture.

6       Further, the last paragraph of Section 4.1(b) of the Financing Agreement, which limits the

7  definition of "revenues" under the Senior Indenture as stated above, provides that in the event of

8  default, the Debtor is required to transfer the balance of the Collection Fund and all Project

9  Revenues to the Trustee for deposit into the Revenue Fund, and then "…all payments permitted

10  or required to be paid from the Collection Fund for Operation and Maintenance shall be paid by

11  the Trustee from the Revenue Fund upon written direction of the Borrower…."   While this

12  section imposes the duty upon the Debtor to deposit its Project Revenues with the Trustee for

13  deposit into the Revenue Fund, it does not alter the order of priority of payment, and Senior

14  Loan Repayments continue to be payable solely from the Net Project Revenues because they are

15  payable only after O&M Costs are paid.  Financing Agreement, § 4.1(b).[14]

16       The definition of "revenues" set forth in Chapter 349 is consistent with this analysis.  The

17  statute provides that "'Revenues' of a project, or derived from a project, include payments under

18  a lease, agreement of sale or financing agreement, or under notes, debentures, bonds and other

19  secured or unsecured debt obligations of an obligor executed and delivered by the obligor to the

20  Director or his designee or assignee (including a trustee) pursuant to such lease, agreement of

21  sale or financing agreement, or under any guarantee of or insurance with respect to any of

22  these." NRS 349.520. Thus the operating revenues of an obligor (e.g., LVMC) do not constitute

23  "revenues" under the statute until they are paid over to the Director (or to the Trustee as the

24  Director's assignee) pursuant to the Financing Agreement.

[14] Consistent with the Financing Agreement provisions, Section 5.03 of the Senior Indenture also requires that if the Company "deposits all of its Project Revenues upon receipt with the Trustee pursuant to…Section 4.1(b) of the Financing Agreement, the Trustee shall, before making the required deposits in subsections (a)-(f) above, remit to the Borrower the amounts required to be paid for Operation and Maintenance in such month in the Annual Budget…" Senior Indenture, § 5.03.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

15

1    Each of these provisions would be rendered meaningless if the Trustee holds a security

2    interest in all of the operating revenues of the Monorail as a result of the security interest in the

3    Franchise Agreement granted to the Trustee.

4    **2.    The question of "proceeds"**

5    As an initial matter, the Trustee has not provided, and counsel for the Debtor has yet to

6    find, any authority in which a secured creditor was found to be entitled to all of the postpetition

7    operating revenues of a debtor-in-possession as "proceeds" of its prepetition interest in a

8    franchise, a license, or other grants of operational authority.  The only authority cited by the

9    Trustee relating to the proceeds of a franchise is <u>Turley</u>, which held that a creditor with a

10   perfected security interest in the debtor's general intangibles, including his interest in a franchise

11   agreement, had a priority interest in interpleaded proceeds attributable to his interest in an auto

12   racing franchise over the unperfected interest held by bank having possession of the debtor's

13   franchise stock certificate.  <u>Thomas C. Thompson Sports, Inc. v. Farmers & Merchants Bank of</u>

14   <u>Long Beach (In re Turley)</u>, 172 F.3d 671 (9th Cir. 1999).  The issue in <u>Turley</u> was the

15   characterization of proceeds resulting from a final disposition of a share certificate disposed of

16   pursuant to the terms of a franchise agreement, and whether the proceeds were of a "certificated

17   security" under the U.C.C. or a general intangible.  While the case involved the debtor's right to

18   receive a payment for his services, the right to receive payment had already vested and the case

19   did not involve postpetition services by the debtor.  The case had nothing to do with the revenues

20   of an operating business.  <u>Id.</u>

21   The Trustee's argument depends upon an unprecedented extension of the concept of

22   proceeds which would defy common sense and leave nothing available for reorganization of the

23   Debtor.  While the definition of proceeds under Article 9 has indeed been expanded as argued by

24   the Trustee, it is not so broad that it swallows Section 552(a) in its entirety.  Section 552(a) of the

25   Bankruptcy Code provides:

26       Except as provided in subsection (b) of this section, property acquired by the
         estate or by the debtor after the commencement of the case is not subject to any
27       lien resulting from any security agreement entered into by the debtor before the
         commencement of the case.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

16

1    11 U.S.C. § 552(a).

2         Section 552(a) provides the general rule that property acquired after the commencement

3    of bankruptcy is not subject to prepetition liens.  See Arkison v. Frontier Asset Mgmt., LLC (In

4    re Skagit Pacific Corp.), 316 B.R. 330, 335-37 (B.A.P. 9th Cir. 2004); In re Cafeteria Operators,

5    L.P., 299 B.R. 400, 403-04 (Bankr. N.D. Tex. 2003).  Section 552(a) renders property acquired

6    by the debtor after the petition date not subject to any lien resulting from any pre-petition

7    security agreement.  See Skagit Pacific Corp., 316 B.R. at 335.  Such security interests are cut

8    off because the purpose of Section 552(a) of the Bankruptcy Code is "to allow a debtor to gather

9    into the estate as much money as possible to satisfy the claims of all creditors."  Id. (quoting

10   Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.), 944 F.2d 500, 502

11   (9th Cir. 1991)).

12        Section 552(b)(1) of the Bankruptcy Code provides:

13        (b)(1)  Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of
     this title, if the debtor and an entity entered into a security agreement before the
14   commencement of the case and if the security interest created by such security
     agreement extends to property of the debtor acquired before the commencement
15   of the case and to proceeds, products, offspring, or profits of such property, then
     such security interest extends to such proceeds, products, offspring, or profits
16   acquired by the estate after the commencement of the case to the extent provided
     by such security agreement and by applicable nonbankruptcy law, except to any
17   extent that the court, after notice and a hearing and based on the equities of the
     case, orders otherwise.
18

19   11 U.S.C. § 552(b)(1).  Thus, if a security interest encumbers collateral and its proceeds, any

20   proceeds of that prepetition collateral remain subject to the security interest even if they are

21   received postpetition.  Skagit Pacific Corp., 316 B.R. at 335.  It is pursuant to this Section that

22   the interest accruing on Prepetition Revenues held in accounts created pursuant to the Senior

23   Indenture on which the Trustee holds a security interest constitutes secured collateral and is thus

24   cash collateral under Section 363 of the Bankruptcy Code.

25        However, the Ninth Circuit has held that Section 552(b)(1) provides only "a *narrow*

26   exception to the general rule of 552(a)."  Bering Trader, Inc., 944 F.2d at 502 (emphasis in

27   original).  This exception applies only to the proceeds, products, offspring, or profits generated

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

17

by prepetition collateral, and not to after-acquired property obtained by the debtor or the estate postpetition. See 5 COLLIER ON BANKRUPTCY, § 552.02[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) (citing 124 Cong. Rec. H11,097-11,098 (daily ed. Sept. 28, 1978); S17,414 (daily ed. Oct. 6, 1978)("proceeds coverage, but not after acquired property clauses, are valid under title 11."))

