1
2
3
4

Entered on Docket
April 26, 2010

_____
Hon. Bruce A. Markell
United States Bankruptcy Judge

5

UNITED STATES BANKRUPTCY COURT

6

DISTRICT OF NEVADA

7

* * * * * *

8    In re:                                    )        Case No.: BK-S-10-10464-BAM
                                               )
9    LAS VEGAS MONORAIL COMPANY,               )        Chapter 11
                                               )
10                     Debtor.                  )        **Date:   February 17, 2010**
     _____)        **Time:  8:30 a.m.**
11

12              **ORDER REGARDING AMBAC'S MOTION TO DISMISS**

13

                         TABLE OF CONTENTS
14

15   I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16   II.  LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
         A.   *Eligibility for Chapter 11, and Jurisdiction of the Court* . . . . . . . . . . . . . . . . . . . . . 5
17       B.   *The Bankruptcy Code and "Municipalities"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
              1.   **The History of Chapter 9 From a Statutory and Caselaw View** . . . . . . . . 8
18                 a.   The Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
                        (1)   Origins in the Depression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
19                      (2)   The 1946 Amendments and the Inclusion of Instrumentalities Issuing
                              Industrial Development and Other Revenue Bonds . . . . . . . . . . . 10
20                      (3)   The 1976 Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
                        (4)   Subsequent Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
21                      (5)   Summary of Legislative Review . . . . . . . . . . . . . . . . . . . . . . . . 16
                   b.   Caselaw Interpretations of the Bankruptcy Code's Definition of
22                      "Municipality" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
              2.   **Synthesizing the Components of an Instrumentality** . . . . . . . . . . . . . . . . . 24
23                 a.   Components of a Federal Definition of "Municipality" . . . . . . . . . . . . . 24
                   b.   LVMC's Representation That It Is An Instrumentality . . . . . . . . . . . . . 26
24                 c.   The Relevance of LVMC's Tax Status as an "Instrumentality" . . . . . . . 29
                        (1)   Revenue Ruling 57-128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
25                      (2)   Beyond Revenue Ruling 57-128 . . . . . . . . . . . . . . . . . . . . . . . . 32
         C.   *LVMC is Not a Municipality Under the Bankruptcy Code* . . . . . . . . . . . . . . . . . . . 34
26            1.   **Do LVMC's Transportation Goals Constitute Traditional Governmental**
                   **Functions?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
27            2.   **Does the Control Held by the Governor Rise to the Level Necessary to be a**
                   **"Municipality" Under Section 101(40)?** . . . . . . . . . . . . . . . . . . . . . . . . . . 35
28            3.   **Does Nevada Law Treat LVMC as One of Its Instrumentalities?** . . . . . . 39

III.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        **Appendix 1–Definition of "Municipality" after 1937 Act** . . . . . . . . . . . . . . . . . . . . . . 43
        **Appendix 2–Definition of "Municipality" after 1946 Act** . . . . . . . . . . . . . . . . . . . . . . 44

I.   INTRODUCTION

Las Vegas Monorail Company ("LVMC"), the debtor and debtor in possession in this case, owns and operates a 3.9 mile long monorail which connects nine hotels in Las Vegas. LVMC seeks to serve the transportation needs of the Las Vegas resort corridor, and caters mostly to tourists and other visitors to Las Vegas. The monorail, however, does not connect to the local airport, and it does not connect to Las Vegas' downtown area. While it does connect to the local convention center, the closest it gets to the principal thoroughfare in Las Vegas, the Las Vegas Strip, is approximately 1,000 to 1,500 feet.

LVMC's somewhat complicated capital structure, and its disappointing ridership, has hampered its ability to expand to better serve its goals. LVMC's immediate predecessor was a joint venture between two local hotels. Starting in 1998, this predecessor took advantage of a change in Nevada law that allowed private companies to operate a public monorail, and obtained a franchise from the local county government to operate the then-one-mile-long monorail. In 2000, the private joint venture sought to expand to its present length. As part of that expansion, the joint venture merged with a nonprofit corporation to form the present LVMC.[1] LVMC then arranged for structured financing to acquire the existing track and to expand it.

The financing required the participation of the Director ("Director") of the Nevada Department of Business and Industry ("Department"). This participation consisted of the Director's sponsoring the issuance of around $650 million of municipal bonds ("Bonds"). These Bonds were offered for sale pursuant to an Offering Statement dated September 12, 2000 (the

---

[1]LVMC is a private, nonprofit corporation, formed under Nevada's nonprofit corporation law. Its income is exempt from taxation under 26 U.S.C. § 503(c)(4). LVMC's articles of incorporation state that LVMC is not organized for profit, and that no part of its net earnings can "inure to the benefit" of any individual or entity other than the State of Nevada or one of its agencies.

"Offering Statement").[2]  Specifically, the Bonds were issued under an indenture ("Indenture") between Wells Fargo Bank ("Trustee") and the Director.  The financing then called for the Director to simultaneously lend the bond proceeds to LVMC pursuant to a separate financing agreement between LVMC and the Director (the "Financing Agreement").  Under the Financing Agreement, the Director lent the bond proceeds to LVMC, and LVMC agreed to repay the loan. It supported its promise with a grant of a security interest in, among other things, its net revenues (but not in any of its track or trains).

A key component of the transaction, known to all, was that the State of Nevada would not be liable on the Bonds.  Indeed, the Director and other public officials assured the public that no tax revenues would be used to acquire or operate the monorail.  Structurally, this promise was honored by making the Bonds nonrecourse as to the State of Nevada.  This was explicit in the offering; the only recourse for bondholders was the collateral the Director assigned to the Trustee, and the insurance mentioned below.

As a result, those buying the Bonds did so knowing that the primary source of repayment on the Bonds was the Financing Agreement – and the security interests it contained – which the Director had assigned to the Trustee.  The only other potential source of repayment was insurance purchased from Ambac Assurance Corp. ("Ambac") which insured payment of principal and interest on the first series of the Bonds.

This type of financing – called variously conduit financing or industrial revenue bond financing or special revenue financing – is a common way to finance municipal infrastructures. It is expressly recognized by the Internal Revenue Code.  *See* 26 U.S.C. § 103.  It allows a State or municipality to secure financing for the construction and operation of enterprises with a public purpose while offering tax-free interest to buyers of the bonds issued as part of the transaction. As part of this effort to obtain tax exempt status, LVMC signed a "Tax Certificate and

---

[2]The Bonds were issued in series.  The first series of Bonds have a principal amount of approximately $450 million, and have the benefit of insurance (of which more later).  Two junior series of the Bonds make up the remainder of the original $650 million financing.  These series are not secured and in some respects are contractually subordinate to the first series.  US Bank has been appointed as an Indenture Trustee to represent the interests of the holders of the two junior series of Bonds.

Agreement" (the "Tax Certification") which expressly states that LVMC "is an instrumentality of the State of Nevada, . . . controlled by the Governor of the State of Nevada."[3]

As time passed, the payments on the Bonds proved to be too much for LVMC to service from its revenues. LVMC's ridership has never met projections; many of its potential patrons use services provided by the Regional Transportation Commission ("RTC"), a public agency charged with meeting the transportation needs of most of Las Vegas's residents. This is not to say that LVMC bleeds money; to the contrary, its revenues exceed its expenses,[4] with more than $5 million annual profit before debt service. This $5 million, however, is barely enough to cover 10% of the scheduled debt service on the Bonds.

To address its financial distress, LVMC filed for Chapter 11 bankruptcy protection on January 13, 2010. Within hours of its filing, Ambac moved to dismiss LVMC's case. Ambac contends that LVMC is a "municipality" as defined by the Bankruptcy Code, and therefore ineligible to file anything other than a Chapter 9 bankruptcy case. Ambac has significant exposure on its insurance obligation.[5]

After extensive briefing and an evidentiary hearing on February 17, 2010, the court took the matter under submission. It now denies Ambac's motion.

---

[3]The level of control is fairly expansive. LVMC's by-laws allow the Governor of Nevada to (i) inspect and audit LVMC's books and records on an annual basis; (ii) disapprove of any by-law amendment; (iii) disapprove of LVMC's rate schedule; and (iv) reject LVMC's annual budget, including any proposed capital expenditures. More importantly, the Governor can reject proposed board members, refuse to reappoint existing board members, and remove such directors for cause.

[4]Its primary expense is its operating agreement with Bombardier Transit Corporation ("Bombardier"), which operates and services the trains. As LVMC is regulated as a private corporation under applicable Nevada law, some of its other expenses include obtaining necessary licenses and permits from governmental agencies to operate its business.

[5]Ambac estimates that its exposure over the life of the bond issue is about $1.16 billion.

1   II.    LAW

2        A.    *Eligibility for Chapter 11, and Jurisdiction of the Court*

3        Ambac alleges that LVMC is ineligible to file a Chapter 11 bankruptcy.  With few

4   exceptions, only "a person that may be a debtor under chapter 7" may be a Chapter 11 debtor.

5   11 U.S.C. § 109(d).  Chapter 7 eligibility, in turn, turns on whether the petitioner is a "person"

6   within the meaning of the Bankruptcy Code.  A "person" under the Bankruptcy Code is defined

7   in Section 101(41) which states:

8        The term "person" includes individual, partnership, and corporation, but does not
         include governmental unit . . . .
9

10  11 U.S.C. § 101(41).  As a result, if LVMC is a "governmental unit," then it cannot be a Chapter

11  11 debtor, and the court must grant Ambac's motion.  *In re Westport Transit District*, 165 B.R.

12  93, 95 (Bankr. D. Conn. 1994); 6 COLLIER ON BANKRUPTCY ¶ 900.02 (Alan Resnick & Henry J.

13  Sommer, eds., 15th ed. rev. 2010).

14       But this determination requires examination of yet another definition, that of

15  "governmental unit."  Section 101(27) defines "governmental unit."  It states:

16       The term "governmental unit" means United States; State; Commonwealth; District;
         Territory; municipality; foreign state; department, agency, or instrumentality of the
17       United States . . .  a State, a Commonwealth, a District, a Territory, a municipality, or
         a foreign state; . . . .
18

19  LVMC is clearly not a State, Commonwealth, District, or Territory.  The only included term that

20  might fit is "municipality."  Section 101(40) of the Bankruptcy Code defines "municipality" as

21  follows:

22       The term "municipality" means political subdivision or public agency or
         instrumentality of a State.[6]
23

24

25

26  ――――――――――――

27       [6]The definition of "municipality" is somewhat redundant in that it includes an "instrumentality of
    the State," which is a phrase the Code already uses in Section 101(27)'s definition of "governmental
    unit."
28

5

LVMC is not a political subdivision, such as a county or city. It is not a public agency, such as the Department or the RTC, as it was formed under general nonprofit corporation statutes. At most, it might be an instrumentality of the State of Nevada.

But statutory or caselaw guidance on what constitutes an instrumentality, or even a municipality, is scarce. As noted more than fifteen years ago: "What constitutes a municipality is, despite current Bankruptcy Code language on point, far from clear." Christopher Smith, *Provisions for Access to Chapter 9 Bankruptcy: Their Flaws and the Inadequacy of Past Reforms*, 14 BANKR. DEV. J. 497, 516 (1998). Clarity has not been achieved in the interim.

    *B.    The Bankruptcy Code and "Municipalities"*

Determining the proper scope of Section 101(40)'s use of "instrumentality" raises significant questions of statutory interpretation. The starting point for all statutory interpretation is the presumption that Congress intended the accepted and plain meaning of the words it used.[7] As the Supreme Court has said:

> The starting point in discerning congressional intent . . . is the existing statutory text . . . and not the predecessor statutes. It is well established that "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.

*Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted) (in turn quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241(1989) (in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917))). This process typically requires looking "to the ordinary meaning of these terms." *Rousey v. Jacoby*, 544 U.S. 320, 330 (2005). *See also Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 388 (1993) ("Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'") (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

---

[7]This court has previously written on the standard tools of statutory interpretation. *See, e.g.*, *In re Slusher*, 359 B.R. 290, 295-96 (Bankr. D. Nev. 2007); *In re Trejos*, 352 B.R. 249, 254-259 (Bankr. D. Nev. 2006), *aff'd*, 374 B.R. 210 (B.A.P. 2007); *In re Kane*, 336 B.R. 477, 486-88 (Bankr. D. Nev. 2006).

But the nonlegal definition of instrumentality is, unfortunately, anything but ordinary or plain. *Webster's Unabridged Dictionary* defines "instrumentality" variously as "something by which an end is achieved" and "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch especially of a governing body."[8] Although undoubtedly accurate definitions, these descriptions are frustratingly slippery to apply in practice, in that they are comprised not of measurable and precise criteria, but rather of reference to function and practice. Even the Supreme Court has given a somewhat vague interpretation of "instrumentality" with respect to the Foreign Sovereign Immunities Act:

> A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 624 (1983). *See also Federal Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 102 (1941) (federal land bank a federal instrumentality given its important governmental function); *Rust v. Johnson*, 597 F.2d 174, 178 (9th Cir.), *cert. denied*, 444 U.S. 964 (1979) (Federal National Mortgage Association is federal government instrumentality given its important governmental function).

These differing uses and definitions underscore that no unique or canonical meaning of "instrumentality" exists. An entity or enterprise might be an instrumentality for one purpose, but not for another. *Lewis v. United States*, 680 F.2d 1239, 1242-43 (9th Cir. 1982) (Federal Reserve Bank an instrumentality for tax purposes but not an instrumentality for purposes of applying the Federal Tort Claims Act); *Fed. Reserve Bank v. Metrocentre Imp. Dist. #1*, 657

---

[8]WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (Merriam-Webster 2002), *available at* http://unabridged.merriam-webster.com (last visited Mar. 31, 2010). The *Oxford English Dictionary* is similarly vague: "The quality or condition of being instrumental; the fact or function of serving or being used for the accomplishment of some purpose or end; agency." OXFORD ENGLISH DICTIONARY (2d ed. 1989), *available at* http://dictionary.oed.com (last visited Mar. 31, 2010)

F.2d 183, 185 n.2 (8th Cir. 1981) (same).[9]  Given this state of affairs, there really is no "plain

meaning" of the term "instrumentality" – or, to be somewhat puckish, there are too many plain

and accepted meanings – and it thus makes sense to look at the context and background of that

term's use in the Bankruptcy Code.

On this score, there is much useful information.  When Congress enacted the current 1978

Bankruptcy Code, the components of Chapter 9 eligibility – including the definition of

municipality –had been around for more than 50 years.  The 1978 Bankruptcy Code, although it

tinkered with the definition of municipality, basically adopted the definition of municipality then

used in the 1898 Bankruptcy Act.   In such cases, the Supreme Court has counseled bankruptcy

courts to remember that, when Congress amends existing statutes, it "does not write on a clean

slate." *Dewsnup v. Timm*, 502 U.S. 410, 417 (1992).  Courts should thus not "'read the

Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress

intended such a departure.'" *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec.

Co*., 549 U.S. 443, 454 (2007) (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998) (in turn

quoting *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 563 (1990))).  This

approach indicates that an examination of the historical understanding of Chapter 9 eligibility

can help inform the present meaning of "municipality" in Section 101(40).

### 1.    The History of Chapter 9 From a Statutory and Caselaw View

Municipal bankruptcy has been a part of American bankruptcy law since 1934.  It arose

because of Congress's desire to extend relief to municipalities that States cannot bestow,[10] while

---

[9]In the Ninth Circuit, "'[t]here are no sharp criteria for determining whether an entity is a federal agency within the meaning of the [Federal Tort Claims] Act, but the critical factor is the existence of federal government control over the 'detailed physical performance' and 'day to day operation' of that entity.'" *Kuntz v. Lamar Corp*., 385 F.3d 1177, 1184 (9th Cir. 2004) (quoting *Lewis v. United States*, 680 F.2d 1239, 1240 (9th Cir. 1982)).

[10]States are subject to the Contracts Clause, U.S. CONST., Art. I, § 10, which limits their ability to modify contracts among their citizens.  *Brown v. Smart*, 145 U.S. 454 (1892) (Contracts Clause prohibits state insolvency law from affecting the contractual rights of the citizens of other states without their consent).  The federal government, however, is not subject to that clause, *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 732, n. 9 (1984), and thus debtors in a federal bankruptcy action can and often do modify contracts with other parties.  *See, e.g*., 11 U.S.C. § 365.

1  simultaneously honoring the constitutional requirements of the Tenth Amendment.  A key point

2  of this balance has been the identification of the entities eligible for Chapter 9 relief.  One way to

3  better understand the struggle, and its culmination in the words of Section 101(40), is to examine

4  this history.

5                          a.    The Statutory Background

6      First and foremost, Chapter 11 provides federal statutory relief for distressed debtors.  It

7  represents a balanced effort to harmonize the often discordant positions of debtors and creditors.

8  As stated by the Supreme Court, reorganization bankruptcy "strikes a balance between a debtor's

9  interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the

10  value of the bankruptcy estate."  *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.

11  Ct. 2326, 2339 (2008) (citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)).  No where is that

12  clash more evident, and the balance more difficult to strike, than in Chapter 9 municipal

13  bankruptcy.

14                          (1)    Origins in the Depression

15      The first municipal bankruptcy legislation was enacted in 1934 during the Depression as a

16  temporary measure to assist local governments.  Act of May 24, 1934, Pub. L. No. 251, 48 Stat.

17  798 (1934).  This law was captioned "Provisions for the Emergency Temporary Aid of Insolvent

18  Public Debtors and to Preserve the Assets Thereof and for other Related Purposes," and added

19  Chapter IX to the Bankruptcy Act of 1898.  Eligibility for this new statute was limited to:

20      [a]ny municipality or other political subdivision of any State, including (but not
        hereby limiting the generality of the foregoing) any county, city, borough, village,
21      parish, town, or township, unincorporated tax or special assessment district, and any
        school, drainage, irrigation, reclamation, levee, sewer, or paving, sanitary, port,
22      improvement or other districts (hereinafter referred to as a 'taxing district') . . . .

23  Bankruptcy Act § 80(a), 11 U.S.C. § 303(a) (as enacted in 1934).

24      Congress was aware of constitutional concerns with municipal bankruptcy, and attempted

25  to address them in the legislation.  When challenged the very next year, however, the Supreme

26  Court held, by a 5-4 vote, that the 1934 Act was unconstitutional as an improper interference

27

28

                                        9

1   with the sovereignty of the States.  *Ashton v. Cameron County Water Improvement Dist. No. 1*,

2   298 U.S. 513 (1936).

3      Congress responded quickly.  It enacted a revised Municipal Bankruptcy Act in 1937, Act

4   of August 17, 1937, Pub. L. No. 302, 50 Stat. 653 (1937).[11]  Although this new law changed the

5   list of types of eligible debtors – the full text is reprinted as Appendix 1 given its length – the

6   1937 Act still required an eligible petitioner to be a "taxing" agency or instrumentality.  In short,

7   the revised legislation kept the requirement that municipal debtors had to have the power to tax.

8   That requirement changed in 1946, when Congress revised virtually all of Chapter IX, and made

9   it permanent.

10                    (2)    The 1946 Amendments and the Inclusion of Instrumentalities Issuing

11                           Industrial Development and Other Revenue Bonds

12      In 1946, Congress made the municipal bankruptcy provisions permanent, and made some

13   adjustments to the legislation.  Act of July 1, 1946, Pub. L. 481, 60 Stat. 409 (1946).  One

14   adjustment was a change in the definition of eligibility.  Congress removed "taxing" as an

15   adjective in each place in the statute in which it appeared.  Again, given its length, the definition

16   is reprinted as Appendix 2 to this opinion.

17      The purpose of this change was to accommodate the type of financing device at issue in

18   this case – the revenue bond.  As explained in the House and Senate Reports that accompanied

19   H.R. 6682 (the bill that became the 1946 Act):

20            The existing act does not adequately cover what is known as revenue bonds.
        These are bonds issued by a public agency which are not payable out of taxes but are
21        payable solely from the revenues received from the operation of a revenue-producing
        public utility or property. When the existing act was enacted [in 1937], revenue bonds
22        were not an important factor in municipal financing. Since that time, however, there
        has been a great development in revenue bond financing and such bonds are now
23        issued by municipalities and other public agencies for many other purposes, such as
        housing, bridges, tunnels, airports, and similar enterprises.  Moreover, the
24        development of this type of financing has brought into existence a new type of
        municipality known as an authority. In some instances they are called commissions or

25

26      [11]This act was later upheld by the Supreme Court.  *United States v. Bekins*, 304 U.S. 27 (1938).
    The decision was decided by a 6-2 vote.  The dissenting justices were Mr. Justice McReynolds, the author
27   of *Ashton*, and Mr. Justice Butler.  Mr. Justice Cardozo, author of the dissent in *Ashton*, did not
    participate in *Bekins*.

28

1

2

3

districts, but essentially they are all of the same character that is, a public agency authorized to construct or acquire a revenue-producing utility and to issue bonds for such purpose payable solely out of the revenues derived from the utility. They possess no power of taxation and were designed as a means of financing public improvements without resorting to the taxing power. The existing law does not apply to this type of municipality.

4

5

6

7

8

9

10

H. R. 6682 amends the existing statute so as to make it applicable to any type of revenue bond issued by a city, town, county, and so forth, and also to make the act applicable to "authorities." The extension of the act along these lines is singularly appropriate because the revenue bonds issued by municipalities or authorities are for the purpose of financing revenue-producing enterprises rather than governmental functions. *They are essentially business enterprises.* The investor purchases these bonds relying upon the ability of the municipality to operate such business enterprises at a profit. Obviously these businesses are subject to the same hazards as other businesses financed by private capital. That fact is realized by the investor when he purchases such bonds and he does not depend upon the taxing power of the municipality to meet the principle and interest. Such bonds today enjoy a very wide market.

11

12

H. R. Rep. No. 2246, 79th Cong., 2d Sess. 2-3 (1946); S. Rep. No. 1633, 79th Cong., 2d Sess. 2 (1946) (emphasis supplied).

13

14

15

16

17

This explicit recognition of revenue bonds is instructive. Reacting to trends in municipal finance which created public entities that did not have taxing powers, Congress kept the basic framework of the definition intact, and just removed the requirement that the entity have the power to tax. To the extent that such entities issued bonds, they would be municipalities for purposes of the Bankruptcy Act.[12]

18

19

20

21

This structure and purpose created a negative inference that entities such as LVMC were also to be considered municipalities; otherwise, the legislation could have been easily extended to the entities to whom the public financing was lent, or from whom project revenues were to be received.

22

23

24

25

The debt to be restructured for the newly-included entities was unlike other debt previously covered by Chapter IX. As recognized by the House and Senate Reports: "The extension of the act along these lines is singularly appropriate because the revenue bonds issued by municipalities or authorities are for the purpose of financing revenue-producing enterprises rather than

26

27

28

[12]Viewed through the lens of this case, these amendments would have made the Department an eligible Chapter IX debtor.

1  governmental functions. *They are essentially business enterprises*." *Id.* (emphasis supplied).

