

**Entered on Docket**
**April 26, 2010**

*Bruce A. Markell*
_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:                                              )         Case No.: BK-S-10-10464-BAM
                                                       )
LAS VEGAS MONORAIL COMPANY,     )         Chapter 11
                                                       )
                    Debtor.                        )         **Date:    February 17, 2010**
_____)         **Time:  1:30 p.m.**

**OPINION ON CASH COLLATERAL MOTIONS**

**Table of Contents**

I.      INTRODUCTION .................................................................... 2

II.     FACTS ............................................................................... 2
        A.      Background ................................................................ 3
        B.      Industrial Revenue Bond Financing ..................................... 3
        C.      LVMC's Indebtedness Under the Financing Agreement ................ 4
        D.      Cash Flow Under the Indenture ......................................... 5

III.    THE LEGAL POSITION OF THE PARTIES .......................................... 7
        A.      The General Rules Regarding Cash Collateral .......................... 7
                1.      **Adequate Protection** ........................................... 8
                2.      **Identification of "Cash Collateral": The Two Components** ........... 8
                3.      **Burdens of Establishing What is Cash Collateral and of Providing**
                        **Adequate Protection** .......................................... 10
        B.      Security Interests and Liens in Favor of the Bondholders ............. 11
                1.      **Statutory Lien** ................................................ 12
                2.      **Consensual Security Interests** ................................. 14
                        a.      Role of Contract Law ................................... 15
                        b.      Role of Article 9 ...................................... 16
                3.      **Interpreting the Financing Agreement Under Nevada Law** ........... 16
                        a.      Contract Rights Under Franchise Agreement ............... 17
                        b.      Deposit Accounts and Funds ............................. 21
                        c.      Net Project Revenues .................................. 22
        C.      The Identification and Extent of the Trustee's Interests in Cash Collateral ....... 25

IV.     ADEQUATE PROTECTION OF THE TRUSTEE'S INTERESTS IN CASH COLLATERAL ....... 27
        A.      Adequate Protection of Cash and Deposit Accounts Held as of the Petition Date . . 27
        B.      Adequate Protection of Postpetition Cash Flows .......................... 29
                1.      **What Law Determines the Content of "Proceeds" as Used in Section**
                        **552(b)?** ...................................................... 30

2.    **Are Ongoing Revenues Proceeds of the Trustee's Prepetition Security Interest?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        a.    Net Project Revenues as Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        b.    Deposit Account Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
3.    **Are There Equitable Considerations that Section 552(b) Would Allow the Court to Consider That Would Restrict the Trustee's Security Interests in Proceeds?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

V.    SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.    INTRODUCTION

Las Vegas Monorail Company ("LVMC"), the debtor in possession in this case, filed its chapter 11 case on January 13, 2010. Almost immediately, its secured creditor sought adequate protection for its cash collateral; in response, LVMC made an offer of adequate protection that was rejected. This opinion resolves the dispute.

II.    FACTS

After filing, both LVMC and its secured creditor moved for orders regarding cash collateral. Under FED. R. BANKR. P. 4001(b)(2), the court held an interim hearing on January 22, 2010, at which time the court approved the parties' provisional stipulation regarding cash collateral use. In addition to outlining LVMC's permissible interim use of cash collateral, this stipulation preserved the parties' rights pending a final hearing, which the court scheduled for February 17, 2010. Both parties then commenced discovery.

At the February 17, 2010 hearing, the court admitted into evidence various declarations and exhibits from all sides, and heard testimony. The court took the matter under submission after the parties agreed to extend their interim stipulation until the court's final ruling.

*A.    Background*[1]

LVMC owns and operates a 3.9 mile long monorail which connects nine hotels along and near the Las Vegas "Strip."  LVMC's ridership has never met projections; it is not overly convenient (it does not connect to the local airport or to the Las Vegas downtown area), and many of its potential patrons use other transportation services.

This is not to say, however, that LVMC cannot cover its operating expenses; to the contrary, its revenues exceed its operating expenses, leaving more than $5 million in annual profits before debt service.  LVMC's operating expenses consist mainly of obligations under an operating agreement with Bombardier Transit Corporation ("Bombardier"), which operates and services LVMC's trains.  Under this agreement, LVMC pays Bombardier, on average, approximately $900,000 per month.

This positive cash flow, however, is barely enough to cover 10% of LVMC's scheduled debt service.  The vast majority of LVMC's debt service arises from a type of financing variously called conduit financing or industrial revenue bond financing or special revenue financing.  This type of financing is a common way to finance municipal infrastructures.  It allows local government to build and operate beneficial projects with private money and without local government having to increase tax burdens.

*B.    Industrial Revenue Bond Financing*

Conduit financing addresses an essential tension – while local government can issue debt which bears tax-free interest, and thus is sought after by tax-conscious investors, it rarely wants its taxpayers to bear the full risk of construction and operation.  In conduit or industrial revenue bond financing such as is present here, a local government issues bonds to the general public under an indenture (the way most public debt is issued).  The local government then lends the bond proceeds to a private party willing to build or operate the project.  This loan is usually

---

[1]Within hours of its filing, other demands were made; the insurer of the Bonds moved to dimisss the case alleging that LVMC was a municipality under the Bankruptcy Code, and was thus ineligible to file for chapter 11 relief.  Concurrently with the issuance of this opinion, the court is denying that motion. Reference is made to the dismissal opinion for many of the background facts of this case.

1    secured by the project or by its revenues. The key aspect of this type of financing, at least for

2    local government, is its nonrecourse nature; the local government's obligation to repay the bonds

3    is limited to the collateral pledged. And that collateral generally consists of all the government's

4    rights under the loan agreement with the private party.[2]

5    All of these transactions happen simultaneously. At the conclusion of the transaction, tax-

6    conscious investors have bonds, the interest on which is tax-free. Repayment of the bonds is

7    secured by the project built with the bond proceeds, and nothing else. The private company has

8    the advantage of a lower rate of interest on its construction loan, since municipal bond rates

9    generally are lower than construction loan rates. And the local government has provided its

10   citizens with new projects designed to improve community life.

11   *C.    LVMC's Indebtedness Under the Financing Agreement*

12   In this case, the industrial revenue bond financing took the following form. In 2000, the

13   Director ("Director") of the Nevada Department of Business and Industry ("Department")

14   sponsored the issuance of approximately $650 million of municipal bonds ("Bonds").[3]

15   Specifically, the Bonds were issued under an indenture ("Indenture") between Wells Fargo Bank

16   ("Trustee")[4] and the Director. As outlined above, the Director simultaneously lent the bond

17

18   [2]The National Federation of Municipal Analysts have provided standard form provisions for such
     financings, albeit directed at public hospital financings. *See* NATIONAL FEDERATION OF MUNICIPAL

19   ANALYSTS, RECOMMENDED TERM SHEET AND LEGAL PROVISIONS FOR HOSPITAL DEBT TRANSACTIONS
     (2005), available at http://data.memberclicks.com/site/nfma/DG.BP.rbp_hosp_term_sheet.doc.pdf (last

20   visited April 20, 2010) (the "Model Term Sheet"). *See also* Paul Groenwegen, *"Revenues" as
     Collateral: The Limits of the Revenue Pledge As a Security Device*, 39 U.C.C. L.J. Art 4 (Spring 2007).

21
     [3]The Bonds were issued in series. The first series has an aggregate principal amount of

22   approximately $450 million, and have the benefit of private insurance. Two junior series of the Bonds
     make up the remainder of the original $650 million financing. These junior series are not insured and in

23   some respects are contractually subordinate to the first series. US Bank has been appointed as an
     Indenture Trustee to represent the interests of the holders of the two junior series of Bonds.

24
     [4]US Bank has a junior security interest in the same collateral as is encumbered in the Trustee's

25   favor, and accordingly US Bank joined in the Trustee's adequate protection request. This request drew
     little response, however, as it that there is little doubt that, as of the filing of LVMC's case, the

26   collateral's value is less than the amount of the Bonds outstanding under the senior Indenture. This
     opinion thus focuses solely on the senior Trustee's interests as an undersecured creditor. To the extent

27   relevant, however, references to the "Trustee" and the collateral should be taken to be references to US
     Bank and to the collateral it holds.

28

4

1    proceeds to LVMC pursuant to a separate financing agreement between LVMC and the Director

2    (the "Financing Agreement").  Under the Financing Agreement, LVMC agreed to repay the loan,

3    and supported this promise with, among other things, a grant of a security interest in LVMC's

4    "Net Project Revenues" (but not in any of its tracks or trains).[5]

5        A key component of the transaction, known to all, was that the State of Nevada would not

6    be liable on the Bonds.  Indeed, the Director and other public officials assured the public that no

7    tax revenues would be used to acquire or operate the monorail.[6]  Structurally, this promise was

8    honored by making the Bonds nonrecourse as to the State of Nevada.  This was explicit in the

9    offering; the only recourse for bondholders was the collateral the Director assigned to the

10   Trustee, and the insurance mentioned below.

11       As a result, those buying the Bonds did so knowing that the primary source of repayment

12   on the Bonds was the Financing Agreement – and the security interests it contained – which the

13   Director had assigned to the Trustee.  The only other source of repayment was insurance

14   purchased from Ambac Assurance Corp. ("Ambac"), which insured payment of principal and

15   interest on the first series of the Bonds.[7]

16       D.    *Cash Flow Under the Indenture*

17       Most of LVMC's revenue arises from the sale of tickets to riders.  During 2009, ticket

18   receipts averaged approximately $74,000 per day.  Patrons buy tickets to ride the monorail at one

19   of LVMC's 42 Ticket Vending Machines ("TVM").  These allow customers to pay in cash or

20   coin, or with a debit or credit card.  Brink's U.S. ("Brink's") collects all receipts from the TVMs.

