1  GORDON SILVER
   GERALD M. GORDON, ESQ.
2  Nevada Bar No. 229
   E-mail:  ggordon@gordonsilver.com
3  WILLIAM M. NOALL, ESQ.
   Nevada Bar No. 3549
4  E-mail:  wnoall@gordonsilver.com
   ERIC J. VAN, ESQ.
5  Nevada Bar No. 10259
   E-mail:  evan@gordonsilver.com
6  3960 Howard Hughes Pkwy., 9th Floor
   Las Vegas, Nevada 89169
7  Telephone (702) 796-5555
   Facsimile (702) 369-2666
8  Attorneys for the Debtor

E-Filed On _8/17/10_

9            **UNITED STATES BANKRUPTCY COURT**

10            **FOR THE DISTRICT OF NEVADA**

11  In re:

12  LAS VEGAS MONORAIL COMPANY,

13            Debtor.

14

15

Case No.: 10-10464-BAM
Chapter 11

Date:
Time:

16  **[PROPOSED] DISCLOSURE STATEMENT TO ACCOMPANY
    DEBTOR'S PLAN OF REORGANIZATION**

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 6

II. INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE
    STATEMENT ......................................................................................................... 7

III. SUMMARY OF THE PLAN .............................................................................. 10

IV. SUMMARY OF VOTING PROCESS ................................................................ 14

    A.    Who May Vote to Accept or Reject the Plan. ..................................... 15
    B.    Summary of Voting Requirements. ..................................................... 15

V. GENERAL INFORMATION ABOUT THE DEBTOR'S BUSINESS,
    RESTRUCTURING EFFORTS AND THE FILING OF THE BANKRUPTCY CASE ........ 16

    A.    The Debtor's Business. ....................................................................... 16
        1.    Corporate Background and Structure. ..................................... 16
        2.    Operations. .............................................................................. 17
        3.    The Debtor's Prepetition Management Structure. ................... 19
        4.    The Debtor's Relationship with Bombardier and CAPEX
            Requirements. ......................................................................... 22
    B.    The Debtor's Prepetition Debt Structure. ........................................... 23
    C.    Events Leading to the Bankruptcy Case. ............................................ 28
        1.    Financial Performance. ........................................................... 28
        2.    Economic Pressures and Requirements. .................................. 31
        3.    Default. .................................................................................... 33
        4.    Uncertainty as to Access to Operating Funds. ........................ 34
        5.    Restructuring Goals. ................................................................ 35
    D.    Significant Events During the Bankruptcy Case. ............................... 35
        1.    First Day Motions. .................................................................. 35
        2.    Other Significant Motions and Post-Petition Events. ............. 36

VI. DESCRIPTION OF THE PLAN ......................................................................... 39

    A.    Overview of Chapter 11. ..................................................................... 39
    B.    Treatment of Unclassified Claims under the Plan. ............................. 41
        1.    Treatment of Administrative Claims. ...................................... 41
        2.    Treatment of Priority Tax Claims. .......................................... 41
    C.    Classification and Treatment of Claims under the Plan. ..................... 42
        1.    Treatment of Class 1 (Other Priority Claims). ........................ 42
        2.    Treatment of Class 2 (Other Secured Claims). ....................... 42
        3.    Treatment of Class 3 (General Unsecured Claims). ................ 42
        4.    Treatment of Class 4 (1st Tier Bond Secured Claims). ........... 43
        5.    Treatment of Class 5 (1st Tier Bond Unsecured Claims). ....... 44
        6.    Treatment of Class 6 (2nd Tier Bond Claims). ....................... 44
        7.    Treatment of Class 7 (3rd Tier Bond Claims). ........................ 45
        8.    Treatment of Class 8 (Director Claims). ................................. 45
        9.    Treatment of Class 9 (Subordinated Claims). ......................... 45
    D.    Means for Implementation of the Plan. ............................................... 45
        1.    Reorganized LVMC. .............................................................. 45

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

| | | 2. | Additional Reorganized LVMC Provisions. | 46 |
| | | 3. | Effective Date Events. | 46 |
| | | 4. | Post-Effective Date Management and Operations. | 46 |
| | | 5. | Post-Effective Date Officers and Directors of Reorganized LVMC. | 47 |
| | | 6. | No Corporate Action Required. | 47 |
| | | 7. | Effectuation of Transactions. | 47 |
| | | 8. | Filing with Nevada Secretary. | 48 |
| | E. | | Executory Contracts and Unexpired Leases. | 48 |
| | | 1. | Executory Contracts. | 48 |
| | | 2. | Approval of Assumption or Rejection. | 48 |
| | | 3. | Cure of Defaults. | 49 |
| | | 4. | Objection to Cure Amounts. | 49 |
| | | 5. | Confirmation Order. | 50 |
| | | 6. | Post-Petition Date Contracts and Leases. | 50 |
| | | 7. | Bar Date. | 50 |
| | F. | | Conditions Precedent to Confirmation and the Effective Date. | 50 |
| | | 1. | Conditions to Confirmation. | 50 |
| | | 2. | Conditions to Effectiveness. | 50 |
| | | 3. | Notice of Effectiveness. | 51 |
| | | 4. | Waiver of Conditions. | 51 |
| VII. RISK FACTORS | | | | 51 |
| | A. | | The Debtor Has No Duty To Update. | 51 |
| | B. | | Information Presented Is Based on the Debtors' Books and Records, and Is Unaudited. | 52 |
| | C. | | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Will Vary. | 52 |
| | D. | | No Legal or Tax Advice Is Provided to You by This Disclosure Statement. | 52 |
| | E. | | No Admissions Made. | 52 |
| | F. | | No Waiver of Right to Object or Right to Recover Transfers and Estate Assets. | 53 |
| | G. | | Bankruptcy Law Risks and Considerations. | 53 |
| | | 1. | Confirmation of the Plan Is Not Assured. | 53 |
| | | 2. | The Effective Date or the Substantial Consummation Date Might Be Delayed or Never Occur. | 53 |
| | | 3. | The Projected Value of Estate Assets Might Not Be Realized. | 54 |
| | | 4. | Allowed Claims in the Various Classes May Exceed Projections. | 54 |
| | | 5. | No Representations Outside of This Disclosure Statement Are Authorized. | 54 |
| | H. | | Risks Related to the Debtor's Business Operations. | 54 |
| | | 1. | Effect of the Bankruptcy Case. | 54 |
| | | 2. | The Volatility and Disruption of the Capital and Credit Markets and Adverse Changes in the Global Economy Have Negatively Impacted the Debtor's Access to Financing. | 55 |
| | | 3. | The Debtor Faces Extensive Regulation from Government Authorities. | 55 |
| | | 4. | The Debtor's Business, Financial Condition and Results of Operations Are Dependent in Part on a Number of Factors That Are Beyond the Debtor's Control. | 56 |
| VIII. CERTAIN SECURITIES LAW CONSIDERATIONS | | | | 56 |

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

IX. POST-EFFECTIVE DATE OPERATIONS.....................................................................57

    A.    Title to Property; Discharge; Injunction. .........................................................57

        1.    Vesting of Assets. ...................................................................................57
        2.    Preservation of Litigation Claims. .........................................................57
        3.    Settlement of Litigation Claims. ............................................................57
        4.    Discharge. ...............................................................................................57
        5.    Compromise and Settlement. .................................................................58
        6.    Debtor Releases. ....................................................................................58
        7.    Injunction. ..............................................................................................59
        8.    Exculpation. ............................................................................................60
        9.    Director and Officer Liability Insurance.................................................60
        10.    Indemnification. .....................................................................................61

    B.    Post Confirmation Reporting and Quarterly Fees to the UST. ...........................61

X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES.............................................62
XI. CONFIRMATION OF THE PLAN ...............................................................................62

    A.    Confirmation of the Plan. .................................................................................62
    B.    Objections to Confirmation of the Plan. ...........................................................62
    C.    The Best Interest Test and Feasibility of the Plan. ..........................................63

        1.    Best Interest of Creditors. ......................................................................63
        2.    Debtor's Projections. .............................................................................64
        3.    Liquidation Analysis. .............................................................................66
        4.    Feasibility. ..............................................................................................68
        5.    Confirmation of the Plan Without Acceptance By All Impaired Classes: the "Cramdown" Alternative ................................................69
        6.    Accepting Impaired Class. .....................................................................71
        7.    Acceptance of the Plan...........................................................................71
        8.    Allowed Claims. .....................................................................................71
        9.    Impaired Claims. ....................................................................................71
        10.    Voting Procedures...................................................................................72

XII. ALTERNATIVES TO THE PLAN ...............................................................................73

    A.    Alternative Plans of Reorganization. ................................................................73
    B.    Liquidation under Chapter 7. ............................................................................73

XIII. PREFERENCE AND OTHER AVOIDANCE ACTIONS .................................................74
XIV. RECOMMENDATION AND CONCLUSION................................................................75

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

1

**APPENDIX**

2 EXHIBIT "A":  PLAN OF REORGANIZATION

3 EXHIBIT "B":  LIQUIDATION ANALYSIS

4 EXHIBIT "C":  FINANCIAL PROJECTIONS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

# I.
# INTRODUCTION

On January 13, 2010 (the "Petition Date"), Las Vegas Monorail Company, a Nevada non-profit corporation (the "Debtor") filed a voluntary Chapter 11 petition for relief (the "Petition") in the United States Bankruptcy Court for the District of Nevada, Las Vegas (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code,[1] being case no. BK-S-10-10464-BAM (the "Bankruptcy Case").

The Debtor has prepared this Disclosure Statement in connection with the solicitation of votes on the Debtor's Plan Of Reorganization (the "Plan") proposed by the Debtor to treat the Claims of Creditors of the Debtor.

**Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. In the event of a conflict or difference between the definitions used in this Disclosure Statement and in the Plan, the definitions contained in the Plan shall control.**

The Exhibits to this Disclosure Statement included in the Appendix are incorporated into, and are a part of, this Disclosure Statement. The Plan is attached as Exhibit A. Any interested party desiring further information should contact:

> Gordon Silver
> Attn: William M. Noall, Esq.
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, Nevada 89169
> Telephone: (702) 796-5555
> Email: wnoall@gordonsilver.com

Interested parties may also obtain further information from the Bankruptcy Court at its website: http://www.nvb.uscourts.gov.

Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Exhibits hereto including the Plan, and the instructions accompanying the Ballots

---

[1] Unless otherwise indicated herein, all references to Chapters or Sections refer to title 11 of the United States Code (the "Bankruptcy Code"), and all Rule references shall refer to the Federal Rules of Bankruptcy Procedure (the "Rules").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

6

in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes.

## II.
## INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE STATEMENT

The objective of a Chapter 11 bankruptcy case is the confirmation (i.e. approval by the bankruptcy court) of a plan of reorganization. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying claims against, and equity interests in, a debtor. After a plan has been filed, the holders of such claims and equity interests that are impaired (as defined in Section 1124 of the Bankruptcy Code) and receiving some cash or property on account of such claims or equity interests are permitted to vote to accept or reject the plan. Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 of the Bankruptcy Code requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed voting decision about whether to accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor and the Plan to enable Holders of General Unsecured Claims, 1st Tier Bond Secured Claims, 1st Tier Bond Unsecured Claims, and Director Claims to make an informed voting decision about whether to accept or reject the Plan (Holders of other Claims will be deemed to have accepted or rejected the Plan, as the case may be, without the need for them to vote). Because the Debtor is a non-profit corporation, it does not have equity interests. This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court has found that this Disclosure Statement provides adequate information in accordance with Section 1125 of the Bankruptcy Code and has entered an order approving this Disclosure Statement. Approval by the Bankruptcy Court is not an opinion or ruling on the merits of the Plan and it does not mean that the Plan has been or will be approved by the Bankruptcy Court.

After the appropriate Persons have voted to accept or reject the Plan, there will be a Confirmation Hearing to determine whether the Plan should be confirmed by the Bankruptcy

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

102200-002/996660_4.doc

1     Court. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan

2     satisfies the requirements of the Bankruptcy Code. The Bankruptcy Court will also receive and

3     consider a Ballot summary, which will present a tally of the votes cast by those Classes entitled

4     to vote on the Plan. Once confirmed, the Plan will be treated essentially as a contract binding on

5     all Creditors and other parties-in-interest in the Bankruptcy Case, even if they rejected the Plan.

6         **THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF**

7     **THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL**

8     **INFORMATION THAT ARE INCORPORATED BY REFERENCE HEREIN**

9     **(COLLECTIVELY, THE "INCORPORATED DOCUMENTS"). THE SUMMARIES**

10    **CONTAINED HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO**

11    **THE INCORPORATED DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY**

12    **OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE**

13    **STATEMENT AND THE ACTUAL CONTENT OF ANY OF THE INCORPORATED**

14    **DOCUMENTS, THE INCORPORATED DOCUMENTS SHALL GOVERN FOR ALL**

15    **PURPOSES.**

16        **THE INFORMATION IN THIS DISCLOSURE STATEMENT IS INCLUDED**

17    **HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND**

18    **MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE**

19    **HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT THEREFORE**

20    **DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF**

21    **FACT OR LIABILITY, A STIPULATION OR A WAIVER IN ANY PROCEEDING**

22    **OTHER THAN THE SOLICITATION OF ACCEPTANCES OF THE PLAN AND**

23    **CONFIRMATION OF THE PLAN. FOR ALL PURPOSES OTHER THAN THE**

24    **SOLICITATION OF ACCEPTANCES OF THE PLAN, THIS DISCLOSURE**

25    **STATEMENT SHOULD BE CONSTRUED AS A STATEMENT MADE IN**

26    **SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS,**

27    **ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED**

28    **LITIGATION OR ACTIONS.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

8

102200-002/996660_4.doc

THE CONFIRMATION, EFFECTIVENESS AND CONSUMMATION OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THESE MATERIAL CONDITIONS ARE DISCUSSED IN <u>SECTION VI</u> OF THIS DISCLOSURE STATEMENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING THOSE HOLDERS WHO DO NOT VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE DEBTOR MAKES THE STATEMENTS AND PROVIDES THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. PERSONS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF.

EACH HOLDER OF AN IMPAIRED CLAIM WHO IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

9

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ALL PERSONS DESIRING SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS ABOUT THE PLAN, THE DEBTOR, OR THE VALUE OF ITS PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE OR GIVEN TO OBTAIN THEIR APPROVAL OF THE PLAN THAT DIFFER FROM, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE MANAGEMENT OF THE DEBTOR HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTOR HAS ENDEAVORED TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS OTHERWISE STATED HEREIN.

### III.
### SUMMARY OF THE PLAN

The following summary of the Plan is qualified in its entirety by reference to the detailed explanations in this Disclosure Statement and the Plan itself.  For a more detailed description of the Plan, see Article VI hereof and the Plan.

The primary objective of the reorganization and restructuring under the Plan is to maximize returns to those Creditors entitled to recoveries from the Estate.  The Debtor desires to achieve this objective through an expeditious restructuring of, among other things, the Financing Agreement, the 1st Tier Note, and certain other debt obligations of the Debtor and other actions described herein and in the Plan.  The key aspects of the Plan are as follows:

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

10

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and Priority Tax Claims are not designated as Classes under the Plan. In general, these Claims consist of the fees and costs of professionals employed on behalf of the Estate. The Holders of such unclassified Claims are not entitled to vote on the Plan and will be paid in full under the Plan consistently with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

The Distributions under the Plan to each Class are summarized in the following table:

| Class | Description | Treatment | Estimated Amount of Claims[1] |
|-------|-------------|-----------|-------------------------------|
| Class 1: | Other Priority Claims | Unimpaired. Paid in full in Cash.[2] No solicitation required. See Section VI.C.1. | $ 1,805.56 |
| Class 2: | Other Secured Claims | Unimpaired. Paid in full in Cash or otherwise left Unimpaired. No solicitation required. See Section VI.C.2. | $ 1,700.00 |
| Class 3: | General Unsecured Claims | Impaired. Paid pro rata share of $175,000. Solicitation required. See Section VI.C.3. | $150,000.00 - 175,000.00[3] |
| Class 4: | 1st Tier Bond Secured Claims | Impaired. Amended and Restated 1st Tier Note for $7,500,000 delivered to the Director. Solicitation required. See Section VI.C.4. | $7,500,000.00 |
| Class 5: | 1st Tier Bond Unsecured Claims | Impaired. Additional Payment Obligation Note for | $445,000,000.00 |

---

[1] These *estimated* amounts were compiled by combining the undisputed, liquidated, and noncontingent claims included on the Debtor's bankruptcy schedules, as amended, together with the proofs of claim on file on or about August 16, 2010. As such, these amounts are estimates only, and may change as additional proofs of claim are filed and/or to the extent that the Debtor obtains the disallowance of certain of the filed proofs of claim.

