Lewis and Roca LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169-5996
Facsimile (702) 949-8321
Telephone (702) 949-8320

40 North Central Avenue, Suite 1900
Phoenix, AZ  85004-4429
Facsimile:  (602) 734-3824
Telephone:  (602) 262-5756

Susan M. Freeman (AZ State Bar No. 004199)
Email:  SFreeman@LRLaw.com (*pro hac vice*)
Robert M. Charles, Jr. (NV State Bar No. 006593)
Email: RCharles@LRLaw.com

Kolesar & Leatham, Chtd.
Wells Fargo Financial Center
3320 W. Sahara Avenue, Suite 380
Las Vegas, Nevada  89102
Facsimile No. (702) 362-9472
Telephone No. (702) 362-7800

Nile Leatham (Nevada State Bar No. 002838)
Email: nleatham@klnevada.com
Natalie M. Cox (Nevada State Bar No. 007662)
Email: ncox@klnevada.com

Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile (212) 715-8000
Telephone (212) 715-9100

Philip Bentley (*pro hac vice* motion pending)
Email: pbentley@kramerlevin.com
Amy Caton (*pro hac vice* motion pending)
Email: acaton@kramerlevin.com

*Attorneys for Indenture Trustee Wells Fargo Bank, N.A.*     *Attorneys for the Majority 1st Tier Bondholders*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 10-10464-BAM |
| LAS VEGAS MONORAIL COMPANY, A Nevada non-profit corporation, | CHAPTER 11 |
| Debtor. | |
| | Hearing Date: TBD<br>Hearing Time: TBD |

### MOTION OF THE INDENTURE TRUSTEE AND MAJORITY 1st TIER BONDHOLDERS FOR AN ORDER TERMINATING EXCLUSIVITY

Wells Fargo Bank, N.A., in its capacity as indenture trustee (the "Indenture Trustee")
under a Senior Indenture (the "Senior Indenture") dated September 1, 2000, issued by the Director
of the State of Nevada Department of Business and Industry (the "Director") with respect to Las
Vegas Monorail Project Revenue Bonds 1st Tier Series 2000 (the "1st Tier Bonds") and the
majority of the holders of the 1st Tier Bonds  (the "Majority 1st Tier Bondholders" and collectively

2188444.2

with the Indenture Trustee, "Movants"),[1] by their undersigned counsel, move pursuant to 11

U.S.C. §§ 105 and 1121(d) for a order terminating Debtor's ("Debtor" or "LVMC") exclusive

periods to file a plan and solicit acceptances (the "Motion").  Pursuant to the Court's Order

Extending Exclusivity dated May 10,  2010 [DE 367], this motion is to be considered as an

objection to the Debtor's prior Exclusivity Motion [DE 335], and is to be heard on not less than

ten days' notice.

### Preliminary Statement

The 1st Tier Bondholders are far and away the principal constituency in this case, holding

*more than 99%* of all claims entitled to vote on the Debtor's plan of reorganization [DE 516] (the

"Plan").  Remarkably, however, the Debtor has refused to engage in good-faith negotiations with

the 1st Tier Bondholders, through the Indenture Trustee and the Majority 1st Tier Bondholders.

Instead, the Debtor waited 216 days and then filed a Plan that it knew was fundamentally

unacceptable to the 1st Tier Bondholders – a Plan that fails to maximize creditor recoveries and

that, on its face, cannot be confirmed over the opposition of the 1st Tier Bondholders.  In short, the

Debtor has done precisely what the Bankruptcy Code's exclusivity provisions are meant to

discourage.  The Debtor's "take it or leave it" approach, the facial unconfirmability of its Plan,

and – perhaps most important of all – the  fact that its Plan is adamantly opposed by creditors

holding more than 99% of all voting claims constitute clear "cause" to terminate Debtor's

exclusive period to file and solicit acceptances of a plan.

At bottom, the Plan elevates management's goals over the Debtor's duty to maximize the

recoveries of creditors, specifically the 1st Tier Bondholders that hold virtually all of the in-the-

money debt.  The Plan permits the Debtor to keep over $26.6 million of Net Project Revenues, for

---

[1] In addition to the Indenture Trustee, this Motion is filed on behalf of the following Majority 1st Tier Bondholders: Eaton Vance Municipal Income Trust, Eaton Vance Municipal Bond Fund, Eaton Vance Municipal Bond Fund II, Nuveen Asset Management, investment adviser, on behalf of the Nuveen municipal bond funds, Restoration Capital Management, LLC, as Investment Advisor for Restoration Holdings Ltd and Restoration Special Opportunities Master Ltd, and Stone Lion Portfolio LP. Collectively, these bondholders hold at least 75% of the 1st Tier Bonds.  A statement under Rule 2019 will be filed in due course.

KL2 2665130.7

2188444.2

management to use in its unfettered discretion, in clear contravention of the financing documents, which were set up to ensure that every dollar of revenue generated by LVMC after operating expenses would be used to repay the hundreds of millions of dollars of bond debt that were used to build the Las Vegas Monorail (the "Monorail").  The Plan gives the Debtor's management a continuous fund of $3 million of "working capital," which the Debtor projects will result in a $26.6 million pot of Net Project Revenues by the time the Monorail Operations and Maintenance Agreement dated September 1, 2000 expires in 2019.  At the same time, the Plan extinguishes the Indenture Trustee's statutory lien on Net Project Revenues and setoff rights in the Debtor's bank accounts and eliminates all financial controls over operating and capital expenditures.

If the 2019 replacement Monorail O&M contract with Bombardier is cost-effective and the capital expenditures are low enough to generate Net Project Revenues thereafter, as may well be the case, the resulting value should go to the 1st Tier Bondholders, as the true owners of the business.  The Plan, however, permits LVMC's reallocation of potential future value away from the 1st Tier Bondholders and allows management to undertake speculative endeavors with no accountability to creditors.  The Plan allows LVMC's management (1) to elevate the payment of capital expenditures (for potential Monorail expansion or anything else they want to spend it on) above payment of bond debt without bondholder consent, (2) to cut the term of the bond debt by over 20 years, when what LVMC should be doing is extending out payments on the bond debt to the maximum possible term (*i.e.*, 2107, the year the Franchise Agreement expires), and (3) does so by having the Director amend the Financing Agreement over the 1st Tier Bondholders' objections, which simply cannot be done.  Serious defects in the Debtor's proposed "amended documents" also jeopardize the tax exempt status of the 1st Tier Bonds and potentially interfere with the Indenture Trustee's claims against Ambac Assurance Corporation ("Ambac"), while conferring no benefit on the Debtor.

In short, the Plan fails to give the 1st Tier Bondholders – the Debtor's only substantial economic stakeholders[2] – any of the potential upside for keeping the Monorail running past 2019 by vastly undervaluing the Monorail.  The Plan also fails to give bondholders fair value under the current priority scheme of the financing documents – and, in fact, the Bankruptcy Code – by hoarding an estimated $26.6 million or more that will not in any way benefit bondholders.  It is premised on a Director action that will not occur.  It imposes significant risks on 1st Tier Bondholders' rights and remedies, which LVMC's management ignored after explicit recommendations for protection.

The Indenture Trustee and the Majority 1st Tier Bondholders, who collectively represent at least 75% of the holders of 1st Tier Bonds, will not agree to such a Plan, rendering it patently unconfirmable.  Among other things, the Plan does not contain a legally created impaired accepting class, but merely a gerrymandered class of trade creditors that should either be paid in full (which, under the Debtor's estimates, could be accomplished with a mere additional $25,000) or should be treated *pari passu* with other unsecured creditors – which would give them an approximate 1% recovery under the Debtor's best estimates.

