EXHIBIT "2"

1  GORDON SILVER
   GERALD M. GORDON, ESQ.
2  Nevada Bar No. 229
   E-mail:  ggordon@gordonsilver.com
3  WILLIAM M. NOALL, ESQ.
   Nevada Bar No. 3549
4  E-mail:  wnoall@gordonsilver.com
   GABRIELLE A. HAMM, ESQ.
5  Nevada Bar No. 11588
   E-mail:  ghamm@gordonsilver.com
6  3960 Howard Hughes Pkwy., 9th Floor
   Las Vegas, Nevada 89169
7  Telephone (702) 796-5555
   Facsimile (702) 369-2666
8  Attorneys for Debtor

9              **UNITED STATES BANKRUPTCY COURT**
                **FOR THE DISTRICT OF NEVADA**
10

11  In re:                                  Case No.: 10-10464-BAM
                                            Chapter 11
12  LAS VEGAS MONORAIL COMPANY,

                    Debtor.                 Disclosure Statement Hearing:
13                                          Date:  ~~May 25~~June 8, 2011
                                            Time:  9:30 a.m.
14

15                                          Continued Disclosure Statement Hearing:
                                            Date:   June 20, 2011
16                                          Time:  1:30 p.m.

17                                          Confirmation Hearing:
                                            Date:  ~~July 29, 2011~~TBD
18                                          Time:  ~~9:30 a.m.~~TBD

19      **[PROPOSED] ~~FIRST AMENDED~~ DISCLOSURE STATEMENT TO ACCOMPANY
        DEBTOR'S ~~FIRST~~THIRD AMENDED PLAN OF REORGANIZATION**
20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE
    STATEMENT ......................................................................................................... 2

III. SUMMARY OF THE PLAN ..................................................................................... 6

    A.     Other Priority Claims (Class 1)........................................................... 9
    B.     Other Secured Claims (Class 2)........................................................... 9
    C.     General Unsecured Claims (Class 3).................................................... 9
    D.     Class 4 – Class 4A (1st Tier Bond Secured Claims), Class 4B (Ambac 1st
          Tier Bondholders' Surety Bond Secured Claims), and Class 4C (Ambac
          Insurance Secured Claims). ................................................................. 9
    E.     Class 5 – Class 5A (1st Tier Bond Unsecured Claims), Class 5B (Ambac
          1st Tier Bondholders' Surety Bond Unsecured Claims), and Class 5C
          (Ambac Insurance Unsecured Claims). ............................................... 12
    F.     2nd Tier Bond Claims (Class 6).......................................................... 14
    G.     3rd Tier Bond Claims (Class 7). ......................................................... 14
    H.     Director Claims (Class 8)..................................................................... 15
    I.     Subordinated Claims (Class 9)............................................................ 15

IV. SUMMARY OF VOTING PROCESS ...................................................................... 15

    A.     Who May Vote to Accept or Reject the Plan...................................... 15
    B.     Summary of Voting Requirements. ...................................................... 16

V. GENERAL INFORMATION ABOUT THE DEBTOR'S BUSINESS,
    RESTRUCTURING EFFORTS AND THE FILING OF THE BANKRUPTCY CASE........ 17

    A.     The Debtor's Business. ......................................................................... 17
          1.     Corporate Background and Structure......................................... 17
          2.     Operations. ................................................................................... 18
          3.     The Debtor's Prepetition Management Structure. ..................... 20
          4.     The Debtor's Relationship with Bombardier and CapEx
                Requirements. ............................................................................. 24
          5.     Description of the Debtor's Assets and Liabilities. ................... 25

    B.     The Debtor's Prepetition Debt Structure. ............................................ 26
          1.     Bonds Issuance by State of Nevada. .......................................... 26
          2.     Financing Agreement with State of Nevada. ............................. 28

    C.     Events Leading to the Bankruptcy Case. ............................................. 31
          1.     Financial Performance. ............................................................... 31
          2.     Economic Pressures and Requirements. ..................................... 33
          3.     Default........................................................................................ 36
          4.     Uncertainty as to Access to Operating Funds. .......................... 37
          5.     Restructuring Goals. ................................................................... 38

    D.     Significant Events During the Bankruptcy Case. ................................ 38
          1.     First Day Motions. ..................................................................... 38
          2.     Other Significant Motions and Post-Petition Events. ............... 39
          3.     Financial Performance During the Bankruptcy Case............... 45
          4.     Ambac Rehabilitation Proceedings............................................ 45

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

ii

        5.        Closure of Sahara Hotel. ................................................. 49

VI. DESCRIPTION OF THE PLAN ..................................................................... 50

    A.    Overview of Chapter 11 ...................................................... 50
    B.    Treatment of Unclassified Claims under the Plan. ...................... 52

        1.        Treatment of Administrative Claims. ............................ 52
        2.        Treatment of Priority Tax Claims. ............................... 52

    C.    Classification and Treatment of Claims under the Plan ............... 52

        1.        Treatment of Class 1 (Other Priority Claims). ............... 52
        2.        Treatment of Class 2 (Other Secured Claims). .............. 53
        3.        Treatment of Class 3 (General Unsecured Claims). ........ 53
        4.        Treatment of Class 4 – Class 4A (1st Tier Bond Secured Claims),
                  Class 4B (Ambac 1st Tier Bondholders' Surety Bond Secured
                  Claims), and Class 4C (Ambac Insurance Secured Claims) .......... 54
        5.        Treatment of Class 5 – Class 5A (1st Tier Bond Unsecured
                  Claims), Class 5B (Ambac 1st Tier Bondholders' Surety Bond
                  Unsecured Claims), and Class 5C (Ambac Insurance Unsecured
                  Claims). .............................................................. 63
        6.        Treatment of Class 6 (2nd Tier Bond Claims) ............... 70
        7.        Treatment of Class 7 (3rd Tier Bond Claims). .............. 70
        8.        Treatment of Class 8 (Director Claims). ..................... 71
        9.        Treatment of Class 9 (Subordinated Claims) ............... 75

    D.    Means for Implementation of the Plan .................................. 76

        1.        Reorganized LVMC. ............................................. 76
        2.        Additional Reorganized LVMC Provisions. ................. 76
        3.        Effective Date Events. .......................................... 76
        4.        Post-Effective Date Directors, Management and Operations. ..... 77
        5.        Capital Expenditures and Procedures. ....................... 79
        6.        Extraordinary Transactions. .................................. 81
        7.        Certain Rights of the New Trustee – Voting. ............... 81
        8.        No Corporate Action Required. .............................. 82
        9.        Effectuation of Transactions. ................................. 82
        10.       Filing with Nevada Secretary. ................................ 83

    E.    Executory Contracts and Unexpired Leases. ........................... 83

        1.        Executory Contracts. .......................................... 83
        2.        Approval of Assumption or Rejection. ...................... 83
        3.        Cure of Defaults. .............................................. 84
        4.        Objection to Cure Amounts. ................................. 85
        5.        Confirmation Order ........................................... 85
        6.        Post-Petition Date Contracts and Leases. .................. 85
        7.        Bar Date. ...................................................... 85

    F.    Conditions Precedent to Confirmation and the Effective Date ...... 86

        1.        Conditions to Confirmation. ................................. 86
        2.        Conditions to Effectiveness. ................................. 86
        3.        Notice of Effectiveness. ..................................... 86
        4.        Waiver of Conditions. ........................................ 87

VII. RISK FACTORS ...................................................................................... 87

    A.    The Debtor Has No Duty To Update. ..................................... 87

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

iii

B. Information Presented Is Based on the Debtor's Books and Records, and Is Unaudited. ........................ 87

C. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Will Vary. ........................ 87

D. No Legal or Tax Advice Is Provided to You by This Disclosure Statement. ........ 88

E. No Admissions Made. ........................ 88

F. No Waiver of Right to Object or Right to Recover Transfers and Estate Assets. ........................ 88

G. Bankruptcy Law Risks and Considerations. ........................ 88

1. Confirmation of the Plan Is Not Assured. ........................ 88
2. The Effective Date Might Be Delayed or Never Occur. ........................ 89
3. The Projected Value of Estate Assets Might Not Be Realized. ........................ 89
4. Changes to Applicable Tax Laws Could Have a Material Adverse Effect on the Debtor's Financial Condition and the Cash Pay Note. ........ 89
5. Allowed Claims in the Various Classes May Exceed Projections. ........... 90
6. No Representations Outside of This Disclosure Statement Are Authorized. ........................ 90

H. Risks Related to the Debtor's Business Operations. ........................ 90

1. Effect of the Bankruptcy Case. ........................ 90
2. The Debtor Requires an Infusion of Capital by 2019 to Meet its Debt Obligations and CapEx Needs. ........................ 91
3. Expansion of the Existing System. ........................ 92
4. The Debtor Faces Extensive Regulation from Government Authorities. ........................ 92
5. The Debtor's Business, Financial Condition and Results of Operations Are Dependent in Part on a Number of Factors That Are Beyond the Debtor's Control. ........................ 93
6. The Potential Loss of IRS Code § 501(c)(4) Designation and Financial Impacts Thereof. ........................ 96

VIII. POST-EFFECTIVE DATE OPERATIONS ........................ 98

A. Title to Property; Discharge; Injunction. ........................ 98

1. Vesting of Assets. ........................ 98
2. Preservation of Litigation Claims. ........................ 99
3. Settlement of Litigation Claims. ........................ 100
4. Discharge. ........................ 100
5. Compromise and Settlement. ........................ 100
6. Debtor Releases. ........................ 101
7. Third Party Releases. ........................ 102
8. Injunction. ........................ 102
9. Exculpation. ........................ 103
10. Compensation of Directors and Officers. ........................ 104
11. Director and Officer Liability Insurance. ........................ 105
12. Indemnification. ........................ 105

B. Post Confirmation Reporting and Quarterly Fees to the UST. ........................ 106
C. Jurisdiction. ........................ 106

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ........................ 108
X. SECURITIES LAW CONSIDERATIONS. ........................ 111
XI. CONFIRMATION OF THE PLAN ........................ 113

A. Confirmation of the Plan. ........................ 113

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

iv

B.    Objections to Confirmation of the Plan. ........................................................ 113
C.    The Best Interest Test and Feasibility of the Plan. ....................................... 113

    1.    The Best Interests Test and the Debtor's Liquidation Analysis. ............ 114
    2.    Debtor's Projections. ......................................................................... 116
    3.    Feasibility. ......................................................................................... 119
    4.    Confirmation of the Plan Without Acceptance By All Impaired
        Classes:  the "Cramdown" Alternative ............................................. 122
    5.    Accepting Impaired Class. ................................................................. 123
    6.    Acceptance of the Plan. ..................................................................... 123
    7.    Allowed Claims. ................................................................................. 123
    8.    Impaired Claims. ................................................................................ 124
    9.    Voting Procedures. ............................................................................ 124

XII. ALTERNATIVES TO THE PLAN ................................................................... 125

A.    Alternative Plans of Reorganization. ........................................................... 126
B.    Liquidation under Chapter 7. ........................................................................ 126

XIII. PREFERENCE AND OTHER AVOIDANCE ACTIONS ............................... 127
XIV. RECOMMENDATION AND CONCLUSION. ................................................ 128

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

v

1

**APPENDIX**

2    EXHIBIT "A":  PLAN OF REORGANIZATION

3    EXHIBIT "B":  LIQUIDATION ANALYSIS

4    EXHIBIT "C":  FINANCIAL PROJECTIONS

5    EXHIBIT "D":  2010 FINANCIAL RESULTS

6    EXHIBIT "E":  2011 PARTIAL FINANCIAL RESULTS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

vi

102200-002/Comparison

# I.
## INTRODUCTION

On January 13, 2010 (the "Petition Date"), Las Vegas Monorail Company, a Nevada non-profit corporation (the "Debtor") filed a voluntary Chapter 11 petition for relief (the "Petition") in the United States Bankruptcy Court for the District of Nevada, Las Vegas (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code,[1] being case no. BK-S-10-10464-BAM (the "Bankruptcy Chapter 11 Case").

The Debtor has prepared this Disclosure Statement in connection with the solicitation of votes on the Debtor's First Third Amended Plan Of of Reorganization (the "Plan") proposed by the Debtor to treat the Claims of Creditors of the Debtor.

**Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. In the event of a conflict or difference between the definitions used in this Disclosure Statement and in the Plan, the definitions contained in the Plan shall control.**

The Exhibits to this Disclosure Statement included in the Appendix are incorporated into, and are a part of, this Disclosure Statement. The Plan is attached as **Exhibit A.** Any interested party desiring further information should contact:

> Gordon Silver
> Attn: William M. Noall, Esq.
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, Nevada 89169
> Telephone: (702) 796-5555
> Email: wnoall@gordonsilver.com

Interested parties may also obtain further information from the Bankruptcy Court at its website: http://www.nvb.uscourts.gov.

---

[1] Unless otherwise indicated herein, all references to Chapters or Sections refer to title 11 of the United States Code (the "Bankruptcy Code"), and all Rule references shall refer to the Federal Rules of Bankruptcy Procedure (the "Rules").

[1] Unless otherwise indicated herein, all references to Chapters or Sections refer to title 11 of the United States Code (the "Bankruptcy Code"), and all Rule references shall refer to the Federal Rules of Bankruptcy Procedure (the "Rules").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

Each Holder[2] of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Exhibits hereto, including the Plan, and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes.

## II.
## INFORMATION REGARDING THE PLAN AND THIS DISCLOSURE STATEMENT

The objective of a Chapter 11 bankruptcy case is the confirmation (i.e. approval by the bankruptcy court) of a plan of reorganization. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying claims against, and equity interests in, a debtor. After a plan has been filed, the holders of such claims and equity interests that are impaired (as defined in Section 1124 of the Bankruptcy Code) and receiving some cash and/or property on account of such claims or equity interests are permitted to vote to accept or reject the plan. Before a debtor or other plan proponent can solicit acceptances of a plan, Section 1125 of the Bankruptcy Code requires the debtor or other plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed voting decision about whether to accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor and the Plan to enable Holders of General Unsecured Claims, 1st Tier Bond Claims, and Directorthe Ambac Surety Bond Claim, the Ambac Insurance Claim, and the Director's Claims to make an informed voting decision about whether to accept or reject the Plan (Holders of other Claims will be deemed to have accepted or rejected the Plan, as the case may be, without the need for them to vote). Each subclass in Classes 4 and 5 is deemed to be a separate class for purposes of voting pursuant to section 1122 of the Bankruptcy Code and for acceptance pursuant to section 1126 of the Bankruptcy Code. Because the Debtor is a non-profit corporation, it does not have equity interests. The Holders of 2nd Tier Bond Claims and 3rd Tier Bond Claims will

---

[2] Any capitalized term not defined in this Disclosure Statement shall be defined as set forth in Section 1.1 of the Plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

2

1    receive nothing under the Plan and are deemed to vote to reject the Plan.

2         This Disclosure Statement will be used to solicit acceptances of the Plan only after the

3    Bankruptcy Court has found that this Disclosure Statement provides adequate information in

4    accordance with Section 1125 of the Bankruptcy Code and has entered an order approving this

5    Disclosure Statement.  Approval by the Bankruptcy Court is not an opinion or ruling on the

6    merits of the Plan and it does not mean that the Plan has been or will be approved by the

7    Bankruptcy Court.

8         After the appropriate Persons have voted to accept or reject the Plan, there will be a

9    Confirmation Hearing to determine whether the Plan should be confirmed by the Bankruptcy

10   Court.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan

11   satisfies the requirements of the Bankruptcy Code.  The Bankruptcy Court will also receive and

12   consider a Ballot summary, which will present a tally of the votes cast by those Classes of

13   Creditors entitled to vote on the Plan.  Once confirmed, the Plan will be treated essentially as a

14   contract binding on all Creditors and other parties-in-interest in the Bankruptcy Case, even if

15   they rejected the Plan.

16        **THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF**

17   **THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL**

18   **INFORMATION THAT ARE INCORPORATED BY REFERENCE HEREIN**

19   **(COLLECTIVELY, THE "INCORPORATED DOCUMENTS").  THE SUMMARIES**

20   **CONTAINED HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO**

21   **THE INCORPORATED DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY**

22   **OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE**

23   **STATEMENT AND THE ACTUAL CONTENT OF ANY OF THE INCORPORATED**

24   **DOCUMENTS, THE INCORPORATED DOCUMENTS SHALL GOVERN FOR ALL**

25   **PURPOSES.**

26        **THE INFORMATION IN THIS DISCLOSURE STATEMENT IS INCLUDED**

27   **HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND**

28   **MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

3

102200-002/Comparison

HOW TO VOTE ON THE PLAN.  THIS DISCLOSURE STATEMENT THEREFORE DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT OR LIABILITY, A STIPULATION OR A WAIVER IN ANY PROCEEDING OTHER THAN THE SOLICITATION OF ACCEPTANCES OF THE PLAN AND CONFIRMATION OF THE PLAN.  FOR ALL PURPOSES OTHER THAN THE SOLICITATION OF ACCEPTANCES OF THE PLAN, THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

THE CONFIRMATION, EFFECTIVENESS AND CONSUMMATION OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THESE MATERIAL CONDITIONS ARE DISCUSSED IN SECTION VI OF THIS DISCLOSURE STATEMENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR (INCLUDING THOSE HOLDERS WHO DO NOT VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

4

102200-002/Comparison

THE DEBTOR MAKES THE STATEMENTS AND PROVIDES THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. PERSONS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE ~~HEREOF~~ OF THIS DISCLOSURE STATEMENT.

EACH HOLDER OF AN IMPAIRED CLAIM WHO IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ALL PERSONS DESIRING SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS ABOUT THE PLAN, THE DEBTOR, OR THE VALUE OF ITS PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS PROCEED AT THEIR OWN RISK TO THE EXTENT THEY RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE OR GIVEN TO OBTAIN THEIR APPROVAL OF THE PLAN THAT DIFFER FROM, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE MANAGEMENT OF THE DEBTOR HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTOR HAS ENDEAVORED TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS OTHERWISE STATED HEREIN.

III.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

## SUMMARY OF THE PLAN

The following summary of the Plan is qualified in its entirety by reference to the detailed explanations in this Disclosure Statement and the Plan itself.  For a more detailed description of the Plan, see Article VI hereof and the Plan.

The primary objective of the reorganization and restructuring under the Plan is (i) to maximize returns to those Creditors entitled to recoveries from the Estate, and (ii) to reorganize and restructure the capital structure of the Debtor.  In particular, the Debtor seeks to meet and harmonize four objectives:  (1) to maximize return to its Creditors, in this case, the Holders of ~~its~~ 1st Tier Bonds and General Unsecured Claims, (2) to maintain its non-profit status, (3) to provide the Debtor with the means to operate up to at least 2019 while meeting its restructured capital structure, and (4) to be in a position to qualify and obtain third party grants and moneys to expand its system and fund its significant CapEx beginning in 2019 so that the Monorail does not cease to operate sometime in the next 8 years.

As more fully discussed below, ~~Bombardier's~~Bombardier's CapEx Projection determined than an initial significant CapEx expenditure of $23,060,266 will be required in 2019 for full replacement of the Debtor's fare collection equipment and platform doors.  At this time, the Debtor's projected revenues are insufficient to both (i) meet its CapEx needs in 2019 and 2024 and (ii) pay a portion of its proposed restructured debt at maturity in 2019.   The Debtor's ability to both (i) meet its CapEx needs in 2019 and 2024 and (ii) pay the restructured debt at maturity is conditioned upon the Debtor obtaining additional capital through expansion of the existing Monorail system, obtaining federal infrastructure funds or grants, or through private financing or investment.  The Debtor believes that the Plan provides a reasonable opportunity to do this.

The Debtor desires to achieve these objectives through an expeditious restructuring of, among other things, the ~~Financing Agreement, the~~ 1st Tier Bond Claims, and certain other debt obligations of the Debtor and other actions described herein and in the Plan.  The key aspects of the Plan are as follows:

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Claims and Priority Tax Claims are not designated as Classes under the Plan.  In general, these Claims

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

6

102200-002/Comparison

consist of the fees and costs of professionals employed on behalf of the Estate.  The Holders of such unclassified Claims are not entitled to vote on the Plan and will be paid in full under the Plan consistently with the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.

The Distributions under the Plan to each Class are summarized in the following table:

| Class | Description | Treatment | Estimated Amount ~~of Claims~~[3] |
|-------|-------------|-----------|-----------------------------------|
| Class 1: | Other Priority Claims | Unimpaired.  Paid in full in Cash.[4]  No solicitation required. <u>See</u> Section VI.C.1. | $~~1,805.56~~0.00 |
| Class 2: | Other Secured Claims | Unimpaired. Paid in full in Cash or otherwise left Unimpaired.  No solicitation required.  <u>See Section VI.C.2.</u> | $1,700.~~00~~ |
| Class 3: | General Unsecured Claims | Impaired.  Paid the lesser of (i) ~~eighty percent (80%)~~100% of Allowed Claims or (ii) pro rata share of $175,000. Solicitation required.  <u>See Section VI.C.3.</u> | $150,~~000~~.00 - 175,000.~~00~~[5] |
| Class 4: | ~~1st Tier Bond Secured Claims~~The | Impaired.  Cancellation of the Debtor's obligations | $~~451,448,217.30~~500,248,667.80[6] |

---

[3] These <u>estimated</u> amounts were compiled by combining the undisputed, liquidated, and noncontingent claims included on the Debtor's bankruptcy schedules, as amended, together with the projected Allowed amounts of proofs of claim on file on or about ~~March 15~~June 1, 2011.  As such, these amounts are estimates only, and may change as additional proofs of claim are filed and/or to the extent that the ~~Debtor obtains the disallowance of certain of the filed proofs of claim.~~ amount of such Claims which are Allowed Claims is greater than projected.

[4] ~~The vast majority~~All of the known Other Priority Claims ~~have been~~were paid in full pursuant to the orders approving the First Day Motions, discussed herein.

[5] ~~This estimate excludes rejection damages and Disputed Claims for personal injuries.~~ This estimate excludes potential rejection damages.  However, the Debtor does not believe there will be any Allowed Claims for rejection damages.  This estimate also does not include potential prepetition personal injury damages reduced to judgment or settled after the date of this Disclosure Statement; however, the Debtor does not believe it is liable for any personal injury damages, and if the Debtor were liable, the damages would very likely be satisfied by Bombardier under the Operations and Maintenance Agreement.

[6] This represents the <u>minimum</u> amount of 1st Tier Bond Claims which the ~~1st Tier Bonds~~Debtor expects will be deemed Allowed at the time of Confirmation, including both the secured and unsecured ~~portion~~portions of the 1st Tier Bond Claims~~.~~, and both the secured and unsecured portions of the Ambac 1st Tier Bondholders' Surety Bond Claims and Ambac Insurance Claims.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

7

| | | | |
|---|---|---|---|
| | Secured Portion of the1st Tier Bond Claims, Ambac 1st Tier Bondholders' Surety Bond Claims and Ambac Insurance Claims | under the 1st Tier Note and 1st Tier Bonds to be replaced in part by the Cash Pay Notes and the CapEx Notes.  Solicitation required.  See Section VI.C.4. | |
| Class 5: | The Unsecured Portion of the 1st Tier Bond Unsecured Claims, the Ambac 1st Tier Bondholders' Surety Bond Claims and Ambac Insurance Claims | Impaired.  Cancellation of the Debtor's obligations under the 1st Tier Note and 1st Tier Bonds to be replaced in part by the Capital Appreciation Notes.  Solicitation Required.  See Section VI.C.5. | |
| Class 6: | 2nd Tier Bond Claims | Impaired.  Subordinated to payment in full of 1st Tier Bond Claims.  No distribution or recovery.  Debtor's obligations under the 2nd Tier Obligation deemedwill be extinguished and 2nd Tier Bonds cancelled..  No solicitation required.  See Section VI.C.6. | $158,749,493.40, plus interest |
| Class 7: | 3rd Tier Bond Claims | Impaired.  Subordinated to payment in full of 1st Tier Bond Claims and 2nd Tier Bond Claims.  Debtor's obligations under the 3rd Tier Note deemedwill be extinguished and 3rd Tier Bonds cancelled..  No distribution or recovery.  No solicitation required.  See Section VI.C.7. | $48,500,000.00, plus interest |
| Class 8: | Director Claims | Impaired.  Solicitation required.  See Section VI.C.8. | $0.00 |

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

8

| | | |
|---|---|---|
| Class 9: | Subordinated Claims | Impaired. No distribution or recovery. No solicitation required. <u>See Section VI.C.9.</u> |

(right-aligned) $0.00

**A.    <u>Other Priority Claims (Class 1).</u>**

Other Priority Claims, which consist of any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, are provided for in Class 1. Allowed Other Priority Claims will be paid in full in Cash under the Plan; therefore, Holders of Allowed Other Priority Claims are Unimpaired.

**B.    <u>Other Secured Claims (Class 2).</u>**

Other Secured Claims, which consist of any Secured ~~Claims~~Claim, other than a Secured ~~Claims~~Claim arising under the Financing Agreement ~~and~~ (such exclusion includes the Director's Claim (to the extent a secured claim), any 1st Tier Bond Claims, the Ambac Insurance Policy Secured Claim ~~portion~~, the Ambac Surety Bond Secured Claim, any Claim of the 1st Tier ~~Bond Claims,~~Trustee, any Claim of the 2nd Tier Trustee, any Claim of the 3rd Tier Trustee, and any Claim arising from the 1st and 2nd Tier Indenture or the 3rd Tier Indenture), are provided for in Class 2. Allowed Other Secured Claims, if any, will be paid in full in Cash or otherwise left Unimpaired, in full and final satisfaction of such Claims.

**C.    <u>General Unsecured Claims (Class 3).</u>**

General Unsecured Claims are provided for in Class 3. Each Holder of an Allowed General Unsecured Claim will be paid ~~80%~~the lesser of the full amount of its Allowed ~~General Unsecured~~ Claim~~, but in no event shall~~ or its Pro Rata share of $175,000, it being understood that if the total ~~payment to the Holders of all~~amount of Allowed General Unsecured Claims ~~exceed $175,000, it being understood that if such total payment would exceed~~exceeds $175,000, the Holders of Allowed General Unsecured Claims shall ~~instead~~ receive their Pro Rata share of $175,000 in full satisfaction of their Allowed General Unsecured Claim. Allowed Claims in Class 3 will be paid in Cash in twelve (12) equal monthly installments, without interest. Holders of Class 3 Claims are Impaired and are entitled to vote on the Plan.

**~~D.    Class 4 – Class 4A (1st Tier Bond Secured Claims~~ (), Class 4).**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

**D.**    ~~The~~ 4B (Ambac **1st Tier Bondholders' Surety** Bond Secured Claims~~, which consist~~), and Class 4C (Ambac Insurance Secured Claims).

Holders of the Secured ~~portion~~Claims portions of the 1st Tier Bond Claims ~~held by (i)~~, the Ambac 1st Tier Bondholders' Surety Bond Claims, and the Ambac Insurance Claims, including the 1st Tier Trustee and Ambac, shall have no rights to payment under the 1st Tier Note ~~issued by the Debtor to the Director in accordance with the~~ from Reorganized LVMC and no rights under the Financing Agreement ~~and assigned by the Director to the 1st~~ or the 1st and 2nd Tier Indenture against Reorganized LVMC after the Effective Date.  Any obligations of the Debtor under the 1st Tier Note and the 1st and 2nd Tier Indenture shall be extinguished, cancelled, and discharged on the Effective Date, and the 1st Tier Note and the 1st and 2nd Tier Indenture shall continue in effect only as to parties other than Reorganized LVMC, including Ambac.  Any term in the Plan to the contrary notwithstanding, nothing as contained in the Plan or the Confirmation Order shall affect:

(a)   The right and ability of the Director and the 1st Tier Trustee~~, and~~ as provided for in the 1st and 2nd Tier Indenture to amend and restate the 1st and ~~(ii)~~2nd Tier Indenture with which Reorganized LVMC will assist, as necessary and appropriate.

(b)   The rights of Holders of 1st Tier Bond Claims under the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond, and their rights under the 1st and 2nd Tier Indenture to the extent of pursuing claims against the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond.

(c)   The powers, rights, privileges and immunities of the 1st Tier Trustee under the 1st and 2nd Tier Indenture as the 1st Tier Trustee deems reasonably necessary and appropriate with respect to the administration of its duties to the 1st Tier Bondholders~~under the~~, provided that the 1st Tier Trustee shall have no rights to receive indemnification or payment of its fees and expenses from Reorganized LVMC for fees and expenses incurred by the 1st Tier Trustee with respect to the Rehabilitation Proceedings or the TIP Proceedings.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1   Subclass 4A.  In full and complete satisfaction of the Secured Claim portion of any and

2   all 1st Tier Bond Claims, Holders of Class 4A Claims (which Claims include, as of the Record

3   Date, Claims of Ambac for 1st Tier Bonds, are provided for in Class 4, which is an Impaired

4   Class.  In full and final satisfaction of 1st Tier Bond Unsecured Claims: purchased and held by

5   Ambac), shall receive on the Effective Date a Pro Rata interest in the Cash Pay Notes and CapEx

6   Notes.  The Cash Pay Notes and the CapEx Notes shall be governed by the New Indenture and

7   the Security Documents.

8       (a)  The 1st Tier Note and 1st Tier Bonds shall be extinguished, cancelled, and

9       discharged;

10      (b)  The 1st and 2nd Tier Indenture shall be superseded by the New Indenture; and

11      (c)  On the Effective Date, the Holders of 1st Tier Bond Secured Claims shall receive a

12  Pro Rata interest in the Cash Pay Notes and the CapEx Notes, discussed in Section VI.C.4,

13  below.

14      Subclass 4B.  In full and complete satisfaction of the Secured Claim portion of any and

15  all Ambac Surety Bond Claims (Class 4B Claims) against LVMC, Ambac's contribution and

16  reimbursement rights with respect to the Ambac Surety Bond Claims, if any, shall be treated by

17  participation in the Cash Pay Notes and CapEx Notes in an amount determined under applicable

18  law and the 1st and 2nd Tier Indenture.

19      Subclass 4C.  In full and complete satisfaction of the Secured Claim portion of any and

20  all Ambac Insurance Claims (Class 4C Claims) against LVMC, on the Effective Date Ambac

21  shall retain its subrogation rights under the 1st Tier Bondholders' Insurance Policy as limited by

22  11 U.S.C. § 509(a) and (b), and pursuant to 11 U.S.C. § 509(c), Ambac shall have the right to

23  assert those subrogation rights only after and to the extent of payment of the 1st Tier Bond

24  Claims in full (or with such lesser amount accepted by the Holders in full and complete

25  satisfaction of the 1st Tier Bond Claims or as otherwise permitted under the governing

26  agreements and applicable law).  The Ambac subrogation rights with respect to the Secured

27  Claim portion of the Ambac Insurance Claims, if any, shall be limited to receipt of the balance

28  outstanding of the outstanding payment stream due under the Cash Pay Notes and CapEx Notes,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

11

1    but only after payment of the Class 4B Claims.

2         The Holders of ~~the 1st Tier Bond Secured~~ Class 4A, Class 4B and Class 4C Claims are

3    Impaired under the Plan and are entitled to vote on the Plan.

4    **E.** ~~**1st Tier**~~**Class 5 – Class 5A (1st Tier Bond Unsecured Claims), Class 5B (Ambac 1st Tier Bondholders' Surety** Bond Unsecured Claims ~~(~~), and Class ~~5).~~

6    **F.E.** ~~**The 1st Tier Bond**~~**5C (Ambac Insurance Unsecured Claims**~~, which consist of the Unsecured portion of the 1st Tier Bond Claims held by (i) the 1st Tier Trustee under the 1st Tier Note issued by the Debtor to the Director in accordance with the Financing Agreement and assigned by the Director to the 1st Tier Trustee, and the 1st and 2nd Tier Indenture and (ii) the 1st Tier Bondholders under the 1st Tier Bonds, are provided for in Class 5, which is an Impaired Class. In full and final satisfaction of 1st Tier Bond Unsecured Claims:~~**).**

9    ~~(d) The 1st Tier Note and 1st Tier Bonds shall be extinguished, cancelled, and discharged;~~

11   ~~(e) The 1st and 2nd Tier Indenture shall be superseded by the New Indenture; and~~

12   ~~On the Effective Date,~~ Holders of Unsecured Claim portion of the 1st Tier Bond Claims, the Ambac 1st Tier Bondholders' Surety Bond Claims, and the Ambac Insurance Claims, including the 1st Tier Trustee and Ambac, shall have no rights to payment under the 1st Tier Note from Reorganized LVMC and no rights under the Financing Agreement or the 1st and 2nd Tier Indenture against Reorganized LVMC after the Effective Date. Any obligations of the Debtor under the 1st Tier Note and the 1st and 2nd Tier Indenture shall be extinguished, cancelled, and discharged on the Effective Date, and the 1st Tier Note and the 1st and 2nd Tier Indenture shall continue in effect only as to parties other than Reorganized LVMC, including Ambac. Any term in the Plan to the contrary notwithstanding, nothing as contained in the Plan or the Confirmation Order shall affect:

    (a) The right and ability of the Director and the 1st Tier Trustee as provided for in the 1st and 2nd Tier Indenture to amend and restate the 1st and 2nd Tier Indenture with the assistance of Reorganized LVMC, as necessary and appropriate.

