1  GORDON SILVER
   GERALD M. GORDON, ESQ.
2  Nevada Bar No. 229
   E-mail:  ggordon@gordonsilver.com
3  WILLIAM M. NOALL, ESQ.
   Nevada Bar No. 3549
4  E-mail:  wnoall@gordonsilver.com
   GABRIELLE A. HAMM, ESQ.
5  Nevada Bar No. 11588
   E-mail:  ghamm@gordonsilver.com
6  3960 Howard Hughes Pkwy., 9th Floor
   Las Vegas, Nevada 89169
7  Telephone (702) 796-5555
   Facsimile (702) 369-2666
8  Attorneys for Debtor

9              UNITED STATES BANKRUPTCY COURT
                FOR THE DISTRICT OF NEVADA
10

11  In re:                              | Case No.: BK-S-10-10464-BAM
                                         | Chapter 11
12  LAS VEGAS MONORAIL COMPANY,          |
13          Debtor.                      |
                                         |
14                                       | Continued Confirmation Hearing:
                                         | Date:   November 14, 2011
                                         | Time:  9:30 a.m.
15

16    **DEBTOR'S BRIEF IN SUPPORT OF DEBTOR'S THIRD AMENDED PLAN, AS
17    FURTHER REVISED [ECF NO. 956] AND OMNIBUS REPLY TO OBJECTIONS**

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

# Table of Contents

I. INTRODUCTION ....................................................................................................... 1

II. STATEMENT OF RELEVANT FACTS ................................................................. 2

III. LEGAL ANALYSIS .............................................................................................. 4

    A.   THE BURDEN OF PROOF FOR PLAN CONFIRMATION IS A PREPONDERANCE OF THE
EVIDENCE. ................................................................................................................. 4

    B.   11 U.S.C. § 1129(A)(11): FEASIBILITY. ........................................................... 4

        1.   The Feasibility Framework. ............................................................................ 4

        2.   The Debtor's Projections and the Reasonable Probability of Success. ........... 5

        3.   The Cases Cited in the Order Regarding Plan Feasibility are Not Factually Similar..... 8

    C.   11 U.S.C. § 1129(A)(1): PLAN COMPLIANCE WITH THE BANKRUPTCY CODE.................... 12

        1.   11 U.S.C. § 1122: Classification of Claims. ............................................... 12

        2.   11 U.S.C. § 1123(a): Mandatory Plan Requirements. ................................. 13

        3.   11 U.S.C. § 1123(b): Permissive Plan Provisions. .................................... 14

    D.   11 U.S.C. § 1129(A)(2): PROPONENT COMPLIANCE WITH THE BANKRUPTCY CODE. ....... 22

    E.   11 U.S.C. § 1129(A)(3): GOOD FAITH. ......................................................... 23

    F.   11 U.S.C. § 1129(A)(4): PAYMENTS FOR SERVICES REASONABLE................... 24

    G.   11 U.S.C. § 1129(A)(5): DISCLOSURE OF MANAGEMENT AND INSIDERS.......... 24

    H.   11 U.S.C. § 1129(A)(6): REGULATORY APPROVALS. ..................................... 25

    I.   11 U.S.C. § 1129(A)(7): BEST INTERESTS TEST. .......................................... 25

    J.   11 U.S.C. § 1129(A)(8): CLASS ACCEPTANCE. ............................................ 26

    K.   11 U.S.C. § 1129(A)(9): PRIORITY CLAIMS. ............................................... 27

    L.   11 U.S.C. § 1129(A)(10): ONE CONSENTING IMPAIRED CLASS. .................. 28

    M.   11 U.S.C. § 1129(A)(12): U.S. TRUSTEE'S FEES PAID. ............................... 28

    N.   11 U.S.C. §§ 1129(A)(13) THROUGH (A)(16): MISCELLANEOUS INAPPLICABLE
PROVISIONS. ............................................................................................................. 28

    O.   "CRAMDOWN" OF THE PLAN IS AVAILABLE PURSUANT TO 11 U.S.C. § 1129(B). ............ 28

    P.   TREATMENT OF AVOIDANCE ACTIONS AND OTHER LITIGATION CLAIMS. ................... 29

    Q.   THE 3RD TIER TRUSTEE'S FEES, COSTS, AND ATTORNEYS' FEES. ...................... 30

    R.   IF NECESSARY, NON-MATERIAL PLAN MODIFICATIONS ARE PERMITTED. ........ 35

IV. CONCLUSION ..................................................................................................... 36

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

1

**Table of Authorities**

2

**CASES**

In re Atrium High Point Ltd. P'ship, 189 B.R. 599 (Bankr. M.D.N.C. 1995)............................ 10

Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352 (9th Cir. 1986) ........................... 5

Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.), 885 F.2d 621 (9th Cir. 1989) ................................................................................................................................. 15

Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106 (1939) ................................................. 14

Cavaliere v. Sapir, 208 B.R. 784 (D. Conn. 1997) .................................................................... 33

Computer Task Grp., Inc. v. Brotby (In re Brotby), 303 B.R. 177 (B.A.P. 9th Cir. 2003) ........... 5

Digesti & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.), 143 B.R. 560 (B.A.P. 9th Cir. 1992) ................................................................................................................................. 35

Estes & Hoyt, P.C. v. Crake (In re Riverside-Linden Inv. Co.), 925 F.2d 320 (9th Cir. 1991) ... 35

In re Adelphia Commc'ns Corp., 327 B.R. 143 (Bankr. S.D.N.Y. 2005) ................................... 15

In re Am. Solar King Corp., 90 B.R. 808 (Bankr. W.D. Tex. 1988) .......................................... 36

In re AOV Industries, Inc., 31 B.R. 1005 (D.D.C. 1983) ........................................................... 18

In re Apex Oil Co., 118 B.R. 683 (Bankr. E.D. Mo. 1990) ....................................................... 19

In re Arrowmill Dev. Corp., 211 B.R. 497 (Bankr. D.N.J. 1997) .............................................. 18

In re Bashas' Inc., 437 B.R. 874 (Bankr. D. Ariz. 2010).......................................................... 11

In re Best Prods. Co., Inc., 177 B.R. 791 (S.D.N.Y. 1995) ....................................................... 14

In re Boston Harbor Marina Co., 157 B.R. 726 (Bankr. D. Mass. 1993) .................................. 18

In re Cellular 101, Inc., 377 F.3d 1092 (9th Cir. 2004) ............................................................ 31

In re Cent. Jersey Airport Servs., Inc., 282 B.R. 176 (Bankr. D.N.J. 2002)............................. 18

In re County of Orange, 179 B.R. 195 (Bankr. C.D. Cal. 1995) ............................................... 31

In re Digital Impact, Inc., 223 B.R. 1 (N.D. Okla. 1998) ......................................................... 18

In re Downtown Inv. Club III, 89 B.R. 59 (B.A.P. 9th Cir. 1988) ............................................. 36

In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992).................. 12

In re Eastview Estates II, 713 F.2d 443 (9th Cir. 1983) ............................................................ 33

In re Elsinore Shore Assocs., 91 B.R. 238 (Bankr. D.N.J. 1988) .............................................. 24

In re Energy Partners, Ltd., No. 09-32957, 2009 WL 2898876 (Bankr. S.D. Tex. Aug. 3, 2009)14

In re Entergy New Orleans, Inc., No. 05-17697, 2007 WL 1343804 (Bankr. E.D. La. May 7, 2007) ......................................................................................................................................... 14

In re Food City, Inc., 110 B.R. 808 (Bankr. W.D. Tex. 1990) ................................................... 24

In re G.I. Indus., Inc., 204 F.3d 1276 (9th Cir. 2000)................................................................ 33

In re Granite Broadcasting Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007) ................................ 22

In re Haardt, 65 B.R. 697 (Bankr. E.D. Pa. 1986) ................................................................... 10

In re Heartland Publications, LLC, No. 09-14459(KG), 2010 WL 2745973 (Bankr. D. Del. Apr. 16, 2010)................................................................................................................................... 22

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

*In re Linens Holding Co.*, No. 08-10832, 2009 WL 2163235 (Bankr. D. Del. June 12, 2009).... 14

*In re Made in Detroit, Inc.*, 299 B.R. 170 (Bankr. E.D. Mich. 2003) ............................................ 9

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984)....................................... 23

*In re Monroe Well Serv., Inc.*, 80 B.R. 324 (Bankr. E.D.Pa. 1987) ............................................... 19

*In re North Valley Mall, LLC*, 432 B.R. 825 (Bankr. C.D. Cal. 2010) .......................................... 11

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ................................................................ 22

*In re Pacific Gas and Elec. Co.*, 304 B.R. 395 (Bankr. N.D. Cal. 2004) ..................................... 15

*In re Penn Cent. Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979)......................................................... 15

*In re Rainbow 215, LLC*, BK-S-09-23414-BAM, ECF No. 323 (Bankr. D. Nev. March 25, 2011) ................................................................................................................................................. 9

*In re Repurchase Corp.*, 332 B.R. 336 (Bankr. N.D. Ill. 2005) ...................................................... 9

*In re Resorts, Int'l*, 145 B.R. 412 (Bankr. D.N.J 1990) ................................................................. 18

*In re Sagewood Manor Assoc. Ltd. P'ship*, 223 B.R. 756 (Bankr. D. Nev. 1998)........................ 5

*In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988) ................................... 23

*In re Simplot*, No. 06-00002, 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007).................... 36

*In re SONICblue, Inc.*, 422 B.R. 204 (Bankr. N.D. Cal. 2009) .................................................... 31

*In re Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir. 1993) ............................................................. 18

*In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988) ....................................................... 23

*In re Trans Max Techs.*, 349 B.R. 80 (Bankr. D. Nev. 2006)........................................................ 4

*In re Trans World Airlines, Inc.*, 185 B.R. 302 (Bankr. E.D. Mo. 1995) ..................................... 23

*In re United States Lines, Inc.*, 103 B.R. 427 (Bankr. S.D.N.Y. 1989) ....................................... 31

*In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011)........................................... 22

*In re Winn-Dixie Stores, Inc.*, 356 B.R. 239 (Bankr. M.D. Fla. 2006)......................................... 14

*Johnson v. Righetti*, 756 F.2d 738 (9th Cir. 1985) ....................................................................... 33

*Jorgensen v. Federal Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104 (B.A.P. 9th Cir. 1986) ............................................................................................................................................ 9

*Liberty Nat'l Enters. v. Ambanc LaMesa Ltd. P'ship (In re Ambanc LaMesa Ltd. P'ship)*, 115 F.3d 650 (9th Cir. 1997) ............................................................................................................. 4

*Lobel & Opera, v. United States Trustee (In re Auto Parts Club, Inc.)*, 211 B.R. 29 (B.A.P. 9th Cir. 1997) ................................................................................................................................ 35

*M & S Assoc., Ltd.*, 138 B.R. 845 (Bankr. W.D. Tex. 1992)......................................................... 9

*Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377 (9th Cir. 1986) ........................................... 15

*Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249 (5th Cir. 1986) ...................................................................................................................................... 31

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374 (9th Cir. 1985) . 4

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070 (9th Cir. 2002) ...................................................................................................................................... 23

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414 (1958).......................................................................................................................................... 14

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

iv

Resort Int'l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394 (9th Cir. 1995)............... 15

Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet), 251 B.R. 103
   (B.A.P. 9th Cir. 2000)........................................................................................................ 35

Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, LLC, 632 F.3d 168 (5th Cir. 2011) .. 8

Schmitt v. Ulrich, 215 B.R. 417 (B.A.P. 9th Cir. 1997)...................................................... 15

