

**Entered on Docket
November 18, 2011**

_____
**Hon. Bruce A. Markell
United States Bankruptcy Judge**

___

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

| | |
|---|---|
| In re: | Case No.: BK-S-10-10464-BAM |
| LAS VEGAS MONORAIL COMPANY, | Chapter 11 |
| Debtor. | Date:   November 14, 2011<br>Time:  10:00 a.m. |

**ORDER DENYING CONFIRMATION**

The Las Vegas Monorail Company ("LVMC"), debtor and debtor in possession in this case, owns and operates a 3.9 mile long monorail which connects several hotels in Las Vegas.[1] After many months of difficult negotiations, it seeks to confirm its plan of reorganization. For the reasons set forth below, confirmation is denied.

As noted by others, "[t]he monorail was and is a fiasco." Richard L. Epling, Kerry A. Brennan & Kent P. Woods, *Monorail, Monorail, Monorail: Chapter 9 and Restructuring Issues Relating to Municipal Authorities,* 20 J. BANKR. L. & PRAC. 2 Art. 1 (Mar. 2011). It originally issued approximately $650 million in bonds to finance its construction; its current plan proposes to discharge this sum by the issuance of just $40.35 million in bonds, less than 7% of the amount owed to creditors. The plan calls for the issuance of three types of bonds:

- Cash Pay Bonds in the principal amount of $10,000,000, bearing interest at 10%, with interest-only payable until 2017, and fully due and payable in 2019;

___

[1] A fuller description of LVMC and its business is found in *In re Las Vegas Monorail Co.*, 429 B.R. 770 (Bankr. D. Nev. 2010).

- CapEx Bonds in the principal amount of $19,500,000, bearing interest at 10%, interest-only payable until maturity in 2019; and
- Capital Appreciation Bonds in the principal amount of $10,850,000, bearing interest at 8.315%, with interest-only payments until maturity in 2055.[2]

Even in the face of this deep discount, bondholders approved the plan by an overwhelming majority. More than 97% of the bondholders voting, who collectively hold over 92% of the principal amount of LVMC's bonds, voted in favor of the plan. In addition, LVMC was able to settle or resolve all other plan objections.

It is against this background that LVMC requests the court to confirm its plan. As with all plans, confirmation is governed by Section 1129 of the Bankruptcy Code. Under that section, "[t]he bankruptcy court ha[s] an affirmative duty to ensure that the [p]lan satisfie[s] all . . . requirements for confirmation." *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) (citations omitted).

One of the key requirements for plan confirmation is feasibility. Feasibility requires, among other things, that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." 11 U.S.C. § 1129(a)(11). Under prevailing law, LVMC carries the burden of proving this requirement by a preponderance of the evidence. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 (9th Cir. 1986). *See also In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 653.

The Code separates the feasibility requirement from any requirement related to creditor consent. *Compare* 11 U.S.C. § 1129(a)(8) (voting requirement) *with* 11 U.S.C. § 1129(a)(11)

---

[2] "Interest-only" is somewhat of a misnomer. If an interest payment would cause LVMC's working capital to dip below a set threshold, it can issue "payment in kind" interest. Neither its amended disclosure statement nor its amended plan define what "payment in kind" means, but testimony at the confirmation hearing indicated that this process would essentially involve adding the interest due to outstanding principal, so the missed payment itself would accrue interest until paid.

2

(feasibility requirement).  Put another way, satisfaction of the feasibility requirement resists negotiation and consent as a solution; the requirement does not dissolve upon proof that no party objected.  As stated in *Collier on Bankruptcy*, a leading bankruptcy treatise: "The bankruptcy judge is not passive during confirmation.  The court has a mandatory, independent duty to review plans and ensure they comply with the requirements of section 1129 . . . .  The judge's independent duty will come into play often with respect to the feasibility requirement." 7 COLLIER ON BANKRUPTCY ¶ 1129.05[1][e] (Henry Sommer & Alan Resnick, eds., 16th ed. 2011).

All of this means that LVMC had the burden to show that it is more likely than not that confirmation of LVMC's plan is not likely to be followed by the need for further financial reorganization, regardless of the creditor preferences and regardless of the lack of objections. LVMC knew this before the start of the confirmation hearing.[3]

As with most chapter 11 cases, LVMC attempted to meet its burden through the testimony of its management – LVMC's chief executive officer Curtis Myles – and an outside financial expert – Matthew Kvarda of Alvarez & Marsal North America, LLC.  Both individuals testified that the plan was feasible, but in an odd sort of way.  The plan provides that a significant segment of LVMC's reorganization debt – some $29.5 million – will be due in seven years.  While Mr. Kvarda's projections show that until that time LVMC will be able to meet its scheduled debt service payments, they also show that LVMC will *not* be able to make the final balloon payment on this debt when it comes due in 2018.