In distinguishing between after-acquired property and proceeds of prepetition collateral, a number of courts have taken guidance from the Supreme Court's decision in Local Loan Co. v. Hunt, "which forbade the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt." In re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649, *10-11 (Bankr. S.D.N.Y. June 16, 2008), (citing Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)); see also Cafeteria Operators, L.P., 299 B.R. at 404. This interpretation of the scope of "proceeds" is consistent with the Code's policy of favoring reorganization. See, e.g., Smoker v. Hill & Assoc., Inc., 204 B.R. 966, 974 (N.D. Ind. 1997). See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).

The Trustee is correct that the definition of "proceeds" under Article 9 is no longer limited to "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral," but now includes "whatever is collected on, or distributed on account of, collateral" and "rights arising out of collateral." NRS 104.9102(1)(kkk). However, that this new definition must be imported in its entirety into Section 552(b) is not clear. The legislative history to Section 552 indicates that the term "proceeds" under Section 552(b) was not intended to be defined exclusively by the term "proceeds" under the U.C.C., but was instead intended to reach any postpetition property into which prepetition property subject to a security interest was converted. See 5 COLLIER, § 552.02[2] (citing H.R. Rep. No. 595, 95th Cong., 1st Sess., 376-77 (1977)). See also Cafeteria Operators, 299 B.R. at 408 (applying revised Article 9 and noting that while the secured lenders' lien extended beyond food and beverages to the fixtures and equipment, the only assets converted to cash were food and beverages - the fixtures and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

18

1    equipment remained after the customers left).

2        Section 552(b) was intended to address after-acquired property that is directly attributable

3    to prepetition collateral, without the addition of estate resources.  5 COLLIER, § 552.02[2].  For

4    this reason, courts have consistently held that revenue that a debtor earns post-petition through

5    the operation of its business does not constitute "proceeds" of prepetition collateral if such

6    revenue represents compensation for goods or services rendered by the debtor during the course

7    of its everyday business.  See, e.g. Skagit Pacific Corp., 316 B.R. at 336; In re Wabash Valley

8    Power Ass'n, Inc., 72 F.3d 1305, 1322 (7th Cir. 1995) (stating that a blanket lien on power

9    generation assets and rights did not capture postpetition income as collateral); Brandt v. Fleet

10   Capital Corp. (In re TMCI Elec.), 279 B.R. 552, 555 (Bankr. N.D. Cal. 2000) (tax refund is after-

11   acquired property instead of proceeds because it vested postpetition); American President Lines,

12   Ltd. v. Lykes Bros. S.S. Co. (In re Lykes Bros. S.S. Co.), 216 B.R. 856, 863-64 (Bankr. M.D.

13   Fla. 1996) (ship charter line's payments generated postpetition are not proceeds under security

14   agreement arising prepetition).  Postpetition revenue that is generated solely from the debtor's

15   labor is not subject to a creditor's prepetition interest.  See id. (citing Cafeteria Operators, L.P.,

16   299 B.R. at 405).

17       Courts have consistently held that revenues generated by a service-oriented business are

18   not "proceeds" because services are not tangible collateral.  Cafeteria Operators, L.P., 299 B.R.

19   at 406; see, e.g., In re S & J Holding Corp., 42 B.R. 249 (Bankr. S.D. Fla. 1984) (holding that

20   money generated from video game machines is not proceeds); Zeeway Corp. v. Rio Salado Bank

21   (In re Zeeway Corp.), 71 B.R. 210, 211-12 (B.A.P. 9th Cir. 1987) (gate receipts generated by

22   post-petition races held at the debtor's racetrack were not cash collateral under Section 363(a) of

23   the Bankruptcy Code because such income was not proceeds of collateral but instead the result

24   of the services provided by the debtor's business); In re General Associated Investors L.P., 150

25   B.R. 756, 762 (Bankr. D. Ariz. 1993) (holding that revenues from food, beverages and tennis and

26   other services generated by the debtor's resort could not properly be considered proceeds, rents

27   or profits); Everett Home Town Ltd. P'ship, 146 B.R. 453, 458 (Bankr. D. Ariz. 1992) (holding

28   that payments for green fees, tennis fees, cart fees, meals, lessons and merchandise were as

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

19

1    much, or more, for the use or services provided by the debtor as they were for the collateral itself

2    and thus were not proceeds of collateral); In re Corner Pockets of the Southwest, Inc., 85 B.R.

3    559, 563-64 (Bankr. D. Mont. 1988) (finding that the income and profits derived from the

4    debtor's operation of its business were not attributable to any collateral in which the secured

5    creditor may have had a security interest but were earned from restaurant and entertainment

6    services provided by the debtor and not cash collateral). Regardless of whether the expanded

7    scope of the Article 9 definition of proceeds expands the scope of Section 552(b), it does not

8    create a lien on postpetition labors or services of the Debtor.

9    Even under the expanded definition of proceeds under Article 9, however, the Trustee's

10    argument goes too far. The Trustee contends that all of the Monorail's operating revenues derive

11    from the Franchise Agreement. The Franchise Agreement provides that it is for the purpose of

12    installing and operating the Monorail in, on, along, under or over the County Rights-of-Way

13    within the route on the legal description set forth in the Franchise Agreement and to collect fares.

14    See Franchise Agreement, § 2.1.[15]  Thus, in the broadest, most obtuse sense, the Trustee's

15    contention may very well be true – the Monorail's operations would cease without the ability to

16    cross the County's property.

17    However, only a portion of the track runs across the County Rights-of-Way, with the

18    remainder of the track running across private land, for which the Debtor has been granted

19    permanent easements in gross (the "Easements").  Passengers do not board the Monorail on

20    County Rights-of-Way, nor do they pay fares on County Rights-of-Way.  Instead, all of the

21    Monorail's stations are located on private property pursuant to the Easements.

22    Courts have suggested that property of the estate generated postpetition may be partially

23    allocable to a creditor's prepetition security and partially allocable to postpetition operations of

24    _____

[15] As set forth in the Omnibus Declaration, on October 20, 1999, the Clark County Monorail Franchise Agreement
25    was amended (the "First Amendment") to, among other things, authorize transfer of the Franchise to the Debtor.
Second Amendment to Franchise Agreement dated October 7, 2003 (the "Second Amendment"), the Third
26    Amendment to Franchise Agreement dated November 1, 2005 (the "Third Amendment"), the Fourth Amendment to
Franchise Agreement dated December 6, 2006 (the "Fourth Amendment"), and the Extension to Fourth Amendment
27    to Franchise Agreement dated December 3, 2008 (the "Extension," and together with the Clark County Monorail
Franchise Agreement, the First Amendment, Second Amendment, Third Amendment, and Fourth Amendment, the
28    "Franchise Agreement"). See Exhibits 3, 4, 5, 6, 7, and 8 to the Omnibus Declaration.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                    20

the debtor.  In <u>Cafeteria Operators, L.P.</u>, the liens of the secured lenders extended to virtually all of the debtor's real and personal property, i.e., a "blanket lien."  <u>In re Cafeteria Operators</u>, 299 B.R. at 402, 403.  <u>See</u> <u>also</u> <u>The Business Bank v. White (In re Timothy Dean Restaurant & Bar)</u>, 342 B.R. 1, 23-24 (Bankr. D. D.C. 2006) (applying revised Article 9 and citing <u>Cafeteria</u> <u>Operators</u> for its discussion of proceeds, and granting trustee's motion for summary judgment because the secured creditor failed to demonstrate the portion of the guest charges at issue that could be identified as proceeds of the inventory on which it had a lien on the petition date).