2  And as private business enterprises, they were subject to relief under chapters other than Chapter

3  IX.  As summarized by the 1973 Bankruptcy Commission Report: "As the result of several

4  amendments, counties and instrumentalities financed by revenue bonds were added to the list of

5  eligible petitioners."  REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED

6  STATES, H.R. DOC. NO. 93-137, 93d. Cong., 1st Sess., Pt. I, at 273 (1973).

7                    (3)    The 1976 Amendments

8          Congress did not change the wording of the eligibility requirements for Chapter IX until

9  the City of New York fiscal crisis in the early 1970s.  After that crisis, Congress amended the

10  definition of municipality to something more akin to the current Section 101(40).  Act of April 8,

11  1976, Pub. L. 94-260, 90 Stat. 315.  In particular, Congress amended Section 81 of the

12  Bankruptcy Act to read: "(8) 'petitioner' means agency, instrumentality, or subdivision which

13  has filed a petition under this chapter."  Bankruptcy Act § 81(8), 11 U.S.C. § 401(8) (as amended

14  in 1976).

15         This change greatly reduced the length of the definition, but no loss in coverage was

16  intended.  As indicated in the House Report accompanying the bill that became the 1976 Act, the

17  change "defines petitioner for convenience only.  No substantive or limiting result is intended."

18  H.R. REP. NO. 94-686, at 16 (1975).  The Conference Report confirmed that the text "adopt[ed]

19  the House language."  H.R. REP. NO. 94-938, at 15 (1976).

20         Industrial development bonds of the type involved in this case did not escape attention.  In

21  revising the Chapter IX definition of claims, Congress sought to ensure that revenue bond claims

22  would not be claims in Chapter IX cases.  As stated in the Conference Report:

23         Municipalities are authorized . . . to issue tax-exempt industrial development revenue
            bonds to provide for the financing of certain projects for *privately owned*
24          *companies*. . . . The municipality merely acts as the vehicle to enable the bonds to be
            issued on a tax-exempt basis.  It is not the intent of the Committee of Conference to
25          include these industrial development bonds in a chapter IX case.

26  H.R. REP. NO. 94-938 at 15 (emphasis supplied).

27

28
                                          12

1    Although, these changes would affect entities such as the Department, not LVMC. But

2    they do show Congress's sensitivity to both the entity issuing bonds, and the entity obligated to

3    pay back the bond proceeds.[13]

4                              (4)    Subsequent Amendments

5         Since 1976, Congress has done little to change the definition of eligibility for municipal

6    bankruptcy relief. Although the 1978 recodification changed the designation of the chapters

7    from Roman numerals to Arabic ones, changed "petitioner" to "municipality," and changed the

8    placement of the definition of municipality, the substance of the definition remained the same.

9    Section 101(40) states that a "'municipality' means political subdivision or public agency or

10   instrumentality of a State." Given the closeness in time to the 1976 revisions, Congress believed

11   that "[t]he need for substantive revision this year is not great, and H.R. 8200 carries over

12   substantially intact many of the reforms adopted last year." H.R. REP. NO. 95-595, at 263

13   (1977). As stated later in the *Report*:

14          The  definition is adapted from the terms used in the chapter IX (municipal
             bankruptcy) amendment to the Bankruptcy Act enacted last year (Pub. L. 94–260).
15          That amendment spoke in terms of "political subdivision or public agency or
             instrumentality of a State". Bankruptcy Act § 84. The term municipality is defined
16          by those three terms for convenience.

17   *Id.* at 312-13. *See also* S. REP. NO. 95-989, at 9 (1978) ("Since [1976], there have been no

18   developments in municipal arrangement proceedings to require any new revision of the law.

19   Thus, the bill tracks the provisions of Public Law 94–260 with stylistic changes to conform to

20   the title.").

21

22

23

_____

24       [13]The Conference Report also referred to statements of Rep. Edwards, the floor manager of the bill,
     made during the House debate with respect to the status of industrial revenue bond financing. H.R. REP.
25   NO. 94-938 at 15. During that debate, when pressed about the status of such assets, Rep. Edwards stated:
             We intend that claims that arise by virtue of these bonds not be among the claims allowable .
26   . . and that amounts owed by private companies to the holders of industrial revenue bonds are
             not among the assets of the municipality that are to be dealt with by the plan. *These*
27   *transactions should really be handled outside the Chapter IX case.*
     121 CONG. REC. 39,412 (1975) (emphasis supplied).

28

                                                    13

The remarks on the final bill by the floor managers[14] confirm the role of industrial revenue bonds. As was noted by the floor managers:

> The [industrial development] bonds are sold on the basis of the credit of the company on whose behalf they are issued, . . . . The municipality merely acts as the vehicle to enable the bonds to be issued on a tax-exempt basis. Claims that arise by virtue of these bonds are not among the claims defined by this paragraph *and amounts owed by private companies to the holders of industrial development revenue bonds are not to be included among the assets of the municipality* that would be affected by the plan.

124 CONG. REC. 32,393 (1978) (remarks of Rep. Edwards) (emphasis added); *id.* at 33,992 (remarks of Sen. DeConcini) (emphasis added).

After the 1978 codification, there was significant concern about how Chapter 9 worked in practice. In particular there was concern over how to treat industrial revenue bonds in legitimate Chapter 9 cases. To address this issue, in 1988 Congress added Section 928 to the Bankruptcy Code. That section reads:

> (a)   Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
> (b)   Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.

Municipal Bankruptcy Amendments, Pub. L. No. 100-597, § 8 (1988) (codified at 11 U.S.C. § 928). The purpose of this provision was to continue the isolation of industrial revenue bond financing from general municipal bond financing. As stated in *Collier*, "[i]n general, its effect is to prevent special revenues that secure an issue of revenue bonds from being diverted to be available for the municipality's general expenses or obligations." 6 COLLIER ON BANKRUPTCY, *supra*, at ¶ 928.01.

---

[14]As noted at the time, Congress believed that the statements of the floor managers imbued Rep. Edwards and Sen. DeConcini's remarks with "the effect of being a conference report." 124 CONG. REC. 32,376 (1978) (statement of Rep. Rousselot). As the Supreme Court subsequently noted: "Because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated their floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent." *Begier v. IRS*, 496 U.S. 53, 64 n.5 (1990).

1    Congress also acknowledged the separation between industrial revenue bonds and general

2    obligation bonds:

3         At the same time the municipality approves financing through a revenue bond
      project or program, however, it has made the assumption that the project or program
4     will generate adequate revenues to repay the bondholders and operate the project or
      program without any general financial obligation on the part of the municipality.
5     Thus, unlike [general obligation] bonds, the general taxpayers are usually not
      committed to repaying the bonds or funding operational deficits through general tax
6     revenues.

7    S. REP. NO. 100-506, at 4 (1988).  *See also* H.R. REP. 100-1011, at 4 (1988) ("Special revenue

8    bonds are issued so that if the asset financed fails, repayment will not come out of general

9    treasury funds – meaning the taxpayer will not have to foot the bill.")

10   At the same time, however, Congress understood and protected the creditors of the special

11   entity borrowing the money raised by the bond financing (and upon whose success the bonds

12   depend).  Section 928(b) essentially subordinates any lien held by bondholders to "necessary

13   operating expenses of such project or system . . . ."  As stated again in *Collier*:

14        The general purpose of this approach is to permit the continued operation or
      functioning of the system, project, or function that was financed by the revenue
15    bonds. Without such continued operation, there is not likely to be a continued source
      of funds from which to service the bonds.  The pledged revenues would not be
16    permitted to be used for any other governmental purpose, but would be used to pay
      operating expenses to facilitate a workout and successful confirmation of an
17    adjustment plan.

18   6 COLLIER ON BANKRUPTCY, *supra*, at ¶ 928.03.

19   Congress passed the final set of amendments relevant to this case in 1994.  Although these

20   amendments did not change the definition of municipality in Section 101(40), they did indicate a

21   narrowing of eligibility.  Before the 1994 amendments, States merely had to generally authorize

22   a municipality's filing.  Section 402 of the 1994 Act, however, amended Section 109(c)(2) of the

23   Code by striking "generally authorized" and inserting "specifically authorized, in its capacity as

24   a municipality or by name."  Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 402

25   (1994).

26   Nevada, along with a majority of States, has not specifically authorized its municipalities to

27   file Chapter 9 bankruptcy.  *See* Daniel J. Freyberg, *Municipal Bankruptcy and Express State*

28

*Authorization to Be a Chapter 9 Debtor: Current State Approaches to Municipal Insolvency-and What Will States Do Now?*, 23 OHIO N.U. L. REV. 1001, 1008-09 (1997) (finding 14 States that had specifically authorized municipalities to file Chapter 9); NATIONAL BANKRUPTCY REVIEW COMM'N, BANKRUPTCY: THE NEXT TWENTY YEARS-NATIONAL BANKRUPTCY REVIEW COMMISSION FINAL REPORT, OCTOBER 20, 1997, at 988 n.2431 (1997) (finding 12 States that had specifically authorized municipalities to file Chapter 9).  To the contrary, Nevada has enacted a elaborate and complete scheme of regulation for local municipalities that does not grant municipalities the right to file Chapter 9 bankruptcy.  NEV. REV. STAT. §§ 354.655-.725.

(5)    Summary of Legislative Review

This review of the legislation, suggested by *Travelers*, *Davenport,* and *de la Cruz* in order to find the pre-1978 understanding of municipality, suggests that Chapter 9's origins looked initially and with great weight into the ability of the entity or enterprise to tax or levy assessments.  It is this ability that attracted the disapproval of the Supreme Court with respect to Congress's initial efforts to extend federal bankruptcy relief to State entities.  Put simply, the Court saw Tenth Amendment concerns in a federal procedure that could force State and local governments to tax their citizens without their direct consent.

But starting in 1946, Congress moved away from a test that centered on taxing powers.  Recognizing the rise of new forms of municipal finance, the 1946 amendments opened up then-Chapter IX to agencies and other departments of local government that, while devoid of the power to tax, had the ability to contract and to issue debt.  This recognition extended through the 1976 amendments.  Even though these amendments came thirty years later, they also acknowledged that private companies can facilitate municipalities' missions without themselves becoming municipalities.  As noted in the debates leading up to the 1976 amendments, "[t]hese transactions should really be handled outside the Chapter IX case."  121 CONG. REC. 39,412 (1975) (remarks of Rep. Edwards).

The 1988 amendments cemented this view.  Congress added Section 928 to continue the separate treatment of revenues from special revenue bond projects and revenues arising from

16

1 | taxation.  This structuring recognizes that entities which facilitate public functions do not raise

2 | the historic concerns that have animated the various definitions related to Chapter 9 eligibility.

3 | Congress has essentially assumed that, while such entities are affiliated with municipalities, they

4 | are not municipalities themselves.

5 |      b. Caselaw Interpretations of the Bankruptcy Code's Definition of

6 |        "Municipality"

7 |   Along with the legislative developments, caselaw similarly evolved to recognize that

8 | entities created to facilitate public financing of infrastructure projects might not themselves be

9 | municipalities.  One of the first cases to examine the modern definition of "municipality" was *Ex*

10 | *parte York County Natural Gas Authority*, 238 F. Supp. 964 (W.D.S.C. 1965), *modified on other*

11 | *grounds by*, *Mozingo v. York County Natural Gas Authority*, 362 F.2d 78 (4th Cir. 1965), *cert.*

12 | *denied*, 383 U.S. 970 (1966).  There, the court had before it the 1946 definition of

13 | "municipality."  The entity before it had been created by the South Carolina Legislature in 1954.

14 | The authorizing legislation stated:

15 |    There is hereby created a body corporate and politic of perpetual succession to be
16 |    known as the York County Natural Gas Authority (hereinafter sometimes referred to
   as the authority). It shall be the function of the authority to purchase, lease, acquire,
   build, construct, maintain and operate natural gas distribution systems within the
17 |    service area . . . .