---

21

22       [5]The Trustee perfected its interest and the Director's interest by filing a financing statement with the
     Nevada Secretary of State on September 20, 2005.  That statement was amended on October 4, 2007 to
23   change the description of the collateral.

24       [6]So fervent were the protestations that no public money would be used on the monorail that LVMC
     established an account with the Trustee which contains about $7.9 million for use in demolishing the
25   monorail structure over public right of ways should the need arise.  This reserve account, called the
     "Removal Fund Account," is in the name of and under the sole control of Clark County, the county in
26   which the monorail operates.

27       [7]Ambac's insurance policy obligates it to pay principal face value as well as the interest on the
     bonds if LVMC does not.  Ambac estimates that its current exposure over the life of the bond issue is
28   about $1.16 billion on an undiscounted basis.

After collection, Brink's is responsible for counting the TVM cash receipts and depositing them with the Trustee.

Once delivered to the Trustee, the deposits are processed and applied according to the Indenture. Under that document, the Trustee established a "Collection Fund" as a separate account at Wells Fargo Bank. Every day for almost last three years,[8] the Trustee has swept all Collection Fund money into another account established under the Indenture called the "Revenue Fund." The Trustee contends that it holds all funds in the Revenue Fund in trust for the benefit of the holders of the Bonds.[9]

Sometime in October 2009, however, LVMC began diverting daily receipts away from the Trustee. Acting on LVMC's instructions, Brink's began depositing TVM cash receipts into a deposit account maintained by LVMC at Bank of America. This was soon discovered – in large part because LVMC told the Trustee when asked. The Trustee was understandably angered, because such a diversion was a breach of the Indenture's provisions on cash flow, and it frustrated the Trustee's performance of its duties under the Indenture. Much was made at the evidentiary hearings about who knew what was happening, and when, with respect to the diversion. Yet the Trustee took no legal action in state court.

The end result of all this maneuvering was that, on the petition date, the Bank of America account contained approximately $971,000. The Trustee held another $225,000 in its accounts under the Indenture. Brink's held $65,000 in coin and $162,000 in cash, some of which was on its way to be deposited, and some of which was held by Brink's as a reserve to stock TVMs.[10]

---

[8] The process described in the body of the opinion is the process the parties used after LVMC's default in June 2006.

[9] This contention does not withstand analysis. *See* note 38, *infra*.

[10] There was also about $30,000 in credit card receivables owed to LVMC from its merchant bank as of the date of the petition. Although LVMC sells ad space on the sides of its trains and in other locations, there were no outstanding receivables related to advertising revenue on the petition date.

III.   THE LEGAL POSITION OF THE PARTIES

   A.    *The General Rules Regarding Cash Collateral*

   Section 363 of the Bankruptcy Code governs the estate's use of cash collateral.[11]  Here, LVMC's funds in Brink's possession and on deposit in the various bank accounts are potentially cash collateral.  The Trustee also argues that LVMC's present and future collections of revenue are also cash collateral.  Under the Code, LVMC may not use cash collateral unless either  "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease . . . ."  11 U.S.C. § 363(c)(2).  Indeed, unless the debtor in possession obtains consent or a court order, it "shall segregate and account for any cash collateral in the trustee's possession, custody, or control."  11 U.S.C. § 363(c)(4).  *See generally Marathon Petroleum Co., LLC. v. Cohen (In re Delco Oil, Inc.)*, __ F.3d __, ___, 2010 Westlaw 918058, at *2, 2010 U.S. App. LEXIS 5452, *5; 52 Bankr. Ct. Dec. 258 (11th Cir., March 16, 2010).

   The Trustee has not consented to LVMC's use of cash collateral.[12]  To authorize use over the dissent of the secured party, the Code directs "the court, with or without a hearing, [to] prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The court must thus "prohibit or condition" LVMC's use of cash collateral based upon whether LVMC has adequately protected the Trustee's interest in such cash collateral.

---

   [11]Cash collateral initially is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . . ."  11 U.S.C. § 363(a).

   [12]In the Ninth Circuit, a debtor in possession seeking to use cash collateral is required to obtain the "affirmative express consent" of each entity having an interest in the cash collateral.  *Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 368-69 (9th Cir. 1987) (finding that implied consent is insufficient to satisfy the requirements of § 363(c)(2), without deciding whether the secured creditor either impliedly consented to the use of its cash collateral or was estopped from denying that it had consented).  As a result, silence is not a secured party's consent.  *Id.* at 368-69.

1.    **Adequate Protection**

Adequate protection, in turn, is a concept that Section 361 of the Code illustrates, but does not define.  That section recognizes that, to the extent that use of cash collateral "results in a decrease in the value of such entity's interest in such property," adequate protection may consist of cash payments or replacement liens.  11 U.S.C. § 361(1), (2).  In addition, the estate may provide other forms of  adequate protection so long as they "will result in the realization by [the secured party] of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 363(3).

LVMC is an operating business that needs to use the cash proceeds of its operations to continue to produce income.  The Trustee, however, contends that this operating cash is subject to its security interests and liens, and demands adequate protection for such use.  These opposing positions are not new.  As noted by the Bankruptcy Appellate Panel of the Ninth Circuit, "'[t]here is an inherent tension between a debtor's need to use its cash to continue operating and a secured creditor's right to preserve its security interest in the debtor's cash proceeds.'" *Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 441 (B.A.P. 9th Cir. 2004) (quoting  Stephen A. Stripp, *Balancing the Interests in Orders Authorizing the Use of Cash Collateral in Chapter 11*, 21 SETON HALL L.REV. 562, 565-66 (1991)).

The general purpose of adequate protection is to ensure that the secured creditor ultimately receives what it would have received had not bankruptcy intervened.  "'Although stripped of the right to immediate possession of its property, the creditor receives assurances that the value it could have received through foreclosure will not decline.'"  *In re ProAlert*, 314 B.R. at 441-42 (quoting 3 JAMES F. QUEENAN, JR. ET. AL, CHAPTER 11 THEORY AND PRACTICE § 16.03 (1994)).

2.    **Identification of "Cash Collateral": The Two Components**

Providing these assurances, however, requires determination as to what property is actually cash collateral.  There are two components to cash collateral.  The first component identifies the type of property.  Section 363(a) states that "'cash collateral' means cash, negotiable instruments, . . . deposit accounts, or other cash equivalents whenever acquired . . . ."  The

1    contenders for this type of cash collateral here, as outlined above, consist in deposit accounts at

2    the Trustee and at Bank of America, and the funds held by Brink's.

3        But there are more types of property which qualify.  Cash collateral also "includes the

4    proceeds, products, offspring, rents, or profits of property . . . as provided in section 552(b) of

5    this title . . . ."[13]  Section 552(b) is an exception to bankruptcy's rule, found in Section 552(a),

6    that after-acquired clauses in security agreements are not given effect in bankruptcy even though

7    authorized by Article 9 of the UCC.  *See* UCC § 9-204(a).

8        Section 552(b) states that:

9        [I]f the debtor and an entity entered into a security agreement before the
         commencement of the case and if the security interest created by such security

10       agreement extends to property of the debtor acquired before the commencement of
         the case and to proceeds, products, offspring, or profits of such property, then such

11       security interest extends to such proceeds, products, offspring, or profits acquired by
         the estate after the commencement of the case to the extent provided by such security

12       agreement and by applicable nonbankruptcy law . . . .

13    11 U.S.C. § 552(b).  This exception allows lenders to follow their legitimate interests in

14    transmuted forms of their collateral; a security interest in a receivable generated prepetition is

15    not lost in bankruptcy simply because it was paid in cash after filing.  Roughly speaking, this

16    section parallels the similar protections under state law afforded by UCC § 9-315, protections

17    which are automatically provided to every secured creditor without the need to request it.  UCC

18

19        [13]The full language is:

20        In this section, "cash collateral" means cash . . . and includes the proceeds, products,
          offspring, rents, or profits of property and the fees, charges, accounts or other payments for

21        the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging
          properties subject to a security interest as provided in section 552(b) of this title, whether

22        existing before or after the commencement of a case under this title.

23    There is an argument, based on the somewhat awkward wording of the last part of Section 363(a), that
      this language only extends to proceeds that are hotel or motel revenues, given that Congress did not use

24    any modifier to link "property" back to the first part of the definition and the antecedent "as provided in
      section 552(b)" would appear to modify only motel and hotel revenues.

25        This interpretation ignores the historical evolution of the section; the hotel language was added in
      1994.  Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 214(b) (1994) (adding "and the fees,

26    charges, accounts or other payments for the use or occupancy of rooms and other public facilities in
      hotels, motels, or other lodging properties" to Section 363(a)).  That legislation did not evince any intent
      to restrict the scope of proceeds coverage under the cash collateral section.

27        There still remains, however, an argument as to the effect of the 2001 amendments to the UCC on
      the scope of "proceeds," and this is discussed later in this opinion.  *See* Section IV.B.1, *infra*.

28

§§ 9-203(f); 9-315.  With respect to Section 552(b), the parties have focused on whether LVMC's postpetition revenues are proceeds of the Trustee's prepetition collateral.[14]

The second component of cash collateral is that it must be property "in which the estate and an entity other than the estate have an interest."  11 U.S.C. § 363(a).[15]  This typically means that the party seeking protection with respect to cash collateral has some ownership or property interest in the disputed cash collateral.  This component is satisfied if the "interest" is a security interest or lien recognized under nonbankruptcy law.  This recognition can take the form of a lien granted by statute, such as a mechanic's lien on a car brought in for repairs, or a consensual security interest such as that governed by Article 9 of the Uniform Commercial Code ("UCC").[16]

3.    **Burdens of Establishing What is Cash Collateral and of Providing Adequate Protection**

In sorting out these two components for each type of property, the Bankruptcy Code assigns various burdens.  Section 363(p) states: "In any hearing under this section—(1) the trustee[17] has the burden of proof on the issue of adequate protection; and (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."  11 U.S.C. § 363(p).