[2] The vast majority of Other Priority Claims have been paid in full pursuant to the orders approving the First Day Motions, discussed herein.

[3] This estimate excludes rejection damages and Disputed personal injury claims.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

11

| | | | |
|---|---|---|---|
| | | $11,000,000 delivered to the Director. Solicitation required. See Section VI.C.5. | |
| Class 6: | 2nd Tier Bond Claims | Impaired. Subordinated to payment in full of 1st Tier Bond Claims. No distribution. No solicitation required. See Section VI.C.6. | $158,749,493.40 |
| Class 7: | 3rd Tier Bond Claims | Impaired. Subordinated to payment in full of 1st Tier Bond Claims and 2nd Tier Bond Claims. No distribution. No solicitation required. See Section VI.C.7. | $48,500,000.00 |
| Class 8: | Director Claims | Impaired. Participation in 1st Tier Bond Claims as provided for in Amended and Restated Financing Agreement and 1st and 2nd Tier Indenture. Solicitation required. See Section VI.C.8. | $0.00 |
| Class 9: | Subordinated Claims | Impaired. No distribution. No solicitation required. See Section VI.C.9. | $0.00 |

Other Priority Claims, which consist of any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, are provided for in Class 1. Allowed Other Priority Claims will be paid in full in Cash under the Plan; therefore, Holders of Allowed Other Priority Claims are Unimpaired.

Other Secured Claims, which consist of any Secured Claims other than Secured Claims arising under the Financing Agreement and the Secured Claim portion of the 1st Tier Bond Claims, are provided for in Class 2. Allowed Other Secured Claims, if any, will be paid in full in Cash or otherwise left Unimpaired, in full and final satisfaction of such Claims.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

12

General Unsecured Claims are provided for in Class 3. Holders of Class 3 Claims are Impaired. Each Holder of an Allowed Claim that is a General Unsecured Claim will be paid 80% of its Allowed General Unsecured Claim, but in no event shall the total payment to the Holders of all Allowed General Unsecured Claims exceed $175,000, it being understood that if such total payment would exceed $175,000, the Holders of Allowed General Unsecured Claims shall instead receive their Pro Rata share of $175,000 in full satisfaction of their Allowed General Unsecured Claim. Allowed Claims in Class 3 will be paid in Cash in twelve (12) equal installments.

1st Tier Bond Secured Claims, which consist of any and all Secured Claims held by a 1st Tier Bondholder and the 1st Tier Trustee under the 1st and 2nd Tier Indenture, the 1st Tier Bonds, the 1st Tier Note, and the Financing Agreement, are provided for in Class 4, which is an Impaired Class. In full and final satisfaction of 1st Tier Bond Secured Claims, the Director will receive the Amended and Restated 1st Tier Note. The Director shall assign the Amended and Restated 1st Tier Note to the 1st Tier Trustee, reserving to the Director its indemnification and other rights as specified in the assignments of those obligations in the 1st and 2nd Tier Indenture. The 1st Tier Note shall be extinguished and discharged and the Amended and Restated Financing Agreement shall provide for the liabilities and obligations arising under the Amended and Restated 1st Tier Note and shall not provide for any liabilities or obligations regarding the 1st Tier Bond Claims or the 1st Tier Notes. Commencing March 31, 2011, Reorganized LVMC will commence payment of the Amended and Restated 1st Tier Note to the Director in full and final satisfaction of the Secured Claim portion of the 1st Tier Bond Claims.

1st Tier Bond Unsecured Claims, which consist of any and all Unsecured Claims held by a 1st Tier Bondholder and the 1st Tier Trustee under the 1st and 2nd Tier Indenture, the 1st Tier Bonds, the 1st Tier Note, and the Financing Agreement, are provided for in Class 5, which is an Impaired Class. In full and final satisfaction of 1st Tier Bond Unsecured Claims, the Director will receive the Additional Payment Obligation Note, which will be unsecured. The Director shall assign the Additional Payment Obligation Note to the 1st Tier Trustee, reserving to the Director its indemnification and other rights as specified in the assignments of those obligations

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

in the 1st and 2nd Tier Indenture.  Commencing March 31, 2011, Reorganized LVMC will commence payment of the Additional Payment Obligation to the Director in full and final satisfaction of the Unsecured Claim portion of the 1st Tier Bond Claims.

2nd Tier Bond Claims, which consist of any and all Claims held by a 2nd Tier Bondholder and the 2nd Tier Trustee under the 1st and 2nd Tier Indenture, the 2nd Tier Bonds, the 2nd Tier Obligation, and the Financing Agreement, are provided for in Class 6, which is an Impaired Class.  Holders of Allowed 2nd Tier Bond Claims will be subordinated to payment in full of Allowed 1st Tier Bond Claims and shall not receive or retain any property on account of their Claims under the Plan.

3rd Tier Bond Claims, which consist of any and all Claims held by a 3rd Tier Bondholder and the 3rd Tier Trustees under the 3rd Tier Indenture, the 3rd Tier Bonds, the 3rd Tier Note, and the Financing Agreement, are provided for in Class 7, which is an Impaired Class.  Holders of Allowed 3rd Tier Bond Claims will be subordinated to payment in full of Allowed 1st Tier Bond Claims and 2nd Tier Bond Claims and shall not receive or retain any property on account of their Claims under the Plan.

Director Claims, which consist of any Claims of the Director arising under or related to the Financing Agreement (and by implication thereof its rights under the 1st and 2nd Tier Indenture) as impaired by the Amended and Restated Financing Agreement, which are not part of the 1st Tier Bond Claims, 2nd Tier Bond Claims, 3rd Tier Bond Claims, or Subordinated Claims, are provided for in Class 8, which is an Impaired Class.  On the Effective Date, the Amended and Restated Financing Agreement shall become effective and from and after the Effective Date, the Holder of Director Claims shall participate in distributions to 1st Tier Bond Claims as provided for in the Amended and Restated Financing Agreement and 1st and 2nd Tier Indenture.

Subordinated Claims are provided for in Class 9, which is an Impaired Class.  Holders of Subordinated Claims shall not receive any distribution on account of such Claims.

## IV.
## SUMMARY OF VOTING PROCESS

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

**A.**     <u>Who May Vote to Accept or Reject the Plan.</u>

Generally, holders of allowed claims or equity interests that are "impaired" under a plan of reorganization and who are receiving some cash or property on account of such claims or equity interests are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor. The Debtor, as a non-profit corporation, has issued no equity interests. In order to vote, a creditor must have an allowed claim. The solicitation of votes on the Plan will be sought only from Holders of Allowed Claims whose Claims are Impaired and who will receive property or rights under the Plan. As explained further below, to be entitled to vote, a Person must be a Holder of a Claim that is both an "Allowed Claim" and "Impaired."

**B.**     <u>Summary of Voting Requirements.</u>

In order for the Plan to be confirmed, it must be accepted by at least one Impaired Class of Claims, excluding the votes of any Insiders within that Class. A Class of Claims is deemed to have accepted the Plan if and when allowed votes representing at least two-thirds in amount and a majority in number of the Claims of the Class actually voting cast votes in favor of the Plan.

Holders of certain Impaired Classes of Claims will not receive or retain anything on account of their Claims. As such, they will be deemed to have voted against the Plan without the need for them to cast votes or receive voting ballots.

The Debtor is soliciting votes only from Holders of Allowed Claims in the following four Classes, which are Impaired under the Plan: Class 3 (General Unsecured Claims), Class 4 (1st Tier Bond Secured Claims), Class 5 (1st Tier Bond Unsecured Claims), and Class 8 (Director Claims).

The Debtor has the right to supplement this Disclosure Statement as to additional Impaired Classes, if any. The treatment of each Class is described in the Plan and is summarized generally in <u>Articles III and VI</u> of this Disclosure Statement.

**A VOTE FOR ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE DEBTOR BELIEVES THAT THE TREATMENT OF HOLDERS OF EACH OF THE GENERAL UNSECURED**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

CLAIMS, 1ST TIER BOND SECURED CLAIMS, 1ST TIER BOND UNSECURED CLAIMS, AND DIRECTOR CLAIMS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR EACH OF THEM, AND THE DEBTOR RECOMMENDS THAT THE HOLDERS OF THOSE ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.

## V.
## GENERAL INFORMATION ABOUT THE DEBTOR'S BUSINESS, RESTRUCTURING EFFORTS AND THE FILING OF THE BANKRUPTCY CASE

A.    **The Debtor's Business.**

    1.    **Corporate Background and Structure.**

The Las Vegas Monorail System, a public improvement (the "Monorail"), was first conceived as a joint venture between MGM Grand and Bally's Hotel, which in 1993 first created a one-mile transportation system linking the two hotels. In 1997, the state of Nevada passed legislation which authorized a private company to own, operate, and charge fares as a public Monorail system. On December 2, 1998, as authorized by statute, Clark County granted a franchise (the "Franchise") to MGM Grand-Bally's Monorail LLC ("MGM-Bally's LLC") to construct, operate, and maintain the Monorail through December 2, 2048 (as amended, the "Franchise Agreement").

On October 20, 1999, the Franchise Agreement was amended to, among other things, authorize transfer of the Franchise to a special-purpose Nevada corporation formed for the sole purpose of developing, acquiring, constructing, operating and improving the Monorail. The Debtor was incorporated in May 2000 as a Nevada not-for-profit corporation organized for the purposes set forth in the amended Franchise Agreement. The Debtor was established to finance, acquire, develop, construct, operate, and maintain the Monorail. In September 2000, upon the formation of the Debtor, the Debtor acquired the original Monorail system from MGM-Bally's LLC and commenced extension of the system to its current state of seven stations.

The Debtor is a Section 501(c)(4) organization under federal tax law and has been granted sales/use tax exempt status as a charitable or non-profit organization pursuant to Nevada Revised Statutes ("NRS") 372.3261. As a nonprofit entity, no part of the Debtor's net earnings may inure to the benefit of anyone other than the Governor of the State of Nevada on behalf of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

1   the State or a designated agency of the State upon dissolution, liquidation, or winding up. The

2   Debtor thus has no capital stock or equity holders.

3       Upon the Debtor's acquisition of the Monorail from MGM-Bally's LLC, the Franchise

4   Agreement was assigned to the Debtor on August 8, 2000. The term of the Franchise Agreement

5   currently extends through December 31, 2107. The Franchise Agreement grants to the Debtor as

6   the franchisee the Franchise to construct and operate the Monorail, including the exclusive right

7   to extend the Monorail to McCarran International Airport.

8       **2.**    **Operations.**

9       The Monorail is a state-of-the-art, fully-automated, driverless rail system that runs above

10  the streets along the east side of Las Vegas Boulevard (a/k/a the "Las Vegas Strip"). It is the

11  first driverless public monorail system in the world.[4] The existing operations provide convenient

12  and cost-effective transportation between its seven stations. The Debtor's business focuses on

13  making the Monorail an easy and convenient connection to the Las Vegas Strip and the Las

14  Vegas Convention Center.

15      Though the Debtor benefits from its tax-exempt status as a nonprofit entity, it is the first

16  privately-owned public transportation system in the nation to be funded solely by fares and

17  advertising. No other U.S. public transit system finances its operations solely through fare and

18  advertising revenues. The Debtor receives no governmental financial support or subsidies.

19      The Monorail currently has seven stations along a 3.9-mile route: MGM Grand;

20  Bally's/Paris Las Vegas; Flamingo/Caesars Palace; Harrah's/Imperial Palace; Las Vegas

21  Convention Center; Las Vegas Hilton; and the Sahara. It travels the 3.9-mile route in 15 minutes

22  or less, and reaches speeds of up to 50 miles per hour. It is capable of moving 3,200 passengers

23  per hour in each direction. The Monorail operates 365 days per year, 19 hours per day during the

24  week and 20 hours each day Friday through Sunday.

25      The Monorail consistently runs at more than 99 percent operational efficiency. During

26  the past 4.5 years of full operations, the Monorail has carried more than 40,000,000 riders with a

27

28

---

[4] The Monorail is an "automated guideway," defined by the Federal Transit Administration as an electric railway of guided transit vehicles operating without vehicle operators or other crew onboard the vehicles.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    goal of further improving mobility in what is nationally recognized as one of the most congested

2    corridors in the United States, the Las Vegas Strip corridor. The Monorail carried 6,005,024

3    riders in 2009; 7,602,599 riders in 2008; 7,917,613 riders in 2007; and 7,015,109 in 2006.

4    During large conventions such as the Consumer Electronics Show, the Monorail carries more

5    than 70,000 people into and out of the Las Vegas Convention Center over the course of a four-

6    day event. This is the equivalent of over 23,000 three-passenger taxi trips or over 1,200 55-

7    passenger bus trips.

8         The Monorail ranks as one of the highest in terms of fare revenues per passenger trip

9    among automated guideways and light rail systems, and first when compared to other automated

10    guideways only. Specifically, the Monorail generates more revenue per mile of system than any

11    other automated guideway or light rail system, and is only second in total annual revenue

12    generation to Boston's MBTA system.[5]

13         The Debtor has consistently generated operational profits; however, as explained more

14    fully below, these operational profits have not been sufficient to service its debt and provide for

15    its future required expenditures for replacement and repair of capital assets ("CAPEX"). The

16    Debtor generates revenue from two primary sources. The largest component of the Debtor's

17    revenues is derived from ticket purchases (the "Fare Revenues"). Approximately 263,350 tickets

18    are sold at 42 ticket vending machines (the "TVMs") each month, at which customers generally

19    may pay in cash or coins, or with a debit or credit card. Customers may also purchase tickets

20    online. Customers may purchase a one-way fare for $5 at a TVM or online; an all-day pass for

21    $14 at a TVM or $13 online; or a 3-day pass for $30 at a TVM or $28 online, while Las Vegas

22    residents can purchase a daily maximum of two local $1 one-way tickets at customer service

23    booths located at the Sahara and MGM Grand stations. The average monthly sales from

24    operations are approximately $2.3 million. The Debtor estimates that its total Fare Revenues for

25    2009 were $26,986,487. Total Fare Revenues were $29.7 million for 2008 and $30.3 million for

26    2007. Through July 31, 2010, the Debtor estimates that it has generated $12.9 million in total

27

28    _____

[5] National Transit Database 2007 Statistics, available at www.ntdprogram.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1  Fare Revenues.  For comparison, through July 31, 2009, the Debtor generated $16.1 million in

2  total Fare Revenues.

3       The other major component of the Debtor's revenue is derived from the sale of

4  advertising space on the Monorail (the "Ad Revenues").  The Debtor estimates that its total Ad

5  Revenues for 2009 were $353,830.    Total Ad Revenues were $1,377,991 for 2008 and

6  $2,273,954 for 2007.  Through July 31, 2010, the Debtor has generated $109,693 in total Ad

7  Revenues.  For comparison, through July 31, 2009, the Debtor generated $252,311 in total Ad

8  Revenues.

9       The Debtor generated approximately $27,409,717 in total revenues for 2009, which

10  consist of Fare Revenues and Ad Revenues along with miscellaneous revenues for vending and

11  concessions.  The Debtor generated $31,097,597 in total revenues in 2008,[6] and $31,750,582 in

12  total revenues in 2007.[7]    Through July 31, 2010, the Debtor has generated $13,018,873 in total

13  revenues.  For comparison, through July 31, 2009, the Debtor generated $16,348,832 in total

14  revenues.

15       In accordance with its organizational documents, each year the Board of Directors of the

16  Debtor (the "Board") adopts a budget which is submitted to the Governor of the State of Nevada

17  for approval.  In addition, in accordance with organizational documents, the Debtor is required to

18  have audited financial reports prepared.

19       **3.**     **The Debtor's Prepetition Management Structure.**

20       As a nonprofit company, no person or entity holds an equity interest in the Debtor.  The

21  Board is appointed by the Governor of the State of Nevada and is comprised of five members.

22  The current Chairman of the Board is Donald L. "Pat" Shalmy, and the other members of the

23  Board are Bruce L. Woodbury, Marcus "Mike" Sloan, Anthony Santo, and Robert Beers.  The

24  Plan proposes that the current members of the Board will continue in place.

25       Mr. Shalmy was first appointed to the Board on January 1, 2000.  During his career he

26  [6] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008; Las Vegas
Monorail Company Financial Statements for the Years Ended December 31, 2008 and 2007 and Independent

27  Auditor's Report ("Auditor's Report"), available at http://www.lvmonorail.com/corporate/.

28  [7] Auditor's Report.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

19

102200-002/996660_4.doc

1    has served as a senior vice president and president of Nevada Power Company, director of

2    government and community relations for Kummer, Kaempfer, Bonner and Renshaw, and

3    president of the Las Vegas Chamber of Commerce, the third largest such chamber in the United

4    States.  Mr. Shalmy dedicated over three decades of work to the public sector, culminating as

5    Clark County manager.

6          Mr. Woodbury was appointed to the Board on February 1, 2009.  He dedicated nearly 28

7    years to public service as the representative for Clark County Commission District A.  Mr.