Terminating exclusivity and allowing the Indenture Trustee and the Majority 1st Tier Bondholders to file their own plan is the best way to move this case forward.  This is not a case where a small group of dissident creditors seeks to terminate exclusivity.  The 1st Tier Bondholders are entitled to be paid 99.97% of the value of this estate, and Debtor has proven itself incapable of proposing a plan that is supported by these creditors.  The Indenture Trustee and the Majority 1st Tier Bondholders must be permitted to file their own plan, which they are prepared to file promptly upon the termination of exclusivity.

---

[2] No other parties in this case have economic interests that are even remotely comparable in size to those of the 1st Tier Bondholders.  The interests of the 2nd and 3rd Tier Bondholders are subordinated to those of the 1st Tier Bondholders and, as a result, will not be paid.  Ambac's rights as bond insurer include certain subrogation rights, but only to the extent that Ambac honors valid claims on the Surety and Municipal Bond Insurance Policy.  The claims of all other general unsecured creditors amount to less than 1% of the claims of the 1st Tier Bondholders.

KL2 2665130.7

2188444.2

**Jurisdiction and Venue**

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. The predicates for relief requested herein are sections 105 and 1121 of the Bankruptcy Code.

**Background**

On January 13, 2010 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada.

On April 21, 2010, Debtor filed a motion (the "Exclusivity Motion") seeking to extend the exclusive period to file a plan and solicit acceptances thereof through August 17, 2010 [DE 335].

On May 7, 2010, Debtor and Indenture Trustee entered into a stipulation (the "Exclusivity Stipulation") for a limited extension of exclusivity. [DE 365]. Specifically, the Indenture Trustee agreed not to object to the Exclusivity Motion, provided that:

> if a plan acceptable to the [Indenture] Trustee is not filed by June 11, 2010, or some later date agreed to by the Debtor and the [Indenture] Trustee in writing, the [Indenture] Trustee reserves the right to object to continuation of the exclusivity period and to seek an expedited hearing on a motion to reconsider the exclusivity extension on ten (10) days written notice. The Debtor agrees that such motion will be heard and considered as an objection to the Exclusivity Motion, without the obligation to meet additional requirements of Bankruptcy Rule 9023 or 9024.

On May 10, 2010, the Court entered an order approving the Exclusivity Stipulation [DE 367].

During the course of plan negotiations, Debtor and the Indenture Trustee entered into five amendments to the Exclusivity Stipulation. The order granting the fifth amendment (entered on August 9, 2010) provided that Debtor would file a plan by August 17, 2010, absent further extension of the exclusivity period [DE 514].

On May 25, 2010, Debtor provided counsel to the Indenture Trustee with an initial draft of plan of reorganization. The Indenture Trustee and the Majority 1st Tier Bondholders had significant concerns about the draft plan. The Indenture Trustee exhaustively analyzed the draft

KL2 2665130.7                                                                                                    2188444.2

plan and provided lengthy comments on ways that the draft could be revised to protect the 1st Tier

Bondholders and advance the goal of a consensual plan ("Indenture Trustee's Comments"). See

Declaration of Gavin Wilkinson in Support of Indenture Trustee's Motion to Terminate the

Exclusivity Period to Confirm a Chapter 11 Plan, filed contemporaneously with this motion.[3]  In

the opening paragraphs of the Indenture Trustee's Comments, counsel to the Indenture Trustee

explained the Indenture Trustee's broad objectives:

> *Proposed Deal Points*.  In our opinion, in order for the holders of the Series 2000 Bondholders to support a Plan from LVMC, at a minimum, such a Plan will have to be reasonably expected to accomplish the following objectives:
>
> A.      Preservation of the rights of Bondholders under the Surety Bond and the Policy;
>
> B.      Capture of a meaningful portion of any future increase in the value of LVMC as an ongoing enterprise;
>
> C.      Exclusion of interest (and accreted value) on the Series 2000 Bonds from gross income for federal income tax purposes; and
>
> D.      Creation of security and sources of payment that will provide the Bondholders with some assurance that future income streams from LVMC will not be vulnerable to manipulation or challenge.
>
> With these business objectives in mind, we focused our comments on developing an integrated series of proposals, organized by each of the financial instruments discussed in the Draft Plan.  The purpose in presenting our comments in this form is to encourage LVMC and the other participants to engage in a focused dialogue about the details of the restructured financing prior to submitting the Plan for a vote.

---

[3] Movants are not seeking to disclose settlement proposals, to the extent referenced in Exhibit A to the Wilkinson Declaration, for any reason other than to show a breakdown in negotiations warranting the relief sought by the Movants.  Federal Rule of Evidence 403(b).  The Movants are also by no means seeking to solicit rejection of the Debtor's Plan before Disclosure Statement approval or to accept an alternative plan, contrary to 11 U.S.C. § 1125(b).  *See Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1500 (9th Cir. 1995) ("bankruptcy courts have given interested parties wide latitude to 'float' (as opposed to solicit votes for) alternative plans"); *Century Glove v. First American Bank of New York*, 860 F.2d 94 (3rd Cir. 1988).  To avoid any questions on these grounds, the Movants are seeking to file Exhibit A under seal.  The Movants may likewise submit to the Court their term sheet for an alternative plan under seal.

KL2 2665130.7                                                                                                                    2188444.2

On July 22, 2010, the Debtor and its legal and financial advisors met with representatives of the Indenture Trustee, the Majority 1st Tier Bondholders and Ambac[4] in Chicago to discuss the draft plan and concerns of parties in interest.

On August 5, 2010, the Debtor provided counsel to the Indenture Trustee and the Majority 1st Tier Bondholders a revised draft plan.  The Indenture Trustee and the Majority 1st Tier Bondholders found that the revised draft plan contained very few changes and virtually ignored the Indenture Trustee Comments and the concerns raised at the July 22, 2010 meeting.

The Debtor did not respond to messages or efforts to communicate about the revised draft, and instead filed the Plan on August 17, 2010, which retreated from the previous drafts in an apparent effort to cram down the Plan on the 1st Tier Bondholders.  *Id.*  In effect, the Debtor has failed to establish a relationship with the 1st Tier Bondholders conducive to meaningful plan negotiations.

### Financing Structure with the 1st Tier Bonds

As this Court is aware, Clark County, Nevada, granted a franchise to operate the Monorail pursuant to the Clark County Monorail Franchise Agreement dated December 2, 1998, as amended (the "Franchise Agreement").  The rights under the Franchise Agreement, which are now held by LVMC, authorize LVMC to charge and collect fares from passengers, display advertising, establish concessions, and lease space on the monorail through December 31, 2107. Franchise Agreement at § 2.1.  In addition, the Franchise Agreement grants LVMC the exclusive right to extend the Monorail to McCarran International Airport.

---

[4]  Ambac is the insurer of the bonds.  On March 21, 2010, Ambac established a segregated account (the "Segregated Account") exclusively to respond to claims arising under certain policies and contracts, including the insurance policy supporting the 1st Tier Bonds.  The Segregated Account is currently in rehabilitation proceedings in Wisconsin and Ambac has defaulted on making interest payments due to the 1st Tier Bondholders under the terms of the insurance policy.  At this point in time, the Movants take no position with respect to their rights against Ambac under the Senior Indenture or the insurance policy. Movants believe that that Ambac's concerns on the economics of the Plan mirror those of the Movants, while understanding that Ambac may have different concerns about certain provisions or mechanics of the Plan.

In 2000, the Director issued tax-exempt bonds to finance the construction and operation of the Monorail.  The 1st Tier and 2nd Tier Bonds were issued pursuant to the Senior Indenture and the 3rd Tier Bonds were issued pursuant to a Subordinate Indenture.  The Director simultaneously lent the bond proceeds to LVMC under a Financing Agreement to fund the construction of the Monorail, and assigned the its right, title and interest in Financing Agreement to the respective Indenture Trustees as security for payment under the various indentures.