    (b) The rights of Holders of 1st Tier Bond Claims under the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond, and their rights under the 1st and 2nd Tier Indenture to the extent of pursuing claims

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

12

against the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond.

(c)  The powers, rights, privileges and immunities of the 1st Tier Trustee under the 1st and 2nd Tier Indenture as the 1st Tier Trustee deems reasonably necessary and appropriate with respect to the administration of its duties to the 1st Tier Bondholders, provided that the 1st Tier Trustee shall have no rights to receive indemnification or payment of its fees and expenses from Reorganized LVMC for fees and expenses incurred by the 1st Tier Trustee with respect to the Rehabilitation Proceedings or the TIP Proceedings.

Subclass 5A.  In full and complete satisfaction of any and all 1st Tier Bond Unsecured Claims (Class 5A Claims), the Holders of 1st Tier Bond Unsecured Claims shall receive (which Claims include, as of the Record Date, Claims of Ambac for 1st Tier Bonds purchased and held by Ambac), shall receive on the Effective Date a Pro Rata interest in the Capital Appreciation Notes discussed in Section VI.C.5, below.  The Capital Appreciation Notes shall be governed by the New Indenture and secured by the Security Documents.  Any obligations of the Debtor under the 1st Tier Note and the 1st and 2nd Tier Indenture shall be extinguished, cancelled, and discharged on the Effective Date..

The Holders of the 1st Tier Bond Unsecured Subclass 5B.  In full and complete satisfaction of the Unsecured Claim portion of any and all Ambac Surety Bond Claims (Class 5B Claims) against LVMC, Ambac's contribution and reimbursement rights with respect to the Ambac Surety Bond Claims, if any, shall be treated by participation in the Capital Appreciation Notes in an amount determined under applicable law and the 1st and 2nd Tier Indenture.

Subclass 5C.  In full and complete satisfaction of the Unsecured Claim portion of any and all Ambac Insurance Claims (Class 5C Claims) against LVMC, on the Effective Date Ambac shall retain its subrogation rights under the 1st Tier Bondholders' Insurance Policy as limited by 11 U.S.C. § 509(a) and (b), and pursuant to 11 U.S.C. § 509(c), Ambac shall have the right to assert those subrogation rights only after and to the extent of payment of the 1st Tier Bond Claims in full (or with such lesser amount accepted by the Holders in full and complete

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

13

1  satisfaction of the 1st Tier Bond Claims or as otherwise permitted under the governing

2  agreements and applicable law).  The Ambac subrogation rights with respect to the Unsecured

3  Claim portion of the Ambac Insurance Claims, if any, shall be limited to receipt of the balance

4  outstanding of the outstanding payment stream due under the Cash Pay Notes and CapEx Notes,

5  but only after payment of the Class 5B Claims.

6  The Holders of Class 5A, Class 5B and Class 5C Claims are Impaired and are entitled to

7  vote on the Plan.

8  **~~G.~~F.    2nd Tier Bond Claims (Class 6).**

9  Holders of the 2nd Tier Bond Claims, which consist of any and all Claims held by a 2nd

10  Tier Bondholder and the 2nd Tier Trustee under the 1st and 2nd Tier Indenture, the 2nd Tier

11  Bonds, the 2nd Tier Obligation, and the Financing Agreement, are provided for in Class 6 of the

12  Plan.  Holders of Class 6 Claims shall not receive or retain any property on account of their

13  Claims under the Plan, as the 2nd Tier Bond Claims are contractually subordinated to the 1st

14  Tier Bond Claims.  ~~The~~Any obligations of the Debtor under the 2nd Tier Obligation and any and

15  all obligations of the Debtor due under the Financing Agreement, the 1st and 2nd Tier Indenture,

16  and the 2nd Tier Bonds ~~will~~shall be extinguished, cancelled, and discharged.  The Holders of the

17  2nd Tier Bond Claims are Impaired, are deemed to have rejected the Plan, and are not entitled to

18  vote on the Plan.

19  **~~H.~~G.    3rd Tier Bond Claims (Class 7).**

20  Holders of the 3rd Tier Bond Claims, which consist of any and all Claims held by a 3rd

21  Tier Bondholder and the 3rd Tier ~~Trustees~~Trustee under the 3rd Tier Indenture, the 3rd Tier

22  Bonds, the 3rd Tier Note, and the Financing Agreement, are provided for in Class 7.  Holders of

23  Class 7 Claims shall not receive or retain any property on account of their Claims under the Plan,

24  as the 3rd Tier Bond Claims are contractually subordinated to the 1st Tier Bond Claims and 2nd

25  Tier Bond Claims.  ~~The~~Any and all obligations of Debtor under the 3rd Tier Note ~~will~~and any

26  and all obligations of the Debtor due under the Financing Agreement, the 3rd Tier Indenture, and

27  the 3rd Tier Bonds shall be extinguished, cancelled, and discharged.  The Holders of the 3rd Tier

28  Bond Claims are Impaired, are deemed to have rejected the Plan, and are not entitled to vote on

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

14

the Plan.

**I.H.    Director Claims (Class 8).**

The Holder of the Director Claims, which consist of any Claims of the Director arising under or related to the Financing Agreement (and by implication thereof its rights under the 1st and 2nd Tier Indenture) which are not part of the 1st Tier Bond Claims, 2nd Tier Bond Claims, 3rd Tier Bond Claims, or Subordinated Claims, are provided for in Class 8 of the Plan.  The Financing Agreement will be deemed extinguished and the Director will not receive or retain any property on account if such Claims other the any funds remaining in the "Indemnification Account" within the Contingency Fund as defined in the 1st and 2nd Tier Indenture.  The Director is a Third Party Releasee and on the Effective Date *__will receive the Third Party Release as provided for in Section 10.7 of the Plan__*.  The Director Claims are Impaired under the Plan and the Director is entitled to vote on the Plan.

**J.I.    Subordinated Claims (Class 9).**

Holders of Subordinated Claims, if any, are provided for in Class 9 of the Plan.  The Holders of Class 9 Claims shall not receive any distribution on account of such Claims.  Holders of Subordinated Claims are Impaired under the Plan, are not entitled to vote on the Plan, and are deemed to have rejected the Plan.

## IV.
## SUMMARY OF VOTING PROCESS

**A.    Who May Vote to Accept or Reject the Plan.**

Generally, holders of allowed claims or equity interests that are "impaired" under a plan of reorganization and who are receiving some cash or property on account of such claims or equity interests are permitted to vote on the plan.  A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor.  The Debtor, as a non-profit corporation, has issued no equity interests.  In order to vote, a creditor must have an allowed claim.  The solicitation of votes on the Plan will be sought only from Holders of Allowed Claims whose Claims are Impaired and who will receive property or rights under the Plan.  As explained further below, to be entitled to vote, a Person must be a Holder of a Claim that is both an

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

15

102200-002/Comparison

1    "Allowed Claim" and "Impaired."

2    **B.    Summary of Voting Requirements.**

3            In order for the Plan to be confirmed, it must be accepted by at least one Impaired Class

4    of Claims, excluding the votes of any Insiders within that Class.  A Class of Claims is deemed to

5    have accepted the Plan if and when allowed votes representing at least two-thirds in amount and

6    a majority in number of the Claims of the Class actually voting cast votes in favor of the Plan.

7            Holders of certain Impaired Classes of Claims will not receive or retain anything on

8    account of their Claims.  As such, they will be deemed to have voted against the Plan without the

9    need for them to cast votes or receive ~~voting~~ ballots.  This includes Class 6 (Second Tier Bond

10   Claims), Class 7 (Third Tier Bond Claims~~)~~), and Class 9 (Subordinated Claims).

11           The Debtor is soliciting votes only from Holders of Allowed Claims in the following

12   ~~three~~ Classes, which are Impaired under the Plan and are receiving or retaining something under

13   the Plan: Class 3 (General Unsecured Claims), Class 4 (~~1st Tier Bond Secured Claims), Class 5~~

14   (~~1st Tier Bond Unsecured~~ the Secured Claims portions of the 1st Tier Bond Claims, the Ambac

15   1st Tier Bondholders' Surety Bond Claims, and the Ambac Insurance Claims), Class 5 (the

16   Unsecured Claims portions of the 1st Tier Bond Unsecured Claims, the Ambac 1st Tier

17   Bondholders' Surety Bond Claims, and the Ambac Insurance Claims), and Class 8 (Director

18   Claims).

19           The Debtor has the right to supplement this Disclosure Statement as to additional

20   Impaired Classes, if any.  The treatment of each Class is described in the Plan and is summarized

21   generally in Articles III and VI of this Disclosure Statement.

22           **A VOTE FOR ACCEPTANCE OF THE PLAN BY HOLDERS OF CLAIMS WHO**

23   **ARE ENTITLED TO VOTE IS MOST IMPORTANT.  THE DEBTOR BELIEVES THAT**

24   **THE TREATMENT OF HOLDERS OF EACH OF THE** ~~GENERAL UNSECURED~~

25   ~~CLAIMS, 1ST TIER BOND SECURED CLAIMS, 1ST TIER BOND UNSECURED~~

26   ~~CLAIMS, AND DIRECTOR CLAIMS~~ **GENERAL UNSECURED CLAIMS, 1ST TIER**

27   **BOND CLAIMS, AMBAC 1ST TIER BONDHOLDERS' SURETY BOND CLAIMS,**

28   **AMBAC INSURANCE CLAIMS, AND DIRECTOR CLAIMS UNDER THE PLAN IS**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

16

1    THE BEST ALTERNATIVE FOR EACH OF THEM, AND THE DEBTOR

2    RECOMMENDS THAT THE HOLDERS OF THOSE ALLOWED CLAIMS VOTE IN

3    FAVOR OF THE PLAN.

## V.
### GENERAL INFORMATION ABOUT THE DEBTOR'S BUSINESS, RESTRUCTURING EFFORTS AND THE FILING OF THE BANKRUPTCY CASE

**A.    The Debtor's Business.**

   **1.    Corporate Background and Structure.**

The Las Vegas Monorail System, a public improvement (the "Monorail"), was first conceived as a joint venture between MGM Grand and Bally's Hotel, which in 1993 first created a one-mile transportation system linking the two hotels.  In 1997, the state of Nevada passed legislation which authorized a private company to own, operate, and charge fares as a public Monorail system.  On December 2, 1998, as authorized by statute, Clark County granted a franchise (the "Franchise") to MGM Grand-Bally's Monorail LLC ("MGM-Bally's LLC") to construct, operate, and maintain the Monorail through December 2, 2048 (as amended, the "Franchise Agreement").

On October 20, 1999, the Franchise Agreement was amended to, among other things, authorize transfer of the Franchise to a special-purpose Nevada corporation formed for the sole purpose of developing, acquiring, constructing, operating and improving the Monorail.  The Debtor was incorporated in May 2000 as a Nevada not-for-profit corporation organized for the purposes set forth in the amended Franchise Agreement.  The Debtor was established to finance, acquire, develop, construct, operate, and maintain the Monorail.[7]  In September 2000, upon the formation of the Debtor, the Debtor acquired the original Monorail system from MGM-Bally's LLC and commenced extension of the system to its current state of seven stations.

The Debtor is a Section 501(c)(4) organization under federal tax law and has been granted sales/use tax exempt status as a charitable or non-profit organization pursuant to Nevada

---

[7] In accordance with its organizational documents, each year the Board of Directors of the Debtor (the "Board") adopts a budget which is submitted to the Governor of the State of Nevada for approval.  In addition, in accordance with organizational documents, the Debtor is required to have audited financial reports prepared.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

17

Revised Statutes ("NRS") 372.3261.  As a nonprofit entity, no part of the Debtor's net earnings may inure to the benefit of anyone other than the Governor of the State of Nevada on behalf of the State or a designated agency of the State upon dissolution, liquidation, or winding up.  The Debtor thus has no capital stock or equity holders.

Upon the Debtor's acquisition of the Monorail from MGM-Bally's LLC, the Franchise Agreement was assigned to the Debtor on August 8, 2000.  The term of the Franchise Agreement currently extends through December 31, 2107.  The Franchise Agreement grants to the Debtor as the franchisee the Franchise to construct and operate the Monorail, including the exclusive right to extend the Monorail to McCarran International Airport.

**2.      Operations.**

The Monorail is a state-of-the-art, fully-automated, driverless rail system that runs above the streets along the east side of Las Vegas Boulevard (a/k/a the "Las Vegas Strip").  It is the first driverless public monorail system in the world.[8]  The existing operations provide convenient and cost-effective transportation between its seven stations.  The Debtor's business focuses on making the Monorail an easy and convenient connection to the Las Vegas Strip and the Las Vegas Convention Center.

Though the Debtor benefits from its tax-exempt status as a nonprofit entity, it is the first privately-owned public transportation system in the nation to be funded solely by fares and advertising.  No other U.S. public transit system finances its operations solely through fare and advertising revenues.  The Debtor receives no governmental financial support or subsidies.

The Monorail currently has seven stations along a 3.9-mile route: MGM Grand, Bally's/Paris Las Vegas; Flamingo/Caesars Palace; Harrah's/Imperial Palace; Las Vegas Convention Center; Las Vegas Hilton; and the Sahara.[9]  It travels the 3.9-mile route in 15 minutes or less, and reaches speeds of up to 50 miles per hour.  It is capable of moving 3,200

---

[8] The Monorail is an "automated guideway," defined by the Federal Transit Administration as an electric railway of guided transit vehicles operating without vehicle operators or other crew onboard the vehicles.

[9] As is more fully discussed in this Disclosure Statement, the Sahara Hotel has announced that it will closeclosed on or about May 1516, 2011.  However, the Sahara station will continue to operate sincebecause it is not located on the Sahara Hotel property. and is expected to continue to generate passengers.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

18

passengers per hour in each direction.  The Monorail operates 365 days per year, 19 hours per day during the week and 20 hours each day Friday through Sunday.

The Monorail consistently runs at more than 99 percent operational efficiency.  During the past 4.5 years of full operations, the Monorail has carried more than 40,000,000 riders with a goal of further improving mobility in what is nationally recognized as one of the most congested corridors in the United States, the Las Vegas Strip corridor.  The Monorail carried 5,240,263 riders in 2010; 6,005,024 riders in 2009; 7,602,599 riders in 2008; 7,917,613 riders in 2007; and 7,015,109 in 2006.  During large conventions such as the Consumer Electronics Show, the Monorail carries more than 70,000 people into and out of the Las Vegas Convention Center over the course of a four-day event.  This is the equivalent of over 23,000 three-passenger taxi trips or over 1,200 55-passenger bus trips.

The Monorail ranks as one of the highest in terms of fare revenues per passenger trip among automated guideways and light rail systems, and first when compared to other automated guideways only.  Specifically, the Monorail generates more revenue per mile of system than any other automated guideway or light rail system, and is only second in total annual revenue generation to Boston's MBTA system.[10]

The Debtor has consistently generated operational profits; however, as explained more fully below, these operational profits have not been sufficient to service its debt and provide for its future required expenditures for replacement and repair of capital assets ("CapEx").  The Debtor generates revenue from two primary sources.  The largest component of the Debtor's revenues is derived from ticket purchases (the "Fare Revenues").  Approximately 263,350 tickets are sold at 42 ticket vending machines (the "TVMs") each month, at which customers generally may pay in cash or coins, or with a debit or credit card.  Customers may also purchase tickets online.  Customers may purchase a one-way fare for $5 at a TVM or online; an all-day pass for $14 at a TVM or $12 online; or a 3-day pass for $28 at a TVM or online, while Las Vegas residents can purchase a daily maximum of two local $1 one-way tickets at customer service

---

[10] National Transit Database 2007 Statistics, available at www.ntdprogram.gov.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

19

booths located at the Sahara and MGM Grand stations.  Total Fare Revenues for 2010 were $23,391,078 compared to ~~2009 which were~~ $26,990,995 in 2009.  Total Fare Revenues were $29.7 million for 2008 and $29.4 million for 2007. During the first 3 months of 2011, total Fare Revenues were $5,983,001 compared to $5,944,634 for the first 3 months of 2010, an increase of 0.6%.

The other major component of the Debtor's revenue is derived from the sale of advertising space on the Monorail (the "Ad Revenues").  Total Ad Revenues for 2010 were $161,495 compared to ~~2009 which were~~ $424,443 for 2009.  Total Ad Revenues were $1,418,844 for 2008 and $2,303,799 for 2007.

The Debtor generated $23,552,572 in total revenue for 2010[11] compared to $27,415,438 in total revenues for 2009[12], which consist of Fare Revenues and Ad Revenues along with miscellaneous revenues for vending and concessions.  The Debtor generated $31,097,597 in total revenues in 2008,[13] and $31,750,582 in total revenues in 2007[14].  During the first 3 months of 2011 total revenues were $6,095,791 compared to $5,982,938 for the first 3 months of 2010, an increase of 1.9%.

As is more fully discussed below, revenues in all categories have decreased over the past ~~4~~ few years, primarily a result of the national recession which has impacted Las Vegas through the loss of visitors.  The Monorail has been especially impacted by the downturn in convention business and attendance and in visitors arriving by air.

### 3.      The Debtor's Prepetition Management Structure.

#### a.      The Board of Directors.

As a nonprofit company, no person or entity holds an equity interest in the Debtor.  The Board is appointed by the Governor of the State of Nevada and is currently comprised of five

---

[11] This number is subject to finalization upon completion of Auditor's Report for 2010

[12] Source: Auditor's Report for 2009.

[13] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008; Las Vegas Monorail Company Financial Statements for the Years Ended December 31, 2008 and 2007 and Independent Auditor's Report ("Auditor's Report"), available at http://www.lvmonorail.com/corporate/.

[14] Source: Auditor's Report.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

20

1   members.   The current Chairman of the Board is Donald L. "Pat" Shalmy, and the other

2   members of the Board are Bruce L. Woodbury, Marcus "Mike" Sloan, Anthony Santo, and

3   Robert Beers.  The Plan proposes that the current members of the Board will continue in place

4   and that two additional board members selected by the ~~First~~1st Tier Bondholders holding the

5   Cash Pay Notes and  CapEx Notes will be added to the Board subject to appointment by the

6   Governor.

7           Mr. Shalmy was first appointed to the Board on January 1, 2000.  During his career he

8   has served as a senior vice president and president of Nevada Power Company, director of

9   government and community relations for Kummer, Kaempfer, Bonner and Renshaw, and

10  president of the Las Vegas Chamber of Commerce, the third largest such chamber in the United

11  States.  Mr. Shalmy dedicated over three decades of work to the public sector, culminating as

12  Clark County manager.

13          Mr. Woodbury was appointed to the Board on February 1, 2009.  He dedicated nearly 28

14  years to public service as the representative for Clark County Commission District A.   Mr.

15  Woodbury served as Chairman of the Regional Transportation Commission Board of

16  Commissioners for more than 16 years, as well as Chairman of the Board of County

17  Commissioners, Big Bend Water District Board of Trustees, and the Clark County Air Quality

18  Management Board.  He was a member on the Las Vegas Valley Water District Board of

19  Directors, University Medical Center Board of Trustees, Henderson Chamber of Commerce

20  Board of Directors, and the Las Vegas Springs Preserve.  He is a partner with the law firm of

21  Jolley, Urga, Wirth, Woodbury & Standish.

22          Mr. Sloan was appointed to the Board on April 1, 2009.  Until his retirement following

23  the acquisition of Mandalay Resort Group by MGM Mirage in 2005, Mr. Sloan was a senior

24  corporate executive with that company for 20 years.  He joined Mandalay Resort Group in 1985

25  as Vice President, General Counsel, and Secretary, having primary responsibilities for directing

26  the company's legal department as well as labor and government relations.  In addition, Mr.

27  Sloan was actively engaged in the planning, development and construction of the company's

28  numerous new projects, including the Excalibur Hotel and Casino, Luxor Hotel and Casino and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

the Mandalay Bay Resort.  Beginning in 1997, Mr. Sloan gave up day-to-day supervision of the legal department in order to concentrate on the planning and development of the company's premiere property, Mandalay Bay, focusing on the development and location of new entertainment and restaurant venues for the project.  Mr. Sloan has been chairman and served on the board of Nevada Resort Association for over 20 years.  Prior to his career as a gaming executive, Mr. Sloan was elected Las Vegas City Attorney and later served as a Nevada state senator.  He also worked as the press secretary for United States Senator Alan Bible, and as a deputy attorney general for the Nevada Gaming Division, providing legal advice for the Nevada Gaming Commission and Nevada Gaming Control Board.  He is a founding trustee and past president for the National Association for Gaming Lawyers and past chairman of the Gaming Law Committee of the American Bar Association.

Mr. Santo was appointed to the Board on April 1, 2009.  He is a 28-year veteran in the gaming industry and is currently consulting in the gaming and hospitality businesses for operational reviews and potential acquisitions.  Mr. Santo served in various senior management roles with Caesars Entertainment, and upon its acquisition, Harrah's Entertainment, Inc. Throughout his career, he managed multiple hotel/casino properties.  Mr. Santo was appointed as Senior Vice President of Western and Mid-South Regions for Caesars Entertainment, as President of Paris Las Vegas, Bally's Las Vegas, Flamingo Las Vegas, Las Vegas Hilton, Reno Hilton, and Flamingo Reno.  He served as Senior Vice President of Operations, Products and Services for Harrah's Entertainment, Inc. where he managed the company's domestic and international operations.  Mr. Santo previously served on the boards of Las Vegas Events, the Culinary Training Academy of Las Vegas, UNLV's Harrah Hotel College Alumni Association, the Las Vegas Convention and Visitors Authority, and the Reno-Sparks Convention and Visitors Authority.

Mr. Beers was appointed to the Board on April 1, 2009.  He is the managing partner for Seale and Beers, CPAs, a PCAOB-registered auditing firm.  He is also the chief financial officer for a start-up tequila importer.  Previously, he owned and operated Wilson, Beers and Alu, a computer systems company, from 1989 to 2002, when he sold the company to a large regional

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

22

accounting firm. In 2004, Mr. Beers was elected to a four-year term in the Nevada Senate. Prior to his senate election, Beers served six years as a Nevada assemblyman.

Each of the members of the Board provide the Debtor with enormous experience and expertise in the areas of legislative affairs or national or regional transportation policy, and the Debtor substantially benefits from the Board members' relationships with the Nevada Legislature, the Transportation Security Administration, the Department of Transportation, Clark County and the Regional Transportation Commission, and the executives of casinos on the Strip. The knowledge, experience, and relationships that each member of the Board brings to the company are crucial to the Debtor's successful emergence from Chapter 11.

b.      Chief Executive Officer.

Curtis L. Myles, III serves as President and Chief Executive Officer of the Debtor and has served in that capacity since July 18, 2005. Prior to joining the Debtor, Mr. Myles served as Deputy General Manager of the Regional Transportation Commission of Southern Nevada from May 2002 to July 2005; Assistant Director of Aviation for McCarran International Airport from June 1995 to May 2002; Operations Manager and Management Analyst for McCarran International Airport from July 1991 to June 1995; and Sales Manager for Northwest Transport Services from 1986 to 1991. In his capacity as the Debtor's President and Chief Executive Officer, Mr. Myles oversees the Debtor's daily business, operational, and financial affairs. In addition, he is responsible for implementing the policies of and actions taken by the Board.

Pursuant to an Employment Agreement dated August 20, 2008, Mr. Myles originally received annual compensation of $346,200, along with employment benefits available to other employees of the Debtor. The Employment Agreement commenced August 21, 2008 and the initial term will end August 20, 2011. After the initial term of employment ends, Mr. Myles' continued employment is at the will of the Board and may terminate at any time thereafter by written notice, unless otherwise agreed to by the parties. As of May 4, 2010, Mr. Myles' annual compensation was voluntarily reduced to $273,240 in conjunction with a general reduction of salaries for Debtor's employees.

Mr. Myles' knowledge of regional transportation policy and the relationships he has

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

23

1  developed with key people at Clark County government, the Regional Transportation

2  Commission of Southern Nevada, the Transportation Security Administration, McCarran

3  International Airport, and the U.S. Department of Transportation, along with local resort and

4  business community leaders, render him uniquely capable of guiding the Debtor through its

5  emergence from Chapter 11 and securing future funding for the Monorail.

6       **4.       The Debtor's Relationship with Bombardier and CapEx Requirements.**

7       Though the Debtor employs approximately 30 employees, including security personnel,

8  most of the physical operations of the Monorail are conducted by Bombardier Transportation,

9  Inc. ("Bombardier"), with whom the Debtor contracted to operate and maintain the Monorail

10  trains, automatic train controls, and other control subsystems pursuant to a~~a~~the Monorail

11  Operations and Maintenance Agreement dated July 14, 2004 (the "Bombardier Agreement").

12  Bombardier has more than 35 years of operations and maintenance experience, providing a range

13  of operation and maintenance services for fully automated systems in cities around the world,

14  including New York, Miami, San Francisco, Kuala Lumpur, Beijing, and London.

15       The initial term of the Bombardier Agreement was for 5 years with two 5-year options.

16  In January 2009, Bombardier was awarded the first 5-year option to continue to operate the

17  system.  There remains one additional 5-year option, which if exercised, will allow the Debtor to

18  continue the Bombardier Agreement until 2019, at which time a new operation and maintenance

19  agreement will need to be negotiated.  The costs of a new contract are unknown, but it is not

20  expected to be less than the cost of the existing Bombardier Agreement.

21       The Debtor paid approximately $16,954,878 to Bombardier for operation and

22  maintenance of the Monorail in 2009.  In 2010, the Debtor paid approximately $14,562,401 to

23  Bombardier for operation and maintenance of the Monorail.

24       While the scope of the Bombardier Agreement includes normal maintenance and repair,

25  along with some replacement costs which costs are paid pursuant to a Capital Asset Replacement

26  Program, it does not include ~~capital expenditures ("CapEx").~~.  In the case of the Debtor, CapEx

27  includes the costs of replacement and repair of train control systems, Monorail escalators,

28  workshop equipment, communication systems, traction power systems/PDS, platform doors,

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

24

guideway elements, Monorail elevators, fare collection equipment, maintenance recovery vehicles, and the Monorail trains themselves.

**5.    Description of the Debtor's Assets and Liabilities.**

The Debtor's assets are identified in its Schedule A [ECF No. 244] and its Amended Schedule B [ECF No. 289]. The Debtor's physical assets consist primarily of the Monorail's stations, tracks, and trains, along with cash on hand and miscellaneous personal property appurtenant to the operation of the Monorail. The Monorail's stations, tracks, and trains are not subject to a security interest. The Debtor holds various easements which allow the Monorail tracks to run along private property and allow for the Monorail's stations. The Debtor also holds an exclusive north/south service franchise pursuant to the Franchise Agreement (on the east side of Las Vegas Boulevard between MGM Grand Hotel to the south and the Sahara hotel-casino on the north). The Franchise Agreement allows the Monorail tracks to run across property owned by Clark County.

The Debtor owns certain intellectual property, primarily consisting of domain names related to the Monorail. The Debtor maintains several insurance policies, including property, casualty, and terrorism insurance, and directors' and officers' liability. The Debtor holds contract and lease rights, including contracts for credit and debit card acceptance services, a land lease for its operation and maintenance facilities, and most significantly, the Bombardier Agreement. The Debtor also owns causes of actions, claims, and a judgment, discussed further in Section VIII.A.2, below.

The Debtor's liabilities consist primarily of its obligations under the Financing Agreement and the 1st Tier Note in the face amount of $451,448,217.30, the 2nd Tier Obligation in the face amount of $158,749,493.40, and the 3rd Tier Note in the face amount of $48,500,000. The Debtor estimates that it has approximately $150,000 to $175,000 in trade Claims, and approximately $15,000 in Priority Tax Claims, Other Priority Claims, and Other Secured Claims. The Debtor is also liable for the contingent and unliquidated Claim of the Director under the Financing Agreement, and the contingent and unliquidated Claim of Ambac representing Ambac's subrogation rights under the 1st Tier Bondholders' Insurance Policy, along with

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    Ambac's Claim for reimbursement or contribution under the 1st Tier Bondholders' Surety Bond

2    in the amount of $20,532,771.15.

3    **B.    The Debtor's Prepetition Debt Structure.**

4    **1.    _Bonds Issuance by State of Nevada._**

5    In September 2000, the Director of the State of Nevada Department of Business and

6    Industry (the "Director"), issued tax-exempt bonds (collectively, the "Bonds") for construction

7    and operation of the Monorail as follows:[15]

8    (a)    Pursuant to the 1st and 2nd Tier Indenture with Wells Fargo Bank, N.A.

9    ("Wells Fargo" or "1st Tier Trustee") as 1st Tier Trustee dated September 1, 2000, the

10    Director issued the 1st Tier Bonds, consisting of $352,705,000 in 1st tier current interest

11    bonds and $98,743,217.30 in 1st tier capital appreciation bonds, to the 1st Tier Trustee

12    on behalf of the 2st Tier Bondholders, payable in part through 2040;

13    (b)    Pursuant to the 1st and 2nd Tier Indenture, the Director also issued the 2nd

14    Tier Bonds, consisting of $149,200,000 in 2nd tier current interest bonds, to Wells Fargo

15    as 2nd tier trustee on behalf of the 2nd Tier Bondholders;[16] and

16    (c)    Pursuant to 3d the 3rd Tier Indenture also dated September 1, 2000

17    (collectively with the 1st Tier and 2nd Tier Indenture, the "Indentures"), the Director

18    issued the 3d Tier Bonds, consisting of $48,500,000 in subordinate capital appreciation

19    bonds, in favor of Wells Fargo as 3rd tier trustee[17] in favor of the 3rd Tier Bondholders

20    (together with the 1st Tier Bondholders and 2nd Tier Bondholders, the "Bondholders").

21    The Bond proceeds were used for partial financing of the acquisition, construction,

22    improvement and equipping of the Monorail as well as for principal and interest payment

---

[15] However, as more fully explained below, the Bonds are non-recourse to the State of Nevada.

[16] On or about December 20, 2009 January 5, 2010, the District Court of Hennepin County, Minnesota appointed U.S. Bank, N.A. National Association as the Co-Trustee of the successor indenture trustee with respect to the 2nd Tier Bonds pursuant to the request of Wells Fargo in its _Verified Petition for the Appointment of a Co-Trustee_ and _for Instruction in the Administration of a Trust Pursuant to Minn. Stat. § 501B.16_. Wells Fargo co-trustee under the 1st and U.S. Bank, N.A. are collectively defined hereafter as the "2nd Tier Trustees." Indenture.

[17] Law Debenture Trust Company of New York has been appointed as co-successor indenture trustee of with respect to the Las Vegas Monorail Project Revenue Bonds 3rd Tier Bonds and is collectively defined with Wells Fargo hereafter as the "3rd Tier Trustees." Series 2000 A-1.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

26

reserves and a separate reserve in favor of Clark County for the removal of the improvements in the public right-of-way (the "Removal Fund Account"), which is in the name of and under the sole control of Clark County. The public right-of-way is only a portion of the 3.9 mile guideway system. There are no funds reserved for the removal of the portion of the guideway which is not part of the public right-of way. As of January 1, 2011, there was $7,903,567 in the Removal Fund Account.

The 1st Tier Bonds are special, limited obligations of the Director, and the principal, premium, if any, accreted value, and interest on the 1st Tier Bonds are payable (except to the extent payable from Bond proceeds) solely from and are secured by a pledge of the net revenues to be made under the Financing Agreement after payment of operation and maintenance costs of the Monorail (as more fully discussed below) and prior to the payment of debt service with respect to the 2nd Tier Bonds.

Payment of principal and interest on the 1st Tier Bonds is insured by Ambac Assurance Corporation ("Ambac"). To the extent any 1st Tier Bond payments are not made when due, Ambac is obligated to pay such amount upon notice pursuant to an insurance policy (the "1st Tier Bondholders' Insurance Policy"). Additionally, a 1st Tier Surety Reserve Bond (the "1st Tier Bondholders' Surety Bond") of $20,991,807.50 was issued by Ambac to be available for payments on the 1st Tier Bonds to the extent that the Debtor was unable to meet debt service on the 1st Tier Bonds. The Debtor was unable to meet the full debt service obligations due on July 1, 2009, and $3,767,799.27 was drawn on the 1st Tier Bondholders' Surety Bond on July 1, 2009. On January 1, 2010, principal and interest on the 1st Tier Bonds came due in the amount of $16,764,971.88. The Debtor was unable to satisfy the debt service, and on or about January 1, 2010, the entire amount of $16,764,971.88 due to the 1st Tier Bondholders was drawn against the 1st Tier Bondholders' Surety Bond.[18] The Debtor understands that the remaining balance on

---

[18] On or about November 16, 2009, Wells Fargo, without notice to the Debtor, withdrew approximately $2.6 million from the Debtor's accounts at Wells Fargo, including $1,898,328 from the 1st Tier Debt Service Fund, for payments and indemnifications provided to Wells Fargo and the Director under the Indentures. The 1st Tier Debt Service Fund was designated for the payment of the 1st Tier debt service obligations due January 1, 2010. Though Wells Fargo subsequently returned some of the funds, it retained the deposits designated for payment of the 1st Tier Debt Service Fund.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1  the 1st Tier Bondholders' Surety Bond is $416,305.52.[19]

2      **2.    Financing Agreement with State of Nevada.**

3      The Debtor is not a party to the 1st and 2nd Tier Indenture or the 3rd Tier Indenture, the

4  Guaranty, (discussed below), or the 1st Tier Bondholders' Insurance Policy, but is obligated

5  under the Financing Agreement, dated September 1, 2000 (the "Financing Agreement"), between

6  the Debtor and the Director, as well as being the maker of the 1st Tier Note and 3rd Tier Note,

7  and being the obligor under the 2nd Tier Obligation, which were concurrently assigned to Wells

8  Fargo as security for payment under the Indentures.  The proceeds of the sale of the Bonds were

9  advanced by the Director to the Debtor pursuant to the Financing Agreement.