Underhill v. Royal, 769 F.2d 1426 (9th Cir. 1985)............................................................ 20

Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc., 924 F.2d 955 (9th Cir. 1991)....... 34

**STATUTES AND RULES**

11 U.S.C. § 1107 ....................................................................................................... 16

11 U.S.C. § 1108 ....................................................................................................... 16

11 U.S.C. § 1123(a) ................................................................................................... 13

11 U.S.C. § 1123(b) ................................................................................................... 14

11 U.S.C. § 1124 ....................................................................................................... 26

11 U.S.C. § 1125(e) ................................................................................................... 21

11 U.S.C. § 1126 ....................................................................................................... 26

11 U.S.C. § 1126(f) ................................................................................................... 26

11 U.S.C. § 1126(g) ................................................................................................... 27

11 U.S.C. § 1127(a) ................................................................................................... 36

11 U.S.C. § 1129(a)(1) ............................................................................................... 12

11 U.S.C. § 1129(a)(10) ............................................................................................. 28

11 U.S.C. § 1129(a)(11) ............................................................................................... 4

11 U.S.C. § 1129(a)(12) ............................................................................................. 28

11 U.S.C. § 1129(a)(13) ............................................................................................. 28

11 U.S.C. § 1129(a)(14) ............................................................................................. 28

11 U.S.C. § 1129(a)(15) ............................................................................................. 28

11 U.S.C. § 1129(a)(16) ............................................................................................. 28

11 U.S.C. § 1129(a)(3) ............................................................................................... 23

11 U.S.C. § 1129(a)(4) ............................................................................................... 24

11 U.S.C. § 1129(a)(5) ............................................................................................... 24

11 U.S.C. § 1129(a)(6) ............................................................................................... 25

11 U.S.C. § 1129(a)(7) ............................................................................................... 25

11 U.S.C. § 1129(a)(8) ............................................................................................... 26

11 U.S.C. § 1129(a)(9) ............................................................................................... 27

11 U.S.C. § 1129(b)(1) ............................................................................................... 28

11 U.S.C. § 1129(b)(2)(B)(ii) ..................................................................................... 28

11 U.S.C. § 323(b) ..................................................................................................... 16

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11 U.S.C. § 502(b)(1) ............................................................................................................ 33

11 U.S.C. § 506(b) ................................................................................................................. 29

11 U.S.C. § 524(e) ................................................................................................................. 18

11 U.S.C. § 547 ...................................................................................................................... 16

11 U.S.C. § 548 ...................................................................................................................... 16

Fed. R. Bankr. P. 3019(a) ...................................................................................................... 36

Fed. R. Bankr. P. 3020(b)(2) ................................................................................................. 24

NRPC 1.5(a) ........................................................................................................................... 35

## OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1127.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2006) .............................................................................................................................. 36

7 Collier on Bankruptcy ¶ 1129.02[11] (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2010) ................................................................................................................................. 11

H.R. Rep. No. 95-595 (1977) ................................................................................................ 12

S. Rep. No. 95-989 (1978) ..................................................................................................... 12

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

Las Vegas Monorail Company (the "Debtor"), debtor and debtor-in-possession, by and through its counsel, the law firm of Gordon Silver, hereby submits its brief in support of confirmation (the "Confirmation Brief") of the *Debtor's Third Amended Plan, as Further Revised* (as may be amended, modified, or supplemented prior to confirmation, the "Plan") [ECF No. 956] and its omnibus reply to the *Objection of Law Debenture Trust Company of New York to Confirmation of Debtor's Third Amended Plan of Reorganization, as Further Revised* [ECF No. 982] (the "3rd Tier Trustee Objection"), the *Response of U.S. Bank National Association, as Trustee, to the Debtor's Third Amended Plan of Reorganization, as Further Revised* [ECF No. 984], and the Director's *Objection to Debtor's Third Amended Plan of Reorganization as Further Revised* [ECF No. 986].[1]

This Confirmation Brief is made and based on the *Omnibus Declaration of Curtis L. Myles, III in Support of Debtor's First Day Motions* [ECF No. 7] (the "Omnibus Declaration"), and the *Declaration of Matthew E. Kvarda in Support of Las Vegas Monorail Company's Third Amended Plan, as Further Revised* ( "Kvarda Declaration") and the *Declaration of Curtis L. Myles, III Regarding Feasibility of Debtor's Third Amended Plan, as Further Revised* (the "Myles Declaration"), filed contemporaneously herewith; the points and authorities herein, any papers or pleadings contained in this Court's file, judicial notice of which are respectfully requested, and any oral argument or evidence presented at the time of the Confirmation Hearing.

## POINTS AND AUTHORITIES

### I.
### INTRODUCTION

1.  On January 13, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Case.[2]

2.  Since the Petition Date, the Debtor has continued operating its business as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

[2] All references to "Chapter" and "Section" herein are to title 11 of the U.S. Code (the "Bankruptcy Code"), all references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1    committees have been appointed in this Chapter 11 Case.  No request has been made for the

2    appointment of a trustee or examiner.

3            3.      The Court has jurisdiction over the confirmation of Debtor's Plan as a core

4    proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).  Venue for Debtor's Chapter 11 in this District

5    is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought herein include,

6    but are not limited to, Section 1129 of the Bankruptcy Code and Bankruptcy Rule 3020.

## II.
## STATEMENT OF RELEVANT FACTS

8            1.      On June 29, 2011, the Debtor filed its *Third Amended Plan of Reorganization*

9    [ECF No. 870].  On July 6, 2011, Debtor filed its *Disclosure Statement to Accompany Debtor's*

10   *Third Amended Plan of Reorganization* [ECF No. 880] (the "July 6, 2011 Disclosure

11   Statement").

12           2.      On July 8, 2011, the Court entered its *Order Approving Adequacy of Disclosure*

13   *Statement to Accompany Debtor's Third Amended Plan of Reorganization and Setting Hearing*

14   *on Confirmation of Plan* [ECF No. 886] (the "Disclosure Statement Order").  On July 6, 2011,

15   the Court entered its *Order Approving Debtor's Amended Motion for Entry of Order Approving*

16   *(A) the Form, Scope, and Nature of Solicitation, Balloting, Tabulation, and Notices with Respect*

17   *to the Debtor's First Amended Plan of Reorganization and (B) Related Confirmation*

18   *Procedures, Deadlines, and Notices* ("Solicitation Procedures Order") [ECF No. 878].

19           3.      Accordingly, on July 13, 2011, the Debtor caused to be served Solicitation

20   Packages in accordance with the Solicitation Procedures Order.  See ECF No. 894.

21           4.      Subsequent to the approval of the July 6, 2011 Disclosure Statement and the

22   service of the Solicitation Package, the Debtor, the Majority 1st Tier Bondholders, the 1st Tier

23   Trustee, and Ambac continued negotiations to narrow or eliminate their remaining plan

24   confirmation issues.  As a consequence of these negotiations, the Debtor made material

25   modifications to the treatment of the Holders of Class 4 Claims and Class 5 Claims, and a

26   resolution of objections made by the 2nd Tier Trustee is explained with regard to Class 6.

27   Accordingly, on September 15, 2011, the Debtor filed *Debtor's Third Amended Plan of*

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

2

102200-002/1364269_2.doc

*Reorganization, As Revised* [ECF No. 942], and thereafter, on September 29, 2011, the *Debtor's Third Amended Plan of Reorganization, as Further Revised* [ECF No. 956].

5.    Consistent therewith, the Debtor filed its *Amendment to Disclosure Statement to Accompany Debtor's Third Amended Plan of Reorganization, as Further Revised* [ECF No. 957] (the "Disclosure Statement Amendment") on September 29, 2011, and thereafter, on October 3, 2011, the *Errata To [Proposed] Amendment To Disclosure Statement To Accompany Debtor's Third Amended Plan Of Reorganization, As Further Revised* [ECF No. 962] (together with the July 6, 2011 Disclosure Statement and the Amendment to Disclosure Statement, the "Disclosure Statement").

6.    On October 4, 2011, the Court entered its *Amended Order Granting Debtor's Ex Parte Motion for Conditional Approval of Amendment to Disclosure Statement to Accompany Debtor's Third Amended Plan of Reorganization, as Further Revised, Approval of Resolicitation of Classes 4 and 5 Regarding Debtor's Amended Plan and Ballots Therefore; and Related Matters* [ECF No. 964], conditionally approving the Disclosure Statement Amendment and authorizing the Debtor to distributed Amended Solicitation Packages to Classes 4 and 5.

7.    On October 7, 2011, Amended Solicitation Packages were distributed to the Holders of Claims in Classes 4A and 5A by service to the 1st Tier Trustee and to the nominees of the Beneficial Holders of 1st Tier Bond Claims as of the Record Date, to the Holders of Claims Classes 4B, 4C, 5B, and 5C by service to Ambac, and to the Office of the United States Trustee and the governmental entities enumerated in Bankruptcy Rule 2002(j), and on October 14, 2011, the Amended Confirmation Hearing Notice was served.  See ECF No. 976.

8.    A copy of the Amended Plan and the Disclosure Statement were posted on the Public Filings section of the Gordon Silver website at www.gordonsilver.com.

9.    On July 29, 2011, the *Plan Supplement to Debtor's Third Amended Plan of Reorganization* [ECF No. 907] was filed and posted on the Public Filings section of the Gordon Silver website at www.gordonsilver.com.  On October 20, 2011, the *Amended Plan Supplement to Debtor's Third Amended Plan of Reorganization, As Further Revised* [ECF No. 974] was filed and posted on the Public Filings section of the Gordon Silver website at www.gordonsilver.com.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

3

On November 3, 2011, the *Second Amended Plan Supplement to Debtor's Third Amended Plan of Reorganization, as Further Revised* [ECF No. 991] (as may be further modified, amended, or supplemented, the "Plan Supplement") was filed and posted on the Public Filings section of the Gordon Silver website at www.gordonsilver.com.

## III.
## LEGAL ANALYSIS

### A.    The Burden of Proof for Plan Confirmation is a Preponderance of the Evidence.

To obtain confirmation of Debtor's Plan, the Debtor must demonstrate that the Plan satisfies the various provisions of Section 1129 by a preponderance of the evidence.  See Liberty Nat'l Enters. v. Ambanc LaMesa Ltd. P'ship (In re Ambanc LaMesa Ltd. P'ship), 115 F.3d 650, 653 (9th Cir. 1997).  The Plan satisfies this standard as it satisfies each applicable provision of Section 1129 by a preponderance of the evidence.

### B.    11 U.S.C. § 1129(a)(11):  Feasibility.

Though no creditor has objected to the Plan on the basis of feasibility, this Court has expressed its own concerns.  See *Order Regarding Upcoming Confirmation Hearing* [ECF No. 927], *Order Regarding Plan Feasibility* [ECF No. 988].  The issue of feasibility therefore is addressed before the remaining elements of Section 1129(a).

#### 1.    The Feasibility Framework.

Section 1129(a)(11) of the Bankruptcy Code requires that a proposed plan be feasible. Specifically, the Debtor must establish that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

"The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985); In re Trans Max Techs., 349 B.R. 80, 91 (Bankr. D. Nev. 2006).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

4

102200-002/1364269_2.doc

This Court has explained the feasibility test as follows:

> The feasibility test set forth in § 1129(a)(11) requires the court to scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable. The debtor must present ample evidence to demonstrate that the plan has a reasonable probability of success. Success need not be guaranteed. The mere potential for failure of the plan or the prospect of financial uncertainty is insufficient to disprove feasibility.