The projected shortfall is $38.4 million, not an insignificant sum.  LVMC understands this. Its disclosure statement states: "At this time, the Debtor's projected revenues are

---

[3]Before the confirmation hearing, the court issued two orders in which it detailed its concerns regarding feasibility.  Dkt. Nos. 927, 988.  In each order, the court advised counsel that LVMC should offer evidence at the confirmation hearing sufficient to convince the court that LVMC's plan was feasible.  Dkt. No. 927, p. 2, *ll.* 13-18; Dkt. No. 988, p. 2, *ll.* 19-25.

3

insufficient to both (i) meet its [capital expenditure] needs in 2019 and 2024 and (ii) pay a portion of its proposed restructured debt at maturity in 2019." Disclosure Statement, p. 6, *ll.* 16-18. To minimize this negative fact, Mr. Myles and Mr. Kvarda posit three possible scenarios – called by Mr. Kvarda "Potential Upside Scenarios" – in which LVMC might be able to make up this shortfall.[4] These scenarios, however, are not included in these basic projections.

The first scenario involves the current northern terminus of the line, located at the now-closed Sahara Hotel. That hotel is believed to be reopening sometime during the next two years, although there is at present no scheduled date, and no clear understanding of its future configuration. When this hotel closed, ridership dropped; Mr. Kvarda surmises that its reopening will increase ridership.

Second, Mr. Myles and Mr. Kvarda note that a new Las Vegas tourist attraction, called Project Linq, is scheduled to open within two years. That attraction is near Caesar's Palace, a hotel on the Las Vegas strip, and is planned to be close to two of LVMC's stations. Mr. Kvarda estimates that the opening of this attraction will result in an increase in the annual number of rides on the monorail – with a low estimate of at least 240,000 per year, to a high estimate of 480,000 rides per year. This is based on estimates, unverified by LVMC, that Project Linq will draw up to 10,000,000 new visits to Las Vegas.

Finally, Mr. Myles and Mr. Kvarda believe that a bankruptcy discharge will improve

---

[4] LVMC's Disclosure Statement confirms the need for funding outside of the basic projections. It says: "The Debtor's ability to both (i) meet its [capital expenditure] needs in 2019 and 2024 and (ii) pay the restructured debt at maturity is conditioned upon the Debtor obtaining additional capital through expansion of the existing Monorail system, obtaining federal infrastructure funds or grants, or through private financing or investment. The Debtor believes that the Plan provides a reasonable opportunity to do this." Disclosure Statement, p. 6, *ll.* 18-23.

Mr. Myles' declaration also bears on this point. It states in part: "Without additional sources of revenue, the LVMC will not be able to pay for the physical replacement of capital assets required to operate the Las Vegas Monorail system when due, resulting in the discontinued operation of the Las Vegas Monorail system sometime after June 30, 2019." Myles Declaration, p. 5, *ll.* 18-23.

LVMC's balance sheet to the point at which it can consider taking steps to become eligible for grants and subsidies from governmental agencies. Although not elaborated in Mr. Myles' declaration, it listed many types of grants that he believes are within a reorganized LVMC's grasp.[5]

These three reasons are not convincing. As an initial matter, they assume the verity of the basic projections, which this court questions. Although Mr. Myles and Mr. Kvarda appeared to have command of various facts and figures regarding LVMC's financial performance, neither one of them gave any real assurance as to their ability to accurately predict future financial performance. Indeed, Mr. Kvarda admitted on cross examination that he has rarely checked his projections against actual results, even though he has participated in many restructurings.[6] Mr. Myles was similarly silent on his history of producing accurate projections. As a consequence, this is little assurance that the basic projections do not suffer from the "sunny skies" effect long noted in the bankruptcy literature. *See* Brian L. Betker, Stephen P. Ferris & Robert M. Lawless, *"Warm with Sunny Skies": Disclosure Statement Forecasts*, 73 AM. BANKR. L.J. 809, 835 (1999) (studying 69 public companies and finding that "[o]n average, the reorganized firm falls short of the ambitious income forecasts presented to the court"). *Cf.* Steven H. Case, *Some Confirmed Chapter 11 Cases Fail. So What?*, 47 B.C. L. REV. 59, 64 (2005) ("uncontested confirmation hearings . . . in the author's opinion, present the highest danger of

---

[5]Both Mr. Myles' and Mr. Kvarda's testimony was initially taken according to this district's alternate direct testimony rule, Local Rule 9014.1, under which a witness' direct testimony is by written declaration and is admitted so long as the witness is available at the hearing for cross-examination. The court cross-examined each of these witnesses under FED. R. EVID. 614, and permitted redirect testimony through LVMC's counsel.