In order to benefit from an allocation analysis, it is incumbent upon the Trustee to prove which of the postpetition revenues are allocable to the Franchise Agreement and which are allocable to the Debtor's postpetition efforts, as it is the creditor's burden to establish the extent of its interest in the collateral.  11 U.S.C. §363(p)(2) (secured lender has the burden of proof on the issue of validity, priority, and/or extent of its lien on the property); <u>see</u> <u>also</u> <u>In re Cafeteria</u> <u>Operators</u>, 299 B.R. at 405 (to reach after-acquired property, the creditor must show that the security agreement extends to the after-acquired property and that the after-acquired property is proceeds, product, offspring, rents or profits of prepetition property subject to the lien) (citing <u>T-H New Orleans Ltd. Pship v. Financial Secrity Assurance, Inc. (In re T-H New Orleans Ltd. Pship.)</u>, 10 F.3d 1099, 1104 (5th Cir. 1993), *cert. denied*, 511 U.S. 1083, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994)); <u>In re Ledis</u>, 259 B.R. 472, 477-78 (Bankr. D. Mass. 2001).  The Trustee can likely establish the percentage of the track that runs across public land and the percentage running across private land.

What the Trustee cannot establish is the amount of postpetition operating revenues derived from the Franchise Agreement, on which it has a lien, and the amount of postpetition operating revenues derived from (i) the postpetition efforts of the Debtor, (ii) the Debtor's property interest in the Easements, and (iii) the equipment and other capital assets of the Monorail, including the trains, the stations, and the track, on which the Trustee does not have a lien.  The underlying fallacy of the Trustee's argument is that it fails to take into account the fact that the Franchise Agreement lacks the capacity to generate revenue.  If the Trustee were to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

1  "foreclose" on its security interest in the Franchise Agreement [16] the Trustee would still have no

2  postpetition revenues because it would still have no interest in the unencumbered assets of the

3  Debtor - its postpetition efforts, its interest in the Easements, and the capital assets - each of

4  which are necessary to the generation of Postpetition Revenues.  Without the unencumbered

5  assets of the Debtor, the Monorail has no capacity to generate revenue.  See generally,  American

6  President Lines, Ltd. v. Lykes Bros. Steamship Co., Inc. (In re Lykes Bros. Steamship Co., Inc.),

7  216 B.R. 856, 864 (Bankr. M.D. Fla. 1996) ("If proceeds included funds generated from any use

8  of collateral, arguably all postpetition funds would become proceeds.  Congress intended to

9  extend a prepetition lien postpetition when collateral is converted into new collateral.") (citing In

10  re Corpus Christi Hotel Partners, Ltd., 133 B.R. 850, 856 (Bankr. S.D. Tex. 1991)).

11      **3.**      **The Trustee's security interest should be cut-off as of the Petition Date under Section 552(a) in the interest of the equities of the case**

13      A bankruptcy court, where possible, should resolve issues presented in favor of

14  reorganization.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984) ("[t]he fundamental

15  purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant

16  loss of jobs and possible misuse of economic resources."); United States v. Whiting Pools, Inc.,

17  462 U.S. 198, 203 (1983) ("By permitting reorganization, Congress anticipated that the business

18  would continue to provide jobs, to satisfy creditors claims, and to produce a return for its

19  owner.")

20      The U.S. Court of Appeals for the Tenth Circuit summarized this principle as follows:

21  > Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor...are of concern to the court, the interests of all creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

24  > The first effort of the court must be to insure that the value of the collateral will be preserved.  Yet, prior to confirmation of a plan of reorganization, the test of that protection is not to be the same measurements applied to the treatment of a secured creditor in a proposed plan.  In order to encourage the Debtors' efforts in a formative period prior to the proposal of a reorganization, the court must be

---

[16] A proposition which is highly debatable in light of the anti-assignment provision of the Franchise Agreement.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

22

1    flexible in approving the adequate protection standard.

2    In re O'Connor, 808 F.2d 1393, 1397 (10th Cir. 1987).

3         Section 552(b) furthers this policy of reorganization, granting the court broad equitable

4    powers in determining the extent of the security interest that the secured creditor should be

5    allowed to maintain postpetition.    In re Cafeteria Operators, 299 B.R. at 409-410 (citing In re

6    Patio & Porch Sys., Inc., 194 B.R. 569, 575 (Bankr. D. Md. 1996)).

7         This equities exception is intended to prevent secured creditors from receiving windfalls

8    and to allow bankruptcy courts broad discretion in balancing the interest of secured creidtors

9    against the general policy of the Bankruptcy Code of promoting reorganization and giving a

10   fresh start.    In re Cafeteria Operators, 299 B.R. at 409-410.    It is intended to cover situations

11   where the expenditure of the estate's resources increases the value of the collateral.    Id.    In

12   Cafeteria Operators, the bankruptcy court relied on this exception as an alternative basis for

13   limiting the secured lenders' lien in after-acquired property, because the postpetition revenues of

14   the debtor represented, in large part, the postpetition toil and effort of the debtor, on which the

15   secured lenders had no lien.    Id. at 410; see also In re Barbara K. Enters., Inc., 2008 WL 2439649

16   at *10-11.

17        Similarly, in this Chapter 11 Case, the Debtor's Postpetition Revenues derive in large part

18   from (i) the postpetition efforts of the Debtor, (ii) the Debtor's property interest in the Easements,

19   and (iii) the equipment and other capital assets of the Monorail, including the trains, the stations,

20   and the track, on which the Trustee does not have a lien.    To the extent the Trustee has any

21   interest in the Postpetition Revenues as "proceeds," the Court should limit that interest in the

22   interest of promoting the reorganization of the Debtor.    Without the use of the Postpetition

23   Proceeds, not only to cover the cost of administering this Chapter 11 Case but also to apply to a

24   plan of reorganization, the Debtor's ability to successfully reorganize may be sharply curtailed.

25   **B.    Postpetition Revenues Are Not Subject to a Statutory Lien**

26        The Trustee's claim of a statutory lien pursuant to NRS § 349.620 depends upon glossing

27   over the distinction between the Financing Agreement and the Senior Indenture.    As described

28   above, the Debtor did not enter into an agreement with the Trustee, but with the Director

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                        23

1    pursuant to the Financing Agreement, as specifically contemplated by Nevada's statutory scheme

2    for conduit financing found in NRS 349.400 through 349.670.

3    Contemporaneously with the execution of the Financing Agreement, the Director

4    executed the Senior Indenture and the Subordinate Indenture pursuant to which the Director

5    assigned and pledged the Director's security interest pursuant to the Financing Agreement to the

6    Trustee in exchange for the financing to issue the bonds.

7    The financing evidenced by the Financing Agreement and the Senior Indenture is

8    "conduit financing" specifically authorized by Chapter 349, in which the issuer of the bonds (the

9    Director) *takes* a security interest from the conduit borrower (in this case, LVMC) and then

10   *grants* a security interest in the issuer's rights to payments from the conduit borrower to the

11   bondholders or trustee for the bondholders.  See generally Paul Groenwegen, "Revenues" as

12   Collateral: The Limits of the Revenue Pledge as a Security Device, 39 UCC L.J. 4 Art. 4 (Spring

13   2007).