18 | *York County*, 238 F. Supp. at 966 (quoting Section 1 of the South Carolina General Assembly's

19 | Act 959 of 1954, as subsequently amended).  The same legislation gave the gas authority a full

20 | set of rights, powers and duties with respect to its management, operations and business affairs,

21 | and identified the authority as a "body corporate and politic."

22 |   The legislation also gave the gas authority the power to issue revenue bonds, but such

23 | bonds had to be non-recourse as to the State and as to any of the other public entities served by

24 | the gas authority.  *Id*. at 966-67.  After its formation, the gas authority had financial trouble,

25 | engaged in refinancing efforts, and ultimately filed a petition under Chapter IX.

26 |   Its status as an eligible Chapter IX debtor was questioned.  Given the scope of the

27 | legislative grant creating it, however, the court held that the gas authority was a "public agency"

28 |

1  as referred to in Chapter IX's definition of "municipality."  In so holding, the court stated that

2  "[t]he legal test between a private or public authority or agency is whether the authority or

3  agency is subject to control by public authority, state or municipal."  *Id.* at 976 & n. 11 (quoting

4  *Kerr v. Enoch Pratt Free Library of Baltimore*, 54 F. Supp. 514 (D.C. Md. 1944)).[15]  Without

5  much discussion, *York County* apparently considered it self-evident that the gas authority

6  qualified as an agency or authority within the meaning of the statute.

7       The next case to examine the definition of municipality in any detail was *In re North and*

8  *South Shenango Joint Municipal Authority*, 14 B.R. 414 (Bankr. W.D. Pa. 1981), *rev'd on other*

9  *grounds*, 80 B.R. 57 (W.D. Pa. 1982).[16]  In *Shenango*, the subject entity was a municipal

10 authority established to construct and operate a sewer system on behalf of two Pennsylvania

11 townships.  The bankruptcy court held that the entity was a "municipality" under the 1978

12 Bankruptcy Code essentially for three reasons: (1) the entity was "incorporated" under

13 Pennsylvania's Municipality Authorities Act, *id.* at 415;  (2) state caselaw already had classified

14 municipal authorities created under this act as public agencies and instrumentalities of the State,

15 *id.* at 418; and (3) the entity had governmental powers conferred upon it by statute, including the

16 power of eminent domain, and the power to assess sewer and water main construction costs, *id.*

17 at 415-16.  *Shenango* thus not only looked to the level of State control over the entity's

18 organization and operations, but also the intent of the State that created it.

19      The characterization used by the State that created the entity at issue was also a factor in *In*

20 *re Pleasant View Utility Dist. of Cheatham County*, 24 B.R. 632 (Bankr. M.D. Tenn. 1982).

21 There, a county had created the debtor utility district to provide water services.  The district had

22 the authority to issue revenue bonds, and did so by resolution of its governing board of

23 commissioners.  *Id.* at 634.

24 ─────────────────

25      [15]*Kerr* was a civil rights case in which the issue of the status of the entity was relevant for the state
action doctrine under the Fourteenth Amendment.

26

27      [16]The district court in *Shenango* did not quibble with the bankruptcy court's analysis of whether the
entity was a municipality.  It reversed, however, based upon its conclusion that Pennsylvania law did not

28 authorize the municipality to file a Chapter 9 petition.

1    Unlike *York County* and, to a lesser extent, *Shenango*, the case does not give any indication

2    whether there was any State control over the district's operations or management.   With

3    virtually no analysis, *Pleasant View* concluded that the district was a municipality for bankruptcy

4    purposes:

5        The parties do not seriously dispute that the District is a municipality as defined by
         the Bankruptcy Code.  11 U.S.C.A. § 101(29) (West 1979) defines municipality as a
6        'political subdivision or public agency or instrumentality of a State.'   This definition
         clearly encompasses a utility district such as the debtor, which [Tennessee law]
7        classifies as a municipality or public corporation.[17]

8    *Pleasant View*, 24 B.R. at 635.  The court also noted that other provisions of the same chapter

9    empowered such districts to make assessments, condemn property, and operate the utilities

10   controlled by the district for the public benefit.  *Id.*

11   The next series of cases examining the definition of "municipality" focused on *York*

12   *County's* concept of control.  In *In re Greene County Hosp.*, 59 B.R. 388 (S.D. Miss. 1986), for

13   example, a community hospital filed for Chapter 9 bankruptcy.  The bankruptcy court

14   determined that the hospital was eligible to be a debtor under Chapter 9, and the district court

15   affirmed.

16   According to the district court, the bankruptcy court had correctly determined that the

17   hospital was a public agency, and thus a municipality.  The district court adopted *York County*'s

18   definition of public agency: "The legal test between a private or public authority or agency is

19   whether the authority or agency is subject to control by public authority, state or municipal."

20   *Greene County Hospital*, 59 B.R. at 389 (citing *York County*, 238 F. Supp. at 976).  The district

21   court did not consider other aspects of the hospital's nature, purpose or governance, but rather

22   affirmed based on the amount of public control.

23   _____

24       [17]*Pleasant View* relied on TENN. CODE § 7-82-301, which provided in relevant part:
             From and after the date of the making and filing of an order of incorporation, the
25       district so incorporated shall be a "municipality" or public corporation in perpetuity under its
         corporate name, and the district shall in that name be a body politic and corporate with power
26       of perpetual succession, but without any power to levy or collect taxes. Charges for services
         authorized in this chapter shall not be construed as taxes. The powers of each district shall be
27       vested in and exercised by a majority of the members of the board of commissioners of the
         district.

28

                                        19

The district court found that even though community hospitals in Mississippi controlled their own day-to-day hospital operations, the county board of supervisors controlled issues relating to property management.  According to the district court, this was enough to make the hospital a public agency of Mississippi, and, therefore, a municipality under the Bankruptcy Code.  *Id.* at 390.

In reaching this conclusion, the district court seemed to use flawed reasoning:  while it is true that the complete absence of public control likely would establish that an entity is not a municipality, the converse is not necessarily true.  A limited measure of public control, regulation or oversight simply does not, by itself, make an entity a public agency.  Otherwise, heavily regulated industries, such as casinos and taxi cabs, would be municipalities.

The absence of control was also an issue in *In re Ellicott School Bldg. Authority*, 150 B.R. 261 (Bankr. D. Colo. 1992).  There, a school building authority was created under Colorado's nonprofit corporation act for the purpose of acquiring land and constructing a school.  The authority had the power to issue revenue bonds to finance the purchase and did so.  The authority's revenues consisted of rent paid by the school district for the use of the school, and this rental stream was the authority's sole authorized source of revenue.  The authority had no power to levy taxes or make assessments.[18]

The authority had been structured as a nonprofit corporation to meet the requirements of IRS Revenue Ruling 63-20, "in order to qualify as a governmental or quasi-governmental issuer whose obligation may then qualify as tax exempt under . . . the Tax Code . . . ."  150 B.R. at 263. Based on the contents of the disclosure statement related to the authority's revenue bonds, and the court's finding that "no governmental entity exercises any right of control" over the authority, the court concluded that the authority was not a municipality within the meaning of the Bankruptcy Code.

---

[18]In this respect, the entity seems to be similar to the debtor in *In re Cottonwood Water and Sanitation Dist., Douglas County, Colo.*, 138 B.R. 973 (Bankr. D. Colo. 1992), in which no issue of the status of the debtor as a municipality was raised.

1    In reaching this holding, the court relied on the control test set forth in *York County* and

2    *Greene County Hospital*.  Important for this case, *Ellicott* is instructive in the treatment given to

3    an issuer of tax exempt municipal bonds; contrary to the thrust and purpose of the 1946

4    Amendments to the definition of municipality, the court held that the authority at issue – even

5    though it issued tax-exempt bonds – could not qualify as a municipality.  Here, of course, there

6    are at least two major distinctions: first, the Director, and not LVMC, issued the Bonds, and

7    second, the State of Nevada has retained the ability to control significant parts of LVMC's

8    governance and operations.

9    The designations used by local authorities were again at issue in *In re Sullivan County*

10   *Regional Refuse Disposal Dist.*, 165 B.R. 60 (Bankr. D.N.H. 1994).  There, under State and

11   federal legislation enacted to encourage cities to band together to achieve the environmental and

12   economic benefits associated with large-scale waste-disposal operations, the debtor had been set

13   up as a "privatization" joint venture.  Among the members of the joint venture were towns,

14   cities, and a private company that owned and operated a waste-to-energy rubbish incinerator.

15   The district agreed to pay the private incinerator owner/operator certain guaranteed minimum

16   amounts for the use of the incinerator, and the district in turn collected tipping fees from its

17   customers.

18   In theory, the district had the power to assess member cities for any shortfall in revenue,

19   but in practice were unable to actually make any assessments because the member cities voted to

20   block such assessments.  *Id.* at 66.  *Sullivan County*'s analysis of whether the district is a

21   municipality is somewhat cursory.  Essentially, because State law described the district as a

22   "body politic and corporate," the court concluded that the district was a municipality.  *Id.*  The

23   court further stated: "[i]t is beyond dispute that [the district] is a political subdivision of the state

24   in implementing federally mandated solid waste laws."  *Id.* at 73.

25   While *Sullivan County* did not make any attempt to parse Section 101(40)'s terms

26   "political subdivision," "public agency" or "instrumentality of a state," the case is instructive in

27   one respect:  it gave significant weight to how State law classified and treated the district.

28

1    Both control and local designation came together in *In re Westport Transit District*, 165

2    B.R. 93 (Bankr. D. Conn. 1994).  There, the town of Westport created a transit district in order to

3    provide public transportation services to its citizens.  State enabling statutes identified such

4    districts as bodies "corporate and politic" and provided for such districts to assume a number of

5    powers and duties within their boundaries otherwise held by the State's department of

6    transportation.  These included setting fares, regulating transit systems, and using revenues to

7    subsidize privately-owned transit companies.  *Id*. at 95-96.

8    In addition, State authority allowed the district to have the power of eminent domain and

9    the ability to issue bonds.  When the district filed a Chapter 9, it was challenged on the grounds,

10    among others, that the district was not a municipality.  The bankruptcy court disagreed.

11    The objecting party argued that the district was an instrumentality of the town of Westport,

12    and that the Bankruptcy Code definition of municipality required the district instead to be an

13    instrumentality of the State.  *Westport* rejected this argument, citing *York County* (which held

14    that public agencies are subject to governmental control, "state *or* municipal").  It also looked to

15    the significant amounts of governmental authority the district possessed, such as eminent

16    domain, and the power to choose between public or private solutions to the transit problems with

17    its geographical area.  Combined with the State designation, the court found this to be a

18    sufficient basis to hold that the district was a municipality within the meaning of the Bankruptcy

19    Code.

20    Perhaps the best-known case addressing the definition of municipality is *In re County of*

21    *Orange*, 183 B.R. 594 (Bankr. C.D. Cal. 1995).  In *County of Orange*, the county treasurer had

22    created a commingled investment pool of government funds received from different

23    governmental entities.  The treasurer then made a series of disastrous financial decisions which

24    drained the pool of much of its capital.  When the county filed for Chapter 9 relief, this separate

25    investment pool, referred to by the court as OCIP, also filed a Chapter 9 petition.  OCIP's status

26    as a municipality was challenged, and the bankruptcy court agreed it was not a municipality.