---

[14]If they are, and are thus presumptively cash collateral under Section 552(b), LVMC then argues, as discussed later, that the last clause of Section 552(b) exempts some or all of those revenues from the general inclusion of proceeds in Section 552(b).

[15]It was a central tenet of the 1978 Bankruptcy Code that property subject to a security interest was to be included as property of the estate in the debtor's case.  Thus, unlike other countries' bankruptcy systems, *see* BOB WESSELS, ET. AL., INTERNATIONAL COOPERATION IN BANKRUPTCY AND INSOLVENCY MATTERS 26-27 (2009), encumbered property is part of the bankruptcy estate under the Code and is subject to bankruptcy court jurisdiction.

[16]Nevada has, together with every other state in the nation, adopted Article 9 of the UCC.  It is found in NEV. REV. STAT. § 104.9101 *et. seq.*  Citations will generally be to the national version of the UCC unless there is a Nevada variation.

[17]The Bankruptcy Code uses the term "trustee" to refer generally to the estate representative, which could be a trustee in bankruptcy or a chapter 11 debtor in possession.  Here, LVMC is a debtor in possession with the full powers of a bankruptcy trustee, 11 U.S.C. § 1107(a).  As a result, references in the Bankruptcy Code to "trustee" can be read as references to a debtor in possession such as LVMC.

This section, particularly paragraph (2), requires the Trustee to establish the existence and the extent of its interest in the property it claims as cash collateral.  *See Textron Fin. Corp. v. Rebel Rents, Inc. (In re Rebel Rents, Inc.)*, 307 B.R. 171, 183 (Bankr. C.D. Cal. 2004); *Kondik v. Ebner (In re Standard Foundry Prods., Inc.)*, 206 B.R. 475, 478 (Bankr. N.D. Ill. 1997).  The Ninth Circuit has held that a party seeking to establish the "extent" of its interest in property under § 363(p)(2) must satisfy a two-prong test:

> First, as a preliminary matter, the party must prove that it holds a perfected security interest in post-petition revenues to which its liens still rightly attach. (Citations omitted).  Second, a party must prove the amount of money to which its liens attach.

*Chequers Inv. Assocs. v. Hotel Sierra Vista Ltd. P'ship (In re Hotel Sierra Vista Ltd. P'ship)*,112 F.3d 429, 434 (9th Cir. 1997).  *Cf. In re Rebel Rents*, 307 B.R. at 183 (holding that revenues related to postpetition receivables from equipment leases were not cash collateral because proceeds, under pre-2001 definition, did not extend to such receivables); *In re GOCO Realty Fund I*, 151 B.R. 241, 252 (Bankr. N.D. Cal. 1993) (holding that creditor did not have a perfected security interest in rental proceeds transferred to an attorney as a retainer); *In re 1726 Wash., D.C. Partners*, 120 B.R. 1, 2 (Bankr. D.D.C. 1990) (holding that post-petition rents were not cash collateral where the mortgagee's security interest in rents was unperfected).

> B.    *Security Interests and Liens in Favor of the Bondholders*

Against this background, the Trustee takes a starkly maximalist view of its rights.  It believes that "all of the [LVMC's] money, wherever held, is the cash collateral of" the Trustee.  LVMC, not surprisingly, disputes this, as well as almost everything else the Trustee says.  The Trustee's position is not without problems; if adopted, it would require LVMC to give the Trustee adequate protection for every dollar LVMC spends postpetition.  This would lead to an almost impossible adequate protection burden – if LVMC has to give dollar-for-dollar adequate protection payments to the Trustee, it would have to have a profit margin of at least 100% just to break even.  Neither it nor any other bankruptcy debtor could meet that requirement; debtors with 100% profit margins rarely need bankruptcy protection.

Presumably in partial recognition of this problem, the Trustee asked for adequate protection in the form of replacement liens on LVMC's cash flow, and of new liens on LVMC's previously unencumbered physical assets.  It also wants strict adherence to the provisions of the Indenture related to LVMC's collection and deposit of its revenues.

As the Trustee has the burden of establishing the existence and extent of its security interest, 11 U.S.C. § 363(p)(2), the resolution of this dispute turns on whether the Trustee can establish that it has valid liens and security interests, and whether those interests inhere in any of LVMC's cash or other property covered by Section 363(a).  In this respect, the Trustee points to three sources of security interests and liens: two provisions of the Financing Agreement (which the Trustee has the benefit of by way of assignment from the Director), and a statutory lien.

### 1.  **Statutory Lien**

The Trustee focuses first on its claimed statutory lien under NEV. REV. STAT. § 349.620(1).[18]  That section provides as follows:

> The principal of, the interest on and any prior redemption premiums due in connection with the bonds issued pursuant to NRS 349.400 to 349.670, inclusive, are payable from, secured by a pledge of, and constitute a lien on the revenues out of which the bonds have been made payable. . . .[19]

The interpretive question here is whether the "revenues out of which the bonds have been made payable" refers to revenues from the Financing Agreement – the sole source of the Director's funds to pay the Bonds – or to LVMC's gross revenues such as the coin and cash collected daily by Brink's.

---

[18]Strategically, the Trustee would prefer the revenues to be subject to a statutory lien because such liens are not subject to Section 552(a)'s nullification of after-acquired property clauses with respect to property the estate acquires postpetition.  5 COLLIER ON BANKRUPTCY ¶ 552.01[2] (Alan Resnick & Henry J. Sommer, eds., 15th ed. rev. 2010).  That is, were LVMC's revenues subject to the lien of Section 349.620, that lien would be unaffected by the filing of the bankruptcy case, and would encumber all of LVMC's revenues without regard to the time of attachment.  *Cf.* 11 U.S.C. § 928 (preserving such statutory liens in Chapter 9 municipal bankruptcy cases, but subordinating them to "necessary operating expenses.").

[19]That the Bonds were issued pursuant to NEV. REV. STAT. §§ 349.400 to 349.670 is not disputed.

Given the statute's focus on items the Director may use as sources of repayment, the best interpretation of the statute is that it refers only to the proceeds or revenues that originate with the Director; that is, from the Financing Agreement.  That is the only source of repayment that the Director could offer the bondholders.  The Department does not operate the monorail, and thus the direct receipts of that operation – such as might be represented by TVM collections – could not be property that it, as issuer and nominal obligor on the Bonds, could control directly. To push the argument further would be to extend the statutory lien to the money in the pockets of the monorail's patrons.

Moreover, the limited interpretation is the only interpretation that does not make the phrase "out of which the bonds have been made payable" surplusage.  Had the Nevada Legislature intended that all revenues would be collateral, they could have omitted this phrase.  But by adding it, they indicated that the Director had discretion in structuring the transaction so that certain revenues would not be earmarked for bond payment.[20]

With respect to the monorail's financing, the Director exercised that discretion by limiting the security interest granted, as will be seen below.  The Director did not take a blanket security interest in all revenues, wherever and whenever found.  Rather, through measured provisions in the Financing Agreement, LVMC granted a security interest in only a subset of its revenue.

As a result, the language added by the legislature made the statutory lien granted derivative upon other agreements.  Put another way, the statutory lien attaches only to money that would be payable under or encumbered by the Financing Agreement.  Therefore, before the court can

---

[20]This view is also supported by the broad definition of revenues in the relevant statute.  Section 349.520 states that "'[r]evenues' of a project, or derived from a project, include payments under a lease, agreement of sale or financing agreement, or under notes, debentures, bonds and other secured or unsecured debt obligations of an obligor executed and delivered by the obligor to the Director or his or her designee or assignee (including a trustee) pursuant to such lease, agreement of sale or financing agreement, or under any guarantee of or insurance with respect to any of these." NEV. REV. STAT. § 349.520.  Clearly, payments by LVMC are "revenues" under this definition.  By using this definition in the statutory lien section, and by adding the limiting qualification that such revenues must be revenues "out of which the bonds are payable," the legislature likely meant that the Director (or other issuer) could limit those revenues to only a portion or type of revenue generated.

1  consider the scope of the statutory lien, it must consider what consensual security interests

2  LVMC's granted in favor of the Director and, by assignment, in favor of the bondholders.

3          **2.**   **Consensual Security Interests**

4        The Financing Agreement is a consensual contract that creates property rights in the form

5  of security interests to secure repayment of the loan from the Director. *See, e.g.*, UCC § 1-

6  201(35); NEV. REV. STAT. § 104.1201(2)(ii) ("'Security interest' means an interest in personal

7  property or fixtures which secures payment or performance of an obligation.").[21]  As a contract,[22]

8  the Financing Agreement is subject to all the rules of contract interpretation, including a subset

9  of rules provided by Nevada's version of Article 9 of the UCC.

10        Interpretation of the Financing Agreement between LVMC and the Director is critical; that

11  agreement was the only security agreement LVMC signed; there is no privity of contract

12  between LVMC and the Trustee, and hence there is no direct grant of a security interest from

13  LVMC to the Trustee either.  The Trustee's only rights against LVMC's property are as an

14  assignee of the Director, and thus the Trustee must look to the Financing Agreement for any

15  recourse.

16

17

18      [21]Nevada adopted Revised Article 1 in 2005.  It is found in NEV. REV. STAT. § 104.1101 *et. seq*.  As

19  with citations to Article 9, future citations in this opinion will be to the national verison of Article 1.

    Under the UCC, an agreement which creates a security interest is a security agreement.  UCC §

20  9102(a)(71) (definition of security agreement).  "Agreement," in turn is "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course

21  of dealing, or usage of trade . . . ."  UCC § 1-201(3).  Definitions from Article 1 apply to terms used in Article 9 unless the context indicates otherwise.  UCC § 9-102(c).