8    Woodbury served as Chairman of the Regional Transportation Commission Board of

9    Commissioners for more than 16 years, as well as Chairman of the Board of County

10   Commissioners, Big Bend Water District Board of Trustees, and the Clark County Air Quality

11   Management Board.  He was a member on the Las Vegas Valley Water District Board of

12   Directors, University Medical Center Board of Trustees, Henderson Chamber of Commerce

13   Board of Directors, and the Las Vegas Springs Preserve.  He is a partner with the law firm of

14   Jolley, Urga, Wirth, Woodbury & Standish.

15         Mr. Sloan was appointed to the Board on April 1, 2009. Until his retirement following the

16   acquisition of Mandalay Resort Group by MGM Mirage in 2005, Mr. Sloan was a senior

17   corporate executive with that company for 20 years.  He joined Mandalay Resort Group in 1985

18   as Vice President, General Counsel, and Secretary, having primary responsibilities for directing

19   the company's legal department as well as labor and government relations.  In addition, Mr.

20   Sloan was actively engaged in the planning, development and construction of the company's

21   numerous new projects, including the Excalibur Hotel and Casino, Luxor Hotel and Casino and

22   the Mandalay Bay Resort.  Beginning in 1997, Mr. Sloan gave up day-to-day supervision of the

23   legal department in order to concentrate on the planning and development of the company's

24   premiere property, Mandalay Bay, focusing on the development and location of new

25   entertainment and restaurant venues for the project. Mr. Sloan has been chairman and served on

26   the board of Nevada Resort Association for over 20 years.  Prior to his career as gaming

27   executive, Mr. Sloan was elected Las Vegas City Attorney and later served as a Nevada state

28   senator.  He also worked as the press secretary for United States Senator Alan Bible, and as a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                                20

1    deputy attorney general for the Nevada Gaming Division, providing legal advice for the Nevada

2    Gaming Commission and Nevada Gaming Control Board.  He is a founding trustee and past

3    president for the National Association for Gaming Lawyers and past chairman of the Gaming

4    Law Committee of the American Bar Association.

5              Mr. Santo was appointed to the Board on April 1, 2009.  He is a 28-year veteran in the

6    gaming industry and is currently consulting in the gaming and hospitality businesses for

7    operational reviews and potential acquisitions.  Mr. Santo served in various senior management

8    roles with Caesars Entertainment, and upon its acquisition, Harrah's Entertainment, Inc.

9    Throughout his career, he managed multiple hotel/casino properties.  Mr. Santo was appointed as

10   Senior Vice President of Western and Mid-South Regions for Caesars Entertainment, as

11   President of Paris Las Vegas, Bally's Las Vegas, Flamingo Las Vegas, Las Vegas Hilton, Reno

12   Hilton, and Flamingo Reno.  He served as Senior Vice President of Operations, Products and

13   Services for Harrah's Entertainment, Inc. where he managed the company's domestic and

14   international operations.  Mr. Santo previously served on the boards of Las Vegas Events, the

15   Culinary Training Academy of Las Vegas, UNLV's Harrah Hotel College Alumni Association,

16   the Las Vegas Convention and Visitors Authority, and the Reno-Sparks Convention and Visitors

17   Authority.

18             Mr. Beers was appointed to the Board on April 1, 2009.  He is the managing partner for

19   Seale and Beers, CPAs, a PCAOB-registered auditing firm.  He is also the chief financial officer

20   for a start-up tequila importer.  Previously, he owned and operated Wilson, Beers and Alu, a

21   computer systems company, from 1989 to 2002, when he sold the company to a large regional

22   accounting firm.  In 2004, Mr. Beers was elected to a four-year term in the Nevada Senate.  Prior

23   to his senate election, Beers served six years as a Nevada assemblyman.

24             Curtis L. Myles, III serves as President and Chief Executive Officer of the Debtor and

25   has served in that capacity since July 18, 2005.  Prior to joining the Debtor, Mr. Myles served as

26   Deputy General Manager of the Regional Transportation Commission of Southern Nevada from

27   May 2002 to July 2005; Assistant Director of Aviation for McCarran International Airport from

28   June 1995 to May 2002; Operations Manager and Management Analyst for McCarran

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

21

International Airport from July 1991 to June 1995; and Sales Manager for Northwest Transport Services from 1986 to 1991. In his capacity as the Debtor's President and Chief Executive Officer, Mr. Myles oversees the Debtor's daily business, operational, and financial affairs. In addition, he is responsible for implementing policies of and actions taken by the Board.

Pursuant to an Employment Agreement dated August 20, 2008, Mr. Myles originally received annual compensation of $346,200, along with employment benefits available to other employees of the Debtor. The Employment Agreement commenced August 21, 2008 and the initial term will end August 20, 2011. After the initial term of employment ends, Mr. Myles' continued employment is at the will of the Board and may terminate at any time thereafter by written notice, unless otherwise agreed to by the parties. As of May 4, 2010, Mr. Myles' annual compensation was voluntarily reduced to $273,240 in conjunction with a general reduction of salaries for Debtor's employees.

**4.    The Debtor's Relationship with Bombardier and CAPEX Requirements.**

Though the Debtor employs approximately 40 employees, including security personnel, most of the physical operations of the Monorail are conducted by Bombardier Transportation, Inc. ("Bombardier"), with whom the Debtor contracted to operate and maintain the Monorail trains, automatic train controls, and other control subsystems pursuant to a Monorail Operations and Maintenance Agreement dated July 14, 2004 (the "Bombardier Agreement"). Bombardier has more than 35 years of operations and maintenance experience, providing a range of operation and maintenance services for fully automated systems in cities around the world, including New York, Miami, San Francisco, Kuala Lumpur, Beijing, and London.

The initial term of the Bombardier Agreement was for 5 years with two 5-year options. In January 2009, Bombardier was awarded the first 5-year option to continue to operate the system. There remains one additional 5-year option, which if exercised, will allow the Debtor to continue the Bombardier Agreement until 2019, at which time a new operation and maintenance agreement will need to be negotiated. The costs of a new contract are unknown, but it is not expected to be less than the cost of the existing Bombardier Agreement.

During the year 2008, in accordance with the Bombardier Agreement, the Debtor paid

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

22

1   $16,675,678 to Bombardier for operation and maintenance of the Monorail.[8]  The Debtor paid

2   approximately $17,027,307 to Bombardier for operation and maintenance of the Monorail in

3   2009.

4           While the scope of the Bombardier Agreement includes normal maintenance and repair,

5   along with some replacement costs which costs are paid pursuant to a Capital Asset Replacement

6   Program, it does not include CAPEX expenditures.   In the case of the Debtor, CAPEX

7   expenditures include the costs of replacement and repair of train control systems, Monorail

8   escalators, workshop equipment, communication systems, traction power systems/PDS, platform

9   doors, guideway elements, Monorail elevators, fare collection equipment, maintenance recovery

10  vehicles, and the Monorail trains themselves.

11  **B.      The Debtor's Prepetition Debt Structure.**

12          In September 2000, the Director of the State of Nevada Department of Business and

13  Industry (the "<u>Director</u>"), issued tax-exempt bonds (collectively, the "<u>Bonds</u>") for construction

14  and operation of the Monorail as follows:[9]

15                  (a)     Pursuant to a Senior Indenture with Wells Fargo Bank, N.A.

16          ("<u>Wells Fargo</u>") as trustee (the "<u>1st Tier Trustee</u>") dated September 1, 2000 (the "<u>1st and</u>

17          <u>2nd Tier Indenture</u>"), the Director issued $352,705,000 in 1st tier current interest bonds

18          and $98,743,217.30 in 1st tier capital appreciation bonds (collectively, the "<u>1st Tier</u>

19          <u>Bonds</u>") to the 1st Tier Trustee on behalf of the beneficiaries under the 1st and 2nd Tier

20          Indenture (the "<u>1st Tier Bondholders</u>"), payable in part through 2040;

21                  (b)     Pursuant to the 1st and 2nd Tier Indenture, the Director also issued

22          $149,200,000 in 2nd tier current interest bonds (the "<u>2nd Tier Bonds</u>") to Wells Fargo as

23          2nd tier trustee on behalf of the beneficiaries under the 1st and 2nd Tier Indenture (the

24          "<u>2nd Tier Bondholders</u>");[10] and

25  _____

26  [8] Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008.

    [9] However, as more fully explained below, the Bonds are non-recourse to the State of Nevada.

27  [10] On or about December 20, 2009, the District Court of Hennepin County, Minnesota appointed U.S. Bank, N.A. as
28  the Co-Trustee of the 2nd Tier Bonds pursuant to the request of Wells Fargo in its *Verified Petition for the
    Appointment of a Co-Trustee and for Instruction in the Administration of a Trust Pursuant to Minn. Stat. § 501B.16.*

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                                                    23

(c)      Pursuant to a Subordinate Indenture also dated September 1, 2000 (the "3rd Tier Indenture" and collectively with the 1st Tier and 2nd Tier Indenture, the "Indentures"), the Director issued $48,500,000 in subordinate capital appreciation bonds (the "3rd Tier Bonds") in favor of Wells Fargo as 3rd tier trustee[11] in favor of the beneficiaries thereunder (the "3rd Tier Bondholders" and together with the 1st Tier Bondholders and 2nd Tier Bondholders, the "Bondholders").

The Bond proceeds were used for partial financing of the acquisition, construction, improvement and equipping of the Monorail as well as for principal and interest payment reserves and a separate reserve in favor of Clark County for the removal of the improvements in the public right-of-way, which reserve account (the "Removal Fund Account") is in the name of and under the sole control of Clark County.  The public right-of-way is only a portion of the 3.9 mile guideway system.   There are no funds reserved for the removal of the portion of the guideway not part of the public right of way.  As of November 30, 2009, there was $7,900,374 in the Removal Fund Account.

The 1st Tier Bonds are special, limited obligations of the Director, and the principal, premium, if any, accreted value, and interest on the 1st Tier Bonds are payable (except to the extent payable from Bond proceeds) solely from and are secured by a pledge of the net revenues to be made under the Financing Agreement after payment of operation and maintenance costs of the Monorail (as more fully discussed below) and prior to the payment of debt service with respect to the 2nd Tier Bonds.

Payment of principal and interest on the 1st Tier Bonds is insured by Ambac Assurance Corporation ("Ambac").   To the extent any 1st Tier Bond payments are not made when due, Ambac will pay such amount upon notice pursuant to an insurance policy (the "1st Tier Bondholders' Insurance Policy").   Additionally, a 1st Tier Surety Reserve Bond (the "Surety Bond") of $20,991,807.50 was issued by Ambac to be available for payments on the 1st Tier

—————————————————— (continued)
Wells Fargo and U.S. Bank, N.A. are collectively defined hereafter as the "2nd Tier Trustees."

[11] Law Debenture Trust Company of New York has been appointed as co-trustee of the 3rd Tier Bonds and is collectively defined with Wells Fargo hereafter as the "3rd Tier Trustees."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

1    Bonds to the extent that the Debtor was unable to meet debt service on the 1st Tier Bonds. The

2    Debtor was unable to meet the full debt service obligations due on July 1, 2009, and

3    $3,767,799.27 was drawn on the Surety Bond on July 1, 2009. On January 1, 2010, principal

4    and interest on the 1st Tier Bonds came due in the amount of $16,764,971.88. The Debtor was

5    unable to satisfy the debt service, and on or about January 1, 2010, the entire amount of

6    $16,764,971.88 due to the 1st Tier Bondholders was drawn against the Surety Bond.[12]  The

7    remaining balance on the Surety Bond is $416,305.52.[13]

8        The Director is obligated to reimburse any funds drawn from Surety Bond coverage

9    pursuant to a Guaranty Agreement (the "Guaranty"), under which the Director granted to Ambac

10   a security interest securing payment of all amounts due under the Guaranty, "[t]o the extent, but

11   only to the extent, that the Indenture pledges to the [1st Tier Bondholders] or any Trustee

12   therefore, or grants a security interest or lien in or on any collateral property, revenue or other

13   payments in order to secure the [1st Tier Bonds]."

14       Once the Surety Bond is drawn in full, there will be no further reimbursements of funds

15   to Ambac by the Director on account of the Guaranty. Both the Financing Agreement and 1st

16   and 2nd Tier Indenture explicitly limit the liability of the Director and the State of Nevada.

17   Specifically, Section 3.9 of the Financing Agreement provides that "Anything in this Agreement

18   to the contrary notwithstanding, any obligation the Director may incur in connection with the

19   undertaking of the Project for the payment of money shall not be deemed to constitute a debt or

20   general obligation of the Director, the State, or any political subdivision thereof, but shall be

21   payable solely from the revenues and receipts received by it under this Agreement…" Section

22   7.01 of the Senior Indenture provides, in part, that "THE BONDHOLDERS SHALL HAVE NO

---

[12] On or about November 16, 2009, Wells Fargo, without notice to the Debtor, withdrew approximately $2.6 million from the Debtor's accounts at Wells Fargo, including $1,898,328 from the 1st Tier Debt Service Fund, to insure payments and indemnifications provided to Wells Fargo and the Director under the Indentures. The 1st Tier Debt Service Fund was designated for the payment of the 1st Tier debt service obligations due January 1, 2010. Though Wells Fargo subsequently returned some of the funds, it retained the deposits designated for payment of the 1st Tier Debt Service Fund.

[13] The 2nd Tier Bonds are not insured. The Debtor was unable to pay any of the interest in the amount of $3,689,360.07 which came due on the 2nd Tier Bonds on July 1, 2009, and was unable to pay any of the interest in the amount of $5,493,875 which came due on the 2nd Tier Bonds on January 1, 2010. The 3rd Tier Bonds are also uninsured.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                                        25

1  RECOURSE AGAINST THE DIRECTOR OR ANY PROPERTY NOW OR HEREAFTER

2  OWNED BY THE STATE OF NEVADA IN THE EVENT THAT SUCH REVENUES AND

3  FUNDS ARE INSUFFICIENT TO MAKE SUCH PAYMENTS…" (emphasis in original).  The

4  Amended and Restated Financing Agreement is intended to continue these limitations in their

5  entirety.

6       The Debtor is not a party to the 1st and 2nd Tier Indenture or the 3rd Tier Indenture, the

7  Guaranty, or the 1st Tier Bondholders' Insurance Policy, but is obligated under the Financing

8  Agreement, dated September 1, 2000 (the "Financing Agreement"), between the Debtor and the

9  Director, which was concurrently assigned to Wells Fargo as security for payment under the

10  Indentures.   Under the Financing Agreement, the security interest granted to the Director is

11  limited to the following: (i)   Contract rights of the Debtor under the Purchase Agreement, the

12  Design-Build Agreement, the Operation and Maintenance Agreement, the Management

13  Agreement, and the Franchise Agreement, each as defined in the Franchise Agreement (the

14  "Project Agreements"); (ii)   Any "Net Project Revenues," defined in the 1st and 2nd Tier

15  Indenture as "Project Revenues" minus "Operation and Maintenance Costs;"[14] and (iii)    All

16  amounts held in any funds or accounts created under the Indentures, all money and funds earned

17  or accrued on any deposit of Net Project Revenues, and related collateral serving as proceeds of

18  the foregoing.  The Director assigned most of its rights under the Financing Agreement to Wells

19  Fargo as security for payment under the Indentures, reserving its right to reimbursement of

20  expenses and indemnification.