The Financing Agreement granted a security interest to Director in, and acknowledged the pledge to the Indenture Trustee of, the following:

- Contract rights of the Debtor under all of the Debtor's substantial operating agreements, including the Franchise Agreement, Purchase Agreement, the Design-Build Agreement, the Operating and Maintenance Agreement and Management Agreement;

- "Net Project Revenues" (defined in the Senior Indenture as "Project Revenues" minus "Operation and Maintenance Costs"); and

- All amounts held in any funds or accounts created under the Senior or Subordinate Indentures, all money and funds earned or accrued on any deposit of Net Project Revenues, and related collateral serving as proceeds.

Section 2.1(c) and 3.1(b) of the Financing Agreement.  All Project Revenues, and thus all Net Project Revenues, are required to be maintained in accounts in which the Indenture Trustee holds a perfected security interest.  See, the Court's cash collateral opinion recognizing the Indenture Trustee's statutory lien on all Net Project Revenues, and the Debtor's obligation to maintain them at Wells Fargo Bank.  [DE 342 at 12-14 & n. 18, 24, 26, 35].

Pursuant to Section 4.1(c) of the Financing Agreement, LVMC maintains a Capital Replacement Fund, intended to cover capital expenditures and capital replacements.  LVMC (and after an event of default, pursuant to Section 4.1(b) of the Financing Agreement, the Indenture Trustee) is permitted to transfer funds into the Capital Replacement Fund to pay for capital expenditures in accordance with its annual budget, but only _after_ the Borrower has paid all debt service due and owing on the 1st Tier Bonds (as well as the 2nd and 3rd Tier Bonds), as well as operation and maintenance costs.

KL2 2665130.7

2188444.2

Because LVMC has failed to make debt service payments on the bonds as and when due, the Capital Replacement Fund contains $0. Under the terms of the Financing Agreement and Section 5.03 of the Senior Indenture, no monies are or will be available to pay capital expenditures until all payments due and owing on the bonds are paid in full.

***The Plan***

The Plan seeks to solicit acceptances only from three groups of creditors:

- (1) The 1st Tier Bondholders, holders of approximately $500 million in claims, who will receive a distribution consisting of $18.5 million in notes maturing in 2019 (yielding a recovery of 3.6%);

- (2) General Unsecured Creditors, holders of approximately $150,000 to $175,000 in claims, who will receive their pro-rata share distribution of a $175,000 cash pool (yielding a recovery of 80% - 100%); and

- (3) The Director, holder of an unknown amount of claims based on certain indemnification obligations under the Financing Agreement not part of the 1st Tier, 2nd Tier or 3rd Tier Bond Claims, who will participate in distributions to the 1st Tier Bondholders as provided for in the Amended and Restated Financing Agreement. The Director's professional fee claims are being paid and these claims may well be non-existent.[5]

In addition to the voting classes noted above, the 2nd Tier Bond Claims (totaling $158,749,493.40) and the 3rd Tier Bond Claims (totaling $48,500,000) will receive no distribution under the Plan. Because the 2nd Tier and 3rd Tier Bonds are contractually subordinated to the 1st Tier Bonds, any recoveries to these classes would be required to be turned over to the 1st Tier Bondholders. The senior and subordinate bonds collectively represent 99.97% of Debtor's debt.

Critically, the Plan provides a "set aside" of approximately $26.6 million through 2019, (*see* Statement of Cash Flows, attached as Exhibit C to the Disclosure Statement) that will be used as LVMC sees fit, presumably for capital improvements on the Monorail or Monorail expansion after the new $18.5 million in notes are repaid by LVMC.

---

[5] Page 12 of the Disclosure Statement estimates the Director Claims at $0, although the liquidation analysis (attached as Exhibit B to the Disclosure Statement) provides that the estimated claim amounts and plan recovery for the Director Claims is "TBD."

KL2 2665130.7

2188444.2

The Plan also impermissibly attempts to extinguish the Indenture Trustee's protections of its statutory lien on Net Project Revenues and setoff rights in Debtor's bank accounts and ends financing controls over operating and capital expenditures.

## Argument

## Cause Exists To Terminate Exclusivity

Pursuant to Section 1121(d)(1) of the Bankruptcy Code, courts may reduce the exclusivity period on a showing of "cause."  *See Geriatrics Nursing Home v. First Fidelity Bank, N.A.* (*In re Geriatrics Nursing Home*), 187 B.R. 128, 132 (D.N.J. 1995); *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987).

While the term "cause" is not defined in the Bankruptcy Code, courts addressing the issue have looked to a variety of factors in determining whether cause exists.  The factors include: (1) the size and complexity of the case; (2) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *In re Adelphia Commc'ns. Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006); *In re Dow Corning*, 208 B.R. 661, 663 (E.D. Mich. 1997).

Although courts consider many factors, the primary consideration in determining whether "cause" exists to terminate exclusivity is whether doing so would facilitate moving the case forward.  *See In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) (noting that "[w]hen the Court is determining whether to terminate a debtor's exclusivity, the primary concern should be whether or not doing so would facilitate moving the case forward.  And that is a practical call that can override a mere toting up of the factors"); s*ee also In re Henry Mayo*

KL2 2665130.7

2188444.2

*Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) ("We also agree with the *Dow Corning* court that a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution").

As discussed below, the Debtor has demonstrated an inability to negotiate with its key creditors and formulate a confirmable plan of reorganization. Rather than advancing these cases, it is clear that maintaining the Debtor's exclusive period to file and solicit acceptance of a plan will only cause increased delay while minimizing recoveries to creditors. The Debtor's actions to date demonstrate "cause" to terminate exclusivity.

A.    **Terminating Exclusivity Will Move the Case Forward**

As noted by this Circuit's BAP, the key question in determining whether "cause" exists to terminate exclusivity is whether "extension of exclusivity function[s] to facilitate movement towards a fair and equitable resolution of the case, taking into account all the divergent interests involved." *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. at 453. The Plan will impede, rather than expedite, the Debtor's emergence from bankruptcy.

The Indenture Trustee and the Majority 1st Tier Bondholders – representing over 99% of creditors entitled to receive a distribution from the Debtor – will oppose the Plan, which provides the 1st Tier Bondholders with a minimal distribution while retaining excess cash for LVMC going forward. This Court should allow the Debtor's creditors to consider an alternate plan that will provide materially more value, while granting the key creditors the right to direct the future of LVMC.

B.    **The Debtor Has Not Made Progress in Negotiating with Creditors and is Using Exclusivity to Pressure Creditors**

The Debtor has not made progress in negotiating an acceptable plan with its creditors, and is not attempting to do so. The Debtor took a first step, as promised in its stipulation with the Indenture Trustee to extend exclusivity, by circulating a draft plan in May 2010. However, it became evident that the Debtor had no interest in engaging in meaningful negotiations with its

KL2 2665130.7                                                                                                      2188444.2

major constituency when it circulated a revised draft plan that ignored or contradicted the Indenture Trustee's Comments and disregarded the critical issues raised during the July 2010 plan discussion meeting.

Despite this apparent breakdown in communication, the Majority 1st Tier Bondholders and Indenture Trustee were open to continuing the dialogue and negotiations and were amenable to a further limited extension of the exclusive periods to allow for meaningful negotiations. Instead of communicating with the Indenture Trustee or responding to messages, the Debtor either chose to proceed with a placeholder plan designed to publicly pressure the Majority 1st Tier Bondholders to capitulate to Debtor's demands, or the Debtor thinks it can actually cram down the Plan on them (which is unlikely, since the Debtor has competent bankruptcy counsel to advise it).