10      Under the Financing Agreement, the security interest granted to the Director is limited to

11  the following: (i) Contract rights of the Debtor under the Purchase Agreement, the Design-Build

12  Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the

13  Franchise Agreement, each as defined in the Franchise Agreement (the "Project Agreements");

14  (ii) Any "Net Project Revenues," defined in the 1st and 2nd Tier Indenture as "Project

15  Revenues" minus "Operation and Maintenance Costs;"[20] and (iii) All amounts held in any funds

16  or accounts created under the Indentures, all money and funds earned or accrued on any deposit

17  of Net Project Revenues, and related collateral serving as proceeds of the foregoing.  The

18  Director assigned most of its rights under the Financing Agreement to Wells Fargo as security

19  for payment under the Indentures, reserving its right to reimbursement of expenses and

[19] The 2nd Tier Bonds are not insured.  The Debtor was unable to pay any of the interest in the amount of $3,689,360.07 which came due on the 2nd Tier Bonds on July 1, 2009, and was unable to pay any of the interest in the amount of $5,493,875 which came due on the 2nd Tier Bonds on January 1, 2010.  The 3rd Tier Bonds are also uninsured.

[20] "Project Revenues" are defined in the 1st and 2nd Tier Indenture as:

all gross income and revenue received or receivable by [the Debtor] from the ownership, operation or use of the Project, including all fees and charges received by [the Debtor] for the use of the Project, including but not limited to farebox revenues, business interruption insurance, advertising revenues, licensing fees, rent, sponsorship income, other contractual revenues, interest earnings on funds held hereunder or by [the Debtor] (excluding the Construction Fund, Contingency Fund, and Rebate Fund) liquidated damages, payments under performance or completion bonds or under the Project Agreements, and all other income and revenue howsoever derived by [the Debtor] from the ownership, operation or use of the Project or dedicated by [the Debtor] or any other person to support the Project, and such other revenues as may be designated by [the Debtor] in the Agreement, but excluding in all cases any refundable deposits made to establish credit and advances or contributions in aid of construction received during such Fiscal Year.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

28

1    indemnification.

2            Under the 1st and 2nd Tier Indenture, the Director pledged to Wells Fargo all Revenues

3    and other amounts held under any accounts created pursuant to the 1st and 2nd Tier Indenture to

4    secure the payment of principal and interest on the 1st Tier Bonds and 2nd Tier Bonds.[21]

5    "Revenues" are defined in the ~~Senior~~ 1st and 2nd Tier Indenture as:

6                 all moneys received by the Director or the Trustee for the account of the
        Director pursuant or with respect to the Agreement for the benefit of the Senior
7        Bonds, including, without limiting the generality of the foregoing, Senior Loan
        Repayments (including both timely and delinquent payments, any late charges,
8        and paid from whatever source), prepayments, and all interest, profits or other
        income derived from the investment of amounts in any fund or account
9        established pursuant to this Senior Indenture, but not including any
        Administrative Fees and Expenses or any moneys paid for deposit into the
10        Rebate Fund.  Revenues do not include Project Revenues deposited with the
        Trustee pursuant to the last paragraph of Section 4.1(b) of the Financing
11        Agreement until such moneys are used to make a Senior Loan Repayment.

12            As such, the 1st Tier Bond Claims are secured by a pledge of and a first lien on

13    Revenues.   The 2nd Tier Obligations are secured by a junior and subordinate pledge and lien.

14    The 3rd Tier Bond Claims are secured by a similar pledge and lien, setting forth a lien on

15    revenues held specifically for the benefit of the 3rd Tier Bond Claims, which lien is subordinate

16    to the liens securing the 1st Tier Bond Claims and 2nd Tier Obligation.  The Debtor never

17    pledged as security to the Director, the Trustee, Ambac or any other party the equipment or other

18    hard assets of the Monorail, including the stations and tracks.  Further, the Debtor never granted

19    a security interest in accounts receivable or in contract rights other than those specifically

20    described in the Financing Agreement.

21            Pursuant to each of the Indentures, under no circumstance is the Director obligated to pay

22    principal or interest due on the 1st Tier Bonds and 2nd Tier Bonds or any other related costs

23    upon acceleration, redemption, or otherwise, except from Revenues and funds pledged under the

24    Financing Agreement and 1st and 2nd Tier Indenture.  Bondholders have no recourse against the

25    Director or property owned by the State of Nevada.  Thus, while the Director has an absolute and

---

[21] Excepting the Indemnification Account and the Rebate Fund (as defined in the Senior Indenture).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

29

unconditional obligation to pay principal and interest due on the 1st Tier Bonds and 2nd Tier Bonds, such obligation extends only to payment out of Revenues and other pledged assets.

The Director is obligated to reimburse any funds drawn from 1st Tier Bondholders' Surety Bond coverage pursuant to a Guaranty Agreement (the "Guaranty"), under which the Director granted to Ambac a security interest securing payment of all amounts due under the Guaranty, "[t]o the extent, but only to the extent, that the Indenture pledges to the [1st Tier Bondholders] or any Trustee therefore, or grants a security interest or lien in or on any collateral property, revenue or other payments in order to secure the [1st Tier Bonds]."

~~Once the Surety Bond is drawn in full, there will be no further reimbursements of funds to Ambac by the Director on account of the Guaranty.~~ Both the Financing Agreement and 1st and 2nd Tier Indenture explicitly limit the liability of the Director and the State of Nevada. Specifically, Section 3.9 of the Financing Agreement provides that "Anything in this Agreement to the contrary notwithstanding, any obligation the Director may incur in connection with the undertaking of the Project for the payment of money shall not be deemed to constitute a debt or general obligation of the Director, the State, or any political subdivision thereof, but shall be payable solely from the revenues and receipts received by it under this Agreement…" Section 7.01 of the ~~Senior~~ 1st and 2nd Tier Indenture provides, in part, that "THE BONDHOLDERS SHALL HAVE NO RECOURSE AGAINST THE DIRECTOR OR ANY PROPERTY NOW OR HEREAFTER OWNED BY THE STATE OF NEVADA IN THE EVENT THAT SUCH REVENUES AND FUNDS ARE INSUFFICIENT TO MAKE SUCH PAYMENTS…" (emphasis in original).

Under the Plan, the Cash Pay Notes, the CapEx Notes, and the Capital Appreciation Notes (collectively, the "Restructured Obligations") shall be issued directly by Reorganized LVMC and shall be secured in the Franchise and all other ~~existing~~ assets of Reorganized LVMC, and the cash proceeds and rents, issues and profits generated therefrom. The obligations of the Director under ~~Franchise~~ the Financing Agreement and the Indentures shall be extinguished.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

C.    **Events Leading to the Bankruptcy Case.**

  1.    <u>**Financial Performance.**</u>

The three individual drivers of revenue of the Monorail are Las Vegas visitor volume, the Monorail's market share of visitors (the percentage of visitors who use the Monorail) and fare yield (revenue per individual passenger).   The revenue drivers with the greatest impact on incremental cash flow are visitor volume and market share, both of which are generally out of the control of the Monorail.   The revenue driver most controllable by the Monorail is fare yield, which has the least impact on cash flow.

The Debtor achieved operational profits in 2006 and has remained profitable at an operational level since that time.   The Debtor's revenues are sufficient to satisfy all costs of operation and maintenance of the Monorail.   The Debtor's recent operational performance has been as follows:

| | 2007[22] | 2008[23] | 2009[24] | 2010[25] | Period Ending March 31, 2011[26] |
|---|---|---|---|---|---|
| Program Revenues | $31,750,582 | $31,097,597 | $27,415,438 | $23,552,572 | $6,095,791 |
| Fare Revenues | $29,446,783 | $29,678,753 | $26,990,995 | $23,391,077 | $5,983,001 |
| Ad Revenues | $2,303,799 | $1,418,844 | $424,443 | $161,495 | $112,790 |
| Investment Income | $4,203,774 | $2,208,294 | $227,588 | $6,009 | $5,074 |
| Miscellaneous Income | $630,333 | $75,775 | $0 | $0 | $0 |
| Total Revenues | $36,584,689 | $33,381,666 | $27,643,026 | $23,558,581 | $6,100,865 |
| Compensation and Employment Benefits | $3,230,727 | $3,085,834 | $2,522,622 | $2,289,329 | $473,336 |

[22] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2007; Auditor's Report.

[23] Source: Debtor's Form 990 (Return of Organization Exempt From Income Tax) for the year 2008; Auditor's Report.

[24] Source: Las Vegas Monorail Company Financial Statements for the Years Ended December 31, 2009 and 2008 and Independent Auditor's Report.

[25] These figures are derived from the Debtor's monthly operating reports, and as of the date of this Disclosure Statement, are unaudited.

[26] These figures are derived from the Debtor's books and records, and as of the date of this Disclosure Statement, are unaudited.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

|  | **2007**[22] | **2008**[23] | **2009**[24] | **2010**[25] | **Period Ending March 31, 2011**[26] |
|---|---|---|---|---|---|
| Bombardier Transportation, Inc. | $15,322,237 | $16,675,678 | $16,954,878 | $14,562,401 | $2,735,438 |
| Other Operational Expenses | $5,689,221 | $5,399,925 | $3,739,391 | $2,365,153[27] | $1,170,079 |
| Total Operational Costs and Expenses | $24,242,185 | $25,161,437 | $23,216,891 | $19,216,884 | $4,378,853 |
| Net Income From Operations[28] | $12,342,504 | $8,220,229 | $4,426,135 | $4,341,697 | $1,722012 |
| Riders | 7,917,613 | 7,602,599 | 6,005,000 | 5,240,263 | 1,306,134 |

Under the economic circumstances prevailing at the time of the formation of the Debtor and the incurrence of the debt obligations described above, forecasts indicated that the Debtor would be able to generate an operating profit (net cash flow) sufficient to operate the Monorail and service the Bonds. However, these projections proved wrong and ridership and resulting revenues as well as advertising revenues never reached projected levels. While the Monorail generates net positive cash flow, it has been insufficient and is projected to remain insufficient to meet both the Debtor's existing debt service requirements and to fund CapEx needs beginning in 2019.

Beginning in 2008, the economy in the United States began to sharply decline, not only in the hotel and gaming industry, but throughout virtually every business sector. This severe world-wide recession had a much more dramatic impact on the Las Vegas economy given its reliance on the hotel, gaming and convention business. The Debtor was sharply impacted by the downturn and contraction in southern Nevada's core tourism industry. Through the first six months of 2009, ridership was down 24.9% compared to the same period of 2008. Though the Monorail carried 7,602,599 riders in 2008, it carried only approximately 6,005,000 riders during 2009, substantially less than preceding years and substantially less than projected, which generated $27,415,438 in revenues, resulting in less than $5,000,000 in net cash flow (or operating profit, excluding depreciation expense). In 2010, the Monorail carried only 5,240,263

---

[27] Exclusive of depreciation, amortization, and restructuring related professional fees.

[28] Exclusive of depreciation, amortization, and restructuring related professional fees.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

32

riders, which generated 23,558,581 in revenues and resulting in a net cash flow of less than $5,000,000 (again excluding depreciation expense). Ignoring reserves for CapEx, approximately $38,000,000[29] is required to maintain debt service each year, far exceeding the operating profits.

Data reported by the Las Vegas Convention and Visitor's Authority confirms that the cyclical pattern of visitor volume marked a considerable decline in late 2008 and 2009.[30] Compounding the effects of low visitor volume on ridership is the reduced level of convention attendance.[31] To cut costs, firms have downsized, relocated, or cancelled conventions. As a result, 2009 experienced significantly less convention attendance, cutting away a key demographic of the Monorail's customers.

In sum, while the Monorail's financial problems existed from the beginning of its operations given the significantly lower than projected ridership and farebox and advertising revenues, the problems were exacerbated due to declining tourism and the consequent decrease in hotel and Convention Center bookings and people deplaning at McCarran International Airport, and the number of riders on the Monorail has not met projections formed prior to the economic collapse. As the projections (as discussed below) indicate, as the Las Vegas economy improves (specifically with regard to tourism and convention business), it is anticipated that the Monorail revenues will improve.

### 2. Economic Pressures and Requirements.

---

[29] This figure is derived from interest due in each of 2010, 2011, and 2012 for the 1st Tier Current Interest Bonds and 2nd Tier Current Interest Bonds. This does not include any principal or interest on the 1st Tier Capital Appreciation Bonds or the 3rd Tier Bonds.

[30] The Las Vegas Monorail Ridership Study concluded that 97% of the Monorail's riders are visitors. Las Vegas Monorail Ridership Study, GLS Research, March 2006. See Year-To-Date Executive Summaries for 2005, 2006, 2007, 2008, and 2009, available at http://www.lvcva.com/press/statistics-facts/index.jsp.

[31] See id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

33

1  Both the Debtor and Conway, Del Genio, Gries & Co., LLC ("CDG")[32] (prior to its

2  termination) prepared projections of revenue and expenses for 2010 through 2040, and each

3  contains analyses of the Debtor's CapEx requirements from 2012 through 2040.[33]  CDG's

4  CapEx analysis determined that the Monorail will require $362,865,726 in 2009 Dollars (without

5  regard to inflation) for CapEx from 2012 through 2040 (the "CDG CapEx Projection").  The

6  Debtor requested that Bombardier also analyze CapEx requirements from 2012 through 2040.

7  This analysis determined that the Monorail will require $261,010,819 in 2009 Dollars (without

8  regard to inflation) for CapEx from 2012 through 2040 (the "Bombardier CapEx Projection," and

9  collectively with the CDG CapEx Projection, the "CapEx Projections").

10  ~~Both~~Each of the CapEx Projections show that the first significant CapEx will occur in

11  2019, fifteen years following the commencement of the Monorail's operations.  The CDG CapEx

12  Projection determined that an initial CapEx investment of $77,459,732 will be required in 2019

13  alone, for full replacement of the Debtor's train control systems, communications equipment,

14  fare collection equipment, and platform doors.

15  The Bombardier CapEx Projection determined that an initial CapEx expenditure of

16  $23,060,266 will be required in 2019 for full replacement of the Debtor's fare collection

17  equipment and platform doors.  Under the Bombardier CapEx Projection, the next significant

18  CapEx requirement would occur in 2024, when the train control system and communication

19  system would be fully replaced at a cost of $52,647,684.

20  The CDG CapEx Projection determined that the remaining bulk of the CapEx

21  requirements would occur between 2029 and 2034, when the Monorail trains would have to be

22  replaced, along with significant other expenditures in 2034 for replacement of the traction power

---

[32] On or about April 24, 2008, in connection with the potential restructuring of the Debtor and in consideration for a forbearance, Ambac demanded that the Board retain CDG as restructuring advisor.  Upon its retention, CDG appointed Michael Monaco ("Monaco") as the Debtor's Chief Restructuring Officer ("CRO").  In his capacity as restructuring officer, Monaco was responsible for considering, evaluating and negotiating restructuring proposals and any aspect thereof with respect to the Debtor, making recommendations to the Board regarding the restructuring, and approving any changes to the Debtor's capital expenditures budget.  In the course of its engagement, CDG prepared revenue and expense projections as well as projections regarding the future capital expenditure needs of the Monorail.

[33] This coincides with the final maturity date of the 1st Tier Bonds.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

34

1  systems/PDS, train control systems, communication systems, guideway elements, fare collection

2  equipment, and platform doors, for a total cost during the period of 2029-2034 of $245,047,396.

3  By contrast, the Bombardier CapEx Projection determined that the remaining bulk of the

4  CapEx requirements would occur between 2034 and 2037, when the Monorail trains would have

5  to be replaced, along with significant other expenditures during 2034-2036 for replacement of

6  the traction power systems, guideway elements, fare collection equipment, and platform doors,

7  for a total cost during the period of 2034-2037 of $177,802,869.

8  Though the Bombardier CapEx Projection and the CDG CapEx Projection differ

9  substantially with respect to the cost of replacement of the train control systems, Monorail

10  escalators, and workshop equipment, both CapEx Projections agree that the CapEx requirements

11  occur in large increments approximately every ten (10) years, necessitating the accumulation of

12  cash reserves for CapEx and leaving little available for debt service.   The alternative to

13  accumulating these cash reserves will be equipment obsolescence and failure resulting in the

14  premature cessation of operations by 2019, regardless of which CapEx Projection is considered.

15  Even without considering the Debtor's CapEx requirements, increases in individual

16  drivers of revenue necessary to generate sufficient cash to meet the existing debt service

17  obligations is unattainable.  In 2011 alone, the total debt service obligation is approximately $38

18  million,[34] of which $19 million is for interest on the 1st Tier Bond Claims.  By contrast, the

19  Debtor is projected to have net operating revenue of only $1.3 million under its projections, and

20  only $15.4 in net operating revenue under CDG's projections.[35]   Under both scenarios, these

21  revenue shortfalls are projected to continue until at least the early 2030s, after significant CapEx

22  investments are required to have been made.

23  As a result of the foregoing analysis, the Debtor has come to the following conclusions:

24  (a)      Net cash flow from the existing Monorail will never be sufficient to

25  [34] This figure is derived from interest due in 2011 for the 1st Tier Current Interest Bonds and 2nd Tier Current Interest Bonds, and does not include any principal or interest on the 1st Tier Capital Appreciation Bonds or the 3rd Tier Bonds.

27  [35] As indicated by actual net operating revenue results through March 31, 2011, even without regard to the affect of the Sahara Hotel closure, the CDG projections are unrealistic and the actual results will be substantially closer to the Debtor's projection.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

35

1    service the present debt service on even the 1st Tier Bond Claims;

2            (b)    Using all available net cash flow for 2010 through 2019 to make partial

3    payments on the 1st Tier Bond Claims will result in the Debtor having no money

4    available to meet its CapEx needs beginning in 2019, regardless of which CapEx

5    Projection is used; and

6            (c)    Restructuring the debt service on the 1st Tier ~~Bonds and 1st Tier~~ Note, and

7    eliminating the 2nd Tier Obligation and ~~2nd Tier Bonds and~~ 3rd Tier Note ~~and 3rd Tier~~

8    ~~Bonds~~ is necessary to allow the Debtor to meet its CapEx needs through 2019 and allow

9    it to operate for the foreseeable future.

10    **3.    Default.**

11        Pursuant to the Financing Agreement, the Debtor is obligated to make certain Senior

12    Loan Repayments, as defined therein, sufficient to fund debt service on the Bonds and replenish

13    the Debt Service Reserve Fund.  Specifically, the Debtor is required to transfer sums before the

14    last business day of each month to the 1st Tier Debt Service Fund and the 2nd Tier Debt Service

15    Fund in an amount sufficient to satisfy the then-due principal and interest on the 1st Tier Bond

16    Claims and the 2nd Tier Bond Claims, respectively, in compliance with the Financing

17    Agreement.

18        The Debtor was unable to transfer sufficient sums to satisfy the Senior Loan Repayments

19    in December 2007, and consequently, on January 2, 2008, there were insufficient amounts

20    available in the 1st Tier Debt Service Fund and the 2nd Tier Debt Service Fund to pay all

21    amounts of principal and interest then due.  The Debtor was also unable to make sufficient

22    payments to satisfy the requirements of the Financing Agreement to fund debt service reserves

23    and replenish the Debt Service Reserve Funds.

24        On February 11, 2008, Wells Fargo sent a Notice of Events of Default to the Debtor.

25    Also on February 11, 2008, Wells Fargo sent its *Notice of Events of Default to Holders of*

26    *Director of the State of Nevada Department of Business and Industry Las Vegas Monorail*

27    *Project Revenue Bonds 1st Tier Series 2000 and 2nd Tier Series 2000*, notifying the Bondholders

28    of the default.  The Debtor has not cured the above-described default, and from December 2007

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

36

1    to the present, has not raised sufficient revenues to comply with the terms of the Financing

2    Agreement.

3         On or about July 17, 2008, the Debtor entered into a forbearance agreement with Wells

4    Fargo and Ambac (the "Forbearance Agreement").  On or about October 31, 2008, the Debtor

5    entered into an Amended and Restated Forbearance Agreement with Wells Fargo and Ambac

6    pursuant to which Wells Fargo and Ambac agreed to continue the forbearance of the exercise of

7    their rights and remedies until January 31, 2009.  The Amended and Restated Forbearance

8    Agreement was subsequently extended to May 31, 2009, and then again to June 30, 2009.  The

9    Amended and Restated Forbearance Agreement expired on June 30, 2009, and no other

10   forbearance agreement was executed.

11        In October of 2009, the Debtor retained the services of Alvarez & Marsal as financial

12   advisors to assist in evaluating financial and strategic alternatives, including preparation of

13   analyses of the Debtor's alternatives with respect to debt restructuring, debt refinancing,

14   divestitures, or reorganization, the Debtor's debt service capacity and long-term financing needs,

15   and the Debtor's business plan, operating and capital expenditures budgets, loan agreements and

16   bond indentures, and multi-year financial projections under various operating scenarios.

17        **4.       Uncertainty as to Access to Operating Funds.**

18        As a result of the inability of the Debtor to satisfy its debt service obligations, the Debtor

19   was required to transfer all of its Project Revenues to Wells Fargo for deposit in the Revenue

20   Fund maintained at Wells Fargo (the "Revenue Fund"), pursuant to the Financing Agreement.

21   Also pursuant to the Financing Agreement, Wells Fargo is required to pay from the Revenue

22   Fund all payments permitted or required to be paid for operation and maintenance costs ("O&M

23   Costs") upon written direction of the Debtor.

24        On the Petition Date, the Debtor had approximately $226,346.06 held in accounts with

25   Wells Fargo.  Also on the Petition Date, the Debtor had a balance in ~~the BofA Account~~a Bank of

26   America account of approximately $971,041.52, an estimated $64,594 in coin inventory on hand

27   with Brinks, U.S. ("Brinks"), and approximately $162,209.95 in undeposited TVM cash receipts

28   (part of which must remain in the TVMs to make change) and $650 in customer service booth

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

37

1  receipts, and an estimated $30,000 in TVM credit receipts in process at Merchant Bank.

2  **5.      Restructuring Goals.**

3  The Debtor believes that the Monorail plays a vital role in meeting the transportation

4  needs of Clark County, Nevada and specifically the Las Vegas Strip corridor.  As previously

5  discussed, the Monorail is an integral factor in relieving congestion in the Las Vegas Strip

6  Corridor while also being one of the most "green" public transportation systems in the United

7  States.

8  While the initial projections and expectations for the Monorail were flawed, that does not

9  mean that the Monorail cannot be restructured so that it can meet its CapEx needs and pursue

10  expansion of its system while providing some reliable, through significantly diminished, level of

11  payment to the 1st Tier Bondholders.  The alternative to an immediate and significant reduction

12  in debt service which can be serviced from its projected income, addressing its CapEx needs

13  beginning in 2019 and providing the opportunity to expand its system, is the Monorail ceasing

14  service and liquidating its assets.

15  **D.      Significant Events During the Bankruptcy Case.**

16  The Debtor has operated its business as debtor-in-possession.  The Bankruptcy Court has

17  certain supervisory powers over the operations of the Debtor during the pendency of the

18  ~~Bankruptcy~~Chapter 11 Case.  These powers are generally limited to reviewing and ruling on any

19  objections raised by a party-in-interest to business operations or proposed transactions of the

20  Debtor.  Except as otherwise authorized by the Bankruptcy Court, the Debtor is required to give

21  notice of any transactions not in the ordinary course of business and of the compromise of any

22  controversy to parties-in-interest who request such notice.  In addition, the Bankruptcy Court

23  supervises the employment of attorneys, accountants and other professionals.

24  **1.      First Day Motions.**

25  Concurrently with the filing of the Petition, the Debtor filed various First Day Motions

26  designed to assist the Debtor in making a smooth transition into Chapter 11, including:

27  a.      *Debtor's Emergency Application for Order Authorizing Maintenance of*

28  *Prepetition Cash Management System and Maintenance of Prepetition Bank Accounts* [ECF No.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

38

30];

b.      *Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining That Adequate Assurance Has Been Provided to Utility Companies* [ECF No. 31];

c.      *Debtor's Emergency Application for Order Permitting Debtor to Honor Prepetition Ticket Purchases and Refunds* [ECF No. 32];

d.      *Debtor's Emergency Motion for Order (i) Authorizing the Debtor to Pay Wages, Salaries, Benefits, Reimbursable Business Expenses and Other Employee Obligations, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* [ECF No. 41]; and

e.      *Debtor's Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b): (1) Initially Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtor* (the "Cash Collateral Motion") [ECF No. 49].

These First Day Motions were heard on January 19, 2010, with the final hearing on the Cash Collateral Motion occurring on February 17, 2010, as more fully discussed below.  The First Day Motions were approved, and corresponding orders were subsequently entered by the Bankruptcy Court.  See ECF Nos. 85, 86, 87, 88, and 89.

**2.      Other Significant Motions and Post-Petition Events.**

a.      Retention and Employment of Professionals.

Various applications were filed for employment of professionals in connection with the ~~Bankruptcy~~Chapter 11 Case.  Such applications include:

i.      Debtor's *Application for Order Approving Employment of Gordon Silver as Attorneys for Debtor* [ECF No. 106];

ii.      Debtor's *Application for Order Approving Employment of Jones Vargas as Special Counsel to Debtor* [ECF No. 127];

iii.      Debtor's *Application for Order Authorizing the Employment of Alvarez &*

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

39

1  *Marsal as Financial and Restructuring Advisor to Debtor* [ECF No. 129];

2           iv.    Debtor's *Application for Order Approving Employment of Kafoury,*

3  *Armstrong & Co. as Auditors for Debtor* [ECF No. 271];

4           v.     Debtor's *Application for Order Approving Employment of Littler*

5  *Mendelson, P.C. as Special Counsel to Debtor* [ECF No. 388]; and

6           vi.    Debtor's *Second Application for Order Approving Employment of*

7  *Kafoury, Armstrong & Co. as Auditors for Debtor* [ECF No. 665].

8           Limited objections to the first three employment applications were filed by the Office of

9  the United States Trustee [ECF Nos. 216, 217, and 218] and a limited objection to the

10  application for employment of Gordon Silver was filed by Ambac [ECF No. 195]; each limited

11  objection sought additional disclosures with respect to the proposed employment.  Each of the

12  foregoing applications was subsequently heard and considered by the Bankruptcy Court.  The

13  Bankruptcy Court approved the applications and corresponding orders were subsequently entered

14  by the Bankruptcy Court.  ECF Nos. 262, 263, 264, 311, 479, and 695.

15           The Debtor filed its *Application for Order Authorizing Employment of Stradling Yocca*

16  *Carlson & Rauth as Special Counsel to Debtor Nunc Pro Tunc to August 16, 2010* [ECF No.

17  523] on August 25, 2010, requesting that the Court permit the Debtor to employ Stradling Yocca

18  Carlson & Rauth ("SYCR") as its public finance and tax counsel.  The 1st Tier Trustee filed the

19  *Indenture Trustee's Objection to Debtor's Application for Order Authorizing Employment of*

20  *SYCR* [ECF No. 550] on September 8, 2010, and the application came on for hearing on

21  September 22, 2010.  Following the hearing, the Bankruptcy Court approved the application and

22  SYCR was employed as special counsel to the Estate. [ECF No. 623].

23           On February 25, 2010, the Debtor also filed *Debtor's Motion for Administrative Order*

24  *Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of*

25  *Professionals* [ECF No. 240].  On April 7, 2010, Wells Fargo filed a limited opposition and

26  Ambac filed an opposition to the motion.  ECF Nos. 312, 313.  On April 9, 2010, the Director

27  filed a limited opposition to the motion.  ECF No. 321.  On April 26, 2010, the Bankruptcy Court

28  entered an order approving the motion, setting forth procedures for the interim monthly

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

40

1   compensation of professionals in the Bankruptcy Case.  ECF Nos. 345, 350.

2                b.        Motion to Dismiss.

3        On January 13, 2010, Ambac filed its *Motion of Ambac Assurance Corporation for*

4   *Dismissal of Chapter 11 Proceeding Pursuant to 28 U.S.C. §1334 and Sections 109(d) and*

5   *1112(b) of the Bankruptcy Code* (the "Dismissal Motion") [ECF No. 8], which sought dismissal

6   of the Bankruptcy Case on the alleged grounds that the Debtor is ineligible to be a debtor under

7   Chapter 11.  The Dismissal Motion was opposed by both the Debtor and the Director.  ECF Nos.

8   138, 141.  On April 26, 2010, the Bankruptcy Court entered an order denying the Dismissal

9   Motion.  ECF No. 341.  On May 10, 2010, Ambac filed an appeal of the order, along with its

10  *Motion for Leave to Appeal by Ambac Assurance Corporation and the Segregated Account of*

11  *Ambac Assurance Corporation (Fed. R. Bankr. P. 8001(b) and 8003)* [ECF No. 370] (the

12  "Motion for Leave").  The appeal is currently pending in the United States District Court for the

13  District of Nevada (Case No. 2:10-cv-00678-JCM).

14       In July and August 2010, the parties fully briefed the merits of the appeal and filed their

15  excerpts of record on appeal.  See Case No. 2:10-cv-00678-JCM, ECF Nos. 31-36, 41-45

16  (excerpts of record on appeal), and Nos. 46, 56 and 58 (briefs).

17       On October 29, 2010, the District Court entered an *Order* [Case No. 2:10-cv-00678-JCM,

18  ECF No. 61] denying Ambac's *Motion to Treat May 10, 2010 Notice of Appeal as a Notice of*

19  *Appeal as of Right Under the Collateral Order Doctrine* [Case No. 2:10-cv-00678-JCM, ECF

20  No. 15] and Ambac's *Emergency Motion for Stay Pending Appeal Pursuant to Federal Rule of*

21  *Bankruptcy Procedure 8005* [Case No. 2:10-cv-00678-JCM, ECF No. 27].

22       On January 31, 2011, the  Court entered an *Order* [Case No. 2:10-cv-00678-JCM, ECF

23  No. 62] denying Ambac's *Emergency Request for Certification for Direct Appeal to the Court of*

24  *Appeals for the Ninth Circuit* [Case No. 2:10-cv-00678-JCM, ECF No. 26], and on March 25,

25  2011, the District Court denied *Ambac's Motion for Rehearing of Order, Dated January 31,*

26  *2011, Holding as Moot Ambac's Emergency Request for Certification for Direct Appeal to the*

27  *Court of Appeals for the Ninth Circuit* [Case No. 2:10-cv-00678-JCM, ECF No. 26].

28       As of the time of this Disclosure Statement, the District Court has not ruled on the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

41

1    Motion for Leave or the merits of the appeal.

2            c.      <u>Use of Cash Collateral.</u>

3            On January 14, 2010, Wells Fargo filed the *Indenture Trustee's Objection to Use of Cash*

4    *Collateral and Motion for Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363(c)(2) and*

5    *363(e)* (the "<u>Cash Collateral Objection</u>") [ECF No. 13], which objected to the Debtor's use of

6    cash collateral without first providing adequate protection.  The Cash Collateral Objection was

7    joined by Ambac [ECF No. 35], while oppositions were filed by Bombardier and the Debtor

8    [ECF Nos. 64, 65].  Further, the Debtor filed its ~~*Emergency Motion for Entry of an Interim*~~

9    ~~*Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b):  (1) Initially Determining Extent*~~

10   ~~*of*~~<u>own</u> Cash Collateral ~~*and Authorizing Interim Use of Cash Collateral by Debtor; and (2)*~~

11   ~~*Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of*~~

12   ~~*Cash Collateral by Debtor*~~<u>Motion</u> [ECF No. 49].   On January 22, 2010, an interim order

13   approving the Cash Collateral Motion was entered, authorizing the Debtor to use cash collateral

14   on an interim basis.  ECF No. 89.  Thereafter, the Debtor and Wells Fargo filed briefs in support

15   of their respective cash collateral motions.  ECF Nos. 143, 144, 167, 168.

16           Thereafter, pursuant to the Bankruptcy Court's direction at hearing on February 17, 2010,

17   on February 19, 2010, Wells Fargo and U.S. Bank filed their *Trustees' Adequate Protection*

18   *Request* (the "<u>Adequate Protection Request</u>") [ECF No. 211].  In response, on February 19,

19   2010, the Debtor filed *Debtor's Offer of Adequate Protection to Certain Creditors* [ECF No.

20   214], submitting a proposed adequate protection order.