> While a reviewing court must examine the totality of the circumstances in order to determine whether the plan fulfills the requirements of § 1129(a)(11), only a relatively low threshold of proof is necessary to satisfy the feasibility requirement. The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan of reorganization can be performed. However, where the financial realities do not accord with the proponent's projections or where the projections are unreasonable, the plan should not be confirmed.

> . . .

> The traditional factors which have evolved to aid the bankruptcy court in a feasibility analysis include: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. . . . This list of factors is neither exhaustive nor exclusive.

In re Sagewood Manor Assoc. Ltd. P'ship, 223 B.R. 756, 762-63 (Bankr. D. Nev. 1998) (citations and quotations omitted); see also Trans Max Techs., 349 B.R. at 92 (referencing the same six feasibility factors and noting that "[t]he Code does not require the debtor to prove that success is inevitable, . . . and a relatively low threshold of proof will satisfy § 1129(a)(11) (citing Computer Task Grp., Inc. v. Brotby (In re Brotby), 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003)); Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1364-65 (9th Cir. 1986) (affirming plan confirmation over feasibility objection and stating that the debtor presented evidence to demonstrate that the proposed plan "has a reasonable probability of success," thereby satisfying the feasibility test).

### 2.    The Debtor's Projections and the Reasonable Probability of Success.

As set forth in detail in the Kvarda Declaration, if the Plan is confirmed, Reorganized LVMC will have sufficient liquidity to fund distributions under the Plan and satisfy its operating expenses in the near term. Moreover, the Debtor's Revised Projections illustrate that between

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

5

102200-002/1364269_2.doc

now and prior to the initial CapEx Bonds Maturity Date, the Reorganized Debtor will be able to fund operating expenses and debt service requirements from its cash flows and the liquidity provided by the terms contemplated in the Plan.  See Kvarda Decl. ¶ 23, Exhibit 2.

On June 30, 2019, the Cash Pay Bonds Maturity Date and the initial CapEx Bonds Maturity Date,[3] the Debtor is projected to have approximately $12.1 million in cash on hand available to satisfy approximately $50.5 million of combined Cash Pay Bonds and CapEx Bonds ($9.6 million of Cash Pay Bonds and $40.9 million of CapEx Bonds), or a cash deficit of approximately $38.4 million prior to the potential mitigating and upside factors discussed below. See id. ¶ 24.  Since the Cash Pay Bonds are senior in payment and priority to the CapEx Bonds, the $12.1 million in cash projected to be available on June 30, 2019 will first be applied to retire the Cash Pay Bonds in full – leaving an approximately $2.5 million remaining cash balance to partially satisfy the $40.9 million of CapEx Bonds outstanding as of June 30, 2019.  See id.  The Debtor assumes that the Court's concerns regarding feasibility arise from the scenario occurring on June 30, 2019.

These Revised Projections, however, effectively demonstrate a worst-case scenario, and do not account for the potential extension of the CapEx Bonds Maturity Date or potential increases in revenue before June 30, 2019.  See id. ¶¶ 25, 26.   As set forth in the Plan and the Disclosure Statement, the holders of the CapEx Bonds can elect to extend the maturity date of the CapEx Bonds to June 30, 2025.  See id. ¶ 25.  In this event, the PIK option of the CapEx Bonds would continue through the revised CapEx Bonds Maturity Date with no interim cash payments required by the Reorganized Debtor until June 30, 2025.  See id.

There are also a variety of "upside events" that are currently underway but not yet completed that, collectively, could more than fully offset the approximately $38.4 million shortfall in cash necessary to payoff both the Cash Pay Bonds and CapEx Bonds at maturity.  See Kvarda Decl. ¶ 26.  These include (1) Ceasars Entertainment's "Project Linq," (2) the re-opening of the Sahara Hotel, and (3) local, state, and federal grant eligibility.  The impact of each of these

---

[3] As detailed in the Plan and the Disclosure Statement, prior to the CapEx Bonds Maturity Date of June 30, 2019, the Reorganized Debtor may make a proposal to the holders of the CapEx Bonds for the extension of the CapEx Bonds Maturity Date through June 30, 2025.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1   events on the Reorganized Debtor's revenues is discussed in detail in the Kvarda Declaration.

2   See id. ¶¶ 27-43.  In sum, it is estimated that the increased traffic as a result of the completion of

3   Project Linq will result in approximately 240,000 to 480,000 additional Monorail rides per year

4   which results in an additional approximately $12.0 million in cash available for debt service

5   during the Projection Period.  See id. ¶ 26.  The reopening of the Sahara in 2012 or 2013 will

6   result in approximately $14.8 million of incremental cash available for debt service during the

7   Projection Period, even if the traffic resulting from the reopening does not increase over the

8   levels achieved prior to the Sahara's closing on May 16, 2011.  See id.  As discussed in detail in

9   the Myles Declaration, the restructuring of LVMC's debts as provided for in the Plan will

10  provide the Reorganized Debtor the opportunity to obtain and the reasonable probability of

11  obtaining various grants to offset a significant portion of its 2013 to June 30, 2019 CARP

12  (Capital Asset Replacement Program) expenditures, which will increase the cash available for

13  debt service by approximately $14.4 million during the Projection Period.  See Myles Decl. ¶¶

14  21-24; Kvarda Decl. ¶¶ 26, 37-40.  Together, these events would more than fully offset the

15  projected shortfall.  See Kvarda Decl. ¶¶ 41-43.

16          Most importantly, the Plan will achieve what the Debtor sought to achieve when it filed

17  its Chapter 11 Case.  Prior to commencing its Chapter 11 Case, the Debtor found that it was

18  ineligible for state and federal grants due to its crushing debt obligations.  See Myles Decl. ¶ 12-

19  13.  In the process of seeking federal grants, the Debtor learned that while the Monorail could

20  meet certain regulatory entitlement criterion, substantial questions remained regarding the

21  system's long term viability due to its financial condition.  See id. ¶ 12.  In other words, the

22  Debtor had to "clean up" its balance sheet before it could obtain grants.  See id. ¶¶ 12, 13.  The

23  Plan effectively achieves this goal by drastically reducing the Debtor's debt load.  See id. ¶¶ 17,

24  24.  Therefore, the Plan achieves the Debtor's goal of making the LVMC eligible for grants, and

25  as set forth in the Myles Declaration, there is a reasonable probability that the Debtor will obtain

26  the grants necessary to decrease the shortfall in the CapEx Bonds and meet its CapEx needs.  See

27  id. ¶¶ 23, 24.

28

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

7

102200-002/1364269_2.doc

3.    **The Cases Cited in the Order Regarding Plan Feasibility are Not Factually Similar.**

By contrast, the cases cited by the Court addressed plans where no evidence as to the funding of the plan was presented, or where evidence presented by the debtor revealed that elements of a plan were improbable or impossible.  Further, issues with plan funding were more immediate, with none occurring more than four years from confirmation.

In <u>Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, LLC</u>, the Fifth Circuit upheld a lower court's finding that debtor's plan was not feasible on the basis that "there was no evidence showing even a reasonable assurance of success."  632 F.3d 168, 172-73 (5th Cir. 2011).  In support of the plan, the debtor had presented evidence of a strong fundraising history and indicated that it had pledges for $20,000 of the fund after soliciting its top donors.  However, the debtor's executive director testified that it would be difficult to raise the remaining $40,000 needed, because many of [the debtor's] donors wanted to prevent their money from going to judgment creditors in bankruptcy.  <u>Id.</u> at 171.  The court was critical of the lack of firm commitments, adding, "[e]ven assuming that the $20,000 would arrive as pledged, there was no evidence that S.O.S. could raise an additional $40,000 in only sixty days when its larges donors has already been tapped."  <u>Id.</u> at 173.

S.O.S. was a small-scale nonprofit whose plan of reorganization relied heavily on charitable donations, which donations were required sixty days after confirmation though only a third of the money had been raised after tapping the biggest donors.  <u>Id.</u>  By contrast, the Debtor's Plan is not contingent upon a sudden influx of unprecedented charitable donations.  The Linq will be opened in 2013.  The Sahara will reopen.  The effects of each of these projects have been fully analyzed.  Government grants to sustain transportation infrastructure that the Debtor has a sound basis for believing it can obtain are not similar to private donations provided to pay the attorneys' fees of opposing parties.

The debtor proposed a plan in <u>In re Repurchase Corp.</u> which contemplated that the reorganized debtor would engage in the same type of business the debtor operated prior to the bankruptcy even though the business had not operated for several years, and while the debtor

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

8

required at least $100,000, and possibly $500,000 more in capital, *no* money at all was shown to be available.  332 B.R. 336, 339, 343 (Bankr. N.D. Ill. 2005).  The court characterized the debtor's fundraising expectations as a "hope against hope that the financing [would] actually materialize," in support of which the debtor provided no corroboration.  Id. at 343.  That court continued, "Optimistic but hollow declarations from [the d]ebtor's [p]resident about hopes for funding did not satisfy its burden of proof."  Id.  (citing M & S Assoc., Ltd., 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992)).  No evidence had been presented to suggest that any funding was available whatsoever, and the debtor's ability to continue operating was nothing more than a pipedream.

In the case at bar, evidence has been presented that amounts to far more that "mere speculation and wishful thinking."  Over the course of the next eight years, the Plan is feasible, unlike Repurchase, where the plan was doomed from day one.  Further, beyond June 30, 2019, the Debtor has presented evidence to show that the Monorail's continued operation is probable.

The court in In re Made in Detroit, Inc. denied confirmation of the debtor's plan on the basis that "the [d]ebtor failed to show at confirmation that it had exit financing to fund its plan.  The proposed financing had so many contingencies that [the d]ebtor's [p]lan was conditional at best."  299 B.R. 170, 180 (Bankr. E.D. Mich. 2003).  That court explained:

> Section 1129(a)(11) prevents confirmation of visionary schemes which promise creditors more than the debtor can possibly attain after confirmation.  A plan that is submitted on a conditional basis is not considered feasible, and thus confirmation of such plan must be denied. . . *The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.*

Id. at 176 (emphasis added) (internal citations omitted).  See also In re Rainbow 215, LLC, BK-S-09-23414-BAM, ECF No. 323, p. 27 (Bankr. D. Nev. March 25, 2011) ("Feasibility has been defined as whether the things which are to be done after confirmation can be done as a practical matter under the facts.") (quoting Jorgensen v. Federal Land Bank of Spokane (In re Jorgensen), 66 B.R. 104, 108 (B.A.P. 9th Cir. 1986)).

That standard was patently not satisfied in Made in Detroit.  There, the future financing contemplated by the debtor was highly improbable.  Though the lender had agreed to provide a

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1  loan at 60% of the value of the underlying collateral, meaning that the property would
2  necessarily need to appraise at greater than $15 million, the evidence suggested that the property
3  was worth no more than $4.2 million.  In re Made in Detroit, 299 B.R. at 178.

4        In In re Atrium High Point Ltd. P'ship, the debtor's plan anticipated that one secured
5  creditor would be paid a lump sum of $4.2 million approximately four years following
6  confirmation, the funds for which would be generated by selling debtor's real property or by
7  refinancing.  189 B.R. 599, 604 (Bankr. M.D.N.C. 1995).  The court noted, however, that the
8  property was valued at $5 million, and because the debtor's own appraiser testified that banks
9  would not typically loan on 75% to 80% of the value of the underlying real property, any
10 potential refinancing or loan would generate only $3.75 to $4.0 million.  Id. at 605.

11       As with Made in Detroit, Atrium High Point's plan relied on speculative financing that,
12 based on the debtor's own evidence presented, was impossible given prevailing property
13 valuations and lending practices.  By contrast, the Debtor has presented evidence to show that it
14 can function immediately and has presented facts to show that, by a preponderance of the
15 evidence, it should succeed beyond the eight year horizon; the Plan is not simply a visionary
16 scheme.