Mr. Myles' impressive command of possible grants and subsidies was not apparent in the declaration prepared by his counsel, and only became known upon cross-examination.

[6]The one reorganization in which he checked results against projections involved a reorganization in which there was a significant management performance incentive built into the reorganization plan.

5

excessively optimistic forecasts that could look foolish in hindsight if the debtor files again.").

Even were the court to fully credit the basic projections, there is a more central objection. No credible reason was offered in their initial testimony for why neither Mr. Myles nor Mr. Kvarda chose to not include these "upside scenarios" in their basic projections. After a long break in the testimony, during which both witnesses conferred with counsel, LVMC recalled Mr. Myles, who then, and only then, testified that it was more likely than not that the upside scenarios are likely to occur. At the same time, however, Mr. Myles did not recant or modify his earlier testimony that he did not include the upside scenarios in his original testimony because the facts supporting them were "just not there." The court chooses to believe his earlier testimony.

That neither Mr. Myles nor Mr. Kvarda included these upside scenarios in their basic projections is consistent with the fact that neither believes that any of these "upsides" are sufficiently firm or within LVMC's control to be counted in their basic projections. And the fact that all three of these contingencies must occur before the shortfall is completely met further highlights the improbable chain of events necessary to yield a scenario in which all reorganization debt will be paid when due.

Reorganization plans need not completely amortize reorganization debt to be confirmed. But if refinancing is anticipated, the plan proponent has to produce some credible evidence about the likelihood of that refinancing. "[S]ection 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *S&P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995) (quoting *In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993)). Against this background, courts have refused to confirm plans whose feasibility turned on future sales of property, or future refinancings, absent an adequate showing that such sales or refinancings would be likely to occur. *See In re Vanderveer Estates Holding, LLC*, 293 B.R. 560 (Bankr. E.D.N.Y. 2003); *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1005 (E.D. Va. 1994); *In re Hoffman*, 52 B.R. 212,

6

215 (Bankr. D.N.D. 1985).

Although the upside scenarios have some appeal, each of them is subject to significant contingencies outside of LVMC's control. LVMC cannot control, for example, when or if the Sahara Hotel will reopen, or the timing of the anticipated Project Linq tourist attraction, or whether the attraction will act as a fare magnet. Even the suggestion that more grants and subsidies are in the offing is subject to either new state legislation, or the sponsorship of some as yet unidentified state or municipal agency.[7]

As the Fifth Circuit recently stated, "Many courts have found debtors' statements that funding is forthcoming to be insufficient in the absence of concrete evidence that the contributors are willing to give and capable of giving." *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, LLC*, 632 F.3d 168, 173 n.8 (5th Cir. 2011).[8] *See also In re Made in Detroit, Inc.*, 299 B.R. 170, 180 (Bankr. E.D. Mich. 2003) (denying confirmation where proposed financing was based on contingencies, at best conditional, and thus, not feasible); *In re Atrium High Point Ltd. P'ship*, 189 B.R. 599, 610 (Bankr. M.D.N.C. 1995) (debtor's plan to obtain refinancing was speculative where industry standard was to refinance 75%-80% of the value of the property,

---

[7]The court places little weight on the expected availability of grants and subsidies. As Mr. Myles testified, LVMC is not currently grant eligible, but only "hope[s] to become grant eligible." This testimony echoes the content of the one paragraph devoted to this topic in LVMC's Disclosure Statement, which states, in part: "The Debtor does not fit into any of these categories and thus is not currently eligible to apply for and receive grants." Disclosure Statement, p. 96, *ll.* 22-24.

[8]The court cited several cases in support of this proposition: *In re Repurchase Corp.*, 332 B.R. 336, 343 (Bankr. N.D. Ill. 2005) (deciding that president's statement that his wife will provide capital is insufficient); *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) (ruling that debtor's statement that outside sources would provide funding is insufficient without other evidence of "firm" commitments); *In re Wiston XXIV, Ltd. P'ship*, 153 B.R. 322, 327 (Bankr. D. Kan. 1993) (finding that partner's promise to contribute $100,000 in cash is not probative, because he testified that he did not have the money and did not know how he would get it). The court remains unpersuaded by LVMC's efforts to distinguish these cases merely because here, no party in interest objected to LVMC's plan.