14   The Trustee's assertion of its "statutory lien" as an exception to Section 552(a) of the

15   Bankruptcy Code depends upon blurring the distinction between the lien granted by LVMC to

16   the Director, on the one hand, and the lien granted by the Director to the Trustee, on the other.

17   NRS 349.620 provides as follows:

18   1.    The principal of, the interest on and any prior redemption premiums due in
     connection with the bonds issued pursuant to NRS 349.400 to 349.670, inclusive,
19   are payable from, secured by a pledge of, and constitute a lien on the revenues out
     of which the bonds have been made payable.  In addition, they may, in the
20   discretion of the Director, be secured by:

21   (a)    A mortgage or mortgages covering all or part of any project
22   financed with the proceeds of the bonds, or upon any other property of the
     lessees, purchasers or obligors of those projects, or by a pledge of the lease, the
23   agreement of sale or the financing agreement with respect to one or more of the
     projects, or both.
24
25   (b)    A pledge of one or more notes, debentures, bonds or other secured
     or unsecured debt obligations of the obligor of one or more of the projects.
26
27   (c)    The proceeds of the bonds and income from investment of the
     proceeds and of revenues.

28   2.    The State, a city or a county may pledge only the property of the project or

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                              24

the revenues therefrom.

NRS 349.620.

The plain language of this provision indicates that it applies to the security interest *granted* by the Director, not the security interest *taken* by the Director. Otherwise, it makes no sense. How can LVMC, the obligor, grant a security interest in its own debt obligations? See NRS 349.620(1)(b). How can LVMC pledge an interest in the Financing Agreement under which it is the borrower? See NRS 349.620(1)(a). NRS 340.620 is coherent only if it applies to the lien granted by the Director to a third party.

This reading of Section 620 of is consistent with Section 570, which distinguishes between the obligations of the obligor (i.e. LVMC) and the Director, providing that

> When the Director has received requests from one or more cities, counties, lessees, purchasers, other obligors or other enterprises, he may issue industrial development revenue bonds to obtain money to fulfill the requests. Title to or in a project may at all times remain in the obligor or the obligor's designee or assignee and, in that case, the bonds must be secured by a pledge of one or more notes, debentures, bonds or other secured or unsecured debt obligations of the obligor.

NRS 349.570.

Thus, while the Trustee's rights against the Director may be secured by a statutory lien that is not cut-off by Section 552(a) of the Bankruptcy Code, the lien granted by LVMC to the Director, evidenced by the Financing Agreement and perfected by the filing of a Financing Statement under Article 9, is a written, bilateral, and consensual lien between LVMC and the Director which falls within Section 552(a) of the Bankruptcy Code. Only when the revenues out of which the bonds are payable are paid to the Director (or to the Trustee to be applied against the account of the Director) would any statutory lien of the Trustee attach. As between the Director and the Debtor, however, the security interest of the Director is governed by the Financing Agreement.

The definition of "revenues" set forth in Chapter 349 is consistent with this analysis. The statute provides that "'Revenues' of a project, or derived from a project, include payments under a lease, agreement of sale or financing agreement, or under notes, debentures, bonds and other secured or unsecured debt obligations of an obligor executed and delivered by the obligor to the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

25

1   Director or his designee or assignee (including a trustee) *pursuant to* such lease, agreement of

2   sale or financing agreement, or under any guarantee of or insurance with respect to any of these."

3   NRS 349.520 (emphasis added).    Thus the debtor's operating revenues do not constitute

4   "revenues" under the statute until they are paid over to the Director (or to the Trustee as the

5   Director's assignee) pursuant to the Financing Agreement.

6           Even if NRS 349.620 did apply to the security interest granted by LVMC to the Director,

7   whether it would constitute a "statutory lien" within the definition of Section 101(53) of the

8   Bankruptcy Code is also questionable.    Section 101(53) of the Bankruptcy Code defines a

9   "statutory lien" as one "arising solely by force of a statute on specified circumstances or

10  conditions." 11 U.S.C. § 101(53).    Chapter 108 of the Nevada Revised Statutes is designated

11  "Statutory Liens," and it identifies 18 types of liens which arise by operation of law in Nevada,

12  including mechanics' liens, boilermakers' liens, jewelers' liens, breeders' liens, drycleaners' liens,

13  and hospitals' liens.  Section 349.620 is not listed in Chapter 108 as a "statutory lien."  See NRS

14  108.221 through 108.896, inclusive.

15          The mandate under Section 570 that the Director "must" secure the bonds by a pledge of

16  the obligor's debt obligations further supports the conclusion that the lien of the Trustee does not

17  arise automatically by operation of law, but requires an affirmative, consensual grant of a

18  security interest by the Director.  NRS 349.570.

19          The ruling of the court in In re County of Orange, that the California statute authorizing

20  the grant of a lien created an automatic lien within the scope of Section 101(53), is questionable.

21  See Growenwegen, (discussing Alliance Capital Mgmt L.P. v. County of Orange (In re County

22  of Orange), 189 B.R. 499 (C.D. Cal. 1995)).    As noted by Gorwenwegen, the court's

23  interpretation of Section 101(53) of the Bankruptcy Code was so broad that all liens would be

24  "statutory liens," because even ordinary Article 9 security interests are "authorized" under the

25  U.C.C. Id.

26          The Orange County decision is also distinguishable because Orange County was a

27  municipal bankruptcy under Chapter 9 of the Bankruptcy Code.    Section 928, which is

28  applicable to Chapter 9 cases but not to the case *sub judice*, provides in subsection (a) that

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

26

1
2
3

> Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

4
5
6
7

11 U.S.C. §928(a).  "Special revenues" include, among other things, "the receipts derived from the ownership, operation, or disposition of projects or systems of the debtor that are primarily used or intended to be used to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or systems...," similar to the revenue bonds at issue in this Chapter 11 Case.  11 U.S.C. § 902(2).

8
9
10
11
12
13
14
15
16
17

Upon the enactment of Section 928 in 1988, Congress did not craft a similar exception to private conduit financings to which Section 552 is applicable.  See Pub. L. No. 100-597, 100th Cong., 2d Sess. (1988).  The purpose of enactment of Section 928 was to avoid the termination of liens on special revenues on the petition date.  See Pub. L. No. 100-597, Municipal Bankruptcy Amendments, H.R. REP. 100–1011 (1988) ("The main problem with the municipal bankruptcy laws raised by supporters of H.R. 5347 is that under section 552(a) of the Bankruptcy Code, made applicable to chapter 9 cases by section 901, property acquired by a debtor after filing bankruptcy is not subject to any lien created prior to bankruptcy.  In a municipal bankruptcy, this means that the lien created by a revenue bond issued prior to bankruptcy is extinguished.")