27

28

1    In reaching its conclusion, *County of Orange* methodically parsed the meaning of the term

2  "municipality," and its history.  It made several findings on its way to holding that OCIP was not

3  a municipality.  First, it held that OCIP was not  a "political subdivision" because, as the court

4  found, "political subdivision" was a phrase reserved for public entities bestowed with sovereign

5  powers, such as the power of eminent domain, the police power, or the power to assess and levy

6  taxes.  Second, the court held that OCIP was not a "public agency" because the court held that

7  this phrase was reserved for publically-controlled entities created to operate revenue-producing

8  enterprises and/or to finance revenue-producing enterprises through the use of government-

9  issued bonds.  Finally, the court held that OCIP was not an "instrumentality of a State," because

10  the court held that this phrase was reserved for specific kinds of improvement districts of which

11  OCIP was not one.

12    According to *County of Orange*, these meanings could be derived from line item

13  descriptions of the specific types of entities qualified to file municipal bankruptcy contained in

14  the predecessor statute to Chapter 9.  *See County of Orange*, 183 B.R. at 600-603 (arguing that

15  Section 81(7) of the 1898 Act defined political subdivisions, Section 81(6) defined public

16  agencies and Sections 81(1)-(5) defined instrumentalities).

17    *County of Orange* has been criticized for being overly-precise in creating these definitions

18  of the terms "political subdivision," "public agency" and "instrumentality of a State."

19    The suggestion that the three categories "political subdivision," "public agency" and
20    "instrumentality of a State" should be defined exclusively by the categories of
       agencies and instrumentalities set forth in Section 81 of the 1937 Act is misplaced
21    because the Bankruptcy Code definition of municipality is strikingly dissimilar to the
       language of Section 81 of the 1937 Act; the suggestion fails to give effect to
       Congress's intention to broaden the definition of 'municipality.'"
22

23  2 COLLIER ON BANKRUPTCY, *supra*, at ¶ 109.04[3][a].

24    Put simply, although Congress stated that "[n]o substantive or limiting result is intended,"

25  H.R. REP. NO. 94-686, at 16 (1975), the 1976 elimination of the lengthy description of the

26  various types of entities and the switch to generic descriptions was not completely without

27  effect.  Given the subtle and constant change in municipal organization and finance, Congress

28

clearly did not want to limit its definitions in a way that restricted eligibility.  To give effect to Congress's intent to "broaden the applicability of Chapter IX as much as possible," *id.* at 20, courts cannot be shackled to difficult-to-find and elaborate descriptions of mid-20th Century municipal organization.  That conclusion, however, does not answer the central question posed here: what is an instrumentality for purposes of Section 101(40)?  Answering this question requires a further synthesis of the history and interpretation of the definition.

2.    **Synthesizing the Components of an Instrumentality**

The examination of the history of the Bankruptcy Code's use of municipality and instrumentality show three distinct threads.  The first thread focuses on whether the entity has any of the powers typically associated with sovereignty, such as eminent domain, the taxing power or sovereign immunity.  *E.g.*, *Westport Transit District*, 165 B.R. at 95-96; *Shenango*, 80 B.R. at 415-16.

If those powers are absent or only weakly present, then courts examine whether the entity has a public purpose.  If so, the level of control exerted by the State (or its agreed agents) on the entity's activities in furtherance of that purpose is relevant; the more control over day-to-day activities, the more likely the entity is an instrumentality under Section 101(40).  *E.g.*, *Ellicott School Bldg. Authority*, 150 B.R. at 263; *Greene County Hospital*, 59 B.R. at 389; *York County*, 238 F. Supp. at 976 & n.11.

The final thread analyzes the effect of the State's own designation and treatment of the entity.  *E.g.*, *County of Orange*, 183 B.R. at 600-03; *Sullivan County*, 165 B.R. at 66; *Pleasant View*, 24 B.R. at 634.

a.    Components of a Federal Definition of "Municipality"

As indicated above, the extent to which these threads must be interwoven to constitute a "municipality" under the Bankruptcy Code starts with an examination of the function and powers of the entity.  Does the entity have traditional governmental attributes or does it engage in traditional governmental functions?  If it does, it likely is a municipality because it is probably a political subdivision or State agency, separate components of the definition of municipality.  *See*

1   *County of Orange,* 183 B.R. at 600-03; *Shenango*, 80 B.R. at 415-16. If not, then the inquiry

2   moves to whether the entity is an instrumentality, and that inquiry turns to the level of State

3   control.

4        If the entity's purpose or attributes reflect a public purpose – that is, they reflect goals and

5   activities which augment the State's provision of some public function – the inquiry next focuses

6   on the extent to which the State controls the implementation of those functions and attributes.

7   This inquiry is necessary because many entities have public functions – the Red Cross and other

8   charities come to mind – but are not instrumentalities of the State because of the lack of any

9   State process to control their activities. If there is State control coupled with public function,

10  then the nature and extent of that control determine whether the entity is an instrumentality. In

11  this regard, the type of control is critical. If the control retained or exercised is necessary or

12  designed to allow the State to manage its finances or its fisc – the traditional concerns of Chapter

13  9 – then the entity is an instrumentality. If the control, however, is more akin to oversight or

14  regulation, then the entity is not an instrumentality. *See Ellicott School Bldg. Authority*, 150

15  B.R. at 263; *Greene County Hospital*, 59 B.R. at 389.

16       Finally, some deference is given to the State's categorization of the entity. While not

17  determinative, this thread reflects the policy of not interfering with a State's ability to select the

18  form of financial assistance its agencies and departments may use. Given that the 1994

19  amendments required States to authorize specifically a Chapter 9 filing, it is apparent that

20  Congress desired States to have great leeway in ordering these functions. In many cases, the

21  State's classification will be determinative not because of the label applied, but because that

22  label carries with it, under State law, the powers and functions that are essential to a

23  municipality. *See County of Orange*, 183 B.R. at 600-03.

24       Each of these inquiries is essentially factual. Given the myriad ways in which the State can

25  express and disburse its power, what may be sufficient control in one context is insufficient in

26  another. Often, however, the design is made explicit through the State's own categorization of

27  the entity.

28

1

b.    LVMC's Representation That It Is An Instrumentality

2      Ambac contends, however, that LVMC's execution of the Tax Certificate essentially

3  overrides this analysis.  Ambac's main argument rests on the undisputed fact that LVMC

4  represented in the bond offering that it was an instrumentality of the State of Nevada and that it

5  was under control of the Governor of Nevada.  Since "instrumentality" is part of the definition of

6  "municipality" in Section 101(40), it believes this statement essentially settles the matter.

7      The fatal problem with Ambac's argument is that the Supreme Court has rejected its basic

8  premise – that a word used in one federal statute necessarily has the same meaning in another

9  federal statute.  In *United States v. Reorganized CF&I Fabricators of Utah, Inc*., 518 U.S. 213

10 (1996), for example, the issue was whether an exaction denominated a tax by Congress in

11 Section 4971 of the Tax Code was an "excise tax" for purposes of priority under Section

12 507(a)(7)(E) of the Bankruptcy Code.  In rejecting that the exaction was even a tax, and hence

13 not an excise tax, the Court used its own historical definition of "tax" developed for purposes of

14 priority claims under both the 1898 Act and the 1978 Code.  Its analysis of why it did not simply

15 adopt Congress's label is worth quoting at length:

16          Here and there in the Bankruptcy Code Congress has included specific
           directions that establish the significance for bankruptcy law of a term used elsewhere
17          in the federal statutes. Some bankruptcy provisions deal specifically with subjects as
           identified by terms defined outside the Bankruptcy Code . . . . Other bankruptcy
18          provisions directly adopt definitions contained in other statutes; . . . .  Not
           surprisingly, there are places where the Bankruptcy Code makes referential use of the
19          Internal Revenue Code, . . . .
               It is significant, therefore, that Congress included no such reference in §
20          507(a)(7)(E), even though the Bankruptcy Code itself provides no definition of
           "excise," "tax," or "excise tax." This absence of any explicit connector between §§
21          507(a)(7)(E) and 4971 is all the more revealing in light of the . . . history of
           interpretive practice in determining whether a "tax" so called in the statute creating it
22          is also a "tax" (as distinct from a debt or penalty) for the purpose of setting the
           priority of a claim under the bankruptcy laws.

23

24 *Reorganized CF&I Fabricators*, 518 U.S. at 219-20.

25      The Court expanded on the meaning of a lack of a specific cross-reference later in its

26 opinion:

27          Congress could, of course, have intended a different interpretive method for reading
           terms used in the Bankruptcy Code it created in 1978.  But if it had so intended we

28

26

would expect some statutory indication, *see Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759-760, 88 L.Ed.2d 859 (1986), whereas the most obvious statutory indicator is very much to the contrary: in the specific instances noted before, it would have been redundant for Congress to refer specifically to Internal Revenue Code definitions of given terms if such cross-identity were to be assumed or presumed, as a matter of interpretive course.

*Reorganized CF&I Fabricators*, 518 U.S. at 221-22.

This analysis acknowledges two points: that in a perfect world identical words would have identical meanings wherever and whenever used; and that we do not live in a perfect world. For purposes of statutory analysis, it is not uncommon for the same word or phrase to have different meanings in different codes; the scope of the word "lease," for example, is particularly slippery in the tax code,[19] and in any event has different nuances than "lease" in the Uniform Commercial Code, U.C.C. § 2A-103(1)(j), or under general accounting principles. *See* FIN. ACCOUNTING STANDARDS BOARD, Statement of Fin. Accounting Standard No. 13 (1976); INT'L ACCOUNTING STANDARDS BOARD, Int'l Accounting Standard 17 (2009). "Security interest" is another example of the same words having different meanings in different codes. *Compare* 26 U.S.C. § 6323(h)(1) *with* 11 U.S.C. § 101(51) *with* U.C.C. § 1-201(37).

Against this background, it is critical to note that LVMC did not make its representation in connection with an acknowledgment that it was ineligible for Chapter 11. Rather, LVMC made this statement in connection with its efforts to ensure that interest on the Bonds would be free from federal taxation – indeed, the Bond offering itself told investors that LVMC could not waive bankruptcy protection.[20] The different context underscores why this court cannot find LVMC is an instrumentality under the Bankruptcy Code simply because it asserted it was one

---

[19]*See, e.g.*, 26 U.S.C. § 4217 ("For purposes of this chapter, the lease of an article (including any renewal or any extension of a lease or any subsequent lease of such article) by the manufacturer, producer, or importer shall be considered a sale of such article); 26 U.S.C. § 4002(c)(1) (for purposes of excise taxes on luxury vehicles, "the lease of a vehicle (including any renewal or any extension of a lease or any subsequent lease of such vehicle) by any person shall be considered a sale of such vehicle at retail.").

[20]The Offering Statement contained, on page 75, the following sentence: "Although the Company has no present intention to institute bankruptcy proceedings or protection under any other debtor relief laws, it may not be prevented from instituting such proceedings or seeking such relief or protection."

1    under the Tax Code.  While the various definitions may be similar, they are not the same, thus

2    necessitating a separate and full inquiry as to the content of the term "instrumentality" in the

3    Bankruptcy Code.[21]

4        But while the argument regarding identity of meaning fails, there is some merit in Ambac's

5    control argument.  As noted above, control is an essential element in determining whether an

6    entity is an instrumentality under Section 101(40).  Ambac contends that LVMC's representation

7    that the State of Nevada had control over its activities is a factual statement that satisfies the

8    elements of control required in any Section 101(40) analysis.

9        Ambac's argument thus resolves into an assertion that the level of "control" which leads to

10   a finding of an instrumentality under tax law is the same level of  "control" Section 101(40)

11   requires for its use of "instrumentality."  There is some precedent for this analogy; an entity's

12   attributes for tax purposes can often be quite relevant when determining bankruptcy eligibility.

13   *See, e.g.*, *In re Sung Soo Rim Irrevocable Intervivos Trust*, 177 B.R. 673, 677-79 (Bankr. C.D.