22      Under the Bankruptcy Code, a security agreement is an "agreement that creates or provides for a security interest."  11 U.S.C. § 101(50).  A security interest under the Code is a "lien created by

23  agreement," 11 U.S.C. § 101(51), and a lien is "charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37).  Given the closeness of definition, a

24  security agreement under Article 9 will likely be a security agreement under the Bankruptcy Code

25      [22]Under the UCC, the term "contract" means "the total legal obligation that results from the parties' agreement as determined by the Uniform Commercial Code as supplemented by any other applicable

26  laws."  UCC § 1-201(12).  Since no party has argued that the agreement – that is the bargain in fact – contained in the Financing Agreement is not enforceable, the two terms mean essentially the same thing

27  in this case.

28

1          a.    Role of Contract Law

2          To determine the validity and extent of the security interests and liens the Trustee claims,

3  and to determine if LVMC's use of cash constitutes diminution of cash collateral, the court must

4  first determine the extent of the security interests and lien by examining the documents the

5  parties signed when the bonds were issued.  These include the Indenture, the Financing

6  Agreement and LVMC's Franchise Agreement with Clark County under which LVMC obtained

7  local governmental permission to operate the monorail (the "Franchise Agreement").  Each of

8  these are contracts subject to interpretation under Nevada law.[23]  *See UnitedHealth Group Inc. v.*

9  *Wilmington Trust Co.*, 548 F.3d 1124, 1128 (8th Cir. 2008) (an indenture is construed under

10  principles of contract interpretation); *Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C.*, 369 F.3d

11  603, 612 (1st Cir. 2004) (construing a financing agreement using contract interpretation

12  principles).

13          In Nevada, "when the facts are not in dispute, contract interpretation is a question of

14  law."[24]  *Federal Ins. Co. v. American Hardware Mut. Ins. Co.*, 184 P.3d 390, 392 (Nev. 2008).

15  Although the court has grave doubts about the general quality of many of the deal documents in

16  this matter, it must construe these contracts, as it would any other contract, to give meaning to

17  the plain language of the contract.  *State ex rel. Masto v. Second Judicial Dist. Court ex rel.*

18  *County of Washoe*, 199 P.3d 828, 832 (Nev. 2009) ("in interpreting a contract, [a court applying

19  Nevada law must] construe a contract that is clear on its face from the written language, and it

20  should be enforced as written.").

21          Part of this task is to ensure that the contract is interpreted as a whole without giving undue

22  weight to any particular clause beyond that which a reasonable third-party would when reading

23

24          [23]Section 12.07 of the Indenture and Section 10.5 of the Financing Agreement each states that the
25  respective document "shall be governed exclusively by and construed in accordance with the applicable
    laws of the State of Nevada."

26          [24]For present purposes, since the court sits as factfinder as well as judge, this distinction does not
27  matter.  It would matter, of course, on appeal.

28

the provision.  As stated by the Nevada Supreme Court, "[a] court should not interpret a contract so as to make meaningless its provisions."  *Phillips v. Mercer*, 94 Nev. 279, 282, 579 P.2d 174, 176 (1978).  *See also Anvui, LLC v. G.L. Dragon, LLC*, 123 Nev. 212, 215, 163 P.3d 405, 407 (2007); *Mohr Park Manor, Inc. v. Mohr*, 83 Nev. 107, 424 P.2d 101 (1967).

### b.    Role of Article 9

Although there are some generally accepted interpretive conventions under Article 9, "[a] security agreement is to be interpreted the same as any other contract."  8A LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9-203:51 (3d. ed. 2009).  *See also* BARKLEY CLARK & BARBARA CLARK, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶ 2.02[3][b] (rev. ed. 2009).[25]  As a result, interpretation of the Financing Agreement is not substantively different from interpreting any other contract under Nevada law.

### 3.    Interpreting the Financing Agreement Under Nevada Law

Although the rules are somewhat straightforward, discovering the meaning of the words used to grant the security interest is not.  The grant of security in the Financing Agreement is not a model of clarity.  Section 3.1(b) of the Financing Agreement reads as follows:

> As security for the payment of any and all amounts due hereunder, the Borrower [LVMC] hereby grants, assigns and pledges to the Director a security interest in all of the Borrower's right, title and interest in, to and under the following (hereafter, the "Collateral"):
>     (i) contract rights of the Borrower under the Purchase Agreement, the Design-Build Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the Franchise Agreement and any amendment or successor agreement thereto,
>     (ii) the Net Project Revenues, and

---

[25]The Clark treatise, usually a solid reference, states that "[b]ecause the security agreement is the bilateral contract by which the debtor grants to the creditor a security interest in collateral, the court's role is to determine the mutual intent of the parties."  Of course, the court's role in determining intent is not so subjective; "'intent' does not invite a tour through [a party's] cranium."  *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987).  As noted by the late Professor Farnsworth:  "By the end of the nineteenth century, the objective theory had become ascendant and courts universally accept it today."  E. ALLAN FARNSWORTH, CONTRACTS § 3.6, at 117 (3d ed. 1999).  As a consequence, an objective reading of what the parties signed generally determines intent.  As to the subjective description used by Clark – well, *quandoque bonus dormitat Homerus*.  *See* HORACE, ARS POETICA v. 359.

(iii) all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or this Agreement (except the Rebate Fund and the Indemnification Account of the Contingency Fund),

whether now owned by the Borrower or hereinafter acquired and whether now existing or hereinafter coming into existence and all money, deposits, funds and balances, whether or not evidenced by any certificates of deposit, passbooks or other documents and all revenues, income, interest, dividends, issues and profits added to earned or accrued on any deposit of the Net Project Revenues; and all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.[26]

Although long and somewhat convoluted, this grant essentially covers three types of collateral:

(i) contract rights in the Franchise Agreement; (ii) all funds on deposit with the Trustee; and (iii)

"Net Project Revenues."

### a.    Contract Rights Under Franchise Agreement

The Trustee believes that this grant of a security interest in the "contract rights" of LVMC

"under the . . . Franchise Agreement" renders all money derived from the operation of the

monorail as "proceeds" of the Franchise Agreement.  Its argument turns on the statutory

definition of "proceeds," which Section 9-102(b)(64) of the UCC defines as:

(64)  "Proceeds", except as used in Section 9-609(b), means the following property:
(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
(B) whatever is collected on, or distributed on account of, collateral;
(C) rights arising out of collateral;
(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

---

[26]The presentation of this clause is as it appears in the amended Financing Statement, which the court takes to be some evidence as to how this clause is to be parsed.  *See* note 5, *supra*.  In the Financing Agreement, there are no line breaks and the text appears as one continuous blob.

1    According to the Trustee, since LVMC could not run the monorail or collect fares without the

2    Franchise Agreement, all fares must be "collected on, or distributed on account of" the Franchise

3    Agreement, UCC § 9-102(b)(64)(B), or must be "rights arising out of the collateral" under UCC

4    Section 9-102(b)(64)(C).[27]

5        The Trustee contends that *CLC Equip. Co. v. Brewer (In re Value-Added Commc's, Inc.)*,

6    139 F.3d 543 (5th Cir. 1998) "is on all fours with the present case" and thus settles the matter.

7    The court disagrees.  In *Value-Added*, a company had leased a telephone system and then

8    installed it in Minnesota prisons.  As part of the process, it granted the lessor a security interest

9    in its agreement with the Minnesota prison system.  When the lessee filed bankruptcy, the lessor

10   discovered that the financing statement covering the Minnesota system only covered equipment,

11   and not the site license agreements with Minnesota under which Minnesota was obligated to pay

12   the debtor.  *Id.* at 544-45.  The court ultimately held that the payments from Minnesota were not

13   proceeds of the equipment covered by the filed financing statements.  *Id.* at 546.

14       The Trustee analogizes the site licenses in *Value-Added* to the Franchise Agreement here,

15   and contends that the Fifth Circuit's implicit holding that those site licenses were the sole source

16   of the funds means that the grant of "contract rights . . . under" the Franchise Agreement

17   includes LVMC's gross revenues.

18       This analogy is not complete or persuasive.  The site licenses in *Value-Added* were direct

19   rights under a contract that had matured and were liquidated – accounts in the parlance of Article

20   9.  But these types of rights are quite different than what the Trustee seems to want to argue; the

21   Trustee's argument seems to assume that "contract rights . . . under" the Franchise Agreement

22   include intangible rights of permission.  And that's where the analogy breaks down.   Fully

23   earned receivables as in *Value-Added* are not the same as a general grant of the right to operate.

24

25       [27]Since the Franchise Agreement is not diminished or reduced by the collection of fares, LVMC's

26   business income cannot be something that is received upon the "sale, lease, license, exchange, or other
     disposition of" the Franchise Agreement.   Section § 9-102(b)(64)(A) accordingly does not apply.

27   Similarly, since there is no loss or insurance involved, UCC § 9-102(b)(64)(D) and (E) do not apply.

28

1    *Value-Added* might help the Trustee if Clark County owed money to LVMC under the

2    Franchise Agreement's terms; that is, if there were any contract provisions under the Franchise

3    Agreement that, if followed, would result in money flowing to LVMC.   But the Trustee has not

4    shown the existence of any such terms or provisions.  So the analogy fails.

5    But even if "contract rights . . . under" the Franchise Agreement were connected in some

6    way to the revenues LVMC takes in from the monorail's operations, *Value-Added* would still be

7    of dubious value in finding that the connection equated to "proceeds" under Article 9.   As stated

8    in *Value-Added*:

9    The funds collected from the prisoners were the product of the use of the equipment.
     Use is not a disposition of the collateral within the meaning of the definition of
10   "proceeds".  If fruits and products from the use of collateral were treated as proceeds,
     every creditor with a security interest in equipment would have a security interest in
11   all items produced from the equipment as well as the revenues earned by the
     equipment. The revenues earned from the inmate's use of the equipment were the
12   proceeds of the Site Leases.