---

[14] Project Revenues are defined in the 1st and 2nd Tier Indenture as:

> all gross income and revenue received or receivable by [the Debtor] from the ownership, operation or use of the Project, including all fees and charges received by [the Debtor] for the use of the Project, including but not limited to farebox revenues, business interruption insurance, advertising revenues, licensing fees, rent, sponsorship income, other contractual revenues, interest earnings on funds held hereunder or by [the Debtor] (excluding the Construction Fund, Contingency Fund, and Rebate Fund) liquidated damages, payments under performance or completion bonds or under the Project Agreements, and all other income and revenue howsoever derived by [the Debtor] from the ownership, operation or use of the Project or dedicated by [the Debtor] or any other person to support the Project, and such other revenues as may be designated by [the Debtor] in the Agreement, but excluding in all cases any refundable deposits made to establish credit and advances or contributions in aid of construction received during such Fiscal Year.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

26

Under the 1st and 2nd Tier Indenture, the Director pledged to Wells Fargo all Revenues and other amounts held under any accounts created pursuant to the 1st and 2nd Tier Indenture to secure the payment of principal and interest on the 1st Tier Bonds and 2nd Tier Bonds.[15] "Revenues" are defined in the Senior Indenture as

> all moneys received by the Director or the Trustee for the account of the Director pursuant or with respect to the Agreement for the benefit of the Senior Bonds, including, without limiting the generality of the foregoing, Senior Loan Repayments (including both timely and delinquent payments, any late charges, and paid from whatever source), prepayments, and all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to this Senior Indenture, but not including any Administrative Fees and Expenses or any moneys paid for deposit into the Rebate Fund. Revenues do not include Project Revenues deposited with the Trustee pursuant to the last paragraph of Section 4.1(b) of the Financing Agreement until such moneys are used to make a Senior Loan Repayment.

As such, the 1st Tier Bonds are secured by a pledge of and a first lien on Revenues. The 2nd Tier Bonds have a junior and subordinate pledge and lien. The 3rd Tier Indenture contains a similar pledge, setting forth a lien on revenues held specifically for the benefit of the 3rd Tier Bonds, which lien is subordinate to the liens securing the 1st Tier Bonds and 2nd Tier Bonds.

Pursuant to each of the Indentures, under no circumstance is the Director obligated to pay principal or interest due on the 1st and 2nd Tier Bonds or any other related costs upon acceleration, redemption, or otherwise, except from Revenues and funds pledged under the 1st and 2nd Tier Indenture. Bondholders have no recourse against the Director or property owned by the State of Nevada. Thus, while the Director has an absolute and unconditional obligation to pay principal and interest due on the 1st and 2nd Tier Bonds, such obligation extends only to payment out of Revenues and other pledged assets.

The Debtor has not pledged as security to the Director, the Trustee, Ambac or any other party the equipment or other hard assets of the Monorail, including the stations and tracks. Further, the Debtor has never granted a security interest in accounts receivable or in contract rights other than those specifically described in the Financing Agreement.

---

[15] Excepting the Indemnification Account and the Rebate Fund (as defined in the Senior Indenture).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1        The Amended and Restated Financing Agreement will provide for a security interest in

2 favor of the Director to secure the Amended and Restated 1st Tier Note in the following:

3                   (i)     Contract rights of the Debtor under the Operation and

4                   Maintenance Agreement and the Franchise Agreement, each as defined in

5                   the Amended and Restated Franchise Agreement (the "Project

6                   Agreements"); and

7                   (ii)    Any "Net Project Revenues," defined in the 1st and 2nd Tier

8                   Indenture as "Project Revenues" minus "Operation and Maintenance

9                   Costs generated after the Effective Date.

10 **C.**    **Events Leading to the Bankruptcy Case.**

11      **1.**    **Financial Performance.**

12        The three individual drivers of revenue of the Monorail are Las Vegas visitor volume, the

13 Monorail's market share of visitors (the percentage of visitors who use the Monorail) and fare

14 yield (revenue per individual passenger). The revenue drivers with the greatest impact on

15 incremental cash flow are visitor volume and market share, both of which are generally out of

16 the control of the Monorail. The revenue driver most controllable by the Monorail is fare yield,

17 which has the least impact on cash flow.

18        The Debtor achieved operational profits in 2006 and has remained profitable at an

19 operational level since that time. The Debtor's revenues are sufficient to satisfy all costs of

20 operation and maintenance of the Monorail. The Debtor's recent operational performance has

21 been as follows:

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

| | Year Ended 12-31-07[16] | Year Ended 12-31-08[17] | Year Ended 12-31-2009[18] | 7-31-10 Year to Date [19] |
|---|---|---|---|---|
| Program Revenues | $31,750,582 | $31,097,597 | $27,409,717 | $13,010,726 |
| Fare Revenues | $29,446,783 | $29,678,753 | $26,990,995 | $12,901,033 |
| Ad Revenues | $2,304,799 | $1,418,844 | $424,443 | $109,693 |
| Investment Income | $4,203,774 | $2,208,294 | $227,588 | $0 |
| Miscellaneous Income | $630,333 | $75,775 | $0 | $8,147 |
| Total Revenues | $36,584,689 | $33,381,666 | $27,643,026 | $13,018,873 |
| Wages, Compensation, Salary, and Employment Benefits | $2,304,542 | $3,063,621 | $1,444,522 | $731,145 |
| Bombardier Transportation, Inc. | $15,322,237 | $16,675,678 | $16,954,878 | $8,455,271 |
| Other Operational Expenses | $6,655,406 | $5,422,131 | $4,817,490 | $3,760,784 |
| Total Operational Costs and Expenses | $24,282,185 | $25,161,430 | $23,216,891 | $12,947,201 |
| Net Income From Operations[20] | $12,302,504 | $8,220,236 | $3,853,427 | $71,672 |

Under the economic circumstances prevailing at the time of the formation of the Debtor and the incurrence of the debt obligations described above, forecasts indicated that the Debtor would be able to generate an operating profit (net cash flow) sufficient to operate the Monorail and service the Bonds. However, these projections proved wrong and ridership and resulting revenues as well as advertising revenues never reached projected levels. While the Monorail generates net positive cash flow, it has been insufficient and is projected to remain insufficient to meet both the Debtor's existing debt service requirements and CAPEX reserves necessary to fund CAPEX needs beginning in 2019.

Beginning in 2008, the economy in the United States began to sharply decline, not only

---

[16] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2007; Auditor's Report.

[17] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008; Auditor's Report.

[18] Source: Las Vegas Monorail Company Financial Statements for the Years Ended December 31, 2009 and 2008 and Independent Auditor's Report.

[19] These figures are estimated and derived from monthly operating reports.

[20] Net of depreciation.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

29

in the hotel and gaming industry, but throughout virtually every business sector.  This severe world-wide recession had a much more dramatic impact on the Las Vegas economy given its reliance on the hotel, gaming and convention business.  The Debtor was sharply impacted by the downturn and contraction in southern Nevada's core tourism industry.  Through the first six months of 2009, ridership was down 24.9% compared to the same period of 2008.  Though the Monorail carried 7,602,599 riders in 2008, it carried only approximately 6,005,000 riders during 2009, substantially less than preceding years and substantially less than projected, which generated approximately $27,409,717 in revenues, resulting in less than $5,000,000 net cash flow (or operating profit, excluding depreciation expense).  Ignoring reserves for CAPEX, approximately $34,000,000 is required to maintain debt service each year, far exceeding the operating profits.

Through the first seven months of 2010, ridership was down 15.1 percent compared to the same period of 2009.  The Monorail carried 3,071,251 riders during the first seven months of 2010, compared to approximately 3,616,778 riders during the same period of 2009.  Both figures are substantially less than preceding years and substantially less than projected.  The Monorail has generated approximately $13,018,873  in revenues in 2010 through July 31, 2010, resulting in approximately $71,672 net operating income.

Data reported by the Las Vegas Convention and Visitor's Authority confirms that the cyclical pattern of visitor volume marked a considerable decline in late 2008 and 2009.[21]  Compounding the effects of low visitor volume on ridership is the reduced level of convention attendance.[22]  To cut costs, firms have downsized, relocated, or cancelled conventions.  As a result, 2009 experienced significantly less convention attendance, cutting away a key demographic of the Monorail's customers.  The trend has continued through the first half of 2010.

In sum, while the Monorail's financial problems existed from the beginning of its

---

[21] The Las Vegas Monorail Ridership Study concluded that 97% of the Monorail's riders are visitors.  Las Vegas Monorail Ridership Study, GLS Research, March 2006.  See Year-To-Date Executive Summaries for 2005, 2006, 2007, 2008, and 2009, available at http://www.lvcva.com/press/statistics-facts/index.jsp.

[22] See id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

30

1   operations given the significantly lower than projected ridership and farebox and advertising

2   revenues, the problems were exacerbated due to declining tourism and the consequent decrease

3   in hotel and Convention Center bookings, and the number of riders on the Monorail has not met

4   projections formed prior to the economic collapse.   As the projections (as discussed below)

5   indicate, as the Las Vegas economy improves (specifically with regard to tourism and

6   convention business), it is anticipated that the Monorail revenues will improve.

7   **2.    Economic Pressures and Requirements.**

8   Both the Debtor and Conway, Del Genio, Gries & Co., LLC ("CDG")[23] (prior to its

9   termination) have prepared projections of revenue and expenses for 2010 through 2040, and each

10  contain analyses of the Debtor's CAPEX requirements from 2012 through 2040.[24]    CDG's

11  CAPEX analysis determined that the Monorail will require $362,865,726 in 2009 Dollars

12  (without regard to inflation) for CAPEX from 2012 through 2040 (the "CDG CAPEX

13  Projection").   The Debtor requested that Bombardier also analyze CAPEX requirements from

14  2012 through 2040.   This analysis determined that the Monorail will require $261,010,819 in

15  2009 Dollars (without regard to inflation) for CAPEX from 2012 through 2040 (the "Bombardier

16  CAPEX Projection," and collectively with the CDG CAPEX Projection, the "CAPEX

17  Projections").

18  Both CAPEX Projections show that the first significant CAPEX will occur in 2019,

19  fifteen years following the commencement of the Monorail's operations.   The CDG CAPEX

20  Projection determined that an initial CAPEX investment of $77,459,732 will be required in 2019

21  alone, for full replacement of the Debtor's train control systems, communications equipment,

22  fare collection equipment, and platform doors.

23  _____

24  [23] On or about April 24, 2008, in connection with the potential restructuring of the Debtor and in consideration for a forbearance, Ambac demanded that the Board retain CDG as restructuring advisor.   Upon its retention, CDG appointed Michael Monaco ("Monaco") as the Debtor's Chief Restructuring Officer ("CRO").   In his capacity as

25  restructuring officer, Monaco was responsible for considering, evaluating and negotiating restructuring proposals and any aspect thereof with respect to the Debtor, making recommendations to the Board regarding the

26  restructuring, and approving any changes to the Debtor's capital expenditures budget.   In the course of its engagement, CDG prepared revenue and expense projections as well as projections regarding the future capital

27  expenditure needs of the Monorail.

28  [24] This coincides with the final maturity date of the 1st Tier Bonds.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

31

The Bombardier CAPEX Projection determined than an initial CAPEX expenditure of $23,060,266 will be required in 2019 for full replacement of the Debtor's fare collection equipment and platform doors. Under the Bombardier CAPEX Projection, the next significant CAPEX requirement would occur in 2024, when the train control system and communication system would be fully replaced at a cost of $52,647,684.

The CDG CAPEX Projection determined that the remaining bulk of the CAPEX requirements would occur between 2029 and 2034, when the Monorail trains would have to be replaced, along with significant other expenditures in 2034 for replacement of the traction power systems/PDS, train control systems, communication systems, guideway elements, fare collection equipment, and platform doors, for a total cost during the period of 2029-2034 of $245,047,396.

By contrast, the Bombardier CAPEX Projection determined that the remaining bulk of the CAPEX requirements would occur between 2034 and 2037, when the Monorail trains would have to be replaced, along with significant other expenditures during 2034-2036 for replacement of the traction power systems, guideway elements, fare collection equipment, and platform doors, for a total cost during the period of 2034-2037 of $177,802,869.

Though the Bombardier CAPEX Projection and the CDG CAPEX Projection differ substantially with respect to the cost of replacement of the train control systems, Monorail escalators, and workshop equipment, both CAPEX Projections agree that the CAPEX requirements occur in large increments approximately every ten (10) years, necessitating the accumulation of cash reserves for CAPEX and leaving little available for debt service. The alternative to accumulating these cash reserves will be equipment obsolescence and failure resulting in the premature cessation of operations by 2019, depending upon which CAPEX Projection is considered.

Even without considering the Debtor's CAPEX requirements, increases in individual drivers of revenue necessary to generate sufficient cash to meet the existing debt service obligations is unattainable. Under the Debtor's analysis, in order to satisfy these debt obligations in 2010, the Debtor would require an increase of 120% in visitor volume, 118% in market share, and 118% in fare yield. In 2010 alone, the total debt service obligation is $37,387,694, of which

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

32

$26,399,944 is for service on the 1st Tier Bonds. By contrast, the Debtor is projected to have net operating revenue of only $6,003,400 under its projections, and only $14,107,485 in net operating revenue under CDG's projections.[25] Under both scenarios, these revenue shortfalls are projected to continue until at least the early 2030s, after significant CAPEX investments are required to have been made.

As a result of the foregoing analysis, the Debtor has come to the following conclusions:

(a)    Net cash flow from the existing Monorail will never be sufficient to service the present debt service on the Bonds;

(b)    Using all available net cash flow for 2010 through 2019 to make partial payments on the Bonds will result in the Debtor having no money available to meet its CAPEX needs beginning in 2019, regardless of which CAPEX Projection is used; and

(c)    Restructuring the debt service on the 1st Tier Bonds and eliminating the 2nd Tier Bonds and 3rd Tier Bonds is necessary to allow the Debtor to meet its CAPEX needs and allow it to operate for the foreseeable future.

## 3.    **Default.**

Pursuant to the Financing Agreement, the Debtor is obligated to make certain Senior Loan Repayments, as defined therein, sufficient to fund debt service on the Bonds and replenish the Debt Service Reserve Fund. Specifically, the Debtor is required to transfer sums before the last business day of each month to the 1st Tier Debt Service Fund and the 2nd Tier Debt Service Fund in an amount sufficient to satisfy the then-due principal and interest on the 1st Tier Bonds and the 2nd Tier Bonds, respectively, in compliance with the Financing Agreement.

The Debtor was unable to transfer sufficient sums to satisfy the Senior Loan Repayments in December 2007, and consequently, on January 2, 2008, there were insufficient amounts available in the 1st Tier Debt Service Fund and the 2nd Tier Debt Service Fund to pay all amounts of principal and interest then due. The Debtor was also unable to make sufficient payments to satisfy the requirements of the Financing Agreement to fund debt service reserves

---

[25] As indicated by actual net operating revenue results through July 31, 2010, the CDG projection was unrealistic and the actual results will be substantially closer to the Debtor's projection.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    and replenish the Debt Service Reserve Funds.

2         On February 11, 2008, Wells Fargo sent a Notice of Events of Default to the Debtor.

3 Also on February 11, 2008, Wells Fargo sent its Notice of Events of Default to Holders of

4 Director of the State of Nevada Department of Business and Industry Las Vegas Monorail

5 Project Revenue Bonds 1st Tier Series 2000 and 2nd Tier Series 2000, notifying the Bondholders

6 of the default. The Debtor has not cured the above-described default, and from December 2007

7 to the present, has not raised sufficient revenues to comply with the terms of the Financing

8 Agreement.

9         On or about July 17, 2008, the Debtor entered into a forbearance agreement with Wells

10 Fargo and Ambac (the "Forbearance Agreement"). On or about October 31, 2008, the Debtor

11 entered into an Amended and Restated Forbearance Agreement with Wells Fargo and Ambac

12 pursuant to which Wells Fargo and Ambac agreed to continue the forbearance of the exercise of

13 their rights and remedies until January 31, 2009. The Amended and Restated Forbearance

14 Agreement was subsequently extended to May 31, 2009, and then again to June 30, 2009. The

15 Amended and Restated Forbearance Agreement expired on June 30, 2009, and no other

16 forbearance agreement was executed.

17         In October of 2009, the Debtor retained the services of Alvarez & Marsal as financial

18 advisors to assist in evaluating financial and strategic alternatives, including preparation of

19 analyses of the Debtor's alternatives with respect to debt restructuring, debt refinancing,

20 divestitures, or reorganization, the Debtor's debt service capacity and long-term financing needs,

21 and the Debtor's business plan, operating and capital expenditures budgets, loan agreements and

22 bond indentures, and multi-year financial projections under various operating scenarios.

23      **4.**      **Uncertainty as to Access to Operating Funds.**

24         As a result of the inability of the Debtor to satisfy its debt service obligations, the Debtor

25 was required to transfer all of its Project Revenues to Wells Fargo for deposit in the Revenue

26 Fund maintained at Wells Fargo (the "Revenue Fund"), pursuant to the Financing Agreement.

27 Also pursuant to the Financing Agreement, Wells Fargo is required to pay from the Revenue

28 Fund all payments permitted or required to be paid for operation and maintenance costs ("O&M

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

34

Costs") upon written direction of the Debtor.