It is hornbook law that the filing of a cramdown plan constitutes, at minimum, a substantial factor favoring the termination of exclusivity:

> In such cramdown situations, exclusivity should be terminated even before the expiration of the 180-day acceptance period.

7 COLLIER ON BANKRUPTCY ¶ 1121.05[3] (16th ed. 2010); *accord,. e.g., In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) (condemning the filing of "placeholder" plans that are merely intended to retain control over the plan process); *In re Grossinger's Associates*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (exclusivity terminated where it was obvious that debtor filed a plan to meet the statutory exclusivity deadlines and the plan did not offer any "serious reorganizational possibilities"). This principle applies with particular force in this case – where the creditors that the Debtor is proposing to cram down constitute far and away the largest economic stakeholders, and cramdown serves the interests only of management, not of any creditor constituency.

In such case, the termination of exclusivity is necessary to "avoid allowing the debtor to hold creditors and other parties in interest 'hostage' so that the debtor can force its view of an appropriate plan upon the other parties." *In re Public Serv. Co. of New Hampshire*, 88 B.R. 521,

537 (Bankr. D.N.H. 1988); *see also In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) (noting that Congress designed section 1121 to strike a balance between the debtor's ability to contract the process of proposing a reorganization plan with a creditor's or equity holder's right to "limit the delay that makes creditors the hostages of Chapter 11 debtors"); *In re Hoffinger Industries, Inc.*, 292 B.R. 639, 643 (8th Cir. B.A.P. 2003) (relying on the Senate Report to the 1978 Bankruptcy Act, stating that "[a]n extension should not be employed as a tactical measure to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 95-989, 95th Cong. 2d Sess. 118 (1978), U.S. Code Cong. & Admin. News 1978 p. 5904).

As noted above, the Indenture Trustee and the Majority 1st Tier Bondholders were receptive to continuing negotiations to develop an acceptable plan, even after Debtor ignored their concerns. The Debtor's precipitous filing of the Plan constitutes the kind of "hostage taking" condemned by the Senate Report and is cause for the termination of exclusivity.

## C.    The Plan Does Not Provide the Greatest Recovery to Creditors

The Debtor's exclusive period to file and solicit acceptances of a plan should be terminated to permit the Indenture Trustee and Majority 1st Tier Bondholders to file an alternative plan that provides a greater recovery to creditors.

A debtor has a fiduciary duty to maximize the value of the estate for its creditors. *See Toibb v. Radloff*, 501 U.S. 157, 163, 111 S. Ct. 2197, 115 L. Ed. 2d 145 (1991) (recognizing that the Bankruptcy Code's general policy is "maximizing the value of the bankruptcy estate"); *In re Northwest Airlines Corp.*, 349 B.R. 338, 369 (S.D.N.Y. 2006), *aff'd*, 483 F.3d 160 (2d Cir. 2007) ("[t]he debtor-in-possession is a fiduciary, obligated to maximize the value of the estate, treat all parties to the case fairly, and protect and conserve the debtor's property"); *In re An-Tze Cheng*, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004) (debtor-in-possession "is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors"). Further, "[t]he Bankruptcy Code recognizes the legitimate interest of creditors, whose money is in

1    the enterprise as much as the debtor's, to have a say in the future of the company." *In re Crescent*

2    *Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr. D. Me. 1982) (citations omitted).  Particularly here,

3    where Debtor was funded from inception to the present with bondholder money, Debtor has an

4    obligation to pursue a plan that maximizes value returned to the 1st Tier Bondholders.

5         This Court, along with others in this Circuit, has terminated exclusivity where a debtor

6    filed a plan that left creditors out of the money and there existed a viable, alternative plan that

7    could provide a greater recovery to a group of creditors.  *See In re FX Luxury Las Vegas I, LLC*,

8    Case No. 10-17015 (BAM) (Bankr. D. Nev. June 22, 2010) (order terminating exclusivity

9    attached hereto as Exhibit A) (terminating exclusivity where debtor filed a "new value" plan); *In*

10   *re Freemont Gen. Corp.*, Case No. 08-13421 (EAS) (Bankr. C.D. Cal. July 16, 2009) (order

11   attached hereto as Exhibit B) (terminating exclusivity period where debtor's stand-alone plan was

12   filed on exclusivity expiration date and provided for retention of interests of equity holders

13   without providing full recovery to unsecured creditors).

14        In direct contravention of Debtor's fiduciary obligation, the Plan seeks to impermissibly

15   amend the Financing Agreement in order to hoard Net Project Revenues that would otherwise be

16   available to the 1st Tier Bondholders.  As noted above, Debtor estimates that it will have

17   approximately $26.6 million cash on hand (presumably to use for capital expenditures or airport

18   expansion efforts) after completing its *de minimis* distribution to the 1st Tier Bondholders.  The

19   Plan not only gives the Debtor's management free rein with respect to use of the $26.6 million,

20   but also prevents the 1st Tier Bondholders from realizing any upside value if, as may well be the

21   case, there is substantial value after 2019 justifying expenditure of some portion of Net Project

22   Revenues for capital expenditures.  The Indenture Trustee and the Majority 1st Tier Bondholders

23   should be permitted to propose an alternative plan that distributes more value to Debtor's creditors

24   in compliance with the Bankruptcy Code and the express terms of the existing Financing

25   Agreement and Senior Indenture.

26

KL2 2665130.7                                                                                              2188444.2

1

2          **D.      The Plan Is Patently Unconfirmable**

3          Because the overarching consideration in Chapter 11 is how to resolve the case, a lack of a

4   viable plan can be determinative in terminating the debtor's exclusivity period.  *See In re Texaco,*

5   *Inc.*, 81 B.R. 806, 812-13 (Bankr. S.D.N.Y. 1988) (proposing an unconfirmable plan constitutes

6   "cause" under Section 1121(d)); *In re Davis*, 262 B.R. 791 (Bankr. D. Ariz. 2001) (refusing to

7   extend exclusivity in light of unconfirmable plan the debtor proposed); *In re Situation Mgmt. Sys.,*

8   *Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (the "debtor's use of exclusivity period to force

9   creditors to accept an unsatisfactory or unconfirmable plan" constitutes "cause").

10         Here, the Debtor has proposed a Plan that cannot be confirmed as a matter of law.

11  Highlighted below are some (but not all) of the Plan's confirmation defects, which weigh in favor

12  of terminating exclusivity.[6]

13              **1.   The Plan Artificially Impairs the General Unsecured Claims, Unfairly
                      Discriminates Against Bondholders and Impermissibly Gerrymanders the
14                    Classes**

15         The Plan provides for vastly different treatment of the two classes of unsecured claims: the

16  1st Tier Bond Unsecured Claims receive an $11 million Additional Payment Obligation Note on

17  account of the estimated $445 million unsecured deficiency claim (a 2.5% distribution), while

18  General Unsecured Claims receive their pro rata share of a $175,000 cash pool (an 80% - 100%

19  distribution, depending on the ultimate size of the claims pool).

20         The Debtor is well aware that the Majority 1st Tier Bondholders will reject the Plan and

21  thus, the Debtor has separately classified a minimal amount of unsecured claims in order to create

22  an impaired consenting class. This classification and treatment of "General Unsecured Claims"

23  creates three major confirmation issues.  First, this class is artificially impaired.  Under the

24  Debtor's own estimates, the General Unsecured Claims are receiving anywhere from $0 to

25  _____
    [6] This discussion is merely intended to highlight some of the many confirmation hurdles Debtor fails to
26  meet.  The Indenture Trustee and the Majority 1st Tier Bondholders reserve their rights to raise other issues
    in connection with further briefing and proceedings on the Disclosure Statement and Plan.