21           On April 26, 2010, the Bankruptcy Court entered its *Opinion on Cash Collateral Motions*

22   which determined that ~~Wells Fargo~~<u>the 1st Tier Trustee</u> holds a security interest in accounts

23   maintained by Wells Fargo at the time of filing, but not in the BofA account or cash held by

24   Brinks collected from the Debtor's ticket vending machines.  ECF No. 342.  The Bankruptcy

25   Court separately entered an *Order on Adequate Protection and Setting Status Conference* which

26   ~~set forth~~ <u>provided for</u> adequate protection and procedures for the ~~Debtors'~~<u>Debtor's</u> use of ~~Wells~~

27   ~~Fargo's~~<u>the 1st Tier Trustee's</u> cash collateral.  ECF No. 343.

28           d.      <u>Other Motions.</u>

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

On March 22, 2010, the Debtor filed *Debtor's Motion to: (i) Authorize Continued Purchasing and Services Relationships with Access Distribution, LLC and (ii) Authorize the Debtor to Pay Related Prepetition Obligations* [ECF No. 280], seeking authority to pay a critical vendor invoice and maintain a business relationship with a magnetic ticket producer. On April 9, 2010, the Bankruptcy Court entered an order approving the motion. ECF No. 318.

On March 24, 2010, the Debtor filed its *Motion to Assume Nonresidential Real Property Lease (Maintenance Yard Lease)* [ECF No. 295]. On April 30, 2010, the Bankruptcy Court entered an order approving the motion, allowing the Debtor to assume its maintenance yard lease with respect to the Monorail. ECF No. 354.

On June 9, 2010, the Debtor filed its *Motion to Reject Nonresidential Real Property Lease* [ECF No. 438], seeking to reject its existing administrative and business office lease. On the same date, the Debtor also filed a *Motion for Order Authorizing New Office Lease* [ECF No. 439] for entry of an order approving a lease of office space to replace its existing lease. On June 29, 2010, the Bankruptcy Court entered orders approving both motions [ECF Nos. 480, 481], serving to reduce the Debtor's monthly office space costs by approximately $30,000 per month.

On June 9, 2010, the Debtor filed *Debtor's Motion (1) to Reject Network Services Agreement and Satellite Services Agreement with Heartland Payment Systems, Inc. and (2) for Order Authorizing New Payment Processing Contract* [ECF No. 445]. On June 29, 2010, the Bankruptcy Court entered an order approving the motion [ECF No. 482], allowing the Debtor to change payment processing service providers at a reduced cost while remaining compliant with credit card security standards.

On August 24, 2010, the Debtor filed its *Motion for Order to Approve Stipulation Regarding Director's Access to and use of Funds in the Indemnification Account* [ECF No. 520], requesting that the Court approve a stipulation to permit the Director to obtain payment for certain indemnified expenses from the Indemnification Account. On September 16, 2010, the motion was approved. ECF No. 567.

On February 17, 2011, the Debtor filed its *Motion to Approve Sale of Claim Pursuant to Claim Sale Agreement* [ECF No. 684], requesting authority to sell its proof of claim in the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

43

1    bankruptcy proceeding of Lehman Brothers Special Financing, Inc. for the benefit of the 2nd

2    Tier Bondholders.  On March 15, 2011, the Court entered an order approving the motion.  ECF

3    No. 709.

4             e.         Plan, Disclosure Statement, and Exclusivity.

5             On August 17, 2010, the Debtor filed its original *Plan of Reorganization* [ECF No. 516]

6    and its original *Disclosure Statement to Accompany Plan of Reorganization* [ECF No. 517].  On

7    August 31, 2010, the Debtor filed its *Motion for Order Approving Adequacy of Disclosure*

8    *Statement* [ECF No. 535] (the "Disclosure Statement Motion") and its *Motion for Entry of Order*

9    *Approving (A) The Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notices*

10   *with respect to the Debtor's Plan of Reorganization and (B) Related Confirmation Procedures,*

11   *Deadlines, and Notices* [ECF No. 538] (the "Solicitation Procedures Motion"), and on

12   September 1, 2010, the Debtor filed its *Motion to Approve Classification of Claims Pursuant to*

13   *Fed. R. Bankr. P. 3013* [ECF No. 541] (the "Classification Motion").

14            On September 9, 2010, the *Motion of the Indenture Trustee and the Majority 1st Tier*

15   *Bondholders for an Order Terminating Exclusivity* [ECF No. 554] was filed.  On October 4,

16   2010, the Debtor filed its *Second Motion for an Order Extending the Exclusive Periods to File its*

17   *Plan of Reorganization and Secure Acceptance of its Plan of Reorganization Pursuant to 11*

18   *U.S.C. § 1121(d)* [ECF No. 582], to which the 1st Tier Trustee filed an opposition [ECF No.

19   588] on October 7, 2010.  Following a hearing on the Debtor's motion, the Court entered the

20   *Order Approving Debtor's Second Motion for an Order Extending the Exclusive Periods to File*

21   *its Plan of Reorganization and Secure Acceptance of its Plan* [ECF No. 631].  Thereafter, the

22   Debtor has filed amendments to the original plan and disclosure statement, culminating in the

23   *Debtor's Third Amended Plan of Reorganization* and the *Disclosure Statement to Accompany*

24   *Debtor's Third Amended Plan of Reorganization.*

25            Due to a series of extensions agreed upon by the Debtor, the Majority 1st Tier

26   Bondholders, the 1st Tier Trustee, the 2nd Tier Trustee, the Director, and Ambac, no hearing has

27   beenwas held on the original *Disclosure Statement to Accompany Plan of*

28   *Reorganization*disclosure statement, the motions related thereto, or the *Motion of the Indenture*

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

44

1    *Trustee and the Majority 1st Tier Bondholders for an Order Terminating Exclusivity.*  See ECF

2    Nos. 619, 633, 639, 640, 657, 658, 681, 682, and 725.

3          **3.      Financial Performance During the Bankruptcy Case.**

4          As discussed above, 2009 experienced significantly less convention attendance, cutting

5    away a key demographic of the Monorail's customers.  This trend continued through 2010 and

6    into 2011.  The 0.6% increase in Fare Revenue for the first three months of 2011 compared to

7    2010 is due to a convention with more than 100,000 attendees that occurred in March 2011.  This

8    convention comes to Vegas once every three years.

9          Ridership in 2010 was down 12.7% compared to the same period of 2009.  The Monorail

10   carried 5,240,263 riders during 2010, compared to 6,005,024 riders during 2009.  Both figures

11   are substantially less than preceding years and substantially less than projected.  For the first

12   three months of 2011 ridership was 1,306,134, compared to 1,249,318 riders during the same

13   period of 2010, an increase of 4.5%.  With the closing of the Sahara Hotel in May, 2011 (as more

14   fully discussed below), the Debtor is projecting further reduced ridership for 2011.

15         Notwithstanding the challenges of reduced visitor volume, convention attendance, and

16   the resulting reduced ridership, the Debtor has continued to generate an operational profit during

17   the Chapter 11 Case.  The Debtor's financial performance for 2010 is reflected in the table

18   contained in Section V.C.1, above., and in **Exhibits "D" and "E,"** attached hereto and

19   incorporated by reference into this Disclosure Statement as though fully set forth herein.

20         During the Bankruptcy Case, the Debtor has taken steps to reduce its operating expenses.

21   In addition to reducing its office space costs by approximately $30,000 per month and switching

22   payment processing service providers, the Debtor has reduced its staff size and salaries, with the

23   largest salary cuts for upper management.

24         **4.      Ambac Rehabilitation Proceedings.**

25         On or about March 21, 2010, Ambac, together with the Office of the Wisconsin

26   Commissioner of Insurance (the "OCI") established a segregated account (the "Segregated

27   Account") to which it transferred the Insurance Policy and 1st Tier Bondholders' Surety Bond

28   (along with all of Ambac's liabilities thereunder), along with numerous "toxic debts."  The

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

45

1    Segregated Account is currently the subject of rehabilitation proceedings (the "Rehabilitation

2    Proceeding") in the Circuit Court for Dane County, Wisconsin.[36]    The Segregated Account is

3    capitalized ~~only~~ with a ~~non-marketable~~ $2 billion note ~~with questionable value~~ issued by Ambac

4    Assurance Corporation to the Segregated Account.

5        The Dane County Circuit Court, in addition to placing the 1st Tier Bondholders'

6    Insurance Policy and 1st Tier Bondholders' Surety Bond in the Rehabilitation Proceeding,

7    entered an injunction against the payment of any obligations for an initial period of 6 months,

8    including any payments to the Debtor's creditors under the 1st Tier Bondholders' Insurance

9    Policy or the 1st Tier Bondholders' Surety Bond.

10    ~~Because Ambac Assurance Corporation has transferred the Insurance Policy, along with~~

11    ~~all of its obligations pursuant to that Insurance Policy, to the Segregated Account, Ambac~~

12    ~~Assurance Corporation no longer faces a $1.16 billion exposure under the Insurance Policy.~~

13    ~~Ambac Assurance Corporation currently acts only as a servicer.    Instead, the obligor is the~~

14    ~~Segregated Account, which is protected from having to satisfy that obligation by the injunction~~

15    ~~issued by the Dane County Circuit Court.~~

16        On February 10, 2011, the OCI filed *its Motion to Approve Settlement With Certain LVM*

17    *Bondholders*[37] (the "Ambac Settlement Motion") in which it requested that the ~~Dan~~Dane County

18    Circuit Court approve a settlement agreement (the "Settlement Agreement") between the

19    Segregated Account, the OCI, and the majority of the 1st Tier Bondholders.[38]    According to the

20    Settlement Motion, the Settlement Agreement provides two alternative means for resolving the

21    Segregated Account's ~~exposures~~exposure on the 1st Tier Bondholders' Insurance Policy and the

22    1st Tier Bondholders' Surety Bond.    The first is a commutation (the "Commutation") and the

23    second is a fall-back which calls for Ambac to offer to purchase from participating bondholders

24    their interests in the 1st Tier Bondholders' Insurance Policy.    Under the Commutation, the

25

26    _____
     [36] See http://www.ambacpolicyholders.com.

27    [37] Case No. 10-CV-1576, In the Matter of the Rehabilitation of: Segregated Account of Ambac Assurance
     Corporation.

28    [38] The settling 1st Tier Bondholders represent 73% of the aggregate principal amount of the 1st Tier Bonds.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1   Segregated Account and Ambac would be completely released from the 1st Tier Bondholders'

2   Insurance Policy and the 1st Tier Bondholders' Surety Bond in exchange for (i) a cash payment

3   of $111 million, (ii) delivery of $90 million (principal amount) in Segregated Account surplus

4   notes, and (iii) transfer of the "Ambac-Owned Bonds" (in the amount of $8.5 million) to the 1st

5   Tier Trustee for the benefit of the 1st Tier Bondholders.  The cash payments and surplus notes

6   would be reduced by the amount of cash payments made or surplus notes issued, if any, under

7   the 1st Tier Bondholders' Insurance Policy or 1st Tier Bondholders' Surety Bond between the

8   date of the Settlement Agreement and the closing of the Commutation.

9           The Settlement Agreement includes certain conditions that must be met to complete the

10  Commutation, including the 1st Tier Trustee obtaining authority from the Fourth Judicial District

11  Court of Hennepin County, Minnesota for the 1st Tier Trustee to settle and resolve all claims

12  against Ambac under the 1st Tier Bondholders' Insurance Policy and the 1st Tier Bondholders'

13  Surety Bond.  The Settlement Agreement requires the Commutation to be completed by August

14  31, 2011 (the "Commutation Termination Date").  The Settlement Agreement also allows either

15  party to cease pursuing the Commutation if it determines that the Commutation is not reasonably

16  likely to be achieved by the Commutation Termination Date or at all.

17          The Settlement Agreement provides for the "Purchase Offer" alternative in the event that

18  the Commutation does not occur by the Commutation Termination Date or the parties cease

19  pursuing Commutation.  Under the Purchase Offer, Ambac will tender an offer to purchase from

20  all 1st Tier Bondholders their rights in the 1st Tier Bondholders' Insurance Policy and the 1st

21  Tier Bondholders' Surety Bond through a synthetic commutation.  This synthetic commutation

22  will provide for the full and complete termination and release of all obligations of Ambac and the

23  Segregated Account under the 1st Tier Bondholders' Insurance Policy and the 1st Tier

24  Bondholders' Surety Bond with respect to 1st Tier Bondholders participating in the Purchase

25  Offer, but preserve for those 1st Tier Bondholders their rights against LVMC.  The Segregated

26  Account would remain liable on the LVMC Policies with respect to the 1st Tier Bondholders

27  who do not accept the Purchase Offer.  If all 1st Tier Bondholders were to accept the Purchase

28  Offer, the Segregated Account would deliver (i) a cash payment of $111 million, (ii) $81 million

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

47

(principal amount) in Segregated Account surplus notes, and (iii) the "Ambac-Owned Bonds" (in the amount of $8.5 million) to the 1st Tier Trustee for the benefit of the 1st Tier Bondholders. If fewer than all 1st Tier Bondholders accepted the Purchase Offer, then the consideration would be reduced proportionally. The cash payment and surplus notes issued, if any, under the 1st Tier Bondholders' Insurance Policy and the 1st Tier Bondholders' Surety Bond to settling 1st Tier Bondholders between the date of the Settlement Agreement and the closing of the Purchase Offer.

In the Settlement Motion, the OCI states that the maximum potential consideration to be paid under the Settlement Agreement is $201 million, which is less than the amount that the Rehabilitator expects it would pay under the confirmed plan of Rehabilitation with respect to the 1st Tier Bondholders' Insurance Policy and the 1st Tier Bondholders' Surety Bond.

In its pleading to the Fourth Judicial District Court of Hennepin County, Minnesota,[39] the 1st Tier Trustee asserted that compared to the alternatives of continued litigation and other uncertainties, the proposed Settlement Agreement with the Segregated Account and Ambac provides benefits to all of the 1st Tier Bondholders.

It is the Debtor's understanding and belief that to the extent the Settlement Agreement is not approved by either the Rehabilitation Court in Dane County, Wisconsin or the Court in Hennepin County, Minnesota, and with respect to any 1st Tier ~~Bondholders~~Bondholder that ~~reject~~rejects the Purchase Offer in the event that the Purchase Offer alternative is triggered, the Rehabilitation Plan approved by the Rehabilitation Court on January 24, 2011 would apply to the claims ~~of the 1st Tier Bondholders under the 1st Tier Bondholders' Insurance Policy and the Surety Bond, or with respect to any 1st Tier Bondholders that reject the Purchase Offer in the event that the Purchase Offer alternative is triggered, the claims retained by such non-settling Bondholders.~~retained by such non-settling Bondholders. Under the Rehabilitation Plan, up until June 7, 2020, claimants are to receive a recovery consisting of cash in the amount of 25% of their claims and surplus notes with a face amount of 75% of their claims, as those claims come due.

---

[39] Case No. 27-TRCV-11-13, *Petition of Wells Fargo Bank, National Association, as Trustee, for Instruction in the Administration of a Trust Pursuant to Minn. Stat. § 501B.16* (Feb. 11, 2011).

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

The Rehabilitation Plan is available at http://www.ambacpolicyholders.com.

The Debtor has no opinion regarding the benefits or efficacy of the Settlement Agreement for the 1st Tier Bondholders. Further, the Debtor cannot project the likelihood of recovery, timing of recovery, or amount of recovery to the 1st Tier Bondholders under the Rehabilitation Plan, nor whether the Rehabilitation Plan will go effective.

**5.    Closure of Sahara Hotel.**

On March ~~11~~16, 2011, the Sahara Hotel ~~announced the closing of the hotel and casino on May 16, 2011.~~permanently closed. The Monorail maintains a station adjacent to the Sahara Hotel on the eastside of Paradise Road (the "Sahara Station"). Since 2008, riders at the Sahara Station have represented approximately 10.7% of total ridership and 8.7% of total Fare Revenues derived from TVMs.

The base case assumption for the potential impact on ridership following the closing of the Sahara is as follows: (a) revenues at all stations other than the Sahara are expected to decline 1.5% based on survey results and ridership patterns that indicate a small portion of patrons at other properties ride the Monorail to visit the Sahara; and (b) riders that board the Monorail at the Sahara station will decline to 500 riders per day.

Applying the above assumptions to 2010 Fare Revenue would have resulted in a decline of 7.2% relative to actual results. This is expected to result in a decrease of TVM Fare Revenue of approximately $800,000 for the second half of 2011 and an average of $2,000,000 per year from 2012 through 2019 from the projected Fare Revenues derived from TVM as determined by LVMC prior to the announced closing of the Sahara Hotel.

The closing of the Sahara Hotel and the effect on the Sahara station and projected revenues has resulted in the Debtor having to modify and reduce the projected revenues available to apply to the restructured 1st Tier Bond Claims, the Ambac 1st Tier Bondholders' Surety Bond Claim, and the Ambac Insurance Claim under the Plan. As set forth below and as will be adduced through evidence at the hearing on confirmation of the Plan, the Debtor believes that the treatment of the restructured 1st Tier Bond Claims, the Ambac 1st Tier Bondholders' Surety Bond Claim, and the Ambac Insurance Claim as provided for in the Plan is feasible and will

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

49

allow the Debtor to meet its operational obligations and payment obligations ~~to~~under the ~~1st Tier Bondholders~~Plan through 2019 and provide the Debtor a reasonable opportunity to acquire third party funding to meet its needs and objectives to extend its operations beyond 2019.

## VI.
## DESCRIPTION OF THE PLAN

**A.    Overview of Chapter 11.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity interest holders.  The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and equity interests in, a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, regardless of whether such creditor or equity interest holder (i) is impaired under, or has accepted, the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the bankruptcy court's confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes.  A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against, or equity

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

50

interest in, a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote on the plan.  Any classes that would receive a distribution of property under the plan, but are not unimpaired, will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides Claims into various Classes and sets forth the treatment for each Class.  As the Debtor has no equity holders, the requirement that equity interests be classified is not applicable here. The Debtor is also required under Section 1122 of the Bankruptcy Code to place a  Claim into a particular Class only if such Claim is substantially similar to other Claims in such Class.  The Debtor believes that the Plan has classified all Claims in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim will challenge the Plan's classifications and that the Bankruptcy Court will find that different classifications are required in order for the Plan to be confirmed.  In such event, the Debtor intends, to the extent permitted by the Bankruptcy Court, to make reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holders are ultimately deemed members.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The Debtor (and its respective Affiliates, agents, directors, officers, employees, advisors and attorneys) has, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions under the Plan, and therefore is not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim will be in full satisfaction, settlement, release and discharge of all such Claims.  The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

51

1  Debtor will make all payments and other distributions under the Plan, unless otherwise specified.

2  **B.      Treatment of Unclassified Claims under the Plan.**

3            **1.        Treatment of Administrative Claims.**

4            Each Holder of an Allowed Administrative Claim shall be paid in full and final

5  satisfaction of such Claim by Reorganized LVMC (or otherwise satisfied in accordance with its

6  terms), upon the latest of:  (i) the Effective Date or as soon thereafter as practicable; (ii) such

7  date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the

8  fourteenth (14th) day after such Claim is Allowed or as soon thereafter as practicable; (iv) the

9  date such Claim becomes due by its terms; and (v) such date as is agreed to by the Holder of

10 such Claim and the Debtor or Reorganized LVMC.

11           The Debtor estimates that its Allowed Administrative Claims will consist of unpaid

12 Chapter 11 Professional Fees.  All such professional fees are subject to approval by the

13 Bankruptcy Court.

14           **2.        Treatment of Priority Tax Claims.**

15           Each Holder of an Allowed Priority Tax Claim, if any, will, in full and final satisfaction

16 of such Claim, be paid in full (or be treated in compliance with Section 1129(a)(9)(C) of the

17 Bankruptcy Code) by Reorganized LVMC on the later of (i) the Effective Date or as soon

18 thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first

19 Business Day following the fourteenth (14th) day after the date on which an order allowing such

20 Claim becomes a Final Order; or (iv) such date as is agreed to by the Holder of such Claim and

21 the Debtor or Reorganized LVMC.  Based upon the Debtor's and its professionals' review of its

22 Schedules and Proofs of Claim filed in this Chapter 11 Case, the Debtor believes there are

23 approximately $6,000 of Priority Tax Claims.

24 **C.      Classification and Treatment of Claims under the Plan.**

25           **1.        Treatment of Class 1 (Other Priority Claims).**

26           Each Allowed Other Priority Claim, if any, shall, in full and final satisfaction of such

27 Claim, be paid in full in Cash by Reorganized LVMC upon the latest of: (i) the Effective Date or

28 as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

52

first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Debtor or Reorganized LVMC. Holders of Claims in Class 1 are Unimpaired under the Plan, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan. ~~The~~Based upon the Debtor's and its professionals' review of its Schedules and the Proofs of Claim filed in this Case, Debtor ~~believes that Allowed~~does not believe there are any allowable Other Priority Claims ~~are approximately $1,800~~at this time.

**2.      Treatment of Class 2 (Other Secured Claims).**

Each Allowed Other Secured Claim, if any, shall, in full and final satisfaction of such Claim, be paid in full in Cash or otherwise left Unimpaired by Reorganized LVMC upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the  fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Debtor, and after the Effective Date, by Reorganized LVMC.   Creditors in Class 2 are Unimpaired under the Plan, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan.  ~~The Debtor believes that Allowed Other Secured Claims are no more than~~ Based upon the Debtor's and its professionals' review of its Schedules and the Proofs of Claim filed in this Case, the Debtor believes there is one allowable Other Secured Claim, consisting of a secured credit card Claim in the approximate amount of $1,700.

**3.      Treatment of Class 3 (General Unsecured Claims).**

General Unsecured Claims are provided for in Class 3.  ~~Holders of Class 3 Claims are Impaired.~~ Each Holder of an Allowed ~~Claim that is a~~ General Unsecured Claim will be paid ~~80%~~the lesser of the full amount of its Allowed ~~General Unsecured Claim, but in no event shall the total payment to the Holders~~Claim or its Pro Rata share of ~~all Allowed General Unsecured Claims exceed~~ $175,000, it being understood that if ~~such total payment would exceed~~the total amount of Allowed General Unsecured Claims exceeds $175,000, the Holders of Allowed General Unsecured Claims shall ~~instead~~ receive their Pro Rata share of $175,000 in full

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

satisfaction of their Allowed General Unsecured Claim.  Allowed Claims in Class 3 will be paid in Cash in twelve (12) equal monthly installments, without interest, commencing upon the latest of: (i) the first Business Day following the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Debtor or Reorganized LVMC.

The Based upon the Debtor's and its professionals' review of its Schedules and the Proofs of Claim filed in this Case, the Debtor believes that Allowed the total amount of allowable General Unsecured Claims are is approximately $150,000  to $175,000 without regard to rejection damages and Disputed personal injury Claims.

**4.    Treatment of Class 4 – Class 4A (1st Tier Bond Secured Claims).**

**4.    The ), Class 4B (Ambac 1st Tier BondBondholders' Surety Bond Secured Claims), and Class 4C (Ambac Insurance Secured Claims, which consist).**

Holders of the Secured Claim portion of the 1st Tier Bond Claims held by (i), the Ambac 1st Tier Bondholders' Surety Bond Claims, and the Ambac Insurance Claims, including the 1st Tier Trustee and Ambac, shall have no rights to payment under the 1st Tier Note issued by the Debtor to the Director in accordance with the from Reorganized LVMC and no rights under the Financing Agreement and assigned by the Director to the 1st Tier Trustee, and or the 1st and 2nd Tier Indenture and (ii) the 1st Tier Bondholders under the 1st Tier Bonds, are provided for in Class 4, which is an Impaired Class.  In full and final satisfaction of 1st Tier Bond Secured Claims:

(a) The 1st Tier Note and 1st Tier Bonds shall be extinguished and discharged;

(b) The 1st and 2nd Tier Indenture shall be amended by the New Indenture; and

Onagainst Reorganized LVMC after the Effective Date, the.  Any obligations of the Debtor under the 1st Tier Note and the 1st and 2nd Tier Indenture shall be extinguished, cancelled, and discharged on the Effective Date, and the 1st Tier Note and the 1st and 2nd Tier Indenture shall continue in effect only as to parties other than Reorganized LVMC, including

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

Ambac.  Any term in the Plan to the contrary notwithstanding, nothing as contained in the Plan or the Confirmation Order shall affect:

(a)   The right and ability of the Director and the 1st Tier Trustee as provided for in the 1st and 2nd Tier Indenture to amend and restate the 1st and 2nd Tier Indenture with the assistance of Reorganized LVMC, as necessary and appropriate.

(b)   The rights of Holders of 1st Tier Bond ~~Secured Claims shall~~ Claims under the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond, and their rights under the 1st and 2nd Tier Indenture to the extent of pursuing claims against the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond.

(c)   The powers, rights, privileges and immunities of the 1st Tier Trustee under the 1st and 2nd Tier Indenture as the 1st Tier Trustee deems reasonably necessary and appropriate with respect to the administration of its duties to the 1st Tier Bondholders, provided that the 1st Tier Trustee shall have no rights to receive indemnification or payment of its fees and expenses from Reorganized LVMC for fees and expenses incurred by the 1st Tier Trustee with respect to the Rehabilitation Proceedings or the TIP Proceedings.

Subclass 4A.  Holders of Class 4A Claims (which Claims include, as of the Record Date, Claims of Ambac for 1st Tier Bonds purchased and held by Ambac), shall receive on the Effective Date a Pro Rata interest in the Cash Pay Notes and ~~the~~ CapEx Notes~~, as follows~~:.  The Cash Pay Notes and the CapEx Notes shall be governed by the New Indenture and the Security Documents.

~~The Cash Pay Notes.  The Holders of 1st Tier Bond Secured~~ Subclass 4B.  In full and complete satisfaction of the Unsecured Claim portion of any and all Ambac Surety Bond Claims (Class 5B Claims) against LVMC, Ambac's contribution and reimbursement rights with respect to the Ambac Surety Bond Claims, if any, shall be treated by participation in the Capital Appreciation Notes in an amount determined under applicable law and the 1st and 2nd Tier Indenture.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

Subclass 4C.  In full and complete satisfaction of the Secured Claim portion of any and all Ambac Insurance Claims (Class 4C Claims) against LVMC, on the Effective Date Ambac shall retain its subrogation rights under the 1st Tier Bondholders' Insurance Policy as limited by 11 U.S.C. § 509(a) and (b), and pursuant to 11 U.S.C. § 509(c), Ambac shall have the right to assert those subrogation rights only after and to the extent of payment of the 1st Tier Bond Claims in full (or with such lesser amount accepted by the Holders in full and complete satisfaction of the 1st Tier Bond Claims or as otherwise permitted under the governing agreements and applicable law).  The Ambac subrogation rights with respect to the Secured Claim portion of the Ambac Insurance Claims, if any, shall be limited to receipt of the balance outstanding of the outstanding payment stream due under the Cash Pay Notes and CapEx Notes, but only after payment of the Class 4B Claims.

The Holders of Class 4A, Class 4B and Class 4C Claims are Impaired under the Plan and are entitled to vote on the Plan.

The Cash Pay Notes.  The Holders of the Allowed Secured Claim portion of the 1st Tier Bond Claims, the Ambac 1st Tier Bondholders' Surety Bond Claims, and the Ambac Insurance Claims shall receive on the Effective Date a Pro Rata interest in the 10% senior notes due June 30, 2019 in the aggregate principal amount of $15,000,000 with interest in arrears at ten percent (10%) per annum, issued by the Reorganized Debtor to the New Trustee, payable quarterly in cash on the Cash Pay Notes Payment Date[40] with the last payment due on the Cash Pay Notes Maturity Date; provided, however, that the accrued interest payable on any Cash Pay Notes Payment Date may be paid "in-kind" through 2014 to the extent that payment of interest in cash would result in Reorganized LVMC having Working Capital of less than $3.0 million.[41] of less than $2.4 million.  In addition, the principal shall be reduced following the end of each calendar quarter by a pro rata redemption in an amount equal to 50% of Excess Cash as of the end of such

---

[40] Defined in the Plan as "The fifteenth (15th) day of the month immediately following the end of the first calendar quarter following the Effective Date and continuing on the same day each calendar quarter thereafter."

[41] "Working Capital" is defined in the Plan as "The sum of the account balances of the Collection Fund, Revenue Fund, and Operating Fund on deposit with the New Trustee as of the end of a calendar quarter less (i) year-to-date insurance reserve accruals, and (ii) outstanding checks and invoices, which may include, among other things, pending payments for the monthly Bombardier O&M invoice, CARP and bi-weekly payroll."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

calendar quarter, after funding of the amounts set forth in clauses (i), (ii), (iii) and (iv) of **Section 5.2.8 of the Plan, and subject to the concluding proviso of such Section.**  In the event that Reorganized LVMC does not have funds available to pay any quarterly interest that is otherwise due and payable on a Cash Pay Notes Payment Date, funds from the CapEx Reserve Account shall be applied to satisfy any interest shortfall to the extent available under **Section 5.2.~~6~~9** of the Plan.  Principal shall begin to be amortized at the quarterly rate of 0.875% of the initial principal balance of the Cash Pay Notes commencing on April 15, 2017.

Reorganized LVMC shall have the right to prepay the Cash Pay Notes at any time upon payment of the outstanding principal amount plus accrued but unpaid interest to the date of redemption, plus a premium of 8% of the initial outstanding principal, declining by 1% per year through 2018 at which time such exit premium shall terminate. The Cash Pay Notes shall be ~~substantially in~~ subject to the ~~form attached as an exhibit to the Plan Supplement.~~terms of the New Indenture.  The Cash Pay Notes ~~are~~shall be transferable in whole or in part, subject to applicable federal and state securities laws (taking account of section 1145(a) of the Bankruptcy Code~~); provided, however, that a holder shall not have the right to transfer the Cash Pay Notes in a face amount less than the interest therein issued by the New Trustee to the holder or the holder's predecessor in interest.~~).

For so long as the Cash Pay Notes have not been paid, ~~100~~at least 66 2/3% of the holders of the Cash Pay Notes ~~shall~~(by principal amount outstanding) will be required for Reorganized LVMC to (i) direct the New Trustee to take any action affecting the Cash Pay Notes, or (ii) modify any term or provision of the Cash Pay Notes or the New Indenture to the extent affecting the Cash Pay Notes, except for certain modifications as provided in the New Indenture and that customarily require the approval of each affected holder of the Cash Pay Notes (modification of the interest rate, ~~reduce~~reduction of the principal amount of, or ~~modify~~modification of the security for the Cash Pay Notes, or ~~extend~~extension of the Cash Pay Notes Maturity Date~~.~~).

Liens Securing the Cash Pay Notes.  The Cash Pay Notes shall be secured by a senior

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

57

first priority lien on the Collateral[42] and will rank senior in right of payment to all of the CapEx Notes and the Capital Appreciation Notes; provided, however, Reorganized LVMC shall have the right to obtain new financing in an amount not to exceed $12,000,000 (up to $6,000,000 per Monorail passenger station) in new senior secured construction financing related solely to the construction of up to two (2) new Monorail passenger stations along the currently existing Monorail alignment if such construction is unanimously approved by the Reorganized LVMC board of directors.  A first lien on 100% of the revenues attributable to the addition of such new Monorail passenger stations, a pledge of the Monorail passenger stations so constructed, and agreements pertaining only to those stations (e.g., leases) shall be available to Reorganized LVMC to secure the repayment of such construction financing for the new stations; provided further, however, that Reorganized LVMC may incur senior purchase money liens in the ordinary course of business (but, except as otherwise expressly stated in the Plan or in the Plan Documents, not liens for borrowed money).  Any such permitted indebtedness and/or permitted liens shall be (i) consistent with annual forecasts approved by the board of directors and (ii) subject to other restrictions contained in the New Indenture. The Cash Pay Notes will rank senior in right of payment to the Cap Ex CapEx Notes (and senior to any other permitted indebtedness of Reorganized LVMC, except as otherwise expressly provided in the Plan or in the Plan Documents).

The CapEx Notes.    The pay-in-kind capital expenditure notes due 2019 The New Indenture shall include provisions for the benefit of the holders of the Cash Pay Notes and the holders of the CapEx Notes that set forth (i) limitations on indebtedness and liens; (ii) a change of control put; (iii) limitations on asset sales and mandatory prepayment provisions with the proceeds of asset sales, with such asset sales limited to sales for fair value in which at least 75% of the consideration consists of cash (provided that Reorganized LVMC may engage without restriction in immaterial sales in the ordinary course of business of assets that are worn or

---

[42] Defined in the Plan as "Except to the extent specifically provided otherwise in [the] Plan, all Assets, and all proceeds, revenues, rents, issues and profits generated therefrom; and all assets and property, whether tangible or intangible, acquired by Reorganized LVMC in exchange or substitution for or in consideration of any of the foregoing, including Project Revenues."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    obsolete or not used or useful in the business of Reorganized LVMC); (iv) limitations on capital

2    expenditures (including an annual cap of $200,000 on expenditures for expansion analysis and

3    preparation, provided that (x) such expenditures are approved by Reorganized LVMC's board of

4    directors and (y) such expenditures are permitted only if all debt service on the Cash Pay Notes

5    is current, all Operations and Maintenance Costs accrued to the relevant date have been paid and

6    Reorganized LVMC has added cash to fund its working capital requirements); and (v) a

7    prohibition on CARP that does not comply with the definition in the Bombardier Agreement.