17       This Court characterized the decision in In re Haardt, as "finding no reasonable chance of
18 refinancing where debtor offered no credible evidence as to why it had been unable to obtain
19 refinancing during the two years since filing bankruptcy, no evidence as to the value of the
20 properties, and no evidence as to its general financial situation and prospects."  Order Regarding
21 Plan Feasibility [ECF No. 988] at 2 (citing In re Haardt, 65 B.R. 697 (Bankr. E.D. Pa. 1986)).
22 The debtor's chances were even more hopeless than the Court's parenthetical indicates, as the
23 debtor's plan sought to reorganize by refinancing the debt on three properties, two of which were
24 sold at sheriff's sale following relief from the automatic stay.  Id. at 702.  As such, the debtor had
25 provided not even a scintilla of evidence of commercial viability of her plan, let alone a
26 reasonable assurance.

27       Unlike Haardt, in which the debtor provided no evidence regarding any potential source
28 for refinancing nor evidence as to how the logistics of the plan could be accomplished in view of

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1  the fact that two of the properties to be retained under the plan had already been lost to

2  foreclosure, the Debtor in this case has presented evidence of a reasonable likelihood that it will

3  achieve the revenues and obtain the necessary grant funding to make the required payments

4  under the Plan and continue operations after 2019.

5      This Court's prior decisions are also instructive.  In <u>In re Trans Max Techs.</u>, the Court

6  noted that

7          Any sane investor would have serious and legitimate questions regarding
        the viability of Trans Max's technology, and Trans Max's inability to

8          provide sufficient answers to those questions reaffirms a lack of feasibility
        in this case.  Trans Max's technology may be promising, but the idea of

9          developing a flying car based on that technology in three years . . . could
        be considered somewhat implausible.  Even more implausible is the notion

10          that Trans Max could develop such a car without incurring a cent of debt.

11  349 B.R. at 95.  In contrast to <u>Trans Max</u>, the "investors" in the present case – the 1st Tier

12  Bondholders and Ambac – have indicated, by negotiating the terms of the Plan before the Court,

13  that they believe that the Reorganized Debtor is viable and the Plan feasible.

14      In <u>Rainbow 215</u>, this Court noted the relatively low threshold required to demonstrate

15  feasibility.  <u>In re Rainbow 215, LLC</u>, BK-S-09-23414-BAM, ECF No. 323, pp. 27, 30 (Bankr. D.

16  Nev. March 25, 2011) (citing <u>In re North Valley Mall, LLC</u>, 432 B.R. 825, 838 (Bankr. C.D. Cal.

17  2010)).  In light of that standard, the Court determined that the fact the debtor's plan relied on

18  obtaining additional financing in the future did not make the plan infeasible.  <u>See id.</u> at 29-30

19  (citing <u>In re Bashas' Inc.</u>, 437 B.R. 874, 915-18 (Bankr. D. Ariz. 2010) (court determined that

20  the debtor's plan was feasible where it called for the re-financing of a $155 million loan three

21  years from the plan's effective date); <u>In re North Valley Mall, LLC</u>, 432 B.R. at 838 (court

22  determined that the debtor's plan was feasible where it involved a projected refinance of the loan

23  and balloon payment at the end of seven years from the plan's effective date)).

24      Where a plan relies on future funding, Collier states that "[t]he debtor must offer more

25  than speculation about the source of funding for the plan."  7 Collier on Bankruptcy ¶

26  1129.02[11] (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2010).  The Debtor has

27  offered not mere speculation, but evidence of a reasonable likelihood of increasing its revenues

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

and obtaining government grants prior to the CapEx Bonds Maturity Date.  While it is possible that the Debtor will not achieve the projected revenues or obtain the grants necessary to pay the CapEx Bonds on June 30, 2019, and may not obtain an extension of the CapEx Bonds Maturity Date, "[t]he mere potential for failure of the plan or the prospect of financial uncertainty is insufficient to disprove feasibility." In re Sagewood Manor, 223 B.R. at 762 (citing In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992)).   Though the Debtor's ability to make the payments required under the Plan is not certain, it is far more than a visionary scheme.

**C.    11 U.S.C. § 1129(a)(1): Plan Compliance With the Bankruptcy Code.**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "[c]omply with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).   This provision encompasses the requirements of Sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of plans, respectively.  See H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); In re Drexel Burnham Lambert Group, 138 B.R. at 757.

**1.    11 U.S.C. § 1122: Classification of Claims.**

The Plan classifies the Debtor's creditors into nine classes, consisting of Other Priority Claims (Class 1), Other Secured Claims (Class 2), General Unsecured Claims (Class 3), Secured 1st Tier Bond Claims (Class 4), Unsecured 1st Tier Bond Claims (Class 5), 2nd Tier Bond Claims (Class 6), 3rd Tier Bond Claims (Class 7), Director Claims (Class 8), and Subordinated Claims (Class 9).  Class 4 is subdivided into 3 sub-Classes, consisting of the Secured Claims portions of the 1st Tier Bond Claims (sub-Class 4A), the Ambac 1st Tier Bondholders' Surety Bond Claims (sub-Class 4B), and the Ambac Insurance Claims (sub-Class 4C).  Class 5 is divided into 3 sub-Classes, consisting of the Unsecured Claims portions of the 1st Tier Bond Claims (sub-Class 5A), the Ambac 1st Tier Bondholders' Surety Bond Claims (sub-Class 5B), and the Ambac Insurance Claims (sub-Class 5C).

On July 6, 2011, the Court entered its *Order Approving Debtor's Classification of Claims Pursuant to Fed. R. Bank. P. 3013* [ECF No. 877].   Therefore, the Debtor incorporates by

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

12

reference the arguments set forth in *Debtor's Amended Motion to Approve Classification Pursuant to Fed. R. Bankr. P. 3013* [ECF No. 766], and the *Debtor's Reply to Objection of Ambac and the 2nd Tier Trustee to the Debtor's Amended Motion to Approve Classification of Claims Pursuant to Fed. R. Bankr. P. 3013* [ECF No. 820], as though fully set forth herein. Accordingly, the Debtor submits that its Plan complies with Section 1122.

**2.    11 U.S.C. § 1123(a):  Mandatory Plan Requirements.**

Debtor's Plan also satisfies the seven (7) requirements in Section 1123(a).  First, Debtor's Plan classifies all Claims as required by Section 1123(a)(1).[4]  See Plan, § 3. Second and third, the Plan specifies which Classes of Claims are Impaired, and the treatment of each Impaired Class as required by Sections 1123(a)(2) and (3).  See id., §§ 3, 4, and 5.  Fourth, the treatment of each Claim in each particular Class of the Plan is the same as the treatment for each other Claim in such Class as required by Section 1123(a)(4).  See id.  Fifth, as more fully set forth in section 5 of the Plan, the Plan provides adequate means for its implementation as required by Section 1123(a)(5) through: (i) the continued existence of Reorganized Debtor and the vesting of Debtor's Assets in Reorganized Debtor; (ii) the execution and delivery of the New Indenture and other effectuating documents; and (iii) the continuation of post-Effective Date management and operations, with the appointment of two additional directors selected by the 1st Tier Bondholders. See id., §§ 6, 13.

Sixth, Section 1123(a)(6) is satisfied because as of the Effective Date, Reorganized Debtor will remain a non-profit corporation, and the articles of organization, by-laws, or other organizational documents of the Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, including, among other things, a provision prohibiting the issuance of non-voting equity securities.  See Plan, § 6.1.

Seventh, Section 1123(a)(7) is met because on and after the Effective Date, the Reorganized Debtor will continue to be managed by the Debtor's prepetition management, which management may subsequently be modified pursuant to applicable nonbankruptcy law,

---

[4] The Debtor is a non-profit corporation, and accordingly, has no equity interests that may be classified.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

13

1     along with two directors chosen by the 1st Tier Bondholders.  <u>Id.</u>, § 6.8.  Finally, Section

2     1123(a)(8) is inapplicable as it applies only to cases in which the debtor is an individual.  Based

3     on the foregoing, the Plan satisfies the mandatory requirements of Section 1123(a) of the

4     Bankruptcy Code.

5          **3.**      **<u>11 U.S.C. § 1123(b):  Permissive Plan Provisions.</u>**

6            a.     **<u>Debtor's Releases – § 10.6.</u>**

7          Pursuant to the Plan, the Debtor will release any and all Causes of Action against the

8     Released Parties, defined as "the Debtor, the Director, the 1st Tier Trustee, and Majority 1st Tier

9     Bondholders, and their officers, directors, employees, attorneys, actuaries, financial advisors,

10    accountants, investment bankers, agents, professionals, and representatives solely in their

11    capacity as such, ***serving on and since the Petition Date***."  Plan §§ 1.1.136, 10.6 (emphasis

12    added).  The release set forth in § 10.6 of the Plan is solely a release of Causes of Action which

13    belong to the Debtor, which is not a release barred by <u>Lowenschuss</u> or <u>American Hardwoods</u>,

14    and constitutes a valid compromise between the Debtor and the Director, the 1st Tier Trustee,

15    and the Majority 1st Tier Bondholders pursuant to Bankruptcy Rule 9019.

16         Compromise and settlement agreements have long been an inherent component of the

17    bankruptcy process.  <u>See</u> <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v.</u>

18    <u>Anderson</u>, 390 U.S. 414, 424 (1958) (citing <u>Case v. Los Angeles Lumber Prods. Co.</u>, 308 U.S.

19    106, 130 (1939)).  Bankruptcy Rule 9019(a) allows courts to approve compromises or

20    settlements, and Sections 1123(b)(3)(A) and (b)(6) of the Bankruptcy Code permit plans of

21    reorganization to incorporate and effectuate such settlements.  <u>See, e.g.</u>, <u>In re Best Prods. Co.,</u>

22    <u>Inc.</u>, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995); <u>In re Energy Partners, Ltd.</u>, No. 09-32957, 2009

23    WL 2898876, at *16 (Bankr. S.D. Tex. Aug. 3, 2009); <u>In re Linens Holding Co.</u>, No. 08-10832,

24    2009 WL 2163235, at *5 (Bankr. D. Del. June 12, 2009); <u>In re Entergy New Orleans, Inc.</u>, No.

25    05-17697, 2007 WL 1343804, at *7 (Bankr. E.D. La. May 7, 2007); <u>In re Winn-Dixie Stores,</u>

26    <u>Inc.</u>, 356 B.R. 239, 250-251 (Bankr. M.D. Fla. 2006).

27         In <u>TMT Trailer</u>, the Supreme Court held that a bankruptcy settlement must be fair and

28    equitable.  390 U.S. at 424.  The Ninth Circuit has enunciated that in order to determine whether

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

14

a proposed settlement is fair and equitable, the bankruptcy court must consider the following four factors:

> (a) the probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection;
>
> (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
>
> (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

See Martin v. Kane (In re A&C Props.), 784 F.2d 1377, 1381 (9th Cir. 1986); Schmitt v. Ulrich, 215 B.R. 417, 421 (B.A.P. 9th Cir. 1997). The debtor is not necessarily required to satisfy each of these factors as long as the factors as a whole favor approval of the settlement. See In re Pacific Gas and Elec. Co., 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (the settlement must only fall "within the reasonable range of litigation possibilities") (citing In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)).

The Plan constitutes a consensual compromise among the Debtor, the Director, the 1st Tier Trustee, and the Majority 1st Tier Bondholders, of which the release is a necessary component. As the Court is aware, this compromise is the result of more than a year of hard-fought negotiations. See Myles Decl. ¶ 28. The Debtor's Release clearly satisfies the A&C Properties test.