7

which amount would be insufficient to meet plan obligations); *In re Haardt*, 65 B.R. 697, 702 (Bankr. E.D. Pa. 1986) (finding no reasonable chance of refinancing where debtor offered no credible evidence as to why it had been unable to obtain refinancing during the two years since filing bankruptcy, no evidence as to the value of the properties, and no evidence as to its general financial situation and prospects).

Ninth Circuit law is consistent. "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11] at 1129–34 (15th ed. 1984)). The shortfalls admitted by LVMC and the declarations of Mr. Myles and Mr. Kvarda are sufficient to establish LVMC's plan as such a "visionary scheme."[9]

Even under the alternate analysis of six feasibility factors, LVMC's plan does not measure up. These six factors consist of:

(1) the adequacy of the debtor's capital structure;

(2) the earning power of its business;

(3) economic conditions;

(4) the ability of the debtor's management;

(5) the probability of the continuation of the same management; and

(6) any related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See In re Trans Max Techs.*, 349 B.R. 80, 92-93 (Bankr. D. Nev. 2006); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226–27 (Bankr. D.N.J. 2000) (quoting *In re Temple Zion*, 125 B.R. 910,

---

[9] LVMC actually asked Mr. Myles if the projections were a "visionary scheme." Mr. Myles honestly and reasonably replied that he did not know what his own counsel meant by "visionary."

8

915 (Bankr. E.D. Pa. 1991)); 7 COLLIER, *supra*, ¶ 1129.02[11].

Here, the failure to adequately provide for significant capital expenditures and debt retirement is built into LVMC's plan and operations. This failure underscores the inadequacy of LVMC's capital structure on a going forward basis; there is simply too much debt to allow LVMC to meet its long-term capital needs. This is not surprising given the numbers: although neither LVMC's amended disclosure statement nor its amended plan set or estimate LVMC's reorganization value, both Mr. Myles and Mr. Kvarda testified that LVMC's reorganization value (or enterprise value in Mr. Myles' testimony) is roughly $16 million to $20 million.[10] That is simply too small a base to sustain over $40 million of reorganization debt.

LVMC argues that its status as a nonprofit entity renders a traditional analysis inapposite. The court disagrees. Mr. Myles and Mr. Kvarda estimate that LVMC will have cash net operating income, before debt service, of between $5 million and $8 million per year. Given LVMC's significant commitment to various nonrecurring capital expenditures – its tracks, trains and equipment will someday need to be replaced – this cash flow simply cannot service and amortize $40 million of debt bearing a blended annual interest rate of approximately 9.5%.

While poor planning undertaken by prior management may have contributed to LVMC's economic woes, LVMC has never shown the ability to service the massive debt incurred in its construction. On top of this wobbly base, the current economic situation simply threw gas on an existing fire – it worsened, rather than created, LVMC's problems. Nonetheless, LVMC now asks the court to trust that it will do, over the next several years, that which it has been unable to do since its inception. LVMC's embrace of these multiple speculative future events

---

[10] Mr. Kvarda's declaration also shows that LVMC will report negative net income, on an accrual basis, in every year until 2019. Declaration of Matthew Kvarda, Ex. A, p, 10 (Dkt. #1000). The projected losses range from $15 million to over $24 million annually. These losses are almost entirely accounted for by depreciation, a noncash charge to income, and thus Mr. Kvarda's testimony is that cash is available to pay bondholders.

9

to establish feasibility underscores its questionable strategy.[11]

As an alternate argument, joined in by the bondholders, LVMC contends that its plan is feasible because it contains a liquidation option. This type of "drop dead" provision, however, is insufficient, in and by itself, to save LVMC's plan from a finding that it is not feasible. *See F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 317 (B.A.P. 10th Cir. 2006) ("[T]he mere existence of a drop-dead clause does not prove feasibility. It only provides a method for a creditor to extricate itself more quickly . . . if it turns out that the court guessed wrong in finding the plan feasible."). *See also Danny Thomas Prop. II Ltd. P'ship v. Beal Bank, S.S.B. (In re Danny Thomas Prop. II Ltd. P'ship )*, 241 F.3d 959, 962 (8th Cir. 2001); 7 COLLIER, *supra*, ¶ 1129.02[11] ("[T]hese so-called 'drop dead' provisions do not make the plan feasible as a matter of law . . . ."). Nonetheless, LVMC essentially asks the court to allow it to float along until it sinks, suggesting that when it ultimately sinks, the court need not concern itself with how creditors will make it onto the life raft – or even whether there will be a life raft available. In short, LVMC invites the court to read "feasibility" out of the "feasibility requirement." The court declines this invitation.