18
19
20
21
22
23
24
25
26

Finally, to the extent any statutory lien is applicable, it is limited to Net Project Revenues, because the lien would only attach to "the revenues out of which the bonds have been made payable." NRS 349.620(1).  "Revenues" are in turn defined in NRS 349.520, in relevant part, as the payments under a financing agreement or under notes or debentures executed and delivered by the obligor to the Director or his assignee (including a trustee) pursuant to such financing agreement. NRS 349.520.  Therefore, the "revenues" to which such lien would attach are those out of which the bonds are made payable pursuant to the Financing Agreement, which are the Net Project Revenues.

...

27
...

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

27

**C.**    **The Trustee lacked a perfected security interest in the Prepetition Project Revenues on the Petition Date**

Even if the Trustee does hold a statutory lien, the Trustee still lacked the requisite possession or control of the BofA Account and in the TVM Cash Receipts on the Petition Date for its security interest to be perfected, and thus those Prepetition Revenues are not the cash collateral of the Trustee.

**1.**    **Only perfected security interests are within the scope of Section 363(a)**

The "interest" protected by Section 363(a) of the Bankruptcy Code is a valid, *perfected* security interest. The Bankruptcy Appellate Panel for the Ninth Circuit, and subsequently the Ninth Circuit, have ruled that the "interest" referenced in Section 363(a) need only be "any legally cognizable interest in the funds at issue" to be considered cash collateral. See In re Scottsdale Medical Pavilion, 159 B.R. 295, 297-298 (B.A.P. 9th Cir. 1993), *aff'd* 52 F.3d 244 (9th Cir. 1995) (Ninth Circuit adopting the Panel's reasoning as its own), see also In re Johnson, 62 B.R. 24, 30 (B.A.P. 9th Cir. 1986) (finding that unperfected rents "technically constitute cash collateral and Section 363 does apply.")  Moreover, to constitute cash collateral, it is not necessary for a party with a legally cognizable interest in such funds to show it is entitled to immediate possession of the funds or that the interest is perfected. Scottsdale, 159 B.R. at 298.

However, the Panel in Scottsdale also noted that while an unperfected interest technically falls within the definition of cash collateral, such an unperfected interest "is not entitled to much in the way of adequate protection under § 363(e)…because an unperfected interest is subject to avoidance under § 544." Id. See Indian Motorcycle Assocs. III L.P. v. Massachusetts Housing Fin. Agency, 66 F.3d 1246, 1252 (1st Cir. 1995); In re Fairview-Takoma Ltd. P'ship, 206 B.R. 792, 796-800 (Bankr. D. Md. 1997); In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (stating that only perfected security interests give rise to "cash collateral" as defined by Section 363 of the Bankruptcy Code) (citing Waldron v. Northwest Acceptance Corp. (In re Johnson), 62 B.R. 24, 28-29 (B.A.P. 9th Cir. 1986)).

The majority of cases addressing this issue are in accord with the authorities provided in the Motion and state that to constitute cash collateral under Section 363, a security interest must

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

28

1   have been perfected.  See, e.g., In re Vienna Park Properties, 976 F.2d 106, 111, 113 (2d Cir.

2   1992); 641 Ave. of Americas Ltd. Partnership v. 641 Associates, Ltd., 189 B.R. 583, 590

3   (S.D.N.Y. 1995); Matter of May, 169 B.R. 462, 466-467 (Bankr. S.D. Ga. 1994); In re Northport

4   Marina Assocs., 136 B.R. 911, 919-20 (Bankr. E.D.N.Y. 1992) (an interest under § 363 requires

5   a perfected security interest, not an enforceable security interest); In re Rancourt, 123 B.R. 143,

6   148 (Bankr. D.N.H. 1991) (same).  Few, if any other courts besides the Ninth Circuit B.A.P. and

7   the Ninth Circuit in Scottsdale have found that unperfected interests fall within Section 363(a)'s

8   definition of cash collateral.

9           **2.      Perfection requires possession (money) or control (deposit accounts)**

10        On the Petition Date, the Trustee lacked control of the BofA Account and did not have

11  possession of the monies in the BofA Account or the undeposited TVM Cash Receipts.[17]  NRS

12  104.9312(2)(c) provides that "a security interest in money may be perfected only by the secured

13  party's taking possession under NRS 104.9313."  NRS 104.9312(2)(c); see also Rus, Miliband &

14  Smith, APC v. Yoo (In re Dick Cepek, Inc.), 339 B.R. 730, 740 (B.A.P. 9th Cir. 2006) (noting

15  that a creditor "perfects a security interest in money by taking possession of the funds as

16  permitted by the UCC"); United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL

17  Corp.), No. 02-B-48191, 2004 WL 3080341, *8 (Bankr. N.D. Ill. Sept. 20, 2004) (stating that a

18  security interest in money can only be perfected by possession).

19        NRS 104.9312(2)(a) provides that "a security interest in a deposit account may be

20  perfected only by control under NRS 104.9314."  NRS 104.9312(2)(a).  NRS 104.9203(2)(c)(4)

21  provides that if the collateral is deposit accounts, control is a requirement for an enforceable

22  security interest.  Control of a deposit account is only achieved if:

23        (a)     the secured party is the bank with which the deposit account is
                   maintained;

24

25        (b)     the debtor, secured party, and bank have agreed in an authenticated
                   record that the bank will comply with instructions originated by the
26                 secured party directing disposition of the funds in the deposit account
                   without further consent by the debtor; or

27

28  ───────────────
    [17] The Trustee also did not have possession of the CSA Booth Receipts.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

29

1

2

(c)     the secured party becomes the bank's customer with respect to the deposit account.

3

NRS 104.9104(1). With respect to the BofA Account, which is clearly not maintained by the

4

Trustee, Wells Fargo as Trustee fails to satisfy any measure of "control."

5

**3.     The Debtor's deposits into the BofA Account raise no constructive trust, estoppel, or other equitable issues**

6

As suggested by the Court and consistent with the Trustee's prior pleadings, the Trustee

7

may contend that the Debtor's "diversion" of Project Revenues entitles the Trustee to a fictional

8

perfection of its security interest in the funds "diverted."

9

Under Nevada law, imposition of a constructive trust requires: "(1) [that] a confidential

10

relationship exists between the parties; (2) retention of legal title by the holder thereof against

11

another would be inequitable; and (3) the existence of such a trust is essential to the effectuation

12

of justice." Waldman v. Maini, 195 P.3d 850 (Nev. 2008) (quoting Locken v. Locken, 650 P.2d

13

803, 804-05 (1982)). While the Trustee certainly asserts unfairness, it is not the beneficiary of a

14

confidential relationship with the Debtor. Under Nevada law, a "confidential relationship" may

15

arise by reason of kinship or professional, business, or social relationships between the parties,

16

and exists "when one party gains the confidence of the other and purports to act or advise with

17

the other's interests in mind." See Perry v. Jordan, 111 Nev. 943, 947, 900 P.2d 335, 337-38

18

(1995).

19

An arms-length lender-borrower relationship is not confidential in nature. See Yerington

20

Ford, Inc. v. General Motors Acceptance Corp., 359 F. Supp. 2d 1075, 1093 (D. Nev. 2004)

21

(finding no fiduciary or confidential relationship between an automobile dealership and a

22

financier, debtor and creditor, or creditor and guarantor), rev'd on other grounds by Giles v. Gen.