14   Cal. 1995) (using federal tax law on spendthrift and business trusts to assess eligibility under §

15   109).

16       To assess this claim, however, the court must examine what "control" was necessary for

17   the tax analysis, and whether the components of that control are consistent with the Bankruptcy

18   Code's purposes.   Only after examining these two aspects of control can the two uses – one tax,

19   the other bankruptcy – be compared.

20

21

22
_____

23   [21]"Instrumentality" is used in many other contexts in federal law.  As noted earlier, it forms part
     of the definitions used in the Foreign Sovereign Immunities Act.  *See First Nat'l City Bank*, 462 U.S. at 624;
24   28 U.S.C. § 1603(a).  It forms part of the definition of government plan under ERISA.  *See Berini v.
     Federal Reserve Bank of St. Louis, Eighth District*, 420 F. Supp. 2d 1021 (E.D. Mo. 2005); 29 U.S.C. §
25   1002(32).  It plays a role in sovereign immunity under the Federal Tort Claims Act.  *Kuntz v. Lamar
     Corp.*, 385 F.3d 1177, 1184 (9th Cir. 2004).  And, relevant here, it also forms part of the analysis as to
26   whether entities or enterprises must pay federal employment taxes on wages; instrumentalities of States
     are exempt.  *See, e.g.*, 26 U.S.C. § 3121(b)(7) (exemption from social security for employees of State
27   instrumentalities); *id.* § 3306(c)(7) (exemption from federal unemployment tax for employees of State
     instrumentalities).

28

1        <u>c.</u>    The Relevance of LVMC's Tax Status as an "Instrumentality"

2        LVMC's instrumentality status was critical to the Director's issuance of the Bonds.  That

3  status allowed the Director to offer the Bonds on the basis that interest payments would be free

4  of federal tax, which in turn lowered LVMC's cost of expanding and running the monorail.  But

5  one can ask why that was so: the Director issued the Bonds, not LVMC, so why was LVMC's

6  status critical if the Bonds were those of the Director, clearly a State agency?  The answer lies in

7  assumptions made generally by the IRS.  For transactions such as the one at issue here, the IRS

8  views a loan to an instrumentality as a loan to the governmental unit on behalf of the

9  instrumentality.  Rev. Proc. 82-26, § 3.041(a), 1982-1 C.B. 476; I.R.S. Priv. Ltr. Rul. 96-24-013

10  (March 15, 1996).

11        In this respect, tax law favors functional over literal categorizations; it looks to the status of

12  the ultimate borrower – LVMC – and not of the legal issuer of the Bonds – the Director.  Under

13  this analysis, if LVMC is an instrumentality under the tax considerations, then the Financing

14  Agreement to LVMC is treated as a loan to a governmental unit, and LVMC's payment of

15  interest on that loan is accordingly free of federal tax to the holders of the Bonds.  In short, the

16  regulations leapfrog testing the nominal obligor on the Bonds in favor of imposing a test on the

17  ultimate obligor for the project.

18        This policy may promote collection of federal taxes, but it has little relevancy to the federal

19  policy concerns behind Chapter 9 availability.  As shown by the legislative history of Chapter 9

20  eligibility, Congress has been quite solicitous of States' protection of their revenues and their

21  ability to control how they perform their essential public functions.  To the extent that such

22  integral government operations have been held or exercised by entities filing federal bankruptcy,

23  courts have also been solicitous in classifying the entities involved as municipalities.

24        Here, however, the State of Nevada's involvement falls in a somewhat unexplored area

25  between essential public function and State oversight.  As a result, while the tax authorities

26  reviewing the appropriate level of control necessary for the Bonds' tax treatment are relevant,

27  they are not controlling in any sense for the simple reason that they incorporate assumptions that

28

do not carry over well into Section 101(40).  Put another way, if an entity is not an instrumentality for tax reasons, it is quite likely it will not be an instrumentality for bankruptcy purposes; the obverse, however, may not be true.  The level of control necessary for federal municipality status, since it focuses on the exercise of traditional municipal powers, is generally higher than that required for tax exempt status.  But tax analysis can inform the decision of the necessary level of control, and thus the court will canvass Ambac's tax authorities.

(1)    Revenue Ruling 57-128

There is a long and full history of what is required for interest on revenue bonds to be tax exempt.  Most agree that the inquiry starts with a 1957 Internal Revenue Service ("IRS") Revenue Ruling.  In Revenue Ruling 57-128, 1957-1 C.B. 311, a voluntary unincorporated organization formed by State insurance officials to promote uniformity in legislation affecting insurance sought exemption from having to pay federal unemployment tax on its employees.  The association's membership consisted of commissioners, directors, superintendents, or other officials who by law were charged with the responsibility of supervising the insurance business within their respective States.  The organization's officers were selected from its members.

The IRS, in finding that such an organization was an instrumentality, looked at the following six factors:

> In cases involving the status of an organization as an instrumentality of one or more states or political subdivisions, the following factors are taken into consideration: (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

Rev. Rul. 57-128, 1957-1 C.B. 311, at 3.[22]

---

[22]A revenue ruling is "an official interpretation by the Service that has been published in the Internal Revenue Bulletin . . .  for the information and guidance of taxpayers, Internal Revenue Service officials, and others concerned." Treas. Reg. § 601.601(d)(2)(i)(a).  Revenue rulings "do not have the force and effect of Treasury Department Regulations . . ., but are published to provide precedents to be

30

1    Revenue Ruling 57-158 has been applied in a wide array of cases.  In Rev. Rul. 65-26,

2    1965-1 C.B. 444, for example, a municipal league had been formed as a nonprofit corporation.

3    Its purpose was to improve municipal government and the general welfare of the cities in the

4    State in which it was formed.  Its members were public officials from the member cities.  It

5    published a magazine, conducted conferences and sponsored research and surveys.  Its income

6    derived solely from the sale of these products.  Given this attenuated connection with

7    government, and the fact that the board members acted as individuals and not as officers of their

8    respective municipalities, the IRS took the position that the entity was not an instrumentality.[23]

9    In contrast, in Rev. Rule 65-196, three municipal corporations formed an entity to jointly

10   own and operate recreational facilities for their residents.  Each municipality appointed the

11   members of the governing board; in contrast to Rev. Rul. 65-26, however, the members could

12   not hold any other public office.  One of the member municipalities issued the industrial revenue

13   bonds to finance the project, and the three municipalities took title to the project in proportion to

14   their respective populations.  Upon dissolution, remaining assets would be distributed to the

15   member municipalities.  Given the more direct involvement of the municipalities, from creation

16   to finance to ownership to dissolution, the IRS stated that the entity was an instrumentality.  *Id.*

17   *See also* Rev. Rul. 79-95, 1979-1 C.B. 331 (local transit authority exempt from federal excise tax

18

19   ────────────────

20   used in the disposition of other cases, and may be cited and relied upon for that purpose."  *Id.* §
     601.601(d)(2)(v)(d).
21       The Ninth Circuit states that the deference required for a Revenue Ruling "depends on the
     'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with
     earlier and later pronouncements, and all those factors which give it the power to persuade . . .'"
22   *Omohundro v. United States*, 300 F.3d 1065, 1068 (9th Cir. 2002) (quoting *United States v. Mead Corp.*,
     533 U.S. 218, 228 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).
23       By contrast, the Tax Court characterizes a revenue ruling as the IRS's litigation position, which
     carries no more weight than any well-reasoned argument.  *See, e.g.*, *McLaulin v. Comm'r*, 115 T.C. 255,
24   263 (2000); *Norfolk S. Corp. v. Comm'r*, 104 T.C. 13, 45-46 (1995).

25       [23]The IRS also indicated that a private non-stock corporation formed by private individuals was not
     an instrumentality, even though State officials were authorized to assist it in carrying out its functions.
26   The owners controlled the entity, although the State paid them a monthly fee to attend board meetings.
     Finding that the entity was formed for private purposes, and that the State's involvement was no more
27   than general regulation, the IRS stated that the entity was not an instrumentality.  Rev. Rul. 69-453, 1969-
     2 C.B. 192.
28

1  given its possession of the power of eminent domain and the power to appoint transit police with

2  the same authority as municipal police).

3                    (2)    Beyond Revenue Ruling 57-128

4       The IRS reiterated its criteria, albeit in a slightly different manner, in Rev. Rul. 89-49,

5  1989-1 C.B. 117.  There, a volunteer fire department, organized under a State's nonprofit

6  corporation law, had contracted with several municipalities for fire protection service.  It also

7  received donations from affected citizens.  It was governed by its own board of trustees, who

8  were not selected by any municipal agency.  The question arose as to whether it was an

9  instrumentality of the State, as such status would greatly affect its retirement plan for its

10  firefighter employees.  In holding that it was not, the IRS said:

11       One of the most important factors to be considered in determining whether an
         organization is an agency or instrumentality of the United States or any state or
12       political subdivision is the degree of control that the federal or state government has
         over the organization's everyday operations.  Other factors include: (1) whether there
13       is specific legislation creating the organization; (2) the source of funds for the
         organization; (3) the manner in which the organization's trustees or operating board
14       are selected; and (4) whether the applicable governmental unit considers the
         employees of the organization to be employees of the applicable governmental unit.
15       Although all of the above factors are considered in determining whether an
         organization is an agency of a government, the mere satisfaction of one or all of the
16       factors is not necessarily determinative.[24]

17       Here, LVMC's execution of the Tax Certificate undoubtedly relied upon the level of

18  control imposed by the State of Nevada.  LVMC must present its annual budget to the Governor,

19  who has the power to veto it.  LVMC must obtain the Governor's consent for its fare schedule.

20  The Governor selects its board of directors.  LVMC's assets escheat to the State upon its

21  dissolution.  Each of these attributes goes directly to the third factor in Rev. Rul. 57-158,

22  _____

23       [24]Professor Aprill states that this test:
         differ[s] somewhat from th[at] established by Revenue Ruling 57-128 for the payroll tax
24       provisions. . . .  In addition to control over the organization's everyday operations, Rev. Rul.
         89-49 lists the following factors: "(1) whether there is specific legislation creating the
25       organization; (2) the source of funds for the organization; (3) the manner in which the
         organization's trustees or operating board are selected; and (4) whether the applicable
26       governmental unit considers the employees of the organization to be employees of the
         applicable governmental unit."
27  Ellen P. Aprill, *The Integral, the Essential, and the Instrumental: Federal Income Tax Treatment of
    Governmental Affiliates*, 23 J. CORP. L. 803, 822 n.162 (1998).

28
                                        32

1    "whether there are any private interests involved, or whether the states or political subdivisions

2    involved have the powers and interests of an owner," as well as the fourth factor, "whether

3    control and supervision of the organization is vested in public authority or authorities."  Here,

4    the assertion is that the participation in strategic and high level decisions – such as budget and

5    selection of directors – when combined with the residual interest in any assets, is sufficient for

6    control under the tax instrumentality test, and thus should be sufficient for the bankruptcy

7    instrumentality test.

8         But the tax tests are not rigid; they rely on factors for which the person applying the test

9    must supply the weight to be given.  Two of the factors highlighted in Rev. Rul. 89-49 favor

10    non-instrumentality status: there was no specific legislation creating LVMC – it is incorporated

11    under the State's nonprofit corporation law – and its operating funds come from fares paid by the

12    general public, not taxes.  These factors were also present in Rev. Rul. 57-128.  Moreover, its

13    day-to-day operations are vested in officers not selected by public officials, and it has incurred

14    debt beyond that related to the Bonds. Moreover, as shown by the Trustee's motions with respect

15    to cash collateral, entities other than public entities can and do control its ability to incur and pay

16    day-to-day and strategic expenses.  Finally, its uneasy relationship with the RTC, a public

17    agency with eminent domain power, shows that Rev. Rul. 57-158's second factor – "whether

18    performance of its function is on behalf of one or more states or political subdivisions" – is

19    weak, especially when considering that LVMC is treated by other public agencies as a private

20    entity; LVMC must still obtain a business license and franchise to operate from Clark County,

21    just as would any other business.