13   *Id.* at 546.

14   Properly applied, *Value-Added* would seem to hold that the fares for the use of LVMC's

15   trains and track, to which the Trustee has no claim, "were the product of the use of the

16   equipment," *id.*, and not the proceeds of the intangible rights to run the business in the first

17   place.   The Trustee has thus not met its burden of establishing the extent of its interest in any of

18   LVMC's cash from operations as proceeds of its security interest in contract rights.

19   In addition, the Trustee's position diminishes to the vanishing point when the terms of the

20   Financing Agreement are read in context; the placement of the grant of the security interest tells

21   a lot about the parties' objective intent as to its scope.  The grant is found last in a list of other

22   agreements, all of which relate to the construction of the monorail's extension.  This list and its

23   placement would lead a reader to believe that the grant was to allow the Trustee to step in and

24   take over the monorail if the planned expansion did not occur or if it faltered; the limitation in

25   each case to the contract rights (as opposed to intangible or other rights) reinforces this

26

27

28

1    conclusion.[28]  When read together, the intent that emerges is one of a series of security interests

2    designed for a contingency that did not occur: the failure of the extension.  Other provisions

3    were left to deal with operations of the completed track.

4        Policy reasons also support LVMC's position.  If the Trustee were correct, its

5    interpretation would make every single dollar that LVMC generates proceeds, thus rendering the

6    remaining grants of security interests in Section 3.1(b) superfluous.[29]  Under Nevada law,

7    interpretations that swallow other clauses, evidently drafted for some purpose, are to be avoided.

8    *See Phillips*, 94 Nev. at 282, 579 P.2d at 176 ("A court should not interpret a contract so as to

9    make meaningless its provisions.").

10       All of this leads to the conclusion that LVMC's grant of a security interest in the contract

11   rights of the Franchise Agreement must be a security interest in a subset of the more general

12   rights that flow from LVMC's franchise to operate the monorail.  Put differently, the Debtor

13   granted a security interest in certain rights – "contract rights" – contained within the Franchise

14   Agreement, but not in all the entitlements and privileges represented by that agreement.[30]  *State*

15

16       [28]The parties may have been influenced by the fact that when the Financing Agreement was signed,
     Article 9 did not apply to contracts which were nonassignable by operation of law or other nonconsensual

17   restriction.  *See* UCC § 9-406 cmt. 6.  Although the rules under Revised Article 9 regarding attachment
     are broader and the limitations on assignment narrower, taking a security interest in  "contract rights" in
     the Franchise Agreement – likely an account under Article 9 – would probably not allow the Trustee to

18   operate the monorail following any foreclosure.  UCC § 9-408(d); *see also* 11 U.S.C. § 365(c)(1).

19       [29]The court asked the parties if the construction of this clause of the Financing Agreement would be

20   influenced by the fact that the monorail does not just traverse over public property, but also covers purely
     private grounds (which it does).  To the extent that this question goes to the extent of the security interest,

21   the burden was on the Trustee to answer this question.  11 U.S.C. § 363(p)(2).  In this regard, the Trustee
     did not meet its burden of demonstrating if the clause distinguishes between money derived from rights

22   under the Franchise Agreement, which would relate receipts associated with public rights of way, and
     money which the monorail receives from operating over private property, which would not necessarily be

23   related to the Franchise Agreement. *See Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering
     Trader, Inc.)*, 944 F.2d 500, 502 (9th Cir. 1991).

24       [30]Before 1972, "contract rights" was a defined term in Article 9 referring to "any right to payment

25   under a contract not yet earned by performance and not evidenced by an instrument or chattel paper."
     UCC § 9-106 (1962 version).  *See* CLARK, *supra*, ¶ 1.04[1], at n.2.  To the extent that the drafters of the

26   Financing Agreement were influenced by this out-of-date definition, it would appear that the grant would
     be to funds payable to LVMC under the Franchise Agreement – such as refunds or adjustments to the

27   franchise fee – as opposed to the general right to charge the public for transit services.

28

*ex rel. Masto*, 199 P.3d at 832 ("In interpreting a contract, [a court applying Nevada law must] construe a contract that is clear on its face from the written language, and it should be enforced as written.").[31]

As this discussion demonstrates, "contract rights under" the Franchise Agreement are not the same as the Franchise Agreement itself; rather, like a security interest in the proceeds of any sale of an FCC license, LVMC's grant of a security interest in its contract rights under the Franchise Agreement gave the Director a limited subset of rights. As LVMC has not implicated those rights, LVMC's cash is not proceeds of the security interest granted in those contract rights.

<u>b.    Deposit Accounts and Funds</u>

Section 3.1(b) also grants a security interest in "all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or this [Financing] Agreement (except the Rebate Fund and the Indemnification Account of the Contingency Fund)." Read literally, this grant means that all funds delivered to the Trustee and kept by it in its deposit accounts (except for the few excluded accounts) are immediately subject to a perfected security interest.[32]

Although deposit accounts as original or initial collateral were outside the scope of Article 9 when the parties signed the Financing Agreement, Nevada's version of Revised Article 9 –

---

[31]So what subset of rights might this grant of a security interest in "contract rights" represent? One possibility would be the rights to receive payment for a sale of the monorail's business– or at least that portion of any payment allocable to the Franchise Agreement. In this regard, "contract rights" under the Franchise Agreement may resemble similar rights in broadcast licenses granted by the Federal Communication Commission ("FCC") to operate radio and television stations. The FCC has ruled that "a broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right." *In re Merkley*, 94 F.C.C.2d 829, (1983). Despite this FCC ruling, courts have found that lenders can perfect a valid security interest (as a general intangible) in any remuneration that a broadcast licensee is entitled to as a result of the transfer of its FCC license. *See In re Ridgely Commc'ns, Inc.*, 139 B.R. 374, 376 (Bankr. D. Md. 1992).

[32]Under Revised Article 9, deposit accounts may be taken as original collateral in non-consumer transactions. UCC § 9-109(d)(13). Perfection is by control, UCC § 9-104. In this circumstance, control is established by the fact that the accounts in question are maintained at the Trustee. UCC § 9-104(a)(1).

which brought deposit account collateral as original collateral into Article 9 when it became effective in 2001 – picks up and validates this security interest nonetheless. *Wiersma v. O.H. Kruse Grain and Milling (In re Wiersma)*, 324 B.R. 92, 107 (B.A.P. 9th Cir. 2005), *rev'd on jurisdictional grounds*, 483 F.3d 933 (9th Cir. 2007).[33]  And for present purposes, even if it did not, the Trustee's setoff rights as to the accounts would have accomplished the same thing, as setoff rights are treated as secured claims in bankruptcy. *See* 11 U.S.C. § 506(a). *See also Contrail Leasing Partners, Ltd. v. Executive Serv. Corp.*, 100 Nev. 545, 550, 688 P.2d 765, 768 (1984) (citing *Korlann v. E-Z Pay Plan, Inc.*, 247 Or. 170, 428 P.2d 172 (1967) (en banc)) (recognizing that banks have, at common law, a setoff right against their depositors).

As a result, the Trustee has a perfected security interest in all deposit accounts which it maintains, and in which LVMC had balances.

c.    Net Project Revenues

LVMC also granted a lien to the Director in "Net Project Revenues."  Financing Agreement § 3.1(b)(ii).  This grant mirrors one aspect of the typical security interest taken in project financing – the lender gets an interest in the stream of revenue that its loan helped create.[34]  But that interest is typically in *gross* revenues, and that is not the case here.  As will be seen, "Net Project Revenues" are just that: the net amount left after certain operating expenses are deducted from gross revenues.

Taking a security interest in net revenues is a definitional nightmare.  Does the security interest attach to revenues only after payment of operating expenses?  Is this a form of delayed attachment under UCC § 9-203(a)?  Does it matter how often those expenses are scheduled to be

---

[33]Revised Article 9 applies even when, as here, the security interest was created before the revision took effect.  UCC § 9-702 ("this article as amended applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before the amendments to this article take effect.").  Revised Article 9 also applies even if there was a change in the law as to the treatment of the type of collateral involved. UCC § 9-703 (with respect to security interests perfected on effective date); UCC § 9-704 (with respect to security interests unperfected on effective date).

[34]*See, e.g.*, Model Term Sheet, *supra* note 2, at 1-4.

paid, or if different kinds of operating expenses are paid under different schedules?  What is the status of the revenues between the time they are generated and the time the operating expenses are paid?  What happens if, after normal payments of operating expenses are made, the parties discover a bill that went unpaid, or a rebate that went uncashed?

Well-drafted security agreements generally resolve these questions; here, the security agreement – the Financing Agreement – confuses more than it clarifies.  To understand what was granted, one has to go through a maze of cross-references.  The starting point is the language of the Financing Agreement.  Section 3.1(b)(ii) states that:  "As security for the payment of any and all amounts due hereunder, the Borrower hereby grants, assigns and pledges to the Director a security interest in all of the Borrower's right, title and interest in, to and under . . . (ii) the Net Project Revenues."  Net Project Revenues is a defined term, but Section 1.1 of the Financing Agreement directs the reader to the Indenture for its definition.