As of the Petition Date, the Debtor had approximately $226,346.06 held in accounts with Wells Fargo. As of the Petition Date, the Debtor had a balance in the BofA Account of approximately $971,041.52, an estimated $64,594 in coin inventory on hand with Brinks, U.S. ("Brinks"), and approximately $162,209.95 in undeposited TVM cash receipts (part of which must remain in the TVMs to make change) and $650 in customer service booth receipts, and an estimated $30,000 in TVM credit receipts in process at Merchant Bank. The BofA Account is not subject to any depository control agreement.

**5.    Restructuring Goals.**

The Debtor believes that the Monorail plays a vital role in meeting the transportation needs of Clark County, Nevada and specifically the Las Vegas Strip corridor. As previously discussed, the Monorail is an integral factor in relieving congestion in the Las Vegas Strip Corridor while also being one of the most "green" public transportation systems in the United States.

While the initial projections and expectations for the Monorail were flawed, that does not mean that the Monorail cannot be restructured so that it can meet its CAPEX needs while providing some payment to the 1st Tier Bondholders. The alternative is the Monorail literally ceasing service no later than 2019.

**D.    Significant Events During the Bankruptcy Case.**

The Debtor has operated its business as debtor-in-possession. The Bankruptcy Court has certain supervisory powers over the operations of the Debtor during the pendency of the Bankruptcy Case. These powers are generally limited to reviewing and ruling on any objections raised by a party-in-interest to business operations or proposed transactions of the Debtor. Except as otherwise authorized by the Bankruptcy Court, the Debtor is required to give notice of any transactions not in the ordinary course of business and of the compromise of any controversy to parties-in-interest who request such notice. In addition, the Bankruptcy Court supervises the employment of attorneys, accountants and other professionals.

**1.    First Day Motions.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

Concurrently with the filing of the Petition, the Debtor filed various First Day Motions designed to assist the Debtor in making a smooth transition into Chapter 11, including:

a.    Emergency Application for Order Authorizing Maintenance of Prepetition Cash Management System and Maintenance of Prepetition Bank Accounts [ECF 30];

b.    Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining That Adequate Assurance Has Been Provided to Utility Companies [ECF 31];

c.    Emergency Application for Order Permitting Debtor to Honor Prepetition Ticket Purchases and Refunds [ECF 32];

d.    Emergency Motion for Order (i) Authorizing the Debtor to Pay Wages, Salaries, benefits, Reimbursable Business Expenses and Other Employee Obligations, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations [ECF 41]; and

e.    Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b): (1) Initially Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtor (the "Cash Collateral Motion") [ECF 49].

These First Day Motions were heard on January 19, 2010, with the final hearing on the Cash Collateral Motion occurring on February 17, 2010, as more fully discussed below. The First Day Motions were approved, and corresponding orders were subsequently entered by the Bankruptcy Court.

**2.    Other Significant Motions and Post-Petition Events.**

a.    Retention and Employment of Professionals.

Various applications were filed for employment of professionals in connection with the Bankruptcy Case. Such applications include:

i.    Application for Order Approving Employment of Gordon Silver as Attorneys for Debtor [ECF 106];

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

36

ii.    Application for Order Approving Employment of Jones Vargas as Special Counsel to Debtor [ECF. 127];

iii.    Application for Order Authorizing the Employment of Alvarez & Marsal as Financial and Restructuring Advisor to Debtor [ECF. 129];

iv.    Application for Order Approving Employment of Kafoury, Armstrong & Co. as Auditors for Debtor [ECF 271]; and

v.    Application for Order Approving Employment of Littler Mendelson, P.C. as Special Counsel to Debtor [ECF 388].

Limited objections to the first three employment applications were filed by the Office of the United States Trustee, and a limited objection to the application for employment of Gordon Silver was filed by Ambac; each limited objection sought additional disclosures with respect to the proposed employment.    Each of the foregoing applications was subsequently heard and considered by the Bankruptcy Court.    The Bankruptcy Court approved the applications and corresponding orders were subsequently entered by the Bankruptcy Court.

On February 25, 2010, the Debtor also filed Debtor's Motion for Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals [ECF 240].  On April 7, 2010, Wells Fargo filed a limited opposition and Ambac filed an opposition to the motion.  On April 8, 2010, the Director filed a limited opposition to the motion.  On April 26, 2010, the Bankruptcy Court entered an order approving the motion, setting forth procedures for the interim monthly compensation of professionals in the Bankruptcy Case.

b.    Motion to Dismiss.

On January 13, 2010, Ambac filed its Motion of Ambac Assurance Corporation for Dismissal of Chapter 11 Proceeding Pursuant to 28 U.S.C. §1334 and Sections 109(d) and 1112(b) of the Bankruptcy Code (the "Dismissal Motion") [ECF 8], which sought dismissal of the Bankruptcy Case on the alleged grounds that the Debtor is ineligible to be a debtor under Chapter 11.  The Dismissal Motion was opposed by both the Debtor and the Director.  On April 26, 2010, the Bankruptcy Court entered an order denying the Dismissal Motion.  On May 10,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

37

1  2010, Ambac filed a notice of appeal and motion for leave to appeal the order, which are

2  currently pending.

3                    c.        Objection to Use of Cash Collateral.

4        On January 14, 2010, Wells Fargo filed the Indenture Trustee's Objection to Use of Cash

5  Collateral and Motion for Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363(c)(2) and

6  363(e) (the "Cash Collateral Objection") [ECF 13], which objected to the Debtor's use of cash

7  collateral without first providing adequate protection.  The Cash Collateral Objection was joined

8  by Ambac, while responses were filed by Bombardier and the Debtor.  On January 22, 2010, an

9  interim order approving the Cash Collateral Motion was entered, authorizing the Debtor to use

10  cash collateral on an interim basis.

11        Thereafter, pursuant to the Bankruptcy Court's direction at hearing on February 17, 2010,

12  on February 19, 2010, Wells Fargo and U.S. Bank filed their Trustees' Adequate Protection

13  Request (the "Adequate Protection Request") [ECF 211].  In response, on February 19, 2010, the

14  Debtor filed Debtor's Offer of Adequate Protection to Certain Creditors [ECF 214], submitting a

15  proposed adequate protection order.

16        On April 26, 2010, the Bankruptcy Court entered an Opinion on Cash Collateral Motions

17  which determined that Wells Fargo holds a security interest in accounts maintained by Wells

18  Fargo at the time of filing, but not in the BofA account or cash held by Brinks collected from the

19  Debtor's ticket vending machines.   The Bankruptcy Court separately entered an Order on

20  Adequate Protection and Setting Status Conference which set forth adequate protection and

21  procedures for the Debtors' use of Wells Fargo's cash collateral.

22                    d.        Other Motions.

23        On March 22, 2010, the Debtor filed Debtor's Motion to: (i) Authorize Continued

24  Purchasing and Services Relationships with Access Distribution, LLC and (ii) Authorize the

25  Debtor to Pay Related Prepetition Obligations [ECF 280], seeking authority to pay a critical

26  vendor invoice and maintain a business relationship with a magnetic ticket producer.  On April 9,

27  2010, the Bankruptcy Court entered an order approving the motion.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                                    38

On March 24, 2010, the Debtor filed its <u>Motion to Assume Nonresidential Real Property Lease (Maintenance Yard Lease)</u> [ECF 295].  On April 30, 2010, the Bankruptcy Court entered an order approving the motion, allowing the Debtor to assume its maintenance yard lease with respect to the Monorail.

On June 9, 2010, the Debtor filed its <u>Motion to Reject Nonresidential Real Property Lease</u> [ECF 438], seeking to reject its existing administrative and business office lease.  On the same date, the Debtor also filed a <u>Motion for Order Authorizing New Office Lease</u> [ECF 439] for entry of an order approving a lease of office space to replace its existing lease.  On June 29, 2010, the Bankruptcy Court entered orders approving both motions, serving to reduce the Debtor's monthly office space costs by approximately $30,000 per month.

On June 9, 2010, the Debtor filed <u>Debtor's Motion (1) to Reject Network Services Agreement and Satellite Services Agreement with Heartland Payment Systems, Inc. and (2) for Order Authorizing New Payment Processing Contract</u> [ECF 445].  On June 29, 2010, the Bankruptcy Court entered an order approving this motion, allowing the Debtor to change payment processing service providers at a reduced cost while remaining compliant with credit card security standards.

## VI.
## DESCRIPTION OF THE PLAN

### A.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders.  The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and equity interests in, a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

39

the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, regardless of whether such creditor or equity interest holder (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the bankruptcy court's confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against, or equity interest in, a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote on the plan. Any classes that would receive a distribution of property under the plan, but are not unimpaired, will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims into various Classes and sets forth the treatment for each Class. The Debtor is also required under Section 1122 of the Bankruptcy Code to classify Claims into Classes that contain Claims that are substantially similar to the other Claims in such respective Classes. The Debtor believes that the Plan has classified all Claims in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim will challenge the Plan's classifications and that the Bankruptcy Court will find that different classifications are required in order for the Plan to be confirmed. In such event, the Debtor intends, to the extent permitted by the Bankruptcy Court, to make reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

40

1    accepting Holders are ultimately deemed members. Any such reclassification could adversely

2    affect the Class in which such Holder was initially a member, or any other Class, by changing

3    the composition of such Class and the vote required of that Class for approval of the Plan.

4         The Debtor (and its respective Affiliates, agents, directors, officers, employees, advisors

5    and attorneys) has, and upon confirmation of the Plan will be deemed to have, participated in

6    good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard

7    to the distributions under the Plan, and therefore is not, and on account of such distributions will

8    not be, liable at any time for the violation of any applicable law, rule or regulation governing the

9    solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the

10   Plan.

11        Other than as specifically provided in the Plan, the treatment under the Plan of each

12   Claim will be in full satisfaction, settlement, release and discharge of all Claims. The Debtor

13   will make all payments and other distributions under the Plan, unless otherwise specified.

14   **B.    Treatment of Unclassified Claims under the Plan.**

15        **1.    Treatment of Administrative Claims.**

16        Each Holder of an Allowed Administrative Claim shall be paid in full and final

17   satisfaction of such Claim by Reorganized LVMC (or otherwise satisfied in accordance with its

18   terms), upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such

19   date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the

20   fourteenth (14th) day after such Claim is Allowed or as soon thereafter as practicable; (iv) the

21   date such Claim becomes due by its terms; and (v) such date as is agreed to by the Holder of

22   such Claim and the Debtor or Reorganized LVMC.

23        **2.    Treatment of Priority Tax Claims.**

24        Each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction

25   of such Claim, be paid in full (or be treated in compliance with Section 1129(a)(9)(C) of the

26   Bankruptcy Code) by Reorganized LVMC on the later of (i) the Effective Date or as soon

27   thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first

28   Business Day following the fourteenth (14th) day after the date on which an order allowing such

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

41

1  Claim becomes a Final Order; or (iv) such date as is agreed to by the Holder of such Claim and

2  the Debtor or Reorganized LVMC.

3  **C.      Classification and Treatment of Claims under the Plan.**

4  **1.      Treatment of Class 1 (Other Priority Claims).**

5  Each Allowed Other Priority Claim, if any, shall, in full and final satisfaction of such

6  Claim, be paid in full in Cash by Reorganized LVMC upon the latest of: (i) the Effective Date or

7  as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the

8  first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such

9  date as agreed upon by the Holder of such Claim and the Debtor or the Reorganized LVMC.

10  Holders of Claims in Class 1 are Unimpaired under the Plan, deemed to have accepted the Plan

11  pursuant to Section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan.

12  The Debtor believes that Allowed Other Priority Claims are approximately $1,800.

13  **2.      Treatment of Class 2 (Other Secured Claims).**

14  Each Allowed Other Secured Claim, if any, shall, in full and final satisfaction of such

15  Claim, be paid in full in Cash or otherwise left Unimpaired by the Debtor or Reorganized

16  LVMC, as the case may be, upon the latest of: (i) the Effective Date or as soon thereafter as

17  practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day

18  following the  fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed

19  upon by the Holder of such Claim and the Debtor, and after the Effective Date, by Reorganized

20  LVMC.  Creditors in Class 2 are Unimpaired under the Plan, deemed to have accepted the Plan,

21  and are not entitled to vote on the Plan.  The Debtor believed that Allowed Other Secured Claims

22  are approximately $1,700.

23  **3.      Treatment of Class 3 (General Unsecured Claims).**

24  Each Holder of Allowed General Unsecured Claims will receive in full and final

25  satisfaction of their Allowed General Unsecured Claim, their pro rata share of $175,000 in Cash,

26  which payment shall be made by Reorganized LVMC in 12 equal installments without interest

27  beginning upon the latest of: (i) the first Business Day following the Effective Date or as soon

28  thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                                    42

1    Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date

2    as agreed upon by the Holder of such Claim and the Debtor or Reorganized LVMC. Creditors in

3    Class 3 are Impaired under the Plan and are entitled to vote on the Plan. The Debtor believes

4    that Allowed General Unsecured Claims are approximately $150,000 - $175,000 without regard

5    to rejection damages and disputed personal injury claim.

6        **4.      Treatment of Class 4 (1st Tier Bond Secured Claims).**

7        On the Effective Date or as soon thereafter as practicable, the Director will receive in full

8    and final satisfaction of the Secured Claim portion of the 1st Tier Bond Claims the Amended and

9    Restated 1st Tier Note for $7,500,000. The Director shall assign the Amended and Restated 1st

10   Tier Note to the 1st Tier Trustee, reserving to the Director its indemnification and other rights as

11   specified in the assignments of those obligations in the 1st and 2nd Tier Indenture. The

12   Amended and Restated 1st Tier Note will be secured by the Project Agreements and the Net

13   Project Revenues generated after the Effective Date. The Amended and Restated 1st Tier Note

14   will provide for interest at 5.625% per annum and interest payable quarterly commencing March

15   31, 2011. Beginning March 31, 2012, 30 quarterly installments of principal and interest will be

16   payable with the last payment of principal and interest due on June 30, 2019 (the "Maturity

17   Date").The 1st Tier Note shall be extinguished and discharged and the Amended and Restated

18   Financing Agreement shall provide for the liabilities and obligations arising under the Amended

19   and Restated 1st Tier Note, and shall not provide for any liabilities or obligations regarding the

20   1st Tier Bond Claims or the 1st Tier Notes. The treatment afforded the Holders of Class 4

21   Claims does not affect the rights of the Holders of Class 4 Claims or the 1st Tier Trustee under

22   the 1st and 2nd Tier Indenture against any party other than the Debtor, and specifically, is not

23   intended to nor does it: (i) modify the maturity, the principal or initial denomination amount, or

24   the interest rate or maturity value of the 1st Tier Bonds; (ii) affect or extinguish the exclusion of

25   interest paid on the 1st Tier Bonds (whether paid by the Reorganized Debtor or any third party)

26   from gross income for federal income tax purposes; or (iii) affect or diminish any third-party

27   rights to reimbursement or subrogation under the 1st and 2nd Tier Indenture or 1st Tier

28   Bondholders Insurance Policy. The Holders of Class 4 Claims are Impaired under the Plan and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                                              43

1  are entitled to vote on the Plan.  The Debtor does not believe that the Allowed 1st Tier Bond

2  Secured Claims in Class 4 exceed $7,500,000.

3       **5.**     **Treatment of Class 5 (1st Tier Bond Unsecured Claims).**

4       On the Effective Date in full satisfaction of the 1st Tier Bond Unsecured Claims,

5  Reorganized LVMC shall deliver the Additional Payment Obligation Note for $11,000,000 to the

6  Director.  The Director shall assign the Additional Payment Obligation Note, which shall be

7  unsecured, to the 1st Tier Trustee, reserving to the Director its indemnification and other rights

8  as specified in the assignments of those obligations in the 1st and 2nd Tier Indenture.

9  Commencing March 31, 2011, Reorganized LVMC will commence payment of the Additional

10  Payment Obligation to the Director in full and final satisfaction of the Unsecured Claim portion

11  of the 1st Tier Bond Claims.  The treatment afforded the Holders of Class 5 Claims does not

12  affect the rights of the Holders of Class 5 Claims or the 1st Tier Trustee under the 1st and 2nd

13  Tier Indenture against any party other than the Debtor, and specifically, is not intended to nor

14  does it: (i) modify the maturity, the principal or initial denomination amount, or the interest rate

15  or maturity value of the 1st Tier Bonds; (ii) affect or extinguish the exclusion of interest paid on

16  the 1st Tier Bonds (whether paid by the Reorganized Debtor or any third party) from gross

17  income for federal income tax purposes; or (iii) affect or diminish any third-party rights to

18  reimbursement or subrogation under the 1st and 2nd Tier Indenture or 1st Tier Bondholders'

19  Insurance Policy.  The Holders of Class 5 Claims are Impaired under the Plan and are entitled to

20  vote on the Plan.   The Debtor believes the Allowed Class 5 Claims are approximately

21  $445,000,000.