KL2 2665130.7                                                                                      2188444.2

$25,000 less in total than would be necessary to pay them in full – a pittance in a case of this magnitude. *See In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (deferral of payment of $2,370 claim is artificial impairment where debtors have resources to pay claim in full); *In re N. Washington Ctr. Ltd. P'ship*, 165 B.R. 805, 810 (Bankr. D. Md. 1994) (finding debtor had artificially impaired class for purpose of securing acceptance by one impaired class where it proposed to pay creditors 80% of their claims, but had "absolutely no reason for this impaired treatment, and could pay the creditors 100% of their claims").

Second, the Plan unfairly discriminates among unsecured claims in violation of § 1129(b)(2). *See In re Ambanc La Mesa Ltd. Partnership*, 115 F.3d 650, 656-57 (9th Cir. 1997). To be "fair," discriminatory treatment among classes of claims of the same priority must (1) have a reasonable basis, (2) be necessary to plan confirmation, (3) be proposed in good faith, and (4) be reasonable in light of its rationale. *Id.* Here, the Debtor seeks to make a 2.5% distribution on account of the 1st Tier Bondholders' unsecured deficiency claim and a 80% - 100% distribution on account of the "other" general unsecured claims. There is no reasonable or rationale basis to provide for such disparate treatment among these creditors.

Third, the Plan impermissibly gerrymanders by creating a separate class of general unsecured claims that are paid far better than other unsecured claims (including the 1st Tier Bondholders' deficiency claims, as well as the 2nd and 3rd Tier Bond claims) in order to obtain an impaired accepting class. This is blatant gerrymandering, and should not be permitted. *See e.g. In re Barakat*, 99 F.3d 1520, 1525 (9th Cir. 1996) ("Although noting that similar claims may be placed in different classes, the court in *Greystone* found that '[there is] one clear rule that emerges from otherwise muddled case law on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization Plan.'" (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279-80 (5th Cir. 1991) (unless there is a business necessity for differing treatment, separate classification is "specious")); *accord, e.g.,* 7 COLLIER ON BANKRUPTCY ¶ 1100.09[2][a] (15th Ed. Rev. 2009) ("there must be a good business

reason or distinct voting interest to justify separate classification") and ¶ 1122.03[6] (noting to justify separate classification there must be a reason independent of the desire to secure an affirmative vote from an impaired class).

### 2. The Plan Seeks to Cram Down the Secured Creditors While Taking Their Collateral

In order to confirm the Plan, the Debtor must seek to cram down the 1st Tier Bondholders, and for the reasons briefly described herein, among others, the Debtor cannot do so.  Importantly, a cram-down plan cannot be confirmed unless it allows a secured creditor to retain its collateral or receive deferred cash payments totaling the allowed amount of its claim.  11 U.S.C. § 1129(b)(2)(A)(i)(I).  The Plan does not do that.  As the Court has ruled, the prepetition collateral securing the 1st Tier Bondholders' claim consists of bank accounts held by the Indenture Trustee, Net Project Revenues, and contract rights under the Franchise Agreement.  *In re Las Vegas Monorail Co.*, 429 B.R. 317, 338, 346 (Bankr. D. Nev. 2010).  Additionally, the Court ruled that the Indenture Trustee's statutory lien (N.R.S. § 349.620) attached to Net Project Revenues.  *Id.* at 345.  Crucially, that statutory lien is not cut off by Section 552 of the Bankruptcy Code and continues throughout the bankruptcy case to secure all of the 1st Tier Bondholders' claims.  *Id.* at 329.

The Debtor projects that it will have approximately $26.6 million in cash on hand in 2019 after paying operating costs, the proposed $7.5 million note for the 1st Tier Bondholders' secured claim, and the $11 million note for the 1st Tier Bondholders' unsecured deficiency claim.  *See* Proposed Disclosure Statement [DE 517-1] p. 126 (final page).   The fact that these additional funds will exist *after* payment of operating expenses (as defined under the Senior Indenture), and yet will not be paid to bondholders, indicates that Debtor is dramatically undervaluing the 1st Tier Bondholders' Net Project Revenue collateral – by at least $26.6 million plus the value of the $11 million "allocated" to the 1st Tier Bondholders' deficiency claim.  No replacement collateral or

KL2 2665130.7

2188444.2

1    payment is offered to compensate the 1st Tier Bondholders for this loss, in clear violation of

2    Section 1129(b)(2)(A)(i)(I) of the Bankruptcy Code.

3          In addition, the Debtor's proposed re-crafting of the Financing Agreement expressly

4    reduces the Indenture Trustee's collateral, as well as reduces the ultimate return to the secured

5    bondholders, in violation of § 1129(b)(2)(A)(i)(I).  Under the terms of the existing documents,

6    Debtor is obligated to hold all bank accounts at Wells Fargo Bank, N.A., which means the funds

7    are subject to a right of setoff, as well as the continued UCC security interest in bank accounts at

8    Wells Fargo and any others that are recognized by the Court's prior ruling and the Indenture

9    Trustee's statutory lien rights are protected.  Additionally, the Indenture Trustee is entitled to have

10   its Administrative Expenses satisfied out of the O&M Costs.

11         The Plan erodes these rights in multiple respects.  First, not only does the Debtor intend to

12   keep over $26.6 million of Net Project Revenues, but there is no obligation in the Plan to hold the

13   Debtor's funds at Wells Fargo Bank, N.A., imperiling the Indenture Trustee's rights to that money

14   upon a default, as provided by the Senior Indenture.  Second, the Plan imperils the Indenture

15   Trustee's statutory lien by exposing the funds to the right of setoff or at least a priority fight with

16   whatever bank the Debtor uses to hold the money.  Third, the Debtor has removed the Indenture

17   Trustee's Administrative Expenses from its new Plan definition of O&M Costs, and limited the

18   Indenture Trustee to fees or other payments relating to its new Plan note.  This means even less of

19   the $7.5 million proposed Debtor payment on the secured claim would find its way to the 1st Tier

20   Bondholders, as such administrative expenses would be withdrawn from payments under that note

21   before distributions to bondholders.  This is clearly impermissible under the terms of the

22   documents; the Indenture Trustee is entitled to be paid first on its legal fees incurred during the

23   case out of Project Revenues, whether or not such claims are classified as "administrative

24   expenses." Senior Indenture § 7.03.

25         Finally, the Debtor proposes to re-define "Net Project Revenues," although it only

26   promises to reveal that definition in some future filing.  *See* Plan at 1.1.72 (definition of Net

1    Project Revenues is "[a]s will be defined in the Amended and Restated Financing Agreement.").

2    If permitted to re-define Net Project Revenues, the Debtor would be attempting to re-write the

3    statutory lien to take the Indenture Trustee's collateral.  The Debtor cannot unilaterally re-write

4    such definitions, as any material amendment to the Financing Agreement requires the consent of a

5    majority of the 1st Tier Bondholders.  *See* Section 6.07 and 9.06 of the Senior Indenture.

6    All of this is impermissible.  Contrary to the Plan, the Debtor must allow the Indenture

7    Trustee and 1st Tier Bondholders, as secured creditors, to retain all of their collateral or receive

8    deferred cash payments totaling the allowed amount of their claim, if the Debtor seeks to cram-

9    down the 1st Tier Bondholders.  11 U.S.C. § 1129(b)(2)(A)(i)(I).

10                    **3.    The Plan is Based on an Impossibility**

11    The lynchpin of the Plan is the concept that the Director will amend the Financing

12    Agreement and the existing notes that were issued pursuant to it despite objections from 1st Tier

13    Bondholders.  The Debtor does not have the authority to implement this proposal.

14    Section 10.4 of the Financing Agreement provides that the "Agreement and the Notes may

15    not be effectively amended, changed, modified, altered or terminated without the written consent

16    of the Indenture Trustee, given as provided in the Senior Indenture and the Subordinate

17    Indenture."  The Senior Indenture provides that, unless the amendment is immaterial, a majority

18    of the 1st Tier Bondholders must consent to an amendment to the Financing Agreement.  *See*

19    Section 6.07 and 9.06 of the Senior Indenture.  The Indenture Trustee and the  Majority 1st Tier

20    Bondholders do not support the terms outlined in the Plan and will not consent to any amendment

21    to the Financing Agreement.