8         The CapEx Notes.  The Holders of the Allowed Secured Claim Portion of 1st Tier Bond

9    Claims, the Ambac 1st Tier Bondholders' Surety Bond Claims, and Ambac Insurance Claims

10   shall receive on the Effective Date a Pro Rata interest in the pay-in-kind capital expenditure

11   notes due on the CapEx Notes Maturity Date[43] to be issued by Reorganized LVMC in favor of

12   the New Trustee on the Effective Date pursuant to the New Indenture which will be in the

13   aggregate principal amount of $19,500,000 with interest in arrears at ten percent (10%) per

14   annum payable quarterly "in-kind" commencing, and thereafter continuing, on the CapEx Notes

15   Payment Date, with the last payment due on the CapEx Notes Maturity Date.

16        The CapEx Notes may be redeemed by Reorganized LVMC prior to the CapEx Notes

17   Maturity Date any time upon payment of the outstanding principal amount plus accrued but

18   unpaid interest to the date of redemption; provided, however, that all interest, principal and

19   principalpremium, if any, on the Cash Pay Notes shall have been paid in full.  For so long as the

20   CapEx Notes have not been paid, 100% of the holders of at least 66 2/3% of the CapEx Notes

21   (by accreted principal amount outstanding) shall be required for to (i) direct the New Trustee to

22   take any action affecting the CapEx Notes, or (ii) modify any term or provision of the CapEx

23   Notes or the New Indenture to the extent affecting the CapEx Notes, whether in response to a

24   proposal of Reorganized LVMC to modify the or otherwise, except for certain modifications as

25   provided in the New Indenture and that customarily require the approval of each affected holder

26   of the CapEx Notes (modification of the interest rate, reducereduction of the principal amount,

27   _____

     [43] The CapEx Notes Maturity Date is defined as "June 30, 2019, or a later agreed upon date in the event the CapEx
28   Notes are extended as provided in [the] Plan."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1   ~~modify~~ of, or modification of the security for the CapEx Notes, or ~~extend~~extension of the CapEx

2   Notes Maturity Date~~.  The~~ beyond June 30, 2025) and except that (i) the terms of the CapEx

3   Notes shall not be ~~substantially in the form attached as~~ modified so long as the Cash Pay Notes

4   are outstanding, except to the extent that such modification does not adversely affect the holders

5   of the Cash Pay Notes, and (ii) without the consent of the New Trustee, no such modification

6   shall cause the reduction at the time or at any future time of the balance of the CapEx Reserve

7   Account to an ~~exhibit to the Plan Supplement.~~ amount below $2,000,000 until or unless the

8   CapEx Notes have been satisfied, at which time the balance of the CapEx Reserve Account may

9   be reduced to $550,000.

10      The CapEx Notes shall be transferable in whole or in part, subject to applicable federal

11  and state securities laws (taking account of section 1145(a) of the Bankruptcy Code); provided,

12  however, that ~~a holder shall not have the right to transfer CapEx Notes in a face amount less than~~

13  ~~the interest therein issued by the New Trustee to the holder or the holder's predecessor-in-~~

14  ~~interest; provided further, however,~~ the holder of CapEx Notes shall have no right to transfer

15  CapEx Notes to a transferee without transferring to that same transferee the Capital Appreciation

16  Notes that were issued to that holder, or that holder's predecessor-in-interest with the CapEx

17  Notes to be transferred.

18      Prior to CapEx Notes Maturity Date, Reorganized LVMC may make a proposal to the

19  holders of the CapEx Notes for the extension of the CapEx Notes Maturity Date through a date

20  not later than June 30, 2025, with continuing contributions to the CapEx Reserve Account to be

21  made through such date~~.~~, or other proposal to redeem or modify the CapEx Notes provided that

22  the CapEx Maturity Date shall not be later than June 30, 2025.  Any such extension, or proposal

23  for redemption or modification, shall require the approval of holders of at least 66 2/3% in

24  principal amount of the CapEx Notes then outstanding.  ~~Reorganized LVMC shall also have the~~

25  ~~right to make a proposal to the holders of the CapEx Notes to redeem or modify the terms of the~~

26  ~~CapEx Notes; provided, however, that the Cash Pay Notes shall be paid in full as a condition to~~

27  ~~such redemption or modification.~~ If the holders of the CapEx Notes do not agree to such

28  extension or other proposal to redeem or modify the provisions of the CapEx Notes, and the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

CapEx Notes are not paid on or prior to the CapEx Notes Maturity Date, the holders of the CapEx Notes ~~amounts may exercise their rights and remedies. At least 66 2/3% in principal amount of the CapEx Notes outstanding with exceptions for certain modifications of the CapEx Notes as provided in the New Indenture (change of interest rate, reduction of principal amount, release of collateral, or extension of maturity beyond June 30, 2025, which require unanimity) may direct the New Trustee to take action with respect to the CapEx Notes.~~may exercise their rights and remedies set forth in the New Indenture and the Security Documents.

Liens Securing the CapEx Notes. The ~~Cap Ex~~CapEx Notes shall be secured by a second priority lien (subordinate only to the Cash Pay Notes) on the Collateral, to become a first priority lien upon repayment in full of the Cash Pay Notes; provided, however, Reorganized LVMC shall have the right to obtain new financing in an amount not to exceed $12,000,000 (up to $6,000,000 per Monorail passenger station) in new senior secured construction financing related solely to the construction of up to two (2) new Monorail passenger stations along the currently existing Monorail alignment if such construction is unanimously approved by the Reorganized LVMC board of directors. A first lien on 100% of the revenues attributable to the addition of such new Monorail passenger stations, a pledge of the Monorail passenger stations so constructed, and agreements pertaining only to those stations (e.g., leases) shall be available to Reorganized LVMC to secure the repayment of such construction financing for the new stations; provided further, however, that Reorganized LVMC may incur senior purchase money liens in the ordinary course of business (but, except as otherwise expressly stated in the Plan or in the Plan Documents, not liens for borrowed money). Any such permitted indebtedness and/or permitted liens shall be (i) consistent with annual forecasts approved by the board of directors and (ii) subject to other restrictions contained in the New Indenture. The CapEx Notes will rank senior in right of payment to the Capital Appreciation Notes (and senior to any other permitted indebtedness of Reorganized LVMC, except as otherwise expressly provided in thw Plan or in the Plan Documents).

Excess Cash. All Excess Cash shall be distributed by the New Trustee in the following order of priority: (i) to pay in cash any quarterly interest on the Cash Pay Notes that had been

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555
102200-002/Comparison

previously paid "in-kind;" (ii) then to pay the minimum amortization of principal to the extent required by the Cash Pay Notes; (iii) then to fund an amount in the CapEx Reserve Account in the amount of $2,000,000 as a reserve for the New Trustee (which reserve shall be reduced to $~~200~~550,000 after or in connection with the satisfaction of the CapEx Notes); (iv) then, provided that all debt service on the Cash Pay Notes is current, $50,000 in each calendar quarter to the payment of the costs and fees described in clause (vi) below; (v) then 50% to redeem the outstanding principal of the Cash Pay Notes, on a pro rata basis, and 50% to fund the CapEx Reserve Account, until the Cash Pay Notes are redeemed in full; (vi) then to pay any otherwise unreimbursed and reasonable professional fees and expenses of the 1st Tier ~~Indenture (specifically the attorney fees and costs of Lewis & Roca and Houlihan Lokey) and of the holders of approximately 73% in face amount of the 1st Tier Bonds (specifically the attorney fees and costs of Kramer Levin, Neftalis & Frankel and Houlihan Lokey); and (v~~Trustee other than in respect of professional fees and expenses incurred in relation to the Rehabilitation Proceeding and the TIP Proceeding and of the Majority 1st Tier Bondholders other than in respect of professional fees and expenses incurred in relation to the Rehabilitation Proceeding and the TIP Proceeding (specifically, the attorney fees and costs of Kramer Levin, Naftalis & Frankel LLP, Nevada counsel, and Houlihan Lokey), and including any fees and costs advanced by such 1st Tier Bondholders to the 1st Tier Trustee, other than in respect of professional fees and expenses incurred in relation to the Rehabilitation Proceeding and the TIP Proceeding, until the professional fees and costs of the 1st Tier Trustee and Majority 1st Tier Bondholders have been paid in full; and (vii) and then to fund the CapEx Reserve Account, unless and until the amount held in the CapEx Reserve Account, after taking account of (and without credit for) any withdrawals that may be made in accordance with its terms from time to time, equals the outstanding balance on the CapEx Notes through June 30, 2019~~.   The funds in the CapEx Reserve Account shall be applied in the following order of priority: (i) the payment of the fees and expenses of the New Trustee (in respect of all of the Cash Pay Notes, the CapEx Notes and the Capital Appreciation Notes); (ii) the payment of scheduled interest and principal (including amortizing the principal) on the Cash Pay Notes; and (iii) the redemption of the CapEx Notes at~~

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

62

1    ~~maturity; provided, however, that if no default shall exist under the Cash Pay Notes, the CapEx~~
2    ~~Notes or the Capital Appreciation Notes, the funds in the CapEx Reserve Account may be~~
3    ~~applied as provided in Section 6.6 of the Plan~~; provided that if the CapEx Notes are extended
4    through June 30, 2025, contributions to the CapEx Reserve Account shall continue to be made as
5    aforesaid until the amount thereof equals the outstanding balance on June 30, 2025; provided
6    further that no distributions shall be made (other than to the CapEx Reserve Account) under
7    clauses (iv), (v) and (vi), if and to the extent that, after giving effect thereto, the amount of the
8    CapEx Reserve Account would be less than $2,000,000.

9    The treatment afforded the Holders of Class 4 Claims herein ~~does~~is not ~~(i)~~intended to and
10    shall not affect or extinguish the exclusion of interest paid on the 1st Tier Bonds (whether paid
11    by the Reorganized Debtor or any third party) from gross income for federal income tax
12    purposes~~; nor (ii) affect~~.

13    At the conclusion of the Confirmation Hearing, provided an 1111(b) election has not
14    been made by the requisite number and percentage of holders of Classes 4A, 4B, 4C, or ~~diminish~~
15    ~~any third-party rights to reimbursement~~ Classes 5A, 5B, or ~~subrogation under the 1st and 2nd~~
16    ~~Tier Indenture or 1st Tier Bondholders' Insurance Policy except as expressly set forth in the~~
17    ~~Plan~~5C Claims prior to the commencement of the Disclosure Statement hearing or as otherwise
18    ordered by the Bankruptcy Court, the 1st Tier Trustee shall have the right to elect to combine
19    Classes 4A and 5A and the treatment from Classes 4A and 5A so that the Plan is amended to
20    treat the 1st Tier Secured Claims and 1st Tier Unsecured Claims in one Class, being an amended
21    Class 4A.  If such an election is made, Class 4B and 5B shall be combined and Class 4C and 5C
22    shall be combined.

23    ~~The Holders of the 1st Tier Bond Secured Claims are Impaired and are entitled to vote on~~
24    ~~the Plan.~~

25    **5.    Treatment of Class 5 – Class 5A (1st Tier Bond Unsecured Claims~~).~~)., Class
26    5B (Ambac 1st Tier Bondholders' Surety Bond Unsecured Claims), and
Class 5C (Ambac Insurance Unsecured Claims).**

27    ~~The~~ Holders of the Unsecured Claims portions of the 1st Tier Bond ~~Unsecured~~ Claims,
28    ~~which consist of~~ the ~~Unsecured portion of the~~ Ambac 1st Tier Bondholders' Surety Bond Claims

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

held by (i), and the Ambac Insurance Claims, including the 1st Tier Trustee and Ambac, shall have no rights to payment under the 1st Tier Note issued by the Debtor to from Reorganized LVMC and no rights under the Financing Agreement or the 1st and 2nd Tier Indenture against Reorganized LVMC after the Effective Date.  Any obligations of the Debtor under the 1st Tier Note and the 1st and 2nd Tier Indenture shall be extinguished, cancelled, and discharged on the Effective Date, and the 1st Tier Note and the 1st and 2nd Tier Indenture shall continue in effect only as to parties other than Reorganized LVMC, including Ambac.  Any term in the Plan to the contrary notwithstanding, nothing as contained in the Plan or the Confirmation Order shall affect:

The right and ability of the Director in accordance with the Financing Agreement and assigned by the Director to the and the 1st Tier Trustee, and the 1st and 2nd Tier Indenture and (ii) the 1st Tier Bondholders under the 1st Tier Bonds, are as provided for in Class 5, which is an Impaired Class.  In full and final satisfaction of 1st Tier Bond Unsecured Claims:

(a) The 1st Tier Note and 1st Tier Bonds shall be extinguished and discharged;

(b) The the 1st and 2nd Tier Indenture shall be amended by the New Indenture; and

(a)  Onto amend and restate the Effective Date, the Holders of 1st and 2nd Tier Bond Unsecured Claims shall receive Indenture with the assistance of Reorganized LVMC, as necessary and appropriate.

(b)  The rights of Holders of 1st Tier Bond Claims under the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond, and their rights under the 1st and 2nd Tier Indenture to the extent of pursuing claims against the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' 1st Tier Bondholders' Surety Bond.

(c)  The powers, rights, privileges and immunities of the 1st Tier Trustee under the 1st and 2nd Tier Indenture as the 1st Tier Trustee deems reasonably necessary and appropriate with respect to the administration of its duties to the 1st Tier Bondholders, provided that the 1st Tier Trustee shall have no rights to receive indemnification or payment of its fees and expenses from Reorganized LVMC for

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

64

1    fees and expenses incurred by the 1st Tier Trustee with respect to the Rehabilitation

2        Proceedings or the TIP Proceedings.

3        Subclass 5A.  In full and complete satisfaction of the Unsecured Claim portion of any and

4    all 1st Tier Bond Claims (Class 5A Claims), the Holders of 1st Tier Bond Claims (which Claims

5    include, as of the Record Date, the Unsecured Claim portion of Ambac's Claim for 1st Tier

6    Bonds purchased and held by Ambac), shall receive on the Effective Date a Pro Rata interest in

7    the Capital Appreciation Notes, as follows:.  The Capital Appreciation Notes shall be governed

8    by the New Indenture and secured by the Security Documents.  Any obligations of the Debtor

9    under the 1st Tier Note and the 1st and 2nd Tier Indenture shall be extinguished, cancelled, and

10    discharged on the Effective Date.

11    The Capital Appreciation Notes.  The Holders of 1st Tier Bond UnsecuredSubclass 5B.

12    In full and complete satisfaction of the Unsecured Claim portion of any and all Ambac Surety

13    Bond Claims (Class 5B Claims) against LVMC, Ambac's contribution and reimbursement rights

14    with respect to the Ambac Surety Bond Claims, if any, shall be treated by participation in the

15    Capital Appreciation Notes in an amount determined under applicable law and the 1st and 2nd

16    Tier Indenture.

17        Subclass 5C.  In full and complete satisfaction of the Unsecured Claim portion of any and

18    all Ambac Insurance Claims (Class 5C Claims) against LVMC, on the Effective Date Ambac

19    shall retain any reimbursement or contribution rights and its subrogation rights under the 1st Tier

20    Bondholders' Insurance Policy as limited by 11 U.S.C. § 509(a) and (b), and pursuant to 11

21    U.S.C. § 509(c) and applicable law, Ambac shall have the rights to assert those reimbursement or

22    contribution rights or rights only after and to the extent of payment of the 1st Tier Bond Claims

23    in full (or with such lesser amount accepted by the Holders in full and complete satisfaction of

24    the 1st Tier Bond Claims or as otherwise permitted under the governing agreements and

25    applicable law). The Ambac subrogation rights with respect to the Unsecured Claim portion of

26    the Ambac Insurance Claims, if any, shall be limited to receipt of the balance outstanding of the

27    outstanding payment stream due under the Capital Appreciation Notes, but only after payment of

28    the Class 5B Claims.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    The Holders of Class 5A, Class 5B and Class 5C Claims are Impaired under the Plan and

2    are entitled to vote on the Plan.

3    The Capital Appreciation Notes.  The Holders of Unsecured Claims portions of the 1st

4    Tier Bond Claims, the Ambac 1st Tier Bondholders' Surety Bond Claims, and the Ambac

5    Insurance Claims shall receive on the Effective Date a Pro Rata interest in the pay-in-kind capital

6    appreciation notes to be issued by Reorganized LVMC in favor of the New Trustee on the

7    Effective Date pursuant to the New Indenture which will be in the aggregate principal amount of

8    $10,000,000 with interest in arrears at 8.315% per annum compounded and payable "in-kind"

9    annually, at the end of each calendar year, with interest commencing on the Effective Date, until

10   the Capital Appreciation Note Maturity Date.[44]  The Capital Appreciation Notes shall be

11   governed by the New Indenture and secured by the Security Documents..

12   The Capital Appreciation Notes may be redeemed by Reorganized LVMC if approved by

13   the holders of at least 66 2/3% of the Capital Appreciation Notes outstanding (by accreted

14   principal amount outstanding), subject to the payment of the Triggering Event Payment.[45] The

15   _____

16   [44] "Capital Appreciation Note Maturity Date" is defined in the Plan as "The earliest to occur of the occurrence of a Triggering Event and June 30, 2055."

17   [45] A "Triggering Event" under the Plan is defined as "Any one or more of the following events: (i) recapitalization

18   of the majority of Reorganized LVMC's then outstanding indebtedness, (ii) the sale of substantially all of the Assets, (iii) an acceleration of the Capital Appreciation Notes Maturity Date by the New Trustee due to a default by Reorganized LVMC under the Capital Appreciation Notes, and (iv) the commencement of a voluntary bankruptcy

19   case by Reorganized LVMC or an involuntary bankruptcy case against Reorganized LVMC by someone other than the New Trustee, the holder of a Cash Pay Note, a CapEx Note or a Capital Appreciation Note or interest therein."

20   "Triggering Event Payment" is defined in the Plan as: An amount equal to (i) the accreted principal amount on the

21   Capital Appreciation Notes plus (ii) an additional amount equal to the yield maintenance premium (defined in the following formula) which when added to the then accreted principal amount on the Capital Appreciation Notes and

22   invested at the applicable treasury rate (defined in the following formula), would be equal to the principal amount at stated maturity, calculated as follows:

23   $M = P/(1 + r)n - A$

24   Where,

25   M        is the yield maintenance premium.

     P        is the principal amount of the Capital Appreciation Notes at stated maturity.

26   r        is the applicable treasury rate, being the lesser of (x) the most recently published 30 year Treasury Bond at the time of the Triggering Event and (y)  2.52%.

27   n        is the number of years to maturity on the Capital Appreciation Notes (rounded up or down to the nearest

28   whole number).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

66

Capital Appreciation Notes shall be ~~substantially in the form attached as an exhibit~~subject to the ~~Plan Supplement.~~terms of the New Indenture.    The Capital Appreciation Notes shall be transferable, subject to applicable federal and state securities laws (taking account of section 1145(a) of the Bankruptcy Code), provided, however, that ~~a holder shall not have the right to transfer Capital Appreciation Notes in a face amount less than the interest therein issued by the New Trustee to the holder or the holder's predecessor in interest, and, provided further, however that the holder of CapEx~~Holders of Capital Appreciation Notes shall have no right to transfer Capital Appreciation Notes to a transferee without transferring to that same transferee all of the ~~CapEx~~Capital Appreciation Notes that were issued to that holder, or that holder's predecessor-in-interest~~,~~ with the Capital Appreciation Notes to be transferred.    ~~The~~ For so long as the Capital Appreciation Notes have not been paid, the holders of at least 66 2/3% of the Capital Appreciation Notes (by accreted principal amount outstanding) ~~with exceptions~~shall be required to (i) direct the New Trustee to take any action affecting the Capital Appreciation Notes, or (ii) modify any term or provision of the Capital Appreciation Notes or the New Indenture to the extent affecting the Capital Appreciation Notes, whether in response to a proposal of Reorganized LVMC or otherwise, except for certain modifications ~~of the Capital Appreciation Notes as~~ as provided in the New Indenture ~~(change of~~and that customarily require the approval of each affected holder of the Capital Appreciation Notes (modification of the interest rate, reduction of the principal amount~~, release of collateral~~ of, or modification of the security for the Capital Appreciation Notes, or extension of ~~maturity beyond June 30, 2025, each of which require unanimity) may direct the New Trustee to take action with respect to~~ the Capital Appreciation Notes: Maturity Date); provided, however, that such ~~customary~~ exceptions shall not apply to a ~~recapitalization or extraordinary transaction~~modification made in connection with an Extraordinary Transaction (i) approved by the vote of the holders of at least 66 2/3% of the ~~holders of the~~Capital Appreciation Notes (by accreted principal amount outstanding) and that results in payment to the holders that is at least as beneficial to the holders of the Capital

_____ (continued)

~~A        is the accreted principal amount of the Capital Appreciation Notes as of the date of the Triggering Event.~~ The terms "Triggering Event" and "Triggering Event Payment" are defined in the Plan.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1   Appreciation Notes as the Triggering Event Payment or (ii) approved by the vote of at least 66

2   2/3% of the holders of the Capital Appreciation Notes outstanding, including holders of 75% of

3   the Capital Appreciation Notes (by accreted principal amount outstanding) voting on the

4   proposed modification.

5          Liens Securing the Capital Appreciation Notes.  The Capital Appreciation Notes shall be

6   secured by a third priority lien (subordinate only to the Cash Pay Notes and CapEx Notes) on the

7   Collateral, to become a second priority lien upon the repayment in full of the Cash Pay Notes and

8   then to become a first priority lien upon repayment in full of the Cash Pay Notes and the CapEx

9   Notes; provided, however, Reorganized LVMC shall have the right to obtain new financing in an

10  amount not to exceed $12,000,000 (up to $6,000,000 per Monorail passenger station) in new

11  senior secured construction financing related solely to the construction of up to two (2) new

12  Monorail passenger stations along the currently existing Monorail alignment if such construction

13  is unanimously approved by the Reorganized LVMC board of directors.  A first lien on 100% of

14  the revenues attributable to the addition of such new Monorail passenger stations, a pledge of the

15  Monorail passenger stations so constructed, and agreements pertaining only to those stations

16  (e.g., leases) shall be available to Reorganized LVMC to secure the repayment of such

17  construction financing for the new stations; provided further, however, that Reorganized LVMC

18  may incur senior purchase money liens in the ordinary course of business (but, except as

19  otherwise expressly stated in the Plan or in the Plan Documents, not liens for borrowed money).

20  Any such permitted indebtedness and/or permitted liens shall be (i) consistent with annual

21  forecasts approved by the board of directors and (ii) subject to other restrictions contained in the

22  New Indenture.  The Capital Appreciation Notes will rank senior in right of payment to any other

23  permitted indebtedness of Reorganized LVMC, except as otherwise expressly provided in the

24  Plan or in the Plan Documents; provided further, however, that the lien of the Capital

25  Appreciation Notes may be subordinated to indebtedness of Reorganized LVMC to fund capital

26  expenditures unanimously approved by Reorganized LVMC's board of directors in amounts to

27  be determined if so approved by holders of at least 66 2/3% of the Capital Appreciation Notes

28  amounts outstanding (in principal amount).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

The treatment afforded the Holders of Class 5 Claims herein does not affect or extinguish the exclusion of interest paid on the 1st Tier Bonds (whether paid by the Reorganized Debtor or any third party) from gross income for federal income tax purposes; nor (iii) affect or diminish any third-party rights to reimbursement or subrogation under the 1st and 2nd Tier Indenture or 1st Tier Bondholders' Insurance Policy..

The Holders of Class 55A, 5B, and 5C Claims are Impaired under the Plan and are entitled to vote on the Plan.

**Terms Applicable to Both Classes 4 and 5.**  Each of the Cash Pay Notes, the CapEx Notes, and the Capital Appreciation Notes shall be issued directly by the Debtor or Reorganized LVMC, as applicable, to the New Trustee.  The New Trustee shall serve under a single indenture (the "New Indenture"), providing for the issuance in three separate series of the Cash Pay Notes, the CapEx Notes, and the Capital Appreciation Notes, and providing for the authority of the New Trustee to appoint series trustees for one or more of the series in the event of conflicts.  The New Indenture shall include provisions for the benefit of the holders of the Cash Pay Notes and the holders of the CapEx Notes that set forth (i) limitations on indebtedness and liens; (ii) a change of control put; (iii) limitations on asset sales and mandatory prepayment provisions with the proceeds of asset sales, with such asset sales limited to sales for fair value in which at least 75% of the consideration consists of cash (provided that Reorganized LVMC may engage without restriction in immaterial sales in the ordinary course of business of assets that are worn or obsolete or not used or useful in the business of Reorganized LVMC); (iv) limitations on capital expenditures (including an annual cap of $200,000 on expenditures for expansion analysis and preparation, provided that (x) such expenditures are approved by Reorganized LVMC's board of directors and (y) such expenditures are permitted only if all debt service on the Cash Pay Notes is current, all Operations and Maintenance Costs accrued to the relevant date have been paid and Reorganized LVMC has added cash to fund its working capital requirements); and (v) a prohibition on CARP that does not comply with the definition in the Monorail Operation and Maintenance Agreement.

Unencumbered fee title to Reorganized LVMC's Assets will vest solely in the State when

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

69

the Cash Pay Notes, CapEx Notes, and Capital Appreciation Notes are discharged. All leases, management contracts, and other similar encumbrances on the Project, shall terminate upon discharge of the Cash Pay Notes, CapEx Notes, and Capital Appreciation Notes.

At the conclusion of the Confirmation Hearing, provided an 1111(b) election has not been made by the requisite number and percentage of holders of Classes 4A, 4B, 4C, or Classes 5A, 5B, or 5C Claims prior to the commencement of the Disclosure Statement hearing or as otherwise ordered by the Bankruptcy Court, the 1st Tier Trustee shall have the right to elect to combine Classes 4A and 5A and the treatment from Classes 4A and 5A so that the Plan is amended to treat the 1st Tier Secured Claims and 1st Tier Unsecured Claims in one Class, being an amended Class 4A. If such an election is made, Class 4B and 5B shall be combined and Class 4C and 5C shall be combined.

**6.    Treatment of Class 6 (2nd Tier Bond Claims).**

Holders of the 2nd Tier Bond Claims, which consist of any and all Claims held by a 2nd Tier Bondholder and the 2nd Tier Trustee under the 1st and 2nd Tier Indenture, the 2nd Tier Bonds, the 2nd Tier Obligation, and the Financing Agreement, are provided for in Class 6 of the Plan. 2nd Tier Bond Claims are contractually subordinated to the 1st Tier Bond Claims. Because the Class 4 and 5 1st Tier Bond Claims are not being paid in full, Holders of Class 5 6 Claims shall not receive or retain any property on account of their Claims under the Plan. The 2nd Tier Obligation will Any obligations of the Debtor under the 2nd Tier Obligation and any and all obligations of the Debtor due under the Financing Agreement, the 1st and 2nd Tier Indenture, and the 2nd Tier Bonds shall be extinguished, cancelled, and discharged. The Holders of the 2nd Tier Bond Claims are Impaired and, are deemed to have rejected the Plan, and are not entitled to vote on the Plan.

**7.    Treatment of Class 7 (3rd Tier Bond Claims).**

Holders of the 3rd Tier Bondholders Bond Claims, which consist of any and all Claims held by a 3rd Tier Bondholder and the 3rd Tier Trustee under the 3rd Tier Indenture, the 3rd Tier Bonds, the 3rd Tier Note, and the Financing Agreement, are contractually subordinated to the 1st Tier Bond Claims and 2nd Tier Bond Claims. Because the provided for in Class 4 1st Tier Bond

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

70

1    Claims and 7.  Holders of Class 5 2nd Tier Bond Claims are not being paid in full, Holders of

2    Class 67 Claims shall not receive or retain any property on account of their Claims under the

3    Plan.  The 3rd Tier Note will, as the 3rd Tier Bond Claims are contractually subordinated to the

4    1st Tier Bond Claims and 2nd Tier Bond Claims.  Any and all obligations of Debtor under the

5    3rd Tier Note and any and all obligations of the Debtor due under the Financing Agreement, the

6    3rd Tier Indenture, and the 3rd Tier Bonds shall be extinguished, cancelled, and discharged.  The

7    Holders of the 3rd Tier Bond Claims are Impaired and, are deemed to have rejected the Plan.,

8    and are not entitled to vote on the Plan.

9         8.    **Treatment of Class 8 (Director Claims).**

10        On the Effective Date, the Financing Agreement shall be terminated and be of no further

11   force and effect.  The Director shall be released and discharged from any liability under the

12   Financing Agreement and the Indentures and shall be released as provided for in the Plan.

13   Specifically, the Director shall be released and discharged from any and all liability under the

14   Financing Agreement, the 1st and 2nd Tier Indenture, 1st Tier Bondholders' Insurance Policy,

15   and the Surety Bond.  In exchange therefor, from and after the Effective Date, all Allowed

16   Director Claims shall be deemed satisfied in full.  *A vote in favor of the Plan shall constitute*

17   *consent to release and discharge of the Director from any liability under the Financing*

18   *Agreement and the Indentures, and for all other releases granted to the Director pursuant to*

19   *the Plan.*

20        The Director Claims are Impaired under the Plan and entitled to vote on the Plan.

21        The Holder of the Director Claims, which consist of any Claims of the Director arising

22   under or related to the Financing Agreement (and by implication thereof its rights under the 1st

23   and 2nd Tier Indenture) which are not part of the 1st Tier Bond Claims, 2nd Tier Bond Claims,

24   3rd Tier Bond Claims, or Subordinated Claims, are provided for in Class 8 of the Plan.  The

25   Financing Agreement will be deemed extinguished and the Director will not receive or retain any

26   property on account of such Director Claims other the any funds remaining in the

27   "Indemnification Account" within the Contingency Fund as defined in the 1st and 2nd Tier

28   Indenture.  The Director is a Third Party Releasee and on the Effective Date *will receive the*

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

71

*Third Party Release as provided for in Section 10.7 of the Plan*.  The Director's Claims are Impaired under the Plan, and the Director is entitled to vote on the Plan.

The Director's Claim consists of its numerous rights under the Financing Agreement, and any rights of the Director under the 1st Tier Note, the 2nd Tier Obligation, and the 3rd Tier Obligation.  The Director has numerous rights under the Financing Agreement, such as indemnification, which were not assigned for the benefit of the 1st Tier Bondholders, 2nd Tier Bondholders, or 3rd Tier Bondholders.

Though the Director assigned substantially all of his rights under the Financing Agreement to the 1st Tier Trustee, the Director specifically retained "the right of the Director to receive certain payments, if any, with respect to expenses and indemnification of the Director, or to enforce its rights, under Sections 4.2(b), 4.2(c),[46] 7.3, 9.2 and 9.3 hereof and consent rights of the Director hereunder."[47]

The rights of the Director specifically withheld were as follows:

- Section 4.2(b) sets forth the right of the Director to be paid by the Debtor for all of " . . . (v) the costs, charges and expenses of the Director incurred in connection with the Director's visit/inspection of the Project pursuant to Section 5.1 hereof . . . and . . . (vi) all other expenses of the Director related to the Project or the Bonds not otherwise expressly required to be paid by the Borrower hereunder. . . ."[48]

- Section 7.3 provides for the right of the Director to receive from the Debtor its reasonable attorneys' fees and other expenses in the event of a default.[49]

- Section 9.2 provides for indemnification of the Director by the Debtor against

  all costs and charges, including reasonable fees and disbursements of attorneys, accountants, consultants and other experts, incurred in good faith in connection with this Agreement, the Bonds, the [1st and 2nd Tier] Indenture or the [3rd Tier] Indenture, including but not limited to any judicial or administrative proceeding or investigation or audit.[50]

- Section 9.3 provides a broad indemnification to the Director, as follows:

  . . . [F]rom and against, any and all losses, claims, damages, liabilities or expenses, of every conceivable kind, character and

---

[46] Section 4.2(c) of the Financing Agreement provides for the payment of a bond issuance fee to the Director, which has been satisfied.
[47] Financing Agreement § 4.4.
[48] Financing Agreement § 4.2(b).
[49] Financing Agreement § 7.3.
[50] Financing Agreement § 9.2.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

nature whatsoever arising out of, resulting from or in any way connected with (1) the Project, or the conditions, occupancy, use, possession, conduct or management of, or work done in or about, or from the planning, design, acquisition, installation or construction of the Project or any part thereof; (2) the issuance of any Bonds or any certifications or representations made in connection therewith and the carrying out of any of the transactions contemplated by the [1st Tier Bonds and 2nd Tier Bonds] or the [3rd Tier] Bonds and this Agreement, including but not limited to any claims related to the offering and sale of any Bonds, or relating to the Tax exempt status of any Bonds; . . . or . . . the Borrower further covenants and agrees, to the extent permitted by law, to pay or to reimburse the Indemnified Party for any and all reasonable costs, reasonable attorneys [sic] fees, liabilities or expenses incurred in connection with investigating, defending against or otherwise in connection with any such losses, claims, damages, liabilities, expenses or actions, except to the extent that the same arise out of the gross negligence or willful misconduct of the party claiming such payment or reimbursement . . . if, in the sole discretion of the Director and his officers, employees and agents, an actual or potential conflict exists with respect to the defenses available to the Borrower and the Director or such officers, employees and agents, such Indemnified Party, at the expense of the Borrower, shall have the right to employ separate counsel in any action and participate in the defense thereof, at its option . . . The provisions of this Section shall survive any resignation or removal of the Trustee and the retirement of the Bonds.