The 3rd Tier Trustee argues that the release under section 10.6 of the Plan does not merely release causes of action by the Debtor, but causes of action that third parties could pursue on behalf of the Debtor, and thus constitutes an illegal discharge under Lowenschuss and American Hardwoods. 3rd Tier Trustee's Objection, pp. 6-13 (citing, among other inapplicable cases, Resort Int'l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401 (9th Cir. 1995) and Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.), 885 F.2d 621, 626 (9th Cir. 1989). To the contrary, section 10.6 does not release any cause of action that a third party could pursue directly against the Released Parties unless such cause of action belongs

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

15

102200-002/1364269_2.doc

to the Estate.  The Debtor, and only the Debtor, has the standing to pursue such causes of action, and to settle such causes of action pursuant to section 10.2 of the Plan, which provides that

> In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as otherwise expressly provided [in the Plan], on the Effective Date all Litigation Claims shall be assigned to Reorganized LVMC, and Reorganized LVMC shall have the exclusive right to enforce, prosecute, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including, without limitation, *any and all derivative actions pending or otherwise existing against the Debtor as of the Effective Date*.

Plan, § 10.2 (emphasis added).  Even absent these Plan provisions, the standing to pursue such claims would reside solely with the Debtor.  See, e.g., 11 U.S.C. §§ 323(b), 547, 548, 1107 and 1108.  The Bankruptcy Code contains no explicit authority for anyone other than the debtor or trustee to initiate such adversary proceedings.  Thus, the release provision does not effectuate a release of any claim *held by a third party* against a third party.

The 3rd Tier Trustee further complains that the Debtor's release of its officers and directors pursuant to section 10.6 is not supported by "any meaningful consideration," though the 3rd Tier Trustee fails to address such releases through the lens of Rule 9019 and its interpretive caselaw and fails to adduce any factual basis for its contention.  In this regard, the 3rd Tier Trustee alleges that the Debtor's officers and directors "were required to provide such services by way of employment contracts."  3rd Tier Trustee Objection, p. 11.  To the contrary, no person was obligated to remain an officer or director of the Debtor through its particularly protracted and difficult Chapter 11 Case.  In fact, the employment contract of Curtis Myles, the Debtor's CEO, expired in August 2011, and no other employee is subject to an employment contract not terminable at will.  See Myles Decl. ¶¶ 32, 33, 36.  Moreover, Mr. Myles voluntarily took a substantial reduction in pay subsequent to the Petition Date.  See id. ¶ 32.  As for the directors, these individuals have no pecuniary interest in the Debtor as a non-profit corporation, and as pointed out in the past, agreed to become directors to help solve the LVMC's financial problems. The release of these individuals is thus supported by consideration.  Further, the Debtor does not believe that it even holds any claims or causes of actions against its current officers or directors

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

16

102200-002/1364269_2.doc

1    (or any of the other Released Parties, for that matter).[5]  See id. ¶ 38.  The Debtor's Release is

2    therefore reasonable and in the best interests of the Estate.

3                   b.    **Third-Party Release – §10.7.**

4          The Plan provides for a consensual third-party release (the "Third-Party Release"), as

5    follows:

6             *…only to the extent each Releasing Party votes in favor of this Plan or*
             *otherwise supports confirmation of this Plan on the record at the*
7            *Confirmation Hearing and that has not opted out of the third-party release*
             granted under Section 10.7 on their respective ballots, to the extent
8            permitted by law, the Releasing Parties shall provide a full discharge and
             release (and each entity so released shall be deemed released by the
9            Releasing Parties) to the Third Party Releasees…provided, however, that
             the foregoing Third Party Release shall not operate to waive or release any
10           of the Third Party Releasees from (a) any Causes of Action expressly set
             forth in and preserved by this Plan or related documents, (b) any claims by
11           1st Tier Bondholders or the 1st Tier Trustee under the Ambac Insurance
             Policy or the Ambac Surety Bond, or (c) as a result of actual fraud, willful
12           misconduct or gross negligence."
13

14   Plan, § 10.7 (emphasis added).  The Third Party Releasees are defined as

15           all current officers and directors of the Debtor serving on and since the
             Petition Date, and, unless and to the extent they opt out of the Third-Party
16           Release (granted under **Section 10.7** of this Plan) on their respective
             ballots, the Holders of 1st Tier Bond Claims, the 1st Tier Trustee, the
17           Director, Ambac and each of their respective officers, directors,
             employees, members, attorneys, actuaries, financial advisors, accountants,
18           investment bankers, agents, professionals, partners and representatives.

19   Plan, §§ 1.1.37, 1.1.48 (emphasis in original).

20         American Hardwoods, Lowenschuss, and related cases prohibit *non-consensual* releases,

21   which Courts in the Ninth Circuit analogize to a discharge described in Section 524.  However,

22   the Third Party Release in Debtor's Plan is not a non-consensual third-party release but rather, a

23   negotiated limited release between certain creditors and the Debtor that is similar to a release

24   allowed by contract or through a settlement, and therefore American Hardwoods, Lowenschuss,

25

26   _____
     [5] The 3rd Tier Trustee makes a number of unsubstantiated charges in the 3rd Tier Trustee Objection, including that
27   causes of action exist against the present directors and officers regarding the failure of LVMC to meet its initial
     projections.  As explained in the Omnibus Declaration, none of the present directors nor Mr. Myles were involved in
28   the initial organization of LVMC or with the initial projections and fundraising efforts.

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

17

102200-002/1364269_2.doc

1    and their progeny are inapplicable.

2         Section 524(e) provides that, "the discharge of a debt of the debtor does not affect the

3    liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. §

4    524(e).  "Section 524(e) provides that the *discharge itself* does not grant such release or

5    injunction, and is silent on whether a bankruptcy court can expressly discharge or otherwise

6    affect the liability of a non-debtor."  In re Adelphia Commc'ns,  368 B.R. at 266 (emphasis in

7    original).  However, a consensual release is no different than any other settlement or contract and

8    does not implicate Section 524(e) as it is not a discharge in bankruptcy.  In re Arrowmill Dev.

9    Corp., 211 B.R. 497, 506-7 (Bankr. D.N.J. 1997).  Rather, "[i]n the case of voluntary releases,

10   the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the

11   *creditor agrees to do so*.  Thus, the Bankruptcy Code has not altered the contractual obligations

12   of third parties, the parties themselves have so agreed."  Id. at 507 (emphasis in original).

13        Courts have consistently found that consensual releases, especially those voted on and

14   approved by parties in interest, are proper.  See In re Specialty Equip. Cos., 3 F.3d 1043, 1046-

15   47 (7th Cir. 1993) (holding that consensual non-debtor releases do not violate §524(e) and are

16   permissible under the Code); In re Digital Impact, Inc., 223 B.R. 1, 14 (N.D. Okla. 1998)

17   (holding that bankruptcy courts do not have the power to grant involuntary non-debtor releases,

18   but may issue voluntary third-party releases where such provisions comply with general

19   principles of contract law); In re AOV Industries, Inc., 31 B.R. 1005, 1010 (D.D.C. 1983)

20   (concluding that consensual non-debtor releases are not barred by §524), *rev'd in part on other*

21   *grounds*, 792 F.2d 1140 (D.C. Cir. 1986); In re Cent. Jersey Airport Servs., Inc., 282 B.R. 176,

22   182-83 (Bankr. D.N.J. 2002) (holding that a voluntary release does not implicate §524(e));

23   Arrowmill Dev. Corp., 211 B.R. at 506-07 (holding that involuntary non-debtor releases are not

24   permissible, but stating in dicta that voluntary releases are valid); In re Boston Harbor Marina

25   Co., 157 B.R. 726, 730-31 (Bankr. D. Mass. 1993) (stating in *dicta* that voluntary non-debtor

26   releases are valid); In re Resorts, Int'l, 145 B.R. 412, 468 (Bankr. D.N.J 1990) (permitting

27   voluntary non-debtor releases to be included in the debtor's plan because such releases are

28   "purely contractual between the parties to the release" and thus do not run afoul of §524(e)); In

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

18

102200-002/1364269_2.doc

re Apex Oil Co., 118 B.R. 683, 701 (Bankr. E.D. Mo. 1990) (concluding that consensual non-debtor releases do not violate §524(e)); In re Monroe Well Serv., Inc., 80 B.R. 324, 334-35 (Bankr. E.D.Pa. 1987) (stating in dicta that involuntary non-debtor releases violate §524(e), but holding that "a plan provision permitting individual creditors the option of providing a voluntary release to nondebtor plan funders does not violate 11 U.S.C. §524(e)").

Notably, In re Digital Impact, Inc. indicates that the bankruptcy court may issue voluntary releases where such provisions comply with general principles of contract law. 223 B.R. at 14-15. The validity of a consensual release is primarily a question of contract law because such releases are, "no different than any other settlement or contract." Id.; see also In re Specialty Equip., 3 F.3d at 1047 (consensual release permissible because "[u]nlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors. It binds only those creditors voting in favor of the plan of reorganization.")

In this case, the Third-Party Release is effective only if it is elected by those voting on the Plan, and is a release by the settling parties amongst themselves. The 3rd Tier Trustee therefore is not bound by release, as neither the 3rd Tier Trustee nor any of the 3rd Tier Bondholders voted on the Plan or had the opportunity to opt out of the release. Similarly, the 2nd Tier Trustee and 2nd Tier Bondholders are not bound by the release, nor is any general unsecured creditor. The only parties bound by the release are the 1st Tier Trustee, the Director, Ambac, and the Holders of the 1st Tier Bond Claims, and solely to the extent they did not opt out of granting the release. The Third-Party Release therefore is consensual. Consequently, the Third Party Release is not prohibited by Section 524(e) or any other provision of the Bankruptcy Code, but rather is an agreement between parties governed by contract law, which is enforceable under the Bankruptcy Code.

Finally, the cases the 3rd Tier Trustee cites in support of his position that the Third Party Release is improper examine third-party releases that differ significantly from the Plan's Third Party Release. Specifically, each case deals with an involuntary or non-consensual release of non-debtor third parties. American Hardwoods, discussed in greater detail above, dealt with a release that was non-consensual, heavily contested, and barred Deutsche Credit from enforcing a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

state court judgment against shareholders of the debtor and guarantors of the Deutsche debt.  See American Hardwoods, 885 F.2d 621.  The plan in Underhill v. Royal contained a release that purportedly released the debtor's founder and other related parties from *all claims* by *any creditor* arising from certain notes executed by the debtor.  Underhill v. Royal, 769 F.2d 1426, 1430 (9th Cir. 1985).  Finally, Lowenschuss dealt with a Plan that included a global release that sought to discharge debtor's connected persons and entities from *all claims* by *all creditors*.  In re Lowenshuss, 67 F.3d at 1397.  Again, in the instant case, the Third Party Release is limited in scope and only between certain parties that have negotiated and expressly consented to the Third Party Release.  It does not act as a general release of non-debtor third parties from claims against non-consenting creditors.