Finally, LVMC argues that the monorail is a socially-responsible transit system, and that its contributions to the community far exceed its costs. Since reorganization of such an entity is by definition desirable, and since LVMC makes more money before debt service than it consumes,[12] LVMC claims its plan is feasible. It short, it contends that since reorganization of such an entity does not present an abuse of the bankruptcy system, feasibility is met. But as set forth above, this is not the test.

---

[11]LVMC's projections suffer from many other problems, too numerous to list here in exhaustive detail. Notably absent from LVMC's disclosures, however, is any realistic discussion or analysis of two of its structural problems: its failure to connect to the airport or to downtown; and its inconvenience to many strip hotels.

[12]Mr. Myles made the point several times in his testimony that LVMC is the only transit system in the country that is covering its operating expenses.

While feasibility determinations do assess a debtor's ability to produce positive cash flow, that is not the requirement's sole function. It is meant to ensure that only financially feasible, if not financially healthy, entities can confirm a plan and discharge debt. LVMC has failed in its burden in this regard. Under its own projections, its existence is not financially sustainable. Regardless of whether all creditors agree – and their plan may be to just exploit management's hopes in order to wring as much cash as they can out of LVMC before it goes bust – the debtor must demonstrate, and the court must assess, LVMC's short, medium, and long-term prospects. Had Congress wished to prevent this court from making that inquiry when there was overwhelming creditor support, it would have written a very different Bankruptcy Code.[13]

As this court has previously stated, "[f]easibility is . . . the last, best hope of those who wish to prevent reorganization from becoming a revolving door for frangible firms doomed to fail again and again." *In re Trans Max*, 349 B.R. at 93; *see also Price v. Spokane Silver & Lead Co.*, 97 F.2d 237, 247 (8th Cir. 1938) ("it was not the intention of Congress in enacting Sec. 77B [one of the first reorganization statutes] to place crutches under corporate cripples, fit subjects for liquidation, and send them out into the business world to be a menace to all who might purchase their securities or deal with them on credit.").

LVMC, under its current plan and its own projections, has failed to show this

---

[13]As *Trans Max* also noted:
Too often, the feasibility determination can be compromised by an unhealthy alliance of professionals who want their fees, creditors who want to postpone reporting the inevitable, and debtors who just want another chance. *See* Lynn M. LoPucki & Joseph W. Doherty, *Why Are Delaware and New York Bankruptcy Reorganizations Failing?*, 55 VAND. L. REV. 1933, 1983–84 (2002); Harvey Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2011 (2002) ("The real problem lies not in the Delaware Bankruptcy Court, but in the conference rooms across the country where the debtors and creditors create and agree to reorganization plans. In those conference rooms, a bankruptcy judge has no control or influence, and the parties themselves may bind each other to dubious reorganization plans.").
*In re Trans Max*, 349 B.R. at 93.

reorganization is not likely to be followed by the need for further financial reorganization. Its plan seeks to saddle LVMC with debt more than twice its value. It financial expert projects accounting losses of not less than $15 million each year for the next seven years. Its management acknowledges that the plan underfunds LVMC's needs by $38.4 million over that same period. For these and other reasons, its current plan dooms it to failure, if not in the next few years, certainly by 2019. Its plan is thus not feasible, and thus the strong creditor support it has garnered is largely irrelevant.

Confirmation denied.[14]

Copies sent to:

BNC MAILING MATRIX

CM/ECF ELECTRONIC FILING

###

---

[14] As no party in interest objected on the grounds of feasibility, for purposes of appeal, the court states that it specifically finds Mr. Kvarda's and Mr. Myles's testimony on the upside scenarios to be not credible. The strongest testimony on this point came after a long break during which counsel was able to confer with both witnesses, and to frame tendentious questions. With due respect to the witnesses, their responses appeared rehearsed. Further, neither witness withdrew or recanted any of their earlier testimony on the ephemeral nature of the upside scenarios, thus creating uncertainty as to their exact testimony. As stated above, the court credits the earlier testimony given before they were recalled.

Lastly, one will exhaust one's patience counting the disclaimers in the amended disclosure statement and in Mr. Kvarda's and Mr. Myles' declarations as to the accuracy of the information given. While the court understands and acknowledges that no witness is, or can be, a guarantor of forward-looking information or projections, the level of disassociation exhibited by these witnesses was beyond reasonable or what this court has seen in the past.

12