23

Motors Acceptance Corp., 494 F.3d 865, 880-81 (9th Cir. 2001); Executive Mgmt. v. Ticor Title

24

Ins. Co., 114 Nev. 823, 963 P.2d 465, 477 (1998) (finding no fiduciary relationship between a

25

purchaser and a seller of real property); Long v. Towne, 98 Nev. 11, 639 P.2d 528 (1982)

26

(same). "The mere fact that one reposes trust and confidence in another does not create a

27

confidential relationship. In the majority of business dealings, opposite parties have trust and

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

30

confidence in each other's integrity, but there is no confidential relationship by this alone." Yerington Ford, Inc., 359 F. Supp. 2d at 1093. The relationship between the Debtor and the Trustee is nothing more than an arms-length business relationship, and nothing in the Financing Documents elevates the relationship beyond an arms-length transaction to one of trust or confidence. Therefore, no constructive trust should be imposed. But see Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88 (2d Cir. 1989) (imposing a constructive trust where secured creditor's security interest thwarted by the debtor).

Equitable estoppel "...operates to prevent a party from asserting legal rights that, in equity and good conscience, they should not be allowed to assert because of their conduct.'" NGA #2 LLC v. Rains, 946 P.2d 163, 168 (Nev. 1997) (quoting Nevada State Bank v. Jamison Partnership, 801 P.2d 1377, 1382 (Nev. 1990)). "Equitable estoppel has been characterized as comprising four elements: (1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; [and] (4) he must have relied to his detriment on the conduct of the party to be estopped." NGA#2 LLC, 946 P.2d at 169; see also Chequer, Inc. v. Painters and Decorators Joint Comm., Inc., 655 P.2d 996, 998-99 (Nev. 1982). None of the elements of equitable estoppel logically apply to the facts before the Court. The Trustee took no action in reliance on any conduct or representation of the Debtor. Further, despite being notified by the Debtor immediately after the Debtor established the BofA Account and the Debtor's reasons for doing so, the Trustee failed to take any action.

Another equitable theory on which the Trustee may rely is that of an equitable lien. In the context of bankruptcy, it has been held that the decision of whether to impose an equitable lien depends on "...whether the creditor has done all it reasonably can do to perfect its lien, but nevertheless is thwarted by the uncooperativeness of the debtor." Peters v. WFS Financial, Inc. (In re Glandon), 338 B.R. 103, 107-108 (Bankr. D. Colo. 2006) (citing Rushton v. Dean Evans Chrysler-Plymouth (In re Solar Energy Sales and Services), 4 B.R. 364, 370 (Bankr. D. Utah 1980), In re O.P.M. Leasing Services, Inc., 23 B.R. 104, 119 (Bankr. S.D.N.Y. 1982) ("The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

31

1    doctrine is further limited to situations where a secured creditor is prevented from perfecting its

2    interest by an uncooperative debtor."))

3          Entitlement to an equitable lien is not automatic:

4          An equitable lien is the right to have property subjected in a court of equity to the
          payment of a claim. * * * It is neither a debt nor a right of property, but a remedy
5          for a debt. It is simply a right of a special nature over the property which
          constitutes a charge or encumbrance thereon, so that the very property itself may
6          be proceeded against in an equitable action and either sold or sequestered under a
          judicial decree and its proceeds in one case, or its rents and profits in the other,
7          applied upon the demand of the creditor in whose favor the lien exists.'

8    Wells Fargo Bank, N.A. v. Courson (In re Courson), 409 B.R. 516, 526-27 (Bankr. E.D. Wash.

9    2009) (quoting Kukuk v. Martin, 331 Ill. 602, 163 N.E. 391, 392, as quoted in Nelson v. Nelson

10   Neal Lumber Co., 171 Wash. 55, 17 P.2d 626, 628 (1932)).  "Thus, an equitable lien is not a

11   right in property but rather a remedy for debt."  Id.  If the Trustee's interest is limited to Net

12   Project Revenues, there is no "debt" caused by the deposit into the BofA Account because there

13   was no injury, and no remedy is necessary.

14        Each of the potential equitable theories that the Trustee could raise require some type of

15   wrongful conduct by the Debtor.   The Debtor did not engage in any wrongful conduct in

16   depositing its Project Revenues into the BofA Account (and giving notice to the Trustee of its

17   actions).  Instead, in authorizing the deposits, the Board was appropriately exercising its business

18   judgment to preserve operating capital to pay its O&M Costs following the wrongful conduct of

19   the Trustee.  The Trustee's hyperbolic indignation over the deposits into the BofA Account is a

20   clever facade to distract from its own conduct.  The Trustee first breached its obligations under

21   the Senior Indenture by refusing to disburse funds for payment of the Board's fees, a component

22   of O&M Costs, due to its objection, without any legal or factual basis, to payment of the Board's

23   fees.  It was in response to this breach that the Debtor opened the BofA Account, and funded the

24   account with Project Revenues (in the form of TVM Cash Receipts) sufficient to satisfy the

25   payment directives that the Trustee refused.[18]  See Omnibus Declaration, ¶ 79.

26   _____

27   [18] The Court raised the question of the extent to which BofA money is identifiable cash proceeds under NRS
     104.9315 and whether the Trustee's ability to reach such funds, if any, is cut off by 104.9332.  The source of the
28   money on deposit in the BofA Account is not disputed - the funds are Project Revenues.  Whether they are proceeds
     under NRS 104.9312(4)(b), which continues perfection of a security interest in identifiable cash proceeds of a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                   32

1    Subsequently, in an egregious breach of its obligations, without notice to the Debtor, the

2    Trustee withdrew approximately $2.6 million from the Debtor's accounts at Wells Fargo,

3    including approximately $600,000 which LVMC had deposited into the Collection Fund as a

4    reserve for 2010 liability insurance premiums, which are critical to the continued operation of

5    the Monorail.  No provision of any of the Financing Documents gives the Trustee authority to

6    unilaterally shut down operations of the Monorail.  At the end of November, after demand by the

7    Debtor, the Trustee returned to the Revenue Fund $490,000 of the insurance reserve, but the

8    remaining $110,000 had to be replaced from subsequent Net Project Revenues, which would

9    otherwise have been available to pay other O&M Costs.  Omnibus Declaration, ¶ 79.

10    Even after it had returned the wrongfully diverted funds, however, the Trustee then

11    notified the Debtor that it reserved the right to withdraw further sums from the Revenue Fund

12    without prior notice to the Debtor.  Omnibus Declaration, ¶ 79.  Later, Ambac issued a written

13    instruction to the Trustee that the Trustee was to withhold funding for certain O&M Costs

14    requested by LVMC for its restructuring professionals totaling $254,451.81, and that to the

15    extent LVMC deposited revenues in the BofA Account for the payment of these or any other

16    expenses to which Ambac objected, "…Ambac will direct Wells Fargo to hold a like amount

17    from the next requisition until the amounts taken prior to deposit into the Collection Account

18    have been recovered."  LVMC immediately sought clarification from the Trustee as to whether it

19    intended to honor payment directives for O&M Costs upon the instruction of Ambac, which

20    would jeopardize payment of such O&M Costs as wages, utilities, and payment to Bombardier

21    under the Bombardier Agreement for operation of the Monorail.  The Trustee refused to respond.