22         This uncertainty is, to some extent, to be expected.  As noted in 1998, "[t]he

23    instrumentality tests, of course, do not avoid all difficulty or ambiguity."  Ellen P. Aprill, *The

24    Integral, the Essential, and the Instrumental: Federal Income Tax Treatment of Governmental

25    Affiliates*, 23 J. CORP. L. 803, 822 (1998).[25]  Regardless of treatment under the tax code,

26    ───────────────

27         [25]To the extent that Ambac has commended Professor Aprill's excellent analysis, it appears that LVMC would not meet the instrumentality test suggested by her article.  Her article suggestions looking

28    to 26 U.S.C. § 502(c)(27) and its four-part test to assess whether an enterprise or organization is an

1  however, the instrumentality test under the Bankruptcy Code is separate and independent.  And

2  application of federal bankruptcy principles indicates that LVMC is not a municipality under

3  Section 101(40).

4         *C.*    *LVMC is Not a Municipality Under the Bankruptcy Code*

5        As indicated above, the inquiry under Section 101(40) involves interpretation of three basic

6  sets of characteristics: the extent to which the entity has traditional governmental attributes or

7  engages in traditional governmental functions; the extent to which the State controls the entity's

8  operations, with elements that go to control of the State's finances having more weight than

9  elements that may simply be general regulation; and the extent to which the State itself

10  categorizes the entity as a municipality or instrumentality.

11          **1.**   **Do LVMC's Transportation Goals Constitute Traditional Governmental**

12                 **Functions?**

13        The initial step in determining whether LVMC is a municipality is to examine its functions

14  and operation.  No one seriously contends that LVMC is a political subdivision or agency of the

15  State of Nevada.  It has no power to tax, no power of eminent domain, and no sovereign

16  immunity.  *Westport Transit District*, 165 B.R. at 95-96; *Shenango*, 80 B.R. at 415-16.  *Cf.*

17  *Washington State Dairy Prods. Comm'n v. United States*, 685 F.2d 298 (9th Cir. 1982) (because

18  immunity from taxation is based on "respect for state sovereignty," "only entities possessing at

19  least some portion of the state's sovereign powers or performing traditional government

20  functions qualify for [tax] exemption."); Rev. Rul. 79-95, 1979-1 C.B. 331 (local transit

21  authority exempt from federal excise tax given its possession of the power of eminent domain

22

23

24  instrumentality for tax purposes.  Aprill, 23 J. CORP. L., at 835 ("The four requirements of section
    501(c)(27) regarding creation, control, initial financial commitment, and destination of assets upon

25  dissolution embody the most important requirements underlying exemption for integral parts, section 115
    entities, and instrumentalities. . . . These four conditions could—and should—apply to all governmental

26  affiliates seeking exemption from federal income tax.").  LVMC, however, would appear to fail the initial
    financial commitment condition – since its funding came from a public bond offering, and its current

27  operating revenues come from passenger fares – and these fares exceed its operating expenses (although
    are not enough to meet its scheduled debt service).  As the conditions of 26 U.S.C. § 502(c)(27) are

28  conjunctive, LVMC would appear to fail the proposed test.

1    and the power to appoint transit police with the same authority as municipal police). Treas. Reg.

2    § 1.103-1(b) ("The term "political subdivision," for purposes of this section denotes any division

3    of any State or local governmental unit which is a municipal corporation or which has been

4    delegated the right to exercise part of the sovereign power of the unit.").

5        LVMC is a creature of general nonprofit corporation laws rather than of a specific

6    legislative enactment.  This analysis shows that the first thread of the definition of a municipality

7    – that of direct exercise of a public function – is lacking.  But this absence does not mean that

8    LVMC is not without a public purpose, a point made by the basis of its exemption from federal

9    tax on its income.[26]

10       The argument was also raised that regulation and control cannot be factors.  The example

11   of taxi companies was used; they provide and assist the public function of transportation, and are

12   under regulation of the most intrusive type.  Yet no one seriously considers taxi companies

13   instrumentalities of the State and, so the argument goes, control cannot be a factor.  This is not

14   wrong, yet it is not right either.  Control, as the cases show, matters.  *Ellicott School Bldg.*

15   *Authority*, 150 B.R. at 263; *Greene County Hospital*, 59 B.R. at 389; *York County*, 238 F. Supp.

16   at 976 & n.11.

17       2.    **Does the Control Held by the Governor Rise to the Level Necessary to be a**

18             **"Municipality" Under Section 101(40)?**

19       The analysis then shifts to whether LVMC is an instrumentality of the State of Nevada.  Is

20   it, as *Webster's* stated, "something that serves as an intermediary or agent through which one or

21   more functions of a controlling force are carried out: a part, organ, or subsidiary branch

22   especially of a governing body"?  To answer this question, LVMC's counsel urged the court to

23   adopt the distinction between public function and public purpose.  Public function is the large-

24   scale and comprehensive treatment of a matter of traditional public concern, such as provided by

25   police departments and public schools.  Public purpose, on the other hand, is more diffuse in the

26   

27       [26]LVMC has an exemption under 26 U.S.C. § 501(c)(4), which is given to "[c]ivic leagues or
28   organizations not organized for profit but operated exclusively for the promotion of social welfare . . . ."

1    sense that a private party can engage in an activity that has a public purpose, such as offering

2    private security or charter schools.  Enterprises with a public purpose augment and assist a larger

3    public function, the charge of which is within the State's overall control.[27]

4        While education, for example, may be a traditional governmental function, *see Ellicott*

5    *School Bldg. Authority*, private charter schools are likely not instrumentalities because of the

6    weak level of State control.  Public transportation is also a traditional governmental function, *see*

7    *Westport Transit District*, 165, although the regulation of private taxi companies would rarely be

8    an occasion for labeling a taxi company an instrumentality of the State.[28]

9        Another way to frame this question is to ask whether LVMC operates in place of the State

10   or whether its operations are simply subject to regulation to ensure that LVMC's decisions

11   further the public good.  In this sense, regulation can be extensive and intrusive and not rise to

12   the level of control required by Section 101(40).  Casinos in Nevada, for example, are subject to

13   wide-ranging and comprehensive regulation, but no one seriously contends that this regulation

14   constitutes control sufficient to classify them as instrumentalities of the State.

15       The tougher issues arise when, as here, there is an acknowledged governmental function,

16   but the control is primarily strategic and periodic, rather than operational and constant.  The

17   State's ability and exercise of control over LVMC, both potentially and actually, is somewhat

18   attenuated.  While the Governor has the power to approve LVMC's fares, approve its budget and

19   appoint its directors, LVMC operates its day-to-day business in significant isolation from the

20   State.  It has more than minimal competition from other government agencies, such as the RTC.

21   _____

22       [27]In one sense, it is a public function to provide financing for public works, but a public purpose to
     work with the State in the creation and operation of these public works.  That is the distinction here; the
23   Department is most certainly an agency of the State of Nevada, charged, among other things, with the
     public function of providing financing for public purposes, such as transportation.  LVMC, in contrast, is
24   part of the provision of that public function, but only a part; the traditional entity charged with fulfilling
     the transport public function is the RTC.  *See Westport Transit Dist*., 165 B.R. at 95-96 (finding that
25   entity was municipality rested in part on the entity's power of eminent domain, the power to directly issue
     bonds, and the power to set its own fares).

26

27       [28]Similarly, States regulate insurance companies' rates, as well as the content of their policies, yet
     no one argues that this intrusive level of control transmutes insurance companies into State
28   instrumentalities.

1    It must apply for permission to operate from other public agencies.  Its creditors are not, and do

2    not expect to be, creditors of the State.  It was created with the express and repeated promise that

3    no taxes would be used to fund its operation.  This low level of State control over matters going

4    to essential state sovereignty and essential state functions indicates that LVMC is not a

5    municipality as contemplated by the Bankruptcy Code.

6         LVMC thus has few of the attributes that would lead to its classification as a municipality

7    under Section 101(40). The concerns for State sovereignty that underlie Chapter 9 are absent

8    here.  LVMC exercises no traditional public powers: it cannot tax; it cannot condemn by eminent

9    domain; and it has no sovereign immunity.  *Westport Transit District*, 165 B.R. at 95-96;

10   *Shenango*, 80 B.R. at 415-16.

11        It is beyond doubt that Nevada's involvement in LVMC is significant, and some might say

12   too intrusive for LVMC to be purely private.  But those intrusions are relatively unique, and not

13   designed to protect public finances or the public fisc.  While the elements of control are many –

14   the Governor appoints LVMC's governing body, and has the right to veto its fares and budget –

15   these controls go to the service LVMC provides and not to protection of Nevada's finances.

16        In this light, the controls in place are best viewed more like traditional regulation and less

17   like sovereign specification of function.  While the State of Nevada can guide LVMC's general

18   course, it can do so only from afar and on a periodic basis.  The day-to-day operations are still

19   within the purview of LVMC's officers and employees, without any direct control from a State

20   official.  While the State of Nevada gets the benefit of added transportation options for its

21   citizens and visitors, it is insulated from any great losses – for example, LVMC liabilities are not

22   borne by the State; injuries caused during its operations are LVMC's liabilities, not the State's.

23        But more importantly, although Nevada, through its Governor, guides LVMC's budget and

24   to a certain extent its management, the State is insulated from any of LVMC's operating losses.

25   While the Bonds are obligations, albeit limited and nonrecourse obligations, of the State, the

26   liability on the Bonds proper is not an issue in this case, as LVMC is not a party to and has not

27   guaranteed payment on the Bonds.  Rather, the focus of this case is LVMC's liability under the

28

1    Financing Agreement and its other contracts with private parties such as Bombardier.  As a

2    consequence, this bankruptcy case at most affects the source of the Bonds' repayment, not

3    repayment on the Bonds themselves.[29]  Indeed, that is precisely why the original offering

4    included Ambac's insurance – to augment the sources of repayment.  Moreover, this case affects

5    not only LVMC's obligations related to the Bonds, but also Bombardier and to all LVMC's

6    employees and other creditors.

7         These attributes all derive from the fact that LVMC was set up so that taxpayers would

8    never have to fund it or its operations.  LVMC has no taxing powers, and no independent power

9    to issue obligations which bear tax-free interest.  It has no power of eminent domain.  It has no

10   sovereign immunity.  It has to obtain licenses and franchises just as if it were a purely private

11   party.

12        LVMC thus bears the consequences of its operations in a manner similar to a private entity.

13   *See, e.g.*, H. R. REP. NO. 2246, 79th Cong., 2d Sess. 2-3 (1946); S. REP. NO. 1633, 79th Cong., 2d

14   Sess. 2 (1946).  Its only revenues are those which come from operation of the monorail, and

15   although its fare structure is set by the Governor, that fact is no more problematic for the

16   instrumentality analysis than having insurance companies rate structures set by a State

17   Department of Insurance, or having interest rates set by usury statutes.  Government often

18   controls or regulates how private entities earn their income.   And although LVMC's expenses

19   are limned by the combined effect of the budgetary process and the Governor's approval, the

20   primary restriction on LVMC's ability to incur expense is the Indenture and the Trustee's

21   oversight.