Section 1.01 of the Indenture contains a long list of alphabetized definitions.  On page 17, "Net Project Revenues" are stated to mean "Project Revenues less Operation and Maintenance Costs."  These two additional definitions are also defined in Section 1.01.  "Project Revenues" are defined as "all gross income and revenue received or receivable by [LVMC] from the ownership, operation or use of the Project . . . ."[35]  Section 1.01 of the Indenture defines "Operation and Maintenance Costs," the key definition for this analysis as:

> [A]ny and all amounts due under the Operation and Maintenance Agreement and the Management Agreement and any reasonable and necessary costs paid or incurred by [LVMC] for maintaining and operating the Project, including all reasonable expenses of management and repair and other expenses necessary to maintain and preserve the Project in good repair and working order . . . all administrative costs of [LVMC] that are charged directly or apportioned to the operation of the Project, such as salaries and wages of employees, legal and accounting fees, insurance, overhead, taxes (if any), fees . . .[36]

---

[35]There were some small but important exclusions.  The Construction Fund, Contingency Fund and Rebate Fund, among others, were excluded.
"Project" is defined to essentially mean the current 3.9 mile reach of LVMC's monorail.

[36]Indenture, § 1.01, p. 17.  The "Operation and Maintenance Agreement" refers to the operating agreement with Bombardier.  *Id.*

The upshot of this excursion through the dark corners of the Indenture is that LVMC's grant of a security interest in the Financing Agreement was a grant of a security interest in whatever was left over after paying Bombardier and other operating and maintenance expenses. This conclusion follows the cash flow under the Indenture; in lieu of obtaining a security interest in gross revenues, the Trustee and the Director opted instead to have their security interest follow the Indenture's cash flow covenants. If there was no default, the security interest did not attach until after payment of Operation and Maintenance Costs, and the testimony was that such payments occurred approximately every thirty days. This conclusion tracks the equation set forth in the Indenture's definition of "Net Project Revenues." An objective reading of the Financing Agreement thus demonstrates that the referent of the grant of the security interest – Net Project Revenues – cannot and does not come into existence until after the subtraction – that is, until after the payment – of Operation and Maintenance Costs from gross revenues.

If there is a default, however, the Indenture channels the flow of funds to the Trustee, whose possession effects both attachment and perfection of a security interest in the revenues it receives and maintains. The Trustee, however, took the property interest in the funds subject to an obligation to pay Operation and Maintenance Costs before paying any principal or interest on the Bonds. Indenture, § 7.03(2) (after a default, Trustee directed to pay first expenses necessary to protect the interests of the Bondholders and Trustee's fees, and then to pay Operation and Maintenance Costs, all before any payment of principal or interest on the Bonds). *See also* Financing Agreement § 4.1(b) ("in the event of default, "all payments permitted or required to be paid from the Collection Fund for Operation and Maintenance shall be paid by the Trustee from the Revenue Fund upon written direction of the Borrower . . . .").

1    No one apparently seriously believed LVMC would upset this arrangement, breach its

2    contract, and not deposit all revenues with the Trustee after default.  This belief seems odd in

3    hindsight.[37]

4        *C.    The Identification and Extent of the Trustee's Interests in Cash Collateral*

5        To veterans of Article 9, all this may seem more than passing strange.  The Indenture

6    creates a world in which operating expenses have priority over a secured creditor's debt

7    payments, a world upside down from the normal loan structure.  An adroit and hardnosed bank

8    lawyer would have insisted on a security interest in all revenues whenever acquired that would

9    attach as soon as the debtor acquired the revenues, with no guaranties of payment to any other

10   creditor.  And he or she would have insisted on procedures within its control to maintain

11   perfection at all times.

12       But the Indenture cannot be read to mean what the bondholders wish they could have or

13   should have negotiated; this court can read it only as it is written.[38]  And that means that no

14

15       [37]Ignoring basic traits of others has long been a puzzling feature of human existence.  The ancient
     fable of the Scorpion and the Frog is apt.  A Scorpion needed to cross a river, and asked a Frog to assist it.
16   The Frog demurred, claiming that the Scorpion would sting and kill it.  The Scorpion countered that any
     sting would doom it as well as the Frog.  So the Frog agreed, and the Scorpion climbed aboard the Frog's
17   back, and they began to cross the river.  Half way across, the Scorpion stung the Frog.  As the Frog
     slipped into unconsciousness, and as the Scorpion was drowning, the Frog asked why the Scorpion had
18   stung him.  "I can't help it," replied the Scorpion.  "It's just my nature."
         It is in the nature of most debtors to take whatever means are necessary to ensure their financial
19   survival, even to the point of breaching their contracts.  Indeed, part of the purpose of taking security is
     the judgment that the debtor's unsecured obligation to repay is insufficiently reliable; as a consequence,
20   there is little force to the argument that the Trustee relied on the unsecured promise of LVMC to transfer
     its revenues to the Trustee.  In retrospect, the Trustee should have respected this elemental nature and
21   provided for different controls, or (and maybe it did this) priced the Bonds to account for this known risk.

22       [38]Although not always.  The Trustee argues that, under the Indenture, deposit of funds with it means
     that the funds are placed in the Revenue Fund, "in which LVMC does not hold an ownership interest."  If
23   the Trustee is arguing that LVMC loses all interest in such funds when they are deposited, it is mistaken.
     While Sections 5.01 to 5.03 of the Indenture are consistent with this argument, Article 9 is not.  It applies
24   to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by
     contract."  UCC § 9-109(a)(1).  This is the classic substance over form argument of secured transactions;
25   parties cannot defeat its application by contract.  *See* UCC § 9-109, cmt. 2 ("When a security interest is
     created, this Article applies regardless of the form of the transaction or the name that parties have given to
26   it.").  Thus, the most that the Trustee obtains upon deposit of such funds is a security interest, a property

27

28

security interest attaches in any of LVMC's revenues until the earlier of: (i) possession or control of the revenues by the Trustee; or (ii) after payment of Operation and Maintenance Costs, with a balance remaining.[39]  Until the security interest attaches, the Trustee cannot hold an "interest" in the property as required by Section 363(a) for such property to be cash collateral.  The Trustee's legitimate interests in cash collateral are thus restricted to: (i) cash in accounts maintained at its branches as of LVMC's filing; and (ii) other cash or deposit accounts to the extent not necessary for Operation and Maintenance Costs.

As a practical matter, however, the only cash collateral as of the petition date would be the amounts then on deposit with the Trustee, or an amount approximating $225,000.  As the Trustee

_____

interest which recognizes residual ownership in the debtor.  Moreover, were the Trustee to take the Indenture seriously, take substantial funds from the debtor and then hold them without applying them to the outstanding indebtedness, such a transaction would raise serious fraudulent transfer issues.

[39]To show perfection of its security interests, the Trustee resorts to equitable arguments to establish by operation of law what it failed to obtain by contract and practice.  These theories are, however, contrary to the general notion that Article 9 generally supplanted such theories in favor of one simple system.  *See In re Schwalb*, 347 B.R. 726, 738 (Bankr. D. Nev. 2006).  Moreover, theses theories are not applicable on the facts.

Constructive trust theories are unavailable because the lender-borrower relationship is not a confidential one under controlling Nevada law, *see Yerington Ford, Inc. v. General Motors Acceptance Corp.*, 359 F. Supp. 2d 1075, 1089-91 (D. Nev. 2004) (finding no fiduciary or confidential relationship generally in debtor-creditor relations), *aff'd in part, rev'd in part on other grounds*, *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 882 (9th Cir. 2007),  and Nevada law requires such a confidential relationship to establish a constructive trust.  *See Waldman v. Maini*, 195 P.3d 850, 857 (Nev. 2008) (quoting *Locken v. Locken*, 98 Nev. 369, 372, 650 P.2d 803, 804-05 (1982) (in turn citing *Schmidt v. Merriweather*, 82 Nev. 372, 375, 418 P.2d 991, 993 (1966))).

Estoppel is also not available.  The Trustee could not show the required detrimental reliance on any act or assertion of LVMC, and the Trustee's did not take prompt action once it learned of the diversion.  *See NGA #2 LLC v. Rains*, 113 Nev. 1151, 1160-61, 946 P.2d 163, 169 (Nev. 1997); *Cheqer, Inc. v. Painters and Decorators Joint Comm., Inc.*, 98 Nev. 609, 614, 655 P.2d 996, 998-99 (Nev. 1982).

Finally, the Trustee is not entitled to an equitable lien.  A critical component of an equitable lien, if permissible at all given Article 9, is that "the creditor has done all it reasonably can do to perfect its lien, but nevertheless is thwarted by the uncooperativeness of the debtor."  *Rushton v. Dean Evans Chrysler-Plymouth (In re Solar Energy Sales and Services)*, 4 B.R. 364, 369 (Bankr. D. Utah 1980).  *See also Peters v. WFS Financial, Inc. (In re Glandon)*, 338 B.R. 103, 107-108 (Bankr. D. Colo. 2006); *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 119 (Bankr. S.D.N.Y. 1982).  Here, however, the Trustee made a conscious choice to leave to LVMC the task of collecting and transferring it revenues, thus taking the risk of diversion and breach.  It also took no affirmative action for at least two months after it learned of the diversion.  It has thus has not done all it could have reasonably have done.  *See note 37 supra.*

1    has the burden of establishing the extent of its interest, 11 U.S.C. § 363(p)(2), and as it did not

2    introduce any evidence of the Operation and Maintenance Costs paid from the Bank of America

3    account, it has failed to carry its burden of establishing that any portion of the Bank of America

4    account constituted cash collateral.[40]

5    IV.    ADEQUATE PROTECTION OF THE TRUSTEE'S INTERESTS IN CASH COLLATERAL

6           As the Trustee has established that it has some cash collateral interests to protect, the

7    question then turns to what actions and procedures should be taken to adequately protect those

8    interests.  At the conclusion of the hearing, the court requested, and the parties provided,

9    proposed orders regarding their respective positions on adequate protection.  Both sides agreed,

10   in one form or another, to follow the Indenture with respect to the collection, deposit, and

11   processing of revenues from LVMC's operations.  Both sides agreed that, to the extent

12   necessary, LVMC would grant a replacement lien in LVMC's postpetition "Net Project

13   Revenues." The point of departure was that the Trustee demanded liens on all of LVMC's

14   unencumbered property, including its tracks and its trains.  LVMC offered no liens on items not

15   previously encumbered.