22       **6.**     **Treatment of Class 6 (2nd Tier Bond Claims).**

23       2nd Tier Bond Claims are contractually subordinated to the 1st Tier Bond Claims.

24  Because the 1st Tier Bond Claims are not being paid in full, Holders of Class 6 Claims shall not

25  receive or retain any property on account of their Claims under this Plan. The 2nd Tier

26  Obligation will be extinguished and discharged, and the Amended and Restated Financing

27  Agreement shall not provide for any liabilities regarding the 2nd Tier Bond Claims or the 2nd

28  Tier Obligation.  2nd Tier Bond Claims are Impaired and are deemed to have rejected the Plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

44

7. **Treatment of Class 7 (3rd Tier Bond Claims).**

3rd Tier Bondholders are contractually subordinated to the 1st Tier Bond Claims and 2nd Tier Bond Claims. Because the 1st Tier Bond Claims and 2nd Tier Bond Claims are not being paid in full, Holders of Class 7 Claims shall not receive or retain any property on account of their Claims under this Plan. The 3rd Tier Note will be extinguished and discharged, and the Amended and Restated Financing Agreement shall not provide for any liabilities regarding the 3rd Tier Bond Claims or the 3rd Tier Note. 3rd Tier Bond Claims are Impaired and are deemed to have rejected the Plan.

8. **Treatment of Class 8 (Director Claims).**

On the Effective Date, the Amended and Restated Financing Agreement shall become effective and from and after the Effective Date, all Allowed Director Claims shall participate in the distributions to Holders of Class 4 Claims and Class 5 Claims as provided for in the Amended and Restated Financing Agreement and the 1st and 2nd Tier Indenture. The Director Claims are Impaired under the Plan and entitled to vote on the Plan.

9. **Treatment of Class 9 (Subordinated Claims).**

Holders of Subordinated Claims shall not receive any distribution on account of such Claims. Holders of Class 9 Claims are Impaired under the Plan, not entitled to vote on the Plan, and deemed to have rejected the Plan.

D. **Means for Implementation of the Plan.**

1. **Reorganized LVMC.**

On or before the Effective Date, the Reorganized LVMC Organizational Documents shall be executed and, to the extent required, filed with the Nevada Secretary. The Reorganized LVMC Organizational Documents shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, Reorganized LVMC shall be responsible for the preparation of all reports, tax returns and other

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

45

governmental filings required to be filed by the Debtor and Reorganized LVMC and all obligations related thereto.

### 2.    Additional Reorganized LVMC Provisions.

Reorganized LVMC Organizational Documents, and resolutions or similar documents related to the formation and governance of Reorganized LVMC under the Plan shall be subject to applicable bankruptcy and/or Nevada law.    Reorganized LVMC shall remain a Nevada non-profit corporation.

### 3.    Effective Date Events.

On the Effective Date, Reorganized LVMC shall execute and deliver to the Director (x) the Amended and Restated 1st Tier Note, (y) the Additional Payment Obligation Note, and (z) the Amended and Restated Financing Agreement and related security documents as provided for in the Plan, all of which shall become immediately effective, and all of which the Director shall assign to the 1st Tier Trustee as provided for in the Amended and Restated Financing Agreement and the 1st and 2nd Tier Indenture, reserving to the Director its indemnification and other rights as specified in the assignments of those obligations in the Amended and Restated Financing Agreement and the 1st and 2nd Tier Indenture.

### 4.    Post-Effective Date Management and Operations.

On and after the Effective Date, Reorganized LVMC will continue to be managed by the existing managers, officers, and directors under their existing employment agreements, if any, pursuant to the Reorganized LVMC Organizational Documents, and otherwise according to the terms and conditions that existed on the date of the filing of the Plan, unless otherwise disclosed. Reorganized LVMC shall be responsible for the payment of all Allowed Claims to be paid pursuant to the Plan which are not paid on or before the Effective Date, as well as all Allowed Claims, including Taxes and Professional Fees, incurred by the Debtor and in operating its business and complying with the Plan up to and including the Effective Date, whether due and payable before or after the Effective Date.   Reorganized LVMC is authorized without further order of the Bankruptcy Court to obtain and effectuate the Working Capital Loan as the board of directors of Reorganized LVMC determines in its business judgment.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

46

1    **5.    Post-Effective Date Officers and Directors of Reorganized LVMC.**

2    On and after the Effective Date, the initial board of directors of Reorganized LVMC shall

3    be comprised of the five (5) individuals serving on the board of directors on the Confirmation

4    Date.    Thereafter, members of the board of directors shall be selected pursuant to the

5    Reorganized LVMC Organizational Documents.    The initial officers shall be comprised of the

6    individuals employed as officers on the Confirmation Date.    The Debtor will disclose, at or prior

7    to the Confirmation Hearing, the identity of such individuals.

8    **6.    No Corporate Action Required.**

9    As of the Effective Date: (i) the adoption, execution, delivery and implementation or

10    assignment of all contracts, leases, instruments, releases and other agreements related to or

11    contemplated by the Plan; and (ii) the other matters provided for under or in furtherance of the

12    Plan involving corporate action to be taken by or required of the Debtor shall be deemed to have

13    occurred and be effective as provided herein, and shall be authorized and approved in all respects

14    without further order of the Bankruptcy Court or any requirement of further action by the board

15    of directors or officers of the Debtor.    In particular, the adoption of the amended organizational

16    documents, and the selection of directors and officers of the Debtor, and all other actions

17    contemplated by or described in the Plan with respect thereto, shall be authorized and approved

18    and be binding and in full force and effect in all respects (subject to the provisions of the Plan

19    and the Confirmation Order), in each case without further notice to or order of the Bankruptcy

20    Court, act or action under applicable law, regulation, order, or rule (other than filing such

21    organizational documents with the applicable governmental unit as required by applicable law)

22    or the vote, consent, authorization or approval of any Person.

23    **7.    Effectuation of Transactions.**

24    On the Effective Date, the appropriate officers of the Debtor and members of the board of

25    directors are authorized to issue, execute, and deliver the contracts, agreements, documents,

26    guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated

27    by or described in the Plan in the name of and on behalf of the Debtor and Reorganized LVMC,

28    and to otherwise fully consummate the transactions contemplated by the Plan, in each case

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

47

1  without further notice to or order of the Bankruptcy Court, act or action under applicable law,

2  regulation, order, or rule or any requirement of further action, vote or other approval or

3  authorization by any Person.

4        **8.**     **<u>Filing with Nevada Secretary.</u>**

5        To the extent applicable, in accordance with applicable law, on the Effective Date a

6  certified copy of the Plan and the Confirmation Order shall be filed with the Nevada Secretary.

7  The Debtor, from the Confirmation Date until the Effective Date, is authorized and directed to

8  take any action or carry out any proceeding necessary to effectuate the Plan pursuant to

9  applicable law.

10  **E.**     **<u>Executory Contracts and Unexpired Leases.</u>**

11        **1.**     **<u>Executory Contracts.</u>**

12        Except for Executory Contracts and Unexpired Leases specifically addressed in the Plan

13  or set forth on the schedule of Rejected Executory Contracts and Unexpired Leases attached as

14  <u>Schedule 7.1</u> to the Plan (which may be supplemented and amended up to the date the

15  Bankruptcy Court enters the Confirmation Order), all Executory Contracts and Unexpired Leases

16  that exist on the Confirmation Date shall be deemed assumed by Reorganized LVMC on the

17  Effective Date.

18        **2.**     **<u>Approval of Assumption or Rejection.</u>**

19        Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval,

20  pursuant to Section 365(a) of the Bankruptcy Code, of the assumption by the Debtor of each

21  Executory Contract and Unexpired Lease to which the Debtor is a party and which is not listed

22  on <u>Schedule 7.1</u>, not otherwise provided for in the Plan and neither assumed, assumed and

23  assigned, nor rejected by separate order prior to the Effective Date; and (ii) rejection by the

24  Debtor of each Executory Contract and Unexpired Lease to which the Debtor is a party listed on

25  <u>Schedule 7.1</u>. Upon the Effective Date, each counter party to an assumed Executory Contract or

26  Unexpired Lease listed shall be deemed to have consented to assumption contemplated by

27  Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such

28  assumption.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

48

To the extent applicable, all Executory Contracts or Unexpired Leases of Reorganized LVMC assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by the confirmation of the Plan.

3.    **Cure of Defaults.**

The Debtor or Reorganized LVMC shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to the Plan upon the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such dates as may be fixed by the Bankruptcy Court or agreed upon by the Debtor, and after the Effective Date, Reorganized LVMC; or (iii) the first Business Day following the fourteenth (14th) day after the entry of a Final Order resolving any dispute regarding (a) a Cure amount; (b) the ability of the Debtor or the Reorganized LVMC to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any other disputed matter pertaining to assumption, assignment or the Cure of a particular Executory Contract or an Unexpired Lease. Schedule 7.3 to the Plan lists the Debtors' proposed Cure amounts, if any, that will be paid as provided for above, which Schedule 7.3 may be amended up to and including the five (5) days prior to the commencement of the Confirmation Hearing.

4.    **Objection to Cure Amounts.**

Any party to an Executory Contract or Unexpired Lease who objects to the Cure amounts listed on Schedule 7.3 to the Plan must file and serve an objection on the Debtor's counsel no later than thirty (30) days after the Effective Date. Failure to file and serve a timely objection shall be deemed consent to the Cure amounts listed on Schedule 7.3. If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of Reorganized LVMC to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

49

required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption, except as provided in <u>Section 7.3</u> of the Plan.

     **5.**     **<u>Confirmation Order.</u>**

     The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Section 7 of the Plan, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date.  Notwithstanding the foregoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease (or if the time period for a non-Debtor to object to the Cure has not yet lapsed), the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by the Debtor.

     **6.**     **<u>Post-Petition Date Contracts and Leases.</u>**

     Each such Executory Contract and Unexpired Lease shall be performed by the Debtor or Reorganized LVMC, as applicable, in the ordinary course of its business.

     **7.**     **<u>Bar Date.</u>**

     All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be filed no later than thirty (30) days after the Effective Date. Any Claim not filed within such time shall be forever barred.

**F.**     **<u>Conditions Precedent to Confirmation and the Effective Date.</u>**

     **1.**     **<u>Conditions to Confirmation.</u>**

     As a condition precedent to the Confirmation of the Plan, the Confirmation Order shall be in form and substance reasonably acceptable to the Debtor and the Director.

     **2.**     **<u>Conditions to Effectiveness.</u>**

     The following are conditions precedent to the occurrence of the Effective Date:

     (i)     The Confirmation Order shall be a Final Order;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

50

(ii)    No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending, including any appeal;

(iii)    All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance reasonably acceptable to the Debtor and the Director; and

(iv)    Sufficient Cash and other Assets shall be set aside, reserved and withheld by the Debtor to make the distributions required to be paid on the Effective Date or within sixty (60) days thereafter by the Bankruptcy Code and the Plan.

**3.    Notice of Effectiveness.**

When all of the steps contemplated by Section 9.2 of the Plan have been completed, the Debtor shall file with the Bankruptcy Court and serve upon all Creditors and all potential Holders of Administrative Claims known to the Debtor (whether or not disputed), a Notice of Effective Date of Plan.   The Notice of Effective Date of Plan shall include notice of the Administrative Claim Bar Date.

**4.    Waiver of Conditions.**

The Debtor, and if applicable, Reorganized LVMC, may waive any or all of the other conditions set forth in the Plan and specifically Sections 9.2.2. and 9.2.4. of the Plan (each for themselves but not for others) without leave of or order of the Bankruptcy Court and without any formal action.  The failure of a party to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time prior to the filing of the Notice of Effectiveness.

# VII.
## RISK FACTORS

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan and the transactions contemplated by the Plan involve the following risks, which should be taken into consideration.

**A.    The Debtor Has No Duty To Update.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

51

1    The statements in this Disclosure Statement are made by the Debtor as of the date hereof,

2    unless otherwise specified herein.  The delivery of this Disclosure Statement after that date does

3    not imply that there has been no change in the information set forth herein since that date.  The

4    Debtor has no duty to update this Disclosure Statement unless ordered to do so by the

5    Bankruptcy Court.

6    **B.**    **Information Presented Is Based on the Debtors' Books and Records, and Is**
        **Unaudited.**

7

8    While the Debtor has endeavored to present information fairly in this Disclosure

9    Statement, there is no assurance that the Debtor's books and records upon which this Disclosure

10   Statement is based are complete and accurate.  Historical financial information contained herein,

11   though, has been audited.

12   **C.**    **Projections and Other Forward-Looking Statements Are Not Assured, and Actual**
        **Results Will Vary.**

13   Certain information in this Disclosure Statement is forward-looking, and contains

14   estimates and assumptions which might ultimately prove to be incorrect, and projections which

15   may differ materially from actual future results.  There are uncertainties associated with all

16   assumptions, projections and estimates, and they should not be considered assurances or

17   guarantees of the amount of funds that will be distributed or the amount of Claims in the various

18   Classes that will be allowed.  The amount of Allowed Claims in each Class could be

19   significantly more than projected, which in turn could cause the value of Distributions to be

20   reduced substantially.

21   **D.**    **No Legal or Tax Advice Is Provided to You by This Disclosure Statement.**

22   The contents of this Disclosure Statement should not be construed as legal, business or

23   tax advice.  Each Creditor should consult his, her or its own legal counsel and accountant as to

24   legal, tax and other matters concerning his, her or its Claim or Equity Interest and the applicable

25   treatment under the Plan.

26   **E.**    **No Admissions Made.**

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

1    Nothing contained herein shall constitute an admission of any fact or liability by the
2    Debtor or any other party nor shall it be deemed evidence of the tax or other legal effects of the
3    Plan on the Debtor or on Holders of Claims.

4    **F.    No Waiver of Right to Object or Right to Recover Transfers and Estate Assets.**

5    A Creditor's vote for or against the Plan does not constitute a waiver or release of any
6    claims or rights of the Debtor (or any other party in interest) to object to that Creditor's Claim, or
7    recover any preferential, fraudulent or other voidable transfer or Estate assets, regardless of
8    whether any claims of the Debtor or its Estate are specifically or generally identified herein.

9    **G.    Bankruptcy Law Risks and Considerations.**

10    **1.    Confirmation of the Plan Is Not Assured.**

11    Although the Debtor believes the Plan will satisfy all requirements for Confirmation, the
12    Bankruptcy Court might not reach that conclusion. It is also possible that modifications to the
13    Plan will be required for Confirmation and that such modifications would necessitate
14    resolicitation of votes.

15    Confirmation requires, among other things, a finding by the Bankruptcy Court that it is
16    not likely there will be a need for further financial reorganization and that the value of
17    Distributions to dissenting members of Impaired Classes of Creditors would not be less than the
18    value of Distributions such Creditors would receive if the Debtor were liquidated under Chapter
19    7 of the Bankruptcy Code. Although the Debtor believes that the Plan will not be followed by a
20    need for further financial reorganization and that dissenting members of Impaired Classes of
21    Creditors will receive distributions at least as great as they would receive in a liquidation under
22    Chapter 7, there can be no assurance that the Bankruptcy Court will conclude that these tests
23    have been met.

24    **2.    The Effective Date or the Substantial Consummation Date Might Be Delayed or Never Occur.**

25    There is no assurance as to the timing of the Effective Date or Substantial Consummation
26    Date or that they both will occur. If the respective conditions precedent to the Effective Date and
27    Substantial Consummation Date have not occurred or been waived within the prescribed time

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

53

frames, the Confirmation Order will be vacated. In that event, the Holders of Claims would be restored to their respective positions as of the day immediately preceding the Confirmation Date, and the Debtor's obligations for Claims would remain unchanged as of such day (except to the extent of any post-Effective Date payments).

### 3. The Projected Value of Estate Assets Might Not Be Realized.

In the Best Interests Analysis discussed herein, the Debtor has projected the value of the Estate's assets that would be available for payment of expenses and Distributions to Holders of Allowed Claims, as set forth in the Plan in the event of liquidation of the Estate's assets. The Debtor has made certain assumptions, which should be read carefully.