22    The proposed amendment to the Financing Agreement deprives the 1st Tier Bondholders

23    of their tax-exempt investment, reduces their collateral and proposes to force them to bear the

24    costs of the Indenture Trustee's expenses incurred in administering the 1st Tier Bonds out of their

25    reduced payout under the Plan.  *Compare* Plan definition of O&M Expenses [DE 517-1] at 1.1.75

26

KL2 2665130.7                                                                                              2188444.2

(no such administrative expenses for the Indenture Trustee) *with* Senior Indenture Definition of O&M Expenses [DE 13-4] § 1.01 (including such "Administrative Expenses").

In addition to the prohibition contained in Section 10.4 of the Financing Agreement, any unilateral modification of the Financing Agreement by the Director would face other hurdles.  As noted below, the proposed modifications could cause interest on the 1st Tier Bonds to lose its tax-exempt status and place the Director in direct violation of its covenants to preserve the tax-exempt status of the 1st Tier Bonds.  In addition, the proposed modification would require the Director to exercise dominion and control over collateral and contract rights that were previously pledged and assigned to the 1st Tier Bondholders under the Senior Indenture.

> **4.  The Plan Unnecessarily Jeopardizes the Tax-Exempt Status of the 1st Tier Bonds.**

Under  current federal tax law, a significant modification of a tax exempt debt instrument (such as the 1st Tier Bonds) may be treated as an exchange of the original debt instrument (pre-modification) for a new debt instrument (post-modification ), commonly referred to as "reissuance."  *U.S. Treas. Reg.* § 1001-3.  This issue is pivotal to investors because, absent the transaction (*i.e.* the modification) qualifying for an exemption, the reissuance will result in the application of the current tax law against the conditions under which the new debt instrument is being issued (post-modification).  Investors in tax-exempt bonds need reasonable assurance concerning the proper treatment of interest income on their bonds in order to avoid unplanned federal tax liability.  This assurance is usually provided in the form of an unqualified opinion from a law firm recognized in the field of municipal tax law.

The Plan anticipates several modifications to the Senior Note (*e.g.*, change in the principal amount, maturity, and yield), which collectively are economically significant.  As such, the Internal Revenue Service may have a basis for finding that the Plan results in the "reissuance" of the Senior Note and, as consequently, reissuance of the 1st Tier Bonds.  The risk of such an adverse tax determination is unacceptable and unnecessary.  With some proper technical guidance

KL2 2665130.7

2188444.2

early in the process, an alternative plan can eliminate this exposure at a modest cost to the Debtor's estate.

The Indenture Trustee's Comments expressly addressed the issue of structuring the Plan so as to avoid an unintended reissuance of the pre-modification 1st Tier Bonds and to anticipate compliance for a reissuance of the post-modification 1st Tier Bonds through the use of a common financing technique known as an "advance refunding". *See Indenture Trustee's Comments - "RESTRUCTURING OF SERIES 2000 BONDS - SUMMARY OF SIGNIFICANT DEAL POINTS."* The Debtor completely ignored the Indenture Trustee's Comments regarding debt structure.

Other courts have recognized the importance of structuring a plan involving municipal bonds in a manner that does not affect the tax-exempt status of the bonds. *See, e.g.*, *In re Revere Copper and Brass Inc.*, 78 B.R. 17, 18-19 (S.D.N.Y. 1987).   In lieu of a thoughtful solution to legitimate concerns raised in by the Indenture Trustee in good faith, the Debtor simply makes repeated references in the Plan and Disclosure Statement to a blanket statement of intent:

> The treatment afforded the Holders of Class 4 Claims does not affect the rights of the Holders of Class 4 Claims or the 1st Tier Trustee under the 1st and 2nd Tier Indenture against any party other than the Debtor, and **specifically, is not intended to nor does it: (i) modify the maturity, the principal or initial denomination amount, or the interest rate or maturity value of the 1st Tier Bonds; (ii) affect or extinguish the exclusion of interest paid on the 1st Tier Bonds (whether paid by the Reorganized Debtor or any third party) from gross income for federal income tax purposes; or (iii) affect or diminish any third-party rights to reimbursement or subrogation under the 1st and 2nd Tier Indenture of 1st Tier Bondholders Insurance Policy**.

Plan §§ 1.1.28, 5.3.

The Debtor's statement of intent is not self effectuating, and the Plan lacks a technically sound and detailed "critical path" through the issues at hand.  It is apparent from the Debtor's filing of the Plan that the Indenture Trustee and Majority 1st Tier Bondholders need to be able to prepare their own alternative plan of reorganization.

KL2 2665130.7

2188444.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**5.    The Plan Unnecessarily Adds Confusion To The Claims Process Under the Surety Bond and The Insurance Policy.**

The 1st Tier Bonds were issued and sold by the Director as being secured and protected by, among other things, a Surety Bond and an Insurance Policy issued by Ambac.  The mechanics (*i.e.*, preconditions and documentation) for making a claim or draw against the Surety Bond and the Insurance Policy are set forth in such instruments as supplemented by the Senior Indenture.  In making a decision to purchase the 1st Tier Bonds, investors looked to the Insurance Policy (as supplemented by the Surety Bond) to assure payment of the aggregate total of the entire outstanding principal amount of and all interest to accrue on the 1st Tier Bonds (the "Aggregate Insured Amount").  The premium paid by the Debtor for the Insurance Policy was based on the Aggregate Insured Amount.  The 1st Tier Bondholders have an unqualified claim to recovery against Ambac for the unpaid portion by the Surety Bond and the Aggregate Insured Amount.

As a threshold matter, any plan that will move this case forward must avoid creating any challenges in the suretyship relationship between the 1st Tier Bondholders and Ambac, especially in view of the uncertainty invoked by the pending Segregated Account Rehabilitation Proceedings before the Circuit Court of Dane County, Wisconsin.  The Indenture Trustee's Comments spoke to this issue in clear, unambiguous terms, with suggestions to avoid risk to the 1st Tier Bondholders.

In response, the Debtor chose to ignore the Indenture Trustee and the fundamentals of conduit financing and processes called for by the Senior Indenture.  The Plan, instead, focuses on modifying the trust estate under the Senior Indenture without any thoughtful regard as to the impact of proposed modifications.  Rather than structuring its Plan to address the problems, the Debtor provided in the Plan that the "1st Tier Note shall be extinguished and discharged and the Amended and Restated Financing Agreement shall provide for the liabilities and obligations arising under the Amended and Restated 1st Tier Note, and shall not provide for any liabilities or

22

obligations regarding the 1st Tier Bond Claims or the 1st Tier Notes." [DE 516 ¶ 5.2 (p. 13)] (emphasis added).

The prospect of the extinguishment and discharge of the 1st Tier Note (the source of conduit payments on the 1st Tier Bonds) is alarming.  In lieu of a thoughtful solution to the legitimate concerns raised by the Indenture Trustee in good faith, the Debtor simply made a blanket statement of its intent not to affect third party rights.  The Debtor's intent is not enough. The Debtor has declined to work with the Indenture Trustee and Majority 1st Tier Bondholders to prepare a reorganization plan that protects the interests of its stakeholders.