Other provisions of the Financing Agreement grant rights to the Director independent of the 1st Tier Trustee.  Section 4.2(d) requires the Debtor to pay the following:

the reasonable fees and expenses of Independent Certified Public Accountants or Independent Engineers necessary for the preparation of annual or other audits, reports or summaries thereof required…by the Director, including a report of an Independent Certified Public Accountant with respect to any fund established under the [1st and 2nd Tier] Indenture or [3rd Tier] Indenture which may be required by law; any other reasonable fees and expenses of financial analysts or Independent Engineers or others reasonably required to be employed by the Director in connection with the Project or the Bonds.[51]

Section 5.1 of the Financing Agreement further provides the Director with certain visitation and inspection rights.  Specifically, Section 5.1 provides:

the Director, the Trustee and the duly authorized agents of either of them (including, but not limited to, the Independent Engineer or Independent Certified Public Accountant) shall have the right at all reasonable times to enter upon the site of the Project to examine and inspect the Project.  The Borrower further agrees and understands that the Director will make at least one visit/inspection of the Project during the term of the Bonds at the

---

[51] Financing Agreement § 4.2(d).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    expense of the Borrower, and the Borrower shall either reimburse the
2    Director or pay in advance the costs, charges and expenses of the Director
     in connection with any such visit/inspection.[52]

3    Certain other provisions of the Financing Agreement set forth the Debtor's financial
4    covenants, which the Director may enforce.  Section 5.2 of the Financing Agreement provides
5    that the Debtor

6    will provide to the Director and the Trustee copies of its budget
     (the "Annual Budget") (which has been reviewed and approved by
7    the Independent Engineer and the Board of Directors of the
     Borrower) setting forth the estimated Operation and Maintenance
8    Costs… and all other necessary costs of the Borrower for such
     Fiscal Year and take such action, if any, as may be required to
9    comply with the Borrower's obligations under Section 5.8(a).  Any
10   such Annual Budget may be amended at any time during any
     Fiscal Year and the Borrower shall provide a copy of such
11   amendment to the Director and the Trustee promptly after the
     approval thereof; provided, however, that if such amendments
12   exceed, when aggregated with any other amendments made during
13   such Fiscal Year, 5% of the then-current Annual Budget, such
     amendment shall be approved by the Independent Engineer.[53]

14
15   Section 5.3 of the Financing Agreement provides that the Debtor may consolidate, merge,
16   or sell all or substantially all of its assets only if (i) the Debtor provides "written notice to the
17   Director 120 days prior to such transfer," (ii) the Debtor provides "an opinion of Bond Counsel
18   to the Director and the Trustee to the effect that the resulting change in ownership of the Project
19   or disposition of assets will not cause interest on the Bonds not to be Tax-exempt…," and (iii)
20   the surviving entity, "if such entity is not the Borrower, assumes and agrees in writing to pay and
     perform all of the obligations of the Borrower hereunder and under the Project Agreements."[54]
21
22   Section 5.6(e) provides the limitation that the Debtor "shall at all times keep the Project,
23   the Project Revenues, the Project Agreements, and the Collateral free of all liens except the
24   security interest granted hereunder or liens permitted hereunder…"[55]  Similarly, Section 5.6(h)
25   provides that the Debtor may only incur additional indebtedness in certain limited circumstances,
26

[52] Financing Agreement § 5.1.
27   [53] Financing Agreement § 5.2.
     [54] Financing Agreement § 5.3.
28   [55] Financing Agreement § 5.6(e).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

74
102200-002/Comparison

if, among other things, the Debtor submits "to the Trustee and the Director a Certificate, supported by a report of a Ridership and Revenue Consultant acceptable to the Director, to the effect that no Loan Default Event has occurred and is continuing under the Financing Agreement."[56]

Section 5.7 entitles the Director to receive, no later than 180 days after the end of each Fiscal Year, the Debtor's audited financial statements, accompanied by an opinion of an Independent Certified Public Accountant."[57]

Section 5.8(a) limits the discretion of the Debtor with respect to the Monorail's fare rates, and Section 5.8(b) provides that if the Debtor fails to satisfy the fare yield required by Section 5.8(a), the Debtor must commission, at its expense, a Ridership and Revenue Consultant to prepare a fare study to recommend actions to remedy the noncompliance, and use its best efforts to implement the recommendations of the Ridership and Revenue Consultant.[58]

As stated above, the Director may enforce the Debtor's financial covenants which are set forth in the Financing Agreement.  Section 7.2(b) provides that in addition to the Trustee, the Director "may take whatever action at law or in equity as may be necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this Agreement."[59]

The Director Claim(s) is impaired and the Holder of the Director Claim(s) is entitled to vote on the Plan.

9.    **Treatment of Class 9 (Subordinated Claims).**

Holders of Subordinated Claims shall not receive any distribution on account of such Claims.  Holders of Class 89 Claims are Impaired under the Plan, not entitled to vote on the Plan, and deemed to have rejected the Plan.  At this time, the Debtor does not believe there are any Holders of Class 9 Subordinated Claims.

---

[56] Financing Agreement § 5.6(h)(ii)(A)-(H).
[57] Financing Agreement § 5.7.
[58] Financing Agreement § 5.8.
[59] Financing Agreement § 7.2(b).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

75

**D.      Means for Implementation of the Plan.**

    **1.      Reorganized LVMC.**

On or before the Effective Date, the Reorganized LVMC Organizational Documents shall be executed and, to the extent required, filed with the Nevada Secretary.   The Reorganized LVMC Organizational Documents shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.   After the Effective Date, Reorganized LVMC shall be responsible for the preparation of all reports, tax returns and other governmental filings required to be filed by the Debtor and Reorganized LVMC and all obligations related thereto.

    **2.      Additional Reorganized LVMC Provisions.**

Reorganized LVMC Organizational Documents, and resolutions or similar documents related to the formation and governance of Reorganized LVMC under the Plan shall be subject to applicable bankruptcy and/or Nevada law.   Reorganized LVMC shall remain a Nevada non-profit corporation.

    **3.      Effective Date Events.**

On the Effective Date:

    (a)      The Any obligations of the Debtor under the 1st Tier Note, the 2nd Tier Note Obligation, and the 3rd Tier Note shall be extinguished, cancelled, and discharged;

    (a)      Reorganized LVMC and of no further force or effect;

    (b)      The the Assets shall be released from any and all obligations and liabilities arising under the 1st and 2nd Tier Indenture and , the 3rd Tier Indenture shall be terminated and of no further force, and effect;

    (c)(b)      The 1st Tier Trustee, 2nd Tier Trustee the Financing Agreement, and 3rd Tier Trustee the Financing Agreement shall each be terminated cancelled and discharged from their duties except to the extent necessary or useful to retain and responsibilities; pursue or recover

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1   claims against the 1st Tier Bondholders' Insurance Policy and/or 1st Tier Bondholders' Surety

2   Bond;

3          (c)      None of the 1st Tier Note, the 2nd Tier Obligation and the 3rd Tier Note shall be

4   a payment obligation of Reorganized LVMC, and the 1st Tier Note and 1st and 2nd Tier

5   Indenture shall continue in effect, provided that in no event shall the 1st Tier Note, 2nd Tier

6   Obligation, the 3rd Tier Note, the 1st and 2nd Tier Indenture, or the 3rd Tier Indenture be

7   effective or enforceable against Debtor or Reorganized LVMC);

8          (d)      Reorganized LVMC shall execute and deliver to the New Trustee the (i) the Cash

9   Pay Notes, (ii) the CapEx Notes, (iii) the Capital Appreciation Notes, (iv) the New Indenture,

10  and (v) the Security Documents, all of which shall become immediately effective,; and

11         (e)      The New Trustee shall deliver the Cash Pay Notes, the CapEx Notes, and the

12  Capital Appreciation Notes to Cede & Co., as nominee of the Depository Trust Company to be

13  distributed byhold as record owner for the Depository Trust Company Pro Rata to the benefit of

14  the Holders of the 1st Tier Bonds as of the Record Date of the 1st Tier Bonds.

15         **4.       Post-Effective Date Directors, Management and Operations.**

16         On and after the Effective Date, Reorganized LVMC will continue to be managed by the

17  existing managers, officers, and directors under their existing employment agreements, if any,

18  including any postpetition modifications thereto, pursuant to the Reorganized LVMC

19  Organizational Documents, and otherwise according to the terms and conditions that existed on

20  the date of the filing of the Plan, unless otherwise disclosed.  Reorganized LVMC shall be

21  responsible for the payment of all Allowed Claims to be paid pursuant to the Plan which are not

22  paid on or before the Effective Date, as well as all Allowed Claims, including Taxes and

23  Professional Fees, incurred by the Debtor and in operating its business and complying with the

24  Plan up to and including the Effective Date, whether due and payable before or after the

25  Effective Date.  Reorganized LVMC is authorized without further order of the Bankruptcy Court

26  to incur new obligations consistent with the Plan, the Cash Pay Note,Notes, the CapEx

27  Note,Notes, the Capital Appreciation NoteNotes, and the New Indenture.

28         **5.       Post-Effective Date Directors, Management, and Operations.**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

77

102200-002/Comparison

On and after the Effective Date, the initial board of directors of Reorganized LVMC shall be reconstituted to be comprised of seven (7) individuals, which shall include the six (6five (5) individuals serving on the board of directorsBoard on the Confirmation Date., and two (2) individuals selected by the Majority 1st Tier Bondholders, one (1) of whom shall be designated the special director of the holders of the Cash Pay Notes and one (1) of whom shall be designated the special director of the holders the CapEx Notes, as provided in **Section 6.8.2** of the Plan. Thereafter, members of the board of directors shall be selected pursuant to the Reorganized LVMC Organizational Documents. The initial officers shall be comprised of the individuals employed as officers on the Confirmation Date, pursuant to each such individuals' employment agreement, if any, as may have been modified or amended prior to Confirmation. The Debtor will disclose, at or prior to the Confirmation Hearing, the identity of such individuals.

Consistent with applicable law and the Nevada Governor's existing rights regarding the appointment and removal of Debtor's directors, prior to the Effective Date but effective only upon the Effective Date, the Reorganized LVMC Organizational Documents are toshall be amended to provide the right of the holders of the Cash Pay Notes and the holders of the CapEx Notes (each acting by majority in principal amount or accreted principal amount) to each select, remove, and replace a special director of Reorganized LVMC until such time as their respective notes have been paid in full, at which time the applicable special director shall be deemed to have resigned.  The vote of the Cash Pay Notes special director and the CapEx Notes special director will be required for any determination by the Reorganized LVMC board of directors to (i) engage in any extraordinary corporate transaction (e.g., a merger, reorganization, expansion, extraordinary dividend or sale of a substantial amount of assets); or (ii) commence any voluntary bankruptcy or other insolvency, restructuring or liquidation proceeding of Reorganized LVMC. AtConsistent with applicable law and the Nevada Governor's existing rights regarding the appointment and removal of Debtor's directors, at such time as the special director appointed by the holders of the Cash Pay Notes is no longer serving on the LVMC board, the holders of the Capital Appreciation Notes (acting by majority in accreted principal amount) shall have the right to select, remove and replace on (1) special director of Reorganized LVMC; and at such time as

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

78

the special directors appointed by the holders of the Cash Pay Notes and the CapEx Notes are no longer serving on the LVMC board, the holders of the ~~holders of the~~ Capital Appreciation Notes (acting by majority in_ accreted_ principal amount) shall have the right to select, remove, and replace two (2) special directors of Reorganized LVMC until such time as the Capital Appreciation Notes are paid, at which time such special directors shall be deemed to have resigned.  The vote of the Capital Appreciation Notes special directors will be required for any determination to (i) engage in any ~~extraordinary corporate transaction (e.g., a merger, reorganization, expansion, extraordinary dividend or sale of a substantial amount of assets);~~Extraordinary Transaction; or (ii) commence any voluntary bankruptcy or other insolvency, restructuring or liquidation proceeding of Reorganized LVMC.

~~Reorganized LVMC shall be responsible for the payment of all Allowed Claims to be paid pursuant to the Plan which are not paid on or before the Effective Date, as well as all Allowed Claims, including Taxes and Professional Fees, incurred by the Debtor in operating its business and complying with the Plan up to and including the Effective Date, whether due and payable before or after the Effective Date.~~

Reorganized LVMC's officers shall be the individuals employed as officers on the Confirmation Date, pursuant to each such individual's Employment Agreement, if any, as may have been modified, amended or extended prior to Confirmation.   The compensation of Reorganized LVMC's officers and directors is discussed in Section VIII.10, below.

### ~~6.~~5.    Capital Expenditures and Procedures.

~~Each~~In each year, Reorganized LVMC may make withdrawals from the CapEx Reserve Account to fund capital expenditures on prior notice to the New Trustee but without the consent of the holders of the CapEx Notes in an amount not to exceed $25,000 in any calendar quarter, with any unused withdrawal capacity to be available for withdrawal during the next succeeding three calendar quarters; provided, however, that the New Trustee's fees, indemnification and reimbursement rights have been fully funded to the extent allowed in the Plan, and that all debt service on the Cash Pay Notes is current; and provided~~,~~ further, however, that after such withdrawal the balance of the CapEx Reserve Account shall be at least $2,000,000 until the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555
102200-002/Comparison

CapEx Notes have been satisfied, at which time the balance of the CapEx Reserve Account may be reduced to $~~200,000~~550,000 as a reserve for the New Trustee.

Reorganized LVMC may make withdrawals from the CapEx Reserve Account to fund capital expenditures in amounts in excess of ~~the foregoing~~ $25,000 only on prior notice to the New Trustee and with the prior written consent of the holders of at least 66 2/3% of the CapEx Notes ~~outstanding~~ (by accreted principal amount outstanding); provided, however, that all debt service on the Cash Pay Notes is current and the New Trustee's fees, indemnification and reimbursement rights have been fully funded to the extent allowed in the Plan, and; provided further, however, that after such withdrawal the balance of the CapEx Reserve Account shall be at least $2,000,000 (absent written consent of the New Trustee) until the CapEx Notes have been satisfied, at which time the balance of the CapEx Reserve Account may be reduced to $~~200~~550,000 as a reserve for the New Trustee. Any such request shall specify the amount of the funds to be drawn and the capital expenditures for which the funds are required, described in reasonable detail.

Capital expenditures (exclusive of CARP) shall be restricted to the costs of renewal or replacement of existing Monorail related parts, systems, and capital assets necessary for the continued operation of the Monorail in a prudent and safe manner, as determined by the Reorganized LVMC board and subject to the negative covenants described below.

Except as otherwise set forth in the Plan, the release of funds to Reorganized LVMC from the CapEx Reserve Account, or any modification to the terms of the CapEx Reserve Account, shall require the consent of the holders of at least 66 2/3% of the CapEx Notes outstanding (by ~~principal amount); provided~~accreted principal amount outstanding); provided, however, that for so long as the Cash Pay Notes are outstanding, no such release or modification shall alter the amount of the funds required to be held in or contributed to the CapEx Reserve Account, as provided in the Plan and the CapEx Reserve Account Agreement; and provided further that without the consent of the New Trustee, no such modification or release shall cause the reduction, currently or at any future time, of the balance of the CapEx Reserve Account to an amount below $~~2,000,000~~the $2,000,000 amount reserved for the New Trustee in the CapEx

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    Reserve Account until the CapEx Notes have been satisfied, at which time the balance of the

2    CapEx Reserve Account may be reduced to $~~200~~550,000 as a reserve for the New Trustee.

3    **~~7.~~6.    Extraordinary Transactions.**

4    ~~For so long as the Cash Pay Notes have not been paid, the approval of the holders of at~~

5    ~~least 66 2/3% in amount of the Cash Pay Notes outstanding (by principal amount) may approve~~

6    ~~any extraordinary transactions of Reorganized LVMC, including Reorganized LVMC's~~

7    ~~recapitalization the majority of Reorganized LVMC's then-outstanding indebtedness or the sale~~

8    ~~of substantially all of Reorganized LVMC's Assets, provided, however, that for so long as the~~

9    ~~Cash Pay Notes have not been paid, One Hundred percent (100%) of the holders of the Cash Pay~~

10   ~~Notes shall be required for Reorganized LVMC to modify the interest rate, reduce the principal~~

11   ~~amount, modify the security for the Cash Pay Notes, or extend the Cash Pay Maturity Date.~~

12   Reorganized LVMC shall not consummate an Extraordinary Transaction (i) for so long as

13   the Cash Pay Notes have not been paid, unless approved by the holders of at least 66 2/3% of the

14   Cash Pay Notes (by principal amount outstanding); (ii) for so long as the CapEx Notes have not

15   been paid, unless approved by the holders of at least 66 2/3% in amount of the CapEx Notes (by

16   accreted principal amount outstanding), and (iii) for so long as the Capital Appreciation Notes

17   have not been paid, unless approved by the holders of at least 66 2/3% of the Capital

18   Appreciation Notes (by accreted principal amount outstanding), subject to payment of the

19   Triggering Event Payment and the other requirements of the Plan, including Section 6.4.4.

20   **~~8.~~7.    Certain Rights of the New Trustee – Voting.**

21   The New Trustee shall have the right, upon instruction from the holders of  at least 51%

22   of the Cash Pay Notes outstanding (by principal amount) and reasonable notice to LVMC, to

23   perform an audit of the LVMC books and records and to access the Assets for purposes of

24   inspection.  Additionally, the New Trustee shall have the right to request and obtain additional

25   information from LVMC with respect to any permitted indebtedness, permitted liens, Asset

26   sales, or expenditures by LVMC for expansion analysis. LVMC will make quarterly and annual

27   financials publicly available (with audited financials to be delivered to the New Trustee within

28   120 days of LVMC's fiscal year end).  Any vote on any matter under the New Indenture by any

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

holder of a Cash Pay Note, CapEx Note, or Capital Appreciation Note shall be sent to such holders no earlier than 90 days and no later than 45 days before the date on which the action or other matter voted upon is to occur or take place. The vote shall be calculated based upon the holders who actually vote.

**9.8.    No Corporate Action Required.**

As of the Effective Date: (i) the adoption, execution, delivery and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Plan, and (ii) the other matters provided for under or in furtherance of the Plan involving corporate action to be taken by or required of the Debtor or Reorganized LVMC shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the board of directors or officers of the Debtor or Reorganized LVMC.   In particular, the adoption of the Reorganized LVMC Organizational Documents, the selection of directors and officers of the Debtor, and all other actions contemplated by or described in the Plan with respect thereto, shall be authorized and approved and be binding and in full force and effect in all respects (subject to the provisions of the Plan and the Confirmation Order), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule (other than filing such organizational documents with the applicable governmental unit as required by applicable law) or the vote, consent, authorization or approval of any Person.  Notwithstanding the forgoing, Reorganized LVMC shall take all action required to effectuate the New Indenture, the perfection and enforceability of the Security Documents, and any other action required to implement the Plan.

**10.9.    Effectuation of Transactions.**

On the Effective Date, the appropriate officers of the Debtor and members of the board of directors are authorized to issue, execute, and deliver the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and Reorganized LVMC, and to otherwise fully consummate the transactions contemplated by the Plan, in each case

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**11.10.  Filing with Nevada Secretary.**

To the extent applicable, in accordance with applicable law, on the Effective Date a certified copy of the Plan and the Confirmation Order shall be filed with the Nevada Secretary. The Debtor, from the Confirmation Date until the Effective Date, is authorized and directed to take any action or carry out any proceeding necessary to effectuate the Plan pursuant to applicable law.

**E.    Executory Contracts and Unexpired Leases.**

**1.    Executory Contracts.**

Except for (i) Executory Contracts and Unexpired Leases specifically addressed in the Plan, (ii) assumed, assumed and assigned, or rejected by separate order prior to the Effective Date, or (iii) set forth on the schedule of Rejected Executory Contracts and Unexpired Leases attached as <u>Schedule 7.1</u> to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed assumed by Reorganized LVMC on the Effective Date.  Among others executory contracts and unexpired leases which will be assumed, the Debtor will assume the Bombardier Agreement with certain modifications that have been agreed upon between the Debtor and Bombardier.  At least 15 days prior to the Confirmation Hearing, the Majority 1st Tier Bondholders shall be provided with a written list of all known Executory Contracts and Unexpired Leases and estimated cure costs for each Executory Contract and Unexpired Lease that is to be assumed.

**2.    Approval of Assumption or Rejection.**

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval, pursuant to Section 365(a) of the Bankruptcy Code, of the assumption by the Debtor of each Executory Contract and Unexpired Lease to which the Debtor is a party and which is not listed on <u>Schedule 7.1</u>, not otherwise provided for in the Plan and neither assumed, assumed and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

83

assigned, nor rejected by separate order prior to the Effective Date; and (ii) rejection by the Debtor of each Executory Contract and Unexpired Lease to which the Debtor is a party listed on Schedule 7.1. Upon the Effective Date, each ~~counter party~~counterparty to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to assumption contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption.

To the extent applicable, all Executory Contracts or Unexpired Leases of Reorganized LVMC assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by the confirmation of the Plan.

### 3. Cure of Defaults.

The Debtor or Reorganized LVMC shall Cure any defaults respecting each Executory Contract or Unexpired Lease assumed pursuant to the Plan upon the latest of (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court or agreed upon by the Debtor, and after the Effective Date, Reorganized LVMC; or (iii) the first Business Day following the fourteenth (14th) day after the entry of a Final Order resolving any dispute regarding (a) a Cure amount; (b) the ability of the Debtor or Reorganized LVMC to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease assumed pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code, provided, however, that upon resolution of a dispute over a Cure amount, Reorganized LVMC may reject the Executory Contract or Unexpired Lease notwithstanding the previous identification thereof as assumed; or (c) any other disputed matter pertaining to assumption, assignment or the Cure of a particular Executory Contract or an Unexpired Lease. Schedule 7.3 to the Plan lists the Debtor's proposed Cure amounts, if any, that will be paid as provided for above, ~~which~~and the Debtor's anticipated schedule of such payments. The Debtor projects that it will have approximately $730,000 in Cure costs. Schedule 7.3 may be amended up to and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

84

1    including the five (5) days prior to the commencement of the Confirmation Hearing.

2            **4.**      **Objection to Cure Amounts.**

3            Any party to an Executory Contract or Unexpired Lease who objects to the Cure amounts

4    listed on Schedule 7.3 to the Plan must file and serve an objection on the Debtor's counsel no

5    later than ~~thirty (30) days after the Effective Date.~~the deadline set by the Bankruptcy Court for

6    filing Plan objections.  Failure to file and serve a timely objection shall be deemed consent to the

7    Cure amounts listed on Schedule 7.3.  If there is a dispute regarding: (i) the amount of any Cure

8    payment; (ii) the ability of Reorganized LVMC to provide "adequate assurance of future

9    performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or

10    (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1)

11    of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute

12    and approving the assumption, except as provided in Section 7.3 of the Plan.

13            **5.**      **Confirmation Order.**

14            The Confirmation Order will constitute an order of the Bankruptcy Court approving the

15    assumptions described in Section 7 of the Plan, pursuant to Section 365 of the Bankruptcy Code,

16    as of the Effective Date.  Notwithstanding the foregoing, if, as of the date the Bankruptcy Court

17    enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute

18    concerning the cure amount or adequate assurance for any particular Executory Contract or

19    Unexpired Lease (or if the time period for a non-Debtor to object to the Cure has not yet lapsed),

20    the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date

21    the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption by

22    the Debtor.

23            **6.**      **Post-Petition Date Contracts and Leases.**

24            Each such Executory Contract and Unexpired Lease shall be performed by the Debtor or

25    Reorganized LVMC, as applicable, in the ordinary course of its business.

26            **7.**      **Bar Date.**

27            All proofs of Claims with respect to Claims arising from the rejection of any Executory

28    Contract or Unexpired Lease shall be filed no later than thirty (30) days after the Effective Date.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

85

1    Any Claim not filed within such time shall be forever barred.

2    **F.    Conditions Precedent to Confirmation and the Effective Date.**

3        **1.    Conditions to Confirmation.**

4        As a condition precedent to the Confirmation of the Plan, the Confirmation Order shall be

5    in form and substance reasonably acceptable to the Debtor.

6        **2.    Conditions to Effectiveness.**

7        The following are conditions precedent to the occurrence of the Effective Date:

8        (i)    ~~The Confirmation Order shall be a Final Order;~~

9        (i)    The Confirmation Order, the form and substance of which shall be both
10   consistent with the terms of the Plan and subject to the Majority 1st Tier
         Bondholders' Approval and in substantially the form annexed to the
11   Debtor's Confirmation Hearing brief, except for such modifications as
         may be approved or ordered by the Bankruptcy Court, shall be a Final
         Order;

12       (ii)    No request for revocation of the Confirmation Order under section 1144 of
13   the Bankruptcy Code shall have been made, or, if made, shall remain
         pending, including any appeal;

14       (iii)    All documents necessary to implement the transactions contemplated by
15   ~~this~~the Plan shall be in form and substance reasonably acceptable to the
         Debtor and subject to Majority 1st Tier Bondholders' Approval, and, as so
16   far as it concerns the rights and remedies of the New Trustee~~; and~~ that are
         inconsistent with the Plan, the New Trustee;

17       (iv)    Sufficient Cash and other Assets shall be set aside, reserved and withheld
18   by the Debtor to make the distributions required to be paid on the
         Effective Date or within sixty (60) days thereafter by the Bankruptcy Code
19   and this Plan~~.~~; and

20       (v)    The two (2) individuals selected by the Holders of a Majority of the 1st
21   Tier Bonds shall have been deemed to be qualified, by any necessary
         government or other approvals, to serve on the board of Reorganized
22   LVMC; provided, however, the identities of such individuals shall be
         provided to the Debtor on or before June 20, 2011, and the failure of the
         Holders of a Majority of the 1st Tier Bonds to timely provide the identities
23   of such individuals to the Debtor and any resulting delay in their
         qualification or approval shall not delay effectiveness of the Plan.

24       **3.    Notice of Effectiveness.**

25       When all of the steps contemplated by Section 9.2 of the Plan have been completed, the

26   Debtor shall file with the Bankruptcy Court and serve upon all Creditors and all potential

27   Holders of Administrative Claims known to the Debtor (whether or not disputed), a Notice of

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison                                86

Effective Date of Plan.   The Notice of Effective Date of Plan shall include notice of the Administrative Claim Bar Date.

    **4.**    **Waiver of Conditions.**

The Debtor, and if applicable, Reorganized LVMC, may waive (each for themselves but not for others) any or all of the other conditions set forth in ~~the Plan~~this Article 9 and specifically **Sections 9.2~~.~~(2~~.~~) and 9.2~~.~~(4~~.~~)** of the Plan without leave of or order of the Bankruptcy Court and without any formal action.   The failure of a party to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time prior to the filing of the Notice of Effectiveness.

**VII.**
**RISK FACTORS**

In addition to risks discussed elsewhere in this Disclosure Statement, the Plan and the transactions contemplated by the Plan involve the following risks, which should be taken into consideration.

**A.**    **The Debtor Has No Duty To Update.**

The statements in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein.   The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.   The Debtor has no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.

**B.**    **Information Presented Is Based on the ~~Debtors'~~Debtor's Books and Records, and Is Unaudited.**

While the Debtor has endeavored to present information fairly in this Disclosure Statement, there is no assurance that the Debtor's books and records upon which this Disclosure Statement is based are complete and accurate.   Historical financial information contained herein, though, has been audited.

**C.**    **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results Will Vary.**

Certain information in this Disclosure Statement is forward-looking, and contains

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1   estimates and assumptions which might ultimately prove to be incorrect, and projections which

2   may differ materially from actual future results.   There are uncertainties associated with all

3   assumptions, projections and estimates, and they should not be considered assurances or

4   guarantees of the amount of funds that will be distributed, the amount of Claims in the various

5   Classes that will be allowed, or the success or results of Reorganized LVMC's business

6   operations.

7   **D.     No Legal or Tax Advice Is Provided to You by This Disclosure Statement.**

8           The contents of this Disclosure Statement should not be construed as legal, business or

9   tax advice.  Each Creditor should consult his, her or its own legal counsel and accountant as to

10  legal, tax and other matters concerning his, her or its Claim and the applicable treatment under

11  the Plan.

12  **E.     No Admissions Made.**

13          Nothing contained herein shall constitute an admission of any fact or liability by the

14  Debtor or any other party nor shall it be deemed evidence of the tax or other legal effects of the

15  Plan on the Debtor or on Holders of Claims.

16  **F.     No Waiver of Right to Object or Right to Recover Transfers and Estate Assets.**

17          Unless specifically provided in the Plan, a Creditor's vote for or against the Plan does not

18  constitute a waiver or release of any claims or rights of the Debtor (or any other party in interest)

19  to object to that Creditor's Claim, or recover any preferential, fraudulent or other voidable

20  transfer or Estate assets, regardless of whether any claims of the Debtor or its Estate are

21  specifically or generally identified herein.

22  **G.     Bankruptcy Law Risks and Considerations.**

23          **1.      Confirmation of the Plan Is Not Assured.**

24          Although the Debtor believes the Plan will satisfy all requirements for Confirmation, the

25  Bankruptcy Court might not reach that conclusion.  It is also possible that modifications to the

26  Plan will be required for Confirmation and that such modifications would necessitate

27  resolicitation of votes.

28          Confirmation requires, among other things, a finding by the Bankruptcy Court that it is

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1     not likely there will be a need for further financial reorganization and that the value of

2     distributions to dissenting members of impaired classes of creditors would not be less than the

3     value of distributions such creditors would receive if the debtor were liquidated under chapter 7

4     of the Bankruptcy Code.  Although the Debtor believes that the Plan will not be followed by a

5     need for further financial reorganization and that dissenting members of Impaired Classes of

6     Creditors will receive distributions at least as great as they would receive in a liquidation under

7     Chapter 7, there can be no assurance that the Bankruptcy Court will conclude that these tests

8     have been met.

9           **2.**     **The Effective Date Might Be Delayed or Never Occur.**

10          There is no assurance as to the timing or occurrence of the Effective Date.  If the

11     conditions precedent to the Effective Date have not occurred or been waived within the

12     prescribed time frames, the Confirmation Order will be vacated.  In that event, the Holders of

13     Claims would be restored to their respective positions as of the day immediately preceding the

14     Confirmation Date, and the Debtor's obligations for Claims would remain unchanged ~~as of such~~

15     ~~day~~.

16           **3.**     **The Projected Value of Estate Assets Might Not Be Realized.**

17          In the Best Interests Analysis discussed herein, the Debtor has projected the value of the

18     Estate's assets that would be available for payment of expenses and Distributions to Holders of

19     Allowed Claims~~, as set forth in the Plan~~ in the event of liquidation of the Estate's assets.  The

20     Debtor has made certain assumptions in its Best Interests Analysis, which should be read

21     carefully.

22           **4.**     **Changes to Applicable Tax Laws Could Have a Material Adverse Effect on**

23     **the ~~Debtors'~~Debtor's Financial Condition and the ~~Cash Pay Note~~Restructured Obligations.**

24          From time to time, federal, state and local legislators and other government officials have

25     proposed and adopted changes in tax laws, or in the administration of those laws affecting tax-

26     exempt instruments.  It is not possible to determine the likelihood of changes in tax laws or in the

27     administration of those laws.  If adopted, changes to applicable tax laws could have a material

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

89

102200-002/Comparison

adverse effect on the tax-exempt treatment of the Cash Pay ~~Note~~Notes, CapEx Notes, and Capital Appreciation Notes (the "Restructured Obligations") as well as the Debtor's business, financial condition and results of operations.  Moreover, though it is the belief of the Debtor that the ~~Cash Pay Note~~Restructured Obligations will be ~~a~~ tax-exempt ~~instrument~~instruments, the Debtor cannot guaranty that federal tax officials will not dispute the tax-exempt treatment of the ~~Cash Pay Note.~~Restructured Obligations.

### 5. Allowed Claims in the Various Classes May Exceed Projections.

The Debtor has also projected the amount of Allowed Claims in each Class in the Best Interests Analysis.  Certain Classes could be significantly affected by the allowance of Claims in an amount that is greater than projected.  While the Debtor has estimated the amount of Allowed Claims based upon the Debtor's and its professionals' review of the Debtor's Schedules and Proofs of Claim filed in this Chapter 11 Case, the Debtor cannot predict with certainty the amount of Claims which will ultimately be Allowed Claims.

### 6. No Representations Outside of This Disclosure Statement Are Authorized.

No representations concerning or related to the Debtor, the Bankruptcy Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  As such, you proceed at your own risk to the extent you rely upon representations or inducements made to secure your acceptance or rejection of the Plan ~~that are~~ other than as contained in, or included with, this Disclosure Statement.