In any event, the Third-Party Release is self-limiting, as it specifically notes that it is "to the extent permitted by law."  See Plan § 10.7.  As noted in In re Adelphia Commc'ns Corp., "since the third-party releases and exculpation [clause] apply only 'to the extent permitted by applicable law,' the Plan is confirmable without change, and without resolicitation of votes." 368 B.R. at 266.  Therefore, to the extent that the Third Party Release is impermissibly broad, the Third Party Release should not preclude confirmation of the Plan because the Third Party Release may only be interpreted to be consistent with applicable law.

    c.    **Injunction - § 10.8.**

Section 10.8 of the Plan (the "Injunction") provides the following injunctive provisions:

> From and after the Effective Date, and except as provided in this Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim that is terminated pursuant to the terms of this Plan are permanently enjoined from taking any of the following actions on account of such Claims:  (i) commencing or continuing in any manner any action or other proceeding against Reorganized LVMC or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Reorganized LVMC or its property; (iii) creating, perfecting or enforcing any Lien or encumbrance against Reorganized LVMC or its property; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to Reorganized LVMC or its property; and (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of this Plan or the Bankruptcy Code.  By accepting distributions pursuant to this Plan, each Holder of an

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

20

Allowed Claim will be deemed to have specifically consented to the injunctions set forth in this <u>Section 10.8</u> of this Plan.

The Injunction merely effectuates the releases set forth in the Plan and the Debtor's discharge pursuant to Sections 524 and 1141 of the Bankruptcy Code. As the 3rd Tier Trustee acknowledges, the Injunction is impermissible as to third parties only if the Third Party Release is impermissible. Because the Third-Party Release is permissible, the Injunction complies with the Bankruptcy Code.

### d. **Exculpation Clause – § 10.9.**

Section 10.9 of the Plan (the "<u>Exculpation Clause</u>") provides, in relevant part:

> From and after the Effective Date, none of the Debtor, Reorganized LVMC, the Majority 1st Tier Bondholders, the 1st Tier Trustee, the 2nd Tier Trustee nor any of their respective directors, officers, managers, employees, advisors, attorneys, or agents ***on and from the Petition Date forward***, shall have or incur any liability to any Holder of a Claim or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward) the Chapter 11 Case, Reorganized LVMC, the pursuit of Confirmation of this Plan, or the Substantial Consummation of this Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan or in the context of the Chapter 11 Case.

(Emphasis added.) The 3rd Tier Trustee contends that the Exculpation Clause is an impermissible Third Party Release. To the contrary, the Exculpation Clause is consistent with Section 1125(e) of the Bankruptcy Code and is of the type that has consistently been approved by courts. <u>See</u> 11 U.S.C. § 1125(e). For example, in <u>Heartland Publications, LLC</u>, the proposed exculpation clause provided as follows:

> The Debtors, their respective officers, directors, managers, employees, members, agents, advisors, accountants, attorneys and representatives, and the Creditor Released Parties (collectively, the "*Exculpated Parties*"), will neither have nor incur any liability to any entity for any action taken or omitted to be taken after the Petition Date in connection with or related to the Chapter 11 Cases or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan;

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

*provided, however,* that this limitation will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan and shall not release any action (or inaction) constituting willful misconduct or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); *provided* that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.

In re Heartland Publications, LLC, No. 09-14459(KG), 2010 WL 2745973, at *18 (Bankr. D. Del. Apr. 16, 2010). The bankruptcy court approved the proposed exculpation clause. Id. at *6. See also In re Granite Broadcasting Corp., 369 B.R. 120, 139-40 (Bankr. S.D.N.Y. 2007) (approving exculpation of secured noteholder over objection where exculpation clause extended only to acts or omissions in connection with the plan and the bankruptcy cases and excluded gross negligence and intentional misconduct) (citing In re Oneida Ltd., 351 B.R. 79, 94, n. 22 (Bankr. S.D.N.Y. 2006)) (other citations omitted).

Here, each of the parties that are the subject of the Exculpation Clause are either fiduciaries of the estate or otherwise participated in the solicitation of acceptances of the Plan, and are thus entitled to exculpation under Section 1125(e), or, in the case of the Majority 1st Tier Bondholders, the 1st Tier Trustee, the 2nd Tier Trustee, and the respective directors, officers, managers, employees, advisors, attorneys, agents, principals and professionals of the Debtor, the Majority 1st Tier Bondholders, the 1st Tier Trustee, and the 2nd Tier Trustee, have contributed to the formulation and negotiation of the Plan, and have made a substantial contribution to the Plan, and are thus entitled to exculpation. See Myles Decl. ¶ 29. See In re Washington Mutual, Inc., 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (discussing appropriate exculpation of directors, officers, fiduciaries, and other parties making a substantial contribution).

**D.    11 U.S.C. § 1129(a)(2):  Proponent Compliance With the Bankruptcy Code.**

Section 1129(a)(2) of the Bankruptcy Code requires a plan proponent to "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). Section

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

22

1   1129(a)(2) of the Bankruptcy Code is intended to encompass the disclosure and solicitation

2   requirements under Section 1125 of the Bankruptcy Code.  See H.R. Rep. No. 95-595, at 412

3   (1977); S. Rep. No. 95-989, at 126 (1978); In re Trans World Airlines, Inc., 185 B.R. 302, 313

4   (Bankr. E.D. Mo. 1995).

5          The determination of adequate information for disclosure statement purposes is made on

6   a case-by-case basis.  See In re Brotby, 303 B.R. at 193 (citing In re Texas Extrusion Corp., 844

7   F.2d 1142, 1157 (5th Cir. 1988)).  LR 3016(d) provides certain requirements, and case law has

8   developed a non-exhaustive list of criteria that may be considered in evaluating the sufficiency or

9   the adequacy of a proposed disclosure statement.  See In re Metrocraft Pub. Servs., Inc., 39 B.R.

10  567, 568 (Bankr. N.D. Ga. 1984); In re Scioto Valley Mortgage Co., 88 B.R. 168, 170-71

11  (Bankr. S.D. Ohio 1988) (using a similar list).

12         The Court has previously approved the Debtor's Disclosure Statement pursuant to the

13  Disclosure Statement Order, and has conditionally approved the Disclosure Statement

14  Amendment.  Further, no creditor has since objected that the Disclosure Statement and Plan fail

15  to provide adequate information pursuant to Section 1125 of the Bankruptcy Code.  As such, the

16  Plan satisfies Section 1129(a)(2) of the Bankruptcy Code.

17  **E.      11 U.S.C. § 1129(a)(3):  Good Faith.**

18         Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good

19  faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Section 1129(a)(3) does

20  not define "good faith."  Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),

21  314 F.3d 1070, 1074 (9th Cir. 2002).  "A plan is proposed in good faith where it achieves a result

22  consistent with the objectives and purposes of the Code."  Id.; In re Trans Max Techs., 349 B.R.

23  at 88; In re Sagewood Manor, 223 B.R. at 761-62.  The good faith determination pursuant to

24  Section 1129(a)(3) of the Bankruptcy Code is based on the "totality of the circumstances."

25  Sylmar Plaza, L.P., 314 F.3d at 1074.

26         The second prong of Section 1129(a)(3) requires that the Plan "not be proposed by any

27  means forbidden by law."  11 U.S.C. § 1129(a)(3).  The term "law" as used in this section,

28  includes state law, and applies not to the substantive provision of a plan itself but rather to the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

23

102200-002/1364269_2.doc

1   means employed in proposing a plan.  See In re Food City, Inc., 110 B.R. 808, 810 (Bankr. W.D.

2   Tex. 1990).

3          Debtor's Plan is the culmination and resolution of extensive compromise and is the

4   product of arm's-length and good faith negotiations.  The Plan is fundamentally fair to the

5   Debtor's Creditors and has been proposed in good faith.  See Myles Decl. ¶ 44.  Moreover, no

6   party has objected to confirmation of the Plan based upon it being proposed in a manner contrary

7   to the good faith requirement or by means forbidden by law, and thus the Court should determine

8   this issue per Bankruptcy Rule 3020(b)(2).  See Fed. R. Bankr. P. 3020(b)(2) ("If no objection is

9   timely made, the court may determine that the plan has been proposed in good faith and not by

10  any means forbidden by law without receiving evidence on such issues.").  Accordingly, the Plan

11  satisfies Section 1129(a)(3) of the Bankruptcy Code.

12  **F.     11 U.S.C. § 1129(a)(4):  Payments For Services Reasonable.**

13         Section 1129(a)(4) requires that all payments of professional fees made from estate assets

14  be subject to review and approval by the court.  Consistent therewith, the Plan provides that all

15  such fees and expenses, as well as all other accrued fees and expenses of professionals through

16  the Effective Date, remain subject to final review by the Court for reasonableness pursuant to

17  Section 330.  See Plan §§ 1.1.67, 2.2, 2.3.  As such, Section 1129(a)(4) is satisfied.  See In re

18  Elsinore Shore Assocs., 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that the requirements of

19  Section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed"

20  administrative expenses).  As a result, the Plan satisfies Section 1129(a)(4).

21  **G.     11 U.S.C. § 1129(a)(5):  Disclosure of Management and Insiders.**

22         Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Debtor disclosed the identity

23  and affiliations of individuals proposed to serve on the board of directors of the Reorganized

24  Debtor in the Disclosure Statement.  Disclosure Statement, § VI.D.  Each such director and

25  officer shall serve from and after the Effective Date pursuant to applicable law and the terms of

26  Reorganized LVMC Organizational Documents.  See id.  The compensation of the Debtor's

27  management was discussed in § VIII.10 of the Disclosure Statement.  As such, the Plan satisfies

28  Section 1129(a)(5) of the Bankruptcy Code.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

24

**H.    11 U.S.C. § 1129(a)(6):  Regulatory Approvals.**

Section 1129(a)(6) of the Bankruptcy Code is inapplicable in the instant case because the Debtor does not charge rates that are regulated by a governmental agency within the meaning of Section 1129(a)(6).  Moreover, no party has objected to confirmation of the Plan on this ground.

**I.    11 U.S.C. § 1129(a)(7):  Best Interests Test.**

Section 1129(a)(7) requires that a plan be in the best interests of creditors and interest holders, and specifically, that each holder of an impaired claim has either accepted the plan, or "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7)(A)(i) and (ii).  In order to satisfy the "best interest test," the court must find that each dissenting creditor will receive or retain value, as of the effective date of the plan, that is not less than the amount it would receive if the debtor were liquidated.  See Drexel Burnham Lambert Group, 138 B.R. at 761.

As demonstrated by Debtor's Liquidation Analysis, a true and correct copy of which the Debtor has offered into evidence as Exhibit "A," each holder of an Allowed Claim in an impaired Class will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is greater than the amount that such Holder would receive or retain if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

Specifically, the Liquidation Analysis estimates proceeds of $6,500,00 to $8,500,000[6] would be available to Creditors in the event of liquidation of the Debtor under Chapter 7, which, but for an insignificant portion to be distributed to Holders of Allowed General Unsecured Claims, would primarily be distributed to the Director and the Director's assignee, the 1st Tier Trustee, subject to the subrogation rights of Ambac, in full and final satisfaction of Claims arising under the Financing Agreement and 1st Tier Note.  Under the Plan, however, the Class 4 and 5 Claims will receive in full and final satisfaction of both the Secured and Unsecured

---

[6] As set forth above, the Majority 1st Tier Bondholders do not agree with or consent to the Debtor's estimated valuation.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

25

portions of the Class 4 and 5 Claims the Cash Pay Notes in the principal amount of $15 million, the CapEx Notes in the principal amount of $19.5 million at the time of issuance, and the Capital Appreciation Notes in the principal amount of $10.8 million at the time of issuance.  Therefore, Holders of Class 4 and Class 5 Claims will receive better treatment under the Plan than they would in a Chapter 7 liquidation.