———————————— (continued) ————————————

22    secured creditor's collateral notwithstanding its sale, exchange, or other disposition, depends on whether such
"proceeds" are actually "proceeds" as discussed above.  NRS 104.9312(4)(b).  If they are not proceeds of any

23    collateral in which the Trustee holds a security interest, then they cannot be identifiable cash proceeds.  If they are
proceeds, then they are identifiable, as they are Project Revenues.  The Debtor does not contend that any

24    commingling occurred.  Whether any subsequent transfer of the funds in the BofA Account by the Debtor to a third
party cuts off any interest of the Trustee is governed by NRS 104.9332(b), which provides that "a transferee of funds

25    from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in
collusion with the debtor in violating the rights of the secured party."  NRS 104.9332(b).  This "collusion" standard

26    more broadly protects transferees than the prior "ordinary course" standard.  The Trustee could only avoid transfers
of funds from the BofA Account if it could first show that such transfers violated its rights.  If it had no security

27    interest in the funds because they were not Net Project Revenues, subsequent transfers would not be avoidable.  If
such transfers violated its rights, then the Trustee would have to show collusion by recipients of the funds in

28    violating its rights.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                          33

Case 10-10464-bam    Doc 143    Entered 02/03/10 23:10:37    Page 40 of 46

Omnibus Declaration, ¶ 80.

It was then clear to the Debtor that failure to preserve some of its Project Revenues for payment of critical O&M Costs might impair continued operation of the Monorail, and the Debtor began depositing all of its revenues into the BofA Account on December 27, 2009 to ensure its continued ability to meet its operational obligations pending assurances that revenues deposited into the Wells Fargo Collection Fund would not be diverted from payment of O&M Costs. Omnibus Declaration, ¶ 81. Having fired the first shot, the Trustee cannot now claim to be the injured party.

Even if the Debtor acted wrongfully in depositing Project Revenues into the BofA Account in violation of the Financing Agreement, the Trustee cannot establish that it was injured by the Debtor's actions, which is a prerequisite to any of the equitable relief discussed above. As set forth at length herein, the Trustee's security interest extends solely to Net Project Revenues, and the Trustee is not secured in any Project Revenues necessary for O&M Costs whether or not the Trustee has possession or control over the Project Revenues. Because the funds on deposit in the BofA Account may well be necessary to satisfy O&M Costs during the pendency of this Chapter 11 Case, the Trustee cannot establish its security interest in those funds. The issue of whether the Debtor wrongfully thwarted the Trustee's security interest does not arise if there is no security interest to begin with.

Finally, with respect to the undeposited TVM Cash Receipts on the Petition Date, there does not appear to be any contention that the Debtor engaged in wrongful conduct in collection such Prepetition Revenues prior to the filing of the Petition, as collecting TVM Cash Receipts is an ordinary part of the Debtor's business activities.

**D.      The Trustee is Not Entitled to Adequate Protection**

Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used…or proposed to be used…by the [debtor in possession], the court…shall prohibit or condition such use…as is necessary to proved adequate protection of such interest." 11 U.S.C. § 363(e). "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in §

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

361." In re Beker Indus. Corp., 58 B.R. 735, 736 (Bankr. N.D.N.Y. 1986).  Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment of periodic cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

The determination of adequate protection is a "fact-specific inquiry." In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case...") (citation omitted).  The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process. See id. at 288 (citation omitted); Beker, 58 B.R. at 726; In re WorldCom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").  "However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond that was bargained for by the parties." Mosello, 195 B.R. at 619; see also Beker, 58 B.R. at 741 ("Adequate protection, not absolute protection, is the statutory standard.").

### 1.    As an undersecured creditor, the Trustee is entitled only to adequate protection for any diminution in value

The purpose of adequate protection is to ensure that a secured creditor is protected from a diminution in the value of its collateral during the bankruptcy case.  See In re Pine Lake Vill. Apartment Co., 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt."); see also In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984).

Where the collateral is not diminishing in value, the Supreme Court has held that mere passage of time did not warrant adequate protection. Matter of Continental Airlines, Inc., 134

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

1   B.R. 536, 544 (Bankr. D. Del. 1991) (citing Timbers for the proposition that: "An undersecured

2   creditor is only entitled to adequate protection payments if its collateral is declining in value.");

3   see also In re Integrated Health Services, Inc., 260 B.R. 71, 74 (Bankr. D. Del. 2001) (denying

4   adequate protection or stay relief because the creditor failed to provide sufficient evidence

5   showing that the value of the collateral was declining).    The Trustee is indisputably an

6   undersecured creditor by virtue of the fact that the operating profits of the Debtor satisfy only a

7   small fraction of the principal and interest obligations under the Bonds.    A showing of

8   diminution in value of the collateral is the only way that the Trustee, as an undersecured creditor,

9   can be entitled to adequate protection.

10          **2.      The validity, priority, and extent of the Trustee's security interest is disputed**

11          Because the Trustee's interest in the Prepetition Revenues and Postpetition Revenues is

12   subject to a bona fide dispute, the Trustee is not entitled to adequate protection as it has not

13   satisfied its burden of proof to establish its interest in the alleged collateral.   As discussed in

14   Debtor's Motion and in this Brief, none of the Debtor's Prepetition Revenues are subject to

15   properly-perfected security interests held by the Trustee and thus are not cash collateral under

16   Section 363(a).   The TVM Cash Receipts as of the Petition Date is not subject to a properly-

17   perfected security interest of the Trustee because such funds are not in the Trustee's possession.

18   The Receivables are not subject to any security interest of the Trustee because no such security

19   interest was ever granted in such property in the Financing Documents.   The BofA Account is

20   not subject to a properly-perfected security interest of the Trustee because the account was not in

21   under its control.   Finally, the funds on deposit at Wells Fargo on the Petition Date are secured

22   only to the extent such funds are not necessary to pay O&M Costs (i.e., only to the extent they

23   constitute Net Project Revenues).

24          Debtor's Postpetition Revenues are also not subject to any properly-perfected security

25   interest of the Trustee and thus do not constitute cash collateral, as discussed herein.   Postpetition

26   Revenues are not subject to any lien resulting from any security interest granted to the Trustee

27   pursuant to any prepetition security agreement by operation of Section 552(a) of the Bankruptcy

28   Code.   Moreover, all of the Debtor's Postpetition Revenues will be derived from operation of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

36

1   Monorail, and thus are not "proceeds" of any prepetition collateral under Article 9 or the

2   exception in Section 552(b) of the Bankruptcy Code. Finally, the Debtor's Postpetition Revenues

3   are not subject to a statutory lien as discussed above.