22   ───────────────

23        [29]Some observers might see this argument as sophistry.  If the Bonds are nonrecourse and payable
     only from the amounts LVMC is liable for under the Financing Agreement, then saying that liability on
24   the Bonds is not affected by LVMC's ability to modify its debt under the Financing Agreement is, so the
     argument goes, a distinction without a difference.  Indeed, as shown above, tax law explicitly ignores this
25   formality.
          But holders of the Bonds have at least two sources of repayment: Ambac's insurance would not be
26   affected by any adjustments to LVMC's obligations under the Financing Agreement.  In the grand
     scheme of things, assuming Ambac's solvency, adjustments to LVMC's obligations under the Financing
27   Agreement simply shift the payment obligations to Ambac, a shift that Ambac agreed to and was paid to
     undertake.
28

1    The Governor's control, then, while extensive, is not the type of control that historically

2    has caused courts to label entities or enterprises instrumentalities of the State.  Indeed, given the

3    thrust and mission of LVMC to be independent of the State and its sources of tax revenues, it is

4    best seen as an entity engaged in a public purpose, not an instrumentality carrying out a public

5    function.

6        3.    **Does Nevada Law Treat LVMC as One of Its Instrumentalities?**

7    Finally, LVMC points to Ninth Circuit law that purportedly requires this federal court to

8    give controlling effect to the labels used by State government.  *See Security Bldg. & Loan Ass'n*

9    *v. Spurlock*, 65 F.2d 768 (9th Cir. 1933).  *Spurlock* dealt with whether a building and loan

10   association, denominated as such, was  the type of "building and loan association" federal

11   bankruptcy law excluded from being eligible to file a federal bankruptcy case.  Although

12   *Spurlock* held that the entity at issue was not eligible, it set no per se rules that federal courts

13   must adopt State designations in such matters.  As the court noted, "[n]o one would dispute, *and*

14   *it is not disputed here*, that the definition of a building and loan association contained in the

15   Arizona statute is in accord with the general conception of such organization throughout the

16   United States."  *Id.* at 772 (emphasis supplied).  In other words, no one seriously contested, as is

17   contested here, that the meaning of "building and loan association" was isomorphic in both State

18   and federal laws.[30]

19   There is, however, a nub of relevancy in this argument that requires some discussion.

20   Historically, Congress has been very deferential to the ability of States to veto the participation

21   by their municipalities in Chapter 9 arrangements; the 1994 amendments to the Bankruptcy Code

22

23

24   _____

25        [30]Even if *Spurlock* could be read as LVMC urges, the Supremacy Clause would make short work of
     the argument.  Courts incorporate definitions from State law into federal law only advisedly, and then
     only when necessary to effect congressional intent.  *Cf. Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90,
26   98 (1991) (discussing that incorporated State terms must not be construed to override federal policy
     concerns); *Americredit Fin. Servs., Inc. v. Penrod (In re Penrod)*, 392 B.R. 835, 843 (B.A.P. 9th Cir.
27   2008) (discussing role of federal law in interpreting undefined phrases in federal law that are defined in
     similar contexts under State law).

28

underscore this point.[31]  It is thus relevant to examine Nevada's plan for distressed municipalities
and examine whether that system applies here.

Nevada has systems for financially distressed public authorities, and thus denies its
departments and agencies access to Chapter 9 in the case of financial need.  The qualifications
for this treatment, however, would exclude LVMC, making it look as though the State has little
interest in whether it files for Chapter 11 or not.  Specifically, Nevada law states that its financial
distress provisions "apply to all local governments."  Under Nevada law,

> "Local government" means every political subdivision or other entity which has the
> right to levy or receive money from ad valorem or other taxes or any mandatory
> assessments, and includes, without limitation, counties, cities, towns, boards, school
> districts and other districts . . . .

NEV. REV. STAT. § 354.474.1(a).  Again, consistent with the origins of municipal bankruptcy, the
key is the power to tax, a power that has been denied to LVMC.  It is not the type of enterprise or
public entity that Nevada has provided for in the case of public distress.

Analyzing the statutes regarding monorails and their operations further underscores these
conclusions.  Nevada's statutes specifically dealing with monorails contemplate that the
monorail owner and operator would be a "person" under Nevada law.  *See* NEV. REV. STAT. §§
705.660, 705.665.  Under Nevada law, a person means a natural person, corporation, or some
other form of business organization other than a political subdivision or governmental agency.
*See* NEV. REV. STAT. § 0.039.  This exclusion indicates Nevada's intent that "persons" such as
LVMC are not governmental entities.

Further, Section 705.690 provides in part that counties and cities may exercise their
respective powers to "facilitate" the installation and operation of a monorail, and "contribute to"
or "assist in the financing of" a monorail.   Notably, the statute does not refer to cities and
counties directly owning and operating a monorail nor does it refer to the taking on of any direct
financial responsibility for them.  The eligibility is open to all "persons."

---

[31]This veto ability assuages some of the constitutional concerns inherent in allowing a federal court
to dictate how a State should manage its internal affairs when there is no countervailing federal policy
involved.

In addition, one gets a hint that Nevada does not consider LVMC a municipality by looking at how it treats entities that are acknowledged municipalities. As with other States, Nevada has a complex and detailed scheme of laws dealing with public improvement projects and public works projects, and the counties and cities of the State of Nevada have broad authority to construct, own, operate, and manage various types of public improvements and various types of public works. *See, e.g.*, NEV. REV. STAT. §§ 244.151, 244A.019, 271.265, 338.010. It is telling that none of these types of city or county powers were employed with respect to LVMC. Indeed, lest there be any doubt, § 705.690 specifically states that a monorail is not a public work and is not a public utility.[32]

LVMC was formed under Chapter 82 of the Nevada Revised Statutes as a nonprofit public benefit corporation. In most particulars, Nevada nonprofit corporations have the same powers and duties as other corporations. One of these, while not controlling here, is that Nevada sought to make Chapter 11 bankruptcy available to all corporations formed under Chapter 82. *See* NEV. REV. STAT. § 82.466. There is no exception for monorail companies such as LVMC.

As a consequence, to the extent that federal interpretation of Section 101(40) of the Bankruptcy Code looks to State classification and categorization, Nevada statutory law would likely not imbue LVMC with sufficient municipal qualities to make LVMC a municipality.

III. CONCLUSION

Chapter 9 is a bankruptcy remedy restricted to municipalities. As used in the Bankruptcy Code, this term includes instrumentalities of the State. Ambac contends that LVMC is such an instrumentality, contending that the level of control held and exercised by the State is sufficient for that categorization under recent bankruptcy caselaw and tax law.

Instrumentalities under Chapter 9, however, are unique, and can be understood only by an examination of the history of Chapter 9 eligibility. That examination reveals a concern not with

---

[32]The parties also acknowledged this implicitly in the Indenture. The remedies section of that agreement, Section 7.02(d), specifically refers to the Trustee's right to appoint a receiver, a remedy not available for any State instrumentality.

1  regulation of matters of public interest, but a concern with the separateness and sovereignty of

2  States, as exemplified through laws affecting traditional public functions and the public fisc.

3          LVMC does not exhibit any of these characteristics to the extent required under the

4  Bankruptcy Code or the caselaw interpreting it.  Ambac's motion is denied.[33]

5                                              * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
_____

27       [33]This opinion shall also serve as the court's findings of facts and conclusions of law under FED. R.
    BANKR. P. 7052, applicable to this contested matter by FED. R. BANKR. P. 9014(c).
28
                                                42

**Appendix 1–Definition of "Municipality" after 1937 Act**

Selected Provisions of Act of August 16, 1937, Pub. L. No. 302, 50 Stat. 653 (1937)

SEC. 81. This Act and proceedings thereunder are found and declared to be within the subject of bankruptcies and, in addition to the jurisdiction otherwise exercised, courts of bankruptcy shall exercise original jurisdiction as provided in this chapter for the composition of indebtedness of, or authorized by, any of the taxing agencies or instrumentalities hereinafter named, payable (a) out of assessments or taxes, or both, levied against and constituting liens upon property in any of said taxing agencies or instrumentalities, or (b) out of property acquired by foreclosure of any such assessments or taxes or both, or (c) out of income derived by such taxing agencies or instrumentalities from the sale of water or power or both, or (d) from any combination thereof; (1) Drainage, drainage and levee, levee, levee and drainage, reclamation, water, irrigation, or other similar districts, commonly designated as agricultural improvement districts or local improvement districts, organized or created for the purpose of constructing, improving, maintaining, and operating certain improvements or projects devoted chiefly to the improvement of lands therein for agricultural purposes; or (2) local improvement districts such as sewer, paving, sanitary, or other similar districts, organized or created for the purposes designated by their respective names; or (3) local improvement districts such as road, highway, or other similar districts, organized or created for the purpose of grading, paving, or otherwise improving public streets, roads, or highways; or (4) public-school districts or public-school authorities organized or created for the purpose of constructing, maintaining and operating public schools or public-school facilities; or (5) local improvement districts such as port, navigation, or other similar districts, organized or created for the purpose of constructing, improving, maintaining, and operating ports and port facilities; or (6) any city, town, village, borough, township, or other municipality; *Provided, however*, That if any provision of this chapter, or the application thereof to any such taxing agency or district or class thereof or to any circumstance, is held invalid, the remainder of the chapter, or the application of such provision to any other or different taxing agency or district or class thereof or to any other or different circumstances, shall not be affected by such holding.

SEC. 82. The following terms as used in this chapter, unless a different meaning is plainly required by the context, shall be construed as follows:

That the term 'petitioner' shall include any taxing agency or instrumentality referred to in section 81 of this chapter.

### Appendix 2–Definition of "Municipality" after 1946 Act
Selected Provisions of the Act of July 1, 1946, Pub. L. 481, 60 Stat. 409

SEC. 81. This Act and proceedings thereunder are found and declared to be within the subject of bankruptcies and, in addition to the jurisdiction otherwise exercised, courts of bankruptcy shall exercise original jurisdiction as provided in this chapter for the composition of indebtedness of, or authorized by, any of the agencies or instrumentalities hereinafter named, payable (a) out of assessments or taxes, or both, levied against and constituting liens upon property in any of said agencies or instrumentalities, or (b) out of property acquired by foreclosure of any such assessments or taxes or both, or (c) out of income derived by such agencies or instrumentalities from any income-producing property, whether or not secured by a lien upon such property : (1) Drainage, drainage and levee, reclamation, water, irrigation, or other similar districts, commonly designated as agricultural improvement districts or local improvement districts, organized or created for the purpose of constructing, improving, maintaining, and operating certain improvements or projects devoted chiefly to the improvement of lands therein for agricultural purposes; or (2) local improvement districts, such as sewer, paving, sanitary, or other similar districts, organized or created for the purposes designated by their respective names; or (3) local improvement districts, such as road, highway, or other similar districts, organized or created for the purpose of grading, paving, or otherwise improving public streets, roads, or highways; or (4) public-school districts or public-school authorities organized or created for the purpose of constructing, maintaining, and operating public schools or public-school facilities; or (5) local improvement districts, such as port, navigation, or other similar districts, organized or created for the purpose of constructing, improving, maintaining, and operating ports and port facilities; or (6) incorporated authorities, commissions, or similar public agencies organized for the purpose of constructing, maintaining, and operating revenue-producing enterprises; or (7) any county or parish or any city, town, village borough, township, or other municipality; *Provided, however*, That if any provision of this chapter, or the application thereof to any such agency or district or class thereof or to any circumstance, is held invalid, the remainder of the chapter, or the application of such provision to any other or different circumstances, shall not be affected by such holding.

SEC. 82. The following terms as used in this chapter, unless a different meaning is plainly required by the context, shall be construed as follows:

The term 'petitioner' shall include any agency or instrumentality referred to in section 81 of this chapter.

* * * * *

Copies sent to:

CM/ECF Electronic noticing

BNC Mailing Matrix

# # #