16          A.    *Adequate Protection of Cash and Deposit Accounts Held as of the Petition Date*

17          The Trustee, as indicated above, has not been able to carry its burden on whether cash and

18   funds on deposit with it or with Bank of America represent Net Project Revenues.  Nonetheless,

19

20          [40]If the cash at Bank of America were cash collateral, the Trustee's interests would likely be
       unperfected as there was no evidence of any control agreement with Bank of America.  See UCC § 9-
21     104(a)(2).  Even though the Trustee's interests in such cash and deposits would be unperfected, LVMC's
       use of that case would still be subject to the cash collateral restrictions contained in Section 363, *see, e.g.,*
22     *Scottsdale Medical Pavilion v. Mutual Benefit Life Ins. Co. (In re Scottsdale Medical Pavilion)*, 159 B.R.
       295, 302 (B.A.P. 9th Cir. 1993), *aff'd*, 52 F.3d 244 (9th Cir. 1995) (adopting BAP's reasoning as its own);
23     *In re Kaneohe Custom Design, Ltd.*, 41 B.R. 298, 301 (Bankr. D. Haw. 1984).  Such protection might be
       different than granted in this opinion; "[i]f the creditor's interest in cash collateral is unperfected  and
24     therefore subject to avoidance under § 544, the interest to be protected is tenuous, and not deserving of
       much in the way of adequate protection." *Scottsdale Medical Pavilion*, 159 B.R. at 302.  *But cf. G & B*
25     *Aircraft Mgmt. v. Smoot (In re Utah Aircraft Alliance)*, 342 B.R. 327, 338 (B.A.P. 10th Cir. 2006)
       (requiring extraordinary circumstances – which could include morally culpable conduct or conduct
26     tipping balance of equities in favor of the creditor – to justify adequate protection of an unperfected lien).

27

28

1    because of the Trustee's interest in deposit accounts, LVMC must give the Trustee some

2    protection of that interest.  Both LVMC's and the Trustee's adequate protection offers required

3    LVMC to follow the cash deposit and disbursal procedures in the Indenture.  This process, as it

4    both requires LVMC to turn over cash to the Trustee, and the Trustee to honor legitimate

5    Operation and Maintenance Costs, both adequately protects the Trustee's interest in the deposit

6    accounts and the estate's interest in smooth operations.[41]  This process preserves the parties'

7    bargain with respect to the dedication of revenues to Operation and Maintenance Costs, and

8    keeps the monorail running for the benefit of all parties.

9        Moreover, LVMC's use of the cash it generates in its operations is itself a form of adequate

10   protection.  This is because LVMC's continued investment in, and operation of, the monorail

11   will increase, or at least maintain, the collateral's value.  A shuttered monorail will not generate

12   any revenue, but every additional rider on the monorail will generate additional cash for

13   distribution to the noteholders, after LVMC pays reasonable expenses.  The Trustee has offered

14   no evidence that monorail ridership is decreasing, as it would have needed to obtain additional

15   adequate protection of its prepetition interests.  This follows from the Supreme Court's decision

16   in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).  In

17   that case, the Court held that when collateral was not diminishing in value, the mere passage of

18   time did not warrant adequate protection.  *See id.* at 382; *In re Integrated Health Services, Inc.*,

19   260 B.R. 71, 74 (Bankr. D. Del. 2001) (denying adequate protection or stay relief because the

20   creditor failed to provide sufficient evidence showing that the value of the collateral was

21   declining); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994); *In re*

---

23   [41]These expenses likely will include the Trustee's attorney's fees and costs, as the Indenture
     contemplates that such fees and costs are within the definition of Operation and Maintenance Costs.
     Indenture, p. 17.  Although this arguably raises an issue under 11 U.S.C. § 506(b), since the Trustee is
24   undersecured, LVMC on behalf of the estate has offered and agreed to these payments.  Moreover,
     because LVMC is obligated to deposit all revenues with the Trustee, the difference would be in whether
25   the estate receives a credit against the Bond indebtedness for the amounts paid in respect of attorneys'
     fees, an issue of relevance for junior classes only.  Given the Trustee's dominating position as an
26   unsecured creditor with respect to its deficiency, however, the net difference to the estate is *de minimis*.

1  *Continental Airlines, Inc.*, 134 B.R. 536, 544 (Bankr. D. Del. 1991) (citing *Timbers* for the

2  proposition that: "An undersecured creditor is only entitled to adequate protection payments if its

3  collateral is declining in value."). Rather, the Debtor's expenditures keep the monorail running

4  and preserve the Trustee's expectation in net revenues as their primary collateral.

5      In a similar manner, other courts have found that a debtor's use of cash collateral to

6  maintain properties from which rents are being generated is a sufficient form of adequate

7  protection. *See Federal Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*. 153 B.R.

8  204, 214 (N.D. Ill. 1993) ("[T]he required adequate protection of Rents is satisfied to the extent

9  the Debtor reinvests the rents in the operation and maintenance of the property because the value

10  of the secured creditor's interest in its collateral will thereby be increased."); *In re 499 W.*

11  *Warren Street Assocs., Ltd. P'ship*, 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (allowing the use of

12  cash collateral to maintain property); *McCombs Prop. VI, Ltd. V. First Texas Sav. Ass'n (In re*

13  *McCombs Prop. VI, Ltd.)*, 88 B.R. 261, 267 (Bankr. C. D. Cal. 1988) (holding that rents could be

14  spent to make repairs or renovations that would increase rent flow even without equity cushion);

15  *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982).

16      B.    *Adequate Protection of Postpetition Cash Flows*

17      These procedures will also help to adequately protect the Trustee's interest, if any, in

18  postpetition cash flows, including any Net Project Revenues. Under Section 552(a) of the

19  Bankruptcy Code, the Trustee may no longer enforce the after-acquired property provisions of

20  the Indenture against LVMC's estate. Section 552(b), however, creates an exception from this

21  termination by recognizing security interests in proceeds of prepetition collateral, as opposed to

22  security interests taken by virtue of the after-acquired property clause.

23      Here, several questions arise. First, what law determines the content of "proceeds" in

24  Section 552(b)? Second, are ongoing revenues really "proceeds" of the Trustee's prepetition

25  position? Finally, if there are proceeds, does the "equities" exception found at the end of Section

26  552(b) apply to restrict or reduce the Trustee's interest?

27

28

1.     **What Law Determines the Content of "Proceeds" as Used in Section 552(b)?**

It is generally assumed that when the Bankruptcy Code, or any other federal statute for that matter, uses terms borrowed from nonbankruptcy law, the intent is that those terms retain the meaning given to them by nonbankruptcy law, at least to the extent that there is no overriding federal policy.  As the Supreme Court has stated when analyzing whether to incorporate state law understandings into federally defined terms:

> Our cases indicate that a court should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards, *see, e.g. Clearfield Trust Co. v. United States,* 318 U.S. 363, 366-367, 63 S.Ct. 573, 574-575, 87 L.Ed. 838 (1943), or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand. *See, e.g., Boyle v. United Technologies Corp.,* 487 U.S. 500, 511-512, 108 S.Ct. 2510, 2518-2519, 101 L.Ed.2d 442 (1988); *DelCostello v. Teamsters*, 462 U.S. 151, 169-172, 103 S.Ct. 2281, 2293-2295, 76 L.Ed.2d 476 (1983). Otherwise, we have indicated that federal courts should "incorporat[e] [state law] as the federal rule of decision," unless "application of [the particular] state law [in question] would frustrate specific objectives of the federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991); *Dzikowski v. N. Trust Bank of Fla. (In re Prudential of Fla. Leasing, Inc.)*, 478 F.3d 1291, 1298 (11th Cir. 2007) (issue of whether understanding of "single satisfaction" under Florida law informs interpretation of § 550(d)); *Americredit Fin. Servs., Inc. v. Penrod (In re Penrod)*, 392 B.R. 835, 843 (B.A.P. 9th Cir. 2008) (discussing incorporation of "purchase money security interest" from UCC into Section 1325(a) of the Bankruptcy Code).  Moreover,

> [t]he presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards. *See* [*Kimbell Foods*, 440 U.S.] at 728-729, 739-740, 99 S.Ct., at 1458-1459, 1464-1465 (commercial law) . . . .

*Kamen*, 500 U.S. at 98.

As a result, unless there are good reasons to depart from it, the UCC satisfies these requirements; it is, for the most part, a unifying code governing commercial transactions across

1    and among the states that have adopted it.  We thus start with the presumption that "proceeds" in

2    Section 552(b) should be construed consistently with the same term as in the UCC.

3         While the court adopts that rule, it still does not answer a central question here: what

4    version of Article 9 applies?  At the time the Indenture was signed, the pre-2001 version of

5    Article 9 was in effect.  This might matter, since it is beyond doubt that the drafters of Revised

6    Article 9 intended to expand the scope of "proceeds."  State law has answered this question;

7    even though the parties signed the Financing Agreement before the effective date of Revised

8    Article 9, Revised Article 9 applies to its interpretation and enforcement, and not pre-2001 law.

9    UCC § 9-702; *In re Wiersma*, 324 B.R. at 107.

10        Whether this should be the federal rule, however, depends on whether, in *Kamen*'s words,

11   the revised definition of proceeds would "frustrate specific objectives of the federal programs."

12   Here, although one could construct a case in which the change in definition frustrated the

13   rehabilitative goals of title 11, this is not such a case.  The differences in scope are not such that

14   they would disturb normal commercial expectations; indeed, a case can be made that the state

15   law sets or at least shapes such expectations.  As a result, this court will follow the revised

16   definition of proceeds contained in Revised Article 9.