### 4. Allowed Claims in the Various Classes May Exceed Projections.

The Debtor has also projected the amount of Allowed Claims in each Class in the Best Interests Analysis. Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

### 5. No Representations Outside of This Disclosure Statement Are Authorized.

No representations concerning or related to the Debtor, the Bankruptcy Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### H. Risks Related to the Debtor's Business Operations.

The following discussions of risks that relate to the Debtor's business should be read as also being applicable to the business of Reorganized LVMC on and after the Substantial Consummation Date.

### 1. Effect of the Bankruptcy Case.

If the Bankruptcy Case continues for a prolonged amount of time, the proceedings could adversely affect the Debtor's business and operations. The longer the Bankruptcy Case continues, the more likely it is that customers, suppliers and agents may lose confidence in the Debtor's ability to successfully reorganize its business and will seek to establish alternative

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

54

1  commercial relationships.  Consequently, the Debtor might lose valuable contracts and other

2  business relationships in the course of the Bankruptcy Case.

3  So long as the Bankruptcy Case continues, the Debtor's senior management will be

4  required to devote significant time and effort to dealing with the Debtor's reorganization instead

5  of focusing exclusively on business operations.  Prolonged continuation of the Bankruptcy Case

6  will also make it more difficult to attract and retain management and other key personnel

7  necessary to the success and growth of the Debtor's business.

8  Furthermore, so long as the Bankruptcy Case continues, the Debtor will be required to

9  incur substantial costs for professional fees and other expenses associated with the proceedings.

10  While cash flow projections indicate there will be sufficient cash flow to meet all

11  ordinary demands and to pay professional fees and expenses, prolonged continuation of the

12  Bankruptcy Case may require the Debtor to seek additional financing.  It may not be possible to

13  obtain additional financing during or after the Bankruptcy Case on commercially reasonable

14  terms or at all.  If the Debtor requires additional financing during the Bankruptcy Case and is

15  unable to obtain it on reasonable terms or at all, the Debtor's chances of a successful

16  reorganization may be seriously jeopardized.

17  **2.    The Volatility and Disruption of the Capital and Credit Markets and Adverse Changes in the Global Economy Have Negatively Impacted the Debtor's Access to Financing.**

18  

19  Due to the existing uncertainty in the capital and credit markets and current adverse

20  conditions in the global economy, the Debtor may not have access to capital on feasible terms or

21  on any terms whatsoever.

22  **3.    The Debtor Faces Extensive Regulation from Government Authorities.**

23  As owner and operator of the Monorail, the Debtor is subject to extensive Nevada state

24  and local regulation.  Nevada state and local government authorities require the Debtor to

25  maintain the Franchise in place for operation of the Monorail.  Clark County authorities may

26  limit, condition, suspend or revoke the Franchise for failure to comply with the Franchise

27  Agreement, applicable Clark County Code provisions, or the laws or regulations of the State of

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc    55

1    Nevada or United States. The occurrence of such an event could have a material adverse effect
2    on the Debtor's business, financial condition and results of operations.

3        No assurances can be given that any new licenses, registrations, findings of suitability,
4    permits and approvals will be given or that existing ones will be renewed when they expire. Any
5    failure to renew or maintain licenses or receive new licenses when necessary would have a
6    material adverse effect on the Debtor.

7        The Debtor is subject to a variety of other rules and regulations, including zoning,
8    environmental, construction and land-use laws and regulations. Any changes to these laws could
9    have a material adverse effect on the Debtor's business, financial condition and results of
10    operations.

11        The compliance costs associated with these laws, regulations and licenses are significant.
12    A change in any such laws, regulations and licenses or a violation of any current or future laws,
13    regulations or licenses could require the Debtor to make material expenditures or could
14    otherwise materially and adversely affect the Debtor's business, financial condition and results
15    of operations.

16    **4.    The Debtor's Business, Financial Condition and Results of Operations Are**
     **Dependent in Part on a Number of Factors That Are Beyond the Debtor's**
17    **Control.**

18        The economic health of the Debtor's business is generally affected by a number of other
19    factors that are beyond the Debtor's control, including: (i) local economic conditions, including
20    seasonal and weather-related factors; (ii) decline in tourism and travel due to poor national or
21    global economic conditions; (iii) decline in tourism and travel due to occurrences or threats of
22    terrorism, environmental disaster, outbreak of disease, or other destabilizing events; and (iv)
23    substantial increases in the cost of electricity and other forms of energy necessary for operation
24    of the Monorail.

25                                    **VIII.**
                        **CERTAIN SECURITIES LAW CONSIDERATIONS**
26
27        [Discussion regarding the securities law implications of the Plan will be provided in an
     amended Disclosure Statement to be provided prior to hearing on Disclosure Statement.]
28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

56

## IX.
## POST-EFFECTIVE DATE OPERATIONS

**A.**    **Title to Property; Discharge; Injunction.**

  **1.**    **Vesting of Assets.**

  Subject to and as provided for in the Plan, the Assets shall be vested and/or transferred to Reorganized LVMC on the Effective Date.  On and after the Effective Date, Reorganized LVMC may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

  **2.**    **Preservation of Litigation Claims.**

  In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, on the Effective Date all Litigation Claims shall be assigned to Reorganized LVMC, and Reorganized LVMC shall have the exclusive right to enforce, prosecute, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.

  **3.**    **Settlement of Litigation Claims.**

  At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtor may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  After the Effective Date, Reorganized LVMC may, and shall have the exclusive right to, compromise and settle any Claims against it and claims it may have against any other Person or entity, including, without limitation, the Litigation Claims, without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.

  **4.**    **Discharge.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

57

On the Effective Date, except as otherwise provided in the Plan, the Debtor shall be discharged from any and all Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code. The Discharge shall be to the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan and shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or nature whatsoever against the Debtor or any of its assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date as to Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9 the Debtor shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

   5.    **Compromise and Settlement.**

The allowance, classification and treatment of all Allowed Claims and their respective distributions under the Plan take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510(c) of the Bankruptcy Code, or otherwise, including without limitation the subordination provisions related to the 1st and 2nd Tier Indenture or 3rd Tier Indenture. As of the Effective Date, any and all such rights described in the preceding sentence will be settled, compromised and released pursuant to the Plan and any and all such Causes of Action related thereto are settled, compromised, and released.

   6.    **Debtor Releases.**

On the Effective Date and effective as of the Effective Date, for good and valuable consideration, including, but not limited to: (i) the discharge of debt and all other good and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

58

1    valuable consideration paid pursuant to the Plan; and (ii) the services of the Debtor's officers and

2    directors serving on and since the Petition Date in facilitating the expeditious implementation of

3    the reorganization contemplated by the Plan, the Debtor and Reorganized LVMC shall provide a

4    full discharge and release to, collectively, and solely in their capacity as such, all officers,

5    directors, employees, attorneys, actuaries, financial advisors, accountants, investment bankers,

6    agents, professionals and representatives of the Debtor serving on and since the Petition Date

7    (collectively, the "Released Parties" (and each such Released Party so released shall be deemed

8    released and discharged by the Debtor and Reorganized LVMC)) and their respective properties

9    from any and all Causes of Action, whether known or unknown, whether for torts, including

10   fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related

11   in any way to the Debtor or Reorganized LVMC, including, without limitation, those that any of

12   the Debtor or Reorganized LVMC would have been legally entitled to assert in its own right

13   (whether individually or collectively) or that any Holder of a Claim or other entity would have

14   been legally entitled to assert on behalf of the Debtor or its Estate, and further including those in

15   any way related to the Bankruptcy Case or the Plan to the fullest extent of the law; provided,

16   however, that the foregoing releases shall not operate to waive or release any Released Party

17   from (a) any Causes of Action expressly set forth in and preserved by the Plan, any Plan

18   Supplement or related documents or (b) as a result of actual fraud, gross negligence or willful

19   misconduct.

20       **7.    <u>Injunction.</u>**

21       From and after the Effective Date, and except as provided in the Plan and the

22   Confirmation Order, all entities that have held, currently hold or may hold a Claim that is

23   terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the

24   following actions on account of any such Claims:  (i) commencing or continuing in any manner

25   any action or other proceeding against Reorganized LVMC or its property; (ii) enforcing,

26   attaching, collecting or recovering in any manner any judgment, award, decree or order against

27   Reorganized LVMC or its property; (iii) creating, perfecting or enforcing any Lien or

28   encumbrance against Reorganized LVMC or its property; (iv) asserting a setoff, right of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                    59

subrogation or recoupment of any kind against any debt, liability or obligation due to Reorganized LVMC or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.  By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in Section 10.7 of the Plan.

**8.    Exculpation.**

From and after the Effective Date, none of the Debtor, any Statutory Committees, Reorganized LVMC nor any of their respective directors, officers, managers, employees, advisors, attorneys or agents on and from the Petition Date forward, shall have or incur any liability to any Holder of a Claim or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward) the Bankruptcy Case, Reorganized LVMC, the pursuit of Confirmation of the Plan or the Substantial Consummation of the Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Bankruptcy Case.  No Holder of a Claim, nor any other party-in-interest, including their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, shall have any right of action against the Debtor, any Statutory Committees, Reorganized LVMC or any of their respective present or former members, officers, directors, managers, employees, advisors, attorneys or agents, relating to, or arising out of (from the Petition Date forward) the Bankruptcy Case, the pursuit of Confirmation of the Plan, the Substantial Consummation of the Plan or the administration of the Plan, except for:  (i) their willful misconduct and gross negligence; (ii) matters specifically contemplated by either the Plan or Reorganized LVMC; and (iii) any liability of an attorney to its client not subject to exculpation under the Bankruptcy Code.

**9.    Director and Officer Liability Insurance.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

As of the Effective Date, Reorganized LVMC will obtain sufficient tail coverage under a directors' and officers' liability insurance policy (the "D&O Liability Insurance Policy", and, together with all insurance policies for directors and officers' liability maintained by the Debtor as of the Petition Date, the "D&O Liability Insurance Policies") for the directors and officers of the Debtor and Reorganized LVMC, as applicable (from the Petition Date forward) for a period of six (6) years.  The Debtor will assume and, if applicable, assign to Reorganized LVMC all of the D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code as of the Effective Date.  Entry of the Confirmation Order will constitute approval by the Bankruptcy Court of the Debtor's foregoing assumption and assignment by the Debtor to Reorganized LVMC of each of the D&O Liability Insurance Policies.   Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor and assigned to Reorganized LVMC under the Plan as to which no proof of Claim need be filed.

**10.     Indemnification.**

All indemnification provisions currently in place (whether in the bylaws, articles or certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions (or resolutions of similar bodies) or employment contracts) for the directors, officers, employees, attorneys, other professionals and agents of the Debtor (from the Petition Date forward) shall be assumed, and shall survive effectiveness of the Plan.   All indemnification provisions in place on and prior to the Effective Date for current directors and officers of the Debtor (from the Petition Date forward) shall (i) survive the Effective Date of the Plan for Claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date, and (ii) remain liabilities of Reorganized LVMC specifically on behalf of the Debtor.

**B.     Post Confirmation Reporting and Quarterly Fees to the UST.**

Until the entry of the final decree closing the Bankruptcy Case, Reorganized LVMC shall

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

61

1    comply with the post-confirmation reporting requirements found in Local Rule 3020 of the
2    Bankruptcy Court.  Additionally, to the extent required, Reorganized LVMC shall file post-
3    confirmation quarterly operating reports as required by the United States Trustee Guidelines,
4    para. 7.2.

5         Prior to the Effective Date, the Debtor, and after the Effective Date, Reorganized LVMC
6    shall pay all quarterly fees payable to the Office of the United States Trustee consistent with
7    applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

## X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

[Discussion regarding the federal income tax implications of the Plan will be provided in an amended Disclosure Statement to be provided prior to hearing on Disclosure Statement.]

## XI.
## CONFIRMATION OF THE PLAN

**A.    Confirmation of the Plan.**

Pursuant to Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the United States Bankruptcy Court for the District of Nevada, Southern Division, 300 Las Vegas Boulevard South, Las Vegas, NV 89101, commencing on _____, 2010, at _____ a.m. (PDT).

**B.    Objections to Confirmation of the Plan.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan of reorganization.  Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for such objections and must be filed with the Bankruptcy Court and served upon the following parties so as to be received on or before the time fixed by the Bankruptcy Court:

The Debtor:                      Las Vegas Monorail Company
                                 Attn: Curtis L. Myles, III
                                 3900 Paradise Road, Suite 260
                                 Las Vegas, NV 89169
                                 Tel:  (702) 699-8200
                                 Fax:  (702) 731-3272

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

62

| | | |
|---|---|---|
| 1 | With a copy to: | Gordon Silver |
| 2 | | Attn: William M. Noall, Esq. |
| | | 3960 Howard Hughes Parkway, 9th Floor |
| 3 | | Las Vegas, NV 89169 |
| | | Tel: (702) 796-5555 |
| 4 | | Fax: (702) 369-2666 |

The Director:                          The Director of the State of Nevada
                                       Department of Business & Industry
                                       Attn: Mr. Lon A. DeWeese

With a copy to:                        Lon A. DeWeese
                                       Chief Financial Officer
                                       Nevada Housing Division
                                       1535 Old Hot Springs Road
                                       Suite 50
                                       Carson City, Nevada 89706

                                       and

                                       Rebecca J. Winthrop, Esq.
                                       Ballard Spahr LLP
                                       2029 Century Park East
                                       Suite 800
                                       Los Angeles, CA 90067-2909
                                       Tel: (424) 204-4330
                                       Fax: (424) 204-4350

**C.**     **The Best Interest Test and Feasibility of the Plan.**

For the Plan to be confirmed, it must satisfy the requirements discussed below.

**1.**     **Best Interest of Creditors.**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed, it must provide Holders of Allowed Claims with at least as much under the Plan as they would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interests Test"). The Best Interests Test with respect to each Impaired Class requires that each Holder of an Allowed Claim in such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7. The Bankruptcy Court will determine whether the value to be received under the Plan by the Holders of Allowed Claims in each Class of Creditors equals or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7. The Debtor believes that the Plan meets the Best

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

63

1    Interests Test and provides value which is not less than what would be recovered by each Holder

2    of an Impaired Claim or Impaired Equity Interest in Class 3, Class 4, Class 5, Class 6, Class 7,

3    Class 8, and Class 9 in a Chapter 7 proceeding for the Debtor.

4    **2.    Debtor's Projections.**

5    In connection with certain matters relating to the Plan, A&M assisted the Debtor prepare

6    a set of financial statement projections.  The Projected Financial Statements, which are attached

7    hereto as <u>Exhibit C</u>, relate to the projected operating results, cash flow and financial position of

8    the Debtor for the period from October 1, 2010 through December 31, 2010 and to the projected

9    operating results, cash flow and financial position of Reorganized LVMC, for the periods from

10   January 1, 2011 through June 30, 2019 (collectively, the "<u>Projected Financial Statements</u>").  For

11   purposes of the Projected Financial Statements, the Effective Date is assumed to occur on

12   December 31, 2010.

13   The Projected Financial Statements are comprised of an income statement, balance sheet,

14   and statement of cash flows for the period from the fourth quarter of 2010 through the first half

15   of 2019, and the narrative assumptions and qualifications incorporated therein.  The Projected

16   Financial Statements are based on the actual and projected consolidated operating results of the

17   Debtor and Reorganized LVMC.

18   As described in greater detail in <u>Exhibit C</u>, the Projected Financial Statements were

19   prepared using a projection model developed by A&M and incorporate myriad assumptions with

20   respect to the anticipated future performance of the Debtor and Reorganized LVMC, general

21   business and economic conditions, and other matters which may be beyond the control of the

22   Debtor and Reorganized LVMC.  Although the Debtor believes the assumptions incorporated

23   into the Projected Financial Statements are reasonable, certain of such assumptions ultimately

24   may not be realized or may otherwise prove not to be materially accurate.  The presentation of

25   certain financial information in the Projected Financial Statements may depart from, or otherwise

26   be inconsistent with, generally accepted accounting principles.

27   The projected financial statements may not necessarily comply with the guidelines for

28   prospective financial statements published by the AICPA or the rules and regulations of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc                    64

1    United States Securities and Exchange Commission.  The Debtor's independent accountants

2    have neither compiled, reviewed nor examined the Projected Financial Statements that

3    accompany the Disclosure Statement and, accordingly, do not express an opinion or any other

4    form of assurance with respect to the Projected Financial Statements, assume no responsibility

5    for the Projected Financial Statements, and disclaim any association with the financial

6    projections.  The Projected Financial Statements were prepared solely for use in connection with

7    the Disclosure Statement and should not be used for any other purpose and are qualified in their

8    entirety by the descriptions and limitations as contained in the Disclosure Statement and as set

9    forth herein.