### 6.  Other Confirmation Issues

In addition to the issues described above, the Plan is unconfirmable for a variety of other reasons, including:

- The Plan was not proposed in good faith.  *See* 11 U.S.C. 1129(a)(3).  As noted above, the Plan is a placeholder plan used to exercise leverage over Debtor's creditors in negotiations; and

- The Plan violates the "best interest of creditors" test.  *See* 11 U.S.C. 1129(a)(7).  The liquidation analysis attached to the proposed Disclosure Statement provides that in a liquidation scenario, the 1st Tier Bondholders' unsecured claims would receive a 1.2% distribution (versus the 2.5% distribution under the Plan).  The Indenture Trustee and the Majority 1st Tier Bondholders strongly dispute this valuation and believe they would receive more if the company were sold.

- The Plan is not feasible, especially if the class of 1st Tier Bondholders exercise Section 1111(b) rights.  11 U.S.C. §§ 1111(b)(2)(B)(i); 1129(b)(2)(A)(i)(II); *In re Weinstein*, 227 B.R. 284, 291-96 (9th Cir. BAP 1998) (generally discussing the contours of Section 1111(b) and the effect of its election).

- Even if the Court were to find that the absolute priority rule does not apply because Debtor is a non-profit corporation, the Plan does not meet the fair and equitable standards for cram-down under Section 1129(b).  Both *Matter of Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305 (7th Cir. 1995) and *In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890*, 265 F.3d 869 (9th Cir. 2001) require Debtor to show find that there is no better option for rejecting unsecured creditors, which it clearly cannot do with this Plan.

### E.    Terminating Exclusivity Does Not Prejudice Debtor

Here, there is no prejudice to the Debtor if exclusivity is terminated.  Courts have previously noted that terminating exclusivity "does not sound a death knell for [a] debtor's

KL2 2665130.7                                                                                                           2188444.2

1   reorganization." *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990).  It

2   only permits creditors to file their own plan while the debtor is free to pursue its own plan.  *Id.*

3       Permitting creditors to propose an alternative plan now benefits the entire estate.   The

4   Debtor's disclosure statement outlines the negative consequences of prolonging this case,

5   including loss of customer confidence, inability to attract and retain management and incurrence

6   of significant professional fees and other expenses associated with the bankruptcy case.  *See*

7   proposed Disclosure Statement at 54:24-55:9.  Pushing forward with the Plan will only exacerbate

8   the harms the Debtor seeks to avoid.  The way to alleviate prolonging this case is to allow

9   creditors to consider all possible options at once.

10      As courts have recognized, terminating exclusivity also fosters a quicker resolution of

11  bankruptcy proceedings by facilitating settlement.  *In re EUA Power Corp.*, 130 B.R. 118, 119

12  (Bankr. D. N.H. 1991) ("It may well be, as has been the experience in cases not only in this Court

13  but in other courts, that while the process starts out after termination of exclusivity with

14  competing Plans the ongoing progress of the case results in compromises and negotiations

15  whereby one joint Plan goes forward."); *In re Mother Hubbard, Inc*, 152 B.R. 189, 195 (Bankr.

16  W.D. Mich. 1993) ("In some instances, authority to file a competing Plan may additionally

17  motivate the debtor to more earnestly negotiate an acceptable consensual Plan.").  It is the

18  Movants' hope that terminating exclusivity will facilitate continued negotiations and resolution of

19  these issues either with Debtor or a Chapter 11 trustee, or through a competing plan.

20                          <u>**Conclusion**</u>

21      After eight months in bankruptcy and the incurrence of Debtor professional fees exceeding

22  $2.5 million, the Debtor has proposed a Plan that reflects no meaningful negotiation, that is

23  adamantly opposed by the Debtor's only substantial economic stakeholders (creditors that hold

24  more than 99% of all claims entitled to vote), and that is unconfirmable on its face.  These facts

25  constitute more than sufficient cause to terminate exclusivity and to permit the 1st Tier

26  Bondholders to file a competing plan.

1    Dated:  September 9 , 2010.

2                                LEWIS AND ROCA LLP

3

4                                 /s/  Susan M. Freeman (AZ 004199)
5                                    Susan M. Freeman, *pro hac vice*
                                      Robert M. Charles, Jr., NV 6593
6

7                                *Attorneys for the Indenture Trustee Wells Fargo*
                                 *Bank, N.A.*
8

9                                AND

10                               **KOLESAR & LEATHAM, CHTD.**

11

12                                /s/  Nathalie M. Cox (007662)
                                 Nile Leatham (Nevada State Bar No. 002838)
13                               Natalie M. Cox (Nevada State Bar No. 007662)

14
                                 **KRAMER LEVIN NAFTALIS & FRANKEL,**
15                               **LLP**
                                 Philip Bentley (*pro hac vice* pending)
16                               Amy Caton (*pro hac vice* pending)

17

18                               *Attorneys for the Majority 1st Tier Bondholders*

19

20

21

22

23

24

25

26

25

KL2 2665130.7                                                        2188444.2

1   PROOF OF SERVICE

2   COPY of the aforementioned sent via e-mail
    or U.S. First Class Mail on September 9,
3   2010 to:

4   Gerald M. Gordon
5   William Noall
    Gabrielle A. Hamm
6   Erika Pike Turner
    Matthew C. Zirzow
7   Gordon and Silver
    3960 Howard Hughes Parkway, 9th Floor
8   Las Vegas, NV 89109
    Attorneys for Debtor
9   E-mail  bankruptcynotices@gordonsilver.com

10  Laurel E. Davis
    Craig S. Dunlap
11  Jeffrey J. Steffen
    Fennemore Craig, P.C.
12  300 S. Fourth Street, # 1400
    Las Vegas, NV 89101
13  Attorneys for Ambac Assurance Corporation
    E-mail:  ldavis@fclaw.com
14  E-mail:  cdunlap@fclaw.com
    E-Mail:  jsteffen@fclaw.com
15
    Amy G. Doehring
16  Miles W. Hughes
    James W. Kapp, III
17  Steven S. Scholes
    William Smith
18  McDERMOTT WILL & EMERY, LLP
    227 West Monroe
19  Chicago, IL  60606
    E-mail:  adoehring@mwe.com
20  E-mail:  mhughes@mwe.com
    E-Mail:  jkapp@mwe.com
21  E-mail:  sscholes@mwe.com
    E-mail:  wsmith@mwe.com
22  Attorneys for Ambac Assurance Corporation

23  Katherine Constantine
    DORSEY & WHITNEY, LLP
24  50 South Sixth Street, Suite 1500
    Minneapolis, MN   55402-1498
25  Email:  Constantine.Katherine@dorsey.com
    Attorneys for U.S. Bank National Association as
26  2nd Tier Trustee

KL2 2665130.7                                                                    2188444.2

Athanasios E. Agelakopoulos
U.S. Trustee
300 S. Las Vegas Boulevard S.
Suite 4300
Las Vegas, V 89101
E-mail:  athanasios.agelakopoulos@usdoj.gov

Richard F. Holley
Victoria L. Nelson
400 S. Fourth Street, 3rd Floor
Las Vegas, NV 89101
E-mail:  tholley@nevadafirm.com
E-mail:  vnelson@nevadafirm.com
Attorneys for Bombardier Transportation Holdings USA, Inc.