### H. Risks Related to the Debtor's Business Operations.

The following discussions of risks that relate to the Debtor's business should be read as also being applicable to the business of Reorganized LVMC on and after the Effective Date.

### 1. Effect of the Bankruptcy Case.

If the Bankruptcy Case continues for a prolonged amount of time, the proceedings could adversely affect the Debtor's business and operations.  The longer the Bankruptcy Case continues, the more likely it is that customers, suppliers and other parties may lose confidence in the Debtor's ability to successfully reorganize its business and will seek to establish alternative relationships.  Consequently, the Debtor might lose ridership and valuable contracts ~~and other~~

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

90

102200-002/Comparison

1    ~~business relationships~~ in the course of the Bankruptcy Case.

2    So long as the Bankruptcy Case continues, the Debtor's senior management and Board

3    will be required to devote significant time and effort to dealing with the Debtor's reorganization

4    instead of focusing exclusively on business operations.  Prolonged continuation of the

5    Bankruptcy Case will also make it more difficult to attract and retain management and other key

6    personnel necessary to the success and growth of the Debtor's business.

7    Furthermore, so long as the Bankruptcy Case continues, the Debtor will be required to

8    incur substantial costs for ~~professional fees~~Professional Fees and other expenses associated with

9    the proceedings.

10    While cash flow projections indicate there will be sufficient cash flow to meet all

11    ordinary demands and to pay ~~professional fees~~Professional Fees and expenses, prolonged

12    continuation of the Bankruptcy Case may require the Debtor to seek additional financing.  It may

13    not be possible to obtain additional financing during or after the Bankruptcy Case on

14    commercially reasonable terms or at all.  If the Debtor requires additional financing during the

15    Bankruptcy Case and is unable to obtain it on reasonable terms or at all, the Debtor's chances of

16    a successful reorganization may be seriously jeopardized.

17    **2.    The Debtor Requires an Infusion of Capital by 2019 to Meet its Debt**
      **Obligations and CapEx Needs.**

18

19    As discussed in Section V.C.2, above, the Bombardier CapEx Projection determined

20    ~~than~~that an initial significant CapEx expenditure of $23,060,266 will be required in 2019 for full

21    replacement of the Debtor's fare collection equipment and platform doors.   The Debtor's ability

22    to both (i) meet its CapEx needs in 2019 and 2024 and (ii) pay the CapEx Note at maturity is

23    conditioned upon the Debtor obtaining additional capital.  Additional capital might be raised

24    through expansion of the existing Monorail system, obtaining federal infrastructure funds or

25    grants, or through private financing or investment.

26    There is no assurance that Debtor will be able to obtain such capital on feasible terms or

27    on any terms whatsoever.  If the Debtor is unable to obtain such capital on feasible terms, the

28    Debtor will have insufficient capital to make necessary CapEx investments in 2019 and 2024,

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    and will unable to pay the CapEx Note at maturity.  In the event the Debtor is unable to meet its

2    CapEx needs, the Monorail will likely cease operations.

3            Moreover, there is no assurance that significant CapEx investment will not be required

4    prior to 2019.  In the event the Monorail requires significant CapEx investment prior to 2019, the

5    Debtor will be unable to make such investment absent additional financing.

6            **3.    Expansion of the Existing System.**

7            While it is the goal of the Debtor and its management to extend the existing Monorail

8    system after emergence from the Chapter 11 Case, there is no assurance that this can be

9    accomplished.  In order to expand the existing Monorail system, the Debtor will require

10   additional financing and regulatory approvals of state and local authorities.  Neither the Debtor's

11   ability to secure the necessary financing nor its ability to obtain the necessary state and local

12   regulatory approvals can be assured.  Further, extension of the existing Monorail system may

13   require the amendment or modification of the Franchise Agreement, which is not assured.

14           **4.    The Debtor Faces Extensive Regulation from Government Authorities.**

15           As owner of the Monorail, the Debtor is subject to extensive Nevada state and local

16   regulation.  Nevada state and local government authorities require the Debtor to maintain the

17   Franchise in place for operation of the Monorail.  Clark County authorities may limit, condition,

18   suspend or revoke the Franchise for failure to comply with the Franchise Agreement, applicable

19   Clark County Code provisions, or the laws or regulations of the State of Nevada or United States.

20   The occurrence of such an event could have a material adverse effect on the Debtor's business,

21   financial condition and results of operations.  No assurance can be given that Clark County

22   authorities will not may limit, condition, suspend or revoke the Franchise for any reason or for

23   no reason.

24           Further, no assurances can be given that any new licenses, registrations, findings of

25   suitability, permits and approvals will be given or that existing ones will be renewed when they

26   expire.  Any failure to renew or maintain licenses or receive new licenses when necessary would

27   have a material adverse effect on the Debtor.

28           The Debtor is subject to a variety of other rules and regulations, including zoning,

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

92

102200-002/Comparison

environmental, construction, and land-use laws and regulations. Any changes to these laws could have a material adverse effect on the Debtor's business, financial condition and results of operations.

The compliance costs associated with these laws, regulations and licenses are significant. A change in any such laws, regulations and licenses or a violation of any current or future laws, regulations or licenses could require the Debtor to make material expenditures or could otherwise materially and adversely affect the Debtor's business, financial condition and results of operations.

**5.    The Debtor's Business, Financial Condition and Results of Operations Are Dependent in Part on a Number of Factors That Are Beyond the Debtor's Control.**

The economic health of the Debtor's business is generally affected by a number of other factors, some of which are within and some of which are beyond the Debtor's control, including:

i.    Economic Recovery.  The Monorail is primarily dependent upon tourism and visitor volumes, including convention attendance.  Beginning in 2008, the economy in the United States began to sharply decline, not only in the hotel and gaming industry, but throughout virtually every business sector.  This severe world-wide recession had a dramatic impact on the Las Vegas economy given its reliance on the hotel, gaming and convention business.  LVMC was sharply impacted by the downturn and contraction in southern Nevada's core tourism industry.  Over the past several years, visitor volume and convention attendance declined considerably, cutting away a key demographic of the Monorail's customers.  Visitor volume and convention attendance figures are only now beginning to show signs of recovery.  The Monorail's projections attached to this Disclosure Statement are premised upon a continued recovery of visitor volumes and convention attendance over the next several years.  There can be no assurance that the Las Vegas hotel and gaming industry and visitor volumes, including convention attendance, will recover to pre-2008 levels or that the Debtor will be able to meet its projected operating results.

ii.    Force Majeure.  The Debtor's financial performance may be negatively impacted

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

93

1   by declines in tourism and travel due to occurrences or threats of terrorism, environmental

2   disaster, outbreak of disease, or other global, regional, or local destabilizing events.

3          iii.    Leadership and Management.  The Debtor's projected financial performance is

4   conditioned upon its ability to retain a dedicated management team and its continued ability to

5   operate in an efficient, customer-oriented manner.

6          iv.    Promotion.  The Debtor's projected financial performance is conditioned upon its

7   ability to maintain a continuous and comprehensive promotion program which is adequately

8   funded and which targets a broad customer base, including convention organizers.  Further, the

9   Debtor's projected financial performance will be dependent upon sufficient signage directing

10  potential riders to the Monorail on all potential approach routes to Monorail stations, including

11  all reasonable locations within the hotel and gaming facilities adjoining each station.

12         v.    Rider Access.  The Debtor's projected financial performance is conditioned upon

13  there being no adverse effects on Monorail ridership or revenues due to further hotel closures or

14  the further consolidation of ownership of hotel and gaming facilities on or near the Las Vegas

15  Strip.  On March ~~11~~16, 2011, the ~~owner of the~~ Sahara hotel-casino on the Las Vegas Strip

16  ~~announced plans to close the property on May 16, 2011~~permanently closed, which is further

17  discussed in Section V.D.2, above.[60]  The Debtor's Monorail station at the Sahara, which is the

18  Monorail's northern terminus and a connecting point to the Regional Transportation Commission

19  of Southern Nevada's bus transit system, accounts for almost 11% of the Debtor's revenues.  As

20  a result, the Debtor anticipates a decline in revenues following the closure of Sahara, though the

21  Monorail's Sahara station will remain open.  Any further closures of hotels along the Las Vegas

22  Strip, or any closure of a Monorail station, would have a materially adverse effect on revenues

23  generated by the Monorail. The Debtor's projected financial performance is also conditioned

24  upon the continued direct connection of Monorail stations to adjacent hotels, gaming areas, and

25  other passenger-generating locations with attractive, air conditioned passageways with adequate

26  signage directing patrons to the Monorail.

27

28

---

[60] See  http://www.lasvegassun.com/news/2011/mar/11/sahara-hotel-casino-close-may-16/.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

vi.    <u>Governmental Action</u>.  The Debtor's projections presume that there will be no government action, at any level, which will adversely affect the ridership and/or farebox revenues of the Monorail, including, but not limited to, changes or increases to the Debtor's tax obligations or changes to federal laws or regulations which would impair the Debtor's ability to obtain federal funds or grants.  In recent months, the Regional Transportation Commission of Southern Nevada (the "<u>RTC</u>") has been developing its own mass transit system on the Las Vegas Strip which would compete with the Monorail.  The RTC has recently introduced several bus routes which undercut the Monorail's ridership.  Unlike the Debtor, the RTC is a government agency which is currently eligible for and receiving federal transit funds.  The Debtor's financial projections are conditioned upon there being no further substantial encroachment by the RTC on the Monorail's routes and ridership.

vii.    <u>Cost of Electricity</u>.  The Monorail is powered by electricity.  Substantial increases in the cost of electricity or other forms of energy necessary for operation of the Monorail could have a materially adverse effect on revenues generated by the Monorail.    Further, any interruption to the provision of electricity to the Monorail, even for a brief period of time, would disrupt the Debtor's ability to continue servicing its customers, thereby negatively impacting ~~customer relationships~~ridership, revenues and profits.

viii.    <u>Sole Light Rail System</u>.  There is currently no continuous transit facility to the west of the Las Vegas Strip, and there is currently no other monorail or other light rail system operating within the County other than private people-mover systems installed by resort properties on the west side of Las Vegas Boulevard.  While the Company enjoys an exclusive north/south service franchise pursuant to the Franchise Agreement (on the east side of Las Vegas Boulevard between the MGM Grand <u>Hotel to</u> the south and the Sahara hotel-casino on the north~~)~~ ~~and a non-exclusive north/south service territory between the Las Vegas Convention Center and the Sahara,~~,). there is no restriction under the Franchise Agreement against construction (privately or publicly) of a monorail or other light rail system on the west side of Las Vegas Boulevard or east-west across Las Vegas Boulevard and down Convention Center Drive to connect directly with the Las Vegas Convention Center.  Construction of a monorail or light rail system on the

95

102200-002/Comparison

west side of Las Vegas Boulevard or east-west across Las Vegas Boulevard could have a material and adverse effect on revenues generated by the Monorail.

**6.    The Potential Loss of IRS Code § 501(c)(4) Designation and Financial Impacts Thereof.**

As a 501(c)(4) corporation under the Internal Revenue Code, LVMC is not required to pay federal corporate income taxes on net profits.  Because of its 501(c)(4) status, the Debtor also benefits from tax exemptions granted by the State of Nevada and Clark County.  In order to preserve its designation as a 501(c)(4) corporation, the IRS must determine that the obligations Restructured Obligations of the Reorganized Debtor under the Plan, including (the Cash Pay Notes, the CapEx Notes, and the Capital Appreciation Notes (collectively, the "Restructured Obligations"), ) do not inure to the benefit of any private person.  As such, to preserve the Debtor's non-profit status, the Restructured Obligations must be found to be debt instruments as opposed to equity instruments.  Should the Restructured Obligations be found to inure to the benefit of a private person, the Reorganized Debtor could lose its 501(c)(4) designation.  The loss of this designation could have significant consequences on the amount of net revenues available for debt service.

The Debtor has also been designated by the State of Nevada Tax Commission as exempt for sales taxes with the State of Nevada.  This has an annual impact of approximately $11,000 on purchases made by the Debtor.  Because part of the Commission's decision as to whether to grant the exemption was based upon the 501(c)(4) designation, it is within the legal right of the Commission or any individual member to request that the exemption be reviewed for revocation due to the loss of this designation.  Further, if the Reorganized Debtor lost its exempt designation with the Commission, then in the event of a system expansion, all purchases associated with the transaction would also be subject to the state sales tax, currently at 8%.

Further, Clark County has exempted the Debtor from real property taxes.  As a result, the Debtor incurs no real property taxes on account of its easements.

The loss of the Reorganized Debtor's not-for-profit status would have four primary impacts, as follows:

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

96

102200-002/Comparison

1

2
(i)  Loss of the Debtor's Ability to Issue Tax-Exempt Debt or Ineligibility of the Restructured Obligations.

In the event of a loss of the Reorganized Debtor's nonprofit status, the Reorganized Debtor would be ineligible to issue tax-exempt obligations under Revenue Ruling 63-20.  In addition, the Restructured Obligations are subject to certain requirements as more fully explained in Article IX below in order to assure their tax-exempt nature.  As such, interest on the Restructured Obligations would be taxable.

(ii)  Easements & Leases.

In the event of a loss of the Reorganized Debtor's non-for-profit status, the company would likely be forced to renegotiate some or all of the provisions in the easements and leases granted for the benefit of the Monorail's stations and tracks, and may become responsible for the payment of property taxes.  In 2002, the County Assessor granted the LVMC an exemption from property taxes and has not since performed a valuation on the easements, leases or improvements.  To accurately determine the property tax burden, a detailed valuation analysis must first be performed by the Assessor.  However, it is estimated that Reorganized LVMC's annual property tax obligation might be as high as $1,000,000.

(iii)  Clark County Monorail Franchise Agreement.

Clark County granted the Debtor a franchise agreement under a county ordinance adopted pursuant to state statute enacted for the construction and operation of a monorail system.  The fees are governed under the County Master Monorail Business License and are based upon a percentage of revenues after debt service, or a minimum of $50,000 per year.  Because of the level of revenues and debt service, the Debtor pays the minimum amount.  If the Reorganized Debtor were to become or be sold to a for-profit entity, the county would likely exercise its right to review the ordinance and resulting payments and fees requirements.  The Monorail's license fees might be subject to a fee and oversight structure similar to those of other for-profit franchises. This would also apply to any future airport extension of the system.  Typical terms of franchises awarded by Clark County to for-profit companies include a fee equal to 5% of gross receipts; rates for services subject to approval the county commission; and annual financial

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    audits and budget review.

2    . . .

3    (iv)    Federal Grant Eligibility.

4        The US Department of Transportation administers grant and transportation financing

5    programs to develop and promote transit through its various agencies, primarily the Federal

6    Transit Administration (FTA) and the Federal Highway Administration (FHWA).   The vast

7    majority of the approximately $10 billion allocated in the grant programs is allocated to capital

8    programs including physical asset replacements and upgrades and new capital projects.   As an

9    example, the Regional Transportation Commission of Southern Nevada was allocated at least

10    $24.6 million in fiscal year 2010 under one the annual grant programs.   If Reorganized LVMC

11    were eligible for such a program, it could expect to receive annual grants in the amount of $2

12    million to $3 million based upon its current ridership level.   To be eligible for the vast majority

13    of these programs, grant recipients must be a state or local government or municipality, a

14    regional government, or otherwise an instrumentality of a state or local government.   The Debtor

15    does not fit into any of these categories and thus is not currently eligible to apply for and receive

16    grants.   However, federal guidelines do allow for partnerships between private and public entities

17    who are eligible for grants for the purpose of funding various transit projects.   The State of

18    Nevada currently performs this function for certain smaller communities and not-for-profit

19    entities within the state for transportation and other grants not granted by the U.S. Department of

20    Transportation.   However, the Debtor is unaware of the State performing this function on behalf

21    of a for-profit entity.   Consequently, in the event of a loss of the Reorganized Debtor's not-for-

22    profit status, the Reorganized Debtor would likely be unable to obtain federal grants.

23                                **VIII.**
                **POST-EFFECTIVE DATE OPERATIONS**

24    **A.    Title to Property; Discharge; Injunction.**

25        **1.    Vesting of Assets.**

26        Subject to and as provided for in the Plan, the Assets shall be vested ~~in~~and/or transferred

27    to Reorganized LVMC on the Effective Date~~.~~, subject to (a) any transfer of Cash to the New

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

98

102200-002/Comparison

Trustee pursuant to the New Indenture, and (b) subject to the Liens of the New Trustee on behalf of Holders of Class 4 and Class 5 Claims, provided that all rights, claims and causes of action with respect to the 1st Tier Bondholders' Insurance Policy and 1st Tier Bondholders' Surety Bond shall vest in and be owned by the 1st Tier Trustee on behalf of the post-Effective Date beneficiaries of the 1st and 2nd Indenture.  On and after the Effective Date, Reorganized LVMC may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

## 2.    Preservation of Litigation Claims.

In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, on the Effective Date all Litigation Claims shall be assigned to Reorganized LVMC, and Reorganized LVMC shall have the exclusive right to enforce, prosecute, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.  The Debtor's Litigation Claims are identified in **Schedule 1.1.92** to the Plan.  Failure to list a Litigation Claim on Schedule 1.1.92 shall not constitute a waiver or release by the Debtor or Reorganized LVMC of such Litigation Claim.

As reflected in Section XIII, the Debtor does not believe that any of its prepetition transfers are avoidable, or if potentially avoidable, that litigation seeking to recover such transfers would result in any material recovery to the estate.  Other Litigation Claims identified in Schedule 1.1.92, consisting of counterclaims, cross-claims, and other potential actions in relation to lawsuits filed against the Debtor, are identified solely to preserve the Debtor's rights.  However, the Debtor does not believe that such counterclaims, cross-claims, and other rights have any value for the benefit of its Creditors.  The Debtor has also listed a judgment against Michael Brenesell and Tix4Vegas, LLC; however, the Debtor has determined that this judgment may be uncollectable.  Finally, the Debtor has listed its claims against Final Film, Inc. and/or

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

99

Creative Graphic Solutions, relating to damages caused by the "wrapping" of one of the Monorail trains, which the Debtor has valued at approximately $200,000.

**3.**     **Settlement of Litigation Claims.**

At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtor may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.    After the Effective Date, Reorganized LVMC may, and shall have the exclusive right to, compromise and settle any Claims against it and claims it may have against any other Person or entity, including, without limitation, the Litigation Claims, without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date.

**4.**     **Discharge.**

On the Effective Date, except as otherwise provided in the Plan, the Debtor shall be discharged from any and all Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code.  The Discharge shall be to the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan and shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or nature whatsoever against the Debtor or any of its assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date as to Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, and 9 the Debtor shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**5.**     **Compromise and Settlement.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison                                                    100

1    The allowance, classification and treatment of all Allowed Claims and their respective

2    distributions under the Plan take into account and/or conform to the relative priority and rights of

3    the Claims in each Class in connection with any contractual, legal and equitable subordination

4    rights relating thereto whether arising under general principles of equitable subordination,

5    Section 510(c) of the Bankruptcy Code, or otherwise, including without limitation the

6    subordination provisions related to the 1st and 2nd Tier Indenture or 3rd Tier Indenture.  As of

7    the Effective Date, any and all such rights described in the preceding sentence will be settled,

8    compromised and released pursuant to the Plan and any and all such Causes of Action related

9    thereto are settled, compromised, and released.

10    **6.    Debtor Releases.**

11    **On the Effective Date and effective as of the Effective Date, for good and valuable**

12    **consideration, including, but not limited to: (i) the discharge of debt and all other good and**

13    **valuable consideration provided pursuant to the Plan; and (ii) the services of the Debtor's**

14    **officers and directors serving on and since the Petition Date in facilitating the expeditious**

15    **implementation of the reorganization contemplated by the Plan, the Debtor and**

16    **Reorganized LVMC shall provide a full discharge and release to the Released Parties (and**

17    **each such Released Party so released shall be deemed released and discharged by the**

18    **Debtor and Reorganized LVMC) and their respective properties from any and all Causes**

19    **of Action, whether known or unknown, whether for torts, including fraud, contract,**

20    **violations of federal or state securities laws, or otherwise, arising from or related in any**

21    **way to the Debtor or Reorganized LVMC, including, without limitation, those that either**

22    **the Debtor or Reorganized LVMC would have been legally entitled to assert in its own**

23    **right (whether individually or collectively) or that any Holder of a Claim or other entity**

24    **would have been legally entitled to assert on behalf of the Debtor or its Estate, and further**

25    **including those in any way related to the Chapter 11 Case or the Plan to the fullest extent**

26    **of the law; provided, however, that the foregoing releases shall not operate to waive or**

27    **release any Released Party from (a) any Causes of Action expressly set forth in and**

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101

102200-002/Comparison

preserved by the Plan, any Plan Supplement, or related documents or (b) as a result of actual fraud, gross negligence, or willful misconduct.

**7.    Third Party Releases.**

On the Effective Date and effective as of the Effective Date, **only to the extent each Releasing Party votes in favor of the Plan or otherwise supports confirmation of the Plan** ~~and as otherwise~~**on the record at the Confirmation Hearing, to the extent** permitted by law, the Releasing Parties shall provide a full discharge and release (and each entity so released shall be deemed released by the Releasing Parties) to the Third Party Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for torts, including fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to ~~Debtors~~**the Debtor**, including, without limitation, those in any way related to the Chapter 11 ~~Cases~~**Case** or the Plan**,** to the fullest extent of the law; provided, however, that the foregoing Third Party Release shall not operate to waive or release any of the Third Party Releasees from (a) any Causes of Action expressly set forth in and preserved by the Plan or related documents, ~~or (b) as a result of~~**(b) any claims by the 1st Tier Bondholders or the 1st Tier Trustee under the Ambac Insurance Policy or the Ambac Surety Bond, or (c)** actual fraud, willful misconduct or gross negligence.

Specifically, as of the Effective Date, the obligations of the Director under the ~~Franchise~~**Financing** Agreement and the 1st and 2nd Tier Indenture and 3rd Tier Indenture shall be released, extinguished, and discharged.  In exchange therefore, the Director shall provide the consideration described in Section VI.C.8, above, and in the Plan.  *A vote in favor of the Plan shall constitute consent to such release and discharge.*

**8.    Injunction.**

From and after the Effective Date, and except as provided in the Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of ~~any~~ such Claims:  (i) commencing or continuing in any

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555
102200-002/Comparison

manner any action or other proceeding against Reorganized LVMC or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Reorganized LVMC or its property; (iii) creating, perfecting or enforcing any Lien or encumbrance against Reorganized LVMC or its property; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Reorganized LVMC or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.  By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in ~~this~~ Section 10.~~7~~8 of the Plan.

9. **Exculpation.**

From and after the Effective Date, none of the Debtor, Reorganized LVMC, the Majority 1st Tier Bondholders, the 1st Tier Trustee, nor any of their respective directors, officers, managers, employees, advisors, attorneys, or agents on and from the Petition Date forward, shall have or incur any liability to any Holder of a Claim or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, ~~or~~ Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, Reorganized LVMC, the pursuit of Confirmation of the Plan, or the Substantial Consummation of the Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case.  No Holder of a Claim, nor any other party-in-interest, including their respective agents, employees, representatives, financial advisors, attorneys, ~~or~~ Affiliates, or their successors and assigns, shall have any right of action against the Debtor, Reorganized LVMC, the Majority 1st Tier Bondholders, the 1st Tier Trustee, or any of their respective present or former members, officers, directors, managers, employees, advisors, attorneys, or agents, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

103

pursuit of Confirmation of the Plan, the Substantial Consummation of the Plan, or the administration of the Plan, except for:  (i) their willful misconduct and gross negligence; (ii) matters specifically contemplated by either the Plan or Reorganized LVMC; and (iii) any liability of an attorney to its client not subject to exculpation under the Bankruptcy Code. Nothing in Section 10.9 shall impair the rights and obligations in that certain Agreement of Resignation, Appointment and Acceptance dated May 27, 2010, by and between Wells Fargo Bank, N.A. and Law Debenture Trust Company of New York, or the enforcement of any rights related thereto, including provisions regarding reimbursement of fees and expenses between the indenture trustees; provided, however, that in no event will the Debtor be liable or responsible to pay the fees and costs of Law Debenture Trust Company of New York promised or otherwise due pursuant to that agreement.

10.    **Compensation of Directors and Officers.**

Curtis Myles is the Debtor's President and Chief Executive Officer.  Pursuant to an Employment Agreement dated August 20, 2008, Mr. Myles originally received annual compensation of $346,200, along with employment benefits available to other employees of the Debtor.  The Employment Agreement commenced August 21, 2008 and the initial term will end August 20, 2011.  As of May 4, 2010, Mr. Myles' annual compensation was voluntarily reduced to $273,240 in conjunction with a general reduction of salaries for the Debtor's employees. After the initial term of employment ends, Mr. Myles' continued employment is at the will of the Board and may terminate at any time thereafter by written notice, unless otherwise agreed to by the parties.  The Debtor anticipates that following Confirmation, Mr. Myles' Employment Agreement will be renewed on a month-to-month basis until a new Employment Agreement is negotiated.

Mary Petersen is the Debtor's Treasurer and Controller.  Pursuant to an Employment Agreement dated April 21, 2008, which is terminable at will, Ms. Petersen received annual compensation of $90,000, which was reduced to $87,369.63 in conjunction with a general reduction of salaries for the Debtor's employees.  The Debtor anticipates that following Confirmation, Ms. Petersen will remain the Debtor's Treasurer and Controller at the same rate of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

1    compensation, subject to future adjustments pursuant to her Employment Agreement.

2         Kris T. Ballard, Esq., a shareholder with the law firm of Jones Vargas, is the Debtor's

3    Secretary, but is not a paid employee of the Debtor.  The Debtor anticipates that following

4    Confirmation, Mr. Ballard will remain the Secretary of Reorganized LVMC, and will not draw a

5    salary.

6         In late September, 2008, the Board reduced the monthly compensation paid to each

7    member of the Board from $5,000 to $2,500 per month. Since that time, except for a brief period

8    immediately preceding the Petition Date, each of the five directors has been paid $2,500 per

9    month as compensation for their services as members of the Board.  The Debtor anticipates that

10   following Confirmation, each of the directors, including the two new directors provided for

11   under the Plan, will receive $2,500 per month in compensation.

12         **10.11.  Director and Officer Liability Insurance.**

13   As of the Effective Date, Reorganized LVMC will obtain sufficient tail coverage under a

14   directors' and officers' liability insurance policy (the "D&O Liability Insurance Policy", and,

15   together with all insurance policies for directors' and officers' liability maintained by the Debtor

16   as of the Petition Date, the "D&O Liability Insurance Policies") for the directors and officers of

17   the Debtor and Reorganized LVMC, as applicable (from the Petition Date forward) for a period

18   of six (6) years. The Debtor will assume and, if applicable, assign to Reorganized LVMC all of

19   the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code as of

20   the Effective Date.  Entry of the Confirmation Order will constitute approval by the Bankruptcy

21   Court of the Debtor's foregoing assumption and assignment by the Debtor to Reorganized

22   LVMC of each of the D&O Liability Insurance Policies.   Notwithstanding anything to the

23   contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise

24   modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability

25   Insurance Policies, and each such indemnity obligation will be deemed and treated as an

26   Executory Contract that has been assumed by the Debtor and assigned to Reorganized LVMC

27   under the Plan as to which no proof of Claim need be filed.

28         **11.12.  Indemnification.**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

All indemnification provisions currently in place (whether in the bylaws, articles or certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions (or resolutions of similar bodies) or employment contracts) for the directors, officers, employees, attorneys, other professionals and agents of the Debtor (from the Petition Date forward) shall be assumed, and shall survive effectiveness of the Plan.  All indemnification provisions in place on and prior to the Effective Date for current directors and officers of the Debtor (from the Petition Date forward) shall (i) survive the Effective Date of the Plan for Claims related to or in connection with any actions, omissions or transactions occurring prior to the Effective Date, and (ii) remain liabilities of Reorganized LVMC specifically on behalf of the Debtor.

**B.    Post Confirmation Reporting and Quarterly Fees to the UST.**

Until the entry of the final decree closing the Bankruptcy Case, Reorganized LVMC shall comply with the post-confirmation reporting requirements found in Local Rule 3020 of the Bankruptcy Court.  Additionally, to the extent required, Reorganized LVMC shall file post-confirmation quarterly operating reports as required by the United States Trustee Guidelines, para. 7.2.

Prior to the Effective Date, the Debtor, and after the Effective Date, Reorganized LVMC shall pay all quarterly fees payable to the Office of the United States Trustee consistent with applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**C.    Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and Reorganized LVMC after the Effective Date as is legally permissible, including jurisdiction to:

a.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Disputed Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Disputed Claims;

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

106

b.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

c.    Resolve any matters related to the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor or Reorganized LVMC is a party and to hear, determine and, if necessary, liquidate any Claims arising therefrom or Cure amounts related thereto;

d.    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications or motions involving the Debtor or Reorganized LVMC that may be pending on the Effective Date or commenced thereafter as provided for by the Plan;

f.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;

g.    Decide or resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of any Final Order, the Plan, the Confirmation Order, or obligations of any Persons incurred in connection with such Final Order, the Plan, or the Confirmation Order;

h.    Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and **Section 12.1** of the Plan or modify any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or Reorganized LVMC; or remedy any defect or omission or reconcile any inconsistency in any Final Order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

i.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any person with consummation, implementation, or enforcement of any Final Order, the Plan, or the Confirmation Order, except as otherwise provided herein;

j.    Enter and implement such orders as are necessary or appropriate if a Final Order or the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

k.    Determine any other matters that may arise in connection with or relate to the Plan, any Final Order, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, any Final Order, or the Confirmation Order (unless such contract, instrument, release, or other agreement or document expressly provides otherwise), except as otherwise provided herein;

l.    Enter an order closing the Chapter 11 Case;

m.    Hear and decide Litigation Claims and any other claim or cause of action of the Debtor and Reorganized LVMC pending on the Effective Date;

n.    Hear and decide any remaining issues related to the 1st and 2nd Tier Indenture, the Ambac Insurance Policy or the Ambac Surety Bond to the extent it is determined by further court order that this Court has jurisdiction over such matters; and

o.    Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to section 505 of the Bankruptcy Code.

# IX.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

THE FOLLOWING SUMMARY DOES NOT CONSTITUTE EITHER A TAX OPINION OR TAX ADVICE TO ANY PERSON. NO REPRESENTATIONS REGARDING THE EFFECT OF IMPLEMENTATION OF THE PLAN ON INDIVIDUAL CREDITORS

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

ARE MADE HEREIN OR OTHERWISE.   RATHER, THE TAX DISCLOSURE IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL CREDITORS ARE URGED TO CONSULT THEIR RESPECTIVE TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN.

ANY FEDERAL INCOME TAX ADVICE CONTAINED HEREIN WAS NOT INTENDED OR WRITTEN FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UPON A TAXPAYER OR TO SUPPORT THE MARKETING OF A TRANSACTION, AND AN INDIVIDUAL TAXPAYER SHOULD SEEK ADVICE BASED UPON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES.  CREDITORS SHOULD CONSULT THEIR TAX ADVISOR REGARDING THE TAX TREATMENT (INCLUDING FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES) OF THEIR RESPECTIVE ALLOWED CLAIMS.  THIS DISCLOSURE IS NOT AN OPINION NOR A SUBSTITUTE FOR TAX PLANNING AND SPECIFIC ADVICE FOR PERSONS AFFECTED BY THE PLAN.

Creditors, parties in interest, and any Person affiliated with the foregoing are strongly urged to consult their respective tax advisors regarding the federal, state, local, and foreign tax consequences which may result from the confirmation and consummation of the Plan.  This Disclosure Statement shall not in any way be construed as making any representations regarding the particular tax consequences of the confirmation and consummation of the Plan to any Person. This Disclosure Statement is general in nature and is merely a summary discussion of potential tax consequences and is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), and pertinent regulations, rulings, court decisions, and treasury decisions, all of which are potentially subject to material and/or retroactive changes.  Under the IRC, there may be federal income tax consequences to the Debtor, its Creditors, its Equity Interest Holders, and/or any Person affiliated therewith as a result of confirmation and consummation of the Plan.

Upon the confirmation and consummation of the Plan, the federal income tax consequences to Creditors and their affiliates arising from the Plan will vary depending upon, among other things, the type of consideration received by the Creditor in exchange for its Claim,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

109

1    whether the Creditor reports income using the cash or accrual method of accounting, whether the

2    Creditor has taken a "bad debt" deduction with respect to its Claim, whether the Creditor

3    received consideration in more than one tax year, and whether the Creditor is a resident of the

4    United States.  If a Creditor's Claim is characterized as a loss resulting from a debt, then the

5    extent of the deduction will depend on whether the debt is deemed wholly worthless or partially

6    worthless, and whether the debt is construed to be a business or nonbusiness debt as determined

7    under the 26 U.S.C. § 166, and/or other applicable provisions of the IRC.