Likewise, under the Plan, Holders of Class 3 General Unsecured Claims will receive a distribution of either the full amount of their Allowed Claims, up to an aggregate of $175,000, whereas in a liquidation such Creditors would receive an insignificant distribution, if any.  The Class 8 Director Claims would receive an insignificant monetary distribution under Chapter 7, but will the Director receive a portion of its General Unsecured Claim in this Chapter 11 Case and the release pursuant to Section 10.7 of the Plan, and therefore will receive better treatment under the Plan than in a Chapter 7 liquidation.  Classes 6, 7, and 9 would receive nothing in the event of distribution under either a Chapter 7 liquidation or the Plan, and therefore would not receive more in liquidation than under the Plan.   Accordingly, the Plan satisfies Section 1129(a)(7).

**J.      11 U.S.C. § 1129(a)(8):  Class Acceptance.**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests either has accepted a plan or is not impaired under a plan.  See 11 U.S.C. § 1129(a)(8). Whether a class of claims is impaired is governed by Section 1124 of the Bankruptcy Code.  See 11 U.S.C. § 1124.  Whether a class of claims has accepted a plan is determined by reference to Section 1126 of the Bankruptcy Code.  See 11 U.S.C. § 1126.

Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are unimpaired and thus deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  See 11 U.S.C. § 1126(f) ("Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.").

The Impaired Classes entitled to vote on the Plan are Class 3 (General Unsecured

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

26

1  Claims), Classes 4 and 5 (the 1st Tier Bond Claims (sub-Classes 4A and 5A), the Ambac 1st Tier

2  Bondholders' Surety Bond Claims (sub-Classes 4B and 5B), and the Ambac Insurance Claims

3  (sub-Classes 4C and 5C), and Class 8 (the Director's Claim).  Based upon a preliminary review

4  of the voting results, Classes 3, 4A, 4B, 4C, 5A, 5B, and 5C have accepted the Plan.

5  Class 6 (2nd Tier Bond Claims), Class 7 (3rd Tier Bond Claims), and Class 9

6  (Subordinated Claims)—are all proposed to not receive or retain any property under the Plan,

7  and thus are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy

8  Code.  See 11 U.S.C. § 1126(g) ("Notwithstanding any other provision of this section, a class is

9  deemed not to have accepted a plan if such plan provides that the claims or interests of such class

10  do not entitle the holders of such claims or interests to receive or retain any property under the

11  plan on account of such claims or interests.").  Because Classes 6, 7, 8, and 9 have not voted in

12  favor of the Plan, cramdown of the Plan pursuant to Section 1129(b) of the Bankruptcy Code is

13  requested as to these Classes, which process is discussed below.

14  **K.      11 U.S.C. § 1129(a)(9):  Priority Claims.**

15  No party has objected to confirmation on the basis that the Plan fails to satisfy Section

16  1129(a)(9) of the Bankruptcy Code.  In accordance with Sections 1129(a)(9)(A) and (B) of the

17  Bankruptcy Code, Plan section 2.2 provides for the payment in full of each holder of an Allowed

18  Administrative Claim.  Moreover, pursuant to sections 1.1.25 and 2.2.1 of the Plan, all requests

19  for payment of Administrative Claims against the Debtor and all final applications for allowance

20  and disbursement of Professional Fees must be filed by the Administrative Claims Bar Date (i.e.,

21  the end of the first Business Day occurring on or after the sixtieth (60th) day after the Effective

22  Date).  In accordance with Sections 1129(a)(9)(C) of the Bankruptcy Code, Plan sections 2.2.2

23  and 4.1 provide that all Allowed Priority Claims and Allowed Priority Tax Claims, if any, will be

24  paid in full by the Debtor or Reorganized LVMC upon the latest of: (i) the Effective Date or as

25  soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the

26  first Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such

27  date as agreed upon by the Holder of such Claim and the Debtor or the Reorganized LVMC.  As

28  such, the Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code.

102200-002/1364269_2.doc

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

**L.      11 U.S.C. § 1129(a)(10):  One Consenting Impaired Class.**

Section 1129(a)(10) of the Bankruptcy Code requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider."  11 U.S.C. § 1129(a)(10).  Based upon preliminary voting results, Classes 3, 4A, 5A, 4B, 5B, 4C, and 5C have accepted the Plan, and none of these Classes include "insiders" as that term is defined in Section 101(31) of the Bankruptcy Code.  Therefore, the Plan satisfies Section 1129(a)(10) of the Bankruptcy Code.

**M.      11 U.S.C. § 1129(a)(12):  U.S. Trustee's Fees Paid.**

In the instant case, all fees payable pursuant to 28 U.S.C. § 1930 will be paid as a condition to the Effective Date of the Plan as Administrative Claims per Plan sections 1.1.7 and 2.3.  As such, Debtor's Plan satisfies Section 1129(a)(12) of the Bankruptcy Code.

**N.      11 U.S.C. §§ 1129(a)(13) Through (a)(16):  Miscellaneous Inapplicable Provisions.**

Sections 1129(a)(13) through (a)(16) are inapplicable to this Chapter 11 Case.

**O.      "Cramdown" of the Plan is Available Pursuant to 11 U.S.C. § 1129(b).**

Section 1129(b) of the Bankruptcy Code provides that if a proposed plan meets all the requirements in Section 1129(a) of the Bankruptcy Code, except for class acceptance pursuant to Section 1129(a)(8) of the Bankruptcy Code, then the plan may still be confirmed "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1).  With respect to a class of unsecured claims, the "fair and equitable" requirement for cramdown can be satisfied if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii).

In the case at hand, the Debtor did not solicit votes from the holders of Claims in Classes 6, 7, and 9 of the Plan, because the Plan proposes that such Classes are not to receive or retain any interest or property under the Plan, and thus such Classes are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Each of Classes 6, 7, and 9 are

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1  comprised of unsecured claims, and thus are subject to cramdown pursuant to Section

2  1129(b)(2)(B)(ii) of the Bankruptcy Code.

3  The Debtor is entitled to have its Plan confirmed notwithstanding the deemed rejection of

4  all of Classes 6, 7, and 9 because the Plan follows the absolute priority rule—meaning no junior

5  claims or interests receive or retain anything under the Plan.  As such, the Plan may be

6  confirmed via cramdown on these remaining three classes pursuant to the applicable provisions

7  in Section 1129(b) of the Bankruptcy Code.

8  The Director makes the bizarre argument that because its claim for attorneys' fees is not

9  being paid, the treatment of its Claim is not fair and equitable under Section 1129(b).  The

10  Director's Claim consists of the Debtor's obligations under the Financing Agreement, which

11  includes the 1st Tier Note in the face amount of $451,448,217, the 2nd Tier Obligation in the

12  original principal amount of $149,200,000, and the 3rd Tier Note in the face amount of

13  $48,500,000.  As such, the Director is vastly undersecured, and its claim for attorneys' fees and

14  costs is not included within its secured claim pursuant to Section 506(b), which permits a secured

15  creditor to include its reasonable fees and expenses in its secured claim only if it is oversecured.

16  11 U.S.C. § 506(b).  The Director's claim for fees and costs can be nothing more than a General

17  Unsecured Claim.

18  **P.    Treatment of Avoidance Actions and Other Litigation Claims.**

19  The 3rd Tier Trustee objects to the Plan on the basis that it "discards valuable causes of

20  action, including avoidance actions" and further alleges that "[u]nder the watch of the directors,

21  officers, accountants, attorneys and other representatives of the Debtor, the Debtor lost in excess

22  of $650 million of value."  3rd Tier Trustee Objection, p. 11.  Though rich with innuendo, the

23  3rd Tier Trustee's Objection is devoid of any shred of factual support for its allegations or a legal

24  basis for how the Debtor's decision not to pursue certain Litigation Claims,[7] protected under the

25  business judgment rule, is violative of Section 1129.

26

27  _____

[7] It should be noted that the Debtor has not decided to forego any causes of action against any former officers or
28  directors, but is releasing claims only against officers and directors serving on and since the Petition Date.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

29

As set forth in the Disclosure Statement, the Debtor does not believe that any of its prepetition transfers are avoidable, or if potentially avoidable, that litigation seeking to recover such transfers would result in any material recovery to the Estate. See Myles Decl. ¶ 37. Moreover, the Debtor has determined, in its business judgment, that there are no colorable claims against the Debtor's current officers or directors for breaches of duty. See id. ¶ 38. Further, prosecuting lawsuits against the Debtor's officers, directors, and vendors would disrupt the Debtor's reorganization efforts by, among other things, distracting the Reorganized Debtor from the operation of the Monorail following the Effective Date, thereby impairing the Debtor's ability to generate revenue for payment of the General Unsecured Claims and 1st Tier Bondholders. See id.

The 3rd Tier Trustee has failed to adduce a single piece of evidence to the contrary. The 3rd Tier Trustee's allegation that there has been a loss of $650 million in value as a result of the actions of the current officers and directors is wholly unsupported. The 3rd Tier Trustee fails to adduce any evidence that the Debtor was ever valued at $650 million or that any loss of value occurred during the tenure of the Debtor's current officers and directors.

The 3rd Tier Trustee has failed to take any action to pursue these alleged Litigation Claims to date, belying his contention that pursuing such claims would be in the best interests of the Estate. If the 3rd Tier Trustee actually believed that the Debtor was acting improperly by failing to prosecute Litigation Claims, as opposed to merely making such accusations for "hold-up value," the Bankruptcy Code affords the 3rd Tier Trustee various avenues for relief. These include a motion for appointment of a trustee or examiner pursuant to Section 1104, a motion for conversion of the case to a Chapter 7 proceeding pursuant to Section 1112, or a motion for dismissal of the bankruptcy case pursuant to Section 1112. The 3rd Tier Trustee has not sought any of these forms of relief, despite having had 18 months to do so.

**Q.    The 3rd Tier Trustee's Fees, Costs, and Attorneys' Fees.**

The 3rd Tier Trustee further alleges that the Debtor's Plan "would appear to bar any payment to the 3rd Tier Trustee for its reimburseable fees and expenses." 3rd Tier Trustee Objection, p. 24. The Plan does no such thing. The 3rd Tier Trustee refers to § 10.9 of the Plan,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

30

which states "in no event will the Debtor be liable or responsible to pay the fees and costs of Law Debenture Trust Company of New York promised or otherwise due pursuant to [the Successorship Agreement]. . . ." This provision does not bar any otherwise allowable claims of the 3rd Tier Trustee against the Debtor; rather, it acknowledges that the Debtor has not assumed liability to the 3rd Tier Trustee under an agreement to which the Debtor is not a party. To the extent the 3rd Tier Trustee is entitled to a claim for its fees and costs, such a claim would be a General Unsecured Claim, and it would be afforded the same treatment as other General Unsecured Claims in Class 3 of the Plan. However, as set forth below, any attorneys' fees claim of the 3rd Tier Trustee would be limited to reasonable fees, and the Debtor disputes that $430,000 is reasonable in view of the fact that the 3rd Tier Bondholders have always been "out of the money" by hundreds of millions of dollars and the 3rd Tier Trustee has never had any reasonable expectation of recovering any value for the 3rd Tier Bondholders.

Though the 3rd Tier Trustee has not filed an administrative expense application, the 3rd Tier Trustee alleges that it is entitled to an administrative expense for making a "substantial contribution" to the bankruptcy estate. This is simply false. The principal test for substantial contribution under Section 503(b)(3)(D) is the extent of the benefit to the estate. See In re Cellular 101, Inc., 377 F.3d 1092, 1096 (9th Cir. 2004). "Substantial contribution" has been defined as services that have "substantially contributed to an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." In re County of Orange, 179 B.R. 195, 202 n.19 (Bankr. C.D. Cal. 1995) (quoting In re United States Lines, Inc., 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989)). "Services that substantially contribute to a Chapter 11 case are those that foster and enhance, rather than retard or interrupt, the progress of reorganization." In re SONICblue, Inc., 422 B.R. 204, 213 (Bankr. N.D. Cal. 2009) (citing Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.), 785 F.2d 1249, 1253 (5th Cir. 1986)).