4   **E.      The Trustee is Not Entitled to Recovery of Postpetition Interest or His Fees**

5          Because the Trustee is undersecured, it is not entitled to interest, fees, or its attorneys'

6   fees. The Bankruptcy Code expressly provides specific and narrow circumstances in which a

7   party may look to the bankruptcy estate to recover postpetition interest or costs and to have

8   professional fees paid. With respect to postpetition interest and costs, Section 506(b) of the

9   Bankruptcy Code provides that oversecured creditors are entitled to interest on their claim. With

10  respect to professional fees, generally, a professional can be paid by the estate only under

11  Sections 330 and 331 of the Bankruptcy Code. In certain limited circumstances, a non-estate

12  professional may also be paid under Sections 506(b) or 503(b) of the Bankruptcy Code.

13         The filing of the bankruptcy petition relieves a debtor of non-bankruptcy obligations to

14  pay professional fees to third parties unless, and to the extent, such payment is provided for in

15  the Bankruptcy Code. See In re Loewen Group Int'l, Inc., 274 B.R. 427, 445, n.36 (Bankr. D.

16  Del. 2002) ("Although a contractual provision providing for the recovery of attorneys' fees and

17  costs may enable an unsecured creditor to pursue recovery of such fees and costs in an action in

18  state court, in the context of bankruptcy, the creditor's right to assert such claims is limited by

19  the provisions of the Bankruptcy Code.")

20         Section 506(b) of the Bankruptcy Code allows holders of an oversecured claim "interest

21  on such claim, and any reasonable fees, costs, or charges provided for under the agreement or

22  State statute under which such claim arose," but only "[t]o the extent that an allowed secured

23  claim is secured by property the value of which…is greater than the amount of such claim…" 11

24  U.S.C. § 506(b). See In re Kord Enterprises II, 139 F.3d 684 (9th Cir. 1998) (allowing attorneys

25  fees for an oversecured creditor).

26         Moreover, Section 506(b) of the Bankruptcy Code is limited to "reasonable fees." See In

27  re Welzel, 275 F.3d 1308, 1315 (11th Cir. 2001) ("even if contractually set attorney's fees owed

28  to oversecured creditors are enforceable under state law…it does not follow that the fees are per

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

37

1  se reasonable under the Bankruptcy Code. This demonstrates, in turn, that 11 U.S.C. § 506(b)

2  adds a new level of scrutiny to fee arrangements that goes beyond state law requirements.")

3      The Trustee at this time also cannot be paid his professional fees under Section 503(b) of

4  the Bankruptcy Code, which provides for allowance as an administrative expense compensation

5  for entities "making a substantial contribution" including "reasonable compensation for

6  professional services rendered by an attorney or an accountant of [such] an entity, based on the

7  time, the nature, the extent, and the value of such services, and the cost of comparable services

8  other than in a case under this title, and reimbursement for actual, necessary expenses incurred

9  by such attorney or accountant." 11 U.S.C. § 503(b)(3)(D), (4). The Debtor's case is not yet at

10  the stage where a substantial contribution application could be addressed.    Thus, any

11  consideration under Section 503(b) of the Bankruptcy Code is premature.    To the extent any

12  substantial contribution is shown, the professional fees would be limited to "actual, necessary

13  expenses" as provided in the language of Section 503(b)(4) of the Bankruptcy Code.    And

14  Section 503(b) of the Bankruptcy Code only contemplates allowance, not payment.  See 11

15  U.S.C. § 503(b) ("After notice and a hearing, there shall be allowed administrative

16  expenses...."). Even if the Trustee's professional fees were allowed, that does not require

17  current payment by the Debtor. The Trustee has failed to establish why its professionals should

18  get paid ahead of other similarly situated creditors.

19      The Supreme Court has made clear that claims of "adequate protection" cannot be used in

20  a manner that would vitiate basic bankruptcy tenets.  In Timbers of Inwood Forest Assoc., Ltd.,

21  the Supreme Court denied post-petition interest sought as adequate protection by an

22  undersecured creditor.  Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365 (1988). The Court

23  observed that allowing post-petition interest to undersecured creditors, under the guise of

24  adequate protection, would render Section 506(b) of the Bankruptcy Code totally meaningless,

25  which could not have been Congress's intent.

26      If the Code had meant to give the undersecured creditor, who is thus denied
         interest on his claim, interest on the value of his collateral, surely this is where
27       that disposition would have been set forth, and not obscured within the "adequate
         protection" provision of § 362(d)(1).  Instead of the intricate phraseology set

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc                                                    38

1  forth above, § 506(b) would simply have said that the secured creditor is entitled
2  to interest "on his allowed claim, or on the value of the property securing his
3  allowed claim, whichever is lesser." Petitioner's interpretation of § 362(d)(1) must be regarded as contradicting the carefully drawn disposition of § 506(b).

4  Id. at 372; see also Baybank-Middlesex v. Ralar Distributions, Inc., 63 F.3d 1200, 1203 (1st Cir.

5  1995) (where creditor challenged sufficiency of adequate protection and sought payment of

6  postpetition interest and fees, the court held: "We need not determine whether there was a

7  failure of adequate protection because...Baybank, as an undersecured creditor, is not entitled to

8  postpetition interest and fees under § 506(b)...")

9  ## V.
## CONCLUSION

10  The Debtor is entitled to a determination that the Trustee lacks a postpetition security

11  interest in the Postpetition Revenues of the Debtor as (i) the Senior Indenture gives the Trustee

12  no security interest in Project Revenues, but only in Net Project Revenues, and the Trustee has

13  not established that the Postpetition Revenues are Net Project Revenues, (ii) the Postpetition

14  Revenues are not "proceeds" of the Franchise Agreement under Section 552(b), (iii) the

15  Postpetition Revenues are not secured by a statutory lien which removes the security interest

16  from the scope of Section 552(a), and (iv) to the extent the Postpetition Revenues are secured by

17  a statutory lien, the lien applies only to Net Project Revenues. The Debtor is also entitled to a

18  determination that the Prepetition Revenues, including the BofA Account, the TVM Credit

19  Receipts, and the TVM Cash Receipts, are not subject to the Trustee's security interest because

20  (i) the Trustee was not perfected on the Petition Date because it lacked the requisite possession

21  of the TVM Cash Receipts, the requisite control of the BofA Account, and any security interest

22  in the TVM Credit Receipts, and (ii) the Trustee has not shown that the Prepetition Revenues are

23  Net Project Revenues.

24  To the extent the Court determines any of the above to be cash collateral of the Trustee,

25  the Debtor seeks an order authorizing the final use of such cash collateral throughout the

26  pendency of this Chapter 11 Case and a determination that the Trustee is not entitled to adequate

27  protection because it will suffer no diminution in the value of its interest in the Postpetition

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

39

1  Revenues as a result of the expenditure of sums for O&M Costs.  Finally, Debtor seeks such

2  further and other relief as the Court deems just and proper.

3       DATED this 3rd day of February, 2010.

4                                 GORDON SILVER

5

6  By: _____
                                     GERALD M. GORDON, ESQ.
                                     WILLIAM M. NOALL, ESQ.
7                                    GABRIELLE A. HAMM, ESQ.
                                     3960 Howard Hughes Pkwy., 9th Floor
8                                    Las Vegas, Nevada 89169
                                     Proposed Attorneys for Debtor
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/838469_2.doc

40