17        2.    **Are Ongoing Revenues Proceeds of the Trustee's Prepetition Security**

18              **Interest?**

19        As indicated above, the Trustee has an automatically attached and perfected interest in

20   most proceeds under Article 9 of the UCC.  But are LVMC's postpetition revenues "proceeds"

21   of the Trustee's prepetition collateral?  As quoted above, the extent of proceeds is quite broad.

22   But the two sources of original collateral that the Trustee has – Net Project Revenues and deposit

23   accounts – lead to different results with respect to proceeds.

24        a.    Net Project Revenues as Proceeds

25        From the discussion above, the security interest in Net Project Revenues is somewhat

26   ephemeral for purposes of cash collateral.  Being the balance left over after all operating and

27

28

1   maintenance costs are paid, Net Project Revenues are thus kept by the Trustee and applied as the

2   Indenture instructs.  This is key – no Net Project Revenues cycle back into LVMC's operations,

3   or are used to fund its activities.  Future revenues cannot be said to be "acquired upon the sale,

4   lease, exchange or other disposition of the collateral," UCC § 9-102(b)(64)(A), nor can they be

5   said to be collected on, or distributed on account of, collateral," UCC § 9-102(b)(64)(B).

6       To see this point more clearly, imagine that LVMC's total revenues exactly equaled its

7   Operation and Maintenance Costs.  There would be no Net Project Revenues, and hence no

8   collateral, even though LVMC could continue to operate.  Thus, future Net Project Revenues are

9   not proceeds of prior Net Project Revenues, and no adequate protection need be given.

10      LVMC has, however, offered to protect any potential interest in Net Project Revenues by

11  granting a replacement lien under 11 U.S.C. § 361(2) in its postpetition Net Project Revenues,

12  and the court accepts that offer.

13                          b.    Deposit Account Proceeds

14      If the Indenture is followed, then another proceeds argument arises.  Postpetition, LVMC

15  will deposit all funds into accounts maintained at the Trustee.  Under the UCC, the Trustee's

16  interest in such funds, as stated earlier, would simultaneously attach and perfect upon such

17  deposit.  *See* UCC § 9-203(b) (attachment); 9-104(a)(1) (perfection).  Yet Section 552(a)

18  operates with respect to attachment of funds in a deposit account in the same manner it acts with

19  respect to any other postpetition attachment pursuant to a prepetition security agreement.  It

20  precludes attachment, thus lessening the Trustee's interests.  One method of protecting this

21  interest is to grant a replacement lien under Section 361(2) in all funds deposited into accounts

22  maintained at the Trustee, and the court shall impose such a replacement lien.

23      While this replacement lien may cover funds that are on deposit with the Trustee, it does

24  not address the proceeds interest the Trustee may obtain in whatever LVMC receives upon

25

26

27

28

expenditure of such funds.[42]  This proceeds interest arises because LVMC will pay all of its bills

and expenses from deposit accounts maintained at the Trustee.  Since these expenses, especially

payments on the contract with Bombardier, contribute to LVMC's revenues, such revenues could

be proceeds – actually, proceeds of proceeds – which maintain their character as cash collateral

deserving of protection.  In this scenario, payments to Bombardier would satisfy LVMC's

obligation to it under the operating agreement.  With payment, Bombardier would then have no

excuse not to perform its obligations under the operating agreement, which in turn lead to

LVMC's revenues.  The best link between this performance and LVMC's gross revenues would

be UCC Section 9-102(b)(64)(B), which defines proceeds to include anything "collected on, or

distributed on account of, collateral [here, Bombardier's performance]."  UCC § 9-

102(b)(64)(B).  Even if this linkage is appropriate – and it may not be as it is clangs on the ear to

say that performance on a contract is "collected" or "distributed" – the Bankruptcy Code may

interpose limitations on this proceeds interest.

3.    **Are There Equitable Considerations that Section 552(b) Would Allow the Court to Consider That Would Restrict the Trustee's Security Interests in Proceeds?**

The last clause of Section 552(b) states that even if a security interest in proceeds survives,

it may be limited to the "extent that the court, after notice and a hearing and based upon the

equities of the case, orders otherwise."  Here, a real question exists as to an equitable division of

the revenues between the initial cash subject to the Trustee's security interest in deposit

accounts, and the revenues produced.  The funds on deposit are undoubtedly necessary, but also

---

[42]The recipient of such funds, such as Bombardier, takes such funds free of the Trustee's security interest, absent any showing of collusion.  UCC § 3-332.

1   assuredly not sufficient; many other aspects of LVMC's operations contribute to revenue

2   production.[43]

3       In such cases, courts have often adopted methods of allocation of contributions between the

4   collateral and the other efforts of the debtor.  *See generally* 4 JAMES J. WHITE & ROBERT S.

5   SUMMERS, UNIFORM COMMERCIAL CODE § 32-8 (6th ed. 2010).  But often the efforts of the

6   estate in generating the income predominate the allocation.  As the Bankruptcy Appellate Panel

7   has noted, "revenue generated by the operation of a debtor's business, post-petition, is not

8   considered proceeds if such revenue represents compensation for goods and services rendered by

9   the debtor in its everyday business performance. . . . Revenue generated post-petition solely as a

10  result of a debtor's labor is [also] not subject to a creditor's pre-petition interest."  *Arkison v.*

11  *Frontier Asset Mgmt. LLC (In re Skagit Pacific Corp.)*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004)

12  (citing *In re Cafeteria Operators*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003)).  *See also In re*

13  *Wabash Valley, Power Ass'n, Inc.*, 72 F.3d 1305, 1322 (7th Cir. 1995) (no proceeds argument

14  made when lender had a blanket lien on power generation assets and rights; postpetition income

15  not treated as collateral).  *See also* Groenwegen, *supra* note 2 ("Although certain components of

16  the debtor's revenue might be classified as 'rent' or 'proceeds,' postpetition operating income

17  will be beyond the reach of the secured claim.")

18      Here, however, LVMC has sought to incorporate the gist of this provision by providing

19  enhanced reporting and disbursement procedures.  The Trustee has mirrored this request in its

20  demand.  This confluence of procedures indicates agreement on adequate protection of any

21  interest the Trustee may have in LVMC's cash flow, and thus the court does not have to allocate

22  any interest the Trustee's may have in proceeds interest across LVMC's revenues.

23

24

25

_____

26      [43]The same argument would apply to the extent that the revenues are proceeds of the Trustee's
    interest in the Franchise Agreement.

27

28

34

V.    SUMMARY

The Trustee has met its burden with respect to establishing the extent of its security interest in the $225,000 in accounts maintained at the Trustee as of the filing.  It has also shown that it has a proceeds interest stemming from its original security interest in LVMC's deposit accounts maintained by the Trustee.  It has not established a security interest in the $971,000 in the Bank of America account, nor has it established a security interest in the $65,000 in coin and the $162,000 in cash held by Brink's.[44]

As the Financing Agreement limited the Trustee's ongoing interest to Net Project Revenues, that is all to which the statutory lien found in NEV. REV. STAT. § 349.620 could attach since its reach is limited to "the revenues out of which the bonds have been made payable."  As a result, no statutory lien attached to or fixed upon any of the funds in the Bank of America account or in the cash held by Brink's.[45]

Adherence to the procedures and obligations for handling and applying cash contained in the Indenture will protect the Trustee's legitimate and proven interests in its collateral.  The court will thus separately enter an order requiring LVMC to follow those procedures.  Should revenues consistently fall below historic levels and the amounts of cash collected threaten to materially lessen these protections, the court will consider amending the order, or will consider a request by the Trustee under 11 U.S.C. § 507(b).[46]

---

[44]This finding is for purposes of the cash collateral motions only.  Any attempt by an estate representative to obtain a final order with respect to the extent of the Trustee's liens and security interests would require an adversary proceeding.  *See* FED. R. BANKR. P. 7001(2).

[45]As the credit card receivables are accounts which were not cash collateral as of the date of LVMC's filing, they need not be protected as cash collateral, *see Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*, 944 F.2d 500, 501 (9th Cir. 1991).  In addition, although likely paid at least in part, there was no evidence showing payment offered at the hearing.

[46]The Trustee requested that the court enter an order now granting it protection under Section 507(b).  That request is premature.  As stated by *Collier*, "this priority claim is for the loss or shortfall not covered by adequate protection."  4 COLLIER, *supra*, at ¶ 507.12.  Until such a loss has been established, there is no need to presage such a superpriority claim.  *See id.* at ¶ 507.12[1][c].

1    VI.    CONCLUSION

2         The Trustee is the assignee of a security interest in bank accounts held by the Trustee, Net

3    Project Revenues, and contract rights under the Franchise Agreement.  Undoubtedly, and with

4    hindsight, this combination of interests falls short of what the Trustee asserted, and probably

5    short of what it might have thought it received.  But application of contract interpretation

6    principles designed e to give the parties' words their most reasonable meaning demonstrates that

7    the Trustee's interests are not particularly robust.  Nevertheless, the parties basically agree that

8    adherence to the procedures embodied in the Indenture, and replacement liens, will preserve the

9    Trustee's position at filing throughout this case.  And that is the goal of adequate protection.

10         This opinion shall constitute the court's findings of facts and conclusions of law in

11    accordance with FED. R. BANKR. P. 7052, made applicable to this contested matter by FED. R.

12    BANKR. P. 9014(c).  The court will enter a separate order regarding the daily implementation of

13    this opinion.

14                                         * * * * *

15
      Copies sent to:
16
      CM/ECF Electronic noticing
17    BNC Mailing Matrix

18                                         # # #

19

20

21

22

23

24

25

26

27

28

36