10        Moreover, the Projected Financial Statements contain certain statements that are

11   "forward-looking statements" within the meaning of The Private Securities Litigation Reform

12   Act of 1995.  These statements are subject to a number of assumptions, risks, and uncertainties,

13   many of which are beyond the control of the Debtor, including the consummation and

14   implementation of the Plan, the continuing availability of sufficient borrowing capacity or other

15   financing to fund operations, achieving operating efficiencies, maintenance of good employee

16   relations, existing and future governmental regulations and actions of governmental bodies,

17   natural disasters and unusual weather conditions, acts of terrorism, industry-specific risk factors,

18   and other market and competitive conditions.  Holders of Claims are cautioned that the Forward-

19   Looking Statements are as of the date thereof and are not guarantees of future performance.

20   Actual results or developments may differ materially from the expectations expressed or implied

21   in the forward-looking statements, and the Debtor and Reorganized LVMC, as applicable,

22   undertake no obligation to update any such statements.

23        The Projected Financial Statements, while presented with numerical specificity, are

24   necessarily based on a variety of estimates and assumptions which, though considered reasonable

25   by the Debtor's management, may, in fact, not be realized and are inherently subject to

26   significant business, economic, competitive, industry, regulatory, market, and financial

27   uncertainties and contingencies, many of which are beyond the control of the Debtor and/or

28   Reorganized LVMC, as applicable.  No representations can be made or are made as to the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

65

accuracy of the Projected Financial Statements or to ability of the Debtor and/or Reorganized LVMC, as applicable, to achieve the projected results. Some assumptions inevitably will be incorrect. Moreover, events and circumstances occurring subsequent to the date on which the Projected Financial Statements were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect future financial results in a materially adverse or materially beneficial manner. The Debtor and Reorganized LVMC, as applicable, do not intend and undertake no obligation to update or otherwise revise the Projected Financial Statements to reflect events or circumstances existing or arising after the date on which they were prepared or to reflect the occurrence of unanticipated events. Therefore, the Projected Financial Statements may not be relied upon as a guaranty or other form of assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own independent determinations as to the adequacy and reasonableness of such assumptions and the reliability of the Projected Financial Statements and should consult with their own advisors on all matters.

> 3. **Liquidation Analysis.**

The Liquidation Analysis attached as Exhibit B hereto summarizes the Debtor's best estimate of recoveries by Creditors in the event of the conversion of the Debtor's case to a Chapter 7 on December 31, 2010.

Generally, to determine what Holders of Allowed Claims in each Impaired Class would receive if the Debtor were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of the Debtor's Assets and properties in a Chapter 7 liquidation case for the Debtor, which for Creditors would consist of the proceeds from the disposition of the Assets of the Debtor, augmented by the unencumbered and available Cash held by the Debtor at the time of commencement of the Chapter 7 case. Such Cash amounts would be reduced by the costs and expenses of the liquidation, a discount inherent to an orderly liquidation, and by such

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

66

1    additional Administrative Claims and Other Priority Claims as may result from the termination

2    of the Debtor's business and the use of Chapter 7 for the purpose of liquidation.[26]

3        In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based

4    on the liquidation of the non-exempt assets of the Debtor.  There are no exempt assets in the

5    Bankruptcy Case, and, as such, the distributions would include the same assets being collected

6    and liquidated under the Plan, namely the interests of the Debtor in the Cash and the Assets.

7    However, the proceeds from the collection and sale of property of the Estate available for

8    distribution to Creditors would be reduced by the satisfaction of any liens and security interests

9    in the Assets, costs of sale, any commission payable to the Chapter 7 trustee, the trustee's

10   attorneys' and accounting fees, as well as the administrative costs of the Chapter 7 estate.  In a

11   Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding-scale commission based

12   upon the funds distributed by such trustee to Creditors.

13       Administrative Claims that may arise in the Chapter 7 case or result from the Bankruptcy

14   Case would be paid in full from the liquidation proceeds before the balance of those proceeds

15   would be made available to pay other Allowed Claims in the Chapter 7 case.

16       In addition, the Debtor is doubtful that a Chapter 7 trustee in the Chapter 7 case would

17   pursue any Litigation Claims as vigorously as Reorganized LVMC, or be able to identify any

18   Litigation Claims that are cost-effective to pursue as prudently as Reorganized LVMC who

19   would have the benefit of the knowledge and information that they previously obtained.

20       The distributions from the liquidation proceeds would be paid Pro Rata according to the

21   amount of the aggregate Claims held by each Creditor in the Chapter 7 case in accordance with

22   the distribution scheme of the Bankruptcy Code.  The Debtor believes that the most likely

23   outcome under Chapter 7 would be the application of the "absolute priority rule."  Under that

24   rule, no junior Creditor in a Chapter 7 case may receive any distribution until all senior Creditors

25   are paid in full, with interest.

26

27   _____

[26] In addition, because the Debtor is a non-profit corporation which does not pay federal income taxes, it is assumed that a buyer will be a for-profit corporation and the buyer will discount the purchase price, among other things, to reflect the impact of federal income taxes on future earnings from the Monorail.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

The Debtor has determined that Confirmation will provide each Creditor with not less of a recovery than it would receive if the Debtor were liquidated under Chapter 7.  In liquidation under Chapter 7, as set forth for the Debtor in the Liquidation Analysis, the recoveries for each Class of Claims would vary, but would not exceed the projected recoveries under the Plan.

Specifically, the Liquidation Analysis estimates proceeds of $12,925,000 would be available to Creditors in the event of liquidation of the Debtor under Chapter 7, which, but for an insignificant portion to be distributed to Holders of Allowed General Unsecured Claims, would primarily be distributed to the Director and the Director's assignee, the 1st Tier Trustee, in full and final satisfaction of Claims arising under the Financing Agreement and 1st Tier Note.  Under the Plan, however, the Director and the 1st Tier Trustee will receive in full and final satisfaction of the Secured Claim portion of the Claims arising under the Financing Agreement and 1st Tier Note the Amended and Restated 1st Tier Note for $7,500,000, and will receive in full and final satisfaction of the Unsecured Claim portion of the Claims arising under the Financing Agreement and 1st Tier Note the Additional Payment Obligation Note for $11,000,000. Therefore, Holders of Class 4 and Class 5 Claims will receive the same or better treatment under the Plan than they would in a Chapter 7 liquidation.

Likewise, under the Plan, Holders of Class 3 General Unsecured Claims will receive a distribution of 80%, up to a total of $175,000 in payment of approximately $150,000 - $175,000 in total Class 3 Claims (excluding damages from Debtor's rejection of Executory Contracts and Unexpired Leases and Disputed personal injury claims), where in a liquidation such Creditors would receive an insignificant distribution.   The Class 8 Holder of Director Claims will participate in the distributions to Holders of Class 4 Claims and Class 5 Claims as provided for in the Amended and Restated Financing Agreement and the 1st and 2nd Tier Indenture, and therefore will also receive better treatment under the Plan than in a Chapter 7 liquidation. Classes 6, 7, and 9 would receive nothing in the event of distribution under either a Chapter 7 liquidation or the Plan, and therefore would not receive more in liquidation than under the Plan.

4.    **Feasibility.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test").  For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that Reorganized LVMC will possess the resources and working capital necessary to meet its obligations under the Plan.

To demonstrate the feasibility of the Plan, the Debtor prepared the Financial Projections attached hereto as Exhibit C.  The Financial Projections demonstrate that the Debtor is capable of satisfying the obligations proposed under the Plan, including the payment of amounts due under the Amended and Restated 1st Tier Note and the Additional Payment Obligation Note.

In addition, as can be seen from the filed monthly financial reports of the Debtor, the Debtor has generally generated revenues and incurred expenses as anticipated.  As such, the Debtor is capable of meeting all Cash demands under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

### 5. Confirmation of the Plan Without Acceptance By All Impaired Classes:  the "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be confirmed even if it has not been accepted by all Impaired classes, as long as at least one Impaired class of claims has accepted it.  Consequently, the Bankruptcy Court may confirm the Plan at the Debtor's request notwithstanding the Plan's rejection by Impaired Classes, as long as at least one Impaired Class has accepted the Plan and the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it.

A plan will be deemed not to discriminate unfairly under the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan will be deemed fair and equitable as to a class of secured claims that rejects the plan if the plan provides: (i)(a) that the holders of claims in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

69

each holder of a claim in such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on such proceeds as described under clause (i) or (ii) of this paragraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides: (i) for each holder of a claim included in the rejecting class to receive or retain on account of such claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

The votes of Holders of 2nd Tier Bond Claims, 3rd Tier Bond Claims, and Subordinated Claims under Classes 6, 7, and 9 are not being solicited because such Holders are not entitled to receive or retain under the Plan any interest or property on account of their Claims. Classes 6 and 7 are contractually subordinated to Classes 4 and 5, and Classes 4 and 5 are not being paid in full. Class 9, to the extent such Allowed Claims exist, are subordinated pursuant to Section 510 of the Bankruptcy Code. Such Classes therefore are deemed to have rejected the Plan. The Debtor is seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to Classes 6, 7, and 9, notwithstanding such Classes' deemed rejection of the Plan. The Debtor also may seek confirmation as to other Classes that reject the Plan. Notwithstanding the deemed rejection of the Plan by Classes 6, 7, and 9, the Debtor believes that under all of the relevant facts and circumstances, Classes 6, 7, and 9 are being treated fairly and equitably under the Bankruptcy Code. The Debtor therefore believes the Plan may be confirmed despite its deemed rejection by those Classes.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

70

### 6.    **Accepting Impaired Class.**

Since at least one Class of Claims is Impaired under the Plan, in order for the Plan to be confirmed, the Plan must be accepted by at least one Impaired Class of Claims (not including the votes of Insiders of the Debtor).

### 7.    **Acceptance of the Plan.**

For an Impaired Class of Claims to accept the Plan, those representing at least two-thirds in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

### 8.    **Allowed Claims.**

You have an Allowed Claim if:  (i) you or your representative timely files a proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely files a proof of Claim and an objection is filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim; (iii) your Claim is listed by the Debtor in its Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by the Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to allow your Claim.  Under the Plan, the deadline for filing objections to Claims is 120 days following the Effective Date.  If your Claim is not an Allowed Claim, it is a Disputed Claim and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Bankruptcy Rule 3018.  If you are uncertain as to the status of your Claim or if you have a dispute with the Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of the Debtor, and seek appropriate legal advice.  Neither the Debtor nor its professionals can advise you about such matters.

### 9.    **Impaired Claims.**

Impaired Claims include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor, or if the full amount of the Allowed

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

71

Claims will not be paid under the Plan.  Holders of Claims which are not Impaired under the Plan will be deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and the Debtor need not solicit acceptance of the Plan by Holders of such Unimpaired Claims.  Holders of Claims which are to receive nothing under the Plan will be deemed to have voted to reject the Plan.  Consequently, only Impaired Holders of Claims in Classes 3, 4, 5, and 8 are entitled to vote on the Plan.

**10.   Voting Procedures.**

a.   Submission of Ballots.

All Creditors entitled to vote will be sent a ballot, together with instructions for voting, and a copy of this approved Disclosure Statement which includes a copy of the Plan.  You should read the ballot carefully and follow the instructions contained therein.  Please use only the ballot that was sent with this Disclosure Statement.

You should complete your ballot and return it as follows:

> Gordon Silver
> Attn: William M. Noall, Esq.
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, NV 89169
> Telephone:  (702) 796-5555
> Facsimile:  (702) 369-2666

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M., PACIFIC TIME, ON _____, 2010.**

b.   Incomplete Ballots.

Unless otherwise ordered by the Bankruptcy Court, ballots which are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote for the Plan.

c.   Withdrawal of Ballots.

You may not withdraw or change your ballot after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the withdrawal or change.

d.   Questions and Lost or Damaged Ballots.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

If you have questions concerning these voting procedures, if your ballot is damaged or lost, or if you believe you should have received a ballot but did not receive one, you may contact the Debtor's counsel as listed above regarding submission of ballots.

## XII.
## ALTERNATIVES TO THE PLAN

The Debtor believes that the Plan provides Creditors the best and most complete form of recovery available. As a result, the Debtor believes that the Plan serves the best interests of all Creditors and parties-in-interest in the Bankruptcy Case.

In formulating and developing the Plan, the Debtor explored numerous alternatives. The Debtor believes not only that the Plan fairly adjusts the rights of various Classes of Creditors and enables the Creditors to realize the greatest sum possible under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims of the various Classes would require, at the very least, an extensive and time-consuming negotiation process and would not result in a better recovery for any Class. It is not atypical for bankruptcy proceedings involving substantial entities to continue for months or years before a plan of reorganization is consummated and payments are made.

**A.    Alternative Plans of Reorganization.**

Under the Bankruptcy Code, a debtor has an exclusive period of 120 days and an additional vote solicitation period of 60 days from the entry of the order for relief during which time, assuming that no trustee has been appointed by the Bankruptcy Court, only a debtor may propose a plan of reorganization. After the expiration of the initial 180-day period and any extensions thereof, the Debtor or any other party-in-interest may propose a different plan, unless the Bankruptcy Court has extended the exclusivity periods. By stipulation between the Debtor and Wells Fargo, and as approved by the Bankruptcy Court, the Debtor has been provided until August 17, 2010 to file a Plan.

**B.    Liquidation under Chapter 7.**

If a plan of reorganization cannot be confirmed, the Bankruptcy Case may be converted to a Chapter 7 case, in which a trustee would be elected or appointed to liquidate the assets of the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

73

1    Debtor for distribution to Creditors in accordance with the priorities established by the

2    Bankruptcy Code. For a discussion of the effect that a Chapter 7 liquidation would have on

3    recovery by Creditors, see Section XI.C., "The Best Interest Test and Feasibility of the Plan."

4    As previously stated, the Debtor believes that liquidation under Chapter 7 would result in

5    a substantially reduced recovery of funds by the Estate because of: (i) the risk that the Debtor

6    may cease or lose business; (ii) additional administrative expenses involved in the appointment

7    of a trustee for the Debtor and attorneys and other professionals to assist such trustee; and (iii)

8    additional expenses and Claims, some of which would be entitled to priority, which would be

9    generated during the liquidation and from the rejection of leases and other executory contracts in

10    connection with a cessation of the Debtor's operations. Accordingly, the Debtor believes that

11    Holders of certain Classes of Claims will receive substantially smaller distributions in a Chapter

12    7 liquidation than under the Plan.

### XIII.
### PREFERENCE AND OTHER AVOIDANCE ACTIONS

13

14    A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a preference a

15    transfer of property made by a debtor to a creditor on account of an antecedent debt while a

16    debtor was insolvent, where that creditor receives more than it would have received in a

17    liquidation of the entity under Chapter 7 had the payment not been made, if (i) the payment was

18    made within 90 days before the date the bankruptcy case was commenced or (ii) the creditor is

19    found to have been an "insider," as defined in the Bankruptcy Code, within one year before the

20    commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the

21    90 days preceding the commencement of the case.

22    A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a fraudulent

23    transfer a transfer of property made by a debtor within two years (and under applicable Nevada

24    law, four years) before the date the bankruptcy case was commenced if the debtor (i) received

25    less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the

26    date of such transfer or became insolvent as a result of such transfer, such transfer left the debtor

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

74

1  with an unreasonably small capital, or the debtor intended to incur debts that would be beyond

2  the debtor's ability to pay as such debts matured.

3      Although the Debtor has not fully analyzed various potential preference or other

4  avoidance actions, it is possible that some pre-Petition transactions may be avoidable. The

5  Debtor thus hereby expressly reserves its right to commence any appropriate actions pursuant to

6  Chapter 5 of the Bankruptcy Code.

7  

**XIV.**
**RECOMMENDATION AND CONCLUSION**

8  

9      The Plan provides the best possible recovery for all parties-in-interest. Accordingly, the

    Debtor recommends that all Creditors who are entitled to vote on the Plan should vote to accept

10  the Plan.

11      DATED this _17th_ day of August, 2010.

12  
13                                      **LAS VEGAS MONORAIL COMPANY**, a
                                        Nevada non-profit corporation

14  
15                                      By: _____

16                                      Name:  Curtis Myles
                                        Title:  President

17  

18  **PREPARED AND SUBMITTED BY:**

19  GORDON SILVER

20  
21  By: _____

22      GERALD M. GORDON, ESQ.
        WILLIAM M. NOALL, ESQ.

23      ERIC J. VAN, ESQ.
        3960 Howard Hughes Pkwy., 9th Floor

24      Las Vegas, Nevada 89169
        Attorneys for the Debtor

25  

26  

27  

28  

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/996660_4.doc

75