Robert E. McPeak, Esq.
BALLARD SPAHR LLP
100 N. City Parkway, Suite 1750
Las Vegas, NV   89106
E-mail:  mcpeakr@ballardspahr.com

Bradley D. Patterson, Esq.
BALLARD SPAHR LLP
One Utah Center, Suite 800
201 South Main Street
Salt Lake City, UT   84111-2221
E-mail:  patterson@ballardspahr.com

Rebecca J. Winthrop, Esq.
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA   90067-2909
E-mail:  Winthropr@ballardspahr.com

Director of the State of Nevada
Department of Business and Industry
Attn:  Lon A. DeWeese
1535 Old Hot Springs Road, Suite 50
Carson City, NV   89706
E-mail:  nhd@nvhousing.state.nv.us

27

KL2 2665130.7

2188444.2

James D. Greene
RICE SILBEY REUTHER & SULLIVAN, LLP
3960 Howard Hughes Pkwy., Suite 700
Las Vegas, NV   89169
E-mail:  jgreene@rsrslaw.com

Lou Dorn, Vice President & General Counsel
Colony Resorts LVH Acquisitions, LLC
3000 Paradise Road
Las Vegas, NV     89109
E-mail:  ldorn@lvhilton.com

Bombardier Transit Corp.
Attn:  Managing Member
1501 Lebanon Church Rd.
Pittsburgh, PA   15236-1491

NV Energy
Attn:  Managing Member
P.O. Box 30086
Reno, NV   89520-3086

Allegiance Direct Bank
Attn:  Managing Member
P.O. Box 1750
Cedar City, UT  84721

Promethean Partners, LC
Attn:  Managing Member
10816 Iris Canyon Land
Las Vegas, NV   89135

Team Grapx, Inc.
Attn:  Managing Member
33562 blue Lantern #1
Dana Point, CA   92629

Anthem Blue Cross Blue Shield
Attn:  Managing Member
P.O. Box 541013
Los Angeles, CA   90054-1013

Brink's U.S.
Attn:  Managing Member
3200 E. Charleston Blvd.
Las Vegas, NV   89104

Nevada Department of Taxation
Bankruptcy Section
555 E. Washington Avenue, Suite 1300
Las Vegas, NV   89101

KL2 2665130.7

2188444.2

1

2  Jumbo Transportation, Inc.
   Attn:  Managing Member
3  1201 Corbin St.
   Elizabeth, NJ   07201

4  Wells Fargo Business Card
   Attn:  Managing Member
5  P.O. Box 348750
   Sacramento, CA   95834

6

7  Ikon Financial Services
   Attn:  Managing Member
8  P.O. Box 650073
   Dallas, TX   75265-0073

9  Czarnowski Display Services, Inc.
   Attn:  Managing Member
10 6067 Eagle Way
   Chicago, IL   60678-1060

11

12 Bearcom
   Attn:  Managing Member
13 P.O. Box 200600
   Dallas, TX   75320-0600

14 Quartermaster, Inc.
   Attn:  Managing Member
15 17600 Fabrica Way
   Cerritos, CA   90703

16

17 Intercall
   Attn:  Managing Member
18 P.O. Box 403749
   Atlanta, GA   30384-3749

19 Philip S. Gerson, Esq.
   OLSON, CANNON, GORMLEY & DESRUISSEAUX
20 9950 W. Cheyenne
   Las Nevada, NV   89129
21 Email:  banknv@rocgd.com
   Attorneys for Harrah's Las Vegas, Inc.,
22 Harrah's Imperial Palace Corp., Park Place
   Entertainment, Par Ball Corporation

23

24

25

26

29

KL2 2665130.7                                                    2188444.2

1  Brett A. Axelrod, Esq.
   Anne M. Loraditch
2  FOX ROTHSCHILD, LLP
   3800 Howard Hughes Pkwy., Suite 500
3  Las Vegas, NV     89169
   Email:  baxelrod@foxrothschild.com
4  Email:  aloraditch@foxrothschild.com
   Attorneys for US Bank National Association, N.A.
5
   Jeffrey R. Sylvester
6  7371 Prairie Falcon Rd., Suite 120
   Las Vegas, NV     89128
7  Email:  jeff@sylvesterpolednak.com
   Attorneys for US Bank National Association, N.A.
8
   Franklin Federal Tax
9  Free Income Fund
   Attn:  Dick Kuersteiner, Esq.
10 One Franklin Pkwy.
   San Mateo, CA   94403-1906
11
   Nuveen Insured Quality
12 Municipal Fund
   c/o  Nuveen Investments, Inc.
13 Attn:  John Miller
   333 W. Wacker Drive
14 Chicago, IL   60606

15 Nuveen Insured Mun.
   Opportunity Fund
16 c/o  Nuveen Investments, Inc.
   Attn:  John Miller
17 333 W. Wacker Drive
   Chicago, IL   60606
18
   Nuveen Mun. Market Opport. Fund
19 c/o  Nuveen Investments, Inc.
   Attn:  John Miller
20 333 W. Wacker Drive
   Chicago, IL   60606
21
   Nuveen High Yield Mun. Bond. Fund
22 c/o  Nuveen Investments, Inc.
   Attn:  John Miller
23 333 W. Wacker Drive
   Chicago, IL   60606
24

25

26

KL2 2665130.7

2188444.2

Nuveen Municipal Value Fund
c/o Nuveen Investments, Inc.
Attn: John Miller
333 W. Wacker Drive
Chicago, IL   60606

General Electric Mortgage Ins. Corp.
c/o Genworth Financial, Inc.
6620 W. Broad Street, Building 1
Richmond, VA   27615

Eaton Vance Insured Municipal Bond Fund
Eaton Vance Investment Mgrs.
Two International Place
Boston, MA   02110

Nuveen Prem. Income Mun. Fund.
c/o Nuveen Investments, Inc.
Attn: John Miller
333 W. Wacker Drive
Chicago, IL   60606

Nuveen Invest. Quality Mun. Fund
c/o Nuveen Investments, Inc.
Attn: John Miller
333 W. Wacker Drive
Chicago, IL   60606

Nuveen Select Tax Free Income Port. 2
c/o Nuveen Investments, Inc.
Attn: John Miller
333 W. Wacker Drive
Chicago, IL   60606

Nuveen Dividend Advantage
Municipal Fund
c/o Nuveen Investments, Inc.
Attn: John Miller
333 W. Wacker Drive
Chicago, IL   60606

Nuveen Dividend Advantage
Municipal Fund
c/o Nuveen Investments, Inc.
Attn: John Miller
333 W. Wacker Drive
Chicago, IL   60606

KL2 2665130.7

2188444.2

| | |
|---|---|
| 1 | Riversource High Yield Tax Exempt Fund |
| 2 | RiverSource Investments c/o Boston Financial |
| 3 | P.O. Box 8041 Boston, MA 02266-8041 |
| 4 | |
| 5 | Van Kampen Insured Tax Free Income Fund c/o Van Kampen Asset Mgt. 522 Fifth Avenue |
| 6 | New York, NY 10036 |
| 7 | Nuveen Select Tax Free Income Port. 1 c/o Nuveen Investments, Inc. |
| 8 | Attn: John Miller 333 W. Wacker Drive |
| 9 | Chicago, IL 60606 |
| 10 | FSA Insurance Company c/o Financial Security Assur., Inc. |
| 11 | 31 West 52nd Street New York, NY 10019 |
| 12 | |
| 13 | Nuveen Municipal Advtg. Fund Inc. c/o Nuveen Investments, Inc. |
| | Attn: John Miller |
| 14 | 333 W. Wacker Drive Chicago, IL 60606 |
| 15 | |
| 16 | Financial Guaranty Insurance Co. Attn: Steven Natko, Esq. |
| | 125 Park Avenue |
| 17 | New York, NY 10017 |
| 18 | JP Morgan Tax Free Bond Fund c/o JP Morgan Distribution Services, Inc. |
| 19 | 1111 Polaris Parkway Columbus, OH 43240 |
| 20 | |
| 21 | Deborah Ann Blackwell 9143 Sunset Ridge Road |
| | Randallstown, MD 21133 |
| 22 | |
| 23 | |
| 24 | By___/s/ Marie H. Mancino_____ |
| | Marie H. Mancino |
| 25 | Lewis and Roca LLP |
| 26 | |

32

KL2 2665130.7

2188444.2