8        The 1st Tier Bonds, 2nd Tier Bonds, and 3rd Tier Bonds are tax-exempt obligations.  The

9    Debtor and its professionals have endeavored and will continue to endeavor to structure the

10    Restructured Obligations (the Cash Pay Notes, CapEx Notes, and Capital Appreciation Notes) to

11    satisfy the restrictions of Revenue Procedure 82-26 such that they may be issued as tax-exempt

12    obligations directly by the Debtor.  However, the issuance of tax-exempt obligations involves

13    many detailed legal requirements that are not necessarily addressed in this Disclosure Statement,

14    and the treatment of the Restructured Obligations by the Internal Revenue Service (the "IRS") as

15    tax-exempt obligations is not assured.

16        Generally, for an obligation to be respected as a debt obligation for federal income tax

17    purposes, and not recharacterized as an equity interest that might result in impermissible private

18    use for purposes of Section 141 of the IRC, it generally must be in form and substance a debt

19    instrument for federal income tax purposes.  If an entity is not a political subdivision, it may still

20    issue tax-exempt obligations if in so doing it is deemed to be acting on behalf of a state or local

21    governmental unit.  Entities formed under applicable state nonprofit corporation law which

22    comply with the requirements of Revenue Ruling 63-20 can issue tax exempt obligations if they

23    meet each of the following tests: (i) the corporation must engage in activities which are

24    essentially public in nature; (ii) the corporation must be one which is not organized for profit

25    (except to the extent of retiring indebtedness); (iii) the corporate income must not inure to any

26    private person; (iv) the state or a political subdivision thereof must have a beneficial interest in

27    the corporation while the indebtedness remains outstanding; (v) the state or a political

28    subdivision thereof must obtain full legal title to the property of the corporation with respect to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

which the indebtedness was incurred upon the retirement of such indebtedness; and (vi) the corporation must have been approved by the state or a political subdivision thereof, either of which must also have approved the specific obligations issued by the corporation. Further discussion of these requirements may be found in Revenue Procedure 82-26, which identifies circumstances in which the six tests of Revenue Ruling 63-20 will be deemed to have been met.

Further, because the 1st Tier Bonds will be refunded with the Restructured Obligations, Reorganized LVMC must establish that all of the original and investment proceeds of the Restructured Obligations are used (a) to pay principal, qualified interest, and any premium, on the prior issue of obligations issued on behalf of the governmental unit (i.e., the 1st Tier Bond Claims) and (b) to fund a reasonably required reserve fund for the refunding issue.[61]

In order for the Restructured Obligations to be tax-exempt, the Director or other agent of the State will have to make certain findings and take certain actions as required by Rev. Rul. 63-20. Though the Debtor expects that the State will make the required findings and take the required actions, this cannot be assured.

## X.
## SECURITIES LAW CONSIDERATIONS.

The only debt instruments that Reorganized LVMC will issue pursuant to the Plan are the Cash Pay Notes, CapEx Notes, and Capital Appreciation Notes (collectively, the "Restructured Obligations"). The Debtor will issue the Restructured Obligations to the New Trustee in full and final satisfaction of the 1st Tier Bond Claims, Ambac Surety Bond Claims and Ambac Insurance Claims, with the Debtor's obligations under the 1st Tier Note being extinguished.

It is the view of the Debtor that the Restructured Obligations may be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws (collectively with registration under the Securities Act, "Securities Law Registration") in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code. This section of the Bankruptcy Code provides that if the following principal requirements are satisfied with respect to the offer and sale of securities under a Chapter 11 plan of

---

[61] Within the meaning of section 103(c)(4) of the IRC.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

111

1  reorganization, then such offer and sale will be exempt from Securities Law Registration: (i) the

2  securities must be offered and sold under a plan of reorganization and must be securities of a

3  debtor, of an affiliate participating in a joint plan with a debtor, or of a successor to a debtor

4  under the plan; (ii) the recipients of the securities must hold claims against or interests in the

5  debtor; and (iii) the securities must be issued in exchange (or principally in exchange) for the

6  recipient's claims against or interests in the debtor.  Also, separately and independently of

7  Section 1145(a)(1) of the Bankruptcy Code, it is the view of the Debtor that the Restructured

8  Obligations will be exempt from the Securities Act, including the registration requirements,

9  under section 3(a)(2) of the Securities Act.

10      It is also the view of the Debtor that the Restructured Obligations will be exempt from the

11  Trust Indenture Act of 1939, as amended (the "TIA"), pursuant to section 304(a)(4)(A) of the

12  TIA.  That section exempts from the TIA any security that is exempted from the provisions of

13  the Securities Act by section 3(a)(2) of the Securities Act.[62]  The Debtor believes that the

14  Restructured Obligations will qualify for the Securities Act exemption set forth in section 3(a)(2)

15  of the Securities Act and, therefore, will qualify for the TIA exemption set forth in section

16  304(a)(4)(A) of the TIA.

17      **THE RIGHT OF ANY RECIPIENT OF ANY SECURITIES TO BE ISSUED**

18  **PURSUANT TO THE PLAN TO TRADE IN SUCH SECURITIES CAN INVOLVE**

19  **QUESTIONS OF A COMPLEX AND SUBJECTIVE NATURE.  IT IS THE**

20  **RESPONSIBILITY OF THE RECIPIENTS OF SUCH SECURITIES TO ASCERTAIN**

21  **THEIR RIGHTS TO TRADE IN THE SECURITIES.  CONSEQUENTLY, THE**

22  **DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY**

23  **PERSON TO TRADE IN SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

24  **THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF SECURITIES**

25  **CONSULT THEIR OWN COUNSEL CONCERNING THEIR RIGHTS TO TRADE**

26  **SUCH SECURITIES.**

27

28

---

[62] Section 304(a)(4)(A) contains other TIA exemptions as well, but they are not pertinent to this analysis.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

112

# ~~X.~~ XI.
## CONFIRMATION OF THE PLAN

**A.      Confirmation of the Plan.**

Pursuant to Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court will hold a hearing regarding confirmation of the Plan at the United States Bankruptcy Court for the District of Nevada, Southern Division, 300 Las Vegas Boulevard South, Las Vegas, NV 89101, commencing on ~~July 29, 2011,~~ _____, at ~~9:30 a.~~ _____.m. (PDT).

**B.      Objections to Confirmation of the Plan.**

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan of reorganization.  Any objections to confirmation of the Plan must be in writing, must state with specificity the grounds for such objections and must be filed with the Bankruptcy Court and served upon the following parties so as to be received on or before the time fixed by the Bankruptcy Court:

The Debtor:

> Las Vegas Monorail Company
> Attn: Curtis L. Myles, III
> 3900 Paradise Road, Suite 260
> Las Vegas, NV 89169
> Fax:  (702) 731-3272

With a copy to:

> Gordon Silver
> Attn:  William M. Noall, Esq.
> 3960 Howard Hughes Parkway, 9th Floor
> Las Vegas, NV  89169
> Fax:  (702) 369-2666

Counsel for the Director of the State of
Nevada Department of Business & Industry:

> Dennis L. Belcourt, Esq.
> Deputy Attorney General
> 100 N. Carson Street
> Carson City, Nevada  89701-4717
> Fax:  (775) 684-1156

Counsel for the 1st Tier Trustee:

> Susan M. Freeman
> Lewis and Roca LLP
> 19th Floor
> 40 North Central Avenue
> Phoenix, AZ  85004-4429
> Fax: (602) 734-3824

**C.      The Best Interest Test and Feasibility of the Plan.**

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

113

102200-002/Comparison

For the Plan to be confirmed, it must satisfy the requirements discussed below.

~~**1.      Best Interest of Creditors.**~~

**1.      The Best Interests Test and the Debtor's Liquidation Analysis.**

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed, it must provide Holders of Allowed Claims with at least as much under the Plan as they would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code (the "Best Interests Test").  The Best Interests Test with respect to each Impaired Class requires that each Holder of an Allowed Claim in such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7.  The Bankruptcy Court will determine whether the value to be received under the Plan by the Holders of Allowed Claims in each Class of Creditors equals or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7.

The Debtor believes that the Plan meets the Best Interests Test and provides value which is not less than what would be recovered by each Holder of an Impaired Claim in a Chapter 7 proceeding for the Debtor.  The Liquidation Analysis attached as **Exhibit B** hereto summarizes the Debtor's best estimate of recoveries by Creditors in the event of the conversion of the Debtor's case to a Chapter 7 on September 1, 2011, and compares the estimated Chapter 7 recoveries with the amount that the Debtor expects its Creditors to recover through 2019 pursuant to the Plan.  The Majority 1st Tier Bondholders do not agree with or consent to the Debtor's estimated valuation of the 1st Tier Bondholders' collateral.

Generally, to determine what Holders of Allowed Claims in each Impaired Class would receive if the Debtor were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of the Debtor's Assets in a Chapter 7 liquidation case for the Debtor, which for Creditors would consist of the proceeds from the disposition of the Assets of the Debtor, augmented by the unencumbered and available Cash held by the Debtor at the time of commencement of the Chapter 7 case.  Such Cash amounts would be reduced by the costs and expenses of the liquidation, a discount inherent to an orderly liquidation, and by such additional

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

114

102200-002/Comparison

1    Administrative Claims and Other Priority Claims as may result from the termination of the

2    Debtor's business and the use of Chapter 7 for the purpose of liquidation.[63]

3         In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based

4    on the liquidation of the non-exempt assets of the Debtor.  There are no exempt assets in the

5    Bankruptcy Case, and, as such, the distributions would include the same assets being collected

6    and liquidated under the Plan, namely the interests of the Debtor in the Assets (including Cash).

7    However, the proceeds from the collection and sale of property of the Estate available for

8    distribution to Creditors would be reduced by the satisfaction of any liens and security interests

9    in the Assets, costs of sale, any commission payable to the Chapter 7 trustee, the trustee's

10   attorneys' and accounting fees, as well as the administrative costs of the Chapter 7 estate.  In a

11   Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding-scale commission based

12   upon the funds distributed by such trustee to Creditors.

13        Administrative Claims that may arise in the Chapter 7 case or result from the Bankruptcy

14   Case would be paid in full from the liquidation proceeds before the balance of those proceeds

15   would be made available to pay other Allowed Claims in the Chapter 7 case.

16        In addition, the Debtor is doubtful that a Chapter 7 trustee in the Chapter 7 case would

17   pursue any Litigation Claims as vigorously as Reorganized LVMC, or be able to identify any

18   Litigation Claims that are cost-effective to pursue as prudently as Reorganized LVMC who

19   would have the benefit of the knowledge and information that they previously obtained.

20        The distributions from the liquidation proceeds would be paid Pro Rata according to the

21   amount of the aggregate Claims held by each Creditor in the Chapter 7 case in accordance with

22   the distribution scheme of the Bankruptcy Code.  The Debtor believes that the most likely

23   outcome under Chapter 7 would be the application of the "absolute priority rule."  Under that

24   rule, no junior Creditor in a Chapter 7 case may receive any distribution until all senior Creditors

25   are paid in full, with interest.

26

27   _____

     [63] In addition, because the Debtor is a non-profit corporation which does not pay federal income taxes, it is assumed
     that a buyer will be a for-profit corporation and the buyer will discount the purchase price, among other things, to

28   reflect the impact of federal income taxes on future earnings from the Monorail.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

The Debtor has determined that Confirmation will provide each Creditor with not less of a recovery than it would receive if the Debtor were liquidated under Chapter 7.  In liquidation under Chapter 7, as set forth for the Debtor in the Liquidation Analysis, the recoveries for each Class of Claims would vary, but would not exceed the projected recoveries under the Plan.

Specifically, the Liquidation Analysis estimates proceeds of $6,500,00 to $8,500,000[64] would be available to Creditors in the event of liquidation of the Debtor under Chapter 7, which, but for an insignificant portion to be distributed to Holders of Allowed General Unsecured Claims, would primarily be distributed to the Director and the Director's assignee, the 1st Tier Trustee, in full and final satisfaction of Claims arising under the Financing Agreement and 1st Tier Note.  Under the Plan, however, the 1st Tier Bondholders will receive in full and final satisfaction of both the Secured and Unsecured portions of the 1st Tier Bond Claims the Cash Pay Notes in the principal amount of $15 million, the CapEx Notes in the principal amount of $19.5 million at the time of issuance, and the Capital Appreciation Notes in the principal amount of $10 million at the time of issuance.  Therefore, Holders of Class 4 and Class 5 Claims will receive better treatment under the Plan than they would in a Chapter 7 liquidation.

Likewise, under the Plan, Holders of Class 3 General Unsecured Claims will receive a distribution of either the full amount of their Allowed Claims, up to an aggregate of $150,000 to $175,000, where in a liquidation such Creditors would receive an insignificant distribution, if any.  The Class 8 Director Claims will be released from all liabilities arising under the Financing Agreement, the 1st Tier Bondholders' Surety Bond and the 1st and 2nd Indenture and the 3rd Tier Indenture, and therefore will also receive better treatment under the Plan than in a Chapter 7 liquidation.  Classes 6, 7, and 9 would receive nothing in the event of distribution under either a Chapter 7 liquidation or the Plan, and therefore would not receive more in liquidation than under the Plan.

### 2.  **Debtor's Projections.**

In connection with certain matters relating to the Plan, A&M assisted the Debtor

---

[64] As set forth above, the Majority 1st Tier Bondholders do not agree with or consent to the Debtor's estimated valuation.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1    ~~prepare~~with the preparation of a set of financial statement projections.  The Projected Financial

2    Statements, which are attached hereto as **Exhibit "C~~.~~,"** relate to the projected operating results,

3    cash flow, and financial position of Reorganized LVMC for the periods from September 1, 2011

4    through June 30, 2019 (collectively, the "Projected Financial Statements").  For purposes of the

5    Projected Financial Statements, the Effective Date is assumed to occur on September 1, 2011.

6         The Projected Financial Statements are comprised of an income statement, balance sheet,

7    and statement of cash flows for the period from the second quarter of 2011 through the first half

8    of 2019, and the narrative assumptions and qualifications incorporated therein.  The Projected

9    Financial Statements are based on the actual and projected consolidated operating results of the

10   Debtor and Reorganized LVMC.

11        As described in greater detail in Exhibit C, the Projected Financial Statements were

12   prepared using a projection model developed by A&M and incorporate myriad assumptions with

13   respect to the anticipated future performance of the Debtor and Reorganized LVMC, general

14   business and economic conditions, and other matters which may be beyond the control of the

15   Debtor and Reorganized LVMC.  Although the Debtor believes the assumptions incorporated

16   into the Projected Financial Statements are reasonable, certain of such assumptions ultimately

17   may not be realized or may otherwise prove not to be materially accurate.  The presentation of

18   certain financial information in the Projected Financial Statements may depart from, or otherwise

19   be inconsistent with, generally accepted accounting principles.

20        The projected financial statements may not necessarily comply with the guidelines for

21   prospective financial statements published by the AICPA or the rules and regulations of the

22   United States Securities and Exchange Commission.  The Debtor's independent accountants

23   have neither compiled, reviewed nor examined the Projected Financial Statements that

24   accompany the Disclosure Statement and, accordingly, do not express an opinion or any other

25   form of assurance with respect to the Projected Financial Statements, assume no responsibility

26   for the Projected Financial Statements, and disclaim any association with the financial

27   projections.  The Projected Financial Statements were prepared solely for use in connection with

28   the Disclosure Statement and should not be used for any other purpose and are qualified in their

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

117

102200-002/Comparison

1    entirety by the descriptions and limitations as contained in the Disclosure Statement and as set

2    forth herein.

3          Moreover, the Projected Financial Statements contain certain statements that are

4    "forward-looking statements" within the meaning of The Private Securities Litigation Reform

5    Act of 1995.  These statements are subject to a number of assumptions, risks, and uncertainties,

6    many of which are beyond the control of the Debtor, including the consummation and

7    implementation of the Plan, the continuing availability of sufficient borrowing capacity or other

8    financing to fund operations, CapEx, and/or extensions to the Monorail system, maintenance of

9    good employee relations, existing and future governmental regulations and actions of

10   governmental bodies, natural disasters and unusual weather conditions, acts of terrorism,

11   industry-specific risk factors, and other market and competitive conditions.  Holders of Claims

12   are cautioned that the Forward-Looking Statements are as of the date thereof and are not

13   guarantees of future performance.  Actual results or developments may differ materially from the

14   expectations expressed or implied in the forward-looking statements, and the Debtor and

15   Reorganized LVMC, as applicable, undertake no obligation to update any such statements.

16         The Projected Financial Statements, while presented with numerical specificity, are

17   necessarily based on a variety of estimates and assumptions which, though considered reasonable

18   by the Debtor's management, may, in fact, not be realized and are inherently subject to

19   significant business, economic, competitive, industry, regulatory, market, and financial

20   uncertainties and contingencies, many of which are beyond the control of the Debtor and/or

21   Reorganized LVMC, as applicable.  No representations can be made or are made as to the

22   accuracy of the Projected Financial Statements or to ability of the Debtor and/or Reorganized

23   LVMC, as applicable, to achieve the projected results.  Some assumptions inevitably will be

24   incorrect.  Moreover, events and circumstances occurring subsequent to the date on which the

25   Projected Financial Statements were prepared may be different from those assumed, or,

26   alternatively, may have been unanticipated, and thus the occurrence of these events may affect

27   future financial results in a materially adverse or materially beneficial manner.  The Debtor and

28   Reorganized LVMC, as applicable, do not intend and undertake no obligation to update or

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

118

1    otherwise revise the Projected Financial Statements to reflect events or circumstances existing or

2    arising after the date on which they were prepared or to reflect the occurrence of unanticipated

3    events.  Therefore, the Projected Financial Statements may not be relied upon as a guaranty or

4    other form of assurance of the actual results that will occur.  In deciding whether to vote to

5    accept or reject the Plan, holders of Claims must make their own independent determinations as

6    to the adequacy and reasonableness of such assumptions and the reliability of the Projected

7    Financial Statements and should consult with their own advisors on all matters.

8              **3.       Liquidation Analysis.**

9              The Liquidation Analysis attached as **Exhibit B** hereto summarizes the Debtor's best

10   estimate of recoveries by Creditors in the event of the conversion of the Debtor's case to a

11   Chapter 7 on September 1, 2011.

12             Generally, to determine what Holders of Allowed Claims in each Impaired Class would

13   receive if the Debtor were liquidated, the Bankruptcy Court must determine what funds would be

14   generated from the liquidation of the Debtor's Assets and properties in a Chapter 7 liquidation

15   case for the Debtor, which for Creditors would consist of the proceeds from the disposition of the

16   Assets of the Debtor, augmented by the unencumbered and available Cash held by the Debtor at

17   the time of commencement of the Chapter 7 case.  Such Cash amounts would be reduced by the

18   costs and expenses of the liquidation, a discount inherent to an orderly liquidation, and by such

19   additional Administrative Claims and Other Priority Claims as may result from the termination

20   of the Debtor's business and the use of Chapter 7 for the purpose of liquidation.[65]

21             In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based

22   on the liquidation of the non-exempt assets of the Debtor.  There are no exempt assets in the

23   Bankruptcy Case, and, as such, the distributions would include the same assets being collected

24   and liquidated under the Plan, namely the interests of the Debtor in the Cash and the Assets.

25   However, the proceeds from the collection and sale of property of the Estate available for

26

27   [65] In addition, because the Debtor is a non-profit corporation which does not pay federal income taxes, it is assumed
     that a buyer will be a for-profit corporation and the buyer will discount the purchase price, among other things, to

28   reflect the impact of federal income taxes on future earnings from the Monorail.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison                                    119

1    distribution to Creditors would be reduced by the satisfaction of any liens and security interests

2    in the Assets, costs of sale, any commission payable to the Chapter 7 trustee, the trustee's

3    attorneys' and accounting fees, as well as the administrative costs of the Chapter 7 estate.  In a

4    Chapter 7 case, the Chapter 7 trustee would be entitled to seek a sliding-scale commission based

5    upon the funds distributed by such trustee to Creditors.

6         Administrative Claims that may arise in the Chapter 7 case or result from the Bankruptcy

7    Case would be paid in full from the liquidation proceeds before the balance of those proceeds

8    would be made available to pay other Allowed Claims in the Chapter 7 case.

9         In addition, the Debtor is doubtful that a Chapter 7 trustee in the Chapter 7 case would

10   pursue any Litigation Claims as vigorously as Reorganized LVMC, or be able to identify any

11   Litigation Claims that are cost-effective to pursue as prudently as Reorganized LVMC who

12   would have the benefit of the knowledge and information that they previously obtained.

13        The distributions from the liquidation proceeds would be paid Pro Rata according to the

14   amount of the aggregate Claims held by each Creditor in the Chapter 7 case in accordance with

15   the distribution scheme of the Bankruptcy Code.  The Debtor believes that the most likely

16   outcome under Chapter 7 would be the application of the "absolute priority rule."  Under that

17   rule, no junior Creditor in a Chapter 7 case may receive any distribution until all senior Creditors

18   are paid in full, with interest.

19        The Debtor has determined that Confirmation will provide each Creditor with not less of

20   a recovery than it would receive if the Debtor were liquidated under Chapter 7.  In liquidation

21   under Chapter 7, as set forth for the Debtor in the Liquidation Analysis, the recoveries for each

22   Class of Claims would vary, but would not exceed the projected recoveries under the Plan.

23        Specifically, the Liquidation Analysis estimates proceeds of $6,500,00 to $8,500,000

24   would be available to Creditors in the event of liquidation of the Debtor under Chapter 7, which,

25   but for an insignificant portion to be distributed to Holders of Allowed General Unsecured

26   Claims, would primarily be distributed to the Director and the Director's assignee, the 1st Tier

27   Trustee, in full and final satisfaction of Claims arising under the Financing Agreement and 1st

28   Tier Note.  Under the Plan, however, the 1st Tier Bondholders will receive in full and final

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

120

102200-002/Comparison

satisfaction of both the Secured and Unsecured portions of the 1st Tier Bond Claims the Cash Pay Notes in the principal amount of $15 million, the CapEx Notes in the principal amount of $19.5 million at the time of issuance, and the Capital Appreciation Notes in the principal amount of $10 million at the time of issuance. Therefore, Holders of Class 4 and Class 5 Claims will receive better treatment under the Plan than they would in a Chapter 7 liquidation.

Likewise, under the Plan, Holders of Class 3 General Unsecured Claims will receive a distribution of 80%, up to a total of $175,000 in payment of approximately $150,000 – $175,000 in total Class 3 Claims (excluding damages from Debtor's rejection of Executory Contracts and Unexpired Leases and Disputed personal injury claims), where in a liquidation such Creditors would receive an insignificant distribution, if any. The Class 8 Director Claims will be released from all liabilities arising under the Financing Agreement, the Surety Bond and the 1st and 2nd Indenture and the 3rd Tier Indenture, and therefore will also receive better treatment under the Plan than in a Chapter 7 liquidation. Classes 6, 7, and 9 would receive nothing in the event of distribution under either a Chapter 7 liquidation or the Plan, and therefore would not receive more in liquidation than under the Plan.

### 4.3.    Feasibility.

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that Reorganized LVMC will possess the resources and working capital necessary to meet its obligations under the Plan.

To demonstrate the feasibility of the Plan, the Debtor prepared the Financial Projections attached hereto as Exhibit C. The Financial Projections demonstrate that the Debtor is capable of satisfying the obligations proposed under the Plan.

In addition, as can be seen from the filed monthly financial reports of the Debtor, the Debtor has generally generated revenues and incurred expenses as anticipated. As such, the Debtor is capable of meeting all Cash demands under the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan

102200-002/Comparison

satisfies the statutory requirements for Confirmation.

### ~~5.~~ 4.    Confirmation of the Plan Without Acceptance By All Impaired Classes:  the "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be confirmed even if it has not been accepted by all Impaired classes, as long as at least one Impaired class of claims has accepted it.  Consequently, the Bankruptcy Court may confirm the Plan at the Debtor's request notwithstanding the Plan's rejection by Impaired Classes, as long as at least one Impaired Class has accepted the Plan and the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it.

A plan will be deemed fair and equitable as to a class of secured claims that rejects the plan if the plan provides: (i)(a) that the holders of claims in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim in such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on such proceeds as described under clause (i) or (ii) of this paragraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides: (i) for each holder of a claim included in the rejecting class to receive or retain on account of such claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

The votes of Holders of 2nd Tier Bond Claims, 3rd Tier Bond Claims, and Subordinated

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

122

Claims under Classes 5, 6, 7, and 89 are not being solicited because such Holders are not entitled to receive or retain under the Plan any interest or property on account of their Claims. Classes 5 6 and 67 are contractually subordinated to ClassClasses 4, and Class5, and Classes 4 isand 5 are not being paid in full. Holders of Class 89 Claims, to the extent such Allowed Claims exist, are subordinated pursuant to Section 510 of the Bankruptcy Code. Classes 5, 6, 7, and 89 therefore are deemed to have rejected the Plan. The Debtor is seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to Classes 5, 6, 7, and 89, notwithstanding such Classes' deemed rejection of the Plan. The Debtor also may seek confirmation as to other Classes that reject the Plan. Notwithstanding the deemed rejection of the Plan by Classes 5, 6, 7, and 89, the Debtor believes that under all of the relevant facts and circumstances, it is not unfairly discriminating against Classes 5, 6, 7, and 89, and Classes 6, 7, and 9 are being treated fairly and equitably under the Bankruptcy Code. The Debtor therefore believes the Plan may be confirmed despite its deemed rejection by those Classes.

6.5.    **Accepting Impaired Class.**

Since at least one Class of Claims is Impaired under the Plan, in order for the Plan to be confirmed, the Plan must be accepted by at least one Impaired Class of Claims (not including the votes of Insiders of the Debtor).

7.6.    **Acceptance of the Plan.**

For an Impaired Class of Claims to accept the Plan, those representing at least two-thirds in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

8.7.    **Allowed Claims.**

You have an Allowed Claim if: (i) you or your representative timely files a proof of Claim and no objection has been filed to your Claim within the time period set for the filing of such objections; (ii) you or your representative timely files a proof of Claim and an objection is filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim; (iii) your Claim is listed by the Debtor in its Schedules or any amendments thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount and undisputed and no

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

objection has been filed to your Claim; or (iv) your Claim is listed by the Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to your Claim upon which the Bankruptcy Court has ruled to allow your Claim.    Under the Plan, the deadline for filing objections to Claims is 120 days following the Effective Date.  If your Claim is not an Allowed Claim, it is a Disputed Claim and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Bankruptcy Rule 3018.  If you are uncertain as to the status of your Claim or if you have a dispute with the Debtor, you should check the Bankruptcy Court record carefully, including the Schedules of the Debtor, and seek appropriate legal advice.    Neither the Debtor nor its professionals can advise you about such matters.

**9.8.    Impaired Claims.**

Impaired Claims include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor, or if the full amount of the Allowed Claims will not be paid under the Plan.  Holders of Claims which are not Impaired under the Plan will be deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and the Debtor need not solicit acceptance of the Plan by Holders of such Unimpaired Claims.  Holders of Claims which are to receive nothing under the Plan will be deemed to have voted to reject the Plan.  Consequently, only Impaired Holders of Claims in Classes 3, 4, 5, and 78 are entitled to vote on the Plan.  Each subclass in Classes 4 and 5 is deemed to be a separate class for purposes of voting pursuant to section 1122 of the Bankruptcy Code and for acceptance pursuant to section 1126 of the Bankruptcy Code.

**10.9.    Voting Procedures.**

a.    Submission of Ballots.

All Creditors entitled to vote will be sent a ballot, together with instructions for voting, and a copy of this approved Disclosure Statement which includes a copy of the Plan.  You should read the ballot carefully and follow the instructions contained therein.  Please use only the ballot that was sent with this Disclosure Statement.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

You should complete your ballot and return it as follows:

~~Gordon Silver~~
The Garden City Group
Attn: ~~Gabrielle A. Hamm, Esq.~~
~~3960 Howard Hughes Parkway, 9th Floor~~
Las Vegas~~, NV 89169~~ Monorail Balloting Agent
~~Facsimile:  (702) 369-2666~~
1985 Marcus Avenue
Lake Success, NY 11042

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED ABOVE BY 5:00 P.M., PACIFIC TIME, ON _____, 2011.**

    b.    <u>Incomplete Ballots.</u>

Unless otherwise ordered by the Bankruptcy Court, ballots which are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote for the Plan.

    c.    <u>Withdrawal of Ballots.</u>

You may not withdraw or change your ballot after it is cast unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the withdrawal or change.

    d.    <u>Questions and Lost or Damaged Ballots.</u>

If you have questions concerning these voting procedures, if your ballot is damaged or lost, or if you believe you should have received a ballot but did not receive one, you may contact the Debtor's counsel as listed above regarding submission of ballots.

**~~XI.~~XII.**
**ALTERNATIVES TO THE PLAN**

The Debtor believes that the Plan provides Creditors the best and most complete form of recovery available.  As a result, the Debtor believes that the Plan serves the best interests of all Creditors and parties-in-interest in the Bankruptcy Case.

In formulating and developing the Plan, the Debtor explored numerous alternatives.  The Debtor believes not only that the Plan fairly adjusts the rights of various Classes of Creditors and enables the Creditors to realize the greatest sum possible under the circumstances, but also

125

102200-002/Comparison

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

that rejection of the Plan in favor of some theoretical alternative method of reconciling the Claims of the various Classes would require, at the very least, an extensive and time-consuming negotiation process and would not result in a better recovery for any Class.  It is not atypical for bankruptcy proceedings involving substantial entities to continue for months or years before a plan of reorganization is consummated and payments are made.

**A.      Alternative Plans of Reorganization.**

Under the Bankruptcy Code, a debtor has an exclusive period of 120 days and an additional vote solicitation period of 60 days from the entry of the order for relief during which time, assuming that no trustee has been appointed by the Bankruptcy Court, only a debtor may propose a plan of reorganization.  After the expiration of the initial 180-day period and any extensions thereof, the Debtor or any other party-in-interest may propose a different plan, unless the Bankruptcy Court has extended the exclusivity periods.  ~~By stipulation between the Debtor, the Director, the 1st Tier Trustee, the Majority 1st Tier Bondholders, the 2nd Tier Trustee, and Ambac, the hearings on the Disclosure Statement Motion, the Solicitation Procedures Motion, and the Classification Motion were continued to May 25, 2011, at 9:30 a.m~~The Debtor's exclusivity period has expired, and no competing plan has been filed.

**B.      Liquidation under Chapter 7.**

If a plan of reorganization cannot be confirmed, the Bankruptcy Case may be converted to a Chapter 7 case, in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  For a discussion of the effect that a Chapter 7 liquidation would have on recovery by Creditors, see Section XI.C., "The Best Interest Test and Feasibility of the Plan."

As previously stated, the Debtor believes that liquidation under Chapter 7 would result in a substantially reduced recovery of funds by the Estate because of:  (i) the risk that the Debtor may cease or lose business; (ii) additional administrative expenses involved in the appointment of a trustee for the Debtor and attorneys and other professionals to assist such trustee; and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison

126

connection with a cessation of the Debtor's operations.  Accordingly, the Debtor believes that Holders of certain Classes of Claims will receive substantially smaller distributions in a Chapter 7 liquidation than under the Plan.

. . .

## XII.XIII.
## PREFERENCE AND OTHER AVOIDANCE ACTIONS

A bankruptcy trustee (or the Debtor as a debtor-in-possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under Chapter 7 had the payment not been made, if (i) the payment was made within 90 days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case.  A debtor is presumed to have been insolvent during the 90 days preceding the commencement of the case.

A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two years (and under applicable Nevada law, four years) before the date the bankruptcy case was commenced if the debtor (i) received less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left the debtor with an unreasonably small capital, or the debtor intended to incur debts that would be beyond the debtor's ability to pay as such debts matured.

Although the Debtor has not fully analyzed various potential preference or other avoidance actions, it is possible that some pre-Petition transactions may be avoidable.  The Debtor thusBased upon the Debtor's and its professionals' preliminary analysis of its prepetition transactions during the 90-day period, one-year period, and two-year period preceding the Petition Date, as applicable, the Debtor does not believe that any of its prepetition transfers are avoidable, or if potentially avoidable, that litigation seeking to recover such transfers would result in any material recovery to the estate.  However, because the Debtor has not engaged in a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

127

102200-002/Comparison

1    thorough analysis of its prepetition transfers, it hereby expressly reserves its right to commence

2    any appropriate actions pursuant to Chapter 5 of the Bankruptcy Code.

3                            XIII.XIV.
             **RECOMMENDATION AND CONCLUSION**

4            TheThe Debtor believes that the Plan provides the best possible recovery for all parties-

5    in-interest.  Accordingly, the Debtor recommends that all Creditors who are entitled to vote on

6    the Plan should vote to accept the Plan.

7            DATED this _____ day of AprilJune, 2011.

8
                                    **LAS VEGAS MONORAIL COMPANY**, a
9                                   Nevada non-profit corporation

10
                                    By:_____
11                                  Name:  Curtis Myles
                                    Title:  President
12

13

14    **PREPARED AND SUBMITTED BY:**

15    GORDON SILVER

16

17    By: _____
             GERALD M. GORDON, ESQ.
18           WILLIAM M. NOALL, ESQ.
             GABRIELLE A. HAMM, ESQ.
19           3960 Howard Hughes Pkwy., 9th Floor
             Las Vegas, Nevada 89169
20           Attorneys for the Debtor

21

22

23

24

25

26

27

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/Comparison                              128