The substantial contribution standard "is extremely difficult to meet." In re County of Orange, 179 B.R. at 202 n.19. Indeed,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

31

[b]enefits which have been found to be insubstantial include those services which would merely deplete the assets of the estate without providing a corresponding greater benefit.  Creditors face an especially difficult burden in passing the substantial contribution test since they are presumed to act primarily in their own interests.  Whereas services that confer a significant and demonstrable benefit upon the reorganization process which have not been rendered solely on behalf of a creditor's own interest should be compensated, extensive participation in a case, without more, is insufficient to compel compensation.  And *efforts undertaken by creditors solely to further their own self-interest are not compensable under section 503(b)*.  The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to *tangible benefits to the creditors, debtor or estate*.  Compensation must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate.  Thus, the general rule remains that attorneys must look to their own clients for payment.

In re Best Prods. Co., 173 B.R. at 866 (internal citations and quotations omitted) (emphasis added); see also In re SONICblue, Inc., 422 B.R. at 213 ("Mere participation in a case, even if extensive, may not be sufficient to constitute substantial contribution.").

It has been abundantly clear from the outset of this Chapter 11 Case that the 3rd Tier Bondholders were "out of the money" by several hundred million dollars due to (i) the chasm between the Debtor's total secured indebtedness and the value of its assets, and (ii) the subordination clause in the 3rd Tier Indenture, which the 3rd Tier Trustee has never challenged.  See *Declaration of William M. Noall in Support of Debtor's Third Amended Plan of Reorganization, as Further Revised*.  The 3rd Tier Trustee cites to no tangible or demonstrable benefit to the Estate, but merely repeats the mantra that it "maintained vigilance."  Consequently, any efforts undertaken by the 3rd Tier Trustee appear to be not for the benefit of the Estate, or even for the benefit of the 3rd Tier Bondholders, but solely for the benefit of the 3rd Tier Trustee and his counsel.  Accordingly, the 3rd Tier Trustee cannot accomplish the "extremely difficult" task of establishing that it is entitled to an administrative expense claim on the grounds that it made a substantial contribution to this Chapter 11 Case.

The Trustee's General Unsecured Claim, if any, would be limited to reasonable fees and costs, which the Debtor submits is something far less than $430,000.  In accordance with Section 502(b) of the Bankruptcy Code, the validity and amount of the claim is determined as of the date

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

32

102200-002/1364269_2.doc

1   of the filing of the bankruptcy petition.  Section 502(b)(1) requires disallowance of a claim if

2   "such claim is unenforceable against the debtor and property of the debtor, under any agreement

3   or applicable law for a reason other than because such claim is contingent or unmatured. . ."  11

4   U.S.C. § 502(b)(1).  The "applicable law" referenced in Section 502(b)(1) includes bankruptcy

5   law as well as other federal and state laws.  See Cavaliere v. Sapir, 208 B.R. 784, 786-787 (D.

6   Conn. 1997) (providing that "applicable law" includes bankruptcy and nonbankruptcy law).  A

7   debtor is therefore allowed to raise any federal or state law defenses to a claim.  See In re G.I.

8   Indus., Inc., 204 F.3d 1276, 1281 (9th Cir. 2000) (stating that a claim cannot be allowed under

9   Section 502(b)(1) if it is unenforceable under nonbankruptcy law); Johnson v. Righetti, 756 F.2d

10  738, 740-41 (9th Cir. 1985) (finding that the validity of the claim may be determined under state

11  law); In re Eastview Estates II, 713 F.2d 443, 447 (9th Cir. 1983) (applying California law).

12          The applicable agreements in this case include the 3rd Tier Indenture and the Financing

13  Agreement.  Under the 3rd Tier Indenture, the claims of the 3rd Tier Bondholders, including any

14  fees and costs of the 3rd Tier Trustee, are subordinate to the claims of the 1st Tier Bondholders

15  and 2nd Tier Bondholders.  Section 5.07(d) of the 3rd Tier Indenture provides:

16              Upon any such dissolution, winding up, liquidation, reorganization,
17              receivership or similar proceeding, any payment or distribution of assets
                of the Borrower of any kind or character, whether in cash, property or
18              securities, *to which* the Holders of the 3rd Tier Bonds or *the Trustee under
                this [3rd Tier] Indenture would be entitled*, except for the provisions
19              hereof, shall be paid by the Borrower. . .or by the Holders or by the
                Trustee under this [3rd Tier] Indenture if received by them, directly to the
20              Holders of 1st Tier Bonds for application to the payment of 1st Tier Bonds
                remaining unpaid until all such 1st Tier Bonds have been paid in full.
21

22  (Emphasis added.)  The 3rd Tier Trustee's contention that the subordination clause may not be

23  enforced by the Debtor is incorrect, as Section 510(a) of the Bankruptcy Code makes such

24  clauses enforceable in bankruptcy proceedings.  Regardless of the merits of this allegation,

25  however, the fact remains that the 3rd Tier Trustee is not entitled to recover its fees and costs so

26  long as the 1st Tier Bonds are not paid in full.[8]  The 3rd Tier Trustee should not be permitted to

27  _____
    [8] The 3rd Tier Trustee also contends that the subordination clause is not contained in sections 4.2, 7.2(b), 7.3, 9.2, or
28  10.9 of the Financing Agreement, and would be expressly included if the drafters of the Financing Agreement
    intended that the fees and costs of the 3rd Tier Trustee were meant to be subordinate.  This argument ignores the fact

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc                                    33

impede confirmation of a plan that is the product of months of negotiations between the Debtor and the only constituency with a real economic interest in the Debtor's restructuring – the 1st Tier Bondholders – when doing so has no hope of benefitting the 3rd Tier Bondholders.

Even if the 3rd Tier Trustee is entitled to recover his fees and expenses, however, the applicable agreements limit the 3rd Tier Trustee's claim to reasonable and necessary fees and costs incurred in good faith. See Financing Agreement, § 4.2 ("the reasonable fees, charges and expenses of the Trustee for the *necessary* extraordinary services rendered by it"); Financing Agreement, § 7.3 ("the reasonable fees of such attorney and such other reasonable expenses so incurred"); Financing Agreement, § 9.2 ("including reasonable fees and disbursements of attorneys, accountants, consultants and other experts, incurred *in good faith* in connection with this Agreement,…or the [3rd Tier] Indenture").

Similarly, O&M Costs are limited to "reasonable and necessary" costs. O&M Costs are defined in the 1st and 2nd Tier Indenture as

> any reasonable and necessary costs paid or incurred by the Borrower for maintaining and operating the Project, including. . .fees and indemnification or other payments to the Director or the Trustee relating to any Senior Bonds and the Subordinate Bonds, Administrative Fees and Expenses and amounts described in Section 4.2(b)-(d) of the Agreement, and including all other reasonable and necessary costs of the Borrower or charges required to be paid by them to comply with the terms hereof or of such Senior Bonds or Subordinate Bonds. . . .[9]

The Debtor contends that the fees and expenses of the 3rd Tier Trustee were not reasonable or necessary under the circumstances of this Chapter 11 Case. Professionals have an obligation to exercise billing judgment, and, more specifically, have "an obligation to consider the potential for recovery and balance the effort required against the result that might be achieved." Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc., 924 F.2d 955, 959-61 (9th Cir. 1991) (affirming a fee award of one third of the requested fees where the attorney for an Unsecured Creditors' Committee incurred the majority of its fees objecting to a secured

——————— (continued)
that when the Financing Agreement and other financing documents were drafted, there was no 3rd Tier Trustee.

[9] 1st and 2nd Tier Indenture, p. 19.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2.doc

1    creditor's attorneys' fees); see also Estes & Hoyt, P.C. v. Crake (In re Riverside-Linden Inv.

2    Co.), 925 F.2d 320, 321 (9th Cir. 1991) ("[w]hen a cost benefit analysis indicates that the only

3    parties who will likely benefit from [a service] are the trustee and his professionals," the service

4    is unwarranted and a court does not abuse its discretion in denying fees for those services);

5    Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet), 251 B.R. 103,

6    108 (B.A.P. 9th Cir. 2000); Lobel & Opera, v. United States Trustee (In re Auto Parts Club,

7    Inc.), 211 B.R. 29 (B.A.P. 9th Cir. 1997) (holding that creditor's committee counsel was required

8    to scale back its services based upon the reasonable expected recovery; Committee counsel were

9    not entitled to compensation for work done to advance the debtor's chapter 11 case after the

10   decision was made to sell the debtor's business); Digesti & Peck v. Kitchen Factors, Inc. (In re

11   Kitchen Factors, Inc.), 143 B.R. 560, 562 (B.A.P. 9th Cir. 1992) (affirming the bankruptcy

12   court's award of 50% of the requested fees of a special counsel because the counsel spent

13   $12,562 in fees in an attempt to recover a $12,000 debt, and noting that an attorney must scale

14   back its services based on the reasonable expected recovery for the estate, not the potential

15   optimum recovery).  Rule 1.5(a) of the Nevada Rules of Professional Conduct likewise mandates

16   that attorneys charge and collect only reasonable fees.  Nev. Rules of Prof. Conduct R. 1.5.

17        In this case, despite the "vigilance" exercised by the 3rd Tier Trustee, the 3rd Tier

18   Bondholders will recover the same amount that they were going to recover on the first day of the

19   case – $0.  It appears that the 3rd Tier Trustee's fees and costs were primarily incurred in

20   attempting to collect its own attorneys' fees, and the only persons who benefitted from the

21   activities of the 3rd Tier Trustee were the 3rd Tier Trustee and his counsel. The amount of the

22   3rd Tier Trustee's fees indicate a remarkable lack of billing judgment, and should not be

23   allowed.

24   **R.    If Necessary, Non-Material Plan Modifications Are Permitted.**

25        To the extent that this Court accepts any of the arguments raised in the objections, and

26   with respect to those matters which the Debtor agrees to resolve through modification, the Plan

27   may easily be modified in accordance with the Bankruptcy Code.  Section 1127(a) allows for

28   plan modifications and Bankruptcy Rule 3019(a) establishes the procedural requirements for

**Gordon Silver**
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

35

102200-002/1364269_2.doc

plan modifications pre-confirmation.  See 11 U.S.C. § 1127(a); Fed. R. Bankr. P. 3019(a).  "Plan modifications do not require a new disclosure statement and court approval unless the modifications are material."  In re Simplot, No. 06-00002, 2007 WL 2479664, at *11 (Bankr. D. Idaho Aug. 28, 2007) (citing In re Downtown Inv. Club III, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988); 7 Collier on Bankruptcy ¶ 1127.03 at 1127-5 to 1127-7 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2006)).  The word "material" in this context has been described as "so affect[ing] a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."  Id. (quoting In re Am. Solar King Corp., 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988)).  To the extent that Debtor is required to amend the Plan, any such changes will not be material, such that they would cause a creditor who voted to accept the Plan to reconsider its acceptance.

## IV.
## CONCLUSION

WHEREFORE, the Debtor respectfully request that all Objections be overruled, and the Plan be confirmed.  The Debtor also requests such other and further relief as is just and proper.

DATED this 7th day of November, 2011.

GORDON SILVER

By: _Gabrielle A. Hamm_
    GERALD M. GORDON, ESQ.
    WILLIAM M. NOALL, ESQ.
    GABRIELLE A. HAMM, ESQ.
    3960 Howard Hughes Pkwy., 9th Floor
    Las Vegas, Nevada 89169
    Attorneys for Debtor

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102200-002/